# EXHIBIT 8

| | |
|---|---|
| From: | kamason@davis-harman.com |
| To: | Dhillon.Janet.L@dol.gov; Lund.Jack.G@dol.gov; Lund.Jack.G@dol.gov; Killmond.James.J@dol.gov |
| Cc: | Michael.Stein@morganstanley.com; PJ.Austin@morganstanley.com; Mark.Greenfield@morganstanley.com; CGaston@davis-harman.com |
| Subject: | [EXTERNAL] Thank you and attached court case |
| Date: | Thursday, July 31, 2025 2:58:15 PM |
| Attachments: | Milligan v. Merrill Lynch - Dkt. 7X - MSJ Order (3.11.2025).pdf |

Thanks so much for the excellent meeting earlier today. We so appreciated being able to meet with the team so quickly, and how much work you all had clearly done in advance. As I mentioned (too many times I am sure), there is a real urgency on this issue for two reasons, one being the growing amount of litigation/arbitration spurred by the strange decision in New York (literally hundreds of individual disputes filed not just against Morgan Stanley but others in the industry as well). The other is the fact that long-term incentive plans are typically reviewed and decided on in early fall for the following year. So, if there need to be material changes (such as eliminating some humanitarian exceptions to the forfeiture on termination of employment), those decisions are going to be made in the next six to eight weeks in many cases. There are many reasons no one wants to eliminate those exceptions, but employers are now in a period of uncertainty over whether they can maintain longstanding, carefully crafted incentive compensation structures. An Advisory Opinion in the immediate future would provide really useful guidance at a really important time.

As discussed, attached is the district court decision in the Fourth Circuit, which ruled favorably on the same issue.

I don't have all the DOL email addresses, so sorry for leaving some of the team off this email. Thanks again.


**Kent A. Mason**
Davis & Harman LLP



The Willard
1455 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20004

Main:  202-347-2230  Direct: 202-662-2288 Cell: 240-418-9813
Fax:    202-393-3310  kamason@davis-harman.com




LIMITATIONS ON ADVICE. Any advice in this communication and any attachments: (i) is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or

representations included herein; (ii) was prepared for the sole benefit of Davis & Harman LLP's client and may not be relied upon by any other person or entity; and (iii) is not intended or written to be used, and cannot be used, by the recipient(s) or any other person or entity, for the purposes of promoting, marketing or recommending to another party any matters addressed herein.

NOTICE OF CONFIDENTIALITY. The information contained in this message from Davis & Harman LLP and any attachments is confidential and intended only for the named recipient(s). This message and any attachments may be an attorney-client communication and as such privileged and confidential. If you have received this message in error, you are prohibited from copying, distributing or using the information. Please contact the sender immediately by telephone or return e-mail and delete the original message. We apologize for any inconvenience, and thank you for your prompt attention.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00440-KDB-DCK

| | |
|---|---|
| KELLY MILLIGAN,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., AND JOHN/JANE DOE 1,<br><br>Defendants. | ORDER |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 41). The Court has carefully considered this motion, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel on March 4, 2025. For the reasons discussed below, the Court will **GRANT** the motion.

### I.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (quoting *Libertarian Party of Va. v.*

1

*Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)).

      The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

Plaintiff Kelly Milligan worked as a financial advisor ("FA") for Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"), a wholly owned subsidiary of Bank of America (collectively, "Defendants") from 2000-2021, at which point he voluntarily departed to start his own company and compete with Merrill. Doc. No. 1 at ¶¶ 1, 11. During his tenure, Plaintiff participated in the "Financial Advisor Incentive Compensation Plan" ("FAICP").[1] Doc. No. 42-10 at 2. As outlined in the FAICP, FAs are paid a guaranteed monthly salary and are eligible to earn monthly incentive compensation. *Id.* In addition, Defendants offer "Long-Term Contingent Awards" which include restricted stock units (RSUs) and the WealthChoice Award ("WCA"). *Id.* at 10. FAs receive RSUs under this award scheme unless they elect to allocate a portion of their long-term contingent award in the form of a WCA. *Id.*

Over his tenure, Plaintiff elected and earned several WCAs. Plaintiff alleges that by departing, he forfeited over $500,000 in "deferred compensation" because he and others similarly situated were forced to forfeit the value of their WCAs when they voluntarily left Merrill before their plans vested. Doc. No. 1 at ¶¶ 1, 11. Plaintiff further asserts that the WCA program is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") because it "provides for deferred commissions." Doc. No. 54-2 at 5. More specifically, Plaintiff argues that each WCA is subject to ERISA because it is an "employee pension benefit plan" that "results in a deferral of income." Doc. No. 1 at ¶ 3. The deferral of income allegedly results when FAs are "paid for the

---

[1] Plaintiff states that the FAICPs issued each year were substantively identical (Doc. No. 54-2 at 5), so the Court will primarily reference the 2020 guide (Doc. No. 42-10).

