## How it adds up:

**Total Potential Incentive Compensation and Growth Award**[1,2]

(Assumes positive revenue growth in 2016 with respect to 2015)

| Annual Gross Revenue ($) | Lending Growth ($) | Net New CME Clients | Aggregate Cash Balance Growth for CME Clients ($) | Length of Service / Length of Experience (years) | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 5 | 10 | 15 | 20 | 25 |
| 5,000,000 | 45,000,000 | 50 | 1,250,000 | 57.1% | 59.1% | 59.6% | 60.1% | 60.6% |
| 3,000,000 | 35,000,000 | 50 | 1,250,000 | 56.3 | 58.3 | 58.8 | 59.3 | 59.8 |
| 2,500,000 | 30,000,000 | 40 | 1,000,000 | 55.2 | 57.2 | 57.7 | 58.2 | 58.7 |
| 2,200,000 | 25,000,000 | 40 | 1,000,000 | 54.0 | 56.0 | 56.5 | 57.0 | 57.0 |
| 1,650,000 | 19,000,000 | 40 | 1,000,000 | 53.9 | 55.9 | 56.4 | 56.4 | 56.4 |
| 1,100,000 | 15,000,000 | 30 | 750,000 | 53.8 | 55.8 | 55.8 | 55.8 | 55.8 |
| 880,000 | 12,500,000 | 30 | 750,000 | 52.2 | 53.7 | 53.7 | 53.7 | 53.7 |
| 825,000 | 10,000,000 | 30 | 750,000 | 51.0 | 52.5 | 52.5 | 52.5 | 52.5 |
| 660,000 | 7,500,000 | 20 | 500,000 | 49.5 | 51.0 | 51.0 | 51.0 | 51.0 |
| 550,000 | 5,000,000 | 20 | 500,000 | 48.3 | 49.8 | 49.8 | 49.8 | 49.8 |
| 440,000 | 2,750,000 | 20 | 500,000 | 48.2 | 48.2 | 48.2 | 48.2 | 48.2 |
| 385,000 | 2,500,000 | 15 | 375,000 | 44.2 | 44.2 | 44.2 | 44.2 | 44.2 |
| 330,000 | 1,500,000 | 10 | 250,000 | 40.6 | 40.6 | 40.6 | 40.6 | 40.6 |
| 275,000 | 750,000 | 5 | 125,000 | 36.8 | 20.0 | 20.0 | 20.0 | 20.0 |
| 220,000 | 500,000 | 5 | 125,000 | 35.1 | 20.0 | 20.0 | 20.0 | 20.0 |

## 1.1 Salary

All Advisors will receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state.

The salary for each Advisor is determined by the state in which the Advisor is employed. The table below summarizes the current Advisor salaries by state. However, the salaries are subject to adjustment throughout the year at Morgan Stanley Wealth Management's sole discretion, including changes based on applicable federal or state law.

Monthly Salary by State

| State | Advisor Salary ($) |
|---|---|
| Alaska | 3,380 |
| California | 3,467 |
| Connecticut | 2,059 |
| Hawaii | 2,000 |
| New York | 2,925 |
| All Other | 1,972 |

[1] Chart reflects estimates and is not intended to reflect a guarantee of any level of remuneration or income

[2] Assumes Advisor was hired before January 1st, 2014, is not part of the Financial Advisor Associate (FAA) program, did not end 2016 with a 20% Credit Rate, opened six new Lending Units (LAL/PLA (excluding Letters of Credit), ECL, Tailored Lending, and Mortgage (excluding HELOC)) in 2016 at a pre-split level



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 1: Compensation Programs

## 1.2 Incentive Compensation

### 1.2.1 Total Credits

Subject to the terms outlined in this Program, an Advisor is allocated Total Credits based on his/her Credit Rate and Creditable Revenue. Each Advisor's Credit Rate is based on two factors: (1) full year Gross Revenue and (2) Length of Service ("LOS"), as shown in the Credit Rate Schedule below.

Credit Rate Schedule (%)

| Annual Gross Revenue ($) | Length of Service (years) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0 - 4.9 | 5 - 6.9 | 7 - 8.9 | 9 - 14.9 | 15 - 19.9 | 20 - 24.9 | 25+ |
| 5,000,000+ | 51.5% | 52.0% | 53.5% | 54.0% | 54.5% | 55.0% | 55.5% |
| 3,000,000–4,999,999 | 49.0 | 49.5 | 51.0 | 51.5 | 52.0 | 52.5 | 53.0 |
| 2,500,000–2,999,999 | 48.0 | 48.5 | 50.0 | 50.5 | 51.0 | 51.5 | 52.0 |
| 2,200,000–2,499,999 | 47.0 | 47.5 | 49.0 | 49.5 | 50.0 | 50.5 | 50.5 |
| 1,650,000–2,199,999 | 46.5 | 47.0 | 48.5 | 49.0 | 49.5 | 49.5 | 49.5 |
| 1,100,000–1,649,999 | 45.5 | 46.0 | 47.5 | 48.0 | 48.0 | 48.0 | 48.0 |
| 880,000–1,099,999 | 43.0 | 43.5 | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 |
| 825,000–879,999 | 42.5 | 43.0 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 |
| 660,000–824,999 | 42.0 | 42.5 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| 550,000–659,999 | 41.0 | 41.5 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 |
| 440,000–549,999 | 41.0 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 |
| 385,000–439,999 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| 330,000–384,999 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 |
| 275,000–329,999 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| 220,000–274,999 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 |
| 0–219,999 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 |

Advisors Registered for Less Than Five Years[3]

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 275,000–329,999 | 36.0% |
| 220,000–274,999 | 35.0 |
| 0–219,999 | 34.0 |

Advisors Registered for Nine or More Years[4]

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 0–299,999 | 20.0% |

If the Advisor reaches a new Gross Revenue band in the Credit Rate Schedule, provided the Advisor did not change LOS bands, then the Total Credits earned for the current month in addition to each prior month in the current calendar year will be retroactively adjusted to apply the Credit Rate of the newly achieved Gross Revenue band to the Advisor's year-to-date Total Credits.

If the Advisor reaches a new LOS band in the Credit Rate Schedule and remains in the same Gross Revenue band for the remainder of the year, then the newly-achieved Credit Rate will be applied to Gross Revenue generated in the month following that in which the LOS breakpoint was crossed, as well as prospectively. However, the Credit Rate will NOT be adjusted retroactively to bring the Advisor's year-to-date Total Credits to the newly-achieved level.

[3] For all Advisors registered for less than five years, this schedule will override the Credit Rate schedule where applicable
[4] For all Advisors registered nine or more years, this schedule will override the Credit Rate schedule where applicable



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

If the Advisor reaches a new LOS band in the Credit Rate Schedule and subsequently reaches a new Gross Revenue band during the same year, then year-to-date Total Credits will be retroactively adjusted to:

- Apply the Credit Rate of the newly-achieved Gross Revenue band and previous LOS band to Total Credits earned while in the previous LOS band; and
- Apply the Credit Rate of the newly-achieved Gross Revenue band and new LOS band to Total Credits earned while in the new LOS band

Retroactive Credit Rate Adjustments will only apply to Grid Revenue (adjustments will not apply to Flat-Rate Revenue or 0% Revenue).

**Total Credits** = Cash Credits + Deferred Credits

### 1.2.2 Deferred Compensation

A percentage of Total Credits are allocated to the Advisor as Deferred Credits based on a Deferral Ratio determined by the Advisor's full year Gross Revenue, as shown in the Deferral Ratio Schedule below.

**Deferred Credits** = Total Credits × Deferral Ratio

Deferral Ratio Schedule

| Annual Gross Revenue ($) | Deferral Ratio (%) |
|---|---|
| 5,000,000+ | 15.5 |
| 3,000,000–4,999,999 | 14.0 |
| 2,500,000–2,999,999 | 13.0 |
| 2,200,000–2,499,999 | 12.5 |
| 1,650,000–2,199,999 | 11.5 |
| 1,100,000–1,649,999 | 10.0 |
| 880,000–1,099,999 | 8.5 |
| 825,000–879,999 | 7.5 |
| 660,000–824,999 | 6.5 |
| 550,000–659,999 | 5.5 |
| 440,000–549,999 | 5.0 |
| 385,000–439,999 | 4.0 |
| 330,000–384,999 | 3.5 |
| 275,000–329,999 | 2.5 |
| 220,000–274,999 | 1.5 |
| 0–219,999 | 1.5 |

Advisors with a Credit Rate equal to 20% will have a Deferral Ratio of 0%.

If the Advisor reaches a new Gross Revenue threshold in the Deferral Ratio Schedule during the year, the Deferral Ratio for each prior month, in addition to the current month, will be retroactively adjusted to bring the Advisor's total year-to-date Deferred Credits to the newly-achieved level.

The value of the Deferred Credits for 2016 will not be paid to the Advisor in cash on a current basis, but will instead be granted as deferred compensation shortly following year-end (provided the Advisor is employed on the grant date). 25% of the Deferred Credits will be granted in the form of an equity-based award that is scheduled to convert to shares approximately four years from the grant date and 75% of the Deferred Credits will be granted in the form of a cash-based deferred compensation award scheduled to be paid approximately six years from the grant date. The remaining terms and conditions of the deferred compensation awards, including vesting, termination of employment, and cancellation provisions, will be determined by the Compensation, Management Development and Succession Committee of Morgan Stanley's Board of Directors (the "Compensation Committee") on or prior to the grant date and will be set



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

forth in the applicable award documentation. Deferred compensation awards are contingent upon the Advisor remaining employed through the grant and vesting dates of the award.

In the event that the Advisor's full-year 2016 Deferred Credit withholding is less than the year-end calculated Deferred Credit amount (defined as the Advisor's full-year 2016 Total Credits multiplied by the Advisor's year-end 2016 Deferral Ratio), the Firm will award the full amount of the year-end calculated Deferred Credit amount in the form of a deferred compensation award. The difference between the Advisor's calculated year-end Deferred Credit amount (e.g., the amount awarded as a deferred compensation award) and the Advisor's full-year 2016 Deferred Credit withholding will be repaid to the Firm by the Advisor through a decrease in the Advisor's 2017 Cash Credit amount. The Firm reserves the right to make adjustments to the amounts withheld during the year pursuant to an Advisor's Deferral Ratio, provided that in all cases the amount of the deferred compensation award will equal the year-end calculated Deferred Credit amount.

If the initial value of an Advisor's deferred compensation award is less than $1,000, such Deferred Credits will not be granted as a deferred compensation award and will instead be paid in cash on the date 2016 year-end bonuses are paid to Firm employees generally, but in no event later than March 15, 2017.

Deferred compensation awards are not intended to provide for retirement income.

Associates/Financial Advisor Associates ("FAAs") are not eligible to receive year-end deferred compensation awards.

### 1.2.3 Cash Compensation

Total Credits remaining after Deferred Credits are allocated are then awarded to the Advisor as Cash Credits. An Advisor's Cash Credits are calculated monthly.

**Cash Credits** = Total Credits − Deferred Credits (including Retroactive Deferred Credit Adjustments)

**Example:**

An Advisor with a Length of Service ("LOS") of 15 years produces $700,000 in Gross Revenue in 2016.

- Credit Rate is 44%
- Total Credits are $308,000 [$700,000 × 44.0%]
- Deferred Credits are $20,020 [$308,000 × 6.5%]
- Cash Credits are $287,980 [$308,000 − $20,020]

**Calculation of Cash Credit Advance**

Cash Credit advance is the amount by which Cash Credits exceed Advisor salary for the month. An Advisor whose Cash Credits do not exceed his/her salary is not eligible to receive a Cash Credit advance. An Advisor's Cash Credit advance is calculated monthly and is paid, in arrears, on a monthly basis. Cash Credit advance is calculated based on the following:

1) Creditable Revenue – Gross Revenue attributable to the Advisor that is in excess of his/her Revenue Share

2) Revenue Share – Creditable Revenue that is allocated to support staff through Revenue Share arrangements

3) Grid Revenue – Revenue where Credits are determined based on the Credit Rate Schedule; includes revenue subject to the Discounting Policy. Grid Revenue does not include Flat-Rate Revenue where Credits are determined based on a flat Credit Rate or 0% Revenue where Credits are determined based on a 0% Credit Rate

4) Credits – Advisors are allocated Credits based on the Credit Rate Schedule (Section 1.2.1) and Credit Rate Schedule Exceptions (Section 1.2.6)



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

5) Retroactive Credit Rate Adjustments – Credits are adjusted upwards or downwards to reflect Retroactive Credit Rate Adjustments based on movements along the Credit Rate Schedule

6) Credit Adjustments – Credits are adjusted upwards or downwards to reflect Incentive Compensation for which the Advisor did not receive proper Credits, or for which the Advisor received prior Credits that he/she should not have received. Under no circumstances is an Advisor to be allocated Credits or maintain Credits for transactions that were canceled, that did not close, that were reversed, and/or where the Advisor was allocated Credits in error

7) Total Credits – Credits after Retroactive Credit Rate Adjustments and Credit Adjustments as described in items 4, 5 and 6 above

8) Deferred Credits – Total Credits multiplied by the Advisor's Deferral Ratio as defined in Section 1.2.2

9) Retroactive Deferred Credit Adjustments – Deferred Credits are adjusted upwards or downwards to reflect Retroactive Deferred Credit Adjustments based on movements along the Deferral Ratio Schedule

10) Length of Service ("LOS") – The amount of time an Advisor has been employed by Morgan Stanley Wealth Management plus the amount of time the Advisor was employed by legacy Morgan Stanley or legacy Smith Barney immediately preceding his or her employment with Morgan Stanley Wealth Management. LOS will not include any period of employment preceding employment at the immediately prior legacy firm, including prior employment at Morgan Stanley or Smith Barney. LOS for all purposes related to Advisor Compensation shall be defined exclusively as set forth in this paragraph and without reference to any other LOS definition that the firm may apply in other contexts, including, for example, for purposes of certain benefits calculations

11) Length of Experience ("LOE") – The amount of time an Advisor has been a Registered Representative in the industry

Under no circumstances shall an Advisor be eligible to receive any Incentive Compensation under this Program unless and until the Incentive Compensation calculation is made and the Advisor meets all other conditions for receipt of such Incentive Compensation as determined by Morgan Stanley Wealth Management. In the event an Advisor who has been advanced Incentive Compensation because of fees that were charged to a customer in advance terminates, the Advisor's allocated Total Credits in the final month of employment will be adjusted to account for the unearned portion of the Cash Credit advance. In addition, an Advisor is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation after termination.

Morgan Stanley Wealth Management expects its Advisors to demonstrate excellent guardianship at all times, including demonstrating the utmost professionalism and upholding the highest ethical and regulatory standards and its Incentive Compensation programs are premised on that expectation. Accordingly, Morgan Stanley Wealth Management reserves the right, on notice to the impacted individual, to make prospective downward adjustments to an individual Advisor's Credit Rate, or to make other downward adjustments as part of the calculation of Incentive Compensation at any time, where, in its sole judgment, such an adjustment is warranted based on the Advisor's conduct. The determination as to whether a downward adjustment is warranted on account of guardianship issues will be made by Morgan Stanley Wealth Management in its sole discretion, but may include, for example, significant trade errors, excessive customer complaints, regulatory or ethical lapses, or other conduct that is determined to be contrary to the best interests of the clients or the Firm.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.4 Team Compensation

In 2016, the Firm will continue to provide the opportunity for eligible Registered Team members to receive an increased Credit Rate based on the Individual Eligibility or Team Eligibility Criteria below.

*Registered Team:* A collection of shared revenue relationships (Joint Production Numbers ("JPNs")), through which each member of the relationship generates at least 50% of his/her individual trailing 12-month Gross Revenue.

**Individual Eligibility**

To be considered for Team Compensation, an Advisor must meet the following eligibility criteria:

- Be a member of a Registered Team
- Generate trailing 12-month Gross Revenue at or above the 50th percentile by Industry Length of Experience ("LOE") thresholds[5] as published on the 2016 Advisor Compensation website
- Generate at least 10% of the Registered Team's aggregate trailing 12-month Gross Revenue OR if the Registered Team's aggregate trailing 12-month Gross Revenue is greater than $3,000,000, each Advisor must generate at least 5% of the Registered Team's aggregate trailing 12-month Gross Revenue

**Team Eligibility**

The Registered Team as a whole can also qualify for Team Compensation. To be considered for Team Eligibility, the Registered Team must meet the following eligibility criteria:

- Be a Registered Team
- Generate aggregate trailing 12-month Gross Revenue of at least $2,500,000 AND have average Gross Revenue per Advisor of at least $750,000

Advisors eligible for Team Compensation will receive the Credit Rate that corresponds to:

- The Gross Revenue band of the Advisor on the Registered Team with the highest Gross Revenue; AND
- The lower LOS band between (i) the Advisor on the Registered Team with the highest Gross Revenue and (ii) the Advisor eligible for Team Compensation

Eligible Advisors will receive the Deferral Ratio that corresponds to the Gross Revenue band of the Advisor on the Registered Team with the highest Gross Revenue.

An Advisor's individual Credit Rate cannot be reduced because of Team Compensation, nor can an Advisor's Team Compensation Credit Rate be greater than the Credit Rate of the Advisor on the Registered Team with the highest annual Gross Revenue.

Advisors who meet the Individual Eligibility requirements for Team Compensation at any time during 2016 will be eligible for Team Compensation beginning the month following his/her qualification. Advisors will receive Team Compensation prospectively through the end of the year, provided the Registered Team continues to satisfy the requirements identified above, but will NOT be awarded Team Compensation retroactively.

Team Compensation is not extended to teams without Registered Team status, to members of a Registered Team that subsequently dissolves, or to Advisors who leave a Registered Team relationship. In such instances, an Advisor's Credit Rate and Deferral Ratio will revert to his/her individual Credit Rate and Deferral Ratio for the remainder of the year.

[5] Advisor with the highest Gross Revenue on the Team must also generate trailing 12-month Gross Revenue at or above the 50th percentile threshold by LOE band



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Team Compensation Example 1:**

The following Advisors are on a Registered Team for all of 2016 and met their respective top 50th percentile by LOE threshold as of January 1st, 2016:

- Advisor #1 produces $1,500,000 of Gross Revenue, has LOS of 20 years, a Credit Rate of 48.0%, and a Deferral Ratio of 10.0%
- Advisor #2 produces $400,000 of Gross Revenue, has LOS of 4 years, a Credit Rate of 38.0%, and a Deferral Ratio of 4.0%

Advisor #2's Credit Rate will be determined using Advisor #1's Gross Revenue band and Advisor #2's LOS band. Therefore, Advisor #2's Credit Rate will be 45.5% and Deferral Ratio will be 10.0%.

**Team Compensation Example 2:**

The following Advisors are on a Registered Team for all of 2016 and met their respective top 50th percentile by LOE threshold as of January 1st, 2016:

- Advisor #1 produces $1,200,000 of Gross Revenue, has LOS of 5 years, a Credit Rate of 46.0%, and a Deferral Ratio of 10.0%
- Advisor #2 produces $500,000 of Gross Revenue, has LOS of 7 years, a Credit Rate of 41.5%, and a Deferral Ratio of 5.0%

Advisor #2's Credit Rate will be determined using Advisor #1's Gross Revenue band and Advisor #1's LOS band. Therefore, Advisor #2's Credit Rate will be 46.0% and Deferral Ratio will be 10.0%

**Recruits**

Recruits will be treated in the same manner as an established Advisor by evaluating the trailing 12-month Gross Revenue listed on their recruit paperwork for the 50th percentile by LOE requirement.

**Associates/Financial Advisor Associates ("FAAs")**

Associates/FAAs are not eligible for Team Compensation while still part of the Associate/FAA program.

### 1.2.5 Start-Up Policy and Reset

At the start of each year, all Advisors are assigned an advanced Credit Rate and Deferral Ratio.

**Advanced Credit Rate and Deferral Ratio**

Advanced Credit Rates and Deferral Ratios are assigned as follows:

- Advisors with prior year Gross Revenue of $1,100,000 or more are assigned an advanced Credit Rate and Deferral Ratio based on their 2015 Gross Revenue, December 2015 LOS and the 2016 Credit Rate and Deferral Ratio Schedules
- Advisors with prior year Gross Revenue of less than $1,100,000 are assigned an advanced Credit Rate and Deferral Ratio based on their 2015 Gross Revenue and December 2015 LOS at one Gross Revenue band lower on the 2016 Credit Rate and Deferral Ratio Schedules[6], but not less than the lowest Gross Revenue band on the applicable Credit Rate or Deferral Ratio Schedules

*Please note that the advanced Credit Rate under this Start-Up Policy is an advance against Advisor Incentive Compensation.*

In July and October, if the Credit Rate corresponding to the Advisor's 2016 annualized Gross Revenue ("target rate") is less than the advanced Credit Rate assigned to the Advisor at the start of the year ("start-up rate"), then the Credit Rate and Deferral Ratio will be reset to one Gross Revenue band below the target rate[6] as determined by the 2016 Credit Rate and Deferral Ratio Schedules. If the target rate is equal to or greater than the start-up rate, the advanced Credit Rate and Deferral Ratio will remain unchanged.

