6) Total Credits – Advisors are allocated monthly Total Credits based on the Credit Rate Schedule (Section 1.2.1), Credit Rate Schedule Exceptions (Section 1.2.7), and Total Credit Adjustments

7) Total Credit Adjustments – Credits are adjusted upwards or downwards to reflect Incentive Compensation for which the Advisor did not receive proper Credits, or for which the Advisor received prior Credits that he/she should not have received. Under no circumstances is an Advisor to be allocated Credits or maintain Credits for transactions that were canceled, that did not close, that were reversed, where Morgan Stanley determines the credits were issued for conduct inconsistent with its expectations for good guardianship, and/or where the Advisor was allocated Credits in error

8) Deferred Credits –Monthly Total Credits multiplied by the Advisor's Deferral Ratio as defined in the Deferral Ratio schedule (Section 1.2.2)

9) Cash Credits– Monthly Total Credits less monthly Deferred Credits

10) Cash Credit Advance – Monthly Cash Credits that are in excess of the Advisor's monthly Salary

11) Length of Service ("LOS") – The number of whole years that an Advisor has been employed by Morgan Stanley Wealth Management on or after June 1, 2009 plus the number of whole years that the Advisor was employed by either legacy Morgan Stanley or legacy Smith Barney immediately preceding his/her employment with Morgan Stanley Wealth Management, rounded down to the nearest whole year. LOS will not include any period of employment preceding employment at the immediately prior legacy firm, including prior employment at either Morgan Stanley or Smith Barney. LOS for all purposes related to Advisor Compensation shall be defined exclusively as set forth in this paragraph and without reference to any other LOS definition that the Firm may apply in other contexts, including, for example, for purposes of certain benefits calculations

12) Length of Experience ("LOE") – The number of whole years that an Advisor has been a Registered Representative in the industry; calculated by subtracting the year of registration from the current year and subtracting "1" from the resulting number

Under no circumstances shall an Advisor be eligible to receive any Incentive Compensation under this Program unless and until the Incentive Compensation calculation is made and the Advisor meets all other conditions for receipt of such Incentive Compensation as determined by Morgan Stanley Wealth Management in its sole discretion. In the event an Advisor who has been advanced Incentive Compensation because of fees that were charged to a customer in advance terminates employment with the Firm, the Advisor's allocated Total Credits in the final month of employment will be adjusted to account for the unearned portion of the advanced Cash Credits. In addition, an Advisor is obligated to repay Morgan Stanley Wealth Management any outstanding advanced, but unearned, Incentive Compensation after termination of employment.

Morgan Stanley Wealth Management expects its Advisors to demonstrate excellent guardianship at all times, including demonstrating the utmost professionalism and upholding the highest ethical and regulatory standards and its Incentive Compensation programs are premised on that expectation. Accordingly, Morgan Stanley Wealth Management reserves the right, on notice to the impacted individual, to make prospective downward adjustments to an individual Advisor's Credit Rate, or to make other downward adjustments as part of the calculation of Incentive Compensation at any time, where, in its sole judgment, such an adjustment is warranted based on the Advisor's conduct. The determination as to whether a downward adjustment is warranted on account of guardianship issues will be made by Morgan Stanley Wealth Management in its sole discretion, but may include, for example, significant trade errors, excessive or significant customer complaints, regulatory or ethical lapses, or other conduct that is determined to be contrary to the best interests of the clients or the Firm.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.4 Financial Planning Enhancement

The Financial Planning Enhancement is designed to reward Advisors who utilize planning tools to understand the financial needs and investment objectives of clients. The enhancement is evaluated at the end of each month and the Credit Rate enhancement applies in the subsequent month. A 1% Credit Rate enhancement is added to the Advisor's standard Credit Rate and applied to Grid Revenue generated by Qualifying Clients.

*Qualifying GPS/Lifeview Plan:* A Goals-Based Planning System ("GPS") or LifeView plan that meets the following requirements.

- Must have a retirement goal
- Must have been adopted or reassessed and readopted within the past 24 months, in consultation with the client
- Must have goal-plan monitoring enabled
- Must be a plan for a client that is enrolled in Morgan Stanley Online ("MSO")[4]

*Eligible Accounts*: All accounts are eligible for the Financial Planning Enhancement except for:

- Accounts that are subject to the Small Households Policy
- Account Linked Groups ("ALG") that have $10,000,000 or greater in Assets Under Management ("AUM")

*Party*: All accounts associated with an individual Social Security Number ("SSN") or Tax Identification Number ("TIN").

*Account Link Group ("ALG")*: A group of accounts that have the same mailing address or plating address and Morgan Stanley employment status[5].

*Qualifying GPS Account*: All Eligible Accounts associated with a Party that has at least one Eligible Account with a Qualifying GPS Plan.

*Qualifying GPS Client*: All Eligible Accounts within an ALG that has at least one Qualifying GPS Account.

*Qualifying LifeView Client*: All Eligible Accounts within an ALG that has at least one Eligible Account with a Qualifying LifeView Plan.

**Example 1:**
An Advisor with a Credit Rate of 48% receives a 1% Credit Rate enhancement on Grid Revenue generated from two Qualifying GPS Accounts in an ALG:

- In May 2020, the Advisor creates a Qualified GPS Plan for Party A. Party A has one Eligible Account
- Party B has one Eligible Account
- Party A and Party B have their accounts linked in an ALG, therefore Party B's Eligible Account qualifies for the Financial Planning Enhancement

In June 2020, the Advisor will receive a 49% (48% + 1%) Credit Rate on Grid Revenue generated by Party A and Party B's Eligible Accounts.

Morgan Stanley Wealth Management reserves the right, at its sole discretion, to review all potential enhancements under this section and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Financial Planning Enhancement, including, without limitation, based on an assessment of the quality of the applicable GPS or LifeView plans and/or engagement with the client on such plans.

[4] A client is considered enrolled in MSO once they create a username and password, accept the Morgan Stanley Online Terms and Conditions, select real-time or delayed market data, and successfully login to their account through Morgan Stanley Online or the Morgan Stanley Mobile App for the first time.
[5] All accounts within an ALG must be non-employee or employee/employee-related



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.5 Net Acquired Assets ("NAA") Incentive

The Net Acquired Assets ("NAA") Incentive is designed to reward organic growth of assets at the Client[6] level. The NAA Incentive is evaluated at the end of each month and the Credit Rate enhancement applies in the subsequent month. Pre-split Trailing 12-month NAA as of month-end and Assets Under Management ("AUM") as of month end from 13 months prior at the Client level are used to determine qualification. The Credit Rate enhancement is added to the Advisor's standard Credit Rate and applied to Grid Revenue generated by the qualifying Client.

**NAA Incentive Eligibility**

- Client must have at least $25,000 in Trailing 12-month NAA; AND
- Account must not be subject to the Small Households policy; AND
- Advisor must have been hired before January 1, 2018

**Net Acquired Assets Incentive Schedule**

Credit allocation for the NAA Incentive will be based on the schedule below.

NAA Incentive Schedule

| Trailing 12-month NAA ($) | | Trailing 12-month NAA / AUM From 13 Months Prior | Credit Rate Enhancement |
|---|---|---|---|
| $5,000,000+ | | N/A | 3% |
| $2,000,000 - 4,999,999 | OR | N/A | 2% |
| $500,000 - 1,999,999 | | 5%+ | 1% |

**Exclusions[7] may include but are not limited to:**

- Internal asset transfers (i.e., journals) between client accounts
- Fixed Income maturities, calls or return of principal payments
- Corporate action distributions
- DVP/RVP accounts
- CSX accounts
- Non-Custodied Fee-Based assets
- Non-Morgan Stanley 529 plans
- Non-networked or Advisory 401(k) plans
- Physical Assets/Commodities
- All fees and commissions

**Example:**

An Advisor with a Credit Rate of 48% has a client with $1,000,000 of assets as of May 31, 2019 and Trailing 12-month NAA of $75,000 as of June 30, 2020. Because the client has Trailing 12-month NAA divided by AUM greater than 5%: [$75,000 / $1,000,000 = 7.5%], the Advisor will receive a 49% (48% + 1%) Credit Rate on Grid Revenue generated by the qualifying Client in July 2020.

Morgan Stanley Wealth Management reserves the right, at its sole discretion, to review all NAA activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the NAA Incentive.

[6] Client is defined as Account Link Group ("ALG")
[7] As of November 2019, the items listed are excluded from the calculation of NAA and are subject to change at the sole discretion of Morgan Stanley Wealth Management for any reason



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.6 Team Compensation

In 2020, the Firm will continue to provide the opportunity for eligible Team members to receive an increased Credit Rate based on the Individual Eligibility or Team Eligibility Criteria below.

For purposes of Team Compensation, a Team eligible for Team Compensation must consist of two or more Advisors who each derive at least 50% of their individual Trailing 12-month Gross Revenue from business generated in JPN(s) they share with each other.

**Individual Eligibility**

To be considered for Team Compensation through Individual Eligibility, an Advisor must meet the following criteria:

- Be a Team eligible for Team Compensation, defined as each Team member generating at least 50% of their individual Trailing 12-month Gross Revenue from business generated in JPN(s) they share with each other
- Generate Trailing 12-month Gross Revenue at or above the 50th percentile by industry Length of Experience ("LOE") thresholds[8] as published on the 2020 Advisor Compensation website
- Generate at least 10% of the Team's aggregate Trailing 12-month Gross Revenue OR if the Team's aggregate Trailing 12-month Gross Revenue is greater than $3,000,000, generate at least 5% of the Team's aggregate Trailing 12-month Gross Revenue

**Team Eligibility**

The Team as a whole can also qualify for Team Compensation through Team Eligibility. To be considered for Team Eligibility, the Team must meet the following criteria:

- Be a Team eligible for Team Compensation, defined as each Team member generating at least 50% of their individual Trailing 12-month Gross Revenue from business generated in JPN(s) they share with each other
- Generate aggregate Trailing 12-month Gross Revenue of at least $2,500,000 AND have average Gross Revenue per Advisor of at least $750,000

Once a Team has qualified for Team Compensation through Team Eligibility, the following will apply to each new Advisor who joins the Team:

- If average Trailing 12-month Gross Revenue per Advisor is at least $750,000 when the new Team member is added, the new Team member will also qualify for Team Compensation through Team Eligibility
- If average Trailing 12-month Gross Revenue per Advisor falls below $750,000 when the new Team member is added, the new Team member will be excluded from Team Eligibility calculations and will not qualify for Team Compensation through Team Eligibility
  - Team Eligibility for existing Team members will not be affected
  - The new Team member may qualify for Team Compensation through Individual Eligibility criteria

Advisors eligible for Team Compensation will receive the Credit Rate, determined monthly, that corresponds to:

- The Trailing 12-month Gross Revenue band of the Advisor on the Team with the highest Trailing 12-month Gross Revenue; AND
- The lower LOS band between (i) the Advisor on the Team with the highest Trailing 12-month Gross Revenue and (ii) the Advisor eligible for Team Compensation

Eligible Advisors will receive the Deferral Ratio that corresponds to the Trailing 12-month Gross Revenue band of the Advisor on the Team with the highest Trailing 12-month Gross Revenue.

An Advisor's individual Credit Rate cannot be reduced because of Team Compensation, nor can an Advisor's Team Compensation Credit Rate be greater than the Credit Rate of the Advisor on the Team with the highest Trailing 12-month Gross Revenue.

[8] Advisor with the highest Gross Revenue on the Team must also generate Trailing 12-month Gross Revenue at or above the 50th percentile threshold by LOE band



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 1: Compensation Programs

Advisors who meet the Individual Eligibility requirements or the Team Eligibility requirements for Team Compensation described above at any time during 2020 will be eligible for Team Compensation beginning the month following his/her qualification. Advisors will receive Team Compensation prospectively through the end of the year, provided the Team continues to satisfy the requirements identified above, but will NOT be awarded Team Compensation retroactively.

Team Compensation is not extended to Advisors outside of a Team relationship, to members of a Team that subsequently dissolves, or to Advisors who leave a Team relationship. In such instances, an Advisor's Credit Rate and Deferral Ratio will revert to his/her individual Credit Rate and Deferral Ratio.

**Team Compensation Example 1:**
The following Advisors are on a Team for all of 2020 and generated Trailing 12-month Gross Revenue at or above their respective 50th percentile by LOE thresholds:

- Advisor #1 produces $1,500,000 of Trailing 12-month Gross Revenue, as of June month-end, and has LOS of 20 years; the associated Credit Rate is 48.0% and Deferral Ratio is 10.0%
- Advisor #2 produces $400,000 of Trailing 12-month Gross Revenue, as of June month-end, and has LOS of 4 years; the associated Credit Rate is 36.0% and Deferral Ratio is 3.5%

Advisor #2's Credit Rate will be determined using Advisor #1's Trailing 12-month Gross Revenue band and Advisor #2's LOS band. Therefore, Advisor #2's Credit Rate in July will be 45.5% and Deferral Ratio will be 10.0%.

**Team Compensation Example 2:**
The following Advisors are on a Team for all of 2020 and generated Trailing 12-month Gross Revenue at or above their respective 50th percentile by LOE thresholds:

- Advisor #1 produces $1,300,000 of Trailing 12-month Gross Revenue, as of August month-end, and has LOS of 5 years; the associated Credit Rate is 46.0% and Deferral Ratio is 10.0%
- Advisor #2 produces $600,000 of Trailing 12-month Gross Revenue, as of August month-end, and has LOS of 7 years; the associated Credit Rate is 41.5% and Deferral Ratio is 5.0%

Advisor #2's Credit Rate will be determined using Advisor #1's Trailing 12-month Gross Revenue band and Advisor #1's LOS band. Therefore, Advisor #2's Credit Rate for September will be 46.0% and Deferral Ratio will be 10.0%

**Recruits**
Recruits will be treated in the same manner as an established Advisor by evaluating the Trailing 12-month Gross Revenue listed on their recruit paperwork against the published 50th percentile by LOE threshold.

**Financial Advisor Associates ("FAAs")**
FAAs are not eligible for Team Compensation while participating in the FAA program.

Teams[9] that partner with an FAA will be eligible for Phantom Gross Revenue[10], based on the amount of Gross Revenue that the FAA[11] generates in the Team. To receive Phantom Gross Revenue, a non-FAA Team member must generate at least $500,000 in Trailing 12-month Gross Revenue and have LOE greater than or equal to 5 years. Non-FAA Team members and the FAA must also generate at least 50% of their individual Trailing 12-month Gross Revenue from JPN(s) shared with the Team or be on bypass towards achieving the 50% threshold.

The maximum amount of Phantom Gross Revenue that non-FAA Team members can receive in aggregate is:

- Up to $30,000 while FAA is in production months 1-12
- Up to $20,000 while FAA is in production months 13-24

[9] Includes Teams who intend to form a Team but are 6 to 9 months from materializing
[10] Phantom Gross Revenue is revenue with 0% Credit Rate and is included in annual Gross Revenue to determine an Advisor's Credit Rate and Deferral Ratio, BDA/DFWA, club qualifications, and titles
[11] Phantom Gross Revenue will not be awarded on Gross Revenue generated by a FAA(s) designated as Does Not Meet ("DNM") requirements



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Phantom Gross Revenue will be allocated to non-FAA Team members based on current JPN split percentages, excluding the FAA's portion from the total. FAAs will not be eligible for Phantom Gross Revenue.

**Team Compensation Example 3:**
The following two Advisors are on a Team and partner with an FAA:

- Advisor #1 and Advisor #2 both have LOS of 10 years, $1,200,000 in Trailing 12-month Gross Revenue and a 40% split on the Team
- FAA joins the team in production month 1, produces $70,000 in Trailing 12-month Gross Revenue by production month 12, and has a 20% split on the Team

Advisors #1 and #2 will receive the full $30,000 in Phantom Gross Revenue. Excluding the FAA's portion of the Team's current JPN split, Advisors #1 and #2 both have a 50% split of the Phantom Gross Revenue. Therefore, Advisors #1 and #2 will receive $15,000 each in Phantom Gross Revenue.

### 1.2.7 Credit Rate Schedule Exceptions

**Advisor / Advisor-Related Retirement Accounts**
All transactions in retirement accounts categorized as Advisor or Advisor-related will not be eligible for Incentive Compensation. Advisor / Advisor-Related accounts include all accounts where the accountholder is the Advisor's spouse, child, financial dependent, or other relation whose account(s) the Advisor could reasonably be expected to influence or control[12]. Retirement accounts include traditional, Roth, SIMPLE, and SEP Individual Retirement Accounts ("IRAs"); 403(b) plans; Versatile Investment Program ("VIP") accounts; Retirement Plan Manager ("RPM") accounts; Coverdell Education Savings Account ("ESA"); and other Retirement Planning accounts.

**Equity, Options, and Choice Select Discounting**
In situations where an Advisor exercises discretion to offer a discount to the client, the Advisor's Credit Rate will be reduced per the Discretionary Discounting Schedule below, subject to a minimum 10% Credit Rate. Discounting on cents-per-share trades will be converted to a percentage discount.

Discretionary Discounting Schedule Summary

| Pricing | Credit |
|---|---|
| Discount of 0% up to 10% | Credit Rate minus 60bps per 1% of Discount over 0% |
| Discount over 10% and up to 30% | Credit Rate minus 45bps per 1% of Discount over 10% |
| Discount over 30% and up to 45% | Credit Rate minus 40bps per 1% of Discount over 30% |
| Discount greater than 45% | Credit Rate minus 25bps per 1% of Discount over 45% |

[12] Scope of Advisor-related account flag is subject to change; policy will apply to all accounts currently self-disclosed and identified as Advisor-related



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 1: Compensation Programs

The below Discretionary Discounting Schedule details the exact impact to the Advisor's Credit Rate based on the level of discount offered to the client. All numbers shown are quoted as percentages:

Discretionary Discounting Schedule

| Level of Discount (%) | Credit Rate Reduction (%) | Level of Discount (%) | Credit Rate Reduction (%) | Level of Discount (%) | Credit Rate Reduction (%) | Level of Discount (%) | Credit Rate Reduction (%) |
|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 25 | 12.75 | 50 | 22.25 | 75 | 28.50 |
| 1 | 0.60 | 26 | 13.20 | 51 | 22.50 | 76 | 28.75 |
| 2 | 1.20 | 27 | 13.65 | 52 | 22.75 | 77 | 29.00 |
| 3 | 1.80 | 28 | 14.10 | 53 | 23.00 | 78 | 29.25 |
| 4 | 2.40 | 29 | 14.55 | 54 | 23.25 | 79 | 29.50 |
| 5 | 3.00 | 30 | 15.00 | 55 | 23.50 | 80 | 29.75 |
| 6 | 3.60 | 31 | 15.40 | 56 | 23.75 | 81 | 30.00 |
| 7 | 4.20 | 32 | 15.80 | 57 | 24.00 | 82 | 30.25 |
| 8 | 4.80 | 33 | 16.20 | 58 | 24.25 | 83 | 30.50 |
| 9 | 5.40 | 34 | 16.60 | 59 | 24.50 | 84 | 30.75 |
| 10 | 6.00 | 35 | 17.00 | 60 | 24.75 | 85 | 31.00 |
| 11 | 6.45 | 36 | 17.40 | 61 | 25.00 | 86 | 31.25 |
| 12 | 6.90 | 37 | 17.80 | 62 | 25.25 | 87 | 31.50 |
| 13 | 7.35 | 38 | 18.20 | 63 | 25.50 | 88 | 31.75 |
| 14 | 7.80 | 39 | 18.60 | 64 | 25.75 | 89 | 32.00 |
| 15 | 8.25 | 40 | 19.00 | 65 | 26.00 | 90 | 32.25 |
| 16 | 8.70 | 41 | 19.40 | 66 | 26.25 | 91 | 32.50 |
| 17 | 9.15 | 42 | 19.80 | 67 | 26.50 | 92 | 32.75 |
| 18 | 9.60 | 43 | 20.20 | 68 | 26.75 | 93 | 33.00 |
| 19 | 10.05 | 44 | 20.60 | 69 | 27.00 | 94 | 33.25 |
| 20 | 10.50 | 45 | 21.00 | 70 | 27.25 | 95 | 33.50 |
| 21 | 10.95 | 46 | 21.25 | 71 | 27.50 | 96 | 33.75 |
| 22 | 11.40 | 47 | 21.50 | 72 | 27.75 | 97 | 34.00 |
| 23 | 11.85 | 48 | 21.75 | 73 | 28.00 | 98 | 34.25 |
| 24 | 12.30 | 49 | 22.00 | 74 | 28.25 | 99 | 34.50 |

The Equity and Options Discounting Policy shall not apply to the following:

| Discount Exceptions |
|---|
| Employee Accounts |
| Employee - Related Accounts |
| Futures (the below Futures Discount Sharing policy applies) |
| Ladder Portfolios - All one-ticket, preplanned ladders in order-entry inventory |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| Corporate Equity Solutions ("CES") - directed Brokerage |
| Flat-Rate accounts are credited at lower of Credit Rate or Flat-Rate |
| Equity Transactions (excluding Choice Select) with commission amount of $350 or more (exemption does not apply to commissions priced at an effective rate of <4 cents per share) |
| Options Transactions (excluding Choice Select) with commission amount of $350 or more (exemption does not apply to transactions with premiums ≥ $1.00 and commissions < $3.00 per contract (equivalent to $0.03 per share) or premiums < $1.00 and commissions < $1.00 per contract (equivalent to $0.01 per share) |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Example 1: Equity transaction with a commission charged to the client of less than $350**
An Advisor with a Credit Rate of 36% executes a trade with a commission of $400:

- Advisor discounts this trade by 40%, yielding commissions of $240 [$400 – ($400 * 40%) = $240]
- As seen in the Discount Sharing Schedule above, the Credit Rate reduction on this trade is 19%
- Credit Rate on this trade is 17% [36% - 19% = 17%]
- Advisor's Total Credit is $40.80 [$240 * 17% = $40.80]

**Example 2: Option transaction with a commission charged to the client of less than $350, subject to a 10% minimum Credit Rate**
An Advisor with a Credit Rate of 36% executes a trade with a commission of $600:

- Advisor discounts this trade by 80%, yielding commissions of $120 [$600 – ($600 * 80%) = $120]
- As seen in the Discount Sharing Schedule above, the Credit Rate reduction on this trade is 29.75%
- Calculated Credit Rate on this trade is 6.25% [36% - 29.75% = 6.25%] however, the applicable Credit Rate will be 10% due to minimum Credit Rate criteria
- Advisor's Total Credit is $12.00 [$120 * 10% = $12.00]

**Futures and Commodities Discounting**
In situations where the Advisor exercises discretion to offer a discount to the client, the Advisor's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate.