3

work years after they perform it." *Id.* at ¶ 4. These payments occur for "periods extending to the termination of covered employment or beyond," because in certain circumstance—such as death or retirement—participants receive the value of their plan after their employment ends. *Id.*

In Plaintiff's view, this means that the plan violates ERISA's vesting schedule, and he has filed a proposed class action suit against Defendants seeking declaratory and equitable relief, along with reformation of the compensation plan. In response, Defendants filed the pending motion for summary judgment, asserting that the WCA is not an employee pension benefit plan because it does not, by design, defer compensation to the end of covered employment or beyond, and because it is a bonus plan that is exempt from ERISA. Doc. No. 42-2 at 5. The motion has been fully briefed and argued and is now ripe for the Court's ruling.

### III. DISCUSSION

Congress passed ERISA in 1974, in an era when many long-term employees were not getting the pension benefits their employers promised would be there when they retired. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (ERISA "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits."); *see also Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (1980) (noting that ERISA was enacted to protect the retirement assets of workers). Congress sought to ensure that if employees were promised a benefit at retirement—and "fulfilled whatever conditions are required to obtain a vested benefit"—they "actually will receive it." *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980). The Supreme Court and others have cautioned, however, that ERISA does not dictate what benefits employers must offer, *Spink*, 517 U.S. at 887, nor is it intended to hamstring or dissuade an employer in designing other compensation programs, such as retention or other bonus programs, tailored to their particular workforce or industry. *See, e.g., Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

4

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee [pension] benefit plan' that is governed by ERISA." *Albers v. Guardian Life Ins. Co.*, No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999). An employee pension benefit plan is defined under ERISA as:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). However, even if an employee pension benefit plan can be established, the Department of Labor ("DOL") carves out an exception excluding bonus payments from ERISA's definition of an employee pension benefit plan unless the payments are "systematically deferred to the termination of covered employments or beyond" or are designed for the purpose of providing retirement income. 29 C.F.R. § 2510.3–2(c). It is within this framework that the Court must consider the compensation structure at Merrill.

As previously noted, a FA's income is comprised of a guaranteed monthly salary, monthly cash compensation, and long-term contingent incentive awards such as a WCA. Doc. Nos. 54-2 at 5; 42-2 at 8. The monthly cash compensation, which is akin to a commission, is calculated and paid monthly, using a "cash" grid that represents a percentage of "production credits" or revenue generated. Doc. No. 42-2 at 9. These percentages substantially increase as "production" or revenue generated increases. In contrast, the WCA program utilizes a separate "long-term" grid that reflects a much smaller percentage of production credits (starting at less than 10% of the "cash" grid

5

percentage) and is calculated only after a full performance year. *Id.* Also, unlike the cash compensation that begins with the first dollar of revenue generated, WCA eligibility does not begin until after a threshold amount of revenue is generated. Doc. No. 42-10 at 2. Significantly, FAs must also remain employed with the company until the vesting date for the award to become "earned and payable." Doc. No. 42-2 at 19.

During oral argument, Defendants noted that, like *Callan v. Merrill Lynch & Co., Inc.,* No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *8 (S.D. Cal. Aug. 30, 2010), which addressed Merrill's predecessor plan to the WCA, there is nothing in the WCA that "would allow a reasonable person to calculate or determine the benefits of the plan or the procedure for receiving [them], as those matters are left to the sole discretion" of Defendants. In its FAICP, the WCA is described as:

> The [WCA], as in effect from time to time, is intended to be **unfunded and maintained primarily for the purpose of providing long-term contingent incentive compensation**, subject to certain conditions, to a select group of Financial Advisors. By awarding a portion of a Financial Advisor's incentive compensation in the form of a cash award which becomes earned and payable over time, **the Company intends to encourage the Financial Advisor to remain employed by the Company** and its Subsidiaries and to further align the interests of the Financial Advisor with the Company's business objectives.