[6] If two successive breakpoint levels contain the same target rate, then the Credit Rate and Deferral ratio will be reset to the next breakpoint level that has a lower Credit Rate and Deferral Ratio



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

If the advanced Incentive Compensation amount exceeds the Incentive Compensation calculated under the terms of this Program, the difference will be subtracted from the Advisor's allocated Cash Credits in the last month of the year and any shortfall will be carried forward into the next year. If the advanced Deferred Credits exceed the Deferred Credits calculated under the terms of this Program, the difference will be added to the Advisor's allocated Cash Credits in the last month of the year.

In the event the Advisor's employment terminates, the Credit Rate and Deferral Ratio will be retroactively adjusted based on year-to-date Gross Revenue and the 2016 Credit Rate and Deferral Ratio Schedules. If the advanced Incentive Compensation amount exceeds the calculated Incentive Compensation under the terms of this Program, the difference will be subtracted from the Advisor's allocated Cash Credits in the final month of employment so that the Advisor will be paid in full based on the actual applicable Credit Rate for the year. In addition, an Advisor whose employment terminates is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation.

### 1.2.6 Credit Rate Schedule Exceptions

**Equity, Options, and Choice Select Discounting**

In situations where an Advisor exercises discretion to offer a discount to the client, the Advisor's Credit Rate will be reduced per the Discount Sharing Schedule below, subject to a minimum 10% Credit Rate. Discounting on cents-per-share trades will be converted to a percentage discount for proper application.

Effective April 1st, 2016, the Discount Sharing Schedule will apply to all trades with Choice Select pricing.

Discount Sharing Schedule Summary

| Pricing | Credit |
|---|---|
| Discount of 0% up to 20% | Credit Rate |
| Discount over 20% and up to 30% | Credit Rate minus 25bps per 1% of Discount over 20% |
| Discount over 30% and up to 45% | Credit Rate minus 40bps per 1% of Discount over 30% |
| Discount greater than 45% | Credit Rate minus 60bps per 1% of Discount over 45% |

The below Discount Sharing Schedule details the exact impact to the Advisor's Credit Rate based on the level of discount offered to the client. All numbers shown are quoted as percentages:

Discount Sharing Schedule

| Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction |
|---|---|---|---|---|---|---|---|
| 0 – 20% | 0.00% | 40% | 6.50% | 60% | 17.50% | 80% | 29.50% |
| 21 | 0.25 | 41 | 6.90 | 61 | 18.10 | 81 | 30.10 |
| 22 | 0.50 | 42 | 7.30 | 62 | 18.70 | 82 | 30.70 |
| 23 | 0.75 | 43 | 7.70 | 63 | 19.30 | 83 | 31.30 |
| 24 | 1.00 | 44 | 8.10 | 64 | 19.90 | 84 | 31.90 |
| 25 | 1.25 | 45 | 8.50 | 65 | 20.50 | 85 | 32.50 |
| 26 | 1.50 | 46 | 9.10 | 66 | 21.10 | 86 | 33.10 |
| 27 | 1.75 | 47 | 9.70 | 67 | 21.70 | 87 | 33.70 |
| 28 | 2.00 | 48 | 10.30 | 68 | 22.30 | 88 | 34.30 |
| 29 | 2.25 | 49 | 10.90 | 69 | 22.90 | 89 | 34.90 |
| 30 | 2.50 | 50 | 11.50 | 70 | 23.50 | 90 | 35.50 |
| 31 | 2.90 | 51 | 12.10 | 71 | 24.10 | 91 | 36.10 |
| 32 | 3.30 | 52 | 12.70 | 72 | 24.70 | 92 | 36.70 |
| 33 | 3.70 | 53 | 13.30 | 73 | 25.30 | 93 | 37.30 |
| 34 | 4.10 | 54 | 13.90 | 74 | 25.90 | 94 | 37.90 |
| 35 | 4.50 | 55 | 14.50 | 75 | 26.50 | 95 | 38.50 |
| 36 | 4.90 | 56 | 15.10 | 76 | 27.10 | 96 | 39.10 |
| 37 | 5.30 | 57 | 15.70 | 77 | 27.70 | 97 | 39.70 |
| 38 | 5.70 | 58 | 16.30 | 78 | 28.30 | 98 | 40.30 |
| 39 | 6.10 | 59 | 16.90 | 79 | 28.90 | 99 | 40.90 |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

The Equity, Options, and Choice Select Discounting Policy shall not apply to the following:

| Discount Exceptions |
|---|
| Employee Accounts |
| Employee - Related Accounts |
| Futures (the below Futures Discount Sharing policy applies) |
| Ladder Portfolios - All one-ticket, preplanned ladders in order-entry inventory |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| Corporate Equity Solutions ("CES") - directed Brokerage |
| Flat-Rate accounts are credited at lower of Credit Rate or Flat-Rate |
| Equity Transactions (excluding Choice Select) with commission amount of $350 or more (exemption does not apply to commissions priced at an effective rate of <4 cents per share) |
| Options Transactions (excluding Choice Select) with commission amount of $350 or more (exemption does not apply to transactions with premiums ≥ $1.00 and commissions < $3.00 per contract (equivalent to $0.03 per share) or premiums < $1.00 and commissions < $1.00 per contract (equivalent to $0.01 per share) |

**Example 1: Equity transaction with a commission charged to the client of less than $350**

An Advisor with a Credit Rate (based on the Credit Rate Schedule) of 36% executes a trade with a commission of $400:

1) Advisor discounts this trade by 40%, yielding commissions of $240 [$400 – ($400 * 40%) = $240]
2) As seen in the Discount Sharing Schedule above, the Credit Rate reduction on this trade is 6.5%
3) Credit Rate on this trade is 29.5% [36% - 6.5% = 29.5%]
4) Advisor's Total Credit is $70.80 [$240 * 29.5% = $70.80]

**Example 2: Option transaction with a commission charged to the client of less than $350, subject to a 10% minimum Credit Rate**

An Advisor with a Credit Rate (based on the Credit Rate Schedule) of 36% executes a trade with a commission of $600:

1) Advisor discounts this trade by 80%, yielding commissions of $120 [$600 – ($600 * 80%) = $120]
2) As seen in the Discount Sharing Schedule above, the Credit Rate reduction on this trade is 29.5%
3) Calculated Credit Rate on this trade is 6.5% [36% - 29.5% = 6.5%] however, the applicable Credit Rate will be 10% due to minimum Credit Rate criteria
4) Advisor's Total Credit is $12 [$120 * 10% = $12]

**Example 3: Choice Select transactions with commissions charged to the client in a given month**

An Advisor with a Credit Rate (based on the Credit Rate Schedule) of 36% has a client who generated commission of $1,000 in a given month through a Choice Select account:

1) Advisor discounts these commission by 30%, yielding commissions of $700 [$1,000 – ($1,000 * 30%) = $700]
2) As seen in the Discount Sharing Schedule above, the Credit Rate reduction on these commissions is 2.5%
3) Calculated Credit Rate on these commissions is 33.5% [36% - 2.5% = 33.5%]
4) Advisor's Total Credit is $234.50 [$700 * 33.5% = $234.50]



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Futures and Commodities Discounting**

In situations where the Advisor exercises discretion to offer a discount to the client, the Advisor's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate.

Summary Table

| Commission Per Half-Turn Contract | Credit |
|---|---|
| Above and equal to $18.00 | Credit Rate |
| Less than $18.00 | Credit Rate minus 1% for each dollar, or portion of dollar, of commission per half-turn under $18.00 |

Below is a detailed table showing the exact impact to Credit allocation based on level of discount:

Detailed Table

| Commission Per Half-Turn Contract | Credit Rate Reduction | Commission Per Half-Turn Contract | Credit Rate Reduction |
|---|---|---|---|
| $17.00 to $17.99 | 1.0% | $8.00 to $8.99 | 10.0% |
| $16.00 to $16.99 | 2.0% | $7.00 to $7.99 | 11.0% |
| $15.00 to $15.99 | 3.0% | $6.00 to $6.99 | 12.0% |
| $14.00 to $14.99 | 4.0% | $5.00 to $5.99 | 13.0% |
| $13.00 to $13.99 | 5.0% | $4.00 to $4.99 | 14.0% |
| $12.00 to $12.99 | 6.0% | $3.00 to $3.99 | 15.0% |
| $11.00 to $11.99 | 7.0% | $2.00 to $2.99 | 16.0% |
| $10.00 to $10.99 | 8.0% | $1.00 to $1.99 | 17.0% |
| $9.00 to $9.99 | 9.0% | | |

Discounting below $1.00 per Half-Turn Contract is only allowed with prior approval from Capital Markets, and will result in a 17.0% Credit Rate reduction.

**Example:**

If an Advisor with a Credit Rate of 36% executes 10 Futures or Commodities contracts with half-turn commission of $10.25 per contract, the Credit Rate on this trade would be 28% [36.0% - 8.0% = 28.0%] and the Advisor's Total Credit would be $28.70 [$10.25 *10 * 28.0% = $28.70].

The Futures and Commodities Discounting policy shall not apply to tickets of $350 or more where the half turn is $5.00 or greater.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Small Households**

Any Household with asset levels less than the below mentioned thresholds for four consecutive months is considered a Small Household. Asset levels are calculated each month on the last trade date using the higher of: (i) the asset balance calculated during any of the immediately preceding three months; or (ii) the asset balance on the last trade date of the current month. Credit allocation for Consulting Group Revenue generated in Small Households will be based on the tables below:

Financial Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[6] | 75,000–99,999 | 20 |
| | 50,000–74,999 | 15 |
| | 0–49,999 | 10 |
| All Other Products | 0–99,999 | 0 |

Credit allocation for PWAs will be based on the PWA Small Households policy rules in the table below for Households where 50.01% or greater of the aggregate split of a FA number or JPN is credited to PWAs AND all of the accounts within the Household were opened on or after April 1st, 2015. Households with at least one account opened before April 1st, 2015 will be subject to the FA Small Households policy rules in the table above. Households with assets less than $100,000, regardless of the aggregate split of the JPN that is credited to PWAs, will be subject to the FA Small Households policy rules in the table above.

Private Wealth Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[7] | 100,000–1,999,999 | 20 |
| All Other Products | 100,000–1,999,999 | 0 |

Credit allocation for Non-Resident Client ("NRC") accounts will be based on the NRC Account Small Households policy rules in the table below. NRC accounts in Households with assets less than $100,000 will be subject to the FA Small Households policy rules in the table above:

Non-Resident Client Accounts – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[6] | 100,000–499,999 | 20 |
| All Other Products | 100,000–499,999 | 0 |

Revenue from products other than Consulting Group Products will receive Gross Revenue but no Credit.

[7] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

The Small Households Policy shall not apply to the following:

| Small Households Exceptions |
|---|
| Alternative Investments that drawdown against a commitment |
| Annuities |
| College Savings External 529 Plans |
| Delivery Versus Payment ("DVP") Accounts |
| Employee Benefits Trusts |
| Financial Planning Fees |
| Futures |
| Insurance |
| New Households (opened within previous 6 months) |
| Retirement Plan Trusts |
| SAR-SEP IRA accounts, SEP IRAs, SIMPLE Accounts, Simple IRAs, VIP/RPM Accounts |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Consulting Group Non-Custody Accounts |
| First State Trust Company Accounts (Product Codes 532 and 533) |
| Households served by FAs (≥50.00% of the aggregate JPN split is credited to FAs) enrolled in OneView with greater than $250,000 in combined (external OneView + Morgan Stanley) assets [see OneView exemption section below] |
| Households served by PWAs (≥50.01% of the aggregate JPN split is credited to PWAs) enrolled in OneView with greater than $10,000,000 in combined (external OneView + Morgan Stanley) assets |

**OneView Exemption on Small Households Policy**[8]

Any Gross Revenue from a client Household that is enrolled in OneView is eligible for exemption from the Small Households Policy provided that it meets the below criteria. This exemption eligibility from the Small Households Policy will apply for two years from the first day of the month following the date of the client's enrollment in OneView, regardless of the initial combined asset level in the Household or whether any transactions have occurred at the time of enrollment. At the end of two years, only assets held at Morgan Stanley will be considered, in accordance with the terms of the Small Households Policy in effect at that time.

Gross Revenue from Households enrolled in OneView that have less than $100,000 in Morgan Stanley assets but a <u>combined asset level</u> (external OneView assets[9] + Morgan Stanley assets) <u>of greater than $250,000 for FAs ($10,000,000 for PWAs) will be exempt from the Small Households Policy.</u>

If a Household enrolled in OneView (served ≥50% by FA(s)) has a combined asset level (external OneView assets + Morgan Stanley assets) of greater than $250,000, but subsequently falls below the $250,000 threshold for four consecutive months, the Household will be subjected to the Small Households Policy until its combined asset level becomes greater than $250,000 again. The exemption eligibility period will remain as two years from the client's initial enrollment in OneView (i.e. the exemption eligibility period will not restart based on changes in the combined asset level).

For example, in February 2016 a client enrolls in OneView for the first time, with a total of $90,000 in Morgan Stanley assets and $200,000 in OneView assets. Starting with February month-end processing, the Household (which is served ≥50% by FA(s)) is eligible for exemption from the Small Households Policy. The two-year eligibility exemption period will begin March 2016 and last through the end of February 2018.

[8] Morgan Stanley reserves the right to modify or terminate this exemption at any time, in its sole discretion, and apply such modification or termination immediately to affected households

[9] Does not include manual entries; only the account types included by Morgan Stanley for asset calculations will be considered for OneView external asset inclusion



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Household Transfers & New Account Referrals to the Client Advisory Center ("CAC")**

For existing Households transferred to the CAC, as well as for new Households referred directly to the CAC, Advisors will receive a one-time Gross Revenue credit equal to 50 bps of the Household AUM, up to $250,000 of AUM for domestic Households and up to $500,000 of AUM for Non-Resident Client ("NRC") Households. Household AUM will be evaluated at the end of the third month after the CAC receives the Household. The following Credit Rates will apply:

CAC Transfer & Referral Credit Rate Schedule

| Household AUM[10] | Credit Rate |
|---|---|
| <$100,000 | 20% |
| $100,000+ | Standard Credit Rate |

**Low-Priced Securities**

Advisors will not be allocated Credits on securities priced at less than $1.00 per share.

**Small Trades**

Credit allocation for Small Trades will be based on the table below:

Small Trades Credit Rate Schedule

| Product | Transaction Amount ($) | Credit Rate (%) |
|---|---|---|
| Options[11] | 75.00–99.99 | 30 |
| | 50.00–74.99 | 20 |
| | 0–49.99 | 0 |
| All Other Products | 0–99.99 | 0 |

The Small Trades policy shall not apply to the following:

| Small Trades Exceptions |
|---|
| Annuities |
| Certificates of Deposit |
| Choice Select Program |
| College Savings External 529 Plans |
| Consulting Group Advisory[12] |
| Corporate Retirement Plan Products (Held-away) |
| Equity and Fixed Income Underwriting |
| Futures |
| Insurance |
| Ladder Portfolios—All one-ticket, preplanned ladders in order-entry inventory |
| Managed Futures |
| Mutual Funds |
| Options - Opening covered sell orders, regardless of size |
| Repurchase Agreements |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| Treasury Bills |
| Unit Trusts |
| Vision-Directed Brokerage |
| Fixed Income Products[13] |
| For accounts on Flat-Rate Credit, Advisors are credited the lesser of the assigned Flat-Rate or Small Ticket Rate |

[10] Household AUM will be evaluated at the end of the third month after the CAC receives the Household
[11] Excludes exercise and assignments
[12] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)
[13] All Global Currency Deposits are subject to the small trade policy



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### Fixed Income Delivery Versus Payment ("DVP") Credit Rate

Advisors are allocated Credits based on a fixed percentage on all Fixed Income business generated in DVP accounts. The Credit Rate is based on the total prior year Gross Revenue, as follows:

Credit Rate Summary

| Prior Year Gross Revenue ($) | Credit Rate (%) |
|---|---|
| 500,000 and over | 35 |
| 0–499,999 | 25 |

The Fixed Income DVP policy shall not apply to Corporate Equity Solutions ("CES")-Directed Brokerage.

### Equity Syndicate

For Households where 70% or more of trailing 12-month Gross Revenue is generated by Equity Syndicate business, Advisors will receive a flat 20% Credit Rate on Equity Syndicate revenue. For Households where less than 70% of trailing 12-month Gross Revenue is generated by Equity Syndicate business, Equity Syndicate Gross Revenue will be credited at the standard Credit Rate (see Section 1.2.1) and all other Credit Rate Schedule exception policies will apply.

The ratio of Equity Syndicate Gross Revenue to total Gross Revenue from a specific Household is calculated on a rolling 12 month basis at the end of each month. For example, if a Household generates $10,000 in trailing 12-month Gross Revenue between May 2015 and April 2016, of which $8,000 is from Equity Syndicate business (80%), then any Equity Syndicate Gross Revenue from that Household for the month of April 2016 will be credited at a flat 20% Credit Rate. However, if at the end of the following month (May 2016) the same Household's trailing 12-month Gross Revenue is $12,000, of which $8,000 is from Equity Syndicate business (~67%), all Equity Syndicate business will be credited at the standard Credit Rate for the month of May 2016 and all other Credit Rate Schedule exception policies will apply; there will be no retroactive Credit back to April 2016.

"Equity Syndicate" business refers to equity syndicate Initial Public Offerings ("IPOs"), secondary offerings, follow-ons, and block trades. This policy does not affect selling concessions on structured investments, fixed income syndicate, preferred new issues, closed-end fund IPOs, or municipal syndicate offerings.

### Non-Resident Client ("NRC") Business

NRC business includes all business done in accounts held by individuals or entities with a Non-U.S. legal address on the account (excluding Stock Option Plan ("SOP"), Cashless Exercise ("CSX"), and Directed Share Business ("DSB") accounts).

Effective January 1st, 2016, all NRC accounts[14] must be held by an International Client Advisor ("ICA") or in a JPN where an ICA(s) receives at least 70% of the Gross Revenue split from that JPN.

Gross Revenue generated by NRC accounts that do not comply with the NRC policy, as stated above, will not be considered compensable.

[14] Accounts in households with greater than $5,000,000 in assets as of December 31st, 2015 may be held in a JPN where an ICA(s) receives at least 50% of the Gross Revenue split from that JPN



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Inherited Accounts**

Beginning April 1st, 2016, accounts that are reassigned through the Account Redistribution System ("ARS") will earn a 0% Credit Rate for the calendar month of reassignment, and for the next three calendar months thereafter (the "Window Period"), except under the following situations:

- Former Advisors (i.e. retired Advisors) will continue to receive the Credit Rate pursuant to their executed Former Advisor Program ("FAP") documentation
- Households in the same JPN for at least 12 months immediately preceding reassignment through ARS
- Households that were in a JPN, or FA-number, with the remaining Advisor(s) before establishment of the Households's current, pre-reassignment, JPN

If at the end of this Window Period the Household's[15] ending asset value[16] is 50% or greater than the Household's initial asset value[17], then the Advisor will be eligible for Supplemental Inherited Account Compensation.

- Supplemental Inherited Account Compensation will be in the form of Credits, pursuant to this Compensation Plan, calculated based on the Advisor's Credit Rate and the Gross Revenue generated by the reassigned Household(s) during the Window Period for which the Advisor had previously earned a 0% Credit Rate.

If at the end of this Window Period the Household's ending asset value is less than 50% of the Household's initial asset value, then the Advisor will not be eligible for Supplemental Inherited Account Compensation, but will be eligible to earn Credits, pursuant to this Compensation Plan, prospectively.