Summary Table

| Commission Per Half-Turn Contract | Credit |
|---|---|
| Above and equal to $18.00 | Credit Rate |
| Less than $18.00 | Credit Rate minus 1% for each dollar, or portion of dollar, of commission per half-turn under $18.00 |

Below is a detailed table showing the exact impact to Credit allocation based on level of discount:

Detailed Table

| Commission Per Half-Turn Contract | Credit Rate Reduction | Commission Per Half-Turn Contract | Credit Rate Reduction |
|---|---|---|---|
| $17.00 to $17.99 | 1.0% | $8.00 to $8.99 | 10.0% |
| $16.00 to $16.99 | 2.0% | $7.00 to $7.99 | 11.0% |
| $15.00 to $15.99 | 3.0% | $6.00 to $6.99 | 12.0% |
| $14.00 to $14.99 | 4.0% | $5.00 to $5.99 | 13.0% |
| $13.00 to $13.99 | 5.0% | $4.00 to $4.99 | 14.0% |
| $12.00 to $12.99 | 6.0% | $3.00 to $3.99 | 15.0% |
| $11.00 to $11.99 | 7.0% | $2.00 to $2.99 | 16.0% |
| $10.00 to $10.99 | 8.0% | $1.00 to $1.99 | 17.0% |
| $9.00 to $9.99 | 9.0% | | |

Discounting below $1.00 per Half-Turn Contract is only allowed with prior approval from Capital Markets, and will result in a 17.0% Credit Rate reduction.

**Example:**
If an Advisor with a Credit Rate of 36% executes 10 Futures or Commodities contracts with half-turn commission of $10.25 per contract, the Credit Rate on this trade would be 28.0% [36.0% - 8.0% = 28.0%]. The Futures and Commodities Discounting policy shall not apply to tickets of $350 or more where the half turn is $5.00 or greater.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Advisory Program[13] Discounting**

In situations where an Advisor exercises discretion to offer a discount to the client, the Advisor's Credit Rate will be reduced per the Discretionary Discounting Schedule below, subject to a minimum 10% Credit Rate:

Summary Table

| Advisory Relationship Asset Size | Credit |
|---|---|
| Above or equal to $5,000,000 | Credit Rate |
| Less than $5,000,000 | Credit Rate minus 1% for each basis point the client fee is priced below the applicable Support Level[14] |

**Example 1:**

If an Advisor with a Credit Rate of 36% prices an account with an Advisory Relationship Asset Size of $250,000 (1.15% Standard Support Level) at 1.05%, or 10 bps below the Standard Support Level, the Credit Rate on this account would be 26% [36% - 10% = 26%].

**Value Pricing Program**

Advisors will be exempt from the Advisory Programs Discounting policy if no more than 40% of the Advisor's eligible[15] post-split assets are priced on average below the Benchmark Level[16] on a Trailing 12-month period.

**Small Households**

Any Household with a Household Value within the below mentioned thresholds for four consecutive months is considered a Small Household.

The Household Value prior to April 1, 2020 is calculated each month using the greater of: (i) the asset balance calculated on the last trade date of the immediately preceding three months; or (ii) the asset balance on the trade date of the current month. The Household Value after April 1, 2020 is calculated each month using the greater of: (i) the asset and liability balance calculated on the last trade date of the immediately preceding three months; or (ii) the asset and liability balance on the trade date of the current month. Credit allocation for Gross Revenue generated in Small Households will be based on the tables below:

Financial Advisor – Small Households Schedule

| Household Value ($) | Qualifying Financial Plan[17] | Credit Rate(%) |
|---|---|---|
| 100,000 - 249,999 | Yes | Standard Credit Rate |
| | No | 10 |
| 0 - 99,999 | N/A | 5 |

Credit allocation for PWAs will be based on the PWA Small Households policy rules in the table below for Households where 50.01% or greater of the aggregate split of a FA number or JPN is credited to PWAs AND all of the accounts within the Household that were opened on or after April 1, 2015. Households with the earliest account opened before April 1, 2015 will be subject to the FA Small Households policy rules in the table above until March 31, 2020. Effective April 1, 2020, all credit allocation for PWAs will be based on the PWA Small Households policy rules in the table below.

[13] Consulting Group Products include: Consulting & Evaluation Services ("CES"), Investment Management Services ("IMS"), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor

[14] Support Levels can be found in the FA/PWA Compensation Plan, Lending Growth Award and Recognition Programs Product Appendix

[15] Eligible Advisory Assets exclude Institutional, CGCM Retirement, Employee/Employee Related Accounts, and where at least 80% of the Account or 60% of the CG Billing Relationship is in fixed income, cash and cash equivalents

[16] The Benchmark Level is a firm established price level set approximately at the 60th percentile per relationship tier, as determined by the Firm

[17] Qualification for Financial Planning Enhancement excluding requirement that the account not be subject to the Small Household Policy



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Private Wealth Advisor – Small Households Schedule

| Household Value ($) | Qualifying Financial Plan[17] | Credit Rate(%) |
|---|---|---|
| 100,000 - 1,999,999 | Yes | Standard Credit Rate |
| | No | 10 |
| 0 - 99,999 | N/A | 5 |

Credit allocation for Non-Resident Client ("NRC") accounts will be based on the NRC Account Small Households policy rules in the tables below.

Non-Resident Client Households – Opened before April 1, 2019 – Small Households Schedule

| Household Value ($) | Qualifying Financial Plan[17] | Credit Rate(%) |
|---|---|---|
| 100,000 - 499,999 | Yes | Standard Credit Rate |
| | No | 10 |
| 0 - 99,999 | N/A | 5 |

Non-Resident Client Households – Opened after April 1, 2019 – Small Households Schedule

| Household Value ($) | Qualifying Financial Plan[17] | Credit Rate(%) |
|---|---|---|
| 100,000 – 1,999,999 | Yes | Standard Credit Rate |
| | No | 10 |
| 0 - 99,999 | N/A | 5 |

The Small Households Policy shall not apply to the following:

| **Small Households Exceptions** |
|---|
| Alternative Investments that drawdown against a commitment |
| Insurance |
| Delivery Versus Payment ("DVP") Accounts |
| Financial Planning Fees |
| New Households (opened within previous 12 months) |
| Small Business IRA Accounts, including SEP IRA, SAR-SEP IRA, and SIMPLE IRA |
| Business Retirement Plan Accounts, including Versatile Investment Program ("VIP"), Retirement Plan Manager ("RPM"), Self-Directed Retirement ("SDR"), 403(b) and External Custodian Retirement Plans |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Consulting Group Non-Custody Accounts |
| First State Trust Company Accounts (Product Codes 532 and 533) |

**Household Transfers to Morgan Stanley Virtual Advisor**

Gross Revenue credit received on existing Households transferred to Morgan Stanley Virtual Advisor will be subject to a Credit Rate in the below schedule. Household AUM will be evaluated at the end of the third month after Morgan Stanley Virtual Advisor receives the Household.

**Morgan Stanley Virtual Advisor Transfer Credit Rate Schedule**

| Household AUM | Credit Rate(%) |
|---|---|
| <$100,000 | 20 |
| $100,000+ | Standard Credit Rate |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Low-Priced Securities**
Advisors will not be allocated Credits on securities priced at less than $1.00 per share.

**Small Trades**
Credit allocation for Small Trades will be based on the table below:

**Small Trades Credit Rate Schedule**

| Product | Transaction Amount ($) | Credit Rate (%) |
|---|---|---|
| Equities[18] | 0–124.99 | 0 |
| Options[19] | 75.00–99.99 | 30 |
| | 50.00–74.99 | 20 |
| | 0–49.99 | 0 |

**Fixed Income Delivery Versus Payment ("DVP") Credit Rate**
Advisors are allocated Credits based on a fixed percentage on all Fixed Income business generated in DVP accounts. The Credit Rate is based on the Advisor's Trailing 12-month Gross Revenue as of the prior month-end, as follows:

Credit Rate Summary

| Trailing 12-month Gross Revenue as of the prior month-end ($) | Credit Rate (%) |
|---|---|
| 500,000 and over | 35 |
| 0–499,999 | 25 |

The Fixed Income DVP policy shall not apply to Corporate Equity Solutions ("CES") Directed Brokerage.

**Equity Syndicate**
For Households where 70% or more of Trailing 12-month Gross Revenue is generated by Equity Syndicate business, Advisors will receive a flat 20% Credit Rate on Equity Syndicate revenue. For Households where less than 70% of Trailing 12-month Gross Revenue is generated by Equity Syndicate business, Equity Syndicate Gross Revenue will be credited at the standard Credit Rate (see Section 1.2.1) and all other Credit Rate Schedule exception policies will apply.

The ratio of Equity Syndicate Gross Revenue to total Gross Revenue from a specific Household is calculated on a rolling 12-month basis at the end of each month. For example, if a Household generates $10,000 in Trailing 12-month Gross Revenue between May 2019 and April 2020, of which $8,000 is from Equity Syndicate business (80%), then any Equity Syndicate Gross Revenue from that Household for the month of April 2020 will be credited at a flat 20% Credit Rate. However, if at the end of the following month (May 2020) the same Household's Trailing 12-month Gross Revenue is $12,000, of which $8,000 is from Equity Syndicate business (~67%), all Equity Syndicate business will be credited at the standard Credit Rate for the month of May 2020 and all other Credit Rate Schedule exception policies will apply; there will be no retroactive Credit back to April 2020.

"Equity Syndicate" business refers to equity syndicate Initial Public Offerings ("IPOs"), secondary offerings, follow-ons, and block trades. This policy does not affect selling concessions on structured investments, fixed income syndicate, preferred new issues, closed-end fund IPOs, or municipal syndicate offerings.

[18] Shall not apply to Equity Underwriting business; for accounts subject to Flat-Rate credit, Advisors are credited the lesser of the assigned Flat-Rate and the Small Trades Credit Rate Schedule
[19] Excludes exercise and assignments



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Non-Resident Client ("NRC") Business**

NRC business includes all business done in accounts held by individuals or entities with a non-U.S. legal address on the account (excluding Stock Option Plan ("SOP"), Cashless Exercise ("CSX"), Directed Share Business ("DSB"), and U.S. Expatriate accounts).

The Credit Rate applicable to Gross Revenue generated by NRC accounts will be three percentage points lower than the Credit Rate reflected on the standard Credit Rate Schedule. The maximum impact to 2020 Total Credits will be the lower of $35,000 per individual Advisor or $70,000 per Team[20], after which the lower Credit Rate on NRC accounts will no longer apply.

If an NRC account qualifies for the NAA Incentive and is in an eligible jurisdiction[21] the Credit Rate applied to Gross Revenue generated by the account will NOT be reduced by three percentage points. Additionally, the Advisor's maximum Total Credit reduction will be offset by the Total Credit reduction that would have applied if the NRC account did not qualify for the NAA Incentive.

**Transactional Futures Business**

Transactional Futures accounts must be held by a designated Futures Specialist or in a JPN where a designated Futures Specialist(s) is credited with at least 60% of the Gross Revenue split from that JPN. Gross Revenue generated by Transactional Futures accounts that do not comply with this policy will be subject to a 0% Credit Rate.

**Inherited Accounts**

Accounts that are reassigned through the Account Retention Tool ("ART") will earn a 0% Credit Rate for the calendar month of reassignment, and for the next three calendar months thereafter (the "Window Period"), except under the following situations:

- Former Advisors (i.e., retired Advisors) will continue to receive the Credit Rate pursuant to their executed Former Advisor Program ("FAP") documentation
- Households in the same JPN for at least 12 months immediately preceding reassignment through ART
- Households that were in a JPN, or FA-number, with the remaining Advisor(s) before the Households' current, pre-reassignment, JPN was established

If at the end of this Window Period the Household's[22] ending asset value[23] is 50% or greater than the Household's initial asset value[24], then the Advisor will be eligible for Supplemental Inherited Account Compensation.

- Supplemental Inherited Account Compensation will be in the form of Total Credits, pursuant to this Compensation Plan, calculated based on the Advisor's Credit Rate at the end of this Window Period and the Gross Revenue generated by the reassigned Household(s) during the Window Period for which the Advisor had previously earned a 0% Credit Rate.

If at the end of this Window Period the Household's ending asset value is less than 50% of the Household's initial asset value, then the Advisor will not be eligible for Supplemental Inherited Account Compensation, but will be eligible to earn Total Credits, pursuant to this Compensation Plan, prospectively.

[20] For purposes of the Team cap, eligible Teams must consist of two or more Advisors who are on an approved Team and who each derive at least 50% of their individual Trailing 12-month Gross Revenue from business generated in JPN(s) they share with each other

[21] Eligible jurisdictions include all jurisdictions except for: Belgium, France, Ireland, Luxemburg, Spain, Sweden, United Arab Emirates (UAE), and United Kingdom. Eligible Jurisdictions are subject to change as determined by Morgan Stanley Wealth Management

[22] As defined by the Household Account Eligibility policy hosted on 3DR > Service > Accounts, Pricing & Reporting > Pricing And Householding

[23] Household asset value is determined as of the close of business on the second to last trade date of the third calendar month following the month of reassignment

[24] Household asset value is determined as of the close of business on the trade date immediately preceding reassignment through the Account Retention Tool



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Example 1:**
Advisor #1 receives a reassigned Household through ART on April 20th, 2020 with the following characteristics:

- $1,000,000 in assets as of the reassignment date
- Generates $3,000 in Grid Revenue between April 20th, 2020 and July 30th, 2020
- $1,100,000 in assets as of July 31st, 2020

Advisor #1 is eligible for Supplemental Inherited Account Compensation since the Household asset level is at least 50% of the asset level as of the date of reassignment:

- The Advisor's July monthly Credit Rate 36%
- Supplemental Inherited Account Compensation = $3,000 Grid Revenue * Credit Rate
- Beginning August 1st, 2020, Advisor #1, will receive Total Credit on all Creditable Revenue associated with this Household prospectively

**Example 2:**
Advisor #2 receives a reassigned Household through ART on July 19th, 2020 with the following characteristics:

- $500,000 in assets as of the reassignment date
- Generates $2,000 in Grid Revenue between July 19th, 2020 and October 31st, 2020
- $100,000 in assets as of October 31st, 2020

Advisor #2 is not eligible for Supplemental Inherited Account Compensation since the Household asset level is below 50% of the asset level as of the date of reassignment:

- Supplemental Inherited Account Compensation = $0
- Beginning November 1st, 2020, Advisor #2 will receive Total Credits prospectively



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 2: Lending Growth Award

## 2.1 Lending Growth Award Program

**Lending Growth Award Program Structure**
The Lending Growth Award Program is intended to reward Advisors for expanding Lending business consistent with the financial needs and investment objectives of clients.

*Qualified Loan:* includes Liquidity Access Line ("LAL"), Express Credit Line ("ECL"), Tailored Lending, Commercial Real Estate Financing ("CREF"), Margin, and Eligible Mortgages.

*Eligible Mortgage:* Closed-end mortgages originated by Morgan Stanley Private Bank, National Association ("MSPBNA"): (a) for which Advisors are eligible for mortgage incentive compensation or (b) that are made to a US-based Morgan Stanley employee who is not an Advisor. For Advisors to be eligible for mortgage incentive compensation, Advisors must be dually employed by MSSB and MSPBNA AND NMLS registered; only then will the Eligible Mortgage(s) be included in the calculation of any Lending Growth Award.

*Ineligible Loans:* The following products are not eligible for consideration in the Lending Growth Award:

- Letters of Credit
- Home Equity Line of Credit
- Commercial Real Estate Loans ("CREL") and Commercial Mortgage Backed Securities ("CMBS") not booked on the MSPBNA balance sheet
- Margin balances that are not on the Retail Margin platform and are not reported/included on the 3D Private Banking Home Page
- Existing Morgan Stanley Home Loans that are modified
- Mortgages for which an Advisor is a named borrower/co-borrower/obligor in the Mortgage
- All other loans categorized as Advisor or Advisor-related. Advisor/Advisor-Related loans include all loans where the accountholder is the Advisor's spouse, child, financial dependent, or other relation whose loan(s) the Advisor could reasonably be expected to influence or control[25].

**Lending Growth Award Program Eligibility**
To be eligible for the Lending Growth Award Program, Advisors must meet the following requirements:

- Must be hired before January 1, 2018; AND
- Not be part of the Financial Advisor Associate ("FAA") program at the end of 2020; AND
- Have Gross Revenue in 2019 that is greater than zero AND were not in a non-producing role at any time during 2019; AND
- Have positive Gross Revenue growth in 2020 with respect to 2019 OR have positive Net Acquired Assets ("NAA") in 2020; AND
- Not end 2020 with a 20% Credit Rate; AND
- Have a minimum of $1,000,000 in Lending Balance Growth (at the post-split level) at the end of 2020 with respect to 2019; AND
- Must open 6 new Qualified Loan[26] units in 2020 at the pre-split level

If at least one member of a Team is eligible for Team Compensation, positive Gross Revenue growth in 2020, as compared to 2019, and positive Net Acquired Assets ("NAA") in 2020, will be evaluated based on aggregate Gross Revenue growth and aggregate NAA for all Advisors[27] on the Team. Otherwise, positive Gross Revenue growth and positive NAA will be evaluated based on individual Gross Revenue growth and individual NAA. All other Lending Growth Award Program Eligibility criteria must be satisfied on an individual basis to qualify.

[25] Scope of Advisor-related account flag is subject to change; policy will apply to all accounts currently self-disclosed and identified as Advisor-related
[26] Excluding Margin, existing MSPBNA Mortgages that are refinanced within 6 months of the funding date of the original MSPBNA Mortgage, and all MSPBNA Mortgages that are modified
[27] Includes Advisors hired after January 1st, 2018, FAAs, Advisors with Gross Revenue in 2019 that was less than or equal to zero, Advisors who were in a non-producing role during 2019 and Advisors with a 20% Credit Rate at the end of 2020



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 2: Lending Growth Award

**Lending Growth Award Calculation**
2020 Lending Balance Growth will be calculated as follows:

For each Qualified Loan, pre-split outstanding daily balances will be averaged to calculate month-end balances in 2019 and 2020. Month-end balances in 2020 will be compared to the Qualified Loan's full-year 2019 average month-end balance to determine 2020 pre-split monthly balance growth. Month-end JPN split percentages will be applied to 2020 pre-split monthly balance growth to determine 2020 post-split monthly balance growth.