Doc. No. 41-3 at 3 (emphasis added). The final amount of each WCA award is further determined by "the Administrator" and "subject to the review and approval by the Company." *Id.* at 6. Also, the company retains the right to adjust the amount of any award to align with the performance of both the company and individual lines or sub-lines of business. Doc. No. 41-10 at 39.

When a WCA is calculated, a notional account is created and the FA can select mutual funds or other investments to benchmark against. Doc. No. 41-1 at 11. The value of the account is indexed to the performance of the chosen fund or benchmark investment. *Id.* at 12. Both the FAICP and the Award Agreement state that the "Account Balance represents an unsecured, unfunded,

6

contingent promise . . . to pay the value of the account [] after the Vesting date." *Id.* Again, the FAICP makes clear that the WCA becomes earned and payable only after an eight-year vesting period, and where the FA remains employed through the payment date. *Id.* at 11. After vesting, the FA is paid "as soon a[s] practicable . . . but in no event later than 2½ months following such vesting date" and there is no option to defer it. Doc. No. 41-3 at 8.

In most cases, when employment ends, the balance of any unvested accounts is cancelled, unless the employee dies, retires, or is involuntarily terminated. Doc. Nos. 41-7 at 7, 42-2 at 12-13. During oral argument, Defendant asserted that *not* cancelling WCAs in those relatively uncommon situations[2] upholds the purpose of the plan, which is, in large part, to reward company loyalty and longevity. FAs who depart under one of these circumstances (which are largely out of a FA's control) must generally covenant to not compete in order to attain their WCA. Doc. No. 41-1 at 13. Involuntary terminations (with a non-competition agreement), death, and retirement do not render an employee adverse to the company the way a FA leaving to work for a competitor might.

The specific circumstances of the departure determine how and when a WCA vests. In the event of death, the FA's estate is paid promptly. Doc. No. 41-1 at 12. If the termination is related to a workforce reduction, divestiture or disability, the award will "continue to become earned and payable on the stated vesting schedule," so long as the FA agrees to certain covenants, including to not solicit clients and employees. *Id.* at 13. For changes in control, awards become immediately earned as of the termination date. *Id.* Finally, for retirement, WCAs become earned and payable in

---

[2] According to the parties, 18% of WCA recipients received some payment after their employment ended and 92.6% of the FAs who received WCAs between 2018 and 2024 were active employees, both of which demonstrate that receiving a WCA payment post-employment is uncommon. Doc. Nos. 42-2 at 13, 54-2 at 8.

7

two installments: first, after the end of the year the FA retires, and second, after the end of the next year. As a condition of payment, retiring FAs must also covenant to not solicit employees or clients and must not engage in competition. *Id.* According to Defendants, spacing retirement payments out this way gives the company some recourse in the event that the FA resumes working and engages in competition. Somewhat paradoxically, it is these unique circumstances that, in Plaintiff's view, bring WCAs under ERISA's narrow ambit.

### A. *Employee Pension Benefit Plan*

Because it is possible for a WCA to be paid out, in certain limited circumstances, after the end of covered employment, the central dispute requires interpretation of subsection (ii) of the ERISA statute. Subsection (ii) addresses whether a plan's express terms or circumstances result in deferrals of income to or beyond the termination of employment. *See* 29 U.S.C. § 1002(2)(A)(ii). Plaintiff urges the Court to use a "results-based" test when considering whether the plan defers income to the end of employment or beyond, which at least one other court has considered. *See Pasternack v. Shrader,* 863 F.3d 162, 171 n.5 (2d Cir. 2017) (noting that the "word 'results' calls for an effects-based inquiry rather than one based on purpose"). However, adopting Plaintiff's view would mean that virtually *any* plan that allows for income to be paid after employment ends, even incidentally, could fall under ERISA's purview.

The Court disagrees with Plaintiff's interpretation. ERISA's "definition is not algorithmic" and its words should not be "read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy,* 611 F.2d at 575. Plaintiff's expansive interpretation reaches far beyond Congress' intent and ignores ERISA's fundamental premise,

both of which are rooted in protecting the *retirement assets* of workers.³ *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51 (1987) ("[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (quotations and citations omitted).