**Example 1:**

Advisor #1 has a Credit Rate of 36% and receives a reassigned Household through ARS on April 22nd, 2016 with the following characteristics:

- $1,000,000 in assets as of the reassignment date
- Generates $3,000 in Grid Revenue between April 22nd, 2016 and July 31st, 2016
- $1,100,000 in assets as of July 31st, 2016

Advisor #1 is eligible for Supplemental Inherited Account Compensation since the Household asset level is at least 50% of the asset level as of the date of reassignment:

- Supplemental Inherited Account Compensation = $3,000 Grid Revenue * 36% Credit Rate
- Beginning August 1st, 2016, Advisor #1 will receive a 36% Credit Rate on all Grid Revenue associated with this Household prospectively

**Example 2:**

Advisor #2 has a Credit Rate of 42% and receives a reassigned Household through ARS on July 19th, 2016 with the following characteristics:

- $500,000 in assets as of the reassignment date
- Generates $2,000 in Grid Revenue between July 19th, 2016 and October 31st, 2016
- $100,000 in assets as of October 31st, 2016

Advisor #2 is not eligible for Supplemental Inherited Account Compensation since the Household asset level is below 50% of the asset level as of the date of reassignment:

- Supplemental Inherited Account Compensation = $0
- Beginning November 1st, 2016, Advisor #2 will receive a 42% Credit Rate on all Grid Revenue associated with this Household prospectively

[15] As defined by the Household Account Eligibility policy hosted on 3DR > Service > Accounts, Pricing & Reporting > Pricing And Householding
[16] Household asset value is determined as of the close of business on the second to last trade date of the third calendar month following the month of reassignment
[17] Household asset value is determined as of the close of business on the trade date immediately preceding reassignment through the Account Redistribution System



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 2: Growth Award

## 2.1 Growth Award

**Growth Award Structure**

The 2016 Growth Award consists of the Lending Award and the Cash Management Award.

Advisors who meet the Eligibility Criteria for the Lending Award listed below will be eligible to receive the Lending Award, as well as 25% Additional BDA in 2017 and a Support Staff Recognition balance.

Advisors who meet the Eligibility Criteria for the Cash Management Award listed below will be eligible to receive the Cash Management Award and a Support Staff Recognition balance.

**Growth Award Schedule**

The Lending Award and Cash Management Award will be issued to Advisors as a 5-year bonus agreement. The bonus agreement will have terms and conditions which will include requirements relating to ongoing employment in good standing, mandatory arbitration, and other material terms, which will be set forth in the applicable documentation in detail, and which must be accepted in order to accept the award. Any award under $10,000 (total of Lending Award and Cash Management Award) will be paid as cash in the first quarter of 2017, but in no event later than March 31st, 2017.

25% Additional BDA, earned as part of the Lending Award, will be funded along with 2017 BDA and will be 25% of the 2016 BDA amount.

The Support Staff Recognition balance, earned as part of the Lending Award and/or Cash Management Award, will be aggregated and funded in the support staff compensation system in the first quarter of 2017. The Advisor will be able to allocate this aggregated Support Staff Recognition balance to eligible support staff employees.

In order to be eligible to receive any award, Advisors must be employed in good standing as of the payment/funding date.

**Loan Eligibility**

Advisors who receive an award may also be eligible for a loan in the first quarter of 2017. The loan will have terms and conditions which will include requirements relating to ongoing employment in good standing and other material terms, including, but not limited to, a general release of all claims against the Firm, which will be set forth in the applicable documentation in detail.

**Growth Award Eligibility**

To be eligible for the Lending Award and/or the Cash Management Award, Advisors must meet the following requirements:

- Must be hired before January 1st, 2014; AND
- Not be part of the Financial Advisor Associate ("FAA") program at the end of 2016; AND
- Have Gross Revenue in 2015 that is greater than zero AND were not in a non-producing role at any time during 2015; AND
- Have positive Gross Revenue growth in 2016 with respect to 2015; AND
- Not end 2016 with a 20% Credit Rate

Advisors who are on a Registered Team and qualify for Team Compensation will be evaluated for positive Gross Revenue growth in 2016, with respect to 2015, based on aggregate Gross Revenue growth for all Advisors[18] on the Registered Team, not based on individual Gross Revenue growth. All other Growth Award Eligibility criteria must be satisfied on an individual basis in order to qualify for the Growth Award.

[18] Includes Advisors hired after January 1st, 2014, FAAs, Advisors with Gross Revenue in 2015 that is less than or equal to zero, Advisors who were in a non-producing role during 2015 and Advisors with a 20% Credit Rate at the end of 2016



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 2.2 Lending Award

The Lending Award is intended to reward Advisors for expanding Lending business consistent with the financial needs and investment objectives of clients. The program will consider total growth in LAL/PLA (excluding Letters of Credit), ECL, Tailored Lending, Margin, and Mortgage (excluding HELOC).

**Lending Award Eligibility Criteria**

- Advisors must meet all Growth Award Eligibility requirements as defined in Section 2.1; AND
- Have a minimum of $500,000 in total Lending growth (at the post-split level) at the end of 2016 with respect to 2015; AND
- Open six (6) new Lending units (LAL/PLA (excluding Letters of Credit), ECL, Tailored Lending and Mortgage (excluding HELOC)) in 2016 (at the pre-split level)

**Lending Award Calculation**

The Lending Award will be calculated as follows:

*Liquidity Access Line ("LAL") / Portfolio Loan Account ("PLA") (excluding Letters of Credit), Express Credit Line ("ECL"), Tailored Lending, and Margin 2016 Growth*: Average outstanding daily balances will determine month-end balances in 2015 and 2016. The average month-end balances for 2016 will be compared to the average month-end balances for 2015 to determine growth in 2016. For JPNs, month-end balances will be split to the members of the JPN based on the month-end JPN split percentages.

*Mortgage (excluding Home Equity Line of Credit ("HELOC")):* Newly originated Morgan Stanley Private Bank, National Association ("MSPBNA") Mortgages closed and disbursed by December 29th, 2016 will be included in the Lending Award (baselines will be zero for the purposes of calculating total Lending growth). Only Mortgages for which Advisors are eligible for incentive compensation will be includable in the Lending Award (i.e. Advisors must be dually employed by MSSB and MSPBNA and NMLS registered to have Mortgage(s) included in the calculation of any Lending Award).

Notwithstanding the above, Employee Loans will be included in the Lending growth calculation, as well as count towards Lending units, as specified below. An Employee Loan is a Mortgage secured by a U.S. property and closed and disbursed by MSPBNA to individuals who are full-time or part-time U.S. based employees of Morgan Stanley. A personal Mortgage for an Advisor is a Mortgage for which the Advisor is a named borrower/co-borrower/obligor in the Mortgage.

A Mortgage is closed at the time all loan proceeds for such Mortgage are disbursed to the named borrower/co-borrower/obligor in the Mortgage:

- An Employee Loan, which is booked in a Primary or Secondary number or a JPN, and is not a personal Mortgage for an Advisor in a Primary or Secondary number or a JPN will count toward Lending growth and Lending unit credit
- An Employee Loan booked in a Primary or Secondary number that is the Advisor's personal Mortgage will not count toward Lending growth. The Employee Loan will count toward Lending unit credit
- An Employee Loan booked in a JPN where the Employee Loan is a personal Mortgage for an Advisor who is a member of the JPN, the Advisor related to such personal Mortgage will not receive Lending growth credit. The remaining members of the JPN will receive credit toward Lending growth. The Employee Loan will count toward Lending unit credit for all Advisor members of the JPN



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 2: Growth Award

To determine the Lending growth in 2016, growth in LAL/PLA (excluding Letters of Credit), ECL, Tailored Lending, and Margin as of December 30th, 2016 will be added to new Mortgages closed and disbursed by December 29th, 2016 (excluding HELOC). At year-end, qualifying Lending growth is eligible for an award based on the below Lending Award Schedule.

Lending Award Schedule

| Lending Growth as of 12/30/16 ($) | Advisor Award (bps) | Support Staff Recognition ($) |
|---|---|---|
| 22,500,001 – 45,000,000 | 50 | 10,000 |
| 15,000,001 – 22,500,000 | 45 | 5,000 |
| 7,500,001 – 15,000,000 | 40 | 3,000 |
| 0 – 7,500,000 | 35 | 1,000 |

The Lending Award Schedule does not apply retroactively. The specified Advisor Award applies only to the dollars of qualifying Lending growth that fall within the corresponding Lending Growth band.

The Support Staff Recognition balance will be the amount that corresponds to the highest Lending Growth band the Advisor achieves.

**25% Additional Business Development Allowance ("BDA")**

Advisors who meet the Lending Award Eligibility Criteria are eligible for 25% Additional BDA in 2017 based on the 2016 BDA policy. 25% Additional BDA will be funded in the first quarter of 2017. Please refer to Section 3.3 for further details on the BDA program.

**Support Staff Recognition**

Advisors who meet the Lending Award Eligibility Criteria will have the opportunity to recommend the distribution of the Support Staff Recognition balance to one or more eligible support staff employee(s) for supporting growth in the Advisor's business during 2016. The Support Staff Recognition balance will be the amount that corresponds to the highest Lending Growth band the Advisor achieves in 2016 and will be payable as cash, in the support staff compensation system in the first quarter of 2017.

Support Staff Recognition recipients must be in a support staff role that is eligible to receive compensation through AFG as of the date of payment, and both recipient and distributing Advisor must be employed by the Firm, in good standing, as of the date of payment. Firm management will make final decisions on eligibility, allocation, and distribution of any Support Staff Recognition balance.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

DOLAR0120

**Lending Growth Calculation Example:**

An Advisor has an average total month-end baseline of $45,000,000 in qualified LAL/PLA[19], ECL, Tailored Lending, and Margin products in 2015. With an average total month-end LAL/PLA[15], ECL, Tailored Lending, and Margin balance for 2016 of $70,000,000, and $10,000,000 in new MSPBNA Mortgages[20] closed and disbursed as of December 29th, 2016 the Advisor will have $35,000,000 in Lending growth as calculated below.

Lending Growth Example

| Month | LAL/PLA[15], ECL, Tailored Lending, and Margin Month-End Balance ($) |
|---|---|
| **2015 Baseline** | **45,000,000** |
| Jan 2016 | 75,000,000 |
| Feb 2016 | 80,000,000 |
| Mar 2016 | 70,000,000 |
| Apr 2016 | 60,000,000 |
| May 2016 | 90,000,000 |
| Jun 2016 | 75,000,000 |
| Jul 2016 | 50,000,000 |
| Aug 2016 | 40,000,000 |
| Sep 2016 | 75,000,000 |
| Oct 2016 | 70,000,000 |
| Nov 2016 | 80,000,000 |
| Dec 2016 | 75,000,000 |
| **Sum of Total Month-End Balances:** | **840,000,000** |
| **Average Total Month-End Balance:** | **840,000,000 / 12 = 70,000,000** |
| **LAL/PLA[13], ECL, Tailored Lending and Margin Balance Growth in 2016:** | **70,000,000 – 45,000,000 = 25,000,000** |
| **Period** | **New Mortgages[16] Closed as of December 29th, 2016** |
| Jan 1st – Dec 29th, 2016 | 10,000,000 |
| **Total Lending Growth:** | **25,000,000 + 10,000,000 = 35,000,000** |

**Lending Award Calculation Example (inclusive of Support Staff Recognition):**

Advisor has $35,000,000 of qualifying Lending growth and is eligible for the following awards if the Advisor also meets the eligibility criteria defined above:

Lending Award Calculation Example
(Assumes Advisor has opened 6 new Lending units in 2016)

| Lending Growth as of 12/30/16 ($) | Advisor Award (S) | Support Staff Recognition ($) |
|---|---|---|
| 12,500,000 at 50 bps | 62,500 | 10,000 |
| Next 7,500,000 at 45 bps | 33,750 | - |
| Next 7,500,000 at 40 bps | 30,000 | - |
| Next 7,500,000 at 35 bps | 26,250 | - |
| **Total:** | **152,500** | **10,000** |

Morgan Stanley Wealth Management reserves the full discretion to review all Lending activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Lending Award or inconsistent with the interests of clients.

[19] Excluding Letters of Credit
[20] Excluding HELOC



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 2.3 Cash Management Award

The Cash Management Award is intended to reward Advisors for expanding Cash Management business consistent with the financial needs and investment objectives of clients. The program will consider Net New Cash Management Engaged Clients and Aggregate Cash Balance Growth across Cash Management Engaged clients.

*Cash Balance*: Combined average daily balance held in a Bank Deposit Program ("BDP"), Sweep Money Market Fund, available cash, and future cash products, such as Morgan Stanley Bank savings deposit, and/or term deposit products, as determined by the Firm. Ticketed Money Market Fund balances and Brokered Certificates of Deposit ("CDs") (including MSPBNA issued Brokered CDs) do not contribute to this cash balance.

*Eligible Clients*: Clients are uniquely identified and counted by party ID[21], which is associated with a Social Security Number ("SSN") or Tax Identification Number ("TIN"). Eligible account types include Single, Joint, Individual IRA, Sole Proprietorship, and Revocable Living Trust accounts[22].

*Cash Management Engaged ("CME")*: Eligible Clients[23] must meet the following requirements for three consecutive months to be considered CME. To maintain CME status, Eligible Clients must continue to meet these requirements in each subsequent month:

- Have at least $50,000 in average daily Cash Balance OR at least $5,000 in aggregate Direct Deposits each month; AND
- Engage in any two of the following five cash management activities each month:
  - Check written from and posted to client's Active Assets Account ("AAA")
  - Bill paid from Morgan Stanley Online or the Morgan Stanley Mobile App
  - Purchase transaction posted to client's Morgan Stanley Card from American Express
  - Purchase or ATM transaction posted to the client's Morgan Stanley Debit Card
  - Automated Clearing House ("ACH") payment or initiated funds transfer to an external account

*Net New CME Clients*: At a pre-split level, the number of Eligible Clients who are CME as of December 30th, 2016 compared to the number of Eligible Clients who were CME as of December 31st, 2015.

*Aggregate Cash Balance Growth*: At a post-split level, aggregate average daily cash balances of CME clients for the month of December 2016 compared to aggregate average daily cash balances of CME clients for the month of December 2015.

**Cash Management Award Eligibility Criteria**

- Advisors must meet all Growth Award Eligibility requirements as defined in Section 2.1; AND
- Have at least five (5) Net New CME Clients (at a pre-split level) at the end of 2016 with respect to 2015; AND
- Have at least $125,000 in Aggregate Cash Balance Growth for CME clients (at a post-split level) at the end of 2016 with respect to 2015

[21] In cases where a client does not have a SSN or TIN, a combination of date of birth, last name and legal address may be used
[22] Client must be an owner on a Single, Individual IRA, or Sole Proprietorship account; client must be a primary owner or secondary owner on a Joint account; client must be a Trustee on a Revocable Living Trust, unless Trustee and Grantor or Trustee and Beneficiary are the same person(s) on the account
[23] Employee and employee-related accounts must meet the Cash Management Engaged definition below



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### Cash Management Award Calculation

The Cash Management Award will be calculated based on the below Cash Management Award Schedule, using the lower of the Net New CME Client tier and the Aggregate Cash Balance Growth for CME Clients tier.

Cash Management Award Schedule

| Net New CME Clients | | Aggregate Cash Balance Growth for CME Clients ($) | Advisor Award ($) | Support Staff Recognition ($) |
|---|---|---|---|---|
| 50+ | | 1,250,000+ | 50,000 | 12,500 |
| 40 – 49 | | 1,000,000 – 1,249,999 | 40,000 | 10,000 |
| 30 – 39 | | 750,000 – 999,999 | 30,000 | 7,500 |
| 20 - 29 | AND | 500,000 – 749,999 | 20,000 | 5,000 |
| 15 – 19 | | 375,000 – 499,999 | 15,000 | 3,750 |
| 10 – 14 | | 250,000 – 374,999 | 10,000 | 2,500 |
| 5 – 9 | | 125,000 – 249,999 | 5,000 | 1,250 |

Subject to the terms and conditions described in this Section, Advisors with at least 50 CME clients AND at least 10% CME Client Penetration[24] at the end of 2016 will qualify for at minimum a $10,000 Advisor Award and a $2,500 Support Staff Recognition balance, but may qualify for a higher award.

### Support Staff Recognition

Advisors who meet the Cash Management Award Eligibility Criteria will have the opportunity to recommend the distribution of the Support Staff Recognition balance to one or more eligible support staff employee(s) for supporting growth in the Advisor's business during 2016. The Support Staff Recognition balance is based on the Advisor's Cash Management Award in 2016 and will be payable as cash, in the support staff compensation system in the first quarter of 2017.

Support Staff Recognition recipients must be in a support staff role that is eligible to receive compensation through AFG as of the date of payment, and both recipient and distributing Advisor must be employed by the Firm, in good standing, as of the date of payment. Firm management will make final decisions on eligibility, allocation, and distribution of any Support Staff Recognition balance.

### Cash Management Award Calculation Example (including Support Staff Recognition):

An Advisor has 35 Net New CME Clients and $1,250,000 in qualifying Aggregate Cash Balance Growth for CME Clients. Since the Net New CME Clients tier achieved is lower than the Aggregate Cash Balance Growth for CME Clients tier, the Advisor is eligible for the following award if the Advisor also meets the eligibility criteria as defined above:

Cash Management Award Calculation Example

| Net New CME Clients | Advisor Award ($) | Support Staff Recognition ($) |
|---|---|---|
| 30 - 39 | 30,000 | 7,500 |

Morgan Stanley Wealth Management reserves the full discretion to review all Cash Management activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Cash Management Award. Additionally, to the extent multiple Advisors service a client or account but it is not part of a JPN in which the Advisors all participate, Morgan Stanley Wealth Management reserves the right to make all calculation, eligibility and allocation decisions concerning that client/account, including, without limitation, the decision to treat the client/account as ineligible towards the Cash Management Award.

[24] Total Cash Management Engaged clients out of total clients in the Advisor's Addressable Book; Addressable Book is defined as all individual clients with ownership of at least one Single, Joint, Revocable Living Trust, Sole Proprietorship, or Individual Retirement Account; client must be the trustee, grantor and beneficiary on the trust account



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**SECTION 3: Other Programs**

## 3.1 Capital Accumulation Program

The Capital Accumulation Program ("CAP") provides the opportunity for eligible Advisors (including Producing Branch Managers and Resident Managers) to defer a portion of 2016 monthly cash compensation on a pre-tax basis (up to 25%, in 5% increments) into Morgan Stanley stock units ("Basic Units") and receive a number of bonus stock units based on the amount of Basic Units awarded ("Bonus Units").

Advisors are eligible to participate in CAP for 2016 if they achieved a minimum trailing 12-month Gross Revenue (through September 30th, 2015) of $400,000 and had a minimum of five years of LOS as of December 31st, 2015 (provided that, for Advisors who are Chairman's Club members as of December 2015, the minimum service requirement is three years).

Contribution elections, which cannot exceed $250,000 annually, or, for Chairman's Club members as of December 2015, $350,000 annually, must be made by the end of 2015.

Advisors who elect to participate in CAP will be awarded Bonus Units in an amount equal to either 25% (for Chairman's Club members as of December 2015) or 20% (for all other eligible Advisors) of the number of Basic Units awarded.

The Basic Units and Bonus Units will be granted on the 15th day of the month following the end of each calendar quarter, with the number of Basic Units awarded based on the amount of the deferral divided by the fair market value of a share of Morgan Stanley common stock on such date (which is generally the average of the closing prices of Morgan Stanley stock on each of the three month-ends preceding the grant date). Subject to the Advisor satisfying the terms and conditions of the award, the Basic Units will vest on the grant date, the Bonus Units will vest on April 15th, 2019, and the Basic Units and Bonus Units will convert to shares of Morgan Stanley common stock on April 15th, 2019.

Advisors must be continuously employed by the Firm through the grant date in order to be awarded the Basic Units and Bonus Units. Termination of employment for any reason prior to the Bonus Unit vesting date will generally result in the cancellation of all Bonus Units and, in general, the previously granted Basic Units will convert to shares of Morgan Stanley common stock on the original scheduled conversion date.

The Basic Units will not be subject to cancellation following grant, but Bonus Units will be subject to cancellation if the Advisor engages in certain prohibited activity prior to conversion as described in the award certificate. The stock units will also be subject to sales restrictions and other terms and conditions as set forth in the award certificate and the equity compensation plan under which the awards are granted.

Additional information may be found in the current prospectus, a copy of which may be obtained by accessing the Executive Compensation intranet website located at the following address: http://execcomp.corpms.com/site/execcomp/webapp/portfolio.jsp



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 3.2 Former Advisor Program ("FAP")

Exceptional client service is the foundation of our business, which is why Morgan Stanley Wealth Management offers flexibility and assistance to Advisors considering retirement from the industry.

The following five options, which may not be mutually exclusive, are currently offered through the FAP:

- **Individual Option** for Advisors with client accounts not under a Joint Production Agreement (JPA)
- **Joint Production Option** for Advisors servicing accounts under a JPA for the duration required by current applicable policy
- **Teaming Option** for Advisors who are members of a Registered Team, or Advisors who join and transition their book of business to a Registered Team, for the duration required by current applicable policy
  - Eligible to receive Team Compensation for 2, 3, or 4 years prior to retirement date, in addition to receiving Team Compensation Cash Credits on FAP
- **Enhanced Option** for Advisors who, for at least 2 years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
- **Platinum Option** for President's or Chairman's Club Advisors[25] who, for at least two years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
  - Eligible to receive a 2, 3, or 4 year bonus agreement equal to 50% of trailing 12-month Gross Revenue, prior to retirement date, in addition to the Enhanced Option FAP after retirement

For more information on eligibility and conduct requirements / restrictions for retiring Advisors ("Former Advisors") and Active Advisor participants, please refer to the Former Advisor Program 2016 - Guide located on the 2016 Advisor Compensation website on 3DR > Practice > Advisor Compensation 2016 or contact your local Human Resources representative.