2020 Lending Balance Growth is determined by the average of 2020 post-split monthly balance growth in Qualified Loans as of December 31, 2020. The balance growth calculation will be determined and capped at $10,000,000 per loan (on a pre-split basis).

Advisor Lending Book size is determined based on Qualified Loan balances as of December 31, 2020, and outstanding principal balances of Mortgages held on MSPBNA's balance sheet as of December 31, 2020. At year-end, qualifying Lending Balance Growth is eligible for an award based on the below Lending Growth Award Schedule.

**Lending Growth Award Schedule**

| Lending Balance Growth as of 12/31/20 ($) | Advisor Award (bps) | |
|---|---|---|
| | Advisor Lending Book Less Than $10MM | Advisor Lending Book Greater Than $10MM |
| 10,000,001+ | 90 | 100 |
| 5,000,001 –10,000,000 | 80 | 90 |
| 2,000,001 – 5,000,000 | 70 | 80 |
| 1,000,001 – 2,000,000 | 60 | 70 |
| First 1,000,000 | 50 | 60 |

The Lending Growth Award Schedule does not apply retroactively. The specified Advisor Award applies only to the dollars of qualifying 2020 Lending Balance Growth that fall within the corresponding Lending Balance Growth bands.

**Lending Growth Award Payment Schedule**
The Lending Growth Award will be issued to Advisors as a 5-year bonus agreement. The bonus agreement will have terms and conditions that will include requirements relating to ongoing employment in good standing, mandatory arbitration, and other material terms, which will be set forth in the applicable documentation in detail, and which must be accepted in order to be eligible for the award. Any Lending Growth Award under $10,000 will be paid as cash in the first quarter of 2021, but in no event later than March 15, 2021.

In order to be eligible to receive any component of the Lending Growth Award Program, Advisors must be employed in good standing as of the payment/funding date.

**Loan Eligibility**
Advisors who receive a Lending Growth Award may also be eligible for a loan in the first quarter of 2021. The loan will have terms and conditions that will include requirements relating to ongoing employment in good standing and other material terms, including, but not limited to, a general release of all claims against the Firm, which will be set forth in the applicable documentation in detail.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 2: Lending Growth Award

**Lending Balance Growth Calculation Example:**
An Advisor has a 2019 average month-end balance of $45,000,000 in Qualified Loans in 2019. With a 2020 average month end balance of $75,000,000 in Qualified Loans, the Advisor will have $25,000,000 in 2020 Lending Balance Growth as calculated below.

**Lending Balance Growth Example**

| Month | Month-End Balance ($) | Monthly Balance Growth |
|---|---|---|
| **2019 Average Month-End Balance** | **45,000,000** | - |
| Jan 2020 | 75,000,000 | 30,000,000 |
| Feb 2020 | 80,000,000 | 35,000,000 |
| Mar 2020 | 70,000,000 | 25,000,000 |
| Apr 2020 | 60,000,000 | 15,000,000 |
| May 2020 | 90,000,000 | 45,000,000 |
| Jun 2020 | 75,000,000 | 30,000,000 |
| Jul 2020 | 50,000,000 | 5,000,000 |
| Aug 2020 | 40,000,000 | -5,000,000 |
| Sep 2020 | 75,000,000 | 30,000,000 |
| Oct 2020 | 70,000,000 | 25,000,000 |
| Nov 2020 | 80,000,000 | 35,000,000 |
| Dec 2020 | 75,000,000 | 30,000,000 |
| **Sum of Monthly Balance Growth** | | **300,000,000** |
| **Average Monthly Balance Growth:** | | **25,000,000** |

**Lending Growth Award Calculation Example:**
Advisor has $25,000,000 of qualifying 2020 Lending Balance Growth, total Lending book amount of $75,000,000, and is eligible for the following award if the Advisor also meets the eligibility criteria defined above:

**Lending Growth Award Calculation Example**

| Lending Balance Growth as of 12/31/20 ($) | Advisor Award ($) |
|---|---|
| Final 15,000,000 at 100bps | 150,000 |
| Next 5,000,000 at 90bps | 45,000 |
| Next 3,000,000 at 80bps | 24,000 |
| Next 1,000,000 at 70bps | 7,000 |
| First 1,000,000 at 60bps | 6,000 |
| **Total:** | **232,000** |

Morgan Stanley Wealth Management reserves the right, at its sole discretion to review all Lending activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Lending Growth Award or inconsistent with the interests of clients. For example, Lending Growth Awards attributable to reallocation of existing loan balances from one FA number/JPN to another may be denied or adjusted.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 3: Other Programs

## 3.1 Capital Accumulation Program

The Capital Accumulation Program ("CAP") provides the opportunity for eligible Advisors (including Producing Branch Managers and Resident Managers) to defer a portion of 2020 monthly cash compensation on a pre-tax basis (up to 25%, in 5% increments) into Morgan Stanley stock units ("Basic Units") and receive a number of bonus stock units based on the amount of Basic Units awarded ("Bonus Units").

Advisors are eligible to participate in CAP for 2020 if they achieved a minimum Trailing 12-month Gross Revenue (through September 30th, 2019) of $400,000 and had a minimum of five years of LOS as of December 31st, 2019 (provided that, for Advisors who are Chairman's Club members as of December 2019, the minimum service requirement is three years).

Contribution elections, which cannot exceed $250,000 annually, or, for Chairman's Club members as of December 2019, $350,000 annually, must be made by the end of 2019.

Advisors who elect to participate in CAP will be awarded Bonus Units in an amount equal to either 25% (for Chairman's Club members as of December 2019) or 20% (for all other eligible Advisors) of the number of Basic Units awarded.

The Basic Units and Bonus Units will be granted on the 15th day of the month following the end of each calendar quarter, with the number of Basic Units awarded based on the amount of the deferral divided by the fair market value of a share of Morgan Stanley common stock on such date (which is generally the average of the closing prices of Morgan Stanley stock on each of the three month-ends preceding the grant date). Subject to the Advisor satisfying the terms and conditions of the award, the Basic Units will vest on the grant date, the Bonus Units will vest on April 15th, 2023, and the Basic Units and Bonus Units will convert to shares of Morgan Stanley common stock on April 15th, 2023.

Advisors must be continuously employed by the Firm through the grant date in order to be awarded the Basic Units and Bonus Units. Termination of employment for any reason prior to the Bonus Unit vesting date will generally result in the cancellation of all Bonus Units and, in general, the previously granted Basic Units will convert to shares of Morgan Stanley common stock on the original scheduled conversion date.

The Basic Units will not be subject to cancellation following grant, but Bonus Units will be subject to cancellation if the Advisor engages in certain prohibited activity prior to conversion as described in the award documentation. The stock units will also be subject to such other terms and conditions as set forth in the award documentation.

Additional information may be found in the current prospectus, a copy of which may be obtained by accessing the Executive Compensation intranet website located at the following address: http://execcomp.corpms.com/site/execcomp/webapp/portfolio.jsp



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 3.2 Former Advisor Program ("FAP")

Exceptional client service is the foundation of our business, which is why Morgan Stanley Wealth Management offers flexibility and assistance to Advisors considering retirement from the industry.
The following seven options, which may not be mutually exclusive, are currently offered through the FAP:

**Pre-Retirement Programs**

- Teaming Option
- Deferred Platinum Option
- Long-Term Platinum Option
- Short-Term Platinum Option

**Post-Retirement Programs**

- Standard Credit Rate
- Teaming Credit Rate
- Enhanced Credit Rate

The 2020 Former Advisor Program Guide will be available in early 2020.

*Please be advised that FAP is subject to SEC, FINRA, and state regulatory requirements. The terms of the FAP are subject to change at the sole discretion of Morgan Stanley Wealth Management for any reason, including changes in applicable regulatory or legal requirements pertaining to such programs.*



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 3.3 Business Development Allowance ("BDA") Program

Under the Business Development Allowance ("BDA") Program, eligible Advisors will have access to corporate funds for business development purposes[28], such as client entertainment, seminars and/or marketing. At year-end, any unused BDA will be canceled and will not carry over into the following year. BDA allocations are determined in January 2020 and are based on 2019 Gross Revenue and the following schedule:

**Business Development Allowance Schedule**

| 2019 Gross Revenue ($) | 2020 Allowance ($) |
|---|---|
| 10,000,000+ | 25,000 |
| 5,000,000–9,999,999 | 20,000 |
| 2,750,000–4,999,999 | 15,000 |
| 1,800,000–2,749,999 | 12,000 |
| 1,200,000–1,799,999 | 10,000 |
| 900,000–1,199,999 | 5,000 |
| 600,000–899,999 | 3,000 |
| 485,000–599,999 | 1,000 |
| 0–484,999 | 750 |

FAAs generating Gross Revenue will receive a BDA based on eligible Gross Revenue as per the policy above. FAAs who begin generating Gross Revenue in the current year will receive a pro-rated BDA based on the lowest revenue band.

The BDA allocation is subject to the Firm's policies and procedures for expenditures.

**BDA Reallocation**

During the AFG Election period in December 2019, qualifying Advisors on a Team will have the ability to:

- Transfer 2020 BDA to other Advisors on their Team and qualified exempt support staff employees[29]
- Transfer 2020 BDA to the Team BDA

Advisors on a Team will have the ability to aggregate a percentage of 2020 BDA for Team-approved business development purposes. Team BDA expenses are subject to the BDA and Team AFG guidelines.
Additional details pertaining to eligible expenses can be found in the 2020 Alternative Flexible Grid Policy and 2020 Wealth Management Expense Policy, which will be located on the 2020 Advisor Compensation website in early 2020.

[28] See the Morgan Stanley Wealth Management Expense policy for additional details.
[29] Business Development Director, Director of Business Strategy or Group Director



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 3.4 Alternative Flexible Grid ("AFG") Program

The Alternative Flexible Grid ("AFG") is a program through which participating Advisors, prior to the start of the calendar year, may elect an effective Credit Rate adjustment for the year and become eligible for certain additional Firm funds for expenditure on additional luxury business resources[30]. With these additional Firm funds, the Advisor may direct the Firm to provide additional compensation to support staff as well as additional resources above those necessary to perform Advisor duties. In order to participate in the AFG Program, Advisors must have a minimum $200,000 in Trailing 12-month eligible Gross Revenue (excludes 0% Revenue).

Advisors should utilize the AFG worksheet prior to the start of the year to determine whether they want to elect to participate and, if so, at what level. In this worksheet, the effective Credit Rate adjustment requested by the Advisor is calculated by determining elected additional support staff compensation contemplated by the Advisor and additional luxury business resources. With Branch Manager approval, this effective Credit Rate adjustment will be applied to transactions from January 1, 2020 through November 30, 2020. Only after the implementation of this Credit Rate adjustment will Incentive Compensation be determined for participating Advisors, as set forth in this Program.

The magnitude of the AFG effective Credit Rate adjustment elected will determine the AFG amount. This amount will enable the Advisor to direct the Firm to provide additional support staff compensation and additional luxury business resources. Any remaining balance at year-end will not be carried forward into the following year.

*Standard Checkpoint:* Advisors will be provided one checkpoint in July 2020, during which time they will be granted an open window to change their effective Credit Rate adjustment for August through November. If a change is made during the Standard Checkpoint, a new AFG worksheet must be completed.

*Contingency Checkpoint:* In the event that a support staff employee, who is part of an Advisor's team, terminates from the Firm, the Advisor may elect to open the checkpoint window before July 2020 and forgo the Standard Checkpoint. Use of this option requires the Advisor to verify support staff termination, is subject to Branch/Complex manager approval and requires a new AFG worksheet to be completed.
All AFG arrangements will be canceled at the end of the calendar year, and Advisors must re-elect for the following calendar year. No balance will be carried forward into the following calendar year.

**Team AFG**

Advisors on a Team where all Team members generate a minimum 80% of their Trailing 12-month Gross Revenue from Team JPN(s), and who individually satisfy the AFG qualifications, may be eligible for Team AFG.

Teams can direct the Firm to provide additional resources that will mutually benefit the Team. Team AFG expenses exclude ineligible AFG expenses and individual expenses that do not benefit the Team.

Additional details on the 2020 AFG Guide will be available on the 2020 Advisor Compensation website in December 2019.

[30] See the Morgan Stanley Wealth Management Expense Policy for additional details



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 3.5 Discretionary Fee Waiver Allowance

The Discretionary Fee Waiver Allowance ("DFWA") is provided to Advisors to waive select account and service fees in client accounts. It is important to note that some of these fees are already waived as part of the Reserved Program. At year-end, any unused DFWA will be canceled and will not carry over into the following year. Allowances are based on 2019 Gross Revenue, as follows:

**Discretionary Fee Waiver Allowance Schedule**

| 2019 Gross Revenue ($) | 2020 Allowance($) |
|---|---|
| 2,400,000+ | 4,000 |
| 1,800,000–2,399,999 | 3,000 |
| 1,200,000–1,799,999 | 2,750 |
| 900,000–1,199,999 | 2,500 |
| 600,000–899,999 | 2,000 |
| 300,000–599,999 | 1,500 |
| 120,000–299,999 | 500 |
| 0–119,999 | 0 |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 4: Recognition Programs

### 4.1 Club Memberships for 2021

The Firm's recognition programs are designed to recognize outstanding performance by Advisors. In addition to demonstrated leadership in the best practices of wealth management, the Firm's recognition Club Members must be in good standing and satisfy other aspects of the Firm's performance, conduct and compliance standards and expectations, as determined by the Firm.

Subject to the foregoing, at the beginning of 2021, Club Memberships will be assigned based on 2020 calendar year Gross Revenue OR 2020 calendar year Total Revenue Premium, as well as LOE and Assets Under Management ("AUM") for Pacesetter's Club only, as follows:

**Club Memberships**

| Club Type | Qualifying Criteria |
|---|---|
| Chairman's Club | Rank amongst the top 2% of the Advisor population in Gross Revenue for 2020 OR amongst the top 2% in Total Revenue Premium for 2020 |
| President's Club | Rank amongst the next 5% of the Advisor population (after Chairman's Club) in Gross Revenue for 2020 OR amongst the next 5% in Total Revenue Premium for 2020 |
| Master's Club | Rank amongst the next 10% of the Advisor population (after President's Club) in Gross Revenue for 2020 OR amongst the next 10% in Total Revenue Premium for 2020 |
| Century Club | Rank in the next 10% of the Advisor population (after Master's Club) in Gross Revenue for 2020 OR amongst the next 10% in Total Revenue Premium for 2020 |
| Pacesetter's Club (Only Advisors with an LOE of 5 or below will be eligible for this Club) | Achieve minimum Gross Revenue of $100,000 OR minimum Total Revenue Premium of $140,000 AND minimum AUM of $8,000,000 for Advisors with an LOE of 0, 1 |
| | Achieve minimum Gross Revenue of $200,000 OR minimum Total Revenue Premium of $280,000 AND minimum AUM of $15,000,000 for Advisors with an LOE of 2 |
| | Achieve minimum Gross Revenue of $250,000 OR minimum Total Revenue Premium of $350,000 AND minimum AUM of $20,000,000 for Advisors with an LOE of 3 |
| | Achieve minimum Gross Revenue of $300,000 OR minimum Total Revenue Premium of $420,000 AND minimum AUM of $25,000,000 for Advisors with an LOE of 4 |
| | Achieve minimum Gross Revenue of $350,000 OR minimum Total Revenue Premium of $490,000 AND minimum AUM of $30,000,000 for Advisors with an LOE of 5 |

Club Memberships may be withdrawn by the Firm, at any time, in its sole discretion. This includes, without limitation, the Firm's sole discretion to review all Advisor conduct, and all Gross Revenue, Total Revenue Premium and AUM activity and determine whether such activity is appropriate for inclusion. For purposes of Club Memberships, the Firm may exclude any Advisor or revenue that the Firm deems to be inconsistent with the spirit of Club Membership or inconsistent with the interests of the Firm or clients. For example, Gross Revenue, Total Revenue Premium and/or AUM attributable to manipulation of JPN(s), without a business explanation the Firm finds satisfactory, may be omitted or reduced in evaluating eligibility.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 4.2 Titles

In addition to specific recognition clubs, the Firm also grants titles to recognize the outstanding performance of Morgan Stanley Wealth Management Advisors. Titles are awarded based on achievement of specific Gross Revenue or Total Revenue Premium levels and the maintenance of high standards of the Firm, including being in good standing and satisfying the Firm's expectations for excellence in all areas, including, but not limited to, guardianship, personal conduct, and adherence to regulatory and compliance requirements.

Titles may be denied, changed or withdrawn at any time by the Firm, in its sole discretion.

**Managing Director, Wealth Management**

Eligibility:

- Minimum cumulative Gross Revenue of $8,800,000 OR Total Revenue Premium of $12,300,000 over the last three years; OR
- Minimum cumulative Gross Revenue of $25,000,000 over the last ten years AND 30 or more years of LOS

Advisors who meet either criteria are eligible for selection by the Firm for the Managing Director, Wealth Management title.

Additional criteria for Managing Director, Wealth Management includes:

- Exhibiting leadership both externally and internally
- Being an ambassador and role model of Morgan Stanley Wealth Management's vision and business principles
- Pursuing excellence and holding self and others to the highest standards
- Consistently exemplifying high standards of corporate guardianship

**Executive Director**

Eligibility: Minimum cumulative Gross Revenue of $4,400,000 OR Total Revenue Premium of $6,150,000 over the last two years.

Advisors who meet the 2-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Executive Director title.

**Senior Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $1,100,000 OR Total Revenue Premium of $1,550,000

**First Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $825,000 OR Total Revenue Premium of $1,150,000

**Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $550,000 OR Total Revenue Premium of $770,000

**Associate Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $440,000 OR Total Revenue Premium of $615,000



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 5: Other

## 5.1 Summary and Additional Information

Morgan Stanley Wealth Management provides one of the most comprehensive Advisor Compensation Plan, Growth Award and Recognition Programs in the securities industry.

This brochure summarizes the Morgan Stanley Wealth Management Advisor Compensation Plan, Growth Award and Recognition Programs in effect for 2020 unless otherwise noted. Morgan Stanley Wealth Management reserves the right to amend, modify, interpret or terminate all or any part of the Program for any year and at any time. Nothing in this brochure is a guarantee of continued employment or of any particular benefits or level of remuneration.

This Compensation Plan and the additional product guidelines and policies referenced in this Compensation Plan set forth guidelines only. Notwithstanding anything to the contrary contained in this Compensation Plan or elsewhere, Morgan Stanley Wealth Management has the sole discretion to determine whether to allocate Credit to an Advisor's Gross Revenue (or to provide compensation in any form) for any particular business and, if so, the amount of Credit to be allocated or the amount of compensation to be awarded, and further Morgan Stanley Wealth Management may adjust and/or decline to award future Credits towards Incentive Compensation where an Advisor has an unsatisfied obligation to the Firm. Under no circumstances is an Advisor eligible to receive any Credit to Gross Revenue or any compensation for any particular business unless and until Morgan Stanley Wealth Management receives the revenue associated with that business. Furthermore, if an Advisor is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy, regulation or otherwise counter to the best interests of our clients, then such Advisor may be deemed, in Morgan Stanley's sole discretion, not to have qualified for compensation, growth awards or any bonus program listed herein. If an Advisor's employment terminates for any reason before Morgan Stanley Wealth Management receives the revenue for any particular business, the Advisor will not be eligible for any Credit to Gross Revenue or any compensation associated with that business and, in the event Morgan Stanley Wealth Management ultimately refunds all or a portion of such revenue for any reason, any associated Incentive Compensation paid on the basis of such revenue shall be deemed an overpayment to the Advisor. Additionally, an Advisor must be employed in good standing at the time that Morgan Stanley Wealth Management receives the revenue to be eligible for any Credit to Gross Revenue or any compensation associated with that business.