Indeed, courts routinely find, as the Court does here, that "the purpose of the plan must be to provide retirement income or to defer income until termination or beyond." *Juric v. USALCO, LLC,* 659 F. Supp. 3d 619, 633 (D. Md. 2023). *See also Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 495 (D. Md. 1993) (finding no employee pension benefit plan under ERISA when the plans did not "require[ ] deferral of income until the termination of employment or thereafter"); *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016) ("[W]e agree with our sister circuits that have determined that the paramount consideration is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits."). And the "mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Murphy,* 611 F.2d at 575. *See also Juric,* 659 F. Supp. 3d at 633 (finding the fact that some income "can or may be deferred" insufficient to sustain an ERISA claim); *Rich,* 823 F.3d at 1211 (finding the same).

The express purpose of the WCA program is to reward employees for performance and tenure, and both the plan structure and administration are tailored to achieve those ends. While the WCA contemplates rare situations under which an award might be paid after the end of employment, as is the case with retirement, in most circumstances, once the award is earned, it is

---

³ *See* U.S. Department of Labor, *ERISA,* https://www.dol.gov/general/topic/health-plans/erisa (last accessed January 30, 2025).

promptly paid out. In sum, this is the type of scenario around which the Court will decline to stretch the "elastic girdle." *Murphy*, 611 F.2d at 575.

## B. Department of Labor Bonus Plan Exemption

Even if the Court were to adopt Plaintiff's results-based test and find that the WCA could be an employee pension benefit plan under ERISA, it is still subject to the Department of Labor's ("DOL") exemption for bonus plans, unless payments under the plan are "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). By definition, "[a] bonus is '[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation.'" *Shafer v. Stanley*, No. 20 CIV. 11047 (PGG), 2024 WL 4697235, at *7 (S.D.N.Y. Nov. 5, 2024) (quoting *Bonus*, Black's Law Dictionary (11th ed. 2019)).

According to the DOL, a bonus plan "in operation," must not be "a vehicle for the provision of retirement income," DOL Advisory Op. 89-07A at 2, and a "significant operative factor" when considering whether a plan is a bonus plan under the regulation, is whether an "inordinate percentage of the bonus recipients were at . . . retirement age." *Id.* See also *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 188–89 (3d Cir. 2003) (holding a plan was not subject to ERISA "because its purpose was to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits"); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931–34 (8th Cir. 1999) ("Though the [plan's] vesting requirement could result in the deferral of a portion of any earned incentive until a participant's termination or retirement, ... such a deferral would only occur by happenstance. In fact, the stated purpose of the vesting requirement reinforces our conclusion that the [plan] is a non-ERISA bonus plan.").

Here, the WCA is an unfunded, discretionary plan, devised for the express purpose of rewarding long-term FAs who also help the company meet financial goals. Awards are not guaranteed (the way salary and commission are); the employee must meet a minimum production threshold and stay at the company until the award vests, eight years later. Also, the award, while based on a small percentage of the FA's revenue generated over a performance year, is subject to adjustments by the company based on company and business line performance. Thus, the WCA is clearly a bonus plan, paid over and above normal compensation, and its intent and operation are not designed to provide retirement income.

Finally the plan does not "systematically defer income to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). Generally, neither the company nor the FA may defer award payouts, and the few exceptions are intended to deter workforce reentry (in the case of retirement) and competition. Again, the vast majority of award payouts are to actively employed FAs. Thus, while it is possible in certain circumstances to receive a WCA payout after the end of employment, it is both limited in scope and uncommon in occurrence. It is, as the *Emmenegger* Court stated, "happenstance," 197 F.3d at 933, and plainly not systematic.

Consistent with the two courts that have found Defendants' functionally identical predecessor plans to be bonus plans exempt from ERISA,[4] the Court finds that the WCA is not an

---

[4] *See Mullett v. Merrill, Lynch, Pierce, Fenner & Smith*, No. CIV.A. 01-CV-2118, 2002 WL 32298599, at *2 (E.D. Pa. Feb. 26, 2002) (finding a bonus program exempt from ERISA where the plan was implemented to "establish and retain a strong salesforce," subject to a ten-year vesting period and paid promptly once vested; also concluding that the plan "provides neither 'retirement income' nor 'systematically deferred compensation until the termination of employment' merely because an employee might receive the benefits after he or she has retired or terminated employment"); *Callan*, WL 3452371, at *7-8 (finding a similar plan with similar criteria, vesting periods, and payment practices to be a bonus plan exempt from ERISA).

11

employee pension benefit plan; it is a bonus plan exempt from ERISA, and the Court will grant Defendants' Motion for Summary Judgment.

### IV.   ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 41) is **GRANTED;** and
2. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 10, 2025

Kenneth D. Bell
United States District Judge