*Please be advised that FAP is subject to SEC, FINRA, and state regulatory requirements. The terms of the FAP are subject to change at the discretion of Morgan Stanley Wealth Management for any reason, including changes in applicable regulatory or legal requirements pertaining to such programs.*

[25] Regardless of club designation, Advisors must have met the qualifying revenue criteria as described in the 2015 Financial Advisor / Private Wealth Advisor Compensation Plan, Growth Award and Recognition Program guide for President's and Chairman's club membership during the 2016 calendar year



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 3.3 Business Development Allowance ("BDA") Program

Under the Business Development Allowance ("BDA") Program, eligible Advisors will have access to corporate funds for business development purposes, such as client entertainment, seminars and/or marketing. At year-end, any unused BDA will be canceled and will not carry over into the following year. BDA allocations are determined in January 2016 and are based on 2015 Gross Revenue and the following schedule:

Business Development Allowance

| 2015 Gross Revenue ($) | Allowance ($) |
|---|---|
| 10,000,000+ | 25,000 |
| 5,000,000–9,999,999 | 20,000 |
| 2,500,000–4,999,999 | 15,000 |
| 1,650,000–2,499,999 | 12,000 |
| 1,100,000–1,649,999 | 10,000 |
| 825,000–1,099,999 | 5,000 |
| 550,000–824,999 | 3,000 |
| 440,000–549,999 | 1,000 |
| 330,000–439,999 | 500 |
| 0–329,999 | 250 |

Associate/FAAs generating Gross Revenue receive a BDA based on eligible Gross Revenue as per the policy above. Associate/FAAs who begin generating Gross Revenue in the current year receive a pro-rated BDA using the lowest revenue band.

The BDA allocation is subject to the Firm's policies and procedures for expenditures.

**Team BDA Transfer**

Advisors who are part of a Registered Team will have the ability to transfer BDA to other Advisors on their Registered Team, as well as certain qualified exempt support staff employees, during the AFG Election period in December 2015. Additional details can be found on the 2016 Advisor Compensation website.

### 3.4 Alternative Flexible Grid ("AFG") Program

The Alternative Flexible Grid ("AFG") is a mechanism through which Advisors, prior to the start of the calendar year, may elect an effective Credit Rate adjustment for the year and, based on the election, direct the Firm to provide additional compensation to support staff as well as additional resources above those necessary to perform Advisor duties. In order to participate in the AFG Program, the Advisor must have a minimum $200,000 in trailing 12-month eligible Gross Revenue (excludes 0% Revenue).

The AFG is calculated via the AFG worksheet prior to the start of the year. In this worksheet, the effective Credit Rate adjustment is calculated by determining expected additional support staff compensation and additional luxury resources. With Branch Manager approval, this effective Credit Rate adjustment will be applied to all transactions for the following calendar year. Upon the implementation of this Credit Rate adjustment, Incentive Compensation is determined as set forth in this Program.

The magnitude of the effective Credit Rate adjustment elected will determine the AFG amount. This amount will enable the Advisor to direct the Firm to provide additional support staff compensation and additional luxury resources. Any remaining balance at year-end will not be carried forward into the following year.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

*Standard Checkpoint:* Advisors will be provided one checkpoint in August 2016, during which time they will be granted an open window to change their effective Credit Rate adjustment for the time remaining in the calendar year. If a change is made during the Standard Checkpoint, a new AFG worksheet must be completed.

*Contingency Checkpoint:* In the event that a support staff employee, who is part of an Advisor's team, terminates from the Firm, the Advisor may elect to open the checkpoint window before August and forgo the Standard Checkpoint. Use of this option requires the Advisor to verify support staff termination, is subject to Branch/Complex manager approval and requires a new AFG worksheet to be completed.

All AFG arrangements will be canceled at the end of the calendar year, and Advisors must re-elect for the following calendar year. No balance will be carried forward into the following calendar year.

**Example:**

Advisor with trailing 11-month Gross Revenue of $550,000 and expected additional support staff compensation/additional luxury resources election of $11,000:

- The effective Credit Rate adjustment is determined by dividing the $11,000 expected additional support staff compensation/additional luxury resources by trailing 11-month Gross Revenue of $550,000. In this case, the Credit Rate adjustment is 2% ($11,000/$550,000)

Advisors will have the option to enter a maximum funding amount for 2016 AFG during the AFG Election period in December 2015. The maximum funding amount must be the greater of $10,000 OR 110% of the contribution budget determined during the AFG Election period in December 2015.

Additional details on the 2016 AFG program can be found on the 2016 Advisor Compensation website.

### 3.5 Discretionary Fee Waiver Allowance

The Discretionary Fee Waiver Allowance ("DFWA") is provided to Advisors to waive select account and service fees in client accounts. It is important to note that some of these fees are already waived as part of the Reserved Program. At year-end, any unused DFWA will be canceled and will not carry over into the following year. Allowances are based on 2015 Gross Revenue, as follows:

Discretionary Fee Waiver Allowance

| 2015 Gross Revenue ($) | Discretionary Fee Waiver Allowance ($) |
|---|---|
| 2,200,000+ | 4,000 |
| 1,650,0000–2,199,999 | 3,000 |
| 1,100,000–1,649,999 | 2,750 |
| 825,000–1,099,999 | 2,500 |
| 550,000–824,999 | 2,000 |
| 275,000–549,999 | 1,500 |
| 110,000–274,999 | 500 |
| 0–109,999 | 0 |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 4: Recognition Programs

### 4.1 Club Memberships for 2017

The Firm's recognition programs are designed to recognize outstanding performance by Advisors. In addition to demonstrated leadership in the best practices of wealth management, the Firm's recognition Club Members must be in good standing and satisfy other aspects of the Firm's performance, conduct and compliance standards and expectations, as determined by the Firm and Club Membership may be withdrawn, by the Firm, at any time, in its discretion.

At the beginning of 2017, Club Memberships will be assigned based on 2016 calendar year Gross Revenue OR 2016 calendar year Total Revenue Premium, as well as LOE and Assets Under Management ("AUM") for Pacesetter's Club only, as follows:

Club Memberships

| Club Type | Qualifying Criteria |
|---|---|
| Chairman's Club | Rank amongst the top 2% of the Advisor population in Gross Revenue for 2016 OR amongst the top 2% in Total Revenue Premium for 2016 |
| President's Club | Rank amongst the next 5% of the Advisor population (after Chairman's Club) in Gross Revenue for 2016 OR amongst the next 5% in Total Revenue Premium for 2016 |
| Master's Club | Rank amongst the next 10% of the Advisor population (after President's Club) in Gross Revenue for 2016 OR amongst the next 10% in Total Revenue Premium for 2016 |
| Century Club | Rank in the next 10% of the Advisor population (after Master's Club) in Gross Revenue for 2016 OR amongst the next 10% in Total Revenue Premium for 2016 |
| Pacesetter's Club (Only Advisors with an LOE of 5 or below will be eligible for this Club) | Achieve minimum Gross Revenue of $100,000 OR minimum Total Revenue Premium of $140,000 AND minimum AUM of $8,000,000 for Advisors with an LOE of 0, 1 |
| | Achieve minimum Gross Revenue of $200,000 OR minimum Total Revenue Premium of $280,000 AND minimum AUM of $15,000,000 for Advisors with an LOE of 2 |
| | Achieve minimum Gross Revenue of $250,000 OR minimum Total Revenue Premium of $350,000 AND minimum AUM of $20,000,000 for Advisors with an LOE of 3 |
| | Achieve minimum Gross Revenue of $300,000 OR minimum Total Revenue Premium of $420,000 AND minimum AUM of $25,000,000 for Advisors with an LOE of 4 |
| | Achieve minimum Gross Revenue of $350,000 OR minimum Total Revenue Premium of $490,000 AND minimum AUM of $30,000,000 for Advisors with an LOE of 5 |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

DOLAR0128

## 4.2 Titles

In addition to specific recognition clubs, the Firm also grants titles to recognize the outstanding performance of Morgan Stanley Wealth Management Advisors. Titles are awarded based on achievement of specific Gross Revenue or Total Revenue Premium levels and the maintenance of high standards of the Firm, including being in good standing and satisfying the Firm's expectations for excellence in all areas, including, but not limited to, guardianship, personal conduct, and adherence to regulatory and compliance requirements. Titles may be changed or withdrawn at any time by the Firm, in its discretion.

**Managing Director, Wealth Management**

Eligibility: Minimum cumulative Gross Revenue of $8,800,000 OR Total Revenue Premium of $12,300,000 over the last three years.

Advisors who meet the 3-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Managing Director, Wealth Management title.

Additional criteria for Managing Director, Wealth Management includes:

- Exhibiting leadership both externally and internally
- Being an ambassador and role model of Morgan Stanley Wealth Management's vision and business principles
- Pursuing excellence and holding self and others to the highest standards
- Consistently exemplifying high standards of corporate guardianship

**Executive Director**

Eligibility: Minimum cumulative Gross Revenue of $4,400,000 OR Total Revenue Premium of $6,150,000 over the last two years.

Advisors who meet the 2-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Executive Director title.

**Senior Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $1,100,000 OR Total Revenue Premium of $1,550,000

**First Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $825,000 OR Total Revenue Premium of $1,150,000

**Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $550,000 OR Total Revenue Premium of $770,000

**Associate Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $440,000 OR Total Revenue Premium of $615,000



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 5: Other

## 5.1 Summary and Additional Information

Morgan Stanley Wealth Management provides one of the most comprehensive Advisor Compensation Plan, Growth Award and Recognition Programs in the securities industry.

This brochure summarizes the Morgan Stanley Wealth Management Advisor Compensation Plan, Growth Award and Recognition Programs in effect for 2016 unless otherwise noted. Morgan Stanley Wealth Management reserves the right to amend, modify, interpret or terminate all or any part of the Program for any year and at any time. Nothing in this brochure is a guarantee of continued employment or of any particular benefits or level of remuneration.

This Compensation Plan and the additional product guidelines and policies referenced in this Compensation Plan set forth guidelines only. Notwithstanding anything to the contrary contained in this Compensation Plan or elsewhere, Morgan Stanley Wealth Management has the sole discretion to determine whether to allocate Credit to an Advisor's Gross Revenue (or to provide compensation in any form) for any particular business and, if so, the amount of Credit to be allocated or the amount of compensation to be awarded, and further Morgan Stanley Wealth Management may adjust and/or decline to award future Credits towards Incentive Compensation where an Advisor has an unsatisfied obligation to the Firm. Under no circumstances is an Advisor eligible to receive any Credit to Gross Revenue or any compensation for any particular business unless and until Morgan Stanley Wealth Management receives the revenue associated with that business. Furthermore, if an Advisor is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy, regulation or otherwise counter to the best interests of our clients, then such Advisor may be deemed, in Morgan Stanley's discretion, not to have qualified for compensation, growth awards or any bonus program listed herein. If an Advisor's employment terminates for any reason before Morgan Stanley Wealth Management receives the revenue for any particular business, the Advisor will not be eligible for any Credit to Gross Revenue or any compensation associated with that business and, in the event Morgan Stanley Wealth Management ultimately refunds all or a portion of such revenue for any reason, any associated Incentive Compensation paid on the basis of such revenue shall be deemed an overpayment to the Advisor. Additionally, an Advisor must be employed in good standing at the time that Morgan Stanley Wealth Management receives the revenue to be eligible for any Credit to Gross Revenue or any compensation associated with that business.

Morgan Stanley Wealth Management retains the full discretion and authority to interpret, modify, and/or terminate the Compensation Plan, or any of the individual guidelines described in the Compensation Plan, at any time, with or without notice, and to resolve any dispute arising out of or in any way related to the Compensation Plan. Morgan Stanley Wealth Management's interpretations and decisions shall be final and binding on all parties.

The information contained in this brochure briefly describes certain employee compensation programs and deferred incentive compensation awards and other arrangements. It is important to note that this brochure merely summarizes the provisions of those programs, awards and plans, and does not address all of their terms, conditions and restrictions. Advisors should consult the pertinent compensation program, plan document or award certificate for a full explanation of their provisions. If there is a conflict between this brochure and any formal compensation program, deferred compensation plan, plan document or award certificate, then the formal program, plan document or award certificate will control. All compensation and recognition plans are subject to changes due to tax laws and other legal requirements or at the discretion of Morgan Stanley Wealth Management.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 5.2 Version History

This section tracks changes made to the Advisor Compensation Plan, Growth Award and Recognition Programs during 2016. The table below documents the date, page number and a brief description of the change for easy reference.

| Date | Page Number | Description |
|---|---|---|
| November 16, 2015 | | Initial Publication |
| December 1, 2015 | 27 | Clarification to Club Membership language |
| December 21, 2015 | 2 | Update to State Minimum Salaries |
| December 30, 2015 | 12 | Update to Small Household language |
| February 29, 2016 | 13 | Update to Small Household exceptions |
| February 29, 2016 | 27 | Update to Club Memberships language |
| March 10, 2016 | 16 | Addition to Compensation Programs – Inherited Accounts |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# MORGAN STANLEY

## 2007 EQUITY INCENTIVE COMPENSATION PLAN

## WEALTH MANAGEMENT
## FINANCIAL ADVISOR/PRIVATE WEALTH ADVISOR AWARDS

## 2016 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE FOR STOCK UNITS

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# TABLE OF CONTENTS FOR AWARD CERTIFICATE


1. Stock units generally. ........ 3
2. Vesting schedule and conversion. ........ 3
3. Special provision for certain employees. ........ 4
4. Dividend equivalent reinvestment. ........ 4
5. Death, Disability and Retirement/Full Career Retirement. ........ 5
6. Involuntary termination by the Firm. ........ 6
7. Governmental Service. ........ 6
8. Specified employees. ........ 7
9. Cancellation of awards under certain circumstances. ........ 7
10. Tax and other withholding obligations. ........ 8
11. Obligations you owe to the Firm. ........ 9
12. Nontransferability. ........ 9
13. Designation of a beneficiary. ........ 9
14. Ownership and possession. ........ 10
15. Securities law compliance matters. ........ 10
16. Compliance with laws and regulation. ........ 11
17. No entitlements. ........ 11
18. Consents under local law. ........ 11
19. Award modification. ........ 12
20. Governing law. ........ 12
21. Defined terms. ........ 12


CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# MORGAN STANLEY

## 2016 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE FOR STOCK UNITS

Morgan Stanley has awarded you retention stock units as part of your incentive compensation for services provided during 2016 and as an incentive for you to remain in Employment and provide services to the Firm through the Scheduled Vesting Date. This Award Certificate sets forth the general terms and conditions of your 2016 stock unit award. The number of stock units in your award has been communicated to you independently.

If you are employed outside the United States, you will also receive an "***International Supplement***" that contains supplemental terms and conditions for your 2016 stock unit award. You should read this Award Certificate in conjunction with the International Supplement, if applicable, in order to understand the terms and conditions of your stock unit award.

Your stock unit award is made pursuant to the Plan. References to "stock units" in this Award Certificate mean only those stock units included in your 2016 stock unit award, and the terms and conditions herein apply only to such award. If you receive any other award under the Plan or another equity compensation plan, it will be governed by the terms and conditions of the applicable award documentation, which may be different from those herein.

The purpose of the 2016 stock unit award is, among other things, to align your interests with the interests of the Firm and Morgan Stanley's stockholders, to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. In view of these purposes, you will earn your 2016 stock unit award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), (2) do not engage in any Prohibited Activity ***and*** (3) satisfy obligations you owe to the Firm as set forth in Section 11 below. Even if your award has vested, you will have no right to your award if you engage in any Prohibited Activity. As Morgan Stanley deems appropriate, it will require you to provide a written certification or other evidence, from time to time in its sole discretion, to confirm that no Prohibited Activity has occurred, including upon a termination of Employment and/or during a specified period of time prior to the Scheduled Conversion Date. If you fail to timely provide any required certification or other evidence, Morgan Stanley will cancel your award. It is your responsibility to provide the Executive Compensation Department with your up-to-date contact information.

Capitalized terms used in this Award Certificate that are not defined in the text have the meanings set forth in Section 21 below. Capitalized terms used in this Award Certificate that are not defined in the text or in Section 21 below have the meanings set forth in the Plan.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

1. **Stock units generally.**

Each of your stock units corresponds to one share of Morgan Stanley common stock. A stock unit constitutes a contingent and unsecured promise of Morgan Stanley to pay you one share of Morgan Stanley common stock on the conversion date for the stock unit. As the holder of stock units, you have only the rights of a general unsecured creditor of Morgan Stanley. You will not be a stockholder with respect to the shares of Morgan Stanley common stock corresponding to your stock units unless and until your stock units convert to shares.

2. **Vesting schedule and conversion.**

**(a)** ***Vesting schedule.*** Except as otherwise provided in this Award Certificate, your stock units will vest on the Scheduled Vesting Date. Except as otherwise provided in this Award Certificate, your stock units will vest only if you continue to provide future services to the Firm by remaining in continuous Employment through the Scheduled Vesting Date and providing value added services to the Firm during this timeframe. The special vesting terms set forth in Sections 5, 6 and 7 of this Award Certificate apply (i) if your Employment terminates by reason of your death or Disability, (ii) upon your Retirement or Full Career Retirement (as applicable), (iii) if the Firm terminates your employment in an involuntary termination under the circumstances described in Section 6 or (iv) upon a Governmental Service Termination. Vested stock units remain subject to the cancellation and withholding provisions set forth in this Award Certificate.

**(b)** ***Conversion.*** Except as otherwise provided in this Award Certificate, your stock units will, to the extent vested, convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date, with any fractional shares to be distributed in cash. The special conversion provisions set forth in Sections 5(a), 5(b), 5(d) and 7 of this Award Certificate apply (i) if your Employment terminates by reason of your death or you die after termination of your Employment, (ii) upon your Retirement or Full Career Retirement (as applicable) under the circumstances set forth in Section 5(d) or (iii) upon your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 7(b).

The shares delivered upon conversion of stock units pursuant to this Section 2(b) will not be subject to any transfer restrictions, other than those that may arise under the securities laws, the Firm's policies or Section 11 below, or to cancellation under the circumstances set forth in Section 9(c).



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(c) *Accelerated conversion.* Morgan Stanley shall have no right to accelerate the conversion of any of your stock units, except to the extent that such acceleration is not prohibited by Section 409A and would not result in your being required to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or your incurring additional tax or interest under Section 409A. If any stock units are converted to shares of Morgan Stanley common stock prior to the Scheduled Conversion Date pursuant to this Section 2(c), these shares may not be transferable and may remain subject to applicable vesting, cancellation and withholding provisions, as determined by Morgan Stanley.

(d) *Rule of construction for timing of conversion.* Whenever this Award Certificate provides for your stock units to convert to shares on the Scheduled Conversion Date or upon a different specified event or date, such conversion will be considered to have been timely made, and neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages based on a delay in conversion of your stock units (or delivery of Morgan Stanley shares following conversion) and the Firm shall have no liability to you (or to any of your beneficiaries or your estate) in respect of any such delay, as long as conversion is made by December 31st of the year in which occurs the Scheduled Conversion Date or such other specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date. Similarly, neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate), based on any acceleration of the conversion of your stock units pursuant to Section 2(c), as applicable.

**3. Special provision for certain employees.**

Notwithstanding the other provisions of this Award Certificate, if Morgan Stanley considers you to be one of its executive officers at the time provided for the conversion of your vested stock units and determines that your compensation may not be fully deductible by virtue of Section 162(m) of the Internal Revenue Code, Morgan Stanley shall delay payment of the nondeductible portion of your compensation, including delaying, to the extent nondeductible, conversion of the stock units, unless the Committee, in its sole discretion, determines not to delay such conversion. This delay will continue until your Separation from Service or, to the extent permitted under Section 409A, the end of the first earlier taxable year of the Firm as of the last day of which you are no longer an executive officer (subject to earlier conversion in the event of your death as described below).

**4. Dividend equivalent reinvestment.**

If Morgan Stanley pays a regular or ordinary dividend on its common stock, a dividend equivalent will be credited with respect to your vested and unvested stock units outstanding on the dividend record date and reinvested in the form of additional stock units. The additional number of stock units credited to you as a result of this dividend reinvestment shall equal:

(i) the cash dividend paid on one share of Morgan Stanley common stock, *multiplied by*



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(ii) the number of stock units subject to your 2016 stock unit award on the applicable dividend record date; with the product of (i) and (ii), *divided by*

(iii) the fair market value of a share of Morgan Stanley common stock on the dividend payment date, as determined by Morgan Stanley in its sole discretion.