In the event that Morgan Stanley Wealth Management determines that any payment or award under this Compensation Plan or any other compensation plan or program would violate any legal, regulatory or contractual obligation, or create undue risk of such violation, such payment or award will not be made, notwithstanding anything to the contrary in this Compensation Plan. Morgan Stanley Wealth Management retains the sole discretion and authority to interpret, modify, and/or terminate the Compensation Plan, or any of the individual guidelines described in the Compensation Plan, at any time, with or without notice, and to resolve any dispute arising out of or in any way related to the Compensation Plan. Given the dynamic and complex nature of the business, calculations under this plan may rely on data that could be revised, improved, modified or otherwise interpreted diffently. Nevertheless, Morgan Stanley Wealth Management's interpretations and decisions shall be final and binding on all parties.

The information contained in this brochure briefly describes certain employee compensation programs and deferred incentive compensation awards and other arrangements. It is important to note that this brochure merely summarizes the provisions of those programs, awards and plans, and does not address all of their terms, conditions and restrictions. Advisors should consult the pertinent compensation program, plan document or award certificate for a full explanation of their provisions. If there is a conflict between this brochure and any formal compensation program, deferred compensation plan, plan document or award certificate, then the formal program, plan document or award certificate will control. All compensation and recognition plans are subject to changes due to tax laws and other legal requirements or at the sole discretion of Morgan Stanley Wealth Management.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 5: Other

## 5.2 Version History

This section tracks changes made to the 2020 Advisor Compensation Plan, Growth Award and Recognition Programs during 2020. The table below documents the date, page number and a brief description of the change for easy reference.

| Date | Page Number | Description |
|---|---|---|
| November 19th, 2019 | - | Initial publication |
| November 26th, 2019 | 15 | Household Transfers to Morgan Stanley Virtual Advisor |
| December 24th, 2019 | 19 | Lending Growth Award |
| February 18th, 2020 | 19 | Lending Growth Award |
| February 26th, 2020 | 2 | Salary |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# MORGAN STANLEY

## EQUITY INCENTIVE COMPENSATION PLAN

## WEALTH MANAGEMENT
## FINANCIAL ADVISOR/PRIVATE WEALTH ADVISOR AWARDS

## 2020 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE FOR STOCK UNITS

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# TABLE OF CONTENTS FOR AWARD CERTIFICATE


1. Stock units generally. 3
2. Vesting schedule and conversion. 3
3. Dividend equivalent reinvestment. 4
4. Death, Disability and Retirement. 5
5. Involuntary termination by the Firm. 6
6. Governmental Service. 6
7. Specified employees. 7
8. Cancellation of awards under certain circumstances. 7
9. Tax and other withholding obligations. 8
10. Obligations you owe to the Firm. 8
11. Nontransferability. 9
12. Designation of a beneficiary. 9
13. Ownership and possession. 9
14. Securities law compliance matters. 10
15. Compliance with laws and regulation. 10
16. No entitlements. 11
17. Consents under local law. 11
18. Award modification. 11
19. Governing law and exclusive jurisdiction. 12
20. Severability. 12
21. Defined terms. 12

# MORGAN STANLEY

## 2020 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE FOR STOCK UNITS

Morgan Stanley has awarded you retention stock units as part of your incentive compensation for services provided during 2020 and as an incentive for you to remain in Employment and provide services to the Firm through the Scheduled Vesting Date. This Award Certificate sets forth the general terms and conditions of your 2020 stock unit award. The number of stock units in your award has been communicated to you independently.

If you are employed outside the United States, you will also receive an "***International Supplement***" that contains supplemental terms and conditions for your 2020 stock unit award. You should read this Award Certificate in conjunction with the International Supplement, if applicable, in order to understand the terms and conditions of your stock unit award.

Your stock unit award is made pursuant to the Plan. References to "stock units" in this Award Certificate mean only those stock units included in your 2020 stock unit award, and the terms and conditions herein apply only to such award. If you receive any other award under the Plan or another equity compensation plan, it will be governed by the terms and conditions of the applicable award documentation, which may be different from those herein.

The purpose of the 2020 stock unit award is, among other things, to align your interests with the interests of the Firm and Morgan Stanley's stockholders, to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. In view of these purposes, you will earn your 2020 stock unit award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), (2) do not engage in any Prohibited Activity and (3) satisfy obligations you owe to the Firm as set forth in Section 10 below. Even if your award has vested, you will have no right to your award if you engage in any Prohibited Activity. As Morgan Stanley deems appropriate, it will require you to provide a written certification or other evidence, from time to time in its sole discretion, to confirm that no Prohibited Activity has occurred, including upon a termination of Employment and/or during a specified period of time prior to the Scheduled Conversion Date. If you fail to timely provide any required certification or other evidence, Morgan Stanley will cancel your award. It is your responsibility to provide the Executive Compensation Department with your up-to-date contact information.

Capitalized terms used in this Award Certificate that are not defined in the text have the meanings set forth in Section 21 below. Capitalized terms used in this Award Certificate that are not defined in the text or in Section 21 below have the meanings set forth in the Plan.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

1. **Stock units generally.**

Each of your stock units corresponds to one share of Morgan Stanley common stock. A stock unit constitutes a contingent and unsecured promise of Morgan Stanley to pay you one share of Morgan Stanley common stock on the conversion date for the stock unit. As the holder of stock units, you have only the rights of a general unsecured creditor of Morgan Stanley. You will not be a stockholder with respect to the shares of Morgan Stanley common stock corresponding to your stock units unless and until your stock units convert to shares.

2. **Vesting schedule and conversion.**

**(a)** ***Vesting schedule.*** Except as otherwise provided in this Award Certificate, your stock units will vest on the Scheduled Vesting Date. Except as otherwise provided in this Award Certificate, your stock units will vest only if you continue to provide future services to the Firm by remaining in continuous Employment through the Scheduled Vesting Date and providing value added services to the Firm during this timeframe. The special vesting terms set forth in Sections 4, 5 and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or Disability, (ii) upon your Retirement, (iii) if the Firm terminates your employment in an involuntary termination under the circumstances described in Section 5 or (iv) upon a Governmental Service Termination. Vested stock units remain subject to the cancellation and withholding provisions set forth in this Award Certificate.

**(b)** ***Conversion.*** Except as otherwise provided in this Award Certificate, your stock units will, to the extent vested, convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date, with any fractional shares to be distributed in cash. The special conversion provisions set forth in Sections 4(a), 4(b), 4(d) and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or you die after termination of your Employment, (ii) upon your Retirement under the circumstances set forth in Section 4(d) or (iii) upon your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b).

The shares delivered upon conversion of stock units pursuant to this Section 2(b) will not be subject to any transfer restrictions, other than those that may arise under the securities laws, the Firm's policies or Section 10 below, or to cancellation under the circumstances set forth in Section 8(c).

**(c)** ***Accelerated conversion.*** Morgan Stanley shall have no right to accelerate the conversion of any of your stock units, except to the extent that such acceleration is not prohibited by Section 409A and would not result in your being required to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or your incurring additional tax or interest under Section 409A. If any stock units are converted to shares of Morgan Stanley common stock prior to the Scheduled Conversion Date pursuant to this Section 2(c), these shares may not be transferable and may remain subject to applicable vesting, cancellation and withholding provisions, as determined by Morgan Stanley.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(d) ***Rule of construction for timing of conversion.*** Whenever this Award Certificate provides for your stock units to convert to shares on the Scheduled Conversion Date or upon a different specified event or date, such conversion will be considered to have been timely made, and neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages based on a delay in conversion of your stock units (or delivery of Morgan Stanley shares following conversion) and the Firm shall have no liability to you (or to any of your beneficiaries or your estate) in respect of any such delay, as long as conversion is made by December 31st of the year in which occurs the Scheduled Conversion Date or such other specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date, or, in connection with any such conversion due to death, to the extent permissible under Section 409A, by the end of the calendar year following the year of your death. Similarly, neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate), based on any acceleration of the conversion of your stock units pursuant to Section 2(c), as applicable.

**3. <u>Dividend equivalent reinvestment</u>.**

If Morgan Stanley pays a regular or ordinary dividend on its common stock, a dividend equivalent will be credited with respect to your stock units outstanding on the dividend record date and reinvested in the form of additional stock units. The additional number of stock units credited to you as a result of this dividend reinvestment shall equal:

(i) the cash dividend paid on one share of Morgan Stanley common stock, *multiplied by*

(ii) the number of stock units subject to your 2020 stock unit award on the applicable dividend record date; with the product of (i) and (ii), *divided by*

(iii) the fair market value of a share of Morgan Stanley common stock on the dividend payment date, as determined by Morgan Stanley in its sole discretion.

Morgan Stanley will credit the dividend equivalents when it pays the corresponding dividend on its common stock. The additional stock units credited to you as a result of the reinvestment of dividend equivalents will vest and convert at the same time as, and be subject to the same vesting and cancellation provisions set forth in this Award Certificate with respect to, the corresponding stock units, and references to "stock units" in this Award Certificate shall include such additional stock units credited to you as a result of the reinvestment of dividend equivalents described in this Section 3. The decision to pay a dividend and, if so, the amount of any such dividend, is determined by Morgan Stanley in its sole discretion. No dividend equivalents will be paid to you on any canceled stock units.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

4. **Death, Disability and Retirement.**

The following special vesting and payment terms apply to your stock units:

(a) ***Death during Employment.*** If your Employment terminates due to death, all of your unvested stock units will vest on the date of your death. Your stock units will convert to shares of Morgan Stanley common stock and be delivered to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

After your death, the cancellation provisions set forth in Section 8(c) will no longer apply, and the shares delivered upon conversion of stock units pursuant to this Section 4(a) will not be subject to any transfer restrictions (other than those that may arise under the securities laws or the Firm's policies).

(b) ***Death after termination of Employment.*** If you die after the termination of your Employment but prior to the Scheduled Conversion Date, any vested stock units that you held at the time of your death will convert to shares of Morgan Stanley common stock and be delivered to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

After your death, the cancellation provisions set forth in Section 8 will no longer apply, and the shares delivered upon conversion of stock units pursuant to this Section 4(b) will not be subject to any transfer restrictions (other than those that may arise under the securities laws or the Firm's policies).

(c) ***Disability.*** If your Employment terminates due to Disability, all of your unvested stock units will vest on the date your Employment terminates. Your stock units will convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

(d) ***Retirement.*** If your Employment terminates as a result of your Retirement, and provided that, in the event the Firm terminates your employment under circumstances not involving any Prohibited Activity, you sign an agreement and release satisfactory to the Firm, (i) all of your unvested stock units will vest on the date your Employment terminates and (ii) your stock units will convert to shares of Morgan Stanley common stock, and the cancellation provisions will lift, on the Scheduled Conversion Date; *provided* that, if you satisfy the conditions for a Retirement upon your Separation from Service, 50% of your stock units will convert, and the cancellation provisions with respect to such units will lift, on the first business day of the month following the first anniversary of your Separation from Service and the remaining 50% of your stock units will convert, and the cancellation provisions with respect to such units will lift, on the first business day of the month following the second anniversary of your Separation from Service, subject to earlier conversion on the Scheduled Conversion Date. If you do not sign an agreement and release satisfactory to the Firm

within the timeframe set by the Firm in connection with your Retirement under the circumstances described in this Section 4(d), any stock units that were unvested immediately prior to your termination shall be canceled.

5. **Involuntary termination by the Firm.**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, your unvested stock units will vest on the date your employment with the Firm terminates and your stock units will convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date, *provided* that you sign an agreement and release satisfactory to the Firm. If you do not sign such an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your involuntary termination as described in this Section 5, any stock units that were unvested immediately prior to your termination shall be canceled. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

6. **Governmental Service.**

(a) ***General treatment of awards upon Governmental Service Termination.*** If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), all of your unvested stock units will vest on the date of your Governmental Service Termination. Your vested stock units will convert to shares of Morgan Stanley common stock on the date of your Governmental Service Termination.

(b) ***General treatment of vested awards upon acceptance of employment at a Governmental Employer following termination of Employment.*** If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), all of your outstanding vested stock units will convert to shares of Morgan Stanley common stock upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence demonstrating that as a result of such employment the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

(c) ***Repayment obligation.*** If any Prohibited Activity occurs within the applicable period of time that would have resulted in cancellation of all or a portion of your stock units had they not converted to shares pursuant to Sections 6(a) or 6(b) above, you will be required to pay to Morgan Stanley an amount equal to:

(1) the number of stock units that would have been canceled upon the occurrence of such Prohibited Activity multiplied by the fair market value, determined using a valuation methodology established by Morgan Stanley, of Morgan Stanley



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

common stock on the date your stock units converted to shares of Morgan Stanley common stock; plus

(2) interest on the amount described in clause (1) above at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date of such conversion through the date preceding the payment date.

**7. Specified employees.**

Notwithstanding any other terms of this Award Certificate, if Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service, any conversion of your stock units that otherwise would occur upon your Separation from Service will be delayed until the first business day following the date that is six months after your Separation from Service; *provided, however*, that in the event that your death, your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b) occurs at any time after the Date of the Award, conversion and payment will be made in accordance with Section 4(a), 4(b) or 6, as applicable.

**8. Cancellation of awards under certain circumstances.**

**(a)** ***Cancellation of unvested awards.*** Your unvested stock units will be canceled if your Employment terminates for any reason other than death, Disability, a Retirement, an involuntary termination by the Firm described in Section 5 or a Governmental Service Termination.

**(b)** ***General treatment of vested awards.*** Except as otherwise provided in this Award Certificate, your vested stock units will convert to shares of Morgan Stanley common stock on the Scheduled Conversion Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Conversion Date.

**(c)** ***Cancellation of awards under certain circumstances.*** This Section 8(c) is designed, among other things, to incentivize compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. This Section 8(c) shall apply notwithstanding any other terms of this Award Certificate (except where sections in this Award Certificate specifically provide that the cancellation events set forth in this Section 8(c) no longer apply).

Your stock units, even if vested, are not earned until the Scheduled Conversion Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 10 below) and, unless prohibited by applicable law, will be canceled in full, or in the case of clause (3) of a Clawback Cancellation Event, in full or in part, until the Scheduled Conversion Date if any Prohibited Activity occurs. Although you will become the beneficial owner of shares underlying your stock units following conversion of your stock units, the Firm may retain custody of your shares following conversion of your stock units pending any investigation or other review that impacts the determination as to whether the stock units are cancellable and, in such an instance,



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

the shares underlying such stock units shall be forfeited in the event the Firm determines that the stock units were cancellable.

**9. Tax and other withholding obligations.**

Any vesting, whether on the Scheduled Vesting Date or some other date, of a stock unit award, and any conversion of a stock unit award or crediting of dividend equivalents, shall be subject to the Firm's withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation to you, including by canceling or accelerating payment of a portion of this award in an amount not to exceed such taxes imposed upon such vesting, conversion or crediting and any additional taxes imposed as a result of such cancellation or acceleration, and to take such other action as the Firm may deem advisable to enable it and you to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting or conversion of your stock units or the crediting of dividend equivalents. However, the Firm may not deduct or withhold such sum from any payroll or any other payment or compensation (including from your award), except to the extent it is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or to incur interest or additional tax under Section 409A.

Pursuant to rules and procedures that Morgan Stanley establishes, you may elect to satisfy the tax or other withholding obligations arising upon conversion of your stock units by having Morgan Stanley withhold shares of Morgan Stanley common stock in an amount sufficient to satisfy the tax or other withholding obligations. Shares withheld will be valued using the fair market value of Morgan Stanley common stock on the date your stock units convert (or such other appropriate date determined by Morgan Stanley based on local legal, tax or accounting rules and practices) using a valuation methodology established by Morgan Stanley. In order to comply with applicable accounting standards or the Firm's policies in effect from time to time, Morgan Stanley may limit the amount of shares that you may have withheld.

**10. Obligations you owe to the Firm.**

As a condition to the earning, conversion or distribution of your award, the Firm may require you to pay such sum to the Firm as may be necessary to satisfy any obligation that you owe to the Firm. Notwithstanding any other provision of this Award Certificate, your award, even if vested or converted, is not earned until after such obligations and any tax withholdings or other deductions required by law are satisfied. Notwithstanding the foregoing, Morgan Stanley may not reduce the number of shares to be delivered upon conversion of your stock units or delay the payment of your award to satisfy obligations that you owe to the Firm except (i) to the extent authorized under Section 9, relating to tax and other withholding obligations or (ii) to the extent such reduction or delay is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares of Morgan Stanley common stock or to incur additional tax or interest under Section 409A.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley's determination of any amount that you owe the Firm shall be conclusive. The fair market value of Morgan Stanley common stock for purposes of the foregoing provisions shall be determined using a valuation methodology established by Morgan Stanley.

**11. Nontransferability.**

You may not sell, pledge, hypothecate, assign or otherwise transfer your award, other than as provided in Section 12 (which allows you to designate a beneficiary or beneficiaries in the event of your death) or by will or the laws of descent and distribution. This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise. During your lifetime, payments relating to your award will be made only to you.

Your personal representatives, heirs, legatees, beneficiaries, successors and assigns, and those of Morgan Stanley, shall all be bound by, and shall benefit from, the terms and conditions of your award.

**12. Designation of a beneficiary.**

You may make a written designation of beneficiary or beneficiaries to receive all or part of your award to be delivered or paid under this Award Certificate in the event of your death. To make a beneficiary designation, you must complete and submit the Beneficiary Designation form on the Executive Compensation website.

Any shares that become deliverable upon your death, and as to which a designation of beneficiary is not in effect, will be distributed to your estate.

If you previously filed a designation of beneficiary form for your equity awards with the Executive Compensation Department, such form will also apply to all of your equity awards, including this award. You may replace or revoke your beneficiary designation at any time. If there is any question as to the legal right of any beneficiary to receive shares or payments under this award, Morgan Stanley may determine in its sole discretion to deliver the shares or make the payments in question to your estate. Morgan Stanley's determination shall be binding and conclusive on all persons and it will have no further liability to anyone with respect to this award.

**13. Ownership and possession.**

(a) ***Before conversion.*** Generally, you will not have any rights as a stockholder in the shares of Morgan Stanley common stock corresponding to your stock units unless and until your stock units convert to shares.

If Morgan Stanley contributes shares of Morgan Stanley common stock corresponding to your stock units to a grantor trust it has established, you may be permitted to direct the trustee how to vote the shares in the trust corresponding to your stock units. Voting rights, if any, are governed by the terms of the grantor trust and Morgan Stanley may amend any such voting rights, in its sole discretion, at any time. Morgan Stanley is under no obligation to contribute shares corresponding to stock units to a trust. If Morgan Stanley elects not to



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

contribute shares corresponding to your stock units to a trust, you will not have voting rights with respect to shares corresponding to your stock units until your stock units convert to shares.

(b) *Following conversion.* Subject to Section 8(c), following conversion of your stock units you will be the beneficial owner of the shares of Morgan Stanley common stock issued to you, and you will be entitled to all rights of ownership, including voting rights and the right to receive cash or stock dividends or other distributions paid on the shares.

(c) *Custody of shares.* Morgan Stanley may maintain possession of the shares subject to your award until such time as your shares are no longer subject to restrictions on transfer.

**14. Securities law compliance matters.**

Morgan Stanley may affix a legend to any stock certificates representing shares of Morgan Stanley common stock issued upon conversion of your stock units (and any stock certificates that may subsequently be issued in substitution for the original certificates). The legend will read substantially as follows:

> **THE SHARES REPRESENTED BY THIS STOCK CERTIFICATE WERE ISSUED PURSUANT TO THE MORGAN STANLEY EQUITY INCENTIVE COMPENSATION PLAN AND ARE SUBJECT TO THE TERMS AND CONDITIONS THEREOF AND OF AN AWARD CERTIFICATE FOR STOCK UNITS AND ANY SUPPLEMENT THERETO.**
>
> **THE SECURITIES REPRESENTED BY THIS STOCK CERTIFICATE MAY BE SUBJECT TO RESTRICTIONS ON TRANSFER BY VIRTUE OF THE SECURITIES ACT OF 1933.**
>
> **COPIES OF THE PLAN, THE AWARD CERTIFICATE FOR STOCK UNITS AND ANY SUPPLEMENT THERETO ARE AVAILABLE THROUGH THE EXECUTIVE COMPENSATION DEPARTMENT.**

Morgan Stanley may advise the transfer agent to place a stop order against such shares if it determines that such an order is necessary or advisable.