Morgan Stanley will credit the dividend equivalents when it pays the corresponding dividend on its common stock. The additional stock units credited to you as a result of the reinvestment of dividend equivalents will vest and convert at the same time as, and be subject to the same vesting and cancellation provisions set forth in this Award Certificate with respect to, the corresponding stock units, and references to "stock units" in this Award Certificate shall include such additional stock units credited to you as a result of the reinvestment of dividend equivalents described in this Section 4. The decision to pay a dividend and, if so, the amount of any such dividend, is determined by Morgan Stanley in its sole discretion. No dividend equivalents will be paid to you on any canceled stock units.

**5. Death, Disability and Retirement/Full Career Retirement.**

The following special vesting and payment terms apply to your stock units:

**(a)** ***Death during Employment.*** If your Employment terminates due to death, all of your unvested stock units will vest on the date of your death. Your stock units will convert to shares of Morgan Stanley common stock and be delivered to the beneficiary you have designated pursuant to Section 13 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

After your death, the cancellation provisions set forth in Section 9(c) will no longer apply, and the shares delivered upon conversion of stock units pursuant to this Section 5(a) will not be subject to any transfer restrictions (other than those that may arise under the securities laws or the Firm's policies).

**(b)** ***Death after termination of Employment.*** If you die after the termination of your Employment but prior to the Scheduled Conversion Date, any vested stock units that you held at the time of your death will convert to shares of Morgan Stanley common stock and be delivered to the beneficiary you have designated pursuant to Section 13 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

After your death, the cancellation provisions set forth in Section 9 will no longer apply, and the shares delivered upon conversion of stock units pursuant to this Section 5(b) will not be subject to any transfer restrictions (other than those that may arise under the securities laws or the Firm's policies).

**(c)** ***Disability.*** If your Employment terminates due to Disability, all of your unvested stock units will vest on the date your Employment terminates. Your stock units will



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

**(d)** ***Retirement/Full Career Retirement.*** If your Employment terminates as a result of your Retirement or Full Career Retirement (as applicable), (i) all of your unvested stock units will vest on the date your Employment terminates and (ii) your stock units will convert to shares of Morgan Stanley common stock, and the cancellation provisions will lift, on the Scheduled Conversion Date; *provided* that, if you satisfy the conditions for a Retirement or a Full Career Retirement (as applicable) upon your Separation from Service, 50% of your stock units will convert, and the cancellation provisions with respect to such units will lift, on the first business day of the month following the first anniversary of your Separation from Service and the remaining 50% of your stock units will convert, and the cancellation provisions with respect to such units will lift, on the first business day of the month following the second anniversary of your Separation from Service, subject to earlier conversion on the Scheduled Conversion Date.

**6. <u>Involuntary termination by the Firm</u>.**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, your unvested stock units will vest on the date your employment with the Firm terminates and your stock units will convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date, *provided* that you sign an agreement and release satisfactory to the Firm. If you do not sign such an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your involuntary termination as described in this Section 6, any stock units that were unvested immediately prior to your termination shall be canceled. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

**7. <u>Governmental Service</u>.**

**(a)** ***General treatment of awards upon Governmental Service Termination.*** If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 7(c), all of your unvested stock units will vest on the date of your Governmental Service Termination. Your vested stock units will convert to shares of Morgan Stanley common stock on the date of your Governmental Service Termination.

**(b)** ***General treatment of vested awards upon acceptance of employment at a Governmental Employer following termination of Employment.*** If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 7(c), all of your outstanding vested stock units will convert to shares of Morgan Stanley common stock upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence demonstrating that as a result of such employment the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**(c)** ***Repayment obligation.*** If any Prohibited Activity occurs within the applicable period of time that would have resulted in cancellation of all or a portion of your stock units had they not converted to shares pursuant to Sections 7(a) or 7(b) above, you will be required to pay to Morgan Stanley an amount equal to:

> **(1)** the number of stock units that would have been canceled upon the occurrence of such Prohibited Activity multiplied by the fair market value, determined using a valuation methodology established by Morgan Stanley, of Morgan Stanley common stock on the date your stock units converted to shares of Morgan Stanley common stock; plus
>
> **(2)** interest on the amount described in clause (1) above at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date of such conversion through the date preceding the payment date.

**8. Specified employees.**

Notwithstanding any other terms of this Award Certificate, if Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service, any conversion of your stock units that otherwise would occur upon your Separation from Service (including, without limitation, stock units whose conversion was delayed due to Section 162(m) of the Internal Revenue Code, as provided in Section 3) will be delayed until the first business day following the date that is six months after your Separation from Service; *provided, however*, that in the event that your death, your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 7(b) occurs at any time after the Date of the Award, conversion and payment will be made in accordance with Section 5(a), 5(b) or 7, as applicable.

**9. Cancellation of awards under certain circumstances.**

**(a)** ***Cancellation of unvested awards.*** Your unvested stock units will be canceled if your Employment terminates for any reason other than death, Disability, a Retirement, an involuntary termination by the Firm described in Section 6 or a Governmental Service Termination.

**(b)** ***General treatment of vested awards.*** Except as otherwise provided in this Award Certificate, your vested stock units will convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

**(c)** ***Cancellation of awards under certain circumstances.*** This Section 9(c) is designed, among other things, to incentivize compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

business interests, and to ensure an orderly transition of responsibilities. This Section 9(c) shall apply notwithstanding any other terms of this Award Certificate (except where sections in this Award Certificate specifically provide that the cancellation events set forth in this Section 9(c) no longer apply).

Your stock units, even if vested, are not earned until the Scheduled Conversion Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 11 below) and, unless prohibited by applicable law, will be canceled in full, or in the case of clause (3) of a Clawback Cancellation Event, in full or in part, until the Scheduled Conversion Date if any Prohibited Activity occurs. Although you will become the beneficial owner of shares underlying your stock units following conversion of your stock units, the Firm may retain custody of your shares following conversion of your stock units pending any investigation or other review that impacts the determination as to whether the stock units are cancellable and, in such an instance, the shares underlying such stock units shall be forfeited in the event the Firm determines that the stock units were cancellable.

**10. Tax and other withholding obligations.**

Any vesting, whether on the Scheduled Vesting Date or some other date, of a stock unit award, and any conversion of a stock unit award or crediting of dividend equivalents, shall be subject to the Firm's withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation to you, including by canceling or accelerating payment of a portion of this award in an amount not to exceed such taxes imposed upon such vesting, conversion or crediting and any additional taxes imposed as a result of such cancellation or acceleration, and to take such other action as the Firm may deem advisable to enable it and you to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting or conversion of your stock units or the crediting of dividend equivalents. However, the Firm may not deduct or withhold such sum from any payroll or any other payment or compensation (including from your award), except to the extent it is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or to incur interest or additional tax under Section 409A.

Pursuant to rules and procedures that Morgan Stanley establishes, you may elect to satisfy the tax or other withholding obligations arising upon conversion of your stock units by having Morgan Stanley withhold shares of Morgan Stanley common stock in an amount sufficient to satisfy the tax or other withholding obligations. Shares withheld will be valued using the fair market value of Morgan Stanley common stock on the date your stock units convert (or such other appropriate date determined by Morgan Stanley based on local legal, tax or accounting rules and practices) using a valuation methodology established by Morgan Stanley. In order to comply with applicable accounting standards or the Firm's policies in effect from time to time, Morgan Stanley may limit the amount of shares that you may have withheld.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**11. Obligations you owe to the Firm.**

As a condition to the earning, conversion or distribution of your award, the Firm may require you to pay such sum to the Firm as may be necessary to satisfy any obligation that you owe to the Firm. Notwithstanding any other provision of this Award Certificate, your award, even if vested or converted, is not earned until after such obligations and any tax withholdings or other deductions required by law are satisfied. Notwithstanding the foregoing, Morgan Stanley may not reduce the number of shares to be delivered upon conversion of your stock units or delay the payment of your award to satisfy obligations that you owe to the Firm except (i) to the extent authorized under Section 10, relating to tax and other withholding obligations or (ii) to the extent such reduction or delay is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or to incur additional tax or interest under Section 409A.

Morgan Stanley's determination of any amount that you owe the Firm shall be conclusive. The fair market value of Morgan Stanley common stock for purposes of the foregoing provisions shall be determined using a valuation methodology established by Morgan Stanley.

**12. Nontransferability.**

You may not sell, pledge, hypothecate, assign or otherwise transfer your award, other than as provided in Section 13 (which allows you to designate a beneficiary or beneficiaries in the event of your death) or by will or the laws of descent and distribution. This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise. During your lifetime, payments relating to your award will be made only to you.

Your personal representatives, heirs, legatees, beneficiaries, successors and assigns, and those of Morgan Stanley, shall all be bound by, and shall benefit from, the terms and conditions of your award.

**13. Designation of a beneficiary.**

You may make a written designation of beneficiary or beneficiaries to receive all or part of your award to be delivered or paid under this Award Certificate in the event of your death. To make a beneficiary designation, you must complete and submit the Beneficiary Designation form on the Executive Compensation website.

Any shares that become deliverable upon your death, and as to which a designation of beneficiary is not in effect, will be distributed to your estate.

If you previously filed a designation of beneficiary form for your equity awards with the Executive Compensation Department, such form will also apply to all of your equity awards, including this award. You may replace or revoke your beneficiary designation at any time. If there is any question as to the legal right of any beneficiary to receive shares or payments under this award, Morgan Stanley may determine in its sole discretion to deliver the shares or make the payments in question to your estate. Morgan Stanley's determination shall be



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

binding and conclusive on all persons and it will have no further liability to anyone with respect to this award.

**14. Ownership and possession.**

**(a)** ***Before conversion.*** Generally, you will not have any rights as a stockholder in the shares of Morgan Stanley common stock corresponding to your stock units unless and until your stock units convert to shares.

If Morgan Stanley contributes shares of Morgan Stanley common stock corresponding to your stock units to a grantor trust it has established, you may be permitted to direct the trustee how to vote the shares in the trust corresponding to your stock units. Voting rights, if any, are governed by the terms of the grantor trust and Morgan Stanley may amend any such voting rights, in its sole discretion, at any time. Morgan Stanley is under no obligation to contribute shares corresponding to stock units to a trust. If Morgan Stanley elects not to contribute shares corresponding to your stock units to a trust, you will not have voting rights with respect to shares corresponding to your stock units until your stock units convert to shares.

**(b)** ***Following conversion.*** Subject to Section 9(c), following conversion of your stock units you will be the beneficial owner of the shares of Morgan Stanley common stock issued to you, and you will be entitled to all rights of ownership, including voting rights and the right to receive cash or stock dividends or other distributions paid on the shares.

**(c)** ***Custody of shares.*** Morgan Stanley may maintain possession of the shares subject to your award until such time as your shares are no longer subject to restrictions on transfer.

**15. Securities law compliance matters.**

Morgan Stanley may affix a legend to any stock certificates representing shares of Morgan Stanley common stock issued upon conversion of your stock units (and any stock certificates that may subsequently be issued in substitution for the original certificates). The legend will read substantially as follows:

> **THE SHARES REPRESENTED BY THIS STOCK CERTIFICATE WERE ISSUED PURSUANT TO THE MORGAN STANLEY 2007 EQUITY INCENTIVE COMPENSATION PLAN AND ARE SUBJECT TO THE TERMS AND CONDITIONS THEREOF AND OF AN AWARD CERTIFICATE FOR STOCK UNITS AND ANY SUPPLEMENT THERETO.**
>
> **THE SECURITIES REPRESENTED BY THIS STOCK CERTIFICATE MAY BE SUBJECT TO RESTRICTIONS ON TRANSFER BY VIRTUE OF THE SECURITIES ACT OF 1933.**
>
> **COPIES OF THE PLAN, THE AWARD CERTIFICATE FOR STOCK UNITS AND ANY SUPPLEMENT THERETO ARE AVAILABLE THROUGH THE EXECUTIVE COMPENSATION DEPARTMENT.**



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley may advise the transfer agent to place a stop order against such shares if it determines that such an order is necessary or advisable.

**16. Compliance with laws and regulation.**

Any sale, assignment, transfer, pledge, mortgage, encumbrance or other disposition of shares issued upon conversion of your stock units (whether directly or indirectly, whether or not for value, and whether or not voluntary) must be made in compliance with any applicable constitution, rule, regulation or policy of any of the exchanges or associations or other institutions with which the Firm or a Related Employer has membership or other privileges, and any applicable law or applicable rule or regulation of any governmental agency, self-regulatory organization or state or federal regulatory body.

**17. No entitlements.**

**(a)** ***No right to continued Employment.*** This award is not an employment agreement, and nothing in this Award Certificate, the International Supplement, if applicable, or the Plan shall alter your status as an "at-will" employee of the Firm or your employment status at a Related Employer. None of this Award Certificate, the International Supplement, if applicable, or the Plan shall be construed as guaranteeing your employment by the Firm or a Related Employer, or as giving you any right to continue in the employ of the Firm or a Related Employer, during any period (including without limitation the period between the Date of the Award and the Scheduled Vesting Date or Scheduled Conversion Date, or any portion of any of these periods), nor shall they be construed as giving you any right to be reemployed by the Firm or a Related Employer following any termination of Employment.

**(b)** ***No right to future awards.*** This award, and all other awards of stock units and other equity-based awards, are discretionary. This award does not confer on you any right or entitlement to receive another award of stock units or any other equity-based award at any time in the future or in respect of any future period.

**(c)** ***No effect on future employment compensation.*** Morgan Stanley has made this award to you in its sole discretion. This award does not confer on you any right or entitlement to receive compensation in any specific amount, a stock unit award or any other award for any future period, and does not diminish in any way the Firm's discretion to determine the amount, if any, of future bonuses or other compensation. This award is not part of your base salary or wages and will not be taken into account in determining any other employment-related rights you may have, such as rights to pension or severance pay.

**18. Consents under local law.**

Your award is conditioned upon the making of all filings and the receipt of all consents or authorizations required to comply with, or required to be obtained under, applicable local law.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**19. Award modification.**

Morgan Stanley reserves the right to modify or amend unilaterally the terms and conditions of your award, without first asking your consent, or to waive any terms and conditions that operate in favor of Morgan Stanley. These amendments may include (but are not limited to) changes that Morgan Stanley considers necessary or advisable as a result of changes in any, or the adoption of any new, Legal Requirement. Morgan Stanley may not modify your award in a manner that would materially impair your rights in your award without your consent; *provided, however*, that Morgan Stanley may, but is not required to, without your consent, amend or modify your award in any manner that Morgan Stanley considers necessary or advisable to (i) comply with any Legal Requirement, (ii) ensure that your award does not result in an excise or other supplemental tax on the Firm under any Legal Requirement, or (iii) ensure that your award is not subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to conversion of your stock units to shares or delivery of such shares following conversion. Morgan Stanley will notify you of any amendment of your award that affects your rights. Any amendment or waiver of a provision of this Award Certificate (other than any amendment or waiver applicable to all recipients generally), which amendment or waiver operates in your favor or confers a benefit on you, must be in writing and signed by the Chief Human Resources Officer (or if such position no longer exists, by the holder of an equivalent position) to be effective.

**20. Governing law.**

This Award Certificate and the related legal relations between you and Morgan Stanley will be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts or choice of law, rule or principle that might otherwise refer the interpretation of the award to the substantive law of another jurisdiction.

**21. Defined terms.**

For purposes of this Award Certificate, the following terms shall have the meanings set forth below:

**(a)** "***Access Person***" means an individual designated by the Firm's Compliance Department as an "access employee" or "access person", which, for example, currently includes all Managing Directors of the Firm.

**(b)** "***Board***" means the Board of Directors of Morgan Stanley.

**(c)** "***Cause***" means:

**(1)** any act or omission which constitutes a breach of your obligations to the Firm, including, without limitation, (A) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (B) your failure to comply with the Firm's compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you;



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(2) your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

(3) your violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules or regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (3) of Clawback Cancellation Event set forth below and is deliberate, intentional or willful.

(d) "***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(1) causes a restatement of the Firm's consolidated financial results;

(2) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(3) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

(a) violation of business unit, product or desk specific risk parameters;

(b) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(c) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(d) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (3) and you do not engage in any other Prohibited Activity described herein, the number of stock units comprising your 2016 stock unit award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**(e)** "***Committee***" means the Compensation, Management Development and Succession Committee of the Board, any successor committee thereto or any other committee of the Board appointed by the Board with the powers of the Committee under the Plan, or any subcommittee appointed by such Committee.

**(f)** "***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

**(g)** "***Date of the Award***" means January 18, 2017.

**(h)** You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

**(i)** "***Disability***" means termination of Employment due to a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are Disabled.

**(j)** "***Employed***" and "***Employment***" refer to employment with the Firm and/or Related Employment.

**(k)** The "***Firm***" means Morgan Stanley (including any successor thereto) together with its subsidiaries and affiliates. For purposes of the definitions of "Cause," "Defamatory or Disparaging Comments," "Non-Public, Privileged or Confidential Information or Trade Secrets" and "Unauthorized Disclosures" set forth in this Award Certificate, references to the "Firm" shall refer severally to the Firm as defined in the preceding sentence and your Related Employer, if any. For purposes of the definition of "Prohibited Activity" set forth in this Award Certificate, references to the "Firm" shall refer to the Firm as defined in the second preceding sentence or your Related Employer, as applicable.

**(l)** If you are a Private Wealth Management Private Wealth Advisor, "***Full Career Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death, a Governmental Service Termination or pursuant to a Qualifying Termination, on or after the date on which:

**(1)** you have attained age 50 and completed at least 12 years of service as a Managing Director of the Firm or equivalent officer title; or



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**(2)** you have attained age 50 and completed at least 15 years of service as an officer of the Firm at the level of Vice President or equivalent officer title or above; or

**(3)** you have completed at least 20 years of service with the Firm; or

**(4)** you have attained age 55 and have completed at least 5 years of service with the Firm and the sum of your age and years of service equals or exceeds 65.

For the purposes of the foregoing definition, service with the Firm will include any period of service with the following entities and any of their predecessors:

(i) AB Asesores ("***ABS***") prior to its acquisition by the Firm (*provided* that only years of service as a partner of ABS shall count towards years of service as an officer);

(ii) Morgan Stanley Group Inc. and its subsidiaries ("***MS Group***") prior to the merger with and into Dean Witter, Discover & Co.;

(iii) Miller Anderson & Sherrerd, L.L.P. prior to its acquisition by MS Group;

(iv) Van Kampen Investments Inc. and its subsidiaries prior to its acquisition by MS Group;

(v) FrontPoint Partners LLC and its subsidiaries prior to its acquisition by the Firm;

(vi) Lend Lease Corporation Limited and its subsidiaries prior to the acquisition of certain of its assets by the Firm; and

(vii) Dean Witter, Discover & Co. and its subsidiaries ("***DWD***") prior to the merger of Morgan Stanley Group Inc. with and into Dean Witter, Discover & Co.;

*provided* that, in the case of an employee who has transferred employment from DWD to MS Group or vice versa, a former employee of DWD will receive credit for employment with DWD only if he or she transferred directly from DWD to Morgan Stanley & Co. Incorporated or its affiliates subsequent to February 5, 1997, and a former employee of MS Group will receive credit for employment with MS Group only if he or she transferred directly from MS Group to Morgan Stanley DW Inc. or its affiliates subsequent to February 5, 1997.

**(m)** "***Governmental Employer***" means a governmental department or agency, self-regulatory agency or other public service employer.

**(n)** "***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

new employment, the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

(o) "***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder.

(p) "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

(q) "***Non-Public, Privileged or Confidential Information or Trade Secrets***" means the Firm's books and records; holding book or customer book pages; the names, addresses, telephone numbers and assets and obligations carried in the account of the Firm's customers; computer software or hardware for use in computer or word processing equipment; all training material provided to you; documents or computer programs prepared or generated by you through use of Firm records and any information that is classified as confidential in the Firm's Global Policy on Confidential Information; *provided*, *however*, that "Non-Public, Privileged or Confidential Information or Trade Secrets" shall include, without limitation, any books, papers, records, electronic communications, videotapes or recordings related to any of the foregoing, including copies.

(r) "***Plan***" means the 2007 Equity Incentive Compensation Plan, as amended.