**15. Compliance with laws and regulation.**

Any sale, assignment, transfer, pledge, mortgage, encumbrance or other disposition of shares issued upon conversion of your stock units (whether directly or indirectly, whether or not for value, and whether or not voluntary) must be made in compliance with any applicable constitution, rule, regulation or policy of any of the exchanges or associations or other institutions with which the Firm or a Related Employer has membership or other privileges, and any applicable law or applicable rule or regulation of any governmental agency, self-regulatory organization or state or federal regulatory body.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

16. **No entitlements.**

(a) ***No right to continued Employment.*** This award is not an employment agreement, and nothing in this Award Certificate, the International Supplement, if applicable, or the Plan shall alter your status as an "at-will" employee of the Firm or your employment status at a Related Employer. None of this Award Certificate, the International Supplement, if applicable, or the Plan shall be construed as guaranteeing your employment by the Firm or a Related Employer, or as giving you any right to continue in the employ of the Firm or a Related Employer, during any period (including without limitation the period between the Date of the Award and the Scheduled Vesting Date or Scheduled Conversion Date, or any portion of any of these periods), nor shall they be construed as giving you any right to be reemployed by the Firm or a Related Employer following any termination of Employment.

(b) ***No right to future awards.*** This award, and all other awards of stock units and other equity-based awards, are discretionary. This award does not confer on you any right or entitlement to receive another award of stock units or any other equity-based award at any time in the future or in respect of any future period.

(c) ***No effect on future employment compensation.*** Morgan Stanley has made this award to you in its sole discretion. This award does not confer on you any right or entitlement to receive compensation in any specific amount, a stock unit award or any other award for any future period, and does not diminish in any way the Firm's discretion to determine the amount, if any, of future bonuses or other compensation. This award is not part of your base salary or wages and will not be taken into account in determining any other employment-related rights you may have, such as rights to pension or severance pay.

17. **Consents under local law.**

Your award is conditioned upon the making of all filings and the receipt of all consents or authorizations required to comply with, or required to be obtained under, applicable local law.

18. **Award modification.**

Morgan Stanley reserves the right to modify or amend unilaterally the terms and conditions of your award, without first asking your consent, or to waive any terms and conditions that operate in favor of Morgan Stanley. These amendments may include (but are not limited to) changes that Morgan Stanley considers necessary or advisable as a result of changes in any, or the adoption of any new, Legal Requirement. Morgan Stanley may not modify your award in a manner that would materially impair your rights in your award without your consent; *provided, however*, that Morgan Stanley may, but is not required to, without your consent, amend or modify your award in any manner that Morgan Stanley considers necessary or advisable to (i) comply with any Legal Requirement, (ii) ensure that your award does not result in an excise or other supplemental tax on the Firm under any Legal Requirement, or (iii) ensure that your award is not subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to conversion of your stock units to shares or delivery of such shares following conversion. Morgan Stanley will notify you of any amendment of your



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

award that affects your rights. Any amendment or waiver of a provision of this Award Certificate (other than any amendment or waiver applicable to all recipients generally), which amendment or waiver operates in your favor or confers a benefit on you, must be in writing and signed by the Chief Human Resources Officer (or if such position no longer exists, by the holder of an equivalent position) to be effective.

**19. Governing law and exclusive jurisdiction.**

This Award Certificate and all rights hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to any conflicts or choice of law, rule or principle that might otherwise refer the interpretation of the award to the substantive or procedural law of another jurisdiction. Unless you are bound by an arbitration agreement with Morgan Stanley (or its parents, subsidiaries, affiliates, predecessors, successors or assigns) covering any dispute arising out of or in any way connected with the Plan or this Award Certificate, your participation in the Plan or rights under the Plan or this Award Certificate, the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any such dispute or, if the United States District Court for the Southern District of New York does not have subject matter jurisdiction, the Supreme Court for the State of New York, New York County shall have exclusive jurisdiction.

**20. Severability.**

The provisions set forth herein shall be severable and, if any provision of this Award Certificate shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law. If a tribunal of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable, or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction, but shall remain effective and enforceable in all other jurisdictions.

**21. Defined terms.**

For purposes of this Award Certificate, the following terms shall have the meanings set forth below:

**(a)** "***Access Person***" means an individual designated by the Firm's Compliance Department as an "access employee" or "access person", which, for example, currently includes all Managing Directors of the Firm.

**(b)** "***Board***" means the Board of Directors of Morgan Stanley.

**(c)** "***Cause***" means:

**(1)** any act or omission which constitutes a breach of your obligations to the Firm, including, without limitation, (A) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (B) your failure to comply



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

with the Firm's policies, or compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you;

**(2)** your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

**(3)** your violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules or regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (3) of Clawback Cancellation Event set forth below and is deliberate, intentional or willful.

**(d)** "***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

**(1)** causes a restatement of the Firm's consolidated financial results;

**(2)** constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

**(3)** causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

(a) violation of business unit, product or desk specific risk parameters;

(b) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(c) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(d) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (3) and you do not engage in any other Prohibited Activity described herein, the number of stock units comprising your 2020 stock unit award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**(e)** "***Committee***" means the Compensation, Management Development and Succession Committee of the Board, any successor committee thereto or any other committee of the Board appointed by the Board with the powers of the Committee under the Plan, or any subcommittee appointed by such Committee.

**(f)** "***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

**(g)** "***Date of the Award***" means January 21, 2021.

**(h)** You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

**(i)** "***Disability***" means termination of Employment due to a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are Disabled.

**(j)** "***Employed***" and "***Employment***" refer to employment with the Firm and/or Related Employment.

**(k)** The "***Firm***" means Morgan Stanley (including any successor thereto) together with its subsidiaries and affiliates. For purposes of the definitions of "Cause," "Defamatory or Disparaging Comments," "Non-Public, Privileged or Confidential Information or Trade Secrets" and "Unauthorized Disclosures" set forth in this Award Certificate, references to the "Firm" shall refer severally to the Firm as defined in the preceding sentence and your Related Employer, if any. For purposes of the definition of "Prohibited Activity" set forth in this Award Certificate, references to the "Firm" shall refer to the Firm as defined in the second preceding sentence or your Related Employer, as applicable.

**(l)** "***Governmental Employer***" means a governmental department or agency, self-regulatory agency or other public service employer.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**(m)** "***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**(n)** "***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder.

**(o)** "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

**(p)** "***Non-Public, Privileged or Confidential Information or Trade Secrets***" means the Firm's books and records; holding book or customer book pages; the names, addresses, telephone numbers and assets and obligations carried in the account of the Firm's customers; computer software or hardware for use in computer or word processing equipment; all training material provided to you; documents or computer programs prepared or generated by you through use of Firm records and any information that is classified as confidential in the Firm's Global Policy on Confidential Information; *provided, however*, that "Non-Public, Privileged or Confidential Information or Trade Secrets" shall include, without limitation, any books, papers, records, electronic communications, videotapes or recordings related to any of the foregoing, including copies.

**(q)** "***Plan***" means the Equity Incentive Compensation Plan, as amended.

**(r)** "***Prohibited Activity***" means you:

**(1)** at any time prior to the Scheduled Conversion Date, (a) use for the benefit of any person or entity other than the Firm, or disclose to any third party, any Non-Public, Privileged or Confidential Information or Trade Secrets; (b) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm; (c) engage in any other conduct in violation of any contractual or legal obligations to the Firm; or (d) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information;

**(2)** at any time prior to the Scheduled Conversion Date, (a) are terminated for Cause; or (b) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Conversion Date); or (c) following termination of your Employment, the Firm determines that you could have been terminated for Cause;

**(3)** without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Scheduled Conversion Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment, in any capacity in a retail branch or in a retail sales or product representative position;

**(4)** without the written consent of the Firm, before the earlier to occur of two years after your termination of Employment and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (a) any of the Firm's customers who were serviced by you while employed by the Firm; or (b) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment;

**(5)** without the written consent of the Firm, before the earlier to occur of three years after your termination of Employment and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm);

**(6)** at any time prior to the Scheduled Conversion Date, without the written consent of the Firm, make Unauthorized Disclosures or Defamatory or Disparaging Comments about the Firm; or

**(7)** at any time prior to the Scheduled Conversion Date, engage in a Clawback Cancellation Event.

**(s)** "***Related Employment***" means your employment with an employer other than the Firm (such employer, herein referred to as a "Related Employer"), *provided* that: (i) you undertake such employment at the written request or with the written consent of Morgan Stanley's Chief Human Resources Officer (or if such position no longer exists, the holder of an equivalent position); (ii) immediately prior to undertaking such employment you were an employee of the Firm or were engaged in Related Employment (as defined herein); and (iii) such employment is recognized by the Firm in its discretion as Related Employment; and, *provided further*, that the Firm may (1) determine at any time in its sole discretion that employment that was recognized by the Firm as Related Employment no longer qualifies as Related Employment, and (2) condition the designation and benefits of Related Employment on such terms and conditions as the Firm may determine in its sole discretion; and *provided further*, the Firm will not provide for Related Employment except to the extent such treatment is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes before your stock units convert to shares or to incur additional tax or interest under Section 409A. The designation of employment as Related Employment does not give rise to an employment relationship between you and the Firm or otherwise modify your and the Firm's respective rights and obligations.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(t) "***Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death or Governmental Service Termination, on or after the date:

(1) on which you have attained age 65;

(2) on which you have attained age 55 and completed at least 5 years of service with the Firm; or

(3) otherwise specified by written agreement between you and the Firm as in effect on December 31, 2019, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment (*provided* that the agreement has been approved by the Committee or its delegee).

(u) "***Scheduled Conversion Date***" means January 27, 2025, *provided, however*, that if you remain employed by the Firm on such date and the date does not occur during an Access Person trading window period, then pursuant to Section 2(d), the Scheduled Conversion Date will be delayed until the first day of the next Access Person trading window period following January 27, 2025 (but in no event beyond December 31, 2025).

(v) "***Scheduled Vesting Date***" means January 27, 2025.

(w) "***Section 409A***" means Section 409A of the Internal Revenue Code and any regulations thereunder.

(x) "***Separation from Service***" means a separation from service with the Firm for purposes of Section 409A determined using the default provisions set forth in Treasury Regulation §1.409A-1(h) or any successor regulation thereto. For purposes of this definition, Morgan Stanley's subsidiaries and affiliates include (and are limited to) any corporation that is in the same controlled group of corporations (within the meaning of Section 414(b) of the Internal Revenue Code) as Morgan Stanley and any trade or business that is under common control with Morgan Stanley (within the meaning of Section 414(c) of the Internal Revenue Code), determined in each case in accordance with the default provisions set forth in Treasury Regulation §1.409A-1(h)(3).

(y) You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following the termination of your Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

| |
|---|
| **This program is a bonus program and not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. You should not look to this bonus program as a source of retirement income. This bonus program is not subject to the Employee Retirement Income Security Act of 1974.** |

**IN WITNESS WHEREOF,** Morgan Stanley has duly executed and delivered this Award Certificate as of the Date of the Award.

**MORGAN STANLEY**

/s/ Jeffrey S. Brodsky

Jeffrey S. Brodsky
Chief Human Resources Officer



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# MORGAN STANLEY

## MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## WEALTH MANAGEMENT

## FINANCIAL ADVISOR/PRIVATE WEALTH ADVISOR AWARDS

## 2020 DISCRETIONARY RETENTION AWARDS AWARD CERTIFICATE

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## TABLE OF CONTENTS FOR AWARD CERTIFICATE


1. Your award generally....3
2. Vesting schedule and payment....3
3. Death, Disability and Retirement....4
4. Involuntary termination by the Firm....5
5. Governmental Service....5
6. Specified employees....6
7. Cancellation of Applicable Account Value under certain circumstances....6
8. Tax and other withholding obligations....7
9. Obligations you owe to the Firm....7
10. Nontransferability....8
11. Designation of a beneficiary....8
12. No entitlements....8
13. Consents under local law....9
14. Award modification....9
15. Governing law and exclusive jurisdiction....10
16. Severability....10
17. Defined terms....10

MORGAN STANLEY

# MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## 2020 DISCRETIONARY RETENTION AWARDS
## AWARD CERTIFICATE

Morgan Stanley has granted you an award under the Morgan Stanley Compensation Incentive Plan (the "***Plan***") as part of your incentive compensation for services provided during 2020 and as an incentive for you to remain in Employment and provide services to the Firm through the Scheduled Vesting Date. This Award Certificate sets forth the general terms and conditions of your 2020 award under the Plan. The initial value of your 2020 award has been communicated to you independently.

If you are employed outside the United States, you will also receive an "***International Supplement***" that contains supplemental terms and conditions for your 2020 award. You should read this Award Certificate in conjunction with the International Supplement, if applicable, and the Plan in order to understand the terms and conditions of your 2020 award.

Your 2020 award is made pursuant to the Plan. References to Applicable Account Value in this Award Certificate mean only the Applicable Account Value related to your 2020 award, and the terms and conditions herein apply only to such award. If you receive any other award under the Plan or another incentive compensation plan, it will be governed by the terms and conditions of the applicable award documentation, which may be different from those herein.

The purposes of the 2020 award are, among other things, to facilitate the allocation of a portion of your above-base compensation for 2020 to the notional investment opportunities afforded by the Plan, to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. In view of these purposes, you will earn your 2020 award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), (2) do not engage in any Prohibited Activity and (3) satisfy obligations you owe to the Firm as set forth in Section 9 below. Even if your award has vested, you will have no right to your award if you engage in any Prohibited Activity. As Morgan Stanley deems appropriate, Morgan Stanley will require you to provide a written certification or other evidence, from time to time in its sole discretion, to confirm that no Prohibited Activity has occurred, including upon a termination of Employment and/or during a specified period of time prior to the Scheduled Distribution Date. If you fail to provide any required certification or other evidence, Morgan Stanley will cancel your award. It is your responsibility to provide the Executive Compensation Department with your up-to-date contact information.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Capitalized terms used in this Award Certificate that are not defined in the text have the meanings set forth in Section 17 below. Capitalized terms used in this Award Certificate that are not defined in the text or in Section 17 below have the meanings set forth in the Plan.

**1. Your award generally.**

**(a)** ***Applicable Account Value.*** This Award Certificate uses the term "Applicable Account Value" to refer to your 2020 award under the Plan and the notional return (positive or negative) thereon based on the performance of the Notional Investments to which your Account is notionally allocated. If you receive another award under the Plan (for example, an award for a future year), your total Account Value under the Plan will include the Applicable Account Value of your 2020 award and the applicable Account Value of such other award(s).

**(b)** ***Notional allocation of Account.*** The notional allocation of your Applicable Account Value is subject to the ultimate discretion of the Firm and is made exclusively for the purpose of determining your Applicable Account Value from time to time in accordance with the Plan. You may notionally allocate your Applicable Account Value to any one fund, or any combination of funds, offered as Notional Investments under the Plan with respect to your 2020 award.

**2. Vesting schedule and payment.**

**(a)** ***Vesting schedule.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest on the Scheduled Vesting Date. Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest only if you continue to provide future services to the Firm by remaining in continuous Employment through the Scheduled Vesting Date and providing value added services to the Firm during this timeframe. The special vesting terms set forth in Sections 3, 4 and 5 of this Award Certificate apply (i) if your Employment terminates by reason of your death or Disability, (ii) upon your Retirement, (iii) if the Firm terminates your employment in an involuntary termination under the circumstances described in Section 4 or (iv) upon a Governmental Service Termination. The vested portion of your Applicable Account Value remains subject to the cancellation and withholding provisions set forth in this Award Certificate.

**(b)** ***Payment.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will, to the extent vested, be paid in cash (minus applicable tax and other withholding liabilities) on the Scheduled Distribution Date; *provided* that, subject to Section 2(d), your Applicable Account Value may be paid to you following the Scheduled Distribution Date on the next administratively practicable payroll date. The special payment provisions set forth in Sections 3(a), 3(b), 3(d) and 5 of this Award Certificate apply (i) if your Employment terminates by reason of your death or you die after termination of your Employment, (ii) upon your Retirement under the circumstances set forth in Section 3(d) or (iii) upon your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 5(b).



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(c) *Accelerated payment.* Morgan Stanley shall have no right to accelerate the payment of any portion of your Applicable Account Value, except to the extent that such acceleration is not prohibited by Section 409A and would not result in your being required to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or your incurring additional tax or interest under Section 409A. If any portion of your Applicable Account Value is paid prior to the Scheduled Distribution Date pursuant to this Section 2(c), Morgan Stanley may condition such payment on your agreement that if you engage in any Prohibited Activity within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value (had it not been paid pursuant to this Section 2(c)), you will be required to repay to Morgan Stanley an amount equal to the payment you received (before taking account of any withholding) in respect of the portion of your Applicable Account Value that would have been canceled upon the occurrence of such Prohibited Activity, plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date such portion of your Applicable Account Value was paid through the date preceding the repayment date.

(d) *Rule of construction for timing of payment.* Whenever this Award Certificate provides for all or a portion of your Applicable Account Value to be paid on the Scheduled Distribution Date or upon a different specified event or date, such payment will be considered to have been timely made, and neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages based on a delay in the payment of your Applicable Account Value, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate) in respect of any such delay, as long as payment is made by December 31st of the year in which occurs the Scheduled Distribution Date or such other specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date, or, in connection with any such payment due to death, to the extent permissible under Section 409A, by the end of the calendar year following the year of your death. Similarly, neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate), based on any acceleration of the payment of your Applicable Account Value pursuant to Section 2(c).

**3. <u>Death, Disability and Retirement</u>.**

The following special vesting and payment terms apply to your award:

(a) *Death during Employment.* If your Employment terminates due to death, the unvested portion of your Applicable Account Value will vest on the date of your death. Your Applicable Account Value will be paid to the beneficiary you have designated pursuant to Section 11 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 7(c) will no longer apply.

(b) *Death after termination of Employment.* If you die after the termination of your Employment but prior to the Scheduled Distribution Date, the vested portion of your Applicable Account Value that you held at the time of your death will be paid to the beneficiary



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

you have designated pursuant to Section 11 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 7(c) will no longer apply.

**(c)** ***Disability.*** If your Employment terminates due to Disability, your unvested Applicable Account Value will vest on the date your Employment terminates. Your Applicable Account Value will be paid on the Scheduled Distribution Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**(d)** ***Retirement.*** If your Employment terminates as a result of your Retirement, and provided that, in the event the Firm terminates your employment under circumstances not involving any Prohibited Activity, you sign an agreement and release satisfactory to the Firm, (i) your unvested Applicable Account Value will vest on the date your Employment terminates and (ii) your Applicable Account Value will be paid, and the cancellation provisions will lift, on the Scheduled Distribution Date; *provided* that, if you satisfy the conditions for a Retirement upon your Separation from Service, 50% of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the first anniversary of your Separation from Service and the remaining portion of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the second anniversary of your Separation from Service, subject to earlier payment on the Scheduled Distribution Date. If you do not sign an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your Retirement under the circumstances described in this Section 3(d), any portion of your Applicable Account Value that was unvested immediately prior to your termination shall be canceled.

**4.** **<u>Involuntary termination by the Firm</u>.**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, your unvested Applicable Account Value will vest on the date your employment with the Firm terminates and your Applicable Account Value will be paid on the Scheduled Distribution Date, *provided* that you sign an agreement and release satisfactory to the Firm. If you do not sign such an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your involuntary termination as described in this Section 4, any portion of your Applicable Account Value that was unvested immediately prior to your termination shall be canceled. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**5.** **<u>Governmental Service</u>.**

**(a)** ***General treatment of awards upon Governmental Service Termination.*** If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 5(c), your unvested Applicable Account Value will vest on the date of your Governmental Service Termination. Your vested Applicable Account Value will be paid on the date of your Governmental Service Termination.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**(b)** ***General treatment of vested awards upon acceptance of employment at a Governmental Employer following termination of Employment.*** If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 5(c), your outstanding vested Applicable Account Value will be paid upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence demonstrating that as a result of such employment the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**(c)** ***Repayment obligation.*** If any Prohibited Activity occurs within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value had it not been paid pursuant to Sections 5(a) or 5(b) above, you will be required to repay to Morgan Stanley the amount distributed to you pursuant to Sections 5(a) or 5(b) above that would have been canceled upon the occurrence of such Prohibited Activity (before taking account of any withholding), plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date of such payment through the date preceding the repayment date.