(s) "***Prohibited Activity***" means you:

(1) at any time prior to the Scheduled Conversion Date, (a) use for the benefit of any person or entity other than the Firm, or disclose to any third party, any Non-Public, Privileged or Confidential Information or Trade Secrets; (b) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm; (c) engage in any other conduct in violation of any contractual or legal obligations to the Firm; or (d) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information;

(2) at any time prior to the Scheduled Conversion Date, (a) are terminated for Cause; or (b) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Conversion Date); or (c) following termination of your Employment, the Firm determines that you could have been terminated for Cause;

(3) without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Conversion Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

of Employment, in any capacity in a retail branch or in a retail sales or product representative position;

**(4)** without the written consent of the Firm, before the earlier to occur of two years after your termination of Employment and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (a) any of the Firm's customers who were serviced by you while employed by the Firm; or (b) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment;

**(5)** without the written consent of the Firm, before the earlier to occur of three years after your termination of Employment and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm);

**(6)** at any time prior to the Scheduled Conversion Date, without the written consent of the Firm, make Unauthorized Disclosures or Defamatory or Disparaging Comments about the Firm; or

**(7)** at any time prior to the Scheduled Conversion Date, engage in a Clawback Cancellation Event.

**(t)** "***Related Employment***" means your employment with an employer other than the Firm (such employer, herein referred to as a "Related Employer"), *provided* that: (i) you undertake such employment at the written request or with the written consent of Morgan Stanley's Chief Human Resources Officer (or if such position no longer exists, the holder of an equivalent position); (ii) immediately prior to undertaking such employment you were an employee of the Firm or were engaged in Related Employment (as defined herein); and (iii) such employment is recognized by the Firm in its discretion as Related Employment; and, *provided further*, that the Firm may (1) determine at any time in its sole discretion that employment that was recognized by the Firm as Related Employment no longer qualifies as Related Employment, and (2) condition the designation and benefits of Related Employment on such terms and conditions as the Firm may determine in its sole discretion; and *provided further*, the Firm will not provide for Related Employment except to the extent such treatment is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares or to incur additional tax or interest under Section 409A. The designation of employment as Related Employment does not give rise to an employment relationship between you and the Firm or otherwise modify your and the Firm's respective rights and obligations.

**(u)** If you are a Financial Advisor, "***Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

involving any Prohibited Activity, and other than due to your death or Governmental Service Termination, on or after the date:

(1) on which you have attained age 65;

(2) on which you qualify for the payment of any retirement benefit under Section 5 or Section 8 of the Morgan Stanley Employee Retirement Plan (as in effect on December 31, 2015), whether or not you are a participant therein; or

(3) otherwise specified by written agreement between you and the Firm as in effect on December 31, 2015, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment (*provided* that the agreement has been approved by the Committee or its delegee).

(v) "***Scheduled Conversion Date***" means January 25, 2021, *provided, however*, that if you remain employed by the Firm on such date and the date does not occur during an Access Person trading window period, then pursuant to Section 2(d), the Scheduled Conversion Date will be delayed until the first day of the next Access Person trading window period following January 25, 2021 (but in no event beyond December 31, 2021).

(w) "***Scheduled Vesting Date***" means January 25, 2021.

(x) "***Section 409A***" means Section 409A of the Internal Revenue Code and any regulations thereunder.

(y) "***Separation from Service***" means a separation from service with the Firm for purposes of Section 409A determined using the default provisions set forth in Treasury Regulation §1.409A-1(h) or any successor regulation thereto. For purposes of this definition, Morgan Stanley's subsidiaries and affiliates include (and are limited to) any corporation that is in the same controlled group of corporations (within the meaning of Section 414(b) of the Internal Revenue Code) as Morgan Stanley and any trade or business that is under common control with Morgan Stanley (within the meaning of Section 414(c) of the Internal Revenue Code), determined in each case in accordance with the default provisions set forth in Treasury Regulation §1.409A-1(h)(3).

(z) You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following the termination of your Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**IN WITNESS WHEREOF,** Morgan Stanley has duly executed and delivered this Award Certificate as of the Date of the Award.

**MORGAN STANLEY**

/s/ Jeffrey Brodsky

Jeffrey Brodsky
Chief Human Resources Officer



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

# Wealth Management Financial Advisor/Private Wealth Advisor Awards

## 2016 DISCRETIONARY RETENTION AWARDS STOCK UNIT SUMMARY DESCRIPTION

**The following is an abbreviated general description of the terms and conditions of Morgan Stanley 2016 equity retention awards of stock units under the Morgan Stanley 2007 Equity Incentive Compensation Plan. This summary does not address all 2016 stock unit award features. Your 2016 Award Certificate provides a full explanation of the terms and conditions of your 2016 stock unit award, which may differ from the description in this summary. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in your 2016 Award Certificate. If there is any conflict between the terms of this summary and those of your 2016 Award Certificate, the latter will control. You will also be provided with a prospectus and tax supplement that contain important information about your award.**

**IF YOU ARE A NON-U.S. BASED EMPLOYEE, PLEASE REFER TO YOUR 2016 INTERNATIONAL SUPPLEMENT FOR OTHER RELEVANT TERMS OF YOUR AWARD**

---

**Earning Award**

You have no right to your 2016 stock unit award until it is "earned." Generally, to earn your award, you must (1) remain in continuous Employment through the Scheduled Vesting Date, (2) even if your award is vested, not engage in any activity that constitutes Prohibited Activity and (3) satisfy any obligations you owe to the Firm. The vesting requirements and Prohibited Activities are summarized below and set forth in full in the 2016 Award Certificate that will be provided to you.

**Initial Value**

The initial value of your 2016 stock unit award, and the number of stock units included in your award, will be communicated to you independently.

**Number of Stock Units**

The number of stock units comprising your 2016 award is calculated using the "fair market value" of Morgan Stanley common stock of **$42.6390** (the volume weighted average price of Morgan Stanley stock on January 18, 2017).

**Scheduled Vesting Date**

Generally, the stock units included in the award will vest on **January 25, 2021** (the "***Scheduled Vesting Date***"). Except as otherwise provided in your Award Certificate, your 2016 stock unit award will vest only if you remain in continuous Employment through the Scheduled Vesting Date.

**Conversion of Stock Units to Shares**

Generally, the stock units included in the award will convert to shares (to the extent vested) on **January 25, 2021**; *provided, however*, that if you remain employed by the Firm on such date and the specified date does not occur during an access employee trading window period, then pursuant to the Section 409A rule of construction incorporated into your award, the conversion of stock units will be delayed until the first day of the next access employee trading window period (but in no event beyond December 31, 2021). January 25, 2021, or the later date to which conversion of stock units may be delayed as set forth above, is referred to as the "***Scheduled Conversion Date***".

Until conversion, stock units constitute a contingent and unsecured promise of Morgan Stanley to pay the unit holder shares of Morgan Stanley common stock.

Notwithstanding the other provisions of the award, if Morgan Stanley considers you to be one of its executive officers at the time provided for the conversion of your vested stock units and determines that your compensation may not be fully deductible by virtue of Section 162(m) of



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

the Internal Revenue Code, Morgan Stanley will delay payment of the nondeductible portion of your compensation, including delaying conversion and payment of your 2016 stock units to the extent nondeductible, unless otherwise determined by Morgan Stanley. This delay will continue until your "Separation from Service" under Section 409A of the Internal Revenue Code ("***Section 409A***"), or to the extent permitted under Section 409A, the end of the first earlier taxable year of the Firm as of the last day of which you are no longer an executive officer (subject to earlier conversion in the event of your death or your employment at a Governmental Employer under the circumstances described below).

**Transfer Restrictions**

You may not sell, pledge or otherwise transfer stock units for any reason. Shares received from stock unit conversions may be sold, pledged or transferred, subject to compliance with applicable securities laws and Firm policies.

Although you will become the beneficial owner of shares underlying your stock units following conversion of your stock units, the Firm may retain custody of your shares following conversion pending any investigation or other review that impacts the determination as to whether the stock units are cancellable under the circumstances set forth below.

**Dividends and Dividend Equivalents**

If Morgan Stanley pays a regular or ordinary dividend on its common stock, dividend equivalents will be credited with respect to your stock units outstanding on the dividend record date and reinvested in the form of additional stock units based on the fair market value of Morgan Stanley common stock, as determined by Morgan Stanley. The additional stock units credited to you as a result of the reinvestment of dividend equivalents will vest and convert at the same time as, and under the same terms and conditions applicable to, the underlying stock units (and only if your stock units vest and convert). Shares received from stock unit conversions will receive dividends in the same manner as shares held by other shareholders. There can be no assurance that Morgan Stanley will pay dividends in the future and no assurance concerning the amount of such dividends, if any.

**Termination of Employment**

If your Employment terminates other than for death, Disability, Retirement or Full Career Retirement (as applicable), involuntary termination not involving any Prohibited Activity or Governmental Service Termination, your unvested stock units will be canceled immediately.

The special provisions that apply if your Employment terminates for death, Disability, Retirement or Full Career Retirement (as applicable), involuntary termination not involving any Prohibited Activity, or Governmental Service Termination are described below.

**Death**

If you die while Employed, unvested stock units will vest. Stock units will convert and be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

If you die after your termination of Employment but prior to the Scheduled Conversion Date, vested stock units that you held as of the date of your death will convert and be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

**Disability**

If your Employment terminates due to Disability, then, subject to the cancellation provisions described below, unvested stock units will vest on your termination date and stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date. Vesting of stock units upon, and conversion of stock units following, Disability is conditioned on your not engaging in any Prohibited Activity.

"***Disability***" is defined as a medically determinable physical or mental incapacity which is



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are disabled.

**Retirement and Full Career Retirement**

If your Employment terminates as a result of your Retirement or Full Career Retirement (as applicable), then, subject to the cancellation provisions described below, unvested stock units will vest upon your termination date and stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date, *provided that* if you satisfy the conditions for a Retirement or a Full Career Retirement (as applicable) upon your "Separation from Service" (as defined in Section 409A), stock units will convert, and cancellation provisions will lift, 50% on the first business day of the month following the first anniversary of your "Separation from Service" and the remaining 50% on the first business day of the month following the second anniversary of your "Separation from Service", subject to earlier conversion on the Scheduled Conversion Date. Vesting of stock units upon, and conversion of stock units following, Retirement or Full Career Retirement (as applicable) is conditioned on your not engaging in any Prohibited Activity.

I. Financial Advisors

If you are a Financial Advisor, your termination will be treated as a "***Retirement***" if your termination is other than as a result of your death or Governmental Service Termination and your Employment terminates on or after the date:

a) You have attained age 65;
b) You qualify for the payment of any retirement benefit under Section 5 or Section 8 of the Morgan Stanley Employee Retirement Plan (as in effect on December 31, 2015), whether or not you are a participant therein; or
c) Otherwise specified by written agreement between the Firm and you (as in effect on December 31, 2015, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment).

II. Private Wealth Management Private Wealth Advisors ("***PWAs***")

If you are a PWA, your termination will be treated as a "***Full Career Retirement***" if your termination is other than a result of your death or Governmental Service Termination and upon your termination you meet any of the following criteria:

a) Age 50 and 12 years as a Managing Director or comparable officer; or
b) Age 50 and 15 years as an officer; or
c) Age 55 with 5 years of service and age plus years of service equals or exceeds 65; or
d) 20 years with the Firm.

(Credit towards Full Career Retirement will be given for prior service with certain entities as described in the 2016 Award Certificate.)

**Involuntary Termination not Involving Any Prohibited Activity**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, then, *provided* that you sign an agreement and release satisfactory to the Firm, your unvested stock units will vest on the date of your termination. Subject to the cancellation provisions described below, your stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date.

**Governmental Service**

If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, unvested stock units will vest, and



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

stock units will convert, on the date of your Governmental Service Termination.

If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, provided that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your outstanding vested stock units will convert to shares upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence that the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

If your stock units convert due to this provision and you engage in any Prohibited Activity within the period of time that would have resulted in cancellation of all or a portion of your stock units, you will be required to pay to Morgan Stanley an amount equal to the sum of the number of stock units that would have been canceled upon the occurrence of such Prohibited Activity multiplied by the fair market value of Morgan Stanley common stock on the date your stock units converted, plus interest on such amount.

"***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**Specified Employees**

If Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service other than in the event of your employment at a Governmental Employer under circumstances described above, conversion of your stock units that otherwise would occur upon your Separation from Service (including, without limitation, stock units whose conversion was delayed due to Section 162(m) of the Internal Revenue Code) will be delayed until the first business day following the date that is six months after your Separation from Service (subject to earlier conversion in the event of your death or your employment at a Governmental Employer under the circumstances described above).

**Cancellation**

Prior to vesting, awards are cancelable for termination of Employment, other than due to death, Disability, Retirement or Full Career Retirement (as applicable), involuntary termination not involving any Prohibited Activity, or Governmental Service Termination.

All vested and unvested stock units will also be subject to cancellation in full, or in the case of a Cancellation Clawback Event described in clause (c) below, in full or in part, subject to applicable law, until the Scheduled Conversion Date if you engage in any Prohibited Activity, as defined below.

"***Prohibited Activity***" means you: (1) without the written consent of the Firm, at any time prior to the Scheduled Conversion Date, (i) use for the benefit of any person or entity other than the Firm, or disclose to any third party Non-Public, Privileged or Confidential Information or Trade Secrets, (ii) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm, (iii) engage in any other conduct in violation of any contractual or legal obligations to the Firm, or (iv)

following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information; or (2) (i) are terminated for Cause, or (ii) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Conversion Date), or (iii) following termination of your Employment, the Firm determines that you could have been terminated for Cause; or (3) without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Conversion Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding termination, in any capacity in a retail branch or in a retail sales or product representative position; or (4) without the written consent of the Firm, before the earlier to occur of two years after termination and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (i) any of the Firm's customers who were serviced by you while employed by the Firm; or (ii) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding termination; or (5) without the written consent of the Firm, before the earlier to occur of three years after termination and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm); or (6) without the written consent of the Firm, make Defamatory or Disparaging Comments or Unauthorized Disclosures about the Firm; or (7) engage in a Clawback Cancellation Event.

"***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including, but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

"***Cause***" means:

(x) any act or omission which constitutes a breach by you of your obligations to the Firm including, without limitation, (i) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (ii) your failure to comply with the Firm's compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you; or

(y) your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

(z) a violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules and regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (c) of Clawback Cancellation Event below and is deliberate, intentional or willful.

You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following termination of Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

"***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(a) causes a restatement of the Firm's consolidated financial results;

(b) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(c) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

  (i) violation of business unit, product or desk specific risk parameters;

  (ii) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

  (iii) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

  (iv) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (c) and you do not engage in any other cancellation or clawback event described herein, the number of stock units will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**Covenants and Certification**

In the event you fail to acknowledge, within the time and in the manner prescribed by the Firm, a notice and non-solicitation or other restrictive covenant agreement required of you by the Firm, the Firm has a right to cancel your award.

You may be required to provide Morgan Stanley with a written certification or other evidence that it deems appropriate, in its sole discretion, to confirm that no Prohibited Activity has occurred. If you fail to submit a timely certification or evidence, Morgan Stanley will cancel



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

your award.

**Tax Withholding** Vesting of your award, conversion of your stock units and crediting or payment of your dividend equivalents, whether on the Scheduled Vesting Date or Scheduled Conversion Date or some other date, shall be subject to withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation owed to you, including by canceling or accelerating payment of a portion of your award in an amount not to exceed such taxes imposed upon vesting, conversion, crediting or payment and any additional taxes imposed as a result of such cancellation or acceleration, subject to limitations imposed under Section 409A.

**Award Modification** Morgan Stanley generally has the right to modify or amend the terms of your award without your consent. However, Morgan Stanley may not make a modification that would materially impair your rights in such award without your consent unless such modification is necessary or advisable (i) to comply with any law, regulation, ruling, judicial decision, accounting standard or similar pronouncement or (ii) to ensure that awards are not subject to federal, state or local income tax prior to payment.

**Timing of Conversion (Section 409A Rule of Construction)** With respect to any provision for vested stock units to convert to shares of Morgan Stanley common stock on a specified event or date, such conversion will be considered to have been timely made as long as conversion is made by December 31st of the year in which occurs the specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date.

**U.S. Taxation** In general, when your stock units convert to shares, the market value of shares at the time of conversion will be taxed as ordinary income. FICA and Medicare tax apply at the time that stock units are deemed to vest for tax purposes. Please refer to the Tax Supplement for a fuller discussion of these tax consequences.

**Non-U.S. Taxation** Taxation on grant, vesting and stock unit conversion depends on the tax laws and regulations in your jurisdiction.

**Governing Law** New York Law.

**By accepting this award, you acknowledge that you have received all 2016 deferred compensation to which you are entitled. Nothing in this summary or any correspondence related to this award should be construed as a guarantee of an equity award or any particular level of compensation, bonus or benefits. Please note that the Firm does not commit to granting the award described in this summary in the future. These awards do not create a contract or guarantee of employment, or modify any agreement entered into by Morgan Stanley or any of its affiliates and you.**

**You are required to keep confidential all matters relating to stock unit awards to the fullest extent permitted by law. The provisions of the Firm's Code of Conduct regarding Confidential and Proprietary Information shall cover all aspects of stock unit awards.**

**This program is not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. Participants should not look to this program as a source of retirement income. This program is not subject to the Employee Retirement Income Security Act of 1974 (ERISA).**

**Morgan Stanley does not render advice on tax and tax accounting matters.**



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# MORGAN STANLEY

## MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## WEALTH MANAGEMENT

## FINANCIAL ADVISER / PRIVATE WEALTH ADVISER AWARDS

## 2016 DISCRETIONARY RETENTION AWARDS AWARD CERTIFICATE

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## TABLE OF CONTENTS FOR AWARD CERTIFICATE


1. Your award generally....3
2. Vesting schedule and payment....3
3. Special provision for certain employees....4
4. Death, Disability and Retirement/Full Career Retirement....5
5. Involuntary termination by the Firm....5
6. Governmental Service....6
7. Specified employees....6
8. Cancellation of Applicable Account Value under certain circumstances....7
9. Tax and other withholding obligations....7
10. Obligations you owe to the Firm....8
11. Nontransferability....8
12. Designation of a beneficiary....8
13. No entitlements....9
14. Consents under local law....9
15. Award modification....9
16. Governing law....10
17. Defined terms....10

MORGAN STANLEY

# MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## 2016 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE

Morgan Stanley has granted you an award under the Morgan Stanley Compensation Incentive Plan (the "***Plan***") as part of your incentive compensation for services provided during 2016 and as an incentive for you to remain in Employment and provide services to the Firm through the Scheduled Vesting Date. This Award Certificate sets forth the general terms and conditions of your 2016 award under the Plan. The initial value of your 2016 award has been communicated to you independently.

If you are employed outside the United States, you will also receive an "***International Supplement***" that contains supplemental terms and conditions for your 2016 award. You should read this Award Certificate in conjunction with the International Supplement, if applicable, and the Plan in order to understand the terms and conditions of your 2016 award.

Your 2016 award is made pursuant to the Plan. References to Applicable Account Value in this Award Certificate mean only the Applicable Account Value related to your 2016 award, and the terms and conditions herein apply only to such award. If you receive any other award under the Plan or another incentive compensation plan, it will be governed by the terms and conditions of the applicable award documentation, which may be different from those herein.

The purposes of the 2016 award are, among other things, to facilitate the allocation of a portion of your above-base compensation for 2016 to the notional investment opportunities afforded by the Plan, to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. In view of these purposes, you will earn your 2016 award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), (2) do not engage in any Prohibited Activity ***and*** (3) satisfy obligations you owe to the Firm as set forth in Section 10 below. Even if your award has vested, you will have no right to your award if you engage in any Prohibited Activity. As Morgan Stanley deems appropriate, Morgan Stanley will require you to provide a written certification or other evidence, from time to time in its sole discretion, to confirm that no Prohibited Activity has occurred, including upon a termination of Employment and/or during a specified period of time prior to the Scheduled Distribution Date. If you fail to provide any required certification or other evidence, Morgan Stanley will cancel your award. It



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

is your responsibility to provide the Executive Compensation Department with your up-to-date contact information.

Capitalized terms used in this Award Certificate that are not defined in the text have the meanings set forth in Section 17 below. Capitalized terms used in this Award Certificate that are not defined in the text or in Section 17 below have the meanings set forth in the Plan.

**1. Your award generally.**

**(a)** ***Applicable Account Value.*** This Award Certificate uses the term "Applicable Account Value" to refer to your 2016 award under the Plan and the notional return (positive or negative) thereon based on the performance of the Notional Investments to which your Account is notionally allocated. If you receive another award under the Plan (for example, an award for a future year), your total Account Value under the Plan will include the Applicable Account Value of your 2016 award and the applicable Account Value of such other award(s).