**6. <u>Specified employees.</u>**

Notwithstanding any other terms of this Award Certificate, if Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service, payment of any portion of your Applicable Account Value that otherwise would be made upon your Separation from Service will be delayed until the first business day following the date that is six months after your Separation from Service; *provided, however*, that in the event that your death, your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 5(b) occurs at any time after the Date of the Award, payment will be made in accordance with Section 3(a), 3(b) or 5, as applicable.

**7. <u>Cancellation of Applicable Account Value under certain circumstances.</u>**

**(a)** ***Cancellation of unvested Applicable Account Value.*** Any unvested portion of your Applicable Account Value will be canceled if your Employment terminates for any reason other than death, Disability, a Retirement, an involuntary termination by the Firm described in Section 4 or a Governmental Service Termination.

**(b)** ***General treatment of vested Applicable Account Value.*** Except as otherwise provided in this Award Certificate, your vested Applicable Account Value will be paid on the Scheduled Distribution Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**(c)** ***Cancellation of Applicable Account Value under certain circumstances.*** This Section 7(c) is designed, among other things, to incentivize compliance with the Firm's



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. This Section 7(c) shall apply notwithstanding any other terms of this Award Certificate (except where sections in this Award Certificate specifically provide that the cancellation events set forth in this Section 7(c) no longer apply).

Your Applicable Account Value, even if vested, is not earned until the Scheduled Distribution Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 9 below) and, unless prohibited by applicable law, will be canceled in full, or in the case of clause (3) of a Clawback Cancellation Event, in full or in part, until the Scheduled Distribution Date if any Prohibited Activity occurs.

The Firm may retain custody of your Applicable Account Value following the Scheduled Distribution Date pending any investigation or other review that impacts the determination as to whether your Applicable Account Value is cancellable and, in such an instance, your Applicable Account Value shall be forfeited in the event the Firm determines that the Applicable Account Value was cancellable.

**8. <u>Tax and other withholding obligations</u>.**

Any vesting, whether on the Scheduled Vesting Date or some other date, of all or a portion of your Applicable Account Value, and any payment of all or a portion of your Applicable Account Value shall be subject to the Firm's withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation to you, including by canceling or accelerating payment of a portion of your Applicable Account Value in an amount not to exceed such taxes imposed upon such vesting or distribution and any additional taxes imposed as a result of such cancellation or acceleration, and to take such other action as the Firm may deem advisable to enable it and you to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting or payment of your Applicable Account Value. However, the Firm may not deduct or withhold such sum from any payroll or any other payment or compensation (including from your Applicable Account Value), except to the extent it is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A.

**9. <u>Obligations you owe to the Firm</u>.**

As a condition to the earning, payment or distribution of your award, the Firm may require you to pay such sum to the Firm as may be necessary to satisfy any obligation that you owe to the Firm. Notwithstanding any other provision of this Award Certificate, your award, even if vested, is not earned until after such obligations and any tax withholdings or other deductions required by law are satisfied. Notwithstanding the foregoing, Morgan Stanley may not reduce the amount of your Applicable Account Value to be distributed to satisfy obligations



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

that you owe to the Firm except (i) to the extent authorized under Section 8, relating to tax and other withholding obligations or, otherwise, (ii) to the extent such reduction is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur additional tax or interest under Section 409A. Morgan Stanley's determination of any amount that you owe the Firm shall be conclusive.

**10. Nontransferability.**

You may not sell, pledge, hypothecate, assign or otherwise transfer your Applicable Account Value, other than as provided in Section 11 (which allows you to designate a beneficiary or beneficiaries in the event of your death) or by will or the laws of descent and distribution. This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise. During your lifetime, payments relating to your Applicable Account Value will be made only to you.

Your personal representatives, heirs, legatees, beneficiaries, successors and assigns, and those of Morgan Stanley, shall all be bound by, and shall benefit from, the terms and conditions of your award.

**11. Designation of a beneficiary.**

You may make a written designation of beneficiary or beneficiaries to receive all or part of the amounts to be distributed in respect of your Applicable Account Value in the event of your death. To make a beneficiary designation, you must complete and submit the Beneficiary Designation form on the Executive Compensation website.

Any portion of your Applicable Account Value that becomes payable upon your death, and as to which a designation of beneficiary is not in effect, will be distributed to your estate.

If you previously filed a designation of beneficiary form for your award(s) under the Plan with the Executive Compensation Department, such form will also apply to all of your awards under the Plan, including this 2020 award. You may replace or revoke your beneficiary designation at any time. If there is any question as to the legal right of any beneficiary to receive your Applicable Account Value, Morgan Stanley may determine in its sole discretion to distribute the amounts in question to your estate. Morgan Stanley's determination shall be binding and conclusive on all persons and it will have no further liability to anyone with respect to such amounts.

**12. No entitlements.**

(a) *No right to continued Employment.* This award is not an employment agreement, and nothing in this Award Certificate, the International Supplement, if applicable, or the Plan shall alter your status as an "at-will" employee of the Firm or your employment status at a Related Employer. None of this Award Certificate, the International Supplement, if applicable, or the Plan shall be construed as guaranteeing your employment by the Firm or a Related



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Employer, or as giving you any right to continue in the employ of the Firm or a Related Employer, during any period (including without limitation the period between the Date of the Award and the Scheduled Vesting Date or Scheduled Distribution Date, or any portion of any of these periods), nor shall they be construed as giving you any right to be reemployed by the Firm or a Related Employer following any termination of Employment.

**(b)** ***No right to future awards.*** This award, and all other awards under the Plan, are discretionary. This award does not confer on you any right or entitlement to receive another award under the Plan or any other award under any other incentive compensation plan of Morgan Stanley at any time in the future or in respect of any future period.

**(c)** ***No effect on future employment compensation.*** Morgan Stanley has made this award to you in its sole discretion. This award does not confer on you any right or entitlement to receive compensation in any specific amount for any future year, and does not diminish in any way the Firm's discretion to determine the amount, if any, of your compensation. This award is not part of your base salary or wages and will not be taken into account in determining any other employment-related rights you may have, such as rights to pension or severance pay.

**13. Consents under local law.**

Your award is conditioned upon the making of all filings and the receipt of all consents or authorizations required to comply with, or required to be obtained under, applicable local law.

**14. Award modification.**

Morgan Stanley reserves the right to modify or amend unilaterally the terms and conditions of your award, without first asking your consent, or to waive any terms and conditions that operate in favor of Morgan Stanley. These amendments may include (but are not limited to) changes that Morgan Stanley considers necessary or advisable as a result of changes in any, or the adoption of any new, Legal Requirement. Morgan Stanley may not modify your award in a manner that would materially impair your rights in your award without your consent; *provided, however*, that Morgan Stanley may, but is not required to, without your consent, amend or modify your award in any manner that Morgan Stanley considers necessary or advisable to (i) comply with any Legal Requirement, (ii) ensure that your award does not result in an excise or other supplemental tax on the Firm under any Legal Requirement, or (iii) ensure that your award is not subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to payment or distribution. Morgan Stanley will notify you of any amendment of your award that affects your rights. Any amendment or waiver of a provision of this Award Certificate (other than any amendment or waiver applicable to all recipients generally), which amendment or waiver operates in your favor or confers a benefit on you, must be in writing and signed by the Chief Human Resources Officer (or if such position no longer exists, by the holder of an equivalent position) to be effective.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**15. Governing law and exclusive jurisdiction.**

This Award Certificate and all rights hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to any conflicts or choice of law, rule or principle that might otherwise refer the interpretation of the award to the substantive or procedural law of another jurisdiction. Unless you are bound by an arbitration agreement with Morgan Stanley (or its parents, subsidiaries, affiliates, predecessors, successors or assigns) covering any dispute arising out of or in any way connected with the Plan or this Award Certificate, your participation in the Plan or rights under the Plan or this Award Certificate, the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any such dispute or, if the United States District Court for the Southern District of New York does not have subject matter jurisdiction, the Supreme Court for the State of New York, New York County shall have exclusive jurisdiction.

**16. Severability.**

The provisions set forth herein shall be severable and, if any provision of this Award Certificate shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law. If a tribunal of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable, or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction, but shall remain effective and enforceable in all other jurisdictions.

**17. Defined terms.**

For purposes of this Award Certificate, the following terms shall have the meanings set forth below:

**(a)** "***Board***" means the Board of Directors of Morgan Stanley.

**(b)** "***Cause***" means:

**(1)** any act or omission which constitutes a breach of your obligations to the Firm, including, without limitation, (A) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (B) your failure to comply with the Firm's policies, or compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you;

**(2)** your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

**(3)** your violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules or regulations of any securities



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (3) of Clawback Cancellation Event set forth below and is deliberate, intentional or willful.

**(c)** ***"Clawback Cancellation Event"*** means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

**(1)** causes a restatement of the Firm's consolidated financial results;

**(2)** constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

**(3)** causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

**(a)** violation of business unit, product or desk specific risk parameters;

**(b)** use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

**(c)** failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

**(d)** failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (3) and you do not engage in any other Prohibited Activity described herein, your 2020 award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**(d)** ***"Competitive Services"*** means services with respect to any line of business in which the Firm is engaged, including but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(e) "***Date of the Award***" means January 21, 2021.

(f) You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

(g) "***Disability***" means termination of Employment due to a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are Disabled.

(h) "***Employed***" and "***Employment***" refer to employment with the Firm and/or Related Employment.

(i) The "***Firm***" means Morgan Stanley (including any successor thereto) together with its subsidiaries and affiliates. For purposes of the definitions of "Cause," "Defamatory or Disparaging Comments," "Non-Public Privileged or Confidential Information or Trade Secrets" and "Unauthorized Disclosures" set forth in this Award Certificate, references to the "Firm" shall refer severally to the Firm as defined in the preceding sentence and your Related Employer, if any. For purposes of the definition of "Prohibited Activity" set forth in this Award Certificate, references to the "Firm" shall refer to the Firm as defined in the second preceding sentence or your Related Employer, as applicable.

(j) "***Governmental Employer***" means a governmental department or agency, self-regulatory agency or other public service employer.

(k) "***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

(l) "***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder.

(m) "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

(n) "***Non-Public, Privileged or Confidential Information or Trade Secrets***" means the Firm's books and records; holding book or customer book pages; the names, addresses, telephone numbers and assets and obligations carried in the account of the Firm's customers; computer software or hardware for use in computer or word processing equipment;

all training material provided to you; documents or computer programs prepared or generated by you through use of Firm records and any information that is classified as confidential in the Firm's Global Policy on Confidential Information; *provided, however*, that "Non-Public, Privileged or Confidential Information or Trade Secrets" shall include, without limitation, any books, papers, records, electronic communications, videotapes or recordings related to any of the foregoing, including copies.

(o) "***Prohibited Activity***" means you:

**(1)** at any time prior to the Scheduled Distribution Date, (a) use for the benefit of any person or entity other than the Firm, or disclose to any third party, any Non-Public, Privileged or Confidential Information or Trade Secrets; (b) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm; (c) engage in any other conduct in violation of any contractual or legal obligations to the Firm; or (d) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information;

**(2)** at any time prior to the Scheduled Distribution Date, (a) are terminated for Cause; or (b) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Distribution Date); or (c) following termination of your Employment, the Firm determines that you could have been terminated for Cause;

**(3)** without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Distribution Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment, in any capacity in a retail branch or in a retail sales or product representative position;

**(4)** without the written consent of the Firm, before the earlier to occur of two years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (a) any of the Firm's customers who were serviced by you while employed by the Firm; or (b) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment;

**(5)** without the written consent of the Firm, before the earlier to occur of three years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm);

**(6)** at any time prior to the Scheduled Distribution Date, without the written consent of the Firm, make Unauthorized Disclosures or Defamatory or Disparaging Comments about the Firm; or

**(7)** at any time prior to the Scheduled Distribution Date, engage in a Clawback Cancellation Event.

**(p)** "***Related Employment***" means your employment with an employer other than the Firm (such employer, herein referred to as a "Related Employer"), *provided* that: (i) you undertake such employment at the written request or with the written consent of Morgan Stanley's Chief Human Resources Officer (or if such position no longer exists, the holder of an equivalent position); (ii) immediately prior to undertaking such employment you were an employee of the Firm or were engaged in Related Employment (as defined herein); and (iii) such employment is recognized by the Firm in its discretion as Related Employment; and, *provided further,* that the Firm may (1) determine at any time in its sole discretion that employment that was recognized by the Firm as Related Employment no longer qualifies as Related Employment, and (2) condition the designation and benefits of Related Employment on such terms and conditions as the Firm may determine in its sole discretion; and *provided further*, the Firm will not provide for Related Employment except to the extent such treatment is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A. The designation of employment as Related Employment does not give rise to an employment relationship between you and the Firm, or otherwise modify your and the Firm's respective rights and obligations.

**(q)** "***Retirement***" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death or Governmental Service Termination, on or after the date:

**(1)** on which you have attained age 65;

**(2)** on which you have attained age 55 and have completed at least 5 years of service with the Firm; or

**(3)** otherwise specified by written agreement between you and the Firm as in effect on December 31, 2019, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment (*provided* that the agreement has been approved by the Compensation Committee or its delegee).

**(r)** "***Scheduled Distribution Date***" means January 27, 2027.

**(s)** "***Scheduled Vesting Date***" means January 27, 2027.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**(t)** "***Section 409A***" means Section 409A of the Internal Revenue Code and any regulations thereunder.

**(u)** "***Separation from Service***" means a separation from service with the Firm for purposes of Section 409A determined using the default provisions set forth in Treasury Regulation §1.409A-1(h) or any successor regulation thereto. For purposes of this definition, Morgan Stanley's subsidiaries and affiliates include (and are limited to) any corporation that is in the same controlled group of corporations (within the meaning of Section 414(b) of the Internal Revenue Code) as Morgan Stanley and any trade or business that is under common control with Morgan Stanley (within the meaning of Section 414(c) of the Internal Revenue Code), determined in each case in accordance with the default provisions set forth in Treasury Regulation §1.409A-1(h)(3).

**(v)** You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following the termination of your Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

**This program is a bonus program and not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. You should not look to this bonus program as a source of retirement income. This bonus program is not subject to the Employee Retirement Income Security Act of 1974.**

**IN WITNESS WHEREOF,** Morgan Stanley has duly executed and delivered this Award Certificate as of the Date of the Award.

**MORGAN STANLEY**

/s/ Jeffrey S. Brodsky
Jeffrey S. Brodsky
Chief Human Resources Officer



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

# Morgan Stanley

## Wealth Management Financial Advisor/Private Wealth Advisor Awards

### 2020 DISCRETIONARY RETENTION AWARDS
### STOCK UNIT SUMMARY DESCRIPTION

**The following is an abbreviated general description of the terms and conditions of Morgan Stanley 2020 equity retention awards of stock units under the Morgan Stanley Equity Incentive Compensation Plan. This summary does not address all 2020 stock unit award features. Your 2020 Award Certificate provides a full explanation of the terms and conditions of your 2020 stock unit award, which may differ from the description in this summary. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in your 2020 Award Certificate. If there is any conflict between the terms of this summary and those of your 2020 Award Certificate, the latter will control. You will also be provided with a prospectus and tax supplement that contain important information about your award.**

**IF YOU ARE A NON-U.S. BASED EMPLOYEE, PLEASE REFER TO YOUR 2020 INTERNATIONAL SUPPLEMENT FOR OTHER RELEVANT TERMS OF YOUR AWARD**

---

**Earning Award**

You have no right to your 2020 stock unit award until it is "earned." Generally, to earn your award, you must (1) remain in continuous Employment through the Scheduled Vesting Date, (2) even if your award is vested, not engage in any activity that constitutes Prohibited Activity and (3) satisfy any obligations you owe to the Firm. The vesting requirements and Prohibited Activities are summarized below and set forth in full in the 2020 Award Certificate that will be provided to you.

**Initial Value**

The initial value of your 2020 stock unit award, and the number of stock units included in your award, will be communicated to you independently.

**Number of Stock Units**

The number of stock units comprising your 2020 award is calculated using the "fair market value" of Morgan Stanley common stock of **$74.8657** (the volume weighted average price of Morgan Stanley stock on January 21, 2021).

**Scheduled Vesting Date**

Generally, the stock units included in the award will vest on **January 27, 2025** (the "***Scheduled Vesting Date***"). Except as otherwise provided in your Award Certificate, your 2020 stock unit award will vest only if you remain in continuous Employment through the Scheduled Vesting Date.

**Conversion of Stock Units to Shares**

Generally, the stock units included in the award will convert to shares (to the extent vested) on **January 27, 2025**; *provided, however*, that if you remain employed by the Firm on such date and the specified date does not occur during an access employee trading window period, then pursuant to the Section 409A of the Internal Revenue Code ("***Section 409A***") rule of construction incorporated into your award, the conversion of stock units will be delayed until the first day of the next access employee trading window period (but in no event beyond December 31, 2025). January 27, 2025, or the later date to which conversion of stock units may be delayed as set forth above, is referred to as the "***Scheduled Conversion Date***".

Until conversion, stock units constitute a contingent and unsecured promise of Morgan Stanley to pay the unit holder shares of Morgan Stanley common stock.

**Transfer Restrictions**

You may not sell, pledge or otherwise transfer stock units for any reason. Shares received from stock unit conversions may be sold, pledged or transferred, subject to compliance with applicable securities laws and Firm policies.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Although you will become the beneficial owner of shares underlying your stock units following conversion of your stock units, the Firm may retain custody of your shares following conversion pending any investigation or other review that impacts the determination as to whether the stock units are cancellable under the circumstances set forth below.

**Dividends and Dividend Equivalents**

If Morgan Stanley pays a regular or ordinary dividend on its common stock, dividend equivalents will be credited with respect to your stock units outstanding on the dividend record date and reinvested in the form of additional stock units based on the fair market value of Morgan Stanley common stock, as determined by Morgan Stanley. The additional stock units credited to you as a result of the reinvestment of dividend equivalents will vest and convert at the same time as, and under the same terms and conditions applicable to, the underlying stock units (and only if your stock units vest and convert). Shares received from stock unit conversions will receive dividends in the same manner as shares held by other shareholders. There can be no assurance that Morgan Stanley will pay dividends in the future and no assurance concerning the amount of such dividends, if any.

**Termination of Employment**

If your Employment terminates other than for death, Disability, Retirement, involuntary termination not involving any Prohibited Activity or Governmental Service Termination, your unvested stock units will be canceled immediately.

The special provisions that apply if your Employment terminates for death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination are described below.

**Death**

If you die while Employed, unvested stock units will vest. Stock units will convert and be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

If you die after your termination of Employment but prior to the Scheduled Conversion Date, vested stock units that you held as of the date of your death will convert and be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

**Disability**

If your Employment terminates due to Disability, then, subject to the cancellation provisions described below, unvested stock units will vest on your termination date and stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date. Vesting of stock units upon, and conversion of stock units following, Disability is conditioned on your not engaging in any Prohibited Activity.

"***Disability***" is defined as a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are disabled.

**Retirement**

If your Employment terminates as a result of your Retirement, then, subject to the cancellation provisions described below and provided that, in the event the Firm terminates your employment under circumstances not involving any Prohibited Activity, you sign an agreement and release satisfactory to the Firm, unvested stock units will vest upon your termination date and stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date; *provided that*, if you satisfy the conditions for a Retirement upon your "Separation from Service" (as defined in Section 409A), stock units will convert, and cancellation provisions will lift, 50% on the first business day of the month following the first anniversary of your "Separation from Service" and the remaining 50% on the first business day of the month



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

following the second anniversary of your "Separation from Service", subject to earlier conversion on the Scheduled Conversion Date. Vesting of stock units upon, and conversion of stock units following, Retirement is conditioned on your not engaging in any Prohibited Activity.

Your termination will be treated as a "***Retirement***" if your termination is other than as a result of your death or Governmental Service Termination and your Employment terminates on or after the date:

a) You have attained age 65;
b) You have attained age 55 and completed at least 5 years of service with the Firm; or
c) Otherwise specified by written agreement between the Firm and you (as in effect on December 31, 2019, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment).

**Involuntary Termination not Involving Any Prohibited Activity**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, then, *provided* that you sign an agreement and release satisfactory to the Firm, your unvested stock units will vest on the date of your termination. Subject to the cancellation provisions described below, your stock units will convert, and cancellation provisions will lift, on the Scheduled Conversion Date.