**(b)** ***Notional allocation of Account.*** The notional allocation of your Applicable Account Value is subject to the ultimate discretion of the Firm and is made exclusively for the purpose of determining your Applicable Account Value from time to time in accordance with the Plan. You may notionally allocate your Applicable Account Value to any one fund, or any combination of funds, offered as Notional Investments under the Plan with respect to your 2016 award.

**2. Vesting schedule and payment.**

**(a)** ***Vesting schedule.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest on the Scheduled Vesting Date. Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest only if you continue to provide future services to the Firm by remaining in continuous Employment through the Scheduled Vesting Date and providing value added services to the Firm during this timeframe. The special vesting terms set forth in Sections 4, 5 and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or Disability, (ii) upon your Retirement or Full Career Retirement (as applicable), (iii) if the Firm terminates your employment in an involuntary termination under the circumstances described in Section 5 or (iv) upon a Governmental Service Termination. The vested portion of your Applicable Account Value remains subject to the cancellation and withholding provisions set forth in this Award Certificate.

**(b)** ***Payment.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will, to the extent vested, be paid in cash (minus applicable tax and other withholding liabilities) on the Scheduled Distribution Date; *provided* that, subject to Section 2(d), your Applicable Account Value may be paid to you following the Scheduled Distribution Date on the next administratively practicable payroll date. The special payment provisions set forth in Sections 4(a), 4(b), 4(d) and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or you die after termination of your Employment, (ii) upon your Retirement or Full Career Retirement (as applicable) under the circumstances set forth in Section 4(d) or (iii) upon your Governmental Service Termination or



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b).

(c) *Accelerated payment.* Morgan Stanley shall have no right to accelerate the payment of any portion of your Applicable Account Value, except to the extent that such acceleration is not prohibited by Section 409A and would not result in your being required to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or your incurring additional tax or interest under Section 409A. If any portion of your Applicable Account Value is paid prior to the Scheduled Distribution Date pursuant to this Section 2(c), Morgan Stanley may condition such payment on your agreement that if you engage in any Prohibited Activity within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value (had it not been paid pursuant to this Section 2(c)), you will be required to repay to Morgan Stanley an amount equal to the payment you received (before taking account of any withholding) in respect of the portion of your Applicable Account Value that would have been canceled upon the occurrence of such Prohibited Activity, plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date such portion of your Applicable Account Value was paid through the date preceding the repayment date.

(d) ***Rule of construction for timing of payment.*** Whenever this Award Certificate provides for all or a portion of your Applicable Account Value to be paid on the Scheduled Distribution Date or upon a different specified event or date, such payment will be considered to have been timely made, and neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages based on a delay in the payment of your Applicable Account Value, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate) in respect of any such delay, as long as payment is made by December 31st of the year in which occurs the Scheduled Distribution Date or such other specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date. Similarly, neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate), based on any acceleration of the payment of your Applicable Account Value pursuant to Section 2(c).

**3. Special provision for certain employees.**

Notwithstanding the other provisions of this Award Certificate, if Morgan Stanley considers you to be one of its executive officers at the time provided for the payment of the vested portion of your Applicable Account Value and determines that your compensation may not be fully deductible by virtue of Section 162(m) of the Internal Revenue Code, Morgan Stanley shall delay payment of the nondeductible portion of your compensation, including delaying payment of your Applicable Account Value to the extent nondeductible, unless the Administrator, in its sole discretion, determines not to delay such payment. This delay will continue until your Separation from Service or, to the extent permitted under Section 409A, the end of the first earlier taxable year of the Firm as of the last day of which you are no longer an executive officer (subject to earlier payment in the event of your death as described below).



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

4. **<u>Death, Disability and Retirement/Full Career Retirement</u>.**

The following special vesting and payment terms apply to your award:

**(a)** ***Death during Employment.*** If your Employment terminates due to death, the unvested portion of your Applicable Account Value will vest on the date of your death. Your Applicable Account Value will be paid to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 8(c) will no longer apply.

**(b)** ***Death after termination of Employment.*** If you die after the termination of your Employment but prior to the Scheduled Distribution Date, the vested portion of your Applicable Account Value that you held at the time of your death will be paid to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 8(c) will no longer apply.

**(c)** ***Disability.*** If your Employment terminates due to Disability, your unvested Applicable Account Value will vest on the date your Employment terminates. Your Applicable Account Value will be paid on the Scheduled Distribution Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**(d)** ***Retirement/Full Career Retirement.*** If your Employment terminates as a result of your Retirement or Full Career Retirement (as applicable), (i) your unvested Applicable Account Value will vest on the date your Employment terminates and (ii) your Applicable Account Value will be paid, and the cancellation provisions will lift, on the Scheduled Distribution Date; *provided* that, if you satisfy the conditions for a Retirement or Full Career Retirement (as applicable) upon your Separation from Service, 50% of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the first anniversary of your Separation from Service and the remaining portion of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the second anniversary of your Separation from Service, subject to earlier payment on the Scheduled Distribution Date.

5. **<u>Involuntary termination by the Firm</u>.**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, your unvested Applicable Account Value will vest on the date your employment with the Firm terminates and your Applicable Account Value will be paid on the Scheduled Distribution Date, *provided* that you sign an agreement and release satisfactory to the Firm. If you do not sign such an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your involuntary termination as described in this Section 5, any portion of your Applicable Account Value that was unvested immediately prior to



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

your termination shall be canceled. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**6. Governmental Service.**

(a) ***General treatment of awards upon Governmental Service Termination.*** If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), your unvested Applicable Account Value will vest on the date of your Governmental Service Termination. Your vested Applicable Account Value will be paid on the date of your Governmental Service Termination.

(b) ***General treatment of vested awards upon acceptance of employment at a Governmental Employer following termination of Employment.*** If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), your outstanding vested Applicable Account Value will be paid upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence demonstrating that as a result of such employment the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

(c) ***Repayment obligation.*** If any Prohibited Activity occurs within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value had it not been paid pursuant to Sections 6(a) or 6(b) above, you will be required to repay to Morgan Stanley the amount distributed to you pursuant to Sections 6(a) or 6(b) above that would have been canceled upon the occurrence of such Prohibited Activity (before taking account of any withholding), plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date of such payment through the date preceding the repayment date.

**7. Specified employees.**

Notwithstanding any other terms of this Award Certificate, if Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service, payment of any portion of your Applicable Account Value that otherwise would be made upon your Separation from Service (including, without limitation, any payments that were delayed due to Section 162(m) of the Internal Revenue Code, as provided in Section 3) will be delayed until the first business day following the date that is six months after your Separation from Service; *provided, however*, that in the event that your death, your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b) occurs at any time after the Date of the Award, payment will be made in accordance with Section 4(a), 4(b) or 6, as applicable.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

8. <u>**Cancellation of Applicable Account Value under certain circumstances.**</u>

**(a)** ***Cancellation of unvested Applicable Account Value.*** Any unvested portion of your Applicable Account Value will be canceled if your Employment terminates for any reason other than death, Disability, a Retirement, an involuntary termination by the Firm described in Section 5 or a Governmental Service Termination.

**(b)** ***General treatment of vested Applicable Account Value.*** Except as otherwise provided in this Award Certificate, your vested Applicable Account Value will be paid on the Scheduled Distribution Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**(c)** ***Cancellation of Applicable Account Value under certain circumstances.*** This Section 8(c) is designed, among other things, to incentivize compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. This Section 8(c) shall apply notwithstanding any other terms of this Award Certificate (except where sections in this Award Certificate specifically provide that the cancellation events set forth in this Section 8(c) no longer apply).

Your Applicable Account Value, even if vested, is not earned until the Scheduled Distribution Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 10 below) and, unless prohibited by applicable law, will be canceled in full, or in the case of clause (3) of a Clawback Cancellation Event, in full or in part, until the Scheduled Distribution Date if any Prohibited Activity occurs.

The Firm may retain custody of your Applicable Account Value following the Scheduled Distribution Date pending any investigation or other review that impacts the determination as to whether your Applicable Account Value is cancellable and, in such an instance, your Applicable Account Value shall be forfeited in the event the Firm determines that the Applicable Account Value was cancellable.

9. <u>**Tax and other withholding obligations.**</u>

Any vesting, whether on the Scheduled Vesting Date or some other date, of all or a portion of your Applicable Account Value, and any payment of all or a portion of your Applicable Account Value shall be subject to the Firm's withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation to you, including by canceling or accelerating payment of a portion of your Applicable Account Value in an amount not to exceed such taxes imposed upon such vesting or distribution and any additional taxes imposed as a result of such cancellation or acceleration, and to take such other action as the Firm may deem advisable to enable it and you to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting or payment of your Applicable Account Value.

However, the Firm may not deduct or withhold such sum from any payroll or any other payment or compensation (including from your Applicable Account Value), except to the extent it is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A.

**10. Obligations you owe to the Firm.**

As a condition to the earning, payment or distribution of your award, the Firm may require you to pay such sum to the Firm as may be necessary to satisfy any obligation that you owe to the Firm. Notwithstanding any other provision of this Award Certificate, your award, even if vested, is not earned until after such obligations and any tax withholdings or other deductions required by law are satisfied. Notwithstanding the foregoing, Morgan Stanley may not reduce the amount of your Applicable Account Value to be distributed to satisfy obligations that you owe to the Firm except (i) to the extent authorized under Section 9, relating to tax and other withholding obligations or, otherwise, (ii) to the extent such reduction is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur additional tax or interest under Section 409A. Morgan Stanley's determination of any amount that you owe the Firm shall be conclusive.

**11. Nontransferability.**

You may not sell, pledge, hypothecate, assign or otherwise transfer your Applicable Account Value, other than as provided in Section 12 (which allows you to designate a beneficiary or beneficiaries in the event of your death) or by will or the laws of descent and distribution. This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise. During your lifetime, payments relating to your Applicable Account Value will be made only to you.

Your personal representatives, heirs, legatees, beneficiaries, successors and assigns, and those of Morgan Stanley, shall all be bound by, and shall benefit from, the terms and conditions of your award.

**12. Designation of a beneficiary.**

You may make a written designation of beneficiary or beneficiaries to receive all or part of the amounts to be distributed in respect of your Applicable Account Value in the event of your death. To make a beneficiary designation, you must complete and submit the Beneficiary Designation form on the Executive Compensation website.

Any portion of your Applicable Account Value that becomes payable upon your death, and as to which a designation of beneficiary is not in effect, will be distributed to your estate.

If you previously filed a designation of beneficiary form for your award(s) under the Plan with the Executive Compensation Department, such form will also apply to all of your



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

awards under the Plan, including this 2016 award. You may replace or revoke your beneficiary designation at any time. If there is any question as to the legal right of any beneficiary to receive your Applicable Account Value, Morgan Stanley may determine in its sole discretion to distribute the amounts in question to your estate. Morgan Stanley's determination shall be binding and conclusive on all persons and it will have no further liability to anyone with respect to such amounts.

**13. No entitlements.**

(a) ***No right to continued Employment.*** This award is not an employment agreement, and nothing in this Award Certificate, the International Supplement, if applicable, or the Plan shall alter your status as an "at-will" employee of the Firm or your employment status at a Related Employer. None of this Award Certificate, the International Supplement, if applicable, or the Plan shall be construed as guaranteeing your employment by the Firm or a Related Employer, or as giving you any right to continue in the employ of the Firm or a Related Employer, during any period (including without limitation the period between the Date of the Award and the Scheduled Vesting Date or Scheduled Distribution Date, or any portion of any of these periods), nor shall they be construed as giving you any right to be reemployed by the Firm or a Related Employer following any termination of Employment.

(b) ***No right to future awards.*** This award, and all other awards under the Plan, are discretionary. This award does not confer on you any right or entitlement to receive another award under the Plan or any other award under any other incentive compensation plan of Morgan Stanley at any time in the future or in respect of any future period.

(c) ***No effect on future employment compensation.*** Morgan Stanley has made this award to you in its sole discretion. This award does not confer on you any right or entitlement to receive compensation in any specific amount for any future year, and does not diminish in any way the Firm's discretion to determine the amount, if any, of your compensation. This award is not part of your base salary or wages and will not be taken into account in determining any other employment-related rights you may have, such as rights to pension or severance pay.

**14. Consents under local law.**

Your award is conditioned upon the making of all filings and the receipt of all consents or authorizations required to comply with, or required to be obtained under, applicable local law.

**15. Award modification.**

Morgan Stanley reserves the right to modify or amend unilaterally the terms and conditions of your award, without first asking your consent, or to waive any terms and conditions that operate in favor of Morgan Stanley. These amendments may include (but are not limited to) changes that Morgan Stanley considers necessary or advisable as a result of changes in any, or the adoption of any new, Legal Requirement. Morgan Stanley may not modify your award in a manner that would materially impair your rights in your award without your consent; *provided,*



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

*however*, that Morgan Stanley may, but is not required to, without your consent, amend or modify your award in any manner that Morgan Stanley considers necessary or advisable to (i) comply with any Legal Requirement, (ii) ensure that your award does not result in an excise or other supplemental tax on the Firm under any Legal Requirement, or (iii) ensure that your award is not subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to payment or distribution. Morgan Stanley will notify you of any amendment of your award that affects your rights. Any amendment or waiver of a provision of this Award Certificate (other than any amendment or waiver applicable to all recipients generally), which amendment or waiver operates in your favor or confers a benefit on you, must be in writing and signed by the Chief Human Resources Officer (or if such position no longer exists, by the holder of an equivalent position) to be effective.

**16. Governing law.**

This Award Certificate and the related legal relations between you and Morgan Stanley will be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts or choice of law, rule or principle that might otherwise refer the interpretation of the award to the substantive law of another jurisdiction.

**17. Defined terms.**

For purposes of this Award Certificate, the following terms shall have the meanings set forth below:

**(a)** "***Board***" means the Board of Directors of Morgan Stanley.

**(b)** "***Cause***" means:

**(1)** any act or omission which constitutes a breach of your obligations to the Firm, including, without limitation, (A) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (B) your failure to comply with the Firm's compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you;

**(2)** your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

**(3)** your violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules or regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (3) of Clawback Cancellation Event set forth below and is deliberate, intentional or willful.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(c) "*Clawback Cancellation Event*" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(1) causes a restatement of the Firm's consolidated financial results;

(2) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(3) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

(a) violation of business unit, product or desk specific risk parameters;

(b) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(c) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(d) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (3) and you do not engage in any other Prohibited Activity described herein, your 2016 award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

(d) "*Competitive Services*" means services with respect to any line of business in which the Firm is engaged, including but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

(e) "*Date of the Award*" means January 18, 2017.

(f) You will be deemed to have made "*Defamatory or Disparaging Comments*" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

**(g)** "***Disability***" means termination of Employment due to a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are Disabled.

**(h)** "***Employed***" and "***Employment***" refer to employment with the Firm and/or Related Employment.

**(i)** The "***Firm***" means Morgan Stanley (including any successor thereto) together with its subsidiaries and affiliates. For purposes of the definitions of "Cause," "Defamatory or Disparaging Comments," "Non-Public Privileged or Confidential Information or Trade Secrets" and "Unauthorized Disclosures" set forth in this Award Certificate, references to the "Firm" shall refer severally to the Firm as defined in the preceding sentence and your Related Employer, if any. For purposes of the definition of "Prohibited Activity" set forth in this Award Certificate, references to the "Firm" shall refer to the Firm as defined in the second preceding sentence or your Related Employer, as applicable.

**(j)** If you are a Private Wealth Management Private Wealth Advisor, "***Full Career Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death, a Governmental Service Termination or pursuant to a Qualifying Termination, on or after the date on which:

**(1)** you have attained age 50 and completed at least 12 years of service as a Managing Director of the Firm or equivalent officer title; or

**(2)** you have attained age 50 and completed at least 15 years of service as an officer of the Firm at the level of Vice President or equivalent officer title or above; or

**(3)** you have completed at least 20 years of service with the Firm; or

**(4)** you have attained age 55 and have completed at least 5 years of service with the Firm and the sum of your age and years of service equals or exceeds 65.

For the purposes of the foregoing definition, service with the Firm will include any period of service with the following entities and any of their predecessors:

(i) AB Asesores ("***ABS***") prior to its acquisition by the Firm (*provided* that only years of service as a partner of ABS shall count towards years of service as an officer);

(ii) Morgan Stanley Group Inc. and its subsidiaries ("***MS Group***") prior to the merger with and into Dean Witter, Discover & Co.;

(iii) Miller Anderson & Sherrerd, L.L.P. prior to its acquisition by MS Group;

(iv) Van Kampen Investments Inc. and its subsidiaries prior to its acquisition by MS Group;

(v) FrontPoint Partners LLC and its subsidiaries prior to its acquisition by the Firm;

(vi) Lend Lease Corporation Limited and its subsidiaries prior to the acquisition of certain of its assets by the Firm; and

(vii) Dean Witter, Discover & Co. and its subsidiaries ("***DWD***") prior to the merger of Morgan Stanley Group Inc. with and into Dean Witter, Discover & Co.;

*provided* that, in the case of an employee who has transferred employment from DWD to MS Group or vice versa, a former employee of DWD will receive credit for employment with DWD only if he or she transferred directly from DWD to Morgan Stanley & Co. Incorporated or its affiliates subsequent to February 5, 1997, and a former employee of MS Group will receive credit for employment with MS Group only if he or she transferred directly from MS Group to Morgan Stanley DW Inc. or its affiliates subsequent to February 5, 1997.

**(k)** "***Governmental Employer***" means a governmental department or agency, self-regulatory agency or other public service employer.

**(l)** "***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**(m)** "***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder.

**(n)** "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

**(o)** "***Non-Public, Privileged or Confidential Information or Trade Secrets***" means the Firm's books and records; holding book or customer book pages; the names, addresses, telephone numbers and assets and obligations carried in the account of the Firm's customers; computer software or hardware for use in computer or word processing equipment; all training material provided to you; documents or computer programs prepared or generated by you through use of Firm records and any information that is classified as confidential in the Firm's Global Policy on Confidential Information; *provided*, *however*, that "Non-Public, Privileged or Confidential Information or Trade Secrets" shall include, without limitation, any



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

books, papers, records, electronic communications, videotapes or recordings related to any of the foregoing, including copies.

**(p)** "***Prohibited Activity***" means you:

**(1)** at any time prior to the Scheduled Distribution Date, (a) use for the benefit of any person or entity other than the Firm, or disclose to any third party, any Non-Public, Privileged or Confidential Information or Trade Secrets; (b) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm; (c) engage in any other conduct in violation of any contractual or legal obligations to the Firm; or (d) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information;

**(2)** at any time prior to the Scheduled Distribution Date, (a) are terminated for Cause; or (b) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Distribution Date); or (c) following termination of your Employment, the Firm determines that you could have been terminated for Cause;

**(3)** without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Distribution Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment, in any capacity in a retail branch or in a retail sales or product representative position;

**(4)** without the written consent of the Firm, before the earlier to occur of two years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (a) any of the Firm's customers who were serviced by you while employed by the Firm; or (b) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment;

**(5)** without the written consent of the Firm, before the earlier to occur of three years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm);



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**(6)** at any time prior to the Scheduled Distribution Date, without the written consent of the Firm, make Unauthorized Disclosures or Defamatory or Disparaging Comments about the Firm; or

**(7)** at any time prior to the Scheduled Distribution Date, engage in a Clawback Cancellation Event.

**(q)** "***Related Employment***" means your employment with an employer other than the Firm (such employer, herein referred to as a "Related Employer"), *provided* that: (i) you undertake such employment at the written request or with the written consent of Morgan Stanley's Chief Human Resources Officer (or if such position no longer exists, the holder of an equivalent position); (ii) immediately prior to undertaking such employment you were an employee of the Firm or were engaged in Related Employment (as defined herein); and (iii) such employment is recognized by the Firm in its discretion as Related Employment; and, *provided further,* that the Firm may (1) determine at any time in its sole discretion that employment that was recognized by the Firm as Related Employment no longer qualifies as Related Employment, and (2) condition the designation and benefits of Related Employment on such terms and conditions as the Firm may determine in its sole discretion; and *provided further*, the Firm will not provide for Related Employment except to the extent such treatment is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A. The designation of employment as Related Employment does not give rise to an employment relationship between you and the Firm, or otherwise modify your and the Firm's respective rights and obligations.

**(r)** If you are a Financial Advisor, "***Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death or a Governmental Service Termination, on or after the date:

**(1)** on which you have attained age 65;

**(2)** on which you qualify for the payment of any retirement benefit under Section 5 or Section 8 of the Morgan Stanley Employee Retirement Plan (as in effect on December 31, 2015), whether or not you are a participant therein; or

**(3)** otherwise specified by written agreement between you and the Firm as in effect on December 31, 2015, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment (*provided* that the agreement has been approved by the Committee or its delegee).