**Governmental Service**

If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, unvested stock units will vest, and stock units will convert, on the date of your Governmental Service Termination.

If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, provided that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your outstanding vested stock units will convert to shares upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence that the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

If your stock units convert due to this provision and you engage in any Prohibited Activity within the period of time that would have resulted in cancellation of all or a portion of your stock units, you will be required to pay to Morgan Stanley an amount equal to the sum of the number of stock units that would have been canceled upon the occurrence of such Prohibited Activity multiplied by the fair market value of Morgan Stanley common stock on the date your stock units converted, plus interest on such amount.

"***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in Morgan Stanley equity awards or continued ownership of Morgan Stanley common stock is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**Specified Employees**

If Morgan Stanley considers you to be one of its "specified employees" as defined in Section



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

409A at the time of your Separation from Service other than in the event of your employment at a Governmental Employer under circumstances described above, conversion of your stock units that otherwise would occur upon your Separation from Service will be delayed until the first business day following the date that is six months after your Separation from Service (subject to earlier conversion in the event of your death or your employment at a Governmental Employer under the circumstances described above).

**Cancellation**

Prior to vesting, awards are cancelable for termination of Employment, other than due to death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination.

All vested and unvested stock units will also be subject to cancellation in full, or in the case of a Cancellation Clawback Event described in clause (c) below, in full or in part, subject to applicable law, until the Scheduled Conversion Date if you engage in any Prohibited Activity, as defined below.

"***Prohibited Activity***" means you: (1) without the written consent of the Firm, at any time prior to the Scheduled Conversion Date, (i) use for the benefit of any person or entity other than the Firm, or disclose to any third party Non-Public, Privileged or Confidential Information or Trade Secrets, (ii) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm, (iii) engage in any other conduct in violation of any contractual or legal obligations to the Firm, or (iv) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information; or (2) (i) are terminated for Cause, or (ii) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Conversion Date), or (iii) following termination of your Employment, the Firm determines that you could have been terminated for Cause; or (3) without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Conversion Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding termination, in any capacity in a retail branch or in a retail sales or product representative position; or (4) without the written consent of the Firm, before the earlier to occur of two years after termination and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (i) any of the Firm's customers who were serviced by you while employed by the Firm; or (ii) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding termination; or (5) without the written consent of the Firm, before the earlier to occur of three years after termination and the Scheduled Conversion Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm); or (6) without the written consent of the Firm, make Defamatory or Disparaging Comments or Unauthorized Disclosures about the Firm; or (7) engage in a Clawback Cancellation Event.

"***Cause***" means:

(x) any act or omission which constitutes a breach by you of your obligations to the Firm



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

including, without limitation, (i) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (ii) your failure to comply with the Firm's policies, or compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you; or

(y) your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

(z) a violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules and regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (c) of Clawback Cancellation Event below and is deliberate, intentional or willful.

"***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including, but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following termination of Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

"***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(a) causes a restatement of the Firm's consolidated financial results;

(b) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(c) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

(i) violation of business unit, product or desk specific risk parameters;

(ii) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(iii) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(iv) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (c) and you do not engage in any other cancellation or clawback event described herein, the number of stock units will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**Covenants and Certification**

In the event you fail to acknowledge, within the time and in the manner prescribed by the Firm, a notice and non-solicitation or other restrictive covenant agreement required of you by the Firm, the Firm has a right to cancel your award.

You may be required to provide Morgan Stanley with a written certification or other evidence that it deems appropriate, in its sole discretion, to confirm that no Prohibited Activity has occurred. If you fail to submit a timely certification or evidence, Morgan Stanley will cancel your award.

**Tax Withholding**

Vesting of your award, conversion of your stock units and crediting or payment of your dividend equivalents, whether on the Scheduled Vesting Date or Scheduled Conversion Date or some other date, shall be subject to withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation owed to you, including by canceling or accelerating payment of a portion of your award in an amount not to exceed such taxes imposed upon vesting, conversion, crediting or payment and any additional taxes imposed as a result of such cancellation or acceleration, subject to limitations imposed under Section 409A.

**Award Modification**

Morgan Stanley generally has the right to modify or amend the terms of your award without your consent. However, Morgan Stanley may not make a modification that would materially impair your rights in such award without your consent unless such modification is necessary or advisable (i) to comply with any law, regulation, ruling, judicial decision, accounting standard or similar pronouncement or (ii) to ensure that awards are not subject to federal, state or local income tax prior to payment.

**Timing of Conversion (Section 409A Rule of Construction)**

With respect to any provision for vested stock units to convert to shares of Morgan Stanley common stock on a specified event or date, such conversion will be considered to have been timely made as long as conversion is made by December 31st of the year in which occurs the specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date, or, in connection with any such conversion due to death, to the extent permissible under Section 409A, by the end of the calendar year following the year of your death.

**U.S. Taxation**

In general, when your stock units convert to shares, the market value of shares at the time of conversion will be taxed as ordinary income. FICA and Medicare tax apply at the time that stock units are deemed to vest for tax purposes. Please refer to the tax supplement for a fuller



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

| | |
|---|---|
| | discussion of these tax consequences. |
| **Non-U.S. Taxation** | Taxation on grant, vesting and stock unit conversion depends on the tax laws and regulations in your jurisdiction. |
| **Governing Law** | New York Law. |

**By accepting this award, you acknowledge that it constitutes all 2020 deferred compensation to which you may be entitled, subject to the terms and conditions of the award. Nothing in this summary or any correspondence related to this award should be construed as a guarantee of an equity award or any particular level of compensation, bonus or benefits. Please note that the Firm does not commit to granting the award described in this summary in the future. These awards do not create a contract or guarantee of employment, or modify any agreement entered into by Morgan Stanley or any of its affiliates and you.**

**You are required to keep confidential all matters relating to stock unit awards to the fullest extent permitted by law. The provisions of the Firm's Code of Conduct regarding Confidential and Proprietary Information shall cover all aspects of stock unit awards.**

**This program is a bonus program and not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. Participants should not look to this bonus program as a source of retirement income. This bonus program is not subject to the Employee Retirement Income Security Act of 1974.**

**Morgan Stanley does not render advice on tax and tax accounting matters.**



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

# Morgan Stanley Compensation Incentive Plan

## Wealth Management Financial Advisor/Private Wealth Advisor Awards

## 2020 DISCRETIONARY RETENTION AWARDS
## MSCIP AWARD SUMMARY DESCRIPTION

**The following is an abbreviated general description of the terms and conditions of 2020 awards under the Morgan Stanley Compensation Incentive Plan ("*MSCIP*"). This summary does not address all 2020 MSCIP award features. Your 2020 Award Certificate provides a full explanation of the terms and conditions of your 2020 MSCIP award, which may differ from the description in this summary. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in your 2020 Award Certificate. If there is any conflict between the terms of this summary and those of your 2020 Award Certificate, the latter will control. You will also be provided with a tax supplement that contains important information about your award.**

**IF YOU ARE A NON-U.S. BASED EMPLOYEE, PLEASE REFER TO YOUR 2020 INTERNATIONAL SUPPLEMENT FOR OTHER RELEVANT TERMS OF YOUR AWARD**

---

**Earning Award**

You have no right to your 2020 MSCIP award until it is "earned." Generally, to earn your award, you must (1) remain in continuous Employment through the Scheduled Vesting Date, (2) even if your award is vested, not engage in any activity that constitutes Prohibited Activity and (3) satisfy any obligations you owe to the Firm. The vesting requirements and Prohibited Activities are summarized below, and set forth in full in the 2020 Award Certificate that will be provided to you.

**Initial Value**

The initial value of your 2020 MSCIP award will be communicated to you independently.

**Account**

Your 2020 MSCIP award will be credited to a bookkeeping account in your name as of January 21, 2021. Pursuant to the section "Notional Allocation of Account" below, if a menu of notional investments is made available by Morgan Stanley, your account will be credited (or debited) with notional returns on the notional investments to which your account is allocated. This summary uses the term "***Applicable Account Value***" to refer to your 2020 MSCIP award and if applicable, any notional return (positive or negative) thereon.

**Notional Allocation of Account**

You may be permitted to notionally allocate your account among a menu of notional investments selected by Morgan Stanley in its sole discretion. If such allocation is made available, the notional value of your account will track the performance of the referenced funds underlying the notional investments that you select and any such allocation (and any subsequent reallocations, if applicable) will be subject to the rules and notional allocation requirements of your 2020 MSCIP award as in effect from time to time.

If applicable, the value of your account is subject at all times to risk based upon the performance of the notional investments to which your account is allocated. If the value of the notional investments to which your account is allocated decreases, the value of your account may be lower than your original award amounts. The Firm may provide you with a description of the referenced funds and their historical returns, as applicable, but this is, of course, no guide or representation as to their future performance.

The performance of your notional investments, if any, and the value of your account, will be impacted by all of the fees and costs of the referenced funds underlying your notional investments, including fees which the funds may pay to the Firm for services the Firm provides to the referenced funds.



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Notwithstanding the foregoing, the notional allocation of your account will be at the sole discretion of Morgan Stanley.

**Scheduled Vesting Date**

Generally, your Applicable Account Value will vest on **January 27, 2027** ("***Scheduled Vesting Date***"). Except as otherwise provided in your Award Certificate, your Applicable Account Value will vest only if you remain in continuous Employment through the Scheduled Vesting Date.

**Scheduled Distribution Date**

Generally, the Firm will pay you your Applicable Account Value, to the extent vested, in cash (minus applicable tax and other withholding liabilities) on **January 27, 2027** ("***Scheduled Distribution Date***"). Until payment, your award constitutes a contingent and unsecured promise of the Firm to pay you your vested Applicable Account Value on the Scheduled Distribution Date. Notwithstanding the foregoing, subject to the "Timing of Payment" provision below, your Applicable Account Value may be paid following the Scheduled Distribution Date on the next administratively practicable payroll date.

**Termination of Employment**

If your Employment terminates other than for death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination, your unvested Applicable Account Value will be canceled immediately.

The special provisions that apply if your Employment terminates for death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination are described below.

**Death**

If you die while Employed, the unvested portion of your Applicable Account Value will vest. Your Applicable Account Value will be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

If you die after your termination of Employment but prior to the Scheduled Distribution Date, the vested portion of your Applicable Account Value that you held as of the date of your death will be paid to your beneficiary or estate upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death.

**Disability**

If your Employment terminates due to Disability, then, subject to the cancellation provisions described below, your unvested Applicable Account Value will vest on your termination date and your Applicable Account Value will be paid on the Scheduled Distribution Date. Vesting of your Applicable Account Value upon, and distribution of your Applicable Account Value following, Disability is conditioned on your not engaging in any Prohibited Activity.

"***Disability***" is defined as a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death. The determination of the Firm shall be conclusive on all parties as to whether you are disabled.

**Retirement**

If your Employment terminates as a result of your Retirement, then, subject to the cancellation provisions described below and provided that, in the event the Firm terminates your employment under circumstances not involving Prohibited Activity, you sign an agreement and release satisfactory to the Firm, your unvested Applicable Account Value will vest upon your termination date and your Applicable Account Value will be paid on the Scheduled Distribution Date; *provided* that, if you satisfy the conditions for a Retirement upon your "Separation from Service" (as defined in Section 409A), 50% of your vested Applicable Account Value will be paid, and cancellation provisions will lift, on the first anniversary of your "Separation from Service" and the remaining vested portion of your Applicable Account Value will be paid, and cancellation provisions will lift, on the second anniversary of your "Separation from Service", subject to earlier



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

payment on the Scheduled Distribution Date. Vesting of your Applicable Account Value upon, and distribution of your Applicable Account Value following, Retirement is conditioned on your not engaging in any Prohibited Activity.

Your termination will be treated as a "***Retirement***" if your termination is other than as a result of your death or Governmental Service Termination and your Employment terminates on or after the date:

a) You have attained age 65;
b) You have attained age 55 and have completed at least 5 years of service with the Firm; or
c) Otherwise specified by written agreement between the Firm and you (as in effect on December 31, 2019, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment).

**Involuntary Termination not Involving Any Prohibited Activity**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, then, *provided* that you sign an agreement and release satisfactory to the Firm, your unvested Applicable Account Value will vest on the date of your termination. Subject to the cancellation provisions described below, your Applicable Account Value will be paid, and cancellation provisions will lift, on the Scheduled Distribution Date.

**Governmental Service**

If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your unvested Applicable Account Value will vest, and your Applicable Account Value will be paid, on the date of your Governmental Service Termination.

If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your repayment obligations summarized below, your outstanding vested Applicable Account Value will be paid upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence that the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

If your Applicable Account Value is paid due to this provision and you engage in any Prohibited Activity within the period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value, you will be required to pay to Morgan Stanley the amount distributed to you in accordance with this provision plus interest on such amount.

"***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

**Specified Employees**

If Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A of the Internal Revenue Code ("***Section 409A***") at the time of your Separation from Service other than in the event of your employment at a Governmental Employer under circumstances described above, payment of your Applicable Account Value that otherwise would occur upon your Separation from Service will be delayed until the first business day



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

following the date that is six months after your Separation from Service (subject to earlier payment in the event of your death or your employment at a Governmental Employer under the circumstances described above).

**Cancellation**

Prior to vesting, awards are cancelable for termination of Employment, other than due to death, Disability, Retirement, involuntary termination not involving any Prohibited Activity, or Governmental Service Termination.

The Firm may retain custody of your Applicable Account Value following the Scheduled Distribution Date pending any investigation or other review that impacts the determination as to whether your Applicable Account Value is cancellable under the circumstances set forth herein.

Your entire unpaid vested and unvested Applicable Account Value is also subject to cancellation in full, or in the case of a Cancellation Clawback Event described in clause (c) below, in full or in part, subject to applicable law, until the Scheduled Distribution Date if you engage in any Prohibited Activity, as defined below.

"***Prohibited Activity***" means you (1) without the written consent of the Firm, at any time prior to the Scheduled Distribution Date, (i) use for the benefit of any person or entity other than the Firm, or disclose to any third party Non-Public, Privileged or Confidential Information or Trade Secrets, (ii) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm, (iii) engage in any other conduct in violation of any contractual or legal obligations to the Firm or (iv) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information; or (2) (i) are terminated for Cause, or (ii) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Distribution Date), or (iii) following termination of your Employment, the Firm determines that you could have been terminated for Cause; or (3) without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Distribution Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding termination, in any capacity in a retail branch or in a retail sales or product representative position; or (4) without the written consent of the Firm, before the earlier to occur of two years after termination and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (i) any of the Firm's customers who were serviced by you while employed by the Firm; or (ii) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding termination; or (5) without the written consent of the Firm, before the earlier to occur of three years after termination and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm); or (6) without the written consent of the Firm, make Defamatory or Disparaging Comments or Unauthorized Disclosures about the Firm; or (7) engage in a Clawback Cancellation Event.

"***Competitive Services***" means services with respect to any line of business in which the Firm is engaged, including, but not limited to: securities, commodities, financial futures, insurance, tax

advantaged investments and mutual funds.

"***Cause***" means:

(x) any act or omission which constitutes a breach by you of your obligations to the Firm including, without limitation, (i) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (ii) your failure to comply with the Firm's policies, or compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you; or

(y) your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

(z) a violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules and regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided*, that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (c) of Clawback Cancellation Event below and is deliberate, intentional or willful.

You will be deemed to have made "***Defamatory or Disparaging Comments***" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter. Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

You will be deemed to have made "***Unauthorized Disclosures***" about the Firm if, while Employed or following termination of Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

"***Clawback Cancellation Event***" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(a) causes a restatement of the Firm's consolidated financial results;

(b) constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(c) causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

(i) violation of business unit, product or desk specific risk parameters;

(ii) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(iii) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(iv) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (c) and you do not engage in any other cancellation or clawback event described herein, the award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

**Covenants and Certification**

In the event you fail to acknowledge, within the time and in the manner prescribed by the Firm, a notice and non-solicitation or other restrictive covenant agreement required of you by the Firm, the Firm has a right to cancel your award.

You may be required to provide Morgan Stanley with a written certification or other evidence that it deems appropriate, in its sole discretion, to confirm that no Prohibited Activity has occurred. If you fail to submit a timely certification or evidence, Morgan Stanley will cancel your award.

**Tax Withholding**

Vesting and payment of your Applicable Account Value, whether on the Scheduled Vesting Date or Scheduled Distribution Date or some other date, shall be subject to withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes). You authorize the Firm to withhold such taxes from any payroll or other payment or compensation owed to you, including by canceling or accelerating payment of a portion of your Applicable Account Value in an amount not to exceed such taxes imposed upon vesting or payment and any additional taxes imposed as a result of such cancellation or acceleration, subject to limitations imposed under Section 409A.

**Award Modification**

Morgan Stanley generally has the right to modify or amend the terms of your award without your consent. However, Morgan Stanley may not make a modification that would materially impair your rights in such award without your consent unless such modification is necessary or advisable (i) to comply with any law, regulation, ruling, judicial decision, accounting standard or similar pronouncement or (ii) to ensure that awards are not subject to federal, state or local income tax prior to payment.

**Timing of Payment (Section 409A Rule of Construction)**

With respect to any provision that provides for payment on a specified event or date, such payment will be considered to have been timely made as long as payment is made by December 31st of the year in which occurs the specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date, or, in connection with any such payment due to death, to the extent permissible under Section 409A, by the end of the calendar year following the year of your death.

**U.S. Taxation**

In general, when your Applicable Account Value is paid, the amount of the payment will be taxed as ordinary income. FICA and Medicare tax apply at the time your Applicable Account Value is deemed to vest for tax purposes. Please refer to the tax supplement for a fuller discussion of these tax consequences.

**Non-U.S. Taxation**

Taxation on grant, vesting and payment depends on the tax laws and regulations in your



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

jurisdiction.

**Governing Law** New York Law.

**By accepting this award, you acknowledge that it constitutes all 2020 deferred compensation to which you may be entitled, subject to the terms and conditions of the award. Nothing in this summary or any correspondence related to this award should be construed as a guarantee of an MSCIP award or any particular level of compensation, bonus or benefits. Please note that the Firm does not commit to granting the award described in this summary in the future. These awards do not create a contract or guarantee of employment, or modify any agreement entered into by Morgan Stanley or any of its affiliates and you.**

**This program is a bonus program and not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. Participants should not look to this bonus program as a source of retirement income. This bonus program is not subject to the Employee Retirement Income Security Act of 1974.**

**You are required to keep confidential all matters relating to MSCIP to the fullest extent permitted by law. The provisions of the Firm's Code of Conduct regarding Confidential and Proprietary Information shall cover all aspects of MSCIP.**

**Morgan Stanley does not render advice on tax and tax accounting matters.**



CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

## Financial Advisor/Private Wealth Advisor

# 2021 Compensation Plan and Recognition Programs - Detailed

## Compensation and Recognition Program

As of January 20th, 2021

Confidential—for internal Morgan Stanley Wealth Management use only. Not to be displayed or distributed to the general public.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

Morgan Stanley

# » 2021 Advisor Compensation Plan and Recognition Programs – Detailed

Table of Contents


1.1 Salary ..... 2
1.2 Incentive Compensation ..... 3
1.2.1 Total Credits ..... 3
1.2.2 Deferred Compensation ..... 4
1.2.3 Cash Compensation ..... 5
1.2.4 Financial Planning Enhancement ..... 7
1.2.5 Net Acquired Assets ("NAA") Incentive ..... 8
1.2.6 Team Compensation ..... 9
1.2.7 Credit Rate Schedule Exceptions ..... 11
2.1 Lending Growth Award Program ..... 18
3.1 Capital Accumulation Program ..... 21
3.2 Former Advisor Program ("FAP") ..... 22
3.3 Business Development Allowance ("BDA") Program ..... 23
3.4 Alternative Flexible Grid ("AFG") Program ..... 24
3.5 Discretionary Fee Waiver Allowance ..... 25
4.1 Club Memberships for 2022 ..... 26
4.2 Titles ..... 27
5.1 Summary and Additional Information ..... 28
5.2 Version History ..... 29


*This document will be periodically updated with any changes. To obtain the latest version, visit the 2021 Advisor Compensation website on 3DR > Practice > Advisor Compensation 2021. In addition, the most recent version of the detailed 2021 Product Appendix will be available on the website in early 2021.*

## Introduction

The Morgan Stanley Wealth Management Financial Advisor / Private Wealth Advisor (collectively "Advisor" or "FA/PWA") Compensation Plan provides Advisors with a guaranteed salary as well as an opportunity to generate significant additional income through Incentive Compensation and the Lending Growth Award. The Compensation Plan determines Financial Advisor and Private Wealth Advisor compensation.