**(s)** "***Scheduled Distribution Date***" means January 23, 2023.

**(t)** "***Scheduled Vesting Date***" means January 23, 2023.

**(u)** "***Section 409A***" means Section 409A of the Internal Revenue Code and any regulations thereunder.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(v) "*Separation from Service*" means a separation from service with the Firm for purposes of Section 409A determined using the default provisions set forth in Treasury Regulation §1.409A-1(h) or any successor regulation thereto. For purposes of this definition, Morgan Stanley's subsidiaries and affiliates include (and are limited to) any corporation that is in the same controlled group of corporations (within the meaning of Section 414(b) of the Internal Revenue Code) as Morgan Stanley and any trade or business that is under common control with Morgan Stanley (within the meaning of Section 414(c) of the Internal Revenue Code), determined in each case in accordance with the default provisions set forth in Treasury Regulation §1.409A-1(h)(3).

**(w)** You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following the termination of your Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

**IN WITNESS WHEREOF**, Morgan Stanley has duly executed and delivered this Award Certificate as of the Date of the Award.

**MORGAN STANLEY**

/s/ Jeffrey Brodsky
Jeffrey Brodsky
Chief Human Resources Officer



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

# Morgan Stanley Compensation Incentive Plan

## Wealth Management Financial Advisor/Private Wealth Advisor Awards

## 2016 DISCRETIONARY RETENTION AWARDS
## MSCIP AWARD SUMMARY DESCRIPTION

**The following is an abbreviated general description of the terms and conditions of 2016 awards under the Morgan Stanley Compensation Incentive Plan ("*MSCIP*"). This summary does not address all 2016 MSCIP award features. Your 2016 Award Certificate provides a full explanation of the terms and conditions of your 2016 MSCIP award, which may differ from the description in this summary. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in your 2016 Award Certificate. If there is any conflict between the terms of this summary and those of your 2016 Award Certificate, the latter will control. You will also be provided with a tax supplement that contains important information about your award.**

**IF YOU ARE A NON-U.S. BASED EMPLOYEE, PLEASE REFER TO YOUR 2016 INTERNATIONAL SUPPLEMENT FOR OTHER RELEVANT TERMS OF YOUR AWARD**

---

**Earning Award**

You have no right to your 2016 MSCIP award until it is "earned." Generally, to earn your award, you must (1) remain in continuous Employment through the Scheduled Vesting Date, (2) even if your award is vested, not engage in any activity that constitutes Prohibited Activity and (3) satisfy any obligations you owe to the Firm. The vesting requirements and Prohibited Activities are summarized below, and set forth in full in the 2016 Award Certificate that will be provided to you.

**Initial Value**

The initial value of your 2016 MSCIP award will be communicated to you independently.

**Account**

Your 2016 MSCIP award will be credited to a bookkeeping account in your name as of January 18, 2017. Pursuant to the section "Notional Allocation of Account" below, if a menu of notional investments is made available by Morgan Stanley, your account will be credited (or debited) with notional returns on the notional investments to which your account is allocated. This summary uses the term "***Applicable Account Value***" to refer to your 2016 MSCIP award and if applicable, any notional return (positive or negative) thereon.

**Notional Allocation of Account**

You may be permitted to notionally allocate your account among a menu of notional investments selected by Morgan Stanley in its sole discretion. If such allocation is made available, the notional value of your account will track the performance of the referenced funds underlying the notional investments that you select and any such allocation (and any subsequent reallocations, if applicable) will be subject to the rules and notional allocation requirements of your 2016 MSCIP award as in effect from time to time.

If applicable, the value of your account is subject at all times to risk based upon the performance of the notional investments to which your account is allocated. If the value of the notional investments to which your account is allocated decreases, the value of your account may be lower than your original award amounts. The Firm may provide you with a description of the referenced funds and their historical returns, as applicable, but this is, of course, no guide or representation as to their future performance.

The performance of your notional investments, if any, and the value of your account, will be impacted by all of the fees and costs of the referenced funds underlying your notional investments, including fees which the funds may pay to the Firm for services the Firm provides to the referenced funds.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Notwithstanding the foregoing, the notional allocation of your account will be at the sole discretion of Morgan Stanley.

**Scheduled Vesting Date**

Generally, your Applicable Account Value will vest on **January 23, 2023** ("***Scheduled Vesting Date***"). Except as otherwise provided in your Award Certificate, your Applicable Account Value will vest only if you remain in continuous Employment through the Scheduled Vesting Date.

**Scheduled Distribution Date**

Generally, the Firm will pay you your Applicable Account Value, to the extent vested, in cash (minus applicable tax and other withholding liabilities) on **January 23, 2023** ("***Scheduled Distribution Date***"). Until payment, your award constitutes a contingent and unsecured promise of the Firm to pay you your vested Applicable Account Value on the Scheduled Distribution Date. Notwithstanding the foregoing, subject to the "Timing of Payment" provision below, your Applicable Account Value may be paid following the Scheduled Distribution Date on the next administratively practicable payroll date.

Notwithstanding the other provisions of the award, if Morgan Stanley considers you to be one of its executive officers at the time provided for the payment of your vested Applicable Account Value and determines that your compensation may not be fully deductible by virtue of Section 162(m) of the Internal Revenue Code, Morgan Stanley will delay payment of the nondeductible portion of your compensation, including delaying payment of your vested Applicable Account Value to the extent nondeductible, unless otherwise determined by Morgan Stanley. This delay will continue until your "Separation from Service" under Section 409A of the Internal Revenue Code ("***Section 409A***"), or to the extent permitted under Section 409A, the end of the first earlier taxable year of the Firm as of the last day of which you are no longer an executive officer (subject to earlier payment in the event of your death or your employment at a Governmental Employer under the circumstances described below).

**Termination of Employment**

If your Employment terminates other than for death, Disability, Retirement or Full Career Retirement (as applicable), involuntary termination not involving any Prohibited Activity, or Governmental Service Termination, your unvested Applicable Account Value will be canceled immediately.

The special provisions that apply if your Employment terminates for death, Disability, Retirement or Full Career Retirement (as applicable), involuntary termination not involving any Prohibited Activity, or Governmental Service Termination are described below.

**Death**

If you die while Employed, the unvested portion of your Applicable Account Value will vest. Your Applicable Account Value will be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

If you die after your termination of Employment but prior to the Scheduled Distribution Date, the vested portion of your Applicable Account Value that you held as of the date of your death will be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

**Disability**

If your Employment terminates due to Disability, then, subject to the cancellation provisions described below, your unvested Applicable Account Value will vest on your termination date and your Applicable Account Value will be paid on the Scheduled Distribution Date. Vesting of your Applicable Account Value upon, and distribution of your Applicable Account Value following, Disability is conditioned on your not engaging in any Prohibited Activity.

"***Disability***" is defined as a medically determinable physical or mental incapacity which is

reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are disabled.

**Retirement and Full Career Retirement**

If your Employment terminates as a result of your Retirement or Full Career Retirement (as applicable), then, subject to the cancellation provisions described below, your unvested Applicable Account Value will vest upon your termination date and your Applicable Account Value will be paid on the Scheduled Distribution Date, *provided that* if you satisfy the conditions for a Retirement or Full Career Retirement (as applicable) upon your "Separation from Service" (as defined in Section 409A), 50% of your vested Applicable Account Value will be paid, and cancellation provisions will lift, on the first anniversary of your "Separation from Service" and the remaining vested portion of your Applicable Account Value will be paid, and cancellation provisions will lift, on the second anniversary of your "Separation from Service", subject to earlier payment on the Scheduled Distribution Date. Vesting of your Applicable Account Value upon, and distribution of your Applicable Account Value following, Retirement or Full Career Retirement (as applicable) is conditioned on your not engaging in any Prohibited Activity.

I. Financial Advisors

If you are a Financial Advisor, your termination will be treated as a "***Retirement***" if your termination is other than as a result of your death or Governmental Service Termination and your Employment terminates on or after the date:

a) You have attained age 65;
b) You qualify for the payment of any retirement benefit under Section 5 or Section 8 of the Morgan Stanley Employee Retirement Plan (as in effect on December 31, 2015), whether or not you are a participant therein; or
c) Otherwise specified by written agreement between the Firm and you (as in effect on December 31, 2015, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment).

II. Private Wealth Management Private Wealth Advisors ("***PWAs***")

If you are a PWA, your termination will be treated as a "***Full Career Retirement***" if your termination is other than a result of your death or Governmental Service Termination and upon your termination you meet any of the following criteria:

a) Age 50 and 12 years as a Managing Director or comparable officer; or
b) Age 50 and 15 years as an officer; or
c) Age 55 with 5 years of service and age plus years of service equals or exceeds 65; or
d) 20 years with the Firm.

(Credit towards Full Career Retirement will be given for prior service with certain entities as described in the 2016 Award Certificate.)

**Involuntary Termination not Involving Any Prohibited Activity**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, then, *provided* that you sign an agreement and release satisfactory to the Firm, your unvested Applicable Account Value will vest on the date of your termination. Subject to the cancellation provisions described below, your Applicable Account Value will be paid, and cancellation provisions will lift, on the Scheduled Distribution Date.

**Governmental Service**

If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your unvested Applicable Account Value will vest, and your Applicable Account Value will be paid, on the date of your Governmental



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Service Termination.

If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your outstanding vested Applicable Account Value will be paid upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence that the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

If your Applicable Account Value is paid due to this provision and you engage in any Prohibited Activity within the period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value, you will be required to pay to Morgan Stanley the amount distributed to you in accordance with this provision plus interest on such amount.

"***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**Specified Employees**

If Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service other than in the event of your employment at a Governmental Employer under circumstances described above, payment of your Applicable Account Value that otherwise would occur upon your Separation from Service (including, without limitation, any payments that were delayed due to Section 162(m) of the Internal Revenue Code) will be delayed until the first business day following the date that is six months after your Separation from Service (subject to earlier payment in the event of your death or your employment at a Governmental Employer under the circumstances described above).

**Cancellation**

Prior to vesting, awards are cancelable for termination of Employment, other than due to death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination.

The Firm may retain custody of your Applicable Account Value following the Scheduled Distribution Date pending any investigation or other review that impacts the determination as to whether your Applicable Account Value is cancellable under the circumstances set forth herein.

Your entire unpaid vested and unvested Applicable Account Value is also subject to cancellation in full, or in the case of a Cancellation Clawback Event described in clause (c) below, in full or in part, subject to applicable law, until the Scheduled Distribution Date if you engage in any Prohibited Activity, as defined below.

"***Prohibited Activity***" means you (1) without the written consent of the Firm, at any time prior to the Scheduled Distribution Date, (i) use for the benefit of any person or entity other than the Firm, or disclose to any third party Non-Public, Privileged or Confidential Information or Trade Secrets, (ii) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm, (iii) engage in any other conduct in violation of any contractual or legal obligations to the Firm or (iv) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information; or (2) (i) are terminated for Cause, or (ii) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Distribution Date), or (iii) following termination of your Employment, the Firm determines that you could have been terminated for Cause; or (3) without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Distribution Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding termination, in any capacity in a retail branch or in a retail sales or product representative position; or (4) without the written consent of the Firm, before the earlier to occur of two years after termination and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (i) any of the Firm's customers who were serviced by you while employed by the Firm; or (ii) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding termination; or (5) without the written consent of the Firm, before the earlier to occur of three years after termination and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm); or (6) without the written consent of the Firm, make Defamatory or Disparaging Comments or Unauthorized Disclosures about the Firm; or (7) engage in a Clawback Cancellation Event.

"***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including, but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

"***Cause***" means:

(x) any act or omission which constitutes a breach by you of your obligations to the Firm including, without limitation, (i) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (ii) your failure to comply with the Firm's compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you; or

(y) your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

(z) a violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules and regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (c) of Clawback Cancellation Event below and is deliberate, intentional or willful.

You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices,



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following termination of Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

"***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(a) causes a restatement of the Firm's consolidated financial results;

(b) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(c) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

  (i) violation of business unit, product or desk specific risk parameters;

  (ii) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

  (iii) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

  (iv) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (c) and you do not engage in any other cancellation or clawback event described herein, the award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**Covenants and Certification**

In the event you fail to acknowledge, within the time and in the manner prescribed by the Firm, a notice and non-solicitation or other restrictive covenant agreement required of you by the Firm, the Firm has a right to cancel your award.

You may be required to provide Morgan Stanley with a written certification or other evidence that it deems appropriate, in its sole discretion, to confirm that no Prohibited Activity has occurred. If you fail to submit a timely certification or evidence, Morgan Stanley will cancel your award.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Tax Withholding**

Vesting and payment of your Applicable Account Value, whether on the Scheduled Vesting Date or Scheduled Distribution Date or some other date, shall be subject to withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation owed to you, including by canceling or accelerating payment of a portion of your Applicable Account Value in an amount not to exceed such taxes imposed upon vesting or payment and any additional taxes imposed as a result of such cancellation or acceleration, subject to limitations imposed under Section 409A.

**Award Modification**

Morgan Stanley generally has the right to modify or amend the terms of your award without your consent. However, Morgan Stanley may not make a modification that would materially impair your rights in such award without your consent unless such modification is necessary or advisable (i) to comply with any law, regulation, ruling, judicial decision, accounting standard or similar pronouncement or (ii) to ensure that awards are not subject to federal, state or local income tax prior to payment.

**Timing of Payment (Section 409A Rule of Construction)**

With respect to any provision that provides for payment on a specified event or date, such payment will be considered to have been timely made as long as payment is made by December 31st of the year in which occurs the specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date.

**U.S. Taxation**

In general, when your Applicable Account Value is paid, the amount of the payment will be taxed as ordinary income. FICA and Medicare tax apply at the time your Applicable Account Value is deemed to vest for tax purposes. Please refer to the Tax Supplement for a fuller discussion of these tax consequences.

**Non-U.S. Taxation**

Taxation on grant, vesting and payment depends on the tax laws and regulations in your jurisdiction.

**Governing Law**

New York Law.

**By accepting this award, you acknowledge that you have received all 2016 deferred compensation to which you are entitled. Nothing in this summary or any correspondence related to this award should be construed as a guarantee of an MSCIP award or any particular level of compensation, bonus or benefits. Please note that the Firm does not commit to granting the award described in this summary in the future. These awards do not create a contract or guarantee of employment, or modify any agreement entered into by Morgan Stanley or any of its affiliates and you.**

**This program is not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. Participants should not look to this program as a source of retirement income. This program is not subject to the Employee Retirement Income Security Act of 1974 (ERISA).**

**You are required to keep confidential all matters relating to MSCIP to the fullest extent permitted by law. The provisions of the Firm's Code of Conduct regarding Confidential and Proprietary Information shall cover all aspects of MSCIP.**

**Morgan Stanley does not render advice on tax and tax accounting matters.**



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

Financial Advisor/Private Wealth Advisor

# 2018 Compensation Plan, Lending Growth Award and Recognition Programs

## Compensation and Recognition Program

As of December 19, 2018

Confidential—for internal Morgan Stanley Wealth Management use only. Not to be displayed or distributed to the general public.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

# » 2018 Advisor Compensation Plan, Lending Growth Award and Recognition Programs

TABLE OF CONTENTS

1. Compensation Programs
  1.1 Salary .......... 2
  1.2 Incentive Compensation .......... 3
2. Lending Growth Award Program .......... 17
3. Other Programs
  3.1 Capital Accumulation Program .......... 22
  3.2 Former Advisor Program .......... 23
  3.3 Business Development Allowance .......... 24
  3.4 Alternative Flexible Grid .......... 25
  3.5 Morgan Stanley Online .......... 26
  3.6 Discretionary Fee Waiver Allowance .... 27
4. Recognition Programs
  4.1 Club Memberships for 2019 .......... 28
  4.2 Titles .......... 29
5. Other
  5.1 Summary and Additional Information .......... 30
  5.2 Version History .......... 31

*This document will be periodically updated with any changes. To obtain the latest version, visit the 2018 Advisor Compensation website on 3DR > Practice > Advisor Compensation 2018. In addition, the most recent version of the detailed 2018 Product Appendix is available on the website.*

## Introduction

The Morgan Stanley Wealth Management Financial Advisor / Private Wealth Advisor (collectively "Advisor" or "FA/PWA") Compensation Plan provides Advisors with a guaranteed salary as well as an opportunity to generate significant additional income through Incentive Compensation and the Growth Award.

## Incentive Compensation

Eligibility is determined monthly based on Total Credits (based on the Credit Rate Schedule and Credit Rate Schedule Exceptions described in sections 1.2.1 & 1.2.6) derived from Trailing 12-month Gross Revenue and the rules and conditions set forth in this Program. Incentive Compensation is comprised of Cash Credits that are awarded and paid in cash each month, and Deferred Credits that accrue each month and are granted as a deferred compensation award in early 2019.

## Lending Growth Award Program

The 2018 Lending Growth Award Program rewards Advisors who help clients meet their Lending needs in a manner that is consistent with their clients' best interests. The Program is comprised of the following components:

- **Lending Growth Award** rewards Advisors who utilize Lending opportunities consistent with the best interests of clients
- Advisors who receive a Lending Growth Award will also receive:
  - **25% Additional Business Development Allowance ("BDA")** to further invest in growing Advisor businesses
  - **Support Staff Recognition Balance** to acknowledge the integral contributions support staff provide in growing Advisor businesses. Advisors will receive the ability to direct the Firm to provide certain funds to support staff

The Lending Growth Award Program is calculated annually and will be awarded prior to March 31, 2019.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## How it adds up:

### Total Potential Incentive Compensation and Lending Growth Award[1,2]

(Assumes positive revenue growth in 2018, with respect to 2017, and that Trailing 12-month Gross Revenue remained in the respective band for all of 2018)

| Trailing 12-month Gross Revenue ($) | Lending Balance Growth ($) | Length of Service / Length of Experience (years) | | | | |
|---|---|---|---|---|---|---|
| | | 5 | 10 | 15 | 20 | 25 |
| 5,000,000 | 45,000,000 | 56.1% | 58.1% | 58.6% | 59.1% | 59.6% |
| 3,300,000 | 35,000,000 | 54.1 | 56.1 | 56.6 | 57.1 | 57.6 |
| 2,750,000 | 30,000,000 | 53.1 | 55.1 | 55.6 | 56.1 | 56.6 |
| 2,400,000 | 25,000,000 | 51.8 | 53.8 | 54.3 | 54.8 | 54.8 |
| 1,800,000 | 19,000,000 | 51.1 | 53.1 | 53.6 | 53.6 | 53.6 |
| 1,200,000 | 15,000,000 | 50.7 | 52.7 | 52.7 | 52.7 | 52.7 |
| 975,000 | 12,500,000 | 48.2 | 49.7 | 49.7 | 49.7 | 49.7 |
| 900,000 | 10,000,000 | 47.0 | 48.5 | 48.5 | 48.5 | 48.5 |
| 725,000 | 7,500,000 | 46.1 | 47.6 | 47.6 | 47.6 | 47.6 |
| 600,000 | 5,000,000 | 44.4 | 45.9 | 45.9 | 45.9 | 45.9 |
| 485,000 | 2,750,000 | 43.5 | 43.5 | 43.5 | 43.5 | 43.5 |
| 425,000 | 2,500,000 | 40.1 | 40.1 | 40.1 | 40.1 | 40.1 |
| 360,000 | 1,500,000 | 37.5 | 37.5 | 37.5 | 37.5 | 37.5 |
| 300,000 | 750,000 | 34.9 | 34.9 | 34.9 | 34.9 | 34.9 |
| 240,000 | 500,000 | 32.7 | 20.0 | 20.0 | 20.0 | 20.0 |

## 1.1 Salary

All Advisors will receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state.

The salary for each Advisor is determined by the state in which the Advisor is employed. The table below summarizes the current Advisor salaries by state. However, the salaries are subject to prospective adjustment throughout the year at Morgan Stanley Wealth Management's sole discretion, including changes based on applicable federal or state law.

Salary payments will be made bi-monthly, on the 15th (or on the preceding business day should the 15th fall on a weekend or holiday) and the last business day of each month. If applicable, incentive compensation payments will be made on the 10th of each month (or on the preceding business day should the 10th fall on a weekend or holiday).

Monthly Salary by State

| State | Advisor Salary ($) |
|---|---|
| Alaska | 3,412 |
| California | 3,814 |
| Connecticut | 2,059 |
| Hawaii | 2,000 |
| Maine | 2,500 |
| New York | 4,225 |
| Oregon | 2,080 |
| All Other | 1,972 |

[1] Chart reflects estimates and is not intended to reflect a guarantee of any level of remuneration or income

[2] Assumes Advisor was hired before January 1st, 2016, is not part of the Financial Advisor Associate ("FAA") program at the end of 2018, had Gross Revenue in 2017 that was greater than zero, was not in a non-producing role at any time during 2017, and did not end 2018 with a 20% Credit Rate



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26