## Incentive Compensation

Eligibility is determined monthly based on Total Credits (based on the Credit Rate Schedule and Credit Rate Schedule Exceptions described in sections 1.2.1 & 1.2.7) derived from Trailing 12-month Gross Revenue and the rules and conditions set forth in this Program. Incentive Compensation is comprised of Cash Credits that are awarded and paid in cash each month, and Deferred Credits that accrue each month and are granted as a deferred compensation award in early 2022.

## Lending Growth Award Program

The 2021 Lending Growth Award Program rewards Advisors who help clients meet their Lending needs by offering appropriate solutions in a manner that is consistent with their clients' investment objectives. The Lending Growth Award Program is calculated annually and will be awarded in early 2022.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

DOLAR0462

## SECTION 1: Compensation Programs

### 1.1 Salary

All Advisors will receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state.

The salary for each Advisor is determined by the state in which the Advisor is employed. The table below summarizes the current Advisor salaries by state. However, the salaries are subject to prospective adjustment throughout the year at Morgan Stanley Wealth Management's sole discretion, including changes based on applicable federal or state law.

Salary payments will be made bi-monthly, on the 15th (or on the preceding business day should the 15th fall on a weekend or holiday) and the last business day of each month. If applicable, incentive compensation payments will be made on the 10th of each month (or on the preceding business day should the 10th fall on a weekend or holiday).

**Monthly Salary by State**

| State | Advisor Salary ($) |
|---|---|
| Alaska | 3,585 |
| California | 4,854 |
| Colorado | 3,376 |
| Maine | 3,038 |
| New York | 4,875 |
| Pennsylvania (effective October 3rd, 2021) | 3,380 |
| Washington | 4,153 |
| All Other[1] | 2,964 |

[1] Including Pennsylvania prior to October 3rd, 2021



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 1.2 Incentive Compensation

### 1.2.1 Total Credits

Subject to the terms outlined in this Program, each month an Advisor will be allocated Total Credits based on his/her Credit Rate and Creditable Revenue. The applicable Credit Rate for each Advisor is based on two factors: (1) the Advisor's Trailing 12-month Gross Revenue and (2) his/her Length of Service ("LOS"), as shown in the Credit Rate Schedule below.

**Credit Rate Schedule (%)**

| Trailing 12-month Gross Revenue ($) | Length of Service (years) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0-4.9 | 5-6.9 | 7-8.9 | 9-14.9 | 15-19.9 | 20-24.9 | 25+ |
| 5,000,000+ | 51.5% | 52.0% | 53.5% | 54.0% | 54.5% | 55.0% | 55.5% |
| 3,600,000 - 4,999,999 | 49.0 | 49.5 | 51.0 | 51.5 | 52.0 | 52.5 | 53.0 |
| 3,000,000 - 3,599,999 | 48.0 | 48.5 | 50.0 | 50.5 | 51.0 | 51.5 | 52.0 |
| 2,650,000 - 2,999,999 | 47.0 | 47.5 | 49.0 | 49.5 | 50.0 | 50.5 | 50.5 |
| 2,000,000 - 2,649,999 | 46.5 | 47.0 | 48.5 | 49.0 | 49.5 | 49.5 | 49.5 |
| 1,300,000 - 1,999,999 | 45.5 | 46.0 | 47.5 | 48.0 | 48.0 | 48.0 | 48.0 |
| 1,075,000 - 1,299,999 | 43.0 | 43.5 | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 |
| 990,000 - 1,074,999 | 42.5 | 43.0 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 |
| 800,000 - 989,999 | 42.0 | 42.5 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| 660,000 - 799,999 | 41.0 | 41.5 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 |
| 535,000 - 659,999 | 41.0 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 |
| 470,000 - 534,999 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| 400,000 - 469,999 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 |
| 330,000 - 399,999 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| 265,000 - 329,999 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 |
| 0 - 264,999 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 |

Advisors with a Length of Experience ("LOE") of Less Than Five Years[2]

| Trailing 12-month Gross Revenue ($) | For All Length of Service |
|---|---|
| 330,000 - 399,999 | 36.0% |
| 265,000 - 329,999 | 35.0 |
| 0 - 264,999 | 34.0 |

Advisors with a Length of Experience ("LOE") of Nine or More Years[3]

| Trailing 12-month Gross Revenue ($) | For All Length of Service |
|---|---|
| 0 - 299,999 | 20.0% |

An Advisor's Credit Rate will be determined monthly pursuant to the foregoing schedule based on the Advisor's Trailing 12-month Gross Revenue and LOS as of the prior month-end (and subject to any election to participate in the Alternative Flexible Grid ("AFG") Program as described in Section 3.4 of this Program). The Advisor's Total Credits for each month will be determined based on the applicable Credit Rate set forth in the foregoing schedule multiplied by the Creditable Revenue generated in such month.

If the Advisor reaches a new Trailing 12-month Gross Revenue band in the Credit Rate Schedule during a given month-end evaluation, the Credit Rate of the newly achieved Trailing 12-month Gross Revenue band will apply to Creditable Revenue generated in the subsequent month only and will NOT apply retroactively. If the Advisor reaches a new LOS band in the Credit Rate schedule during a given month-end evaluation, the Credit Rate of the newly achieved LOS band will apply to Creditable Revenue generated in the subsequent

[2] For all Advisors with an LOE of less than five years, this schedule will apply to the three specified Trailing 12-month Gross Revenue bands, rather than the standard Credit Rate Schedule

[3] For all Advisors with an LOE of nine or more years, this schedule will apply to the specified Trailing 12-month Gross Revenue band, rather than the standard Credit Rate Schedule



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

month and will NOT apply retroactively. The new LOS band will be used prospectively to determine applicable monthly Credit Rates.

Advisors with an LOE of nine or more years as of January 1st, 2021 who have less than $300,000 in Trailing 12-month Gross Revenue, as of December 2020 month-end, will receive a monthly Credit Rate of 20.0% until the Advisor generates Trailing 12-month Gross Revenue of $300,000 or more during a given month-end evaluation, at which point the Advisor's monthly Credit Rate will be determined by the Credit Rate Schedule for the remainder of the calendar year.

**Total Credits** = Cash Credits + Deferred Credits

### 1.2.2 Deferred Compensation

A percentage of Total Credits is allocated to the Advisor as Deferred Credits based on a Deferral Ratio determined by the Advisor's Trailing 12-month Gross Revenue, as shown in the Deferral Ratio Schedule below.

**Deferred Credits** = Total Credits × Deferral Ratio

**Deferral Ratio Schedule[4] (%)**

| Trailing 12-month Gross Revenue ($) | Deferral Ratio (%) |
|---|---|
| 5,000,000+ | 15.5 |
| 3,600,000 - 4,999,999 | 14.0 |
| 3,000,000 - 3,599,999 | 13.0 |
| 2,650,000 - 2,999,999 | 12.5 |
| 2,000,000 - 2,649,999 | 11.5 |
| 1,300,000 - 1,999,999 | 10.0 |
| 1,075,000 - 1,299,999 | 8.5 |
| 990,000 - 1,074,999 | 7.5 |
| 800,000 - 989,999 | 6.5 |
| 660,000 - 799,999 | 5.5 |
| 535,000 - 659,999 | 5.0 |
| 470,000 - 534,999 | 4.0 |
| 400,000 - 469,999 | 3.5 |
| 330,000 - 399,999 | 2.5 |
| 265,000 - 329,999 | 1.5 |
| 0 - 264,999 | 1.5 |

An Advisor's Deferral Ratio is determined monthly based on Trailing 12-month Gross Revenue as of the prior month-end. The Deferral Ratio will be applied to Total Credits to determine monthly Deferred Credits.

If the Advisor reaches a new Trailing 12-month Gross Revenue band in the Deferral Ratio schedule during a given month-end evaluation, the Deferral Ratio of the newly achieved Trailing 12-month Gross Revenue band will apply to Total Credits generated in the subsequent month-end and will NOT apply retroactively.

The cumulative value of all monthly Deferred Credits for 2021 will generally be granted to the Advisor in the form of a deferred compensation award shortly following year-end (provided the Advisor is employed on the grant date). Twenty-five percent of the cumulative monthly Deferred Credits will be granted in the form of a restricted stock unit award that is scheduled to convert to shares of Morgan Stanley common stock approximately four years from the grant date and seventy-five percent of the cumulative monthly Deferred Credits will be granted in the form of a cash-based deferred compensation award scheduled to be paid approximately six years from the grant date. The remaining terms and conditions of the deferred compensation awards, including termination of employment and cancellation provisions, will be determined

[4] Deferred Compensation grid is subject to the approval of the Morgan Stanley Compensation, Management Development and Succession Committee



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

by the Compensation, Management Development and Succession Committee of Morgan Stanley's Board of Directors on or prior to the grant date and will be set forth in the applicable award documentation. Deferred compensation awards are contingent, among other things, upon the Advisor remaining employed through the grant and vesting dates of the award.

If the initial value of an Advisor's cumulative monthly Deferred Credits for 2021 is less than $1,000, the Deferred Credits will not be granted as a deferred compensation award, but will instead be paid in cash on the date 2021 year-end bonuses are paid to Firm employees generally (and in no event later than March 15, 2022), contingent on the Advisor's continued employment in good standing through the payment date.

Advisors with an LOE of nine or more years as of January 1st, 2021 who have less than $300,000 in Trailing 12-month Gross Revenue as of December 2020 month-end, will receive a monthly Deferral Ratio of 0%. If the Advisor generates Trailing 12-month Gross Revenue of $300,000 or more during a given month-end evaluation, the Advisor's monthly Deferral Ratio will be determined by the Deferral Ratio Schedule for the remainder of the calendar year.

Deferred compensation awards are not intended to provide for retirement income.

Financial Advisor Associates ("FAAs") are not eligible to receive year-end deferred compensation awards.

### 1.2.3 Cash Compensation

Total Credits remaining after Deferred Credits are allocated are then awarded to the Advisor as Cash Credits. An Advisor's Cash Credits are calculated monthly.

**Cash Credits** = Total Credits – Deferred Credits

**Example:**

An Advisor with an LOS of 15 years produces $810,000 in Trailing 12-month Gross Revenue as of May 31, 2021. The Advisor's Creditable Revenue for June 2021 is $70,000.

- Credit Rate is 44.0%
- Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
- Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
- Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

**Calculation of Cash Credit Advance**

Cash Credit Advance is the amount by which monthly Cash Credits exceed Advisor salary for the month. An Advisor whose monthly Cash Credits do not exceed his/her salary for the month is not eligible to receive Cash Credit Advance. An Advisor's Cash Credit is calculated monthly and is paid in arrears on a monthly basis. Cash Credit Advance is calculated based on the following:

1) Gross Revenue – Revenue attributable to the Advisor that is inclusive of his/her Revenue Share
2) Trailing 12-month Gross Revenue – Gross Revenue attributable to the Advisor generated over the preceding twelve months; e.g. May 2021 Trailing 12-month Gross Revenue is the aggregate Gross Revenue generated during the twelve consecutive months between June 2020 and May 2021
3) Creditable Revenue – Gross Revenue attributable to the Advisor that is in excess of his/her Revenue Share
4) Revenue Share – Gross Revenue that is allocated to support professional(s) through Revenue Share arrangements
5) Grid Revenue – Revenue for which Credits are determined based on the Credit Rate Schedule, which includes revenue subject to the Discounting Policy. Grid Revenue does not include Flat-Rate Revenue (for which Credits are determined based on a flat Credit Rate) or 0% Revenue (for which Credits are determined based on a 0% Credit Rate)



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

6) Total Credits – Advisors are allocated monthly Total Credits based on the Credit Rate Schedule (Section 1.2.1), Credit Rate Schedule Exceptions (Section 1.2.7), and Total Credit Adjustments

7) Total Credit Adjustments – Credits are adjusted upwards or downwards to reflect Incentive Compensation for which the Advisor did not receive proper Credits, or for which the Advisor received prior Credits that he/she should not have received. Under no circumstances is an Advisor to be allocated Credits or maintain Credits for transactions that were canceled, that did not close, that were reversed, where Morgan Stanley determines the credits were issued for conduct inconsistent with its expectations for good guardianship, and/or where the Advisor was allocated Credits in error

8) Deferred Credits – Monthly Total Credits multiplied by the Advisor's Deferral Ratio as defined in the Deferral Ratio schedule (Section 1.2.2)

9) Cash Credits – Monthly Total Credits less monthly Deferred Credits

10) Cash Credit Advance – Monthly Cash Credits that are in excess of the Advisor's monthly Salary

11) Length of Service ("LOS") – The number of whole years that an Advisor has been employed by Morgan Stanley Wealth Management on or after June 1, 2009 plus the number of whole years that the Advisor was employed by either legacy Morgan Stanley or legacy Smith Barney immediately preceding his/her employment with Morgan Stanley Wealth Management, rounded down to the nearest whole year. LOS will not include any period of employment preceding employment at the immediately prior legacy firm, including prior employment at either Morgan Stanley or Smith Barney. LOS for all purposes related to Advisor Compensation shall be defined exclusively as set forth in this paragraph and without reference to any other LOS definition that the Firm may apply in other contexts, including, for example, for purposes of certain benefits calculations

12) Length of Experience ("LOE") – The number of whole years that an Advisor has been a Registered Representative in the industry; calculated by subtracting the year of registration from the current year and subtracting "1" from the resulting number

Under no circumstances shall an Advisor be eligible to receive any Incentive Compensation under this Program unless and until the Incentive Compensation calculation is made and the Advisor meets all other conditions for receipt of such Incentive Compensation as determined by Morgan Stanley Wealth Management in its sole discretion. In the event an Advisor who has been advanced Incentive Compensation because of fees that were charged to a customer in advance terminates employment with the Firm, the Advisor's allocated Total Credits in the final month of employment will be adjusted to account for the unearned portion of the advanced Cash Credits. In addition, an Advisor is obligated to repay Morgan Stanley Wealth Management any outstanding advanced, but unearned, Incentive Compensation after termination of employment.

Morgan Stanley Wealth Management expects its Advisors to demonstrate excellent guardianship at all times, including demonstrating the utmost professionalism and upholding the highest ethical and regulatory standards and its Incentive Compensation programs are premised on that expectation. Accordingly, Morgan Stanley Wealth Management reserves the right, on notice to the impacted individual, to make prospective downward adjustments to an individual Advisor's Credit Rate, or to make other downward adjustments as part of the calculation of Incentive Compensation at any time, where, in its sole judgment, such an adjustment is warranted based on the Advisor's conduct. The determination as to whether a downward adjustment is warranted on account of guardianship issues will be made by Morgan Stanley Wealth Management in its sole discretion, but may include, for example, significant trade errors, excessive or significant customer complaints, regulatory or ethical lapses, or other conduct that is determined to be contrary to the best interests of the clients or the Firm.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.4 Financial Planning Enhancement

The Financial Planning Enhancement is designed to reward Advisors who utilize planning tools to understand the financial needs and investment objectives of clients. The enhancement is evaluated at the end of each month and the Credit Rate enhancement applies in the subsequent month. A 1% Credit Rate enhancement is added to the Advisor's standard Credit Rate and applied to Grid Revenue generated by Qualifying Clients.

*Qualifying GPS/LifeView Plan*: A Goals Planning System ("GPS") or LifeView plan that meets the following requirements.

- Must have a retirement goal
- Must have been adopted or reassessed and readopted within the past 24 months, in consultation with the client
- Must be enrolled in Progress to Goal Reporting Service
- Must be a plan for a client that is enrolled in Morgan Stanley Online ("MSO")[5]

*Eligible Accounts*: All accounts are eligible for the Financial Planning Enhancement except for:

- Accounts that are subject to the Small Households Policy
- Account Linked Groups ("ALG") that have $10,000,000 or greater in Assets Under Management ("AUM")

*Party*: All accounts associated with an individual Social Security Number ("SSN") or Tax Identification Number ("TIN").

*Account Link Group ("ALG")*: A group of accounts that have the same mailing address or plating address and Morgan Stanley employment status[6].

*Qualifying GPS Account*: All Eligible Accounts associated with a Party that has at least one Eligible Account with a Qualifying GPS Plan.

*Qualifying GPS Client*: All Eligible Accounts within an ALG that has at least one Qualifying GPS Account.

*Qualifying LifeView Client*: All Eligible Accounts within an ALG that has at least one Eligible Account with a Qualifying LifeView Plan.

**Example 1:**
An Advisor with a Credit Rate of 48% receives a 1% Credit Rate enhancement on Grid Revenue generated from two Qualifying GPS Accounts in an ALG:

- In May 2021, the Advisor creates a Qualified GPS Plan for Party A. Party A has one Eligible Account
- Party B has one Eligible Account
- Party A and Party B have their accounts linked in an ALG, therefore Party B's Eligible Account qualifies for the Financial Planning Enhancement

In June 2021, the Advisor will receive a 49% (48% + 1%) Credit Rate on Grid Revenue generated by Party A and Party B's Eligible Accounts.

Morgan Stanley Wealth Management reserves the right, at its sole discretion, to review all potential enhancements under this section and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Financial Planning Enhancement, including, without limitation, based on an assessment of the quality of the applicable GPS or LifeView plans and/or engagement with the client on such plans.

---

[5] A client is considered enrolled in MSO once they create a username and password, accept the Morgan Stanley Online Terms and Conditions, select real-time or delayed market data, and successfully login to their account through Morgan Stanley Online or the Morgan Stanley Mobile App for the first time.
[6] All accounts within an ALG must be non-employee or employee/employee-related



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

### 1.2.5 Net Acquired Assets ("NAA") Incentive

The Net Acquired Assets ("NAA") Incentive is designed to reward organic growth of assets at the Client[7] level. The NAA Incentive is evaluated at the end of each month and the Credit Rate enhancement applies in the subsequent month. Pre-split Trailing 12-month NAA as of month-end and pre-split Assets Under Management ("AUM") as of month end from 13 months prior at the Client level are used to determine qualification. The Credit Rate enhancement is added to the Advisor's standard Credit Rate and applied to Grid Revenue generated by the qualifying Client.

**NAA Incentive Eligibility**

- Client must have at least $25,000 in Trailing 12-month NAA; AND
- Account must not be subject to the Small Households policy; AND
- Advisor must have been hired before January 1, 2019

**Net Acquired Assets Incentive Schedule**

Credit allocation for the NAA Incentive will be based on the schedule below.

**NAA Incentive Schedule**

| Trailing 12-month NAA ($) | | Trailing 12-month NAA / AUM From 13 Months Prior | Credit Rate Enhancement |
|---|---|---|---|
| $5,000,000+ | | N/A | 3% |
| $2,000,000 - 4,999,999 | OR | N/A | 2% |
| $500,000 - 1,999,999 | | 5%+ | 1% |

**Exclusions[8] may include but are not limited to:**

- Internal asset transfers (i.e., journals) between client accounts
- Fixed Income maturities, calls or return of principal payments
- Corporate action distributions
- DVP/RVP accounts
- CSX accounts
- Non-Custodied Fee-Based assets
- Non-Morgan Stanley 529 plans
- Non-Approved 401(k) plans
- Physical Assets/Commodities
- All fees and commissions

**Example:**

An Advisor with a Credit Rate of 48% has a client with $1,000,000 of assets as of May 31, 2020 and Trailing 12-month NAA of $75,000 as of June 30, 2021. Because the client has Trailing 12-month NAA divided by AUM greater than 5%: [$75,000 / $1,000,000 = 7.5%], the Advisor will receive a 49% (48% + 1%) Credit Rate on Grid Revenue generated by the qualifying Client in July 2021.

Morgan Stanley Wealth Management reserves the right, at its sole discretion, to review all NAA activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the NAA Incentive.

[7] Client is defined as Account Link Group ("ALG")
[8] As of December 2020, the items listed are excluded from the calculation of NAA and are subject to change at the sole discretion of Morgan Stanley Wealth Management for any reason



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26