## 4.1 Club Memberships for 2022

The Firm's recognition programs are designed to recognize outstanding performance by Advisors. In addition to demonstrated leadership in the best practices of wealth management, the Firm's recognition Club Members must be in good standing and satisfy other aspects of the Firm's performance, conduct and compliance standards and expectations, as determined by the Firm.

Subject to the foregoing, at the beginning of 2022, Club Memberships will be assigned based on 2021 calendar year Gross Revenue OR 2021 calendar year Total Revenue Premium, as well as LOE and Assets Under Management ("AUM") for Pacesetter's Club only, as follows:

Club Memberships

| Club Type | Qualifying Criteria |
|---|---|
| Chairman's Club | Rank among the top 225 Advisors in Gross Revenue for 2021 OR among the top 225 in Total Revenue Premium for 2021 |
| President's Club | Rank among the next 575 of the Advisor population (after Chairman's Club) in Gross Revenue for 2021 OR among the next 575 in Total Revenue Premium for 2021 |
| Master's Club | Rank among the next 1,150 of the Advisor population (after President's Club) in Gross Revenue for 2021 OR among the next 1,150 in Total Revenue Premium for 2021 |
| Century Club | Rank in the next 1,150 of the Advisor population (after Master's Club) in Gross Revenue for 2021 OR among the next 1,150 in Total Revenue Premium for 2021 |
| Pacesetter's Club (Only Advisors with an LOE of 5 or below will be eligible for this Club) | Achieve minimum Gross Revenue of $100,000 OR minimum Total Revenue Premium of $140,000 AND minimum AUM of $8,000,000 for Advisors with an LOE of 0, 1 |
| | Achieve minimum Gross Revenue of $200,000 OR minimum Total Revenue Premium of $280,000 AND minimum AUM of $15,000,000 for Advisors with an LOE of 2 |
| | Achieve minimum Gross Revenue of $250,000 OR minimum Total Revenue Premium of $350,000 AND minimum AUM of $20,000,000 for Advisors with an LOE of 3 |
| | Achieve minimum Gross Revenue of $300,000 OR minimum Total Revenue Premium of $420,000 AND minimum AUM of $25,000,000 for Advisors with an LOE of 4 |
| | Achieve minimum Gross Revenue of $350,000 OR minimum Total Revenue Premium of $490,000 AND minimum AUM of $30,000,000 for Advisors with an LOE of 5 |

Club Memberships may be withdrawn by the Firm, at any time, in its sole discretion. This includes, without limitation, the Firm's sole discretion to review all Advisor conduct, and all Gross Revenue, Total Revenue Premium and AUM activity and determine whether such activity is appropriate for inclusion. For purposes of Club Memberships, the Firm may exclude any Advisor or revenue that the Firm deems to be inconsistent with the spirit of Club Membership or inconsistent with the interests of the Firm or clients. For example, Gross Revenue, Total Revenue Premium and/or AUM attributable to manipulation of JPN(s), without a business explanation the Firm finds satisfactory, may be omitted or reduced in evaluating eligibility.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

SECTION 4: Recognition Programs

## 4.2 Titles

In addition to specific recognition clubs, the Firm also grants titles to recognize the outstanding performance of Morgan Stanley Wealth Management Advisors. Titles are awarded based on achievement of specific Gross Revenue or Total Revenue Premium levels and the maintenance of high standards of the Firm, including being in good standing and satisfying the Firm's expectations for excellence in all areas, including, but not limited to, guardianship, personal conduct, and adherence to regulatory and compliance requirements.

Titles may be denied, changed or withdrawn at any time by the Firm, in its sole discretion.

**Managing Director, Wealth Management**
Eligibility:

- Minimum cumulative Gross Revenue of $8,800,000 OR Total Revenue Premium of $12,300,000 over the last three years; OR
- Minimum cumulative Gross Revenue of $25,000,000 over the last ten years AND 30 or more years of LOS

Advisors who meet either criteria are eligible for selection by the Firm for the Managing Director, Wealth Management title.

Additional criteria for Managing Director, Wealth Management includes:

- Exhibiting leadership both externally and internally
- Being an ambassador and role model of Morgan Stanley Wealth Management's vision and business principles
- Pursuing excellence and holding self and others to the highest standards
- Consistently exemplifying high standards of corporate guardianship

**Executive Director**
Eligibility: Minimum cumulative Gross Revenue of $4,400,000 OR Total Revenue Premium of $6,150,000 over the last two years.

Advisors who meet the 2-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Executive Director title.

**Senior Vice President**
Eligibility: Minimum Prior Year Gross Revenue of $1,100,000 OR Total Revenue Premium of $1,550,000

**First Vice President**
Eligibility: Minimum Prior Year Gross Revenue of $825,000 OR Total Revenue Premium of $1,150,000

**Vice President**
Eligibility: Minimum Prior Year Gross Revenue of $550,000 OR Total Revenue Premium of $770,000

**Associate Vice President**
Eligibility: Minimum Prior Year Gross Revenue of $440,000 OR Total Revenue Premium of $615,000



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## 5.1 Summary and Additional Information

Morgan Stanley Wealth Management provides one of the most comprehensive Advisor Compensation Plan, Growth Award and Recognition Programs in the securities industry.

This brochure summarizes the Morgan Stanley Wealth Management Advisor Compensation Plan, Growth Award and Recognition Programs in effect for 2021 unless otherwise noted. Morgan Stanley Wealth Management reserves the right to amend, modify, interpret or terminate all or any part of the Program for any year and at any time. Nothing in this brochure is a guarantee of continued employment or of any particular benefits or level of remuneration.

This Compensation Plan and the additional product guidelines and policies referenced in this Compensation Plan set forth guidelines only. Notwithstanding anything to the contrary contained in this Compensation Plan or elsewhere, Morgan Stanley Wealth Management has the sole discretion to determine whether to allocate Credit to an Advisor's Gross Revenue (or to provide compensation in any form) for any particular business and, if so, the amount of Credit to be allocated or the amount of compensation to be awarded, and further Morgan Stanley Wealth Management may adjust and/or decline to award future Credits towards Incentive Compensation where an Advisor has an unsatisfied obligation to the Firm. Under no circumstances is an Advisor eligible to receive any Credit to Gross Revenue or any compensation for any particular business unless and until Morgan Stanley Wealth Management receives the revenue associated with that business. Furthermore, if an Advisor is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy, regulation or otherwise counter to the best interests of our clients, then such Advisor may be deemed, in Morgan Stanley's sole discretion, not to have qualified for compensation, growth awards or any bonus program listed herein. If an Advisor's employment terminates for any reason before Morgan Stanley Wealth Management receives the revenue for any particular business, the Advisor will not be eligible for any Credit to Gross Revenue or any compensation associated with that business and, in the event Morgan Stanley Wealth Management ultimately refunds all or a portion of such revenue for any reason, any associated Incentive Compensation paid on the basis of such revenue shall be deemed an overpayment to the Advisor. Additionally, an Advisor must be employed in good standing at the time that Morgan Stanley Wealth Management receives the revenue to be eligible for any Credit to Gross Revenue or any compensation associated with that business.

In the event that Morgan Stanley Wealth Management determines that any payment or award under this Compensation Plan or any other compensation plan or program would violate any legal, regulatory or contractual obligation, or create undue risk of such violation, such payment or award will not be made, notwithstanding anything to the contrary in this Compensation Plan. Morgan Stanley Wealth Management retains the sole discretion and authority to interpret, modify, and/or terminate the Compensation Plan, or any of the individual guidelines described in the Compensation Plan, at any time, with or without notice, and to resolve any dispute arising out of or in any way related to the Compensation Plan. Given the dynamic and complex nature of the business, calculations under this plan may rely on data that could be revised, improved, modified or otherwise interpreted differently. Nevertheless, Morgan Stanley Wealth Management's interpretations and decisions shall be final and binding on all parties.

The information contained in this brochure briefly describes certain employee compensation programs and deferred incentive compensation awards and other arrangements. It is important to note that this brochure merely summarizes the provisions of those programs, awards and plans, and does not address all of their terms, conditions and restrictions. Advisors should consult the pertinent compensation program, plan document or award certificate for a full explanation of their provisions. If there is a conflict between this brochure and any formal compensation program, deferred compensation plan, plan document or award certificate, then the formal program, plan document or award certificate will control. All compensation and recognition plans are subject to changes due to tax laws and other legal requirements or at the sole discretion of Morgan Stanley Wealth Management.



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

## SECTION 5: Other

### 5.2 Version History

This section tracks changes made to the 2021 Advisor Compensation Plan and Recognition Programs during 2021. The table below documents the date, page number and a brief description of the change for easy reference.

| Date | Page Number | Description |
|---|---|---|
| December 8th, 2020 | - | Initial publication |
| December 16th, 2020 | 21 | Capital Accumulation Program |
| January 5th, 2021 | 17 | Inherited Accounts |
| March 18th, 2021 | 12 | MSAW – 10b5-1 Transactional Revenue |
| March 18th, 2021 | 15 | MSAW – 10b5-1 Transactional Revenue |



FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

CONFIDENTIAL PURSUANT TO 5 U.S.C. § 552 & 29 C.F.R. § 70.26

**Figure 1**
**EICP Conversions to Current Employees Versus Former Employees by Year (Percentage of Shares)**
*Plan Years 2009 to 2019*




**Notes:**
[1] Percentage of Conversions to Current (Former) Employees for each Plan Year is calculated based on the sum of the values in the "num_unts_conv_for_event" field in MS-Rude-029295 for events with "IF for Active/Term" being "A" ("T") and the sum of all values in the same field. The converted units do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] Smith Barney Replacement Awards are not included in this Figure.
[3] All EICP awards are in units. One unit converts to one share. Conversions are in shares.

**Sources:**
[A] MS-Rude-029295.
[B] *See, e.g.,* 2015 Discretionary Retention Awards, Award Certificate for Stock Units, MS-McC-0000001–020.

*Confidential*

**Figure 2**
**Total EICP Conversions to Current Employees Versus Former Employees**
*Plan Years 2009 to 2019*




**Notes:**
[1] Percentage of Conversions to Current (Former) Employees is calculated based on the sum of the values in the "num_unts_conv_for_event" field in MS-Rude-029295 for events with "IF for Active/Term" being "A" ("T") and the sum of all values in the same field. The converted units do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] Smith Barney Replacement Awards are not included in this Figure.
[3] All EICP awards are in units. One unit converts to one share. Conversions are in shares.

**Sources:**
[A] MS-Rude-029295.
[B] *See, e.g.*, 2015 Discretionary Retention Awards, Award Certificate for Stock Units, MS-McC-0000001–020.


NFIDENTIAL TREATMENT REQUESTED UNDER 5 U.S.C. § 552 AN .F.R. § 70.26

**Figure 3**
**Total EICP Conversions to Current Employees Versus Former Employees**
*Plan Years 2015 to 2019*




**Notes:**
[1] Percentage of Conversions to Current (Former) Employees is calculated based on the sum of the values in the "num_unts_conv_for_event" field in MS-Rude-029295 for events with "IF for Active/Term" being "A" ("T") and the sum of all values in the same field. The converted units do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] All EICP awards are in units. One unit converts to one share. Conversions are in shares.

**Sources:**
[A] MS-Rude-029295.
[B] *See, e.g.*, 2015 Discretionary Retention Awards, Award Certificate for Stock Units, MS-McC-0000001–020.

*Confidential*

**Figure 4**
**MSCIP Distributions to Current Employees Versus Former Employees by Year (Percentage of Total Distributions)**
*Plan Years 2009 to 2017*




**Notes:**
[1] Percentage of Distributions to Current Employees for each Plan Year is calculated based on the sum of the values in the "Total Distributed Amount" field in MS-Rude-029296 and the sum of the values in the "EVENT AMOUNT" field in MS-Rude-029294. Percentage of Distributions to Former Employees is 100% minus Percentage of Distributions to Current Employees for each Plan Year. The distributed amounts reflect changes in value due to appreciation or reduction of notional investments. The date of distribution for Former Employees may be earlier than that for Current Employees. The distributed amounts do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] Smith Barney Replacement Awards are not included in this Figure.
[3] The vesting period decreased from eight years to six years starting with the Plan Year 2016 Awards. Therefore, there is no current balance for the Plan Year 2017 Awards. The amounts for the Plan Years 2018 and 2019 Awards are not included in this Figure because they have current balances.

**Sources:**
[A] MS-Rude-029294; MS-Rude-029296.
[B] *See, e.g.*, 2015 Discretionary Retention Awards, Award Certificate, MS-McC-0001007–023; 2016 Discretionary Retention Awards, Award Certificate, MS-McC-0001024–040.

**Figure 5**
**Total MSCIP Distributions to Current Employees Versus Former Employees**
*Plan Years 2009 to 2017*




**Notes:**
[1] Percentage of Distributions to Current Employees is calculated based on the sum of the values in the "Total Distributed Amount" field in MS-Rude-029296 and the sum of the values in the "EVENT AMOUNT" field in MS-Rude-029294. Percentage of Distributions to Former Employees is 100% minus Percentage of Distributions to Current Employees. The distributed amounts reflect changes in value due to appreciation or reduction of notional investments. The date of distribution for Former Employees may be earlier than that for Current Employees. The distributed amounts do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] Smith Barney Replacement Awards are not included in this Figure.
[3] The vesting period decreased from eight years to six years starting with the Plan Year 2016 Awards. Therefore, there is no current balance for the Plan Year 2017 Awards. The amounts for the Plan Years 2018 and 2019 Awards are not included in this Figure because they have current balances.

**Sources:**
[A] MS-Rude-029294; MS-Rude-029296.
[B] *See, e.g.*, 2015 Discretionary Retention Awards, Award Certificate, MS-McC-0001007–023; 2016 Discretionary Retention Awards, Award Certificate, MS-McC-0001024–040.



CONFIDENTIAL TREATMENT REQUESTED UNDER 5 U.S.C. § 552 AND C.F.R. § 70.26

*Confidential*

**Figure 6**
**Total MSCIP Distributions to Current Employees Versus Former Employees**
*Plan Years 2015 to 2017*




**Notes:**
[1] Percentage of Distributions to Current Employees is calculated based on the sum of the values in the "Total Distributed Amount" field in MS-Rude-029296 and the sum of the values in the "EVENT AMOUNT" field in MS-Rude-029294. Percentage of Distributions to Former Employees is 100% minus Percentage of Distributions to Current Employees. The distributed amounts reflect changes in value due to appreciation or reduction of notional investments. The date of distribution for Former Employees may be earlier than that for Current Employees. The distributed amounts do not account for certain de minimis payments, including to beneficiaries of deceased employees.
[2] The vesting period decreased from eight years to six years starting with the Plan Year 2016 Awards. Therefore, there is no current balance for the Plan Year 2017 Awards. The amounts for the Plan Years 2018 and 2019 Awards are not included in this Figure because they have current balances.

**Sources:**
[A] MS-Rude-029294; MS-Rude-029296.
[B] *See, e.g.*, 2015 Discretionary Retention Awards, Award Certificate, MS-McC-0001007–023; 2016 Discretionary Retention Awards, Award Certificate, MS-McC-0001024–040.


\FIDENTIAL TREATMENT REQUESTED UNDER 5 U.S.C. § 552 AN R. § 70.26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,

Defendants.

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 11047 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action, Plaintiffs Matthew Shafer, Sheri Haugabook, Peter Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel assert that Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development and Succession Committee (the "Compensation Committee"), and certain unnamed members of the Compensation Committee (together, "Morgan Stanley" or the "Bank"), violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying Plaintiffs all of their deferred compensation when they left their financial advisor positions at

Morgan Stanley. Defendants have moved to compel arbitration and for a stay of these proceedings. (Dkt. No. 65) For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[1]

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney.[2] They reside throughout the country and worked for the Bank at various times between 1994 and 2020. (Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16)

"Defendant Morgan Stanley is a Delaware corporation with a principal place of business in New York, New York. Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, including [Defendant Morgan Stanley Smith Barney LLC, a Delaware limited liability company with its principal place of business in New York, New York] provides financial advisory services to clients. Defendant Compensation Committee is a committee of Morgan Stanley's Board of Directors formed to discharge the Board's responsibilities related to compensation. . . . The Compensation Committee is an unincorporated

---

[1] In resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

The facts discussed below are drawn from (1) the Amended Complaint (Dkt. No. 58); (2) the alleged "Plan Documents" cited in the Amended Complaint, which have been docketed as exhibits to Plaintiff's September 15, 2023 letter (Dkt. No. 83); and (3) the declarations and accompanying exhibits submitted by the parties (Porco Decl. (Dkt. No. 67); Krentzman Decl. (Dkt. No. 68); Jasinski Decl. (Dkt. No. 72-1)).

[2] Morgan Stanley describes the financial advisor's role as "help[ing] [clients] create a wealth plan that takes [their] specific goals and circumstances into account," including providing advice on "retirement income . . . , asset allocation . . . , and changes in tax policy." Morgan Stanley Wealth Mgmt., Why Advice Matters (May 31, 2023), available at https://www.morganstanley.com/articles/advice-matters.

association with its principal place of business in New York. John and Jane Does 1-20 are the individual members of the Compensation Committee." (Id. ¶¶ 23-26)

Plaintiffs purport to bring this action on behalf of all Morgan Stanley financial advisors who forfeited deferred compensation as a result of leaving their Morgan Stanley employment between December 29, 2014 and the present. (Id. ¶ 90)

Plaintiffs assert general federal question jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA jurisdiction pursuant to 29 U.S.C. § 1132(e). (Id. ¶ 7)

## I. FACTS

### A. Financial Advisors' Compensation at Morgan Stanley

Morgan Stanley's "compensation program[]" for financial advisors during the relevant time period largely consists of two components: salary and incentive compensation.[3] (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[4]

"All Advisors . . . receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state." (Id. § 1.1) As of 2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per year. (Id. § 1.1)

Incentive compensation is based on the "Total Credits" that a financial advisor is awarded monthly. (Id. § 1.2.1) "The Advisor's Total Credits for each month [are] determined based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with

---

[3] Morgan Stanley also offers certain income and savings programs that are not at issue here, including a "lending growth award program" and a "capital accumulation program." (See generally 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2))

[4] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

"(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" – "multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

Incentive compensation is further divided between (1) "Cash Credits," which are "calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and (2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–1.2.3) The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5% (for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue increases. (Id. §§ 1.2.2–1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred compensation paid out years after it is earned.

The 2018 Financial Advisor Compensation Plan provides the following example of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
>
> - Credit Rate is 44.0%
> - Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
> - Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
> - Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

(Id. § 1.2.3)

"Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of Morgan Stanley common stock approximately four years from the grant date" (the "Equity Incentive Plan"). (Id. § 1.2.2) "[S]eventy-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. §

Case 1:20-cv-11047-PGG Document 86 Filed 11/21/23 Page 5 of 56

1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive Compensation Plan Document (Dkt. No. 83-8)) The Compensation Committee administers both plans. (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 5(a))

"[Financial advisors] have individual, notional accounts in the [Compensation Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred compensation. [Financial advisors] can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments." (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 1)) As to vesting under the Equity Incentive Plan, "a Stock Unit will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to the Fair Market Value on the payment date of one Share." (Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 8)

As to both plans, "[d]eferred compensation awards are contingent upon the Advisor remaining employed through the grant and vesting dates of the award." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2) Plaintiffs refer to this policy as the "Cancellation Rule." (Am. Cmplt. (Dkt. No. 58) passim)

There are several exceptions to the Cancellation Rule. Deferred cash compensation and deferred equity compensation both vest after employment if the financial advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e., "termination of . . . [e]mployment . . . for any reason other than under circumstances involving any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for] [g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified

combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" – i.e., layoffs; or (4) departure for governmental service. (2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

"[E]nter[ing] into an employment or consulting relationship with a firm offering Competitive Services" constitutes "Prohibited Activity." Accordingly, a long-tenured financial advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm is not eligible for the "full career retirement" exception to the Cancellation Rule. (2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

### B. The Arbitration Agreements

In moving to compel arbitration, Morgan Stanley cites arbitration clauses in three types of Morgan Stanley employment agreements: the "Bonus Agreement"; the "Employment Agreement"; and the "CARE Program."

#### 1. The Bonus Agreement's Arbitration Provision

The Bonus Agreement's arbitration provision provides as follows:

> 7. Resolution of Disputes
>
> (a) Any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof, including, but not limited to common law claims for breach of contract or tort, wage and hour claims, and/or statutory discrimination claims (individually and collectively referred to herein as "Covered Claims"), will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes. Notwithstanding the foregoing, any Covered Claim that has been initiated or is being maintained on a class, collective, or representative action basis, or is otherwise brought on behalf of others, may not be submitted to arbitration before FINRA. Also, notwithstanding the foregoing, any Covered

Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA"). Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures. Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims. Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only. With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action. An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7. Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration. In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law. For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

> (e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . .

(2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7; see also 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7) (same); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7) (similar))[5]

### 2. The Employment Agreement's Arbitration Provision

The Employment Agreement contains the following arbitration provision:

> 7. ARBITRATION
>
> 7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction. Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. This Paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provision[al] relief from any court, as provided for in this agreement.
>
> 7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ("CARE"). Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Administrator's Office and in the CARE Program explanatory brochure.

(2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7)

### 3. The CARE Program

"For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called 'CARE,' short for Convenient Access to Resolution for Employees.

[5] The cited 2014 and 2015 bonus agreements contain substantially similar – albeit not identical – language addressing the arbitration of claims. The parties have not argued that language differences in the relevant sections of the 2014 and 2015 bonus agreements are material.

CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the program is available to employees on Morgan Stanley's intranet site. . . . In 2015, Morgan Stanley announced an expansion of the CARE [P]rogram. Morgan Stanley notified all U.S. employees of the expansion via their individualized Morgan Stanley email accounts. These communications were sent in waves. . . . [and] describ[ed] the process through which employees could opt out of participating." (Krentzman Decl. (Dkt. No. 68) ¶¶ 20, 22)

The 2015 email regarding the CARE Program expansion and opt-out reads as follows:

> Morgan Stanley is announcing the expansion of CARE and modifications to related Firm policies and programs to extend arbitration obligations for all US employees – registered and non-registered. Effective October 2, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a nonclass, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook. . . .
>
> By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook, unless you elect to opt out of the CARE Arbitration Program by completing, signing and submitting an effective CARE Arbitration Program Opt-Out Form by October 2, 2015.

(Sept. 2, 2015 Morgan Stanley Human Resources email (Dkt. No. 68-3) at 2)

The 2015 email contains hyperlinks to the "Arbitration Agreement" (the "CARE Program Arbitration Agreement") and the "CARE Guidebook." (Id.)

The CARE Program Arbitration Agreement provides as follows:

> **Binding Mutual Arbitration.** You and Morgan Stanley agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement and in the arbitration provisions of the CARE Guidebook, a copy of which is annexed hereto. This Arbitration Agreement, including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA"). This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by you or Morgan Stanley, and makes arbitration the required

and exclusive forum for the resolution of all Covered Claims. By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

**Covered Claims.** Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring. Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized. **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

**Excluded Claims.** The following claims and disputes are not subject to this Arbitration Agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. . . .

Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

(CARE Program Arbitration Agmt. (Dkt. No. 68-5) §§ 1-4 (emphases in original)) The CARE Guidebook contains similar language. (CARE Guidebook (Dkt. No. 68-4) at 4-6, 20)

### C. Applicability of Arbitration Provisions to Plaintiffs

Defendants have proffered evidence that Plaintiffs are bound by the arbitration provisions contained in the following agreements:

- Shafer: 2015 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 6 and Ex. B);
- Haugabook, Heidt, Shover, Livanos, Samsen, Jeffrey Sheresky, Steve Sheresky, Jukel: 2015 CARE Program expansion, by virtue of not having opted out (Krentzman Decl. (Dkt. No. 68) ¶ 31);
- Tamse: 2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 8 and Ex. C);
- Loftus: 2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 10 and Ex. D); and
- Nadler: 2008 Employment Agreement (Krentzman Decl. (Dkt. No. 68) ¶ 18 and Ex. A).

## II. PROCEDURAL HISTORY

The Complaint was filed on December 30, 2020, with Shafer as the sole plaintiff. (Dkt. No. 1)[6]

On March 24, 2022, Plaintiffs filed the Amended Complaint. (Dkt. No. 58) The Amended Complaint asserts claims for (1) declaratory and equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (id. ¶¶ 98-101); (2) "reformation of the [Financial Advisor] Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA §§ 502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (id. ¶¶ 102-07); and (3) "breach of fiduciary duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the

[6] On April 5, 2021, Defendants moved to compel arbitration and for a stay of proceedings. (Dkt. No. 42) The Court denied that motion without prejudice on March 10, 2022, after new plaintiffs moved for joinder and stated that they intended to file an Amended Complaint. (Dkt. No. 57)

[Equity Incentive Plan]," pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3). (Id. ¶¶ 108-17 (capitalization altered))

On June 29, 2022, Defendants moved to compel arbitration and for a stay of proceedings. (Dkt. No. 65)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Motion to Compel Arbitration

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement." 9 U.S.C. § 4. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). Given the federal policy favoring arbitration, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration." Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011). However, this "presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made." Id.

"'In deciding whether a dispute is arbitrable, [a court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 394 (2d Cir. 2015) (quoting Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010)). "When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). As to the scope of the arbitration agreement, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4). Where, however, "'the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and "avoid the need for further court proceedings."'" Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011); Bensadoun, 316 F.3d at 175).

As noted above, in resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw[] all reasonable inferences in favor of the non-moving party." Id. (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)). However, "[a] party to an arbitration

agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

**B. ERISA**

"ERISA's comprehensive regulatory scheme governs most employee benefit plans." Liberty Mut. Ins. Co. v. Donegan, 746 F.3d 497, 503 (2d Cir. 2014), aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312 (2016). "The statute . . . seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." Gobeille, 577 U.S. at 320-21.

ERISA § 502(a), codified at 29 U.S.C. § 1132(a), provides that

> [a] civil action may be brought –
>
> (1) by a participant or beneficiary –
>
> (A) for the relief provided for in subsection (c) of this section, or
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(1)-(3).

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee benefit plan' that is governed by ERISA." Albers v. Guardian Life Ins. Co., No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999).

ERISA addresses two types of "employee benefit plans": "welfare plans" and "pension plans." ERISA § 3(2)(A) defines "pension plan" as follows:

> (A) Except as provided [elsewhere in ERISA], the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A).

ERISA requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable" in most circumstances. ERISA § 203(a), codified at 29 U.S.C. § 1053(a). In the case of an "individual account plan,"[7] benefits must generally fully vest (1) after three years of service, or (2) gradually in accordance with a statutorily defined schedule. Id. §§ 203(a)(2)(B)(i)-(iii).

## II. ANALYSIS

### A. Whether the Parties Agreed to Arbitrate

As discussed above, Defendants have offered evidence that Plaintiffs Shafer, Tamse, Loftus, and Nadler executed written agreements containing arbitration clauses. As to the remaining Plaintiffs, Defendants have offered evidence that they continued to work at Morgan Stanley without opting out of the 2015 CARE Program expansion, which provides for binding

[7] "The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." ERISA § 3(34), codified at 29 U.S.C. § 1002(34).

mutual arbitration. (See Porco Decl. (Dkt. No. 67) and accompanying exhibits; Krentzman Decl. (Dkt. No. 68) and accompanying exhibits) Plaintiffs do not dispute the evidence showing their agreement to the arbitration provisions at issue. Given this record, the Court concludes that Defendants have demonstrated that Plaintiffs and Defendants entered into agreements to arbitrate. See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004) (employee's signed contract containing arbitration clause sufficient to establish agreement to arbitrate under New York law); Victorio v. Sammy's Fishbox Realty Co., LLC, No. 14 CIV. 8678 CM, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (same); Lockette v. Morgan Stanley, No. 18-CV-876 (JGK), 2018 WL 4778920, at *4–5 (S.D.N.Y. Oct. 3, 2018) (concluding that plaintiff's continued work at Morgan Stanley after receiving the 2015 CARE Program expansion email and plaintiff's decision not to opt out were sufficient to demonstrate an agreement to arbitrate under New York law); Pelligrino v. Morgan Stanley Smith Barney LLC, No. 17-CV-7865 (RA), 2018 WL 2452768, at *3-5 (S.D.N.Y. May 31, 2018) (same).

It is likewise clear that the arbitration provisions at issue unambiguously delegate disputes as to arbitrability to the arbitrator, except as to challenges to the provisions' class action waivers. (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d) ("Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver."); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7(d) ("Any issue concerning the arbitrability of a particular issue or claim pursuant to this arbitration agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the

arbitrator, not the court."); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1 ("Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration."); CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4 ("Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.")) See Frazier v. Morgan Stanley, No. 16 CIV. 804 (RJS), 2018 WL 11585450, at *8 (S.D.N.Y. Nov. 29, 2018) (holding that identical provision in Morgan Stanley employment agreements "clearly provide[d] for the arbitration of questions concerning the arbitrability of any dispute arising out of or relating to those agreements").[8]

While Plaintiffs do not dispute that the signed agreements and Plaintiffs' failure to opt out of the CARE Program expansion signify consent to arbitration, they argue that "[e]ven if the arbitration agreements applied to Plaintiffs' claims, they were superseded by the [Compensation Incentive] [P]lan [D]ocument, which specifically requires disputes about the plan to be resolved in court, **not** arbitration." (Pltf. Opp. (Dkt. No. 72) at 18-19 (emphasis in original))

In support of this argument, Plaintiffs cite to the Compensation Incentive Plan Document's "Governing Law and Exclusive Jurisdiction" provision:

---

[8] Citing NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031-32 (2d Cir. 2014), and Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281 (5th Cir. 2019), Plaintiffs contend that "the parties did not clearly and unmistakably commit questions about the arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator." (Pltf. Opp. (Dkt. No. 72) at 15 n.11) These cases are not persuasive here, however, because they address arbitration provisions that do not contain the explicitly worded delegations quoted above. In NASDAQ-OMX Grp., for example the agreement at issue was "silent as to who should decide arbitrability." NASDAQ OMX Grp., 770 F.3d at 1031. And in Archer & White Sales, the Fifth Circuit found that "[t]he parties could have unambiguously delegated th[e] question [of who decides arbitrability], but they did not, and we are not empowered to re-write their agreement." Archer & White Sales, 935 F.3d at 282.

> [The Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any conflicts or choice of law rule or principle that might otherwise refer the interpretation of the Award or Account Value to the substantive law of another jurisdiction. Following the timely and proper exhaustion of applicable internal claims and appeals procedures, the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan, a Participant's participation in the Plan or rights under the Plan.

(Compensation Incentive Plan Document (Dkt. No. 83-4) § 17) The Compensation Incentive Plan Document – unlike the agreements containing arbitration clauses discussed above – does not contain a merger clause.[9]

According to Plaintiffs, the "Governing Law and Exclusive Jurisdiction" provision in the Compensation Incentive Plan Document constitutes "'a subsequent contract regarding the same matter'" – i.e., arbitration – that "'supersede[s] the prior contract[s].'" (Pltf. Opp. (Dkt. No. 72) at 19 (quoting Applied Energetics, 645 F.3d at 526)) But the evidence before the Court suggests that nearly all of the agreements at issue containing the arbitration provisions were executed after the Compensation Incentive Plan Document was issued.

[9] The Bonus Agreement's arbitration provision states that "[e]mployee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . ." (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(k); see also 2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(e) (same); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7(e) (same))

The Employment Agreement states that "[t]his writing constitutes the entire agreement of the parties with respect to the subject matter recited in this Agreement. This Agreement may be amended only by a writing signed by both you and Morgan Stanley." (2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 13)

The CARE Program Arbitration Agreement states that "**[t]his Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**" (CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 2 (emphasis in original))

Case 1:20-cv-11047-PGG Document 86 Filed 11/21/23 Page 19 of 56

While the Compensation Incentive Plan Document is not dated, Plaintiffs assert "[u]pon information and belief, [that] this document has been in effect since 2008 and [is] part of the 'applicable award documentation' when participants' deferred compensation is credited to their account each January." (Jasinski Decl. (Dkt. No. 72-1) ¶ 4) However, the record does not indicate whether (1) the Compensation Incentive Plan Document has changed over time, or (2) if, when issued as part of the "applicable award documentation" in a given year, it should be considered a document current as of that year or in the alternative, merely a copy of a 2008 document. These matters are material here, because all Plaintiffs other than Nadler signed arbitration agreements after 2008, when Plaintiffs assert that the Compensation Incentive Plan Document was issued. (Porco Decl. (Dkt. No. 67) ¶¶ 6-11; Krentzman Decl. (Dkt. No. 68) ¶¶ 23-30) And given the merger provisions found in the agreements containing arbitration clauses, if these agreements were executed after the Compensation Incentive Plan Document was issued, there is a compelling argument that these agreements supersede the Compensation Incentive Plan Document.

For example, Plaintiff Mark Tamse "was employed by Morgan Stanley as a[] [financial advisor] from March 7, 1994, until March 27, 2015." (Krentzman Decl. (Dkt. No. 68) ¶ 9) On February 18, 2014, he entered into to a Bonus Agreement containing an arbitration provision, which provides that "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof . . . will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) §§ 7(a)) The Bonus Agreement further provides that the arbitration provision "constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered

Claims." (Id. § 7(e)) Based on the merger provision, it appears that the Bonus Agreement's arbitration clause would supersede the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction clause with respect to any deferred compensation that Tamse received under the Compensation Incentive Plan.

In any event, even if – contrary to the record before the Court – the Compensation Incentive Plan Document was issued after the agreements containing the arbitration provisions, the Governing Law and Exclusive Jurisdiction provision would not vitiate the arbitration provisions, because to the extent that the Compensation Incentive Plan is an ERISA plan – as Plaintiffs allege (Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) – the Governing Law and Exclusive Jurisdiction provision is null and void.

As discussed above, the Amended Complaint asserts that the deferred compensation programs at issue are ERISA plans, and all of the claims alleged in the Amended Complaint are premised on ERISA. (See Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) The "exclusive jurisdiction" provision on which Plaintiffs rely, however, states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that disputes arising under the Compensation Incentive Plan must be resolved by the "courts of New York." (Id. § 17)

Accepting Plaintiffs' argument that the deferred compensation programs at issue are ERISA plans, the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision is null and void to the extent that it provides that all disputes arising under it are governed by New York law, and that all disputes arising under it must be heard by New York courts. Claims under ERISA are governed by Federal law and are heard by Federal courts.

"If a state law 'relate[s] to . . . [an ERISA] employee benefit plan,' it is pre-empted." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (quoting ERISA § 514(a), codified at 29 U.S.C. § 1144(a) ("Except as provided in [statutory exceptions not relevant here], the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of [ERISA].") (alterations in Dedeaux). Moreover, ERISA provides – with a narrow exception not at issue here – that "[t]he district courts of the United States shall have exclusive jurisdiction of an action under [ERISA]." ERISA § 4301(c), codified at 29 U.S.C. § 1451(c); see Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *4 n.6 (S.D.N.Y. Mar. 30, 2007) ("Federal district courts have exclusive jurisdiction over all claims arising under ERISA except for those arising under § 1132(a)(1)(B).").

Accordingly, the Governing Law and Exclusive Jurisdiction provision in the Compensation Incentive Plan Document – which states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that "the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan" (Dkt. No. 83-4 § 17) – is null and void with respect to the ERISA claims raised in the Amended Complaint. See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 367 (6th Cir. 2000) ("[I]f ERISA preempts . . . state law . . . , there is no state law to which the administrator of the . . . plan must conform."), aff'd sub nom. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); Matter of HECI Expl. Co., Inc., 862 F.2d 513, 521 (5th Cir. 1988) ("Even if a party may, under some circumstances, waive the application of federal law to a

federally preempted state law claim by failing to raise federal law in a timely fashion, it would go too far to hold that parties could agree to apply state law to an ERISA claim.") (emphasis in original) (citation omitted); Stevenson, 2007 WL 9815654, at *4 n.6.

Finally, where an agreement containing an exclusive jurisdiction provision overlaps with – but does not entirely displace – a related agreement containing an arbitration provision, the issue of which provision applies presents a question of scope, and is thus subject to language in an arbitration provision delegating disputes about arbitrability to an arbitrator. See CleanSpark, Inc. v. Discover Growth Fund, LLC, 485 F. Supp. 3d 494, 504 & n.10 (S.D.N.Y. 2020) ("where a later-in-time forum selection clause arguably wholly supersedes the earlier-in-time arbitration agreement . . . a court must independently determine whether the agreement to arbitrate is still enforceable"; where the later agreement does not entirely displace the earlier agreement and contains an exclusive jurisdiction provision that applies only to disputes within the scope of the later agreement, the arbitration provision has not been "wholly displaced by the forum selection clause, . . . the Court need not pause on the threshold question [of whether there has been an agreement to arbitrate]," because "'[w]hether the forum-selection clause in the later-in-time agreement supersedes the arbitration clauses in the earlier agreement[] presents a question of arbitrability'" that can be delegated to the arbitrator) (quoting TAPCO Underwriters, Inc. v. Catalina London Ltd., No. 14-CV-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014)) (alteration omitted); PB Life & Annuity Co. v. Universal Life Ins. Co., No. 20-CV-2284 (LJL), 2020 WL 2476170, at *3, *6–11 (S.D.N.Y. May 12, 2020) (reinsurer and insurer first entered into reinsurance agreement containing an arbitration provision, and then entered into trust agreement containing a New York choice of law and exclusive jurisdiction provision; the court held that, with respect to disputes implicating both agreements, whether the arbitration

provision or exclusive jurisdiction provision controlled was a question of arbitrability properly delegated to the arbitrator).

Here, the subject matter of the Compensation Incentive Plan Document is not identical to the subject matter of the employment agreements containing the arbitration provisions, and the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision applies only to the Compensation Incentive Plan. (Dkt. No. 83-4 § 17) The jurisdiction provision does not apply to claims regarding the Equity Incentive Plan. In these circumstances, as in CleanSpark and PB Life, disputes over the jurisdiction provision's application are within the arbitrator's ambit.

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014), Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc., 5 F. Supp. 3d 537 (S.D.N.Y. 2014), Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522 (2d Cir. 2011), and Ruiz v. New Avon LLC, No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) – all cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 72) at 19-20) – are not to the contrary.

In Goldman and Citigroup Glob. Markets, courts concluded that broker-dealer agreements that provided for exclusive jurisdiction in the Southern District of New York, and that contained merger provisions, superseded the "background FINRA arbitration rule." Goldman, 764 F.3d at 212, 216; see also Citigroup Glob. Markets, 5 F. Supp. 3d at 539-40.

In Applied Energetics, plaintiff manufacturer and defendant broker-dealer "entered into a preliminary letter agreement" that required disputes to be submitted to arbitration before the National Association of Securities Dealers, FINRA's predecessor. Applied Energetics, 645 F.3d at 523. The letter agreement "contemplated that the parties would enter into a subsequent, more formal agreement." Id. The parties subsequently entered into the

contemplated more formal agreement, which (1) "expressly provided that the agreement would be governed by New York law"; (2) provided that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York"; and (3) contained a merger clause. Id. The Second Circuit concluded that the language in the later formal agreement superseded the arbitration provision in the initial letter agreement because (1) "[the formal agreement's] language that 'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the [letter agreement's] parallel language that 'any dispute shall be resolved through binding arbitration'"; and (2) "[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Id. at 525-26 (quotation and alterations omitted).

And in Ruiz, the plaintiff employee signed (1) a November 14, 2017 employment agreement in which the parties "irrevocably consent and submit to the sole exclusive jurisdiction of the United States District Court for New York, or the Courts of the State of New York," with respect to "[a]ny and all actions arising out of the [employment agreement] or the termination thereof"; (2) a November 27, 2017 "Employment Arbitration Agreement" containing an arbitration provision for employment disputes; and (3) a revised December 19, 2017 employment agreement with a later start date, which contained the same exclusive jurisdiction clause as the original agreement, as well as a merger clause. Ruiz, 2019 WL 4601847, at *2, *7. The court concluded that the exclusive jurisdiction clause in the December employment agreement displaced the arbitration agreement agreed to the previous month, because the "language [of the December agreement] – which encompasses any dispute relating to Ruiz's employment by New

Avon – is both mandatory and exclusive, and cannot be reconciled with the parties' prior agreement to arbitrate all disputes"; and (2) and because of the merger clause. Id. at *9.

These cases are not on point because the circumstances in the instant case are entirely different. As an initial matter, these cases do not involve a situation in which – as here – Plaintiffs have brought exclusively federal ERISA claims and then incongruously cited to a contract provision stating that any disputes are governed by New York law and must be heard by "the courts of New York." Moreover, in all four of Plaintiffs' cases, the later-in-time agreement (1) had the same subject matter as the prior agreement, and/or (2) contained a merger clause. Here, as discussed above, it is not clear that the Compensation Incentive Plan Document is the later document and, in any event, the Compensation Incentive Plan Document does not contain a merger clause and does not address subject matter that is identical to the subject matter of the Employment Agreement, the Bonus Agreement, or the CARE Program. See PB Life, 2020 WL 2476170, at *9 (finding Goldman and Applied Energetics not on point where the subject matter of the contracts at issue overlapped only in part).

In sum, in multiple documents, Plaintiffs agreed – either via a signed writing or by not opting out of the CARE Program expansion – to arbitrate disputes regarding their employment at Morgan Stanley. Morgan Stanley has thus made a "prima facie showing" of "the agreements' contractual validity," and Plaintiffs have not met their "'heavy burden . . . to disprove [the] presumption[]'" that the "'agreement[s] [are] valid.'" Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1996)), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

**B. Whether the Agreements to Arbitrate Encompass the Claims at Issue**

The arbitration provisions at issue here encompass "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof"; "any controversy or claim between Employee and Morgan Stanley . . . based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley"; "[a]ny controversy or claim arising out of or relating to . . . employment by Morgan Stanley"; and "any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof . . . includ[ing] . . . claims under, based on, or relating to any federal . . . statute or regulation." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(a); 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(a); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1; CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 2)

"Courts have typically found such language indicative of a broad agreement." Cour Pharms. Dev. Co., Inc. v. Phosphorex, Inc., No. 20-CV-4417 (JPO), 2021 WL 1062568, at *3 (S.D.N.Y. Mar. 19, 2021) (listing cases); see Sportvision, Inc. v. MLB Advanced Media, LP, No. 18 CIV. 3025 (PGG), 2020 WL 1957450, at *5 (S.D.N.Y. Apr. 23, 2020) ("A clause 'submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" is the paradigm of a broad clause.'") (quoting Collins & Aikman Prod. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995); further citation omitted) (brackets in Sportvision).[10]

---

[10] Citing Cooper v. Ruane Cunniff & Goldfarb Inc., 990 F.3d 173 (2d Cir. 2021), Plaintiffs contend that "Plaintiffs' claims do not 'arise from or relate to their employment' because they do not involve facts particular to them." (Pltf. Opp. (Dkt. No. 72) at 12)

In Cooper, plaintiff employees, "[a]cting on behalf of a putative class of plan participants and an employee benefit plan . . . sued [an investment advisor] under § 502(a)(2) of [ERISA], claiming damages arising from [the advisor's] alleged breach of fiduciary duty and mismanagement of a profit-sharing fund sponsored by [plaintiffs'] employer ." Cooper, 990 F.3d at 175. In particular, plaintiffs alleged that the investment advisor had breached its fiduciary duty by investing "almost 30% of the Plan's total assets" in "shares [of] Valeant Pharmaceuticals," which precipitously declined in value following a series of scandals involving Valeant's price-gouging and fraud. Id. at 175, 177; see Katie Thomas, Battered Valeant Stock Drops a Further 50% After Weak Guidance, N.Y Times (Mar. 15, 2016), available at https://www.nytimes.com/2016/03/16/business/valeant-q4-financial-2016-guidance.html?smid=url-share.

Defendant moved to compel arbitration, citing employment agreements that "mandate[d] arbitration of 'all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms' of the Agreement." Id. at 178. The Second Circuit reversed the district court's decision granting the motion to compel arbitration, holding that plaintiffs' breach of fiduciary duty claim did not "relate to" their employment:

> Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to Cooper's individual experience. Moreover, . . . others who were never DST employees could have brought claims identical to those stated by Cooper – for example, the mismanagement claims could have been pursued by other Plan beneficiaries (such as spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST itself; and by the Secretary of Labor. See ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing plan participants and beneficiaries and the Secretary of Labor to bring a civil action for breach of fiduciary duties).
>
> We therefore [conclude] . . . that in the context of an employment arbitration agreement, a claim will "relate to" employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment. Here, the merits of Cooper's claims do not involve such facts.

Id. at 183-84 (citations omitted).

Plaintiffs contend, however, that they have brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable. According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual

---

Here, according to Plaintiffs,

> the arbitration provisions, like the arbitration agreement in Cooper, pertain to Plaintiffs' employment. But, as in Cooper, the merits of Plaintiffs' claims do not involve facts particular to their employment. The claims do not concern Plaintiffs' work performance, evaluations, working conditions, amount of compensation, or any other fact particular to their individual experiences at Morgan Stanley. Rather, Plaintiffs' claims concern whether the [Compensation Incentive Plan] and [Equity Incentive Plan] are governed by ERISA and, if so, whether the Cancellation Rule violates ERISA. Nothing about these claims "involve facts particular to an individual plaintiff's own employment." To the contrary, the relevant facts apply equally to every [financial advisor] who forfeited deferred compensation, and each such [financial advisor] can bring the same claims. Indeed, even the Secretary of Labor could do so.

(Pltf. Opp. (Dkt. No. 72) at 12-13 (quoting Cooper, 990 F.3d at 184) (emphasis in Pltf. Opp.))

Plaintiffs' "relate to employment" argument is not persuasive. Although both Cooper and the instant case involve § 502(a)(2) breach of fiduciary duty claims, the similarities between the cases end there. In Cooper, the alleged breach of fiduciary duty was the mismanagement of fund assets, an issue entirely unrelated to plaintiffs' employment. Here, by contrast, the alleged breach of fiduciary duty is "selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA." (Am. Cmplt. (Dkt. No. 58) ¶ 113) These challenged actions "relate to" Plaintiffs' employment, because whether Plaintiffs' deferred compensation vested depends on the timing and circumstances of their separation from Morgan Stanley, including whether they were fired, quit, or retired. Cooper's concern that "[r]elatedness" "not encompass everything that touche[s] employment in any way," Cooper, 990 F.3d at 183, is thus not implicated here. See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *9 (E.D.N.Y. Sept. 30, 2023) (finding that Cooper did not preclude plaintiff's "claims against her former employer directly, challenging her former employer's calculation of her retirement benefits," because there was "a more substantial nexus between Plaintiff's claims and her employment" than in Cooper).

In sum, Cooper's analysis of "relate to employment" does not support Plaintiffs' position here.

Case 1:20-cv-03510-PGG Document 86 Filed 11/29/23 Page 29 of 56

arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21 (quoting Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

In considering Plaintiffs' arguments, this Court must first determine whether (1) the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so, whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged ERISA plan and/or would be contrary to ERISA.[11]

---

[11] Defendants contend that "[b]ecause plaintiffs have agreed to arbitrate arbitrability, the Court need not – and should not – reach arbitrability itself. . . . [T]he validity of plaintiffs' representative action waiver is not at issue. The parties do not dispute whether plaintiffs have waived the right to bring a representative action – they dispute whether plaintiffs' claims seeking individual benefits must be arbitrated. The agreements clearly and unmistakably commit such questions to the arbitrator, and plaintiffs have identified no arbitrability issue reserved to the court that 'at least arguably covers the present dispute.'" (Def. Reply Br. (Dkt. No. 69) at 7-8 (quoting NASDAQ OMX Grp., 770 F.3d at 1031))

By contrast, Plaintiffs contend that "[t]hree of the four arbitration provisions purport to waive the right to pursue a Covered Claim 'on a class action, collective action, or representative action basis.' To the extent that any such claim is allowed to proceed, it must do so in court. Moreover, 'any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers shall be decided by a court of competent jurisdiction, and not by an arbitrator.' Thus, contrary to Morgan Stanley's argument that any disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, the Court – not an arbitrator – must decide whether Plaintiffs' claims must be allowed to proceed on a class-action or representative-action basis, such that they are not subject to arbitration." (Pltf. Opp. (Dkt. No. 72) at 15 (quoting 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(d); citing 2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d), and CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4; alterations omitted); see also 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1)

In sum, Plaintiffs argue that the arbitration provisions are unenforceable because (1) they "prohibit[] Plaintiffs from bringing [their] claim[s] [on] a representative basis"; and (2) this restriction violates ERISA. And they further contend that the validity of the class action waivers must be determined by a court. (Id. at 15, 22) Because the arbitration provisions provide that the validity of the class action waivers must be determined by a court, this Court concludes that this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator.

**1. Whether the Deferred Compensation Programs are ERISA Plans**

Plaintiffs contend that Morgan Stanley's deferred compensation programs are "employee benefit pension plan[s]" under ERISA because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond." (Am. Cmplt. (Dkt. No. 58) ¶ 64) (capitalization altered). See ERISA 3(2)(A)(ii), codified at 29 U.S.C. § 1002(2)(A)(ii).[12] According to Plaintiffs, the deferred compensation programs' deferral of income "extend[s] to the termination of covered employment or beyond" in that (1) financial advisors "whose employment ends because of a disability, involuntary termination, retirement, or full career retirement still receive their deferred compensation on the scheduled distribution date . . . after their employment with Morgan Stanley . . . end[s]"; and (2) financial advisors "who qualify for a government service termination receive their deferred compensation when they leave Morgan Stanley." (See id. ¶¶ 59-67 (capitalization altered))

**a. Applicable Law**

As discussed above, ERISA defines "pension plan" to include, inter alia, any employer "plan, fund, or program" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ." ERISA § 3(2)(A), codified at 29 U.S.C. § 1002(2)(A). In determining whether an employer's plan or program is an "employee benefit pension plan" under ERISA, the Act directs courts to consider the "express terms" and "surrounding circumstances" of the plan or program. ERISA § 3(2)(A), codified at 29 U.S.C. § 1002(2)(A). The Second Circuit has cautioned that the ERISA provision defining pension plans "is 'not to be read as an elastic girdle that can be stretched to cover any content

[12] Plaintiffs do not contend that Morgan Stanley's deferred compensation programs "provide[] retirement income to employees." ERISA § 3(2)(A)(i).

that can conceivably fit within its reach.'" Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)).

Most cases that have considered whether an employer's plan or program "results in deferral of income" for purposes of § 3(2)(A)(ii) have involved bonus plans, typically in the form of stock options programs or "long-term incentive plans." E.g., Albers, 1999 WL 228367, *1; International Paper Co. v. Suwyn, 978 F. Supp. 506, 508-09 (S.D.N.Y. 1997); Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, *1 (S.D.N.Y. Apr. 20, 1994); Hahn v. Nat'l Bank, N.A., 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); Pasciutti v. LiquidPiston, Inc., No. 3:20-CV-01243 (RNC), 2021 WL 4502950, *2 (D. Conn. Sept. 30, 2021); Oatway v. Am. Int'l Grp., 325 F.3d 184, 187 (3d Cir. 2003); Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 (8th Cir. 1999). In determining whether a bonus plan is subject to ERISA, a court must consider both § 3(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c), which provides that "the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." See, e.g., Albers, 1999 WL 228367, at *3-4 (analyzing deferral of bonus payments under both § 1002(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c)); Foster, 1994 WL 150830, at *2 (same).

In that context, courts consider whether a plan's "purpose [is] to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." Oatway, 325 F.3d at 188. In such an inquiry, "[a] [p]lan's express statement of purpose . . . is entitled to weight when determining the nature of the plan." Hahn, 99 F. Supp. 2d at 279. Courts also consider whether plans "by operation . . . require the deferral of income," or

on the other hand, if "any such deferral to periods extending to termination is merely incidental." Suwyn, 978 F. Supp. at 512; see id. at 511 (plan does not result in the deferral of income when it "cannot be said to generally defer the receipt of income to the termination of employment"); Foster, 1994 WL 150830, at *2 ("[T]he 'natural reading of [29 U.S.C.] § 1002(2)(A)(ii)'s requirement that there be a "deferral of income . . . to the termination of covered employment or beyond" is that the statute requires that a plan generally defer the receipt of income to the termination of employment. The statute is not satisfied when, under the facts of a particular case, a portion of withheld income happens to become due after termination.'") (quoting Hagel v. United Land Co., 759 F. Supp. 1199, 1202 (E.D. Va. 1991); emphasis and ellipsis in Foster).

In Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), the Fifth Circuit considered whether an employer's "wealth accumulation plan" was an "employee benefit pension plan." The court noted that the "wealth accumulation plan"

> "[was] designed to provide an opportunity for [certain] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share [in defendant] RBC's growth and profitability, if any." . . . Generally, a participating employee [could] elect to have her account distributed either "In–Service" (i.e., during her employment) or upon separation from employment. . . . Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement.

Id. at 622-23 & n.1 (quoting plan document; alteration omitted).

RBC argued that its wealth accumulation plan "[was] not a 'pension plan' because 'the primary purpose of the [plan] [was] not to provide retirement or deferred post-termination income, but rather, to attract and retain key employees by awarding bonuses and other incentives.'" Id. at 623 (quoting RBC's brief) (emphasis in RBC's brief; alteration omitted).

Although the Fifth Circuit found that the wealth accumulation plan "was not designed to provide retirement income," and noted that, under § 3(2)(A)(i), the issue of whether a plan "provides retirement income" depends on the "primary thrust" and "purpose" of the plan, id. at 624, it rejected RBC's arguments with respect to § 3(2)(A)(ii). As to that provision, the Tolbert court holds that the employer's purpose is irrelevant, and that the proper inquiry is whether a deferral of income necessarily ensues as a result of the plan:

> The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i). Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income. Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. . . .
>
> In analyzing subsection (ii), we begin with the predicate – "results in a deferral of income." The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in Burrage v. United States, 571 U.S. 204 (2014). The Court explained that "a thing 'results' when it arises as an effect, issue, or outcome from some action, process or design." Id. at 210 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)). Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan. The remaining text of subsection (ii) – "by employees for periods extending to the termination of covered employment or beyond" – indicates that the employees must defer the income to the end of their employment or beyond.
>
> . . . .
>
> We conclude that the plain language of the statute and the interpretations expressed in [our precedents] all compel one result: The [wealth accumulation plan] is a "pension plan" under subsection (ii). The [wealth accumulation plan's] "express terms" reveal themselves at the outset of the document. The first section of the [wealth accumulation plan], the statement of purpose, refers to the [wealth accumulation plan] as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." Later sections of the [wealth accumulation plan] contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred. A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the [wealth accumulation

> plan]. Put another way, by participating in the [wealth accumulation plan], the plaintiffs have "[forgone] income in exchange for receiving income" at a later date. See Boos v. AT&T, Inc., 643 F.3d 127, 134 (5th Cir. 2011).
>
> The "express terms" of the [wealth accumulation plan] also contemplate employees deferring income "to the termination of covered employment or beyond." The vesting sections explain that, upon separation, unvested amounts vest immediately. The distribution sections contain further support: "If distribution is made due to Separation," then "available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii).

Id. at 624-26 (citations altered; emphases in original; footnote, further citations, and alterations omitted).

The Fifth Circuit goes on to reject RBC's reliance on § 2510.3-2(a) – the regulation setting out the "systematically deferred" standard for bonuses – and related case law, finding that RBC's wealth accumulation plan is not a bonus plan: "The [wealth accumulation plan] is not among the 'specific plans' identified in § 2510.3-2(c), and we therefore decline to require the [wealth accumulation plan] to satisfy the 'systematically deferred' condition. In other words, the [wealth accumulation plan] fits comfortably within the meaning of § 1002(2)(A)(ii), and nothing in § 2510.3-2(c) takes it out. Reliance on [Emmenegger v. Bull Moose Tube Co., 197 F.3d 929 (8th Cir. 1999)] is thus misplaced." Id. at 626 (paragraph break omitted).

In Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), the Sixth Circuit followed the Tolbert analysis and held that a "similar" "income deferral plan" was an ERISA pension plan under § 3(2)(A)(ii), because the plan "expressly provide[d] for employees to defer income from several sources to the future and authorize[d] options for payment of deferred income both before and after termination" Id. at 437.

Although the Second Circuit has not addressed Tolbert and Wilson, much of the reasoning in Pasternack v. Shrader, 863 F.3d 162 (2d Cir. 2017) is consistent with the analysis in

these cases. For example, the Pasternack court states that (1) "the two subparagraphs of [§ 3(2)(A)] set out independent tests to determine whether a plan is protected by ERISA"; (2) "[t]he statutory phrase 'provides retirement income' does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement. The very fact that [§ 3(2)(A)(i)] is an alternative to [§ 3(2)(A)(ii)], which explicitly asks whether a plan 'results' in deferred income, suggests that the phrase 'provides retirement income' considers the plan's primary purpose rather than its result"; and (3) "[s]ubparagraph (ii) extends ERISA coverage to any plan that 'results in a deferral of income by employees.' The word 'results' calls for an effects-based inquiry rather than one based on purpose." Id. at 168-69 & 170 n.5.

Having considered the relevant case law, this Court concludes that the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan. If it is, a court must consider both the plan's purpose and whether deferral of income is systematic. If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

**b. Whether Plaintiffs' Deferred Compensation Programs Are Bonus Programs**

Plaintiffs contend that financial advisors'

> deferred compensation in the [Financial Advisor] Deferred Compensation Program is not a "bonus" . . . [because] [financial advisors] do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits . . . . Given that [financial advisors] are expected to generate revenue, their compensation for performing this core function – at the absolute minimum level – is not, and cannot, be a "bonus." Rather, [financial advisors'] compensation – including their deferred compensation – is a "commission." . . . Indeed, the [Financial Advisor] Compensation Plan distinguishes between [financial advisors'] "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. [Financial advisors] earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate. In

> contrast, [financial advisors] earn "year-end bonuses" by achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 73-79 (citing 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2 (differentiating "deferred compensation award[s]" from "year-end bonuses . . . paid to Firm employees generally")))

This Court concludes that the deferred compensation programs at issue here are not bonus programs.

As discussed above, Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission." See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").

By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation").

Courts generally treat these two types of compensation as distinct. See Smith v. Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action, concluding that employee benefits committee did not "err[] in deciding that commissions are not bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New

York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v. Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

In sum, the deferred compensation programs at issue here are not bonus plans. Accordingly, in deciding whether Morgan Stanley's deferred compensation programs are ERISA plans under § 3(2)(A)(ii), this Court considers only whether these programs "result[] in" the deferral of income to a period after employment.

c. **Whether the Deferred Compensation Programs "Result[] in a Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond"**

"Although [ERISA] do[es] not define 'deferral of income' or 'deferred compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either: (1) '[p]ayment for work performed, to be paid in the future or when some future event occurs,' or (2) 'an employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan.'" Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017)

(quoting Deferred Compensation, Black's Law Dictionary (10th ed. 2014)). And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan." Tolbert, 758 F.3d at 625 (quoting Burrage, 571 U.S. at 210).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Id. § 3(2)(A)(ii).

And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" Pasternack, 863 F.3d at 168 (quoting Murphy, 611 F.2d at 575), application of ERISA in these circumstances does not unreasonably expand the reach of the Act. Although Plaintiffs in the instant case – unlike plaintiffs in Tolbert and Wilson – cannot elect post-

employment vesting, disability, retirement, layoff, and government service are not unusual means by which workers leave their employment. And nothing in the record suggests that post-employment deferred compensation payments are rare.

Defendants argue, however, that Plaintiffs did not earn payments under the Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments, because financial advisors "have no right to payment until and unless they remain employed at vesting – a condition [P]laintiffs [did not] meet." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4) Defendants thus argue that "Morgan Stanley's program does not entail any 'deferral of income by employees.'" (Id. at 4 (emphasis in original)) This argument is not persuasive, because it exalts form over substance. Whenever an action (here, leaving Morgan Stanley's employ) results in the forfeiture of a contractual right, those facts can always be recharacterized by stating that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to the performance of the contract.

In sum, Morgan Stanley's deferred compensation programs result in the deferral of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii).

* * * *

For the reasons stated above, this Court concludes that Morgan Stanley's deferred compensation programs are ERISA plans.

### 2. Whether Plaintiffs' ERISA Claims Are Arbitrable

Second Circuit law makes clear that compulsory arbitration of ERISA claims is lawful. Bird v. Shearson Lehman/Am. Exp., Inc., 926 F.2d 116, 122 (2d Cir. 1991) ("[S]tatutory claims arising under ERISA may be the subject of compulsory arbitration.").

Plaintiffs contend, however, that their claims are not arbitrable, because they are § 502(a)(2) claims for breach of fiduciary duty, and § 502(a)(3) claims for equitable relief that

are brought in a representative capacity on behalf of the plans. According to Plaintiffs, their § 502(a)(2) claims "can be brought only in a representative capacity." (Pltf. Opp. (Dkt. No. 72) at 16 (emphasis in original)) Moreover, their "representative [§ 502(a)(3)] claims should not be litigated in individual arbitrations," because these "claims 'belong' to the [Financial Advisor] Deferred Compensation Program, including the [Compensation Incentive Plan] and [Equity Incentive Plan], [and] Plaintiffs' individual arbitration agreements do not cover them." (Id. at 18) "[T]he ERISA plan[s] [thus] never agreed to arbitrate any claims." (Id.) Plaintiffs further argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA" – namely, the ability to remediate the plans as a whole via a representative action. (Id. at 21)[13]

Defendants respond that

> [P]laintiffs do not actually bring these claims in a representative capacity. . . . Here, [P]laintiffs seek the recovery of alleged benefits that were not paid **to them**, and their claims "fall comfortably within the scope of § 502(a)(1)(B), which allows a plan participant 'to recover benefits due to him,'". . . . [P]laintiffs cannot avoid their agreements to arbitrate their individual claims by slapping a "representative" label on them. . . .
>
> [T]he plan need not agree to arbitrate claims that plaintiffs bring on their own behalf. . . . The complaint here . . . alleges injuries that are personal to these [P]laintiffs; the complaint individually describes each plaintiff's tenure at Morgan Stanley and the deferred compensation each purportedly "earned" in that time and now seeks. Seeking "plan-wide relief" is not the same as seeking relief on behalf of the plan, and plaintiffs' claims seeking benefits from the plan cannot "belong

[13] Plaintiffs do not argue that § 502(a)(1) claims for benefits are, as a general matter, non-arbitrable. Plaintiffs' claims for benefits are brought as part of the "two-step" Second Cause of Action, however, in which Plaintiffs first seek (1) reformation under § 502(a)(3), and then (2) recovery of benefits from the reformed plans pursuant to § 502(a)(1). (Am. Cmplt. (Dkt. No. 58) ¶¶ 102-07) See Laurent v. PricewaterhouseCoopers LLP, 945 F.3d 739, 747 (2d Cir. 2019) ("[W]e have previously affirmed the entry of a two-step reformation and enforcement remedy under ERISA.") (citing Amara v. CIGNA Corp., 775 F.3d 510, 532 (2d Cir. 2014)).

Case 1:20-cv-11047-PGG Document 86 Filed 11/21/23 Page 41 of 55

> to" the plan. Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them. . . .
>
> Plaintiffs can obtain complete relief, if any, through their individual claims for benefits. It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class – plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims. . . . Arbitration of plaintiffs' claims accordingly does not frustrate anyone's ability to obtain any ERISA remedy that they may be due.

(Def. Reply Br. (Dkt. No. 69) at 9-11 (quoting Frommert v. Conkright, 433 F.3d 254, 270 (2d Cir. 2006) (in turn quoting 29 U.S.C. § 1132(a)(1)(B); further citations and quotations omitted; alterations omitted) (emphasis in original))

Accordingly, this Court must determine (1) whether Plaintiffs' § 502(a)(2) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; (2) whether Plaintiff's § 502(a)(3) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; and (3) whether arbitration would impermissibly curtail Plaintiffs' statutory rights.

a. **ERISA § 502(a)(2) Claim for Breach of Fiduciary Duty**

The Amended Complaint's Third Cause of Action alleges that

> [t]he Compensation Committee is a fiduciary under the [Financial Advisor] Deferred Compensation Program because it is the administrator of the [Compensation Incentive Plan] and [Equity Incentive Plan] and is responsible for, among other things, reviewing and establishing the rules and procedures of the [Financial Advisor] Deferred Compensation Program, including the ability to determine that it is governed by ERISA.
>
> ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. Id.

> ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but **only if** the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).
>
> The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA.
>
> . . . .
>
> Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 108-13, 117 (emphasis in original))

### i. Applicable Law

ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section [409] of this title."

ERISA § 409, codified at 29 U.S.C. § 1109, in turn provides that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

The "responsibilities, obligations, or duties imposed upon fiduciaries" are set out in ERISA § 404, codified at 29 U.S.C. § 1104, which provides in relevant part that fiduciaries must adhere to the "prudent man standard of care":

> (a) Prudent man standard of care
>
> (1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a).

Thus, "ERISA imposes 'four distinct, but interrelated duties' on fiduciaries, including the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to comply with the provisions of the plan." Anderson v. Advance Publications, Inc., No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *2 (S.D.N.Y. June 13, 2023) (quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715-16 (2d Cir. 2013)). "[T]hese fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

The Supreme Court has explained that it was "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs authorized to bring breach of fiduciary duty actions] is in the financial integrity of the plan." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985); see also Browe v. CTC Corp., 15 F.4th 175, 205-06 (2d

Cir. 2021) ("[T]he remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary).").

Plaintiffs allege – and this Court agrees – that the deferred compensation programs at issue are "individual account plans." (Am. Cmplt. (Dkt. No. 58) § 68) Under ERISA, "[t]he term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." ERISA § 3(34), codified at 29 U.S.C. § 1002(34); see Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008) ("A 401(k) plan is a common defined contribution plan.").[14] In the context of a defined contribution plan, § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," notwithstanding the tension between the individualized nature of each employee's pension and the representative nature of claims brought under § 502(a)(2). LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008).

In Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit held that "the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." Coan, 457 F.3d at 259. "[A]lthough plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

[14] By contrast, a "defined benefit plan" under ERISA "'conventional[ly] . . . credit[s] the employee with a specific percentage of salary for each year of employment.'" Hirt, 533 F.3d at 104-05 (quoting Esden v. Bank of Bos., 229 F.3d 154, 158 n.4 (2d Cir. 2000)).

in a 'representative capacity' properly for purposes of section 502(a)(2)." Id. at 261 (footnote omitted).

ii. **Application**

In arguing that the procedural safeguards applicable to representative claims under § 502(a)(2) preclude compelled arbitration of their claims, Plaintiffs must – of course – establish that they have actually asserted representative claims under § 502(a)(2).

As both Plaintiffs and Defendants recognize (Pltf. Opp. (Dkt. No. 72) at 21; Def. Reply Br. (Dkt. No. 69) at 9-10), "section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, requires plan fiduciaries '"to make good to such plan any losses to the plan"' resulting from a breach of fiduciary duty." Coan, 457 F.3d at 259 (quoting Russell, 473 U.S. at 140) (in turn quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added in Russell).

Here, the Amended Complaint seeks – pursuant to § 502(a)(2) – "the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) This type of claim is not properly brought under § 502(a)(2), however, because it is not a claim for "losses to the plan."

While "ERISA does not define 'loss' as that term is used in section 409," Donovan v. Bierwirth, 754 F.2d 1049, 1052 (2d Cir. 1985), "its draftsmen were primarily concerned with the possible misuse of plan assets." Russell, 473 U.S. at 142. "[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." Id. at 140 n.8. Accordingly, the case law indicates that "loss" is defined with reference to investment losses or other financial diminutions of plan assets that are attributable to a fiduciary's mismanagement. See Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir.

2016) ("'If, but for the breach, the plan would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.' Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'") (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989), and Donovan, 754 F.2d at 1056) (alteration omitted). And while the Supreme Court in LaRue held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches" with respect to individual accounts, its holding is limited to "fiduciary breaches that impair the value of plan assets in . . . [such] account[s]." LaRue, 552 U.S. at 256 (emphasis added).

Here, Plaintiffs have not alleged that the Compensation Committee – the alleged fiduciary – mismanaged plan assets or otherwise "impair[ed] [their] value" (LaRue, 552 U.S. at 256), such as by making imprudent or conflicted investment decisions, or by incurring unnecessary administrative costs.

Plaintiffs instead "seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) Any such forfeited compensation, however, would be equivalent to "the balance of [each] individual's account" – which ERISA defines as an "accrued benefit" in an "individual account plan." ERISA § 3(23), codified at 29 U.S.C. § 1002(23). The relief Plaintiffs seek in their § 502(a)(2) breach of fiduciary cause of action is thus redundant of their claim for benefits under § 502(a)(1), in which they seek to "recover their vested benefits [and] enforce their rights to the payment of their past vested benefits . . . after reformation [of the plan to comply with ERISA's anti-forfeiture rules]." (Am. Cmplt. (Dkt. No. 58) ¶ 107; see Russell, 473 U.S. at 147 (explaining that ERISA provides for "an action pursuant to § 502(a)(1)(B) to recover accrued benefits").

In L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc., 710 F.3d 57 (2d Cir. 2013), the Second Circuit observed that "a 'claim for benefits' under ERISA § 502(a)(1)(B)" is by definition distinct from "a claim for recovery of 'losses to the plan' caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and 409(a)." Id. at 66. L.I. Head Start cites with approval Chief Justice Roberts' concurring opinion in LaRue, in which he states that "[i]f LaRue may bring his claim under § 502(a)(1)(B), it is not clear that he may do so under § 502(a)(2) as well. . . . The significance of the distinction between a § 502(a)(1)(B) claim and one under § 502(a)(2) is not merely a matter of picking the right provision to cite in the complaint. Allowing a § 502(a)(1)(B) action to be recast as one under § 502(a)(2) might permit plaintiffs to circumvent safeguards for plan administrators that have developed under § 502(a)(1)(B)." LaRue, 552 U.S. at 258 (Roberts, C.J., concurring).

Moreover, other circuits have cautioned that plaintiffs may not use artful pleading to bring what are, in reality, § 502(a)(1) claims, under § 502(a)(2). See Stephens v. Pension Ben. Guar. Corp., 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) ("[The] exception to the exhaustion requirement [for § 502(a)(2) claims] does not embrace plan-based claims artfully dressed in statutory clothing, such as where a plaintiff seeks to avoid the exhaustion requirement [of § 502(a)(1)] by recharacterizing a claim for benefits as a claim for breach of fiduciary duty.") (quotation omitted); Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc., 102 F.3d 712, 714 (4th Cir. 1996) ("Although [plaintiff employer] directs our attention to sections 502(a)(2) and (a)(3), the analysis of who may recover benefits under ERISA must begin with section 502(a)(1)(B), the section which specifically provides a cause of action for benefits. [Plaintiff employer's] description of its claim as one for breach of [defendant] Blue Cross' fiduciary duty does not alter the fact that it is seeking medical benefits which it claims are owed

to [plaintiff's employee]. To permit the suit to proceed as a breach of fiduciary duty action would encourage parties to avoid the implications of section 502(a)(1)(B) by artful pleading; indeed every wrongful denial of benefits could be characterized as a breach of fiduciary duty under [plaintiff's] theory.") (emphasis in original).

The same reasoning applies here. The Amended Complaint's Third Cause of Action for breach of fiduciary duty is a disguised claim for benefits; while actually bringing a claim under § 502(a)(1)(B), Plaintiffs invoke the procedural safeguards associated with a claim under § 502(a)(2). But because Plaintiffs have not alleged "losses to the plan," they are not, in fact, proceeding in a representative capacity, and are therefore not entitled to the procedural safeguards available under § 502(a)(2).

In arguing that they have brought a § 502(a)(2) claim on behalf of the plans, and therefore cannot be compelled to arbitrate, Plaintiffs cite Cooper v. Ruane Cunniff & Goldfarb Inc., 990 F.3d 173 (2d Cir. 2021), Ferguson v. Ruane Cuniff & Goldfarb Inc., No. 17-CV-6685 (ALC), 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), Hawkins v. Cintas Corp., 32 F.4th 625 (6th Cir. 2022), and Munro v. U.S.C., 896 F.3d 1088 (9th Cir. 2018). (Pltf. Opp. (Dkt. No. 72) at 16, 18)

In Cooper, the Second Circuit reversed a district court order granting defendant's motion to compel arbitration of an employee's breach of fiduciary duty claim. That claim had been brought on behalf of a class of plan participants regarding the "catastrophic over-allocation of Plan assets" to a single company's stock. The motion to compel arbitration was premised on an arbitration provision in an employee handbook that (1) applied to "all legal claims arising out of or relating to employment," and (2) "prohibit[ed] joinder of multiple parties and class or collective actions." Cooper, 990 F.3d at 177-78, 184. While the Second Circuit disagreed with

the district court's interpretation of the phrase "relating to employment" and reversed on that basis (id. at 180-84), the Circuit went on to state in dicta that the defendant's "[broad] reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the Coan representative adequacy requirement." Id. at 184 (citing Coan, 457 F.3d at 261).

In Ferguson, the court applied the dicta in Cooper and, on that basis, rejected arbitration claimants' objections to certification of a settlement class regarding the same claims, made against the same third-party benefits administrator as in Cooper, even though the plan documents in Ferguson themselves – rather than an employee handbook – contained the arbitration provision. Ferguson, 2021 WL 3667979, at *3-4.

In Hawkins, plaintiff employees brought a putative class action, alleging that plan fiduciaries had breached the duty of loyalty and the duty of prudence by "offer[ing] participants the ability to invest only in actively managed funds, rather than more cost-effective passively managed funds[,] . . . [and by] charg[ing] the Plan imprudently expensive recordkeeping fees." Hawkins, 32 F.4th at 628. And in Munro, plaintiff employees, "as representatives of a class of participants and beneficiaries of the Plans," alleged that defendant plan administrators had "squandered [their negotiating] leverage by allowing the Plans' conflicted third party service providers – TIAA-CREF, Vanguard, Fidelity, and Prudential – to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products." Munro v. U.S.C., 16 Civ. 6191, Am. Cmplt. (Dkt. No. 40) ¶¶ 4-5 (C.D. Cal. Nov. 17, 2016). In these cases the Sixth and Ninth Circuits, respectively, held that plaintiffs could not be compelled to arbitrate based on arbitration provisions in their individual employment agreements, because

their breach of fiduciary claims "should be thought of as Plan claims, not [p]laintiffs' claims. And because the arbitration provisions only establish the [p]laintiffs' consent to arbitration, the employment agreements do not subject these claims to arbitration." Hawkins, 32 F.4th at 635; accord Munro, 896 F.3d at 1094.

These cases do not support Plaintiffs' arguments, because they involve significantly different factual circumstances. As described above, Cooper, Ferguson, Hawkins, and Munro all involve mismanagement of plan assets – i.e., straightforward "losses to the plan." Given these circumstances, plaintiffs properly raised claims under § 502(a)(2), and benefitted from the procedural safeguards available under that statutory provision. As discussed above, however, those procedural safeguards are not available to Plaintiffs, who have brought a disguised claim for recovery of benefits, rather than a true § 502(a)(2) claim. Cf. Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *5 (S.D.N.Y. Mar. 30, 2007) ("[a] court's . . . inquiry ultimately must focus on the factual nature of the claims rather than the . . . label that has been applied by the plaintiff") (quotation omitted).[15]

[15] Plaintiffs have also not alleged a "breach[] [of] any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), codified at 29 U.S.C. § 1109(a). Although the Amended Complaint alleges that "[t]he Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA" (Am. Cmplt. (Dkt. No. 58) ¶ 113), "'[t]rustees do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions, but rather, where the trustee fails to discharge one or more of the duties described in 29 U.S.C. § 1104.' 'The proposition that a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA, while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.'" Roe v. Empire Blue Cross Blue Shield, No. 12-CV-04788 NSR, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) (quoting Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2005)) (alterations omitted), aff'd, 589 F.

Having failed to allege a true § 502(a)(2) claim, Plaintiffs will not be heard to complain that claims under § 502(a)(2) are non-arbitrable.

b. **ERISA § 502(a)(3) Claims for Equitable Relief**

ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Amended Complaint asserts § 502(a)(3) claims in the first and second causes of action. In the First Cause of Action,

> Plaintiffs seek a declaration that the [Financial Advisor] Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).
>
> Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:
>
> a. A declaration that the [Financial Advisor] Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;
>
> b. An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;
>
> c. Surcharge;
>
> d. An "accounting" of all deferred compensation wrongfully withheld from [financial advisors] because of the Cancellation Rule;
>
> e. Disgorgement of all amounts wrongfully withheld;

---

App'x 8 (2d Cir. 2014). Plaintiffs' failure to identify any fiduciary duty that the Compensation Committee breached supports this Court's conclusion that they have not brought a true § 502(a)(2) claim.

f. Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

g. A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

h. An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

i. All other relief the Court determines is just and proper under its equitable powers.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 98-101)

In the Second Cause of Action, Plaintiffs assert that they and the putative class "are entitled to reformation of the [Financial Advisor] Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a)." (Id. ¶ 105) As discussed above, the requested reformation is a prelude to recovery of benefits from the reformed plan under § 502(a)(1). (Id. ¶¶ 106-07)

Plaintiffs argue that they "assert claims in a representative capacity under ERISA § 502(a)(3)," and "[t]hese representative claims should not be litigated in individual arbitrations." (Pltf. Opp. (Dkt. No. 72) at 16-18)

The case law does not support Plaintiffs' assertion that (1) § 502(a)(3) claims must be brought on behalf of a plan, or (2) it is unlawful to compel individual arbitration of such claims. To the contrary, the Supreme Court has held that – in contrast to § 502(a)(2) breach of fiduciary duty claims – "§ 502(a)(3) authorizes . . . lawsuit[s] for individual relief." Varity, 516 U.S. at 507. And the case law indicates that plaintiffs who bring putative class actions alleging § 502(a)(3) claims may nevertheless be required to arbitrate their claims individually. See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *10 (E.D.N.Y. Sept. 30, 2023) (granting motion to compel arbitration of § 502(a)(3) claims brought

by plaintiffs on behalf of a putative class; stating that "the concerns [regarding procedural safeguards for § 502(a)(2) claims] do not apply").

Plaintiffs cite no case demonstrating that § 502(a)(3) claims are non-arbitrable. At best, Plaintiffs have cited case law stating that § 502(a)(3) claims are not inherently limited to individual relief. See Banyai v. Mazur, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) ("[N]othing suggests that section 502(a)(3) authorizes only individual relief, thereby precluding suits seeking 'other appropriate equitable relief' – on behalf of the plan – against non-fiduciaries.") (emphasis in original).[16]

In sum, Plaintiffs have not demonstrated that their § 502(a)(3) claims are non-arbitrable.

c. **Whether Arbitration Would Void Statutory Rights**

The Supreme Court has held that courts cannot compel arbitration when enforcing an arbitration clause would entail a "prospective waiver of a party's right to pursue statutory remedies." Italian Colors, 570 U.S. at 229 (quotation omitted).

Under the prospective waiver doctrine, courts have denied motions to compel arbitration where the arbitration provision at issue contains limitations on remedies that are inconsistent with ERISA. See, e.g., Lloyd v. Argent Tr. Co., No. 22CV4129 (DLC), 2022 WL 17542071, at *3 (S.D.N.Y. Dec. 6, 2022) ("The Plan states that . . . arbitration cannot provide

---

[16] Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) – also cited by Plaintiffs (Pltf. Opp. (Dkt. No. 72) at 17) – is not on point. In Browe, the Second Circuit considered a district court post-bench trial opinion addressing, inter alia, § 502(a)(3) claims. Browe, 15 F.4th at 188-89. The court ordered the disbursement of an award on remand, and directed the district court to "include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled." Id. at 206. Plaintiffs contend that this direction is an example of a plan-wide application of § 502(a)(3) relief. (Pltf. Opp. (Dkt. No. 72) at 17) The portion of Browe cited by Plaintiffs does not address § 502(a)(3), however, and it is thus not clear that § 502(a)(3) was the statutory basis for the disbursement. See Browe, 15 F.4th at 206.

'any remedy which has the purpose or effect of providing additional benefits or monetary relief to any other Employee, Participant, or Beneficiary other than the Claimant.' . . . This provision imposes a limitation on relief that ERISA does not contain, and precludes remedies that ERISA expressly authorizes, such as the removal of a fiduciary."); Cedeno v. Argent Tr. Co., No. 20-CV-9987 (JGK), 2021 WL 5087898, at *2 (S.D.N.Y. Nov. 2, 2021) (same).

Prohibiting class treatment does not inherently limit statutory remedies, however, because class treatment is a procedural matter, and not a substantive right. See Smith v. Bd. of Directors of Triad Mfg., 13 F.4th 613, 622 (7th Cir. 2021) ("[T]he problem with the plan's arbitration provision is its prohibition on certain plan-wide remedies, not plan-wide representation. It is not that the plan funnels its participants away from class actions."); Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408 (2010) (plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.").[17]

Here, Plaintiffs argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA." (Pltf. Opp. (Dkt. No. 72) at 21) Plaintiffs have not

[17] To the extent that "the Second Circuit's opinion in Cooper indicates that the ability to bring a representative action is a 'statutory right' that an arbitration agreement cannot override," Lloyd, 2022 WL 17542071, at *4 (citing Cooper, 990 F.3d at 184), that is the result of Coan's requirement – reiterated in Cooper – that in § 502(a)(2) cases "'plan participants must employ procedures to protect effectively the interests they purport to represent.'" Cooper, 990 F.3d at 184 (quoting Coan, 457 F.3d at 259). As explained above, Coan's procedural requirements are not at issue here, because Plaintiffs have not brought a claim for "losses to the plan," as required by § 502(a)(2). See Duke, 2023 WL 6385389, at *10 (holding that concerns regarding compelling arbitration of § 502(a)(2) claims do not apply in the § 502(a)(3) context).

identified any limitation on remedies that would apply in an arbitration, however, other than the class waiver. Moreover, the arbitration provisions in the Bonus Agreement and CARE Program Arbitration Agreement provide that "[a]rbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction." (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(g); see CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 5(d) (same)) Accordingly, Plaintiffs have not demonstrated that the prospective waiver doctrine applies.

* * * *

For the reasons stated above, Plaintiffs have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed.[18]

[18] Plaintiffs argue that "[i]ndividual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants." (Pltf. Opp. (Dkt. No. 72) at 24) But this argument is foreclosed by the Second Circuit's decision in Bird. See Bird, 926 F.2d at 122 ("We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.").

## CONCLUSION

Defendants' motion to compel arbitration (Dkt. No. 65) is granted. Because "the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), the case will be stayed pending arbitration.

The Clerk of Court is directed to terminate the motion (Dkt. No. 65).

Dated: New York, New York
November 21, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,

Defendants.

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 11047 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action, Plaintiffs assert that Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development and Succession Committee (the "Compensation Committee"), and certain unnamed members of the Compensation Committee (together, "Morgan Stanley," or the "Bank"), violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying Plaintiffs all of their deferred compensation when they left their financial advisor positions at Morgan Stanley.

On November 21, 2023, this Court issued a Memorandum Opinion & Order granting Defendants' motion to compel arbitration and stay the proceedings pending the outcome of arbitration. Shafer v. Morgan Stanley, No. 20 CIV. 11047(PGG), 2023 WL 8100717, at *1

(S.D.N.Y. Nov. 21, 2023) (the "Opinion"). In granting Defendants' motion, this Court addressed and resolved the parties' dispute as to whether the deferred compensation programs at issue are covered by ERISA. See, e.g., Am. Cmplt. (Dkt. No. 58) ¶ 3 ("The [Morgan Stanley financial advisors'] Deferred Compensation Program is an 'employee benefit pension plan' under ERISA because it 'results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.'"); Pltf. MTCA Opp. (Dkt. No. 72) at 7 ("[t]he [Financial Advisor] Deferred Compensation Program . . . is an ERISA plan"); Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) (contending that the deferred compensation programs at issue are not covered by ERISA) The Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." Shafer, 2023 WL 8100717, at *20.

On December 5, 2023, Defendants – who prevailed on their motion to compel arbitration – moved for "reconsideration and/or clarification" of this Court's determination that Morgan Stanley's deferred compensation programs are covered by ERISA. (Dkt. No. 87)

For the reasons stated below, Defendants' motion for reconsideration or clarification will be denied.

## BACKGROUND[1]

## I. FACTS

### A. Financial Advisor Compensation at Morgan Stanley

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney. They "reside throughout the country and worked for the Bank at various times between 1994 and

[1] This Court assumes familiarity with the facts of this case, which are set forth in greater detail in this Court's Opinion granting Defendants' motion to compel arbitration. See Shafer, 2023 WL 8100717, at *1-7.

2020." Shafer, 2023 WL 8100717, at *1 (citing Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16))

As set forth in the Opinion, Morgan Stanley's compensation program for financial advisors includes both salary and incentive compensation:

> "All Advisors . . . receive a guaranteed monthly salary. Total compensation in any month will not be lower than the applicable monthly salary by state." ([2018 Financial Advisor Compensation Plan (Dkt. No. 83-2)] § 1.1) As of 2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per year. (Id. § 1.1)
>
> Incentive compensation is based on the "Total Credits" that a financial advisor is awarded monthly. (Id. § 1.2.1) "The Advisor's Total Credits for each month [are] determined based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with "(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" – "multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)
>
> Incentive compensation is further divided between (1) "Cash Credits," which are "calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and (2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–1.2.3) The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5% (for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue increases. (Id. §§ 1.2.2–1.2.3)

Id. (citing 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[2]

Morgan Stanley's 2018 Financial Advisor Compensation Plan provides the following example of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
>
> • Credit Rate is 44.0%

[2] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

• Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]

• Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]

• Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

Id. (quoting 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred compensation paid out years after it is earned. The Deferred Credits are administered in the following manner:

> "Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of Morgan Stanley common stock approximately four years from the grant date" (the "Equity Incentive Plan"). (Id. § 1.2.2) "[S]eventy-five percent of the cumulative monthly Deferred Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. § 1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive Compensation Plan Document (Dkt. No. 83-8)) The Compensation Committee administers both plans. (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 5(a))
>
> "[Financial advisors] have individual, notional accounts in the [Compensation Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred compensation. [Financial advisors] can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments." (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 1)) As to vesting under the Equity Incentive Plan, "a Stock Unit will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to the Fair Market Value on the payment date of one Share." (Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 8)

Id. at 2-3.

For both the Compensation Incentive Plan and the Equity Incentive Plan, the deferred compensation awards are "'contingent upon the Advisor remaining employed through the grant and vesting dates of the award.'" Id. at 3 (quoting 2018 Financial Advisor

Compensation Plan (Dkt. No. 83-2) § 1.2.2) Plaintiffs refer to this policy as the "Cancellation Rule." Id. at 3 (quoting Am. Cmplt. (Dkt. No. 58) passim).

There are several exceptions to the Cancellation Rule:

> Deferred cash compensation and deferred equity compensation both vest after employment if the financial advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e., "termination of . . . [e]mployment ... for any reason other than under circumstances involving any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for] [g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" – i.e., layoffs; or (4) departure for governmental service. (2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

Shafer, 2023 WL 8100717, at *3.

Subject to the exception for involuntary termination,

> "enter[ing] into an employment or consulting relationship with a firm offering Competitive Services" constitutes "Prohibited Activity." Accordingly, a long-tenured financial advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm is not eligible for the "full career retirement" exception to the Cancellation Rule. (2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

Id.

Defendants contend that "[t]he principal purposes of the [deferred compensation] awards are to 'reward [advisors] for [their] continued Employment and service to the Firm in the future and [their] compliance with the Firm's policies (including the Code of Conduct)' – that is, to promote retention and good conduct." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2 (second brackets added; remaining brackets in original) (quoting 2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) at 2))

## II. PROCEDURAL HISTORY

### A. The Amended Complaint

The Amended Complaint was filed on March 24, 2022, and asserts claims for (1) declaratory and equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Amended Cmplt. (Dkt. No. 58) ¶¶ 98-101); (2) "reformation of the [Financial Advisor] Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA § 502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (id. ¶¶ 102-07); and (3) "breach of fiduciary duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the [Equity Incentive Plan]," pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3). (Id. ¶¶ 108-17 (capitalization altered))

The Amended Complaint pleads extensive allegations in support of Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA:

> ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). An "employee benefit pension plan" is:
>
> > any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances such plan, fund, or program—
> >
> > > (i) provides retirement income to employees, **or**
> > >
> > > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
> >
> > regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
>
> ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (emphasis added).

(Am. Cmplt. (Dkt. No. 58) ¶ 53) (emphasis in Amended Complaint)

> Subsections (i) and (ii) in Section 3(2)(A) of ERISA "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." Pasternack v. Schrader, 863 F.3d 162, 168 (2d Cir. 2017); see also Tolbert v. RBC Capital Markets Corp., 758 F.3d 619, 624 (5th Cir. 2014) ("The plain language of

the statute makes clear that subsection (ii) is separate and distinct from subsection (i)."). The second of these two independent tests – whether a "plan, fund or program" "results in a deferral of income" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii) – is "an effects-based inquiry rather than one based on purpose." Pasternack, 863 F.3d at 170, n.5.

(Id. ¶ 59)

The [Financial Advisor] Deferred Compensation Program results in a deferral of FAs' income. The first portion of an FA's Total Credits are designated as Deferred Credits, which the FA receives years later through either the [Morgan Stanley Compensation Incentive Plan] or [Equity Incentive Compensation Plan]. FAs receive their remaining Total Credits, i.e., their Cash Credits, at the end of the next month as cash compensation. In other words, FAs defer the first portion of their compensation, instead of receiving it right away in cash.

(Id. ¶ 60)

The terms of the [Financial Advisor] Compensation Plan demonstrate that FAs defer part of their income. The Plan section titled "Deferred Compensation" describes how FAs earn "deferred compensation awards" by generating revenue. FA Compensation Plan at § 1.2.2. While ERISA does not define the phrase "deferral of income," it has the same meaning as "deferred compensation." See, e.g., Tolbert, 758 F.3d at 625. Accordingly, "by its express terms," Morgan Stanley's compensation program for FAs "results in a deferral of income." See, e.g., id. at 625-26 (plan covered by ERISA because it "contain[ed] provisions for both Voluntary Deferred Case Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred."); Wilson v. Safelite Group, Inc., 930 F.3d 429, 434 (6th Cir. 2019) (ERISA applied "when a deferral of income by employees . . . arises as an effect, issue, or outcome from' the provisions of that plan.").

(Id. ¶ 61)

In addition, Morgan Stanley describes the [Morgan Stanley Compensation Incentive Plan] and [Equity Incentive Compensation Plan] as "Deferred Compensation Plans" in its audited financial statements. Morgan Stanley Form 10-K for YE Dec. 31, 2019, at 137-38. Likewise, [Morgan Stanley Smith Barney] describes the [Morgan Stanley Compensation Incentive Plan] and [Equity Incentive Compensation Plan] as "Deferred Compensation Plans" in its financial statements. MSSB Consolidated Statement of Financial Condition as of June 30, 2020, at 4-5.

(Id. ¶ 62)

These descriptions are consistent with the dictionary definition of "deferred compensation" as (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed

> when received or distributed rather than when earned. . . ." BLACK'S LAW DICTIONARY (11th ed. 2019). Here, FAs defer part of their compensation for work performed (by generating revenue) until a later date and do not pay taxes on this compensation until it is distributed. 2018 FA Compensation Plan at 4; MSCIP Plan Document at § 11; EICP Plan Document at § 16(a). . . .

(Id. ¶ 63)

> The FA Deferred Compensation Program results in FAs deferring income "for periods extending to the end of covered employment or beyond." ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii). The phrase "end of covered employment" refers to when an employee stops working for a company. Wilson, 930 F.3d at 435.

(Id. § 64)

> A plan need **not** require employees to defer income until "the end of covered employment or beyond" in order to be governed by ERISA. Wilson, 930 F.3d at 434. ERISA "covers plans containing terms that have as an effect, issue, or outcome – even if not a requirement – deferral of income by employees extending to the termination of covered employment or beyond." Id. at 435. As the court explained in Wilson,
>
> > Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in service distributions.

(Id. ¶ 65) (emphasis in original)

> The FA Deferred Compensation Program contains several provisions that contemplate FAs receiving their deferred compensation at or after the end of their employment with Morgan Stanley.

(Id. ¶ 66)

> FAs whose employment ends because of a Disability, Involuntary Termination, Retirement, or Full Career Retirement **still receive their deferred compensation** on the Scheduled Distribution Date under the [Morgan Stanley Compensation Incentive Plan] and on the Scheduled Vesting Date under the [Equity Incentive Compensation Plan] – both of which occur after their employment with Morgan Stanley has ended. Meanwhile, FAs who qualify for a Government Service Termination receive their deferred compensation when they leave Morgan Stanley. Thus, "by design," Tolbert, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," Wilson, 930 F.3d at 434, Morgan

> Stanley pays FAs their deferred compensation on or after their termination of employment.

(Id. ¶ 67) (emphasis in original)

**B. Defendants' Motion to Compel Arbitration**

On May 9, 2022, Defendants moved to compel arbitration and for a stay of the proceedings. (Dkt. No. 65)

In opposing Defendants' motion, Plaintiffs argued that "[t]he [Financial Advisor] Deferred Compensation Program . . . is an ERISA plan" (Pltf. MTCA Opp. (Dkt. No. 72) at 7), and that compelling Plaintiffs to arbitrate their claims would violate their rights under ERISA. For example, Plaintiffs argued that (1) their "claims under ERISA § 502(a)(2) can be brought only in a representative capacity on behalf of the plan," and therefore "these claims must proceed in court under the terms of the arbitration provisions, which prohibit the arbitration of representative actions" (id. at 16) (citation omitted); (2) "Plaintiffs' § 502(a)(2) claims 'belong' to the FA Deferred Compensation Program," which "never agreed to arbitrate them" (id. at 18); and (3) the "arbitration agreements are unenforceable as 'prospective waiver[s] of a party's right to pursue statutory remedies' under ERISA § 502." (Id. at 21)

In their June 29, 2022 reply brief, Defendants did not directly respond to Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA. (Dkt. No. 69) Defendants instead argued that compelled arbitration would not violate any of Plaintiffs' rights under ERISA. For example, Defendants argued that "plaintiffs do not actually bring [their ERISA] claims in a representative capacity," because "plaintiffs seek the recovery of alleged benefits that were not paid to them, and their claims 'fall[] comfortably within the scope of [ERISA] § 502(a)(1)(B), which allows a plan participant to recover benefits due to him.'" (Def. MTCA Reply (Dkt. No. 69) at 9-10 (emphasis in original) (quoting

Frommert v. Conkright, 433 F.3d 254, 270 (2d Cir. 2006))) Defendants similarly argued that it is irrelevant that "'the plan itself never agreed to arbitrate' [Plaintiffs'] claims,'" because "the plan need not agree to arbitrate claims that plaintiffs bring on their own behalf." (Id. at 10 (quoting Pltf. MTCA Opp. (Dkt. No. 72) at 18)) Finally, Defendants argued that because Plaintiffs "can obtain complete relief, if any, through their individual claims for benefits," "[a]rbitration of plaintiffs' claims . . . does not frustrate anyone's ability to obtain any ERISA remedy that they may be due." (Id. at 11) (emphasis in original)

While Defendants did not directly address Plaintiffs' claim that the Morgan Stanley deferred compensation programs are covered by ERISA, they also did not invite the Court to assume – for purposes of deciding the motion to compel arbitration – that Morgan Stanley's deferred compensation programs are covered by ERISA.

In a September 15, 2023 order, this Court stated that because "[t]he parties' briefing [in connection with Defendants' motion to compel arbitration] does not adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan," the parties would submit supplemental briefing by September 20, 2023 addressing "whether Plaintiffs' allegations that, in certain scenarios, some financial analysts receive their scheduled payouts after their employment with Morgan Stanley ends demonstrates that the deferred compensation program is an ERISA plan." (Sept. 15, 2023 Order (Dkt. No. 82) at 2)

On September 20, 2023, the parties filed supplemental briefing addressing whether Morgan Stanley's deferred compensation programs are covered by ERISA. Plaintiffs argued that Defendants' deferred compensation programs were covered by ERISA (Sept. 20, 2023 Pltf. Ltr. (Dkt. No. 84)), while Defendants argued that they were not. (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85))

### C. The November 21, 2023 Memorandum Opinion & Order

In the November 21, 2023 Opinion, the Court granted Defendant's motion to compel arbitration. Shafer, 2023 WL 8100717, at *1.

The Court began its analysis by considering whether the parties had entered into valid agreements to arbitrate. Id. at *9-14. While Plaintiffs conceded that they had entered into agreements that provided for arbitration of claims arising out of Morgan Stanley's deferred compensation programs, Plaintiffs asserted that they had

> brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable. According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21 (quoting Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

Id. at 15.

This Court found that "[b]ecause the arbitration provisions provide that the validity of the class action waivers must be determined by a court, . . . this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator." Id. at 15 n.11. And in order to decide whether the claims asserted in the Amended Complaint are subject to arbitration, this Court concluded that it "must first determine whether (1) the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so, whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged ERISA plan and/or would be contrary to ERISA." Id.

This Court went on to conclude that while "Morgan Stanley's deferred compensation programs are ERISA plans," Plaintiffs "have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed." Id. at 20, 29.

In concluding that Morgan Stanley's deferred compensation programs are ERISA plans, this Court surveyed the applicable law regarding ERISA's definition of "pension plan" in 29 U.S.C. § 1002(2)(a), as well as the U.S. Department of Labor's treatment of "[b]onus program[s]" in 29 C.F.R. § 2510.3-2(c). See id. at *16-18. This Court also addressed Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), and Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), in which the Fifth and Sixth Circuits find that deferred compensation programs similar to those at issue here are covered by ERISA. See id. After surveying the applicable statutory, regulatory, and case law authority, this Court concluded that

> the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan. If it is, a court must consider both the plan's purpose and whether deferral of income is systematic. If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

Id. at 18.

This Court went on to find that Morgan Stanley's deferred compensation program is not a "bonus program," because

> Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission." See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation").
>
> Courts generally treat these two types of compensation as distinct. See Smith v. Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in

Case 1:20-cv-11047-PGG Document 99 Filed 11/05/24 Page 13 of 34

ERISA action, concluding that employee benefits committee did not "err[ ] in deciding that commissions are not bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v. Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

Id. at 19.

This Court next concluded that Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond" under 29 U.S.C. § 1002(2)(A)(ii):

"Although [ERISA] do[es] not define 'deferral of income' or 'deferred compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either: (1) '[p]ayment for work performed, to be paid in the future or when some future event occurs,' or (2) 'an employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan.'" Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017) (quoting Deferred Compensation, Black's Law Dictionary (10th ed. 2014)). And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan." Tolbert, 758 F.3d at 625 (quoting [Burrage v. United States, 571 U.S. 204, 210, (2014)]).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs

> (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, Morgan Stanley's deferred compensation programs "result[ ] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Id. § 3(2)(A)(ii).
>
> And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" [Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980))], application of ERISA in these circumstances does not unreasonably expand the reach of the Act. Although Plaintiffs in the instant case – unlike plaintiffs in Tolbert and Wilson – cannot elect post-employment vesting, disability, retirement, layoff, and government service are not unusual means by which workers leave their employment. And nothing in the record suggests that post-employment deferred compensation payments are rare.
>
> Defendants argue, however, that Plaintiffs did not earn payments under the Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments, because financial advisors "have no right to payment until and unless they remain employed at vesting – a condition [P]laintiffs [did not] meet." (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4) Defendants thus argue that "Morgan Stanley's program does not entail any 'deferral of income by employees.'" (Id. at 4 (emphasis in original)) This argument is not persuasive, because it exalts form over substance. Whenever an action (here, leaving Morgan Stanley's employ) results in the forfeiture of a contractual right, those facts can always be recharacterized by stating that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to the performance of the contract.

Id. at 19-20.

For these reasons, this Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." Id. at 20.

### D. Defendants' Motion for Reconsideration and/or Clarification

On December 5, 2023, Defendants moved for "reconsideration and/or clarification" of this Court's determination that Morgan Stanley's deferred compensation

programs are ERISA plans. (Dkt. No. 87) Plaintiffs filed an opposition brief on January 9, 2024 (Dkt. No. 91), and Defendants filed a reply brief on January 30, 2024. (Dkt. No. 92)

In an April 2, 2024 letter, Defendants seek expedited resolution of their motion and request that this Court consider supplementary evidence from recently concluded ERISA arbitration proceedings involving Defendants. (April 2, 2024 Def. Ltr. (Dkt. No. 93) at 1) Plaintiffs filed an April 5, 2024 letter opposing both requests. (April 5, 2024 Pltf. Ltr. (Dkt. No. 95))[3]

## DISCUSSION

## I. MOTION FOR CLARIFICATION

In their motion, Defendants ask this Court to "clarify" that the Opinion "decide[s] only the arbitrability issue presented by [Defendants'] motion to compel, and that the question whether ERISA applies to Morgan Stanley's deferred compensation program can and must be decided by the arbitration panel." (Def. Reconsid. Br. (Dkt. No. 88) at 10)

While "'there is no Federal Rule of Civil Procedure specifically governing 'motions for clarification,'" Nortek Inc. v. ITT LLC, No. 21-CV-03999 (PMH), 2022 WL 2657189, at *1 (S.D.N.Y. July 8, 2022) (quoting United States v. Timmons Corp., No. 03-CV-00951, 2017 WL 11237145, at *7 (N.D.N.Y. Sept. 20, 2017)), "[c]larifications of previously issued orders 'add certainty to an implicated party's efforts to comply with the order and provide fair warning as to what future conduct may be found contemptuous,' and 'may be obtained on motion or made sua sponte by the court.'" Jones v. United States Postal Serv., No. 20 CIV. 6516

---

[3] On May 24, 2024, Defendants filed a petition for a writ of mandamus with the Second Circuit, seeking an order directing this Court to, inter alia, rule on their motion for reconsideration. On August 27, 2024, the Second Circuit denied Defendant's mandamus petition "without prejudice to renewal if the district court fails to act on the reconsideration motion within a reasonable time." (Aug. 27, 2024 2d Cir. Order (Dkt. No. 97))

(VM), 2020 WL 6554904, at *5 (S.D.N.Y. Sept. 29, 2020) (quoting N.A. Sales Co. v. Chapman Indus. Corp., 736 F.2d 854, 858 (2d Cir. 1984)). However, "a motion for clarification is not intended to alter or change a court's order, but merely to resolve alleged ambiguities in that order." Metcalf v. Yale Univ., No. 15-CV-1696 (VAB), 2019 WL 1767411, at *2 (D. Conn. Jan. 4, 2019)); see Deutsche Bank Nat'l Tr. Co. v. WMC Mortg., LLC, No. 12-CV-1699-CSH, 2015 WL 11237310, at *6 (D. Conn. July 6, 2015) ("A clarification motion asks the Court: 'What did you mean to say?' A reconsideration motion says to the Court: 'We know what you said. It is wrong. Change it.'").

Here, there is no ambiguity to "clarify." After an extensive discussion of the relevant language in the plan documents and the applicable case law, this Court concluded that "Morgan Stanley's deferred compensation programs are ERISA plans." Shafer, 2023 WL 8100717, at *20.

To the extent that Defendants seek clarification as to whether this Court's decision will have preclusive effect in subsequent proceedings regarding Morgan Stanley's deferred compensation programs, that subject "is better suited to be addressed in any subsequent litigation where the issue arises." RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 316 (2d Cir. 2003).

Accordingly, Defendants' motion for clarification will be denied.

## II. MOTION FOR RECONSIDERATION

### A. Legal Standard

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court." Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012). "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of

scarce judicial resources.'" RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citations and quotation marks omitted)). "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." Davidson v. Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001).

"The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478). "To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

"[Local] Rule 6.3 is intended to '"ensure the finality of decisions and to prevent the practice of a losing party . . . plugging the gaps of a lost motion with additional matters."'" Id. (second alteration in original) (quoting S.E.C. v. Ashbury Capital Partners, L.P., No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting Carolco Pictures, Inc. v. Sirota, 700 F. Supp. 169, 170 (S.D.N.Y. 1988))). "A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment." Id.

**B. Analysis**

In seeking reconsideration, Defendants contend that this Court erred in ruling that Morgan Stanley's deferred compensation programs are covered by ERISA, because (1) the applicability of ERISA was "unnecessary to the Court's decision"; (2) the Court's resolution of this issue violates "the principle of party presentation," given that Defendants had not asked for a ruling on this issue; (3) the decision regarding the applicability of ERISA is "beyond the Court's authority" under the Federal Arbitration Act ("FAA"); and (4) the issue is "fact-specific" and "must be decided based on a developed record and dedicated briefing." (Def. Reconsid. Br. (Dkt. No. 88) at 15-25) Defendants also contend that this Court's ruling regarding the applicability of ERISA "reflects clear errors that warrant reconsideration." (Id. at 15-31)

This Court addresses each of Defendants' arguments below.

**1. Whether it Was Necessary for the Court to Resolve the ERISA Coverage Issue**

Defendants contend that it was unnecessary for this Court to decide the ERISA coverage issue, given the Court's later determination that Plaintiffs "do not assert any genuinely representative claims [under ERISA] or seek any uniquely classwide relief." According to Defendants, this Court "should [have] . . . simply assum[ed] that the [Morgan Stanley deferred compensation] program[s] [are] ERISA plan[s] and [then] ask[ed] whether plaintiffs could . . . avoid arbitration on any of their asserted grounds." (Def. Reconsid. Br. (Dkt. No. 88) at 16)

Through three rounds of briefing concerning their motion to compel arbitration, however, Defendants never suggested that this Court should assume – for purposes of their motion to compel arbitration – that ERISA applied to their deferred compensation programs. To the contrary, Defendants asked this Court to rule that their deferred compensation programs were not covered by ERISA. See, e.g., Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2) ("Plaintiffs cannot

claim their unvested, cancelled deferred compensation is an unpaid ERISA benefit, because ERISA has no application to this program at all.").

Indeed, the issue of ERISA coverage was squarely posed by the parties' briefing, because Plaintiffs' arguments opposing Defendants' motion were premised on their claim – repeatedly pled in the Amended Complaint (see Am. Cmplt. (Dkt. No. 58) ¶¶ 3-4, 53-67) – that Morgan Stanley's deferred compensation programs are ERISA plans. Plaintiff's ERISA-based arguments include the following: that (1) Plaintiffs' claims under ERISA § 502(a)(2) are brought in a representative capacity and therefore are not subject to arbitration under the terms of the arbitration agreements; (2) in the alleged ERISA plan documents there is no agreement to arbitrate claims; and (3) the arbitration agreements are unenforceable as "'prospective waiver[s] of a party's right to pursue statutory remedies'" under ERISA. (Pltf. MTCA Opp. (Dkt. No. 72) at 16, 18, 21)

In sum, in order to rule on the enforceability of the arbitration provisions on which Defendants rely, this Court had to determine (1) whether ERISA applies to Plaintiffs' claims – i.e., whether Morgan Stanley's deferred compensation programs are indeed ERISA plans; and (2) if so, whether arbitration of Plaintiffs' claims would be contrary to ERISA. See Shafer, 2023 WL 8100717, at *15 & n.11. Ruling on the first of those questions – whether the deferred compensation programs are covered by ERISA – was necessary, because if Morgan Stanley's deferred compensation programs are not covered by ERISA, Plaintiffs' arguments to avoid arbitration fail, and there would be no need to reach the second issue – whether arbitration of Plaintiffs' claims would be contrary to ERISA.

In any event, Defendants never suggested that this Court should assume – for purposes of resolving their motion to compel arbitration – that their deferred compensation

programs are ERISA plans. To the contrary, Defendants denied that their deferred compensation programs are covered by ERISA. Having chosen to litigate ERISA coverage on the merits, Defendants will not be heard to complain that this Court ruled on the merits arguments they chose to make.

**2. Whether this Court Violated the Principle of Party Presentation**

Defendants contend that this Court committed "clear error" in deciding the ERISA coverage question, because in doing so it violated "'the principle of party presentation.'" (Def. Reconsid. Br. (Dkt. No. 88) at 20) (quoting Greenlaw v. United States, 554 U.S. 237, 243 (2008)) According to Defendants, in "[n]one of the nine filings on Morgan Stanley's motion [did it] ask[] the Court to decide whether the program really is an ERISA plan." (Id.)

This argument is both disingenuous and incorrect. As discussed above, several of Plaintiffs' arguments in opposition to the motion to compel arbitration turn on the applicability of ERISA. And, as discussed above, Defendants never asked this Court to assume that their deferred compensation programs are ERISA plans. Indeed, they vigorously argued that their deferred compensation programs are not ERISA plans. (See, e.g., Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2) And the Opinion addresses at length Defendants' arguments as to ERISA's applicability. See Shafer, 2023 WL 8100717, at *15-20.[4]

[4] Defendants also complain that it was a "manifest injustice" for this Court to decide the ERISA coverage question on the basis of "five pages" of supplementary briefing, which the Court directed be submitted "on five days' notice." (Def. Reconsid. Br. (Dkt. No. 88) at 24-25) This argument is likewise both disingenuous and incorrect. The issue of ERISA's applicability to Defendants' deferred compensation programs has been front and center since this lawsuit was filed in 2020. The Complaint alleges three ERISA-based claims and repeatedly asserts that Defendants' deferred compensation programs are covered by ERISA. (Am. Cmplt. (Dkt. No. 58) ¶¶ 3-4, 53-67) In opposing the motion to compel arbitration, Plaintiffs repeatedly argued that granting the motion would violate ERISA. (Pltf. MTCA Opp. (Dkt. No. 72) at 16, 18, 21) In sum, Defendants were on notice of the ERISA coverage issue from the outset of this action and chose not to properly brief it, which is what led to the Court's order (Dkt. No. 82) directing that

Case 1:20-cv-11047-PGG Document 99 Filed 11/05/24 Page 21 of 34

Given these circumstances, this Court's decision to reach the ERISA coverage issue does not violate "the principle of party presentation."

### 3. Whether Resolution of the ERISA Coverage Issue Violated the Federal Arbitration Act

Defendants also contend that because this Court "did not need to decide whether the deferred compensation program is an ERISA plan to compel arbitration," its decision on the ERISA coverage question constitutes "clear error under decades of case law [under the Federal Arbitration Act] holding that courts deciding whether to compel arbitration 'have no business weighing the merits of the grievance.'" (Def. Reconsid. Br. (Dkt. No. 88) at 19 (quoting United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 568 (1960)))

Defendants have never disputed, however, that "[b]ecause the arbitration provisions provide that the validity of the class action waivers must be determined by a court, . . . this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator." Shafer, 2023 WL 8100717, at *15 n.11. Where, as here, "the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits." Rite Aid of Pennsylvania, Inc. v. United Food & Com. Workers Union, Loc. 1776, 595 F.3d 128, 136 (3d Cir. 2010); see Int'l Bhd. of Elec. Workers, AFL-CIO, Loc. 1 v. GKN Aerospace N. Am., Inc., 431 F.3d 624, 628 (8th Cir. 2005) ("[T]he judicial responsibility to determine arbitrability takes precedence over the general rule to avoid consideration of the merits of a grievance."); Indep. Lift Truck Builders Union v. Hyster Co., 2

---

the issue of ERISA coverage be briefed. And to the extent that Defendants believed that they could not properly present their arguments in five single-spaced pages, or lacked sufficient time to do so, they could have requested an extension of time or an increase in the page limit. They did neither.

F.3d 233, 236 (7th Cir. 1993) ("If the court must, to decide the arbitrability issue, rule on the merits, so be it.").

Defendants respond that – because this Court could have resolved the ERISA coverage question by assuming that ERISA applies – the arbitrability issue is not "inextricably intertwined" with the merits. (Def. Reconsid. Reply Br. (Dkt. No. 92) at 8-9) As discussed above, however, Defendants never suggested that – in resolving their motion to compel arbitration – the Court should assume that their deferred compensation programs were covered by ERISA. To the contrary, Defendants argued that their deferred compensation programs were not covered by ERISA.

In any event, and as explained above, it was necessary to resolve the ERISA coverage issue because – if ERISA does not apply to Morgan Stanley's deferred compensation programs – Plaintiffs' arguments to avoid arbitration fail. The arbitrability question is thus "intertwined" with the merits, and this Court did not err in reaching the issue of ERISA coverage.

**4. Whether this Court Decided the ERISA Coverage Issue Without an "Adequately Developed Record"**

Defendants also argue that it was "clear error" for this Court to decide the ERISA coverage issue because it is a "fact-based question that must be answered based on . . . a fully developed factual record and full briefing by the parties regarding the applicability of the law to those facts." (Def. Reconsid. Br. (Dkt. No. 88) at 21-24)

"'[W]here the record contains the undisputed terms of the disputed plan[, however,] . . . a [c]ourt may decide the applicability of ERISA as a matter of law.'" Adams v. Intralinks, Inc., No. 03 CIV.5384 SAS, 2004 WL 1627313, at *7 (S.D.N.Y. July 20, 2004) (quoting Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, at

*1 (S.D.N.Y. Apr. 20, 1994)); see Shea v. Wells Fargo Armored Serv. Corp., 810 F.2d 372, 377 (2d Cir. 1987) (affirming summary judgment for defendant based on review of alleged ERISA plan's terms). And "where the language of a [plan] is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." McCutcheon v. Colgate-Palmolive Co., 62 F.4th 674, 691 (2d Cir. 2023) (quoting Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002)); see also Tolbert, 758 F.3d at 626 & n.5 (concluding that deferred compensation programs were ERISA plans based solely on plan documents).

Here, all of the Morgan Stanley deferred compensation program documents cited in the Amended Complaint were submitted to the Court. (Sept. 15, 2023 Def. Ltr. (Dkt. No. 83)) Indeed, Defendants cited to these plan documents and argued that they "establish beyond question" that ERISA does not apply to Morgan Stanley's deferred compensation programs. (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 2 & n.2, 5) Prior to this Court's November 21, 2023 ruling that the deferred compensation programs were subject to ERISA, Defendants never argued that this Court should consider additional plan documents or other evidence prior to ruling on the ERISA coverage question.

Only now, in connection with their motion for reconsideration, do Defendants argue that this Court should have considered "the full array of documents applicable to plaintiffs' deferred compensation awards, documents clearly denominating the deferred compensation a 'bonus,' and documents reflecting advisors' understanding that the deferred compensation is not 'earned' until the terms of the awards are satisfied." (Def. Reconsid. Br. (Dkt. No. 88) at 23-24) According to Defendants,

> the Court did not . . . have before it the foundation it would need to determine what "plan" controls plaintiffs' claims – is it the award certificates, the summary



DOLAR0665

> term sheets, the [Morgan Stanley Compensation Incentive Plan/Equity Incentive Compensation Plan], the compensation guide plaintiffs cite as evidence the compensation is "earned" without conditions, or some or all of the above?

(Def. Reconsid. Reply Br. (Dkt. No. 92) at 11)

"[I]t is well established[, however,] that the submission of new evidence is precluded on a motion for reconsideration." Davidson, 172 F. Supp. 2d at 463. In sum, Defendants cannot support their reconsideration motion with documents that were available to them during the briefing process for their motion to compel arbitration, but which they chose not to submit to the Court.

In any event, while Defendants provide a general description of these documents, they have not (1) identified specific documents that should be considered; or (2) explained why the content of these documents demonstrates that Morgan Stanley's deferred compensation programs are not covered by ERISA.

The same is true as to Defendants' argument that the Court should have invited "testimony of . . . witnesses who could address the history of the program, the regulatory directives that influenced its structure, and how it operates in practice." (Def. Reconsid. Br. (Dkt. No. 88) at 23) Defendants did not offer to provide any such testimony in connection with their motion, of course. And even assuming arguendo that it would have been appropriate for this Court to sua sponte direct that evidence outside the plan documents be submitted in connection with the ERISA coverage issue, Defendants briefing on their reconsideration motion provides no explanation as to what the content of this testimony would be and why it would result in a different outcome. (See Def. Reconsid. Br. (Dkt. No. 88) at 23-24; Def. Reconsid. Reply Br. (Dkt. No. 92) at 11)

In an April 2, 2024 letter – submitted more than two months after the close of briefing on January 30, 2024 – Defendants offer excerpts of testimony from a related arbitration proceeding. According to Defendants, this testimony demonstrates that

- most of the deferred compensation that Morgan Stanley pays out goes to current employees;
- government regulators believe that Morgan Stanley's deferred compensation programs promote good guardianship of assets and stability in client service;
- financial advisors understand that they must act as good guardians of client assets and remain at Morgan Stanley in order to receive their deferred compensation awards;
- deferred compensation is awarded separately from financial advisors' base compensation; is distinct from incentive compensation paid to them in cash on an ongoing basis; and, unlike these other components of compensation, is not earned unless and until additional requirements are met;
- the exceptions to the Cancellation Rule are intended to benefit financial advisors who can no longer work;
- financial advisors benefit from having deferred compensation paid during their employment, without having to wait until retirement to receive these payments; and
- similar deferred compensation programs are in place throughout the financial services industry.

(April 2, 2024 Def. Ltr. (Dkt. No. 93) at 4)

None of this testimony sheds light on the plan documents that this Court previously addressed, however. For example, whether or not the deferred compensation programs encourage employees to be "good guardians" of their clients' assets is irrelevant to whether the plans at issue are covered by ERISA. Likewise irrelevant is the testimony that similar deferred compensation programs are common throughout the financial services industry. Moreover, the fact that deferred compensation is awarded separately from financial advisors' base compensation and is a sub-set of their incentive compensation was already clear in the

record. Similarly, the fact that most of the deferred compensation payments are made to current employees requires no change in this Court's analysis.[5]

In sum, the testimony cited by Defendants does not shed light on the meaning of the plan documents that this Court previously analyzed, and Defendants have not shown that this Court erred in deciding the ERISA coverage issue that the Defendants chose to litigate, on the record that they laid before the Court.

#### 5. **Whether this Court's Analysis of the ERISA <u>Coverage Issue Constitutes "Clear Error"</u>**

Defendants contend that this Court committed clear error in (1) concluding "that the Department of Labor's 'bonus' regulation, 29 C.F.R. § 2510.3-2(c), does not apply to Morgan Stanley's deferred compensation program"; and (2) "in its analysis of when the awards at issue here are earned and whether payments are deferred, based on an apparent misunderstanding of the terms of the contracts governing the awards." (Def. Reconsid. Br. (Dkt. No. 88) at 26, 29)

##### a. **<u>Applicability of the Bonus Regulation</u>**

As discussed in the Opinion, ERISA defines "pension plan" to include

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--

---

[5] At the arbitration proceeding, a Morgan Stanley employee testified that "in the case of the equity awards [under the deferred compensation program], it was 8 percent [that] went to former employees [as opposed to current employees] and then for the deferred cash awards, it was just under 15 percent [that] went to former employees." (Feb. 27, 2024 Arb. Tr., <u>Serrano v. Morgan Stanley</u> (No. 22-02150) (Dkt. No. 94-3) at 224) This testimony merely confirms this Court's statement in the Opinion that "post-employment deferred compensation payments are [not] rare." <u>Shafer</u>, 2023 WL 8100717, at *20. Deferred compensation payments to former employees cannot be considered "rare" when they occur at a rate of 8 to 15 percent.

> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

29 U.S.C. § 1002(2)(A)

U.S. Department of Labor regulations provide, however, that "the term[] . . . 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c).

As discussed above, in concluding that the Department of Labor's "bonus" regulation is not applicable to Morgan Stanley's deferred compensation programs, this Court reasoned as follows:

> Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission." See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation").
>
> Courts generally treat these two types of compensation as distinct. See Smith v. Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action, concluding that employee benefits committee did not "err[ ] in deciding that commissions are not bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v. Voya

> Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).
>
> The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4

Shafer, 2023 WL 8100717, at *19.

Defendants contend that this Court should have given weight to the fact that "Morgan Stanley['s] deferred compensation program . . . expressly states that its purposes include encouraging retention," citing language in Morgan Stanley's Compensation Incentive Plan Document stating that the plan "'is intended to attract, retain and motivate employees and to compensate them for their contributions to the Firm.'" (Def. Reconsid. Br. (Dkt. No. 88) at 27 (quoting Compensation Incentive Plan Document (Dkt. No. 83-4) § 1)) Defendants also cite cases stating that a plan's stated purpose of "motivat[ing] retention" is relevant to determining whether that plan falls within the Department of Labor's bonus regulation. (Id. at 26-27 (citing, e.g., Wilson v. Safelite Grp., Inc., 930 F.3d 429, 435-36 (6th Cir. 2019); Oatway v. Am. Int'l Grp., Inc., 325 F.3d 184, 189 (3d Cir. 2003); and McKinsey v. Sentry Ins., 986 F.2d 401, 406 (10th Cir. 1993))

None of these cases suggests that a plan's stated purpose is dispositive, however, much less that a court may ignore the structure and operation of a compensation plan in determining whether it falls within the Department of Labor's bonus regulation.

In concluding that Morgan Stanley's deferred compensation programs do not fall within the Department of Labor's bonus regulation, this Court noted that (1) "Morgan Stanley

financial advisors' deferred compensation is premised on the revenue they generate," in the form of a percentage commission rather than a payment "over and above normal compensation"; and (2) "Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan." Shafer, 2023 WL 8100717, at *19. In other words, the objective features of Morgan Stanley's deferred compensation programs – considered in light of the other forms of compensation paid to Morgan Stanley financial advisors – are not consistent with a bonus plan. While this Court considered the fact that one of the deferred compensation programs' stated purposes is to encourage employee retention, this fact was outweighed by the other circumstances cited by the Court.

In sum, the Court did not commit clear error in concluding that Morgan Stanley's deferred compensation programs do not fall within the U.S. Department of Labor's bonus regulation.[6]

b. **When the Deferred Compensation Awards are "Earned"**

Defendants contend that this Court "clearly erred in its analysis of when the [deferred compensation] awards at issue here are earned [by Morgan Stanley financial advisors] and whether payments are deferred." According to Defendants,

> the condition precedent [for entitlement to an award of deferred compensation] is contained in the contract itself. Put differently, the contractual right to payment is itself conditioned on the requirement that an employee remain employed through the vesting period. The conditional nature of the compensation is built directly into the contract. The materials before the Court reflect that financial advisors have no right to the deferred compensation at the time of the award. In contrast to cash-based incentive compensation, which is earned and paid on an ongoing basis, the deferred compensation is expressly conditioned on an employee's

---

6 Defendants also complain that this Court failed to "cite any authorities applying the [bonus] regulation." (Def. Reconsid. Br. (Dkt. No. 88) at 28) But this Court addressed at length Tolbert, 758 F.3d at 626, Wilson, 930 F.3d at 438, and Oatway, 325 F.3d at 188, all of which considered whether the compensation plan at issue fell within the bonus regulation. Shafer, 2023 WL 8100717, at *16-18.

> remaining with the firm for the vesting period. Morgan Stanley's program does not result in the "forfeiture" of any "contractual right" because – as the governing documents clearly explain – financial advisors do not acquire any right to payment until they satisfy the conditions for payment.

(Def. Reconsid. Br. (Dkt. No. 88) at 29-30) (emphasis in original)

Defendants also argue that this Court overlooked

> the critical limiting factor in Tolbert for ERISA to apply: that the plan entail employees *forgoing* income to which they have a present right. See Tolbert v. RBC Cap. Mkts. Corp., 758 F.3d 619, 625-26 (5th Cir. 2014) ("The first section of the [wealth accumulation plan] . . . explains that, by design, employees have the option 'to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.' . . . Put another way, by participating in the [wealth accumulation plan], the plaintiffs have foregone income ... in exchange for receiving income at a later date." (quotation and alteration omitted)).

(Id. at 31) (emphasis in original)

Finally, Defendants assert that the "vast majority of compensation [under Morgan Stanley's deferred compensation programs] is paid to current employees" (Apr. 2, 2024 Def. Ltr. (Dkt. No. 93) at 4), citing testimony from a Morgan Stanley employee – at an arbitration proceeding – that "in the case of the equity awards [under the deferred compensation program], it was 8 percent [that] went to former employees [as opposed to current employees] and then for the deferred cash awards, it was just under 15 percent [that] went to former employees." (Feb. 27, 2024 Arb. Tr., Serrano v. Morgan Stanley (No. 22-02150) (Dkt. No. 94-3) at 224)

For the reasons explained below, none of these arguments is persuasive.

As an initial matter, "the submission of new evidence is precluded on a motion for reconsideration." Davidson, 172 F. Supp. 2d at 463. Accordingly, the Morgan Stanley employee's testimony at an arbitration proceeding is not properly offered in connection with Defendants' reconsideration motion. This data was in Defendants' possession during the briefing on their motion to compel arbitration, but Defendants chose not to submit it. They may not supplement the record with this evidence in connection with their reconsideration motion. In

Case 1:20-cv-11047-PGG Document 99 Filed 11/05/24 Page 31 of 37

any event, this data supports the Court's ruling, because it indicates that post-termination awards of deferred compensation are not rare.

As to Tolbert, Defendants' argument that that case turns on the fact that employees were "*forgoing* income to which they have a present right" (Def. Reconsid. Br. (Dkt. No. 88) at 31 (emphasis in original), is misleading, because Defendants tell only half the story. While the "wealth accumulation plan" in Tolbert included "Voluntary Deferred Compensation" that reflected "the percentage of a participating employee's compensation that the employee elects to defer," and which "is always fully vested," Tolbert, 758 F.3d at 622, the plan in Tolbert also included "Mandatory Deferred Compensation," which reflected "the percentage of an employee's compensation that the [Company] Committee designates as a required deferral," as well as "Company Contributions," which "includ[ed] matching contributions and discretionary contributions." Id. The Mandatory Deferred Compensation "vest[s] later, on dates determined by the Committee." Id.

> Notwithstanding the Committee's vesting dates, Mandatory Deferred Compensation and Company Contributions vest immediately upon either the death of the employee or the separation of the employee. In order for the amounts to vest at the time of an employee's separation, certain criteria must be met; if the criteria are not met, then the employee forfeits the unvested amounts. . . . Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement.

Id. at 622 & n1.

The Fifth Circuit considered these features of the company's "wealth accumulation plan" in concluding that

> [t]he "express terms" of [that plan] . . . contemplate employees deferring income "to the termination of covered employment or beyond." The vesting sections explain that, upon separation, unvested amounts vest immediately. The distribution sections contain further support: "If distribution is made due to Separation," then "[a]vailable forms of distribution include a single lump sum or,

> if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii) [of 29 U.S.C. § 1002(2)(A)].

Id. at 626 (emphasis in original).

Morgan Stanley's deferred compensation programs and the "wealth accumulation plan" in Tolbert share multiple common features: both involve mandatory deferred compensation that vests after the award date (rather than immediately); both expressly provide for post-employment vesting upon an employee's death or separation; and both require that – in the case of an employee's separation – the employee must meet certain conditions or the deferred compensation will be forfeited. The Tolbert court does not draw a distinction – as Defendants do here – between voluntary deferred compensation that vests immediately, and mandatory deferred compensation that vests later, subject to conditions. See id. at 624-26. To the contrary, Tolbert implies that both forms of compensation may qualify as a "pension plan" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii), so long as they "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Id.

Here, Morgan Stanley's deferred compensation programs expressly provide for post-employment vesting and payment in the case of "disability, full career retirement, layoffs, or departure for governmental service." Shafer, 2023 WL 8100717, at *20. Where Morgan Stanley makes payments to former employees in those situations, all of the relevant "condition[s] precedent" in the contracts – i.e., leaving Morgan Stanley's employment under qualifying circumstances – have been satisfied, and the income has by then been "earned." (See Def. Reconsid. Br. (Dkt. No. 88) at 29-30) In such circumstances, it is irrelevant that "financial advisors have no right to the deferred compensation at the time of the award," as opposed to the time at which the award vests. (Id. at 30) Whether such deferred compensation is "earned"

Case 1:20-cv-11047-PGG Document 99 Filed 11/05/24 Page 33 of 99

when it is awarded or when it vests, the operation of Morgan Stanley's deferred compensation programs "results in a deferral of income . . . for periods extending to the termination of covered employment or beyond." ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).

Moreover, in the Opinion, this Court reasoned that "disability, retirement, layoff, and government service are not unusual means by which workers leave their employment," and that "nothing in the record suggests that post-employment deferred compensation payments are rare." Shafer, 2023 WL 8100717, at *20. As noted above, Defendants have proffered evidence – in support of their reconsideration motion – demonstrating that deferred equity and cash awards to former employees are in fact not rare; such payments occur at a rate ranging from 8 to 15 percent. (Feb. 27, 2024 Arb. Tr., Serrano v. Morgan Stanley (No. 22-02150) (Dkt. No. 94-3) at 224) Acknowledging that "'the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage,'" Tolbert, 758 F.3d at 625 (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)), payments made at a rate of 8 to 15 percent are not rare – they are commonplace. And here, the payments to former employees are expressly contemplated by the terms of the plan documents. Morgan Stanley's deferred compensation programs therefore "fit[] comfortably within the meaning of [29 U.S.C. § 1002(2)(A)(ii)]." Id. at 626.

## CONCLUSION

For the reasons stated above, Defendants' motion for reconsideration and/or clarification (Dkt. No. 87) is denied.

The Clerk of Court is directed to terminate the motions. (Dkt. No. 87, 89, 93)

Dated: New York, New York
November 4, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge

Opinion No. 2002-13A (E.R.I.S.A), Pens. Plan Guide (CCH) P 19,989H, 2002 WL 31846478

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Ms. Jane O. Francis

*1 Holland & Hart LLP
P.O. Box 8749
Denver, Colorado 80201-8749
December 6, 2002

ERISA Section:

3(2)

Dear Ms. Francis:

This is in response to your request on behalf of Kaiser-Hill Company, LLC (Kaiser-Hill or Company) for an advisory opinion from the Department of Labor (Department) regarding the applicability of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Specifically, you asked whether the Kaiser-Hill Employee Incentive Compensation Plan (ECOMP) and the Kaiser-Hill Incentive Compensation Plan for Executives and Manager Staff (EICP), collectively (Plans), are "pension plans" within the meaning of section 3(2)(A) of Title I of ERISA, and, if the Plans should be considered pension plans, whether they are so-called "top hat" plans under ERISA sections 201(2), 301(a)(3), and 401(a)(1).

In connection with your request, you represent the following. Kaiser-Hill is a joint venture formed for the purpose of engaging in a project to safely close the Rocky Flats nuclear waste site under the terms of a multi-year contract (Contract) with the U.S. Department of Energy (DOE). Duties under the Contract are undertaken in stages and are planned and performed by workers with specialized expertise and training. Under the Contract, the Company's earnings are dependent on the safe closure of the project site within set cost and schedule parameters. The Company has the potential to earn a substantial incentive payment if the project is completed safely, on time and certain cost savings are realized. [1] The incentive payment declines on a sliding scale, and beyond a certain date and/or above a certain cost, no incentive payment will be earned. Quarterly progress payments will be made to the Company; however, an incentive payment is neither earned nor paid to the Company until the DOE determines that the project is complete.

The Company believes its ability to earn an incentive payment will largely depend upon motivating and retaining skilled employees. Accordingly, in 2001 the Company established the ECOMP and the EICP to share any incentive payment with eligible employees. The ECOMP is available to all salaried non-union employees and the EICP is available to an identified group of managers and officers; however, no employee may participate in both. Each of the Plans consists of two incentive components--an annual cash payment and a contingent component. In February of each year, unless changed by the Company's Board of Managers, a $9,000,000 bonus pool for the ECOMP Plan and an $8,000,000 bonus pool for the EICP Plan are established to reward the employees' Contract related performance during the prior calendar year. The Plans award amounts to participants based upon their contributions to: (1) safety, (2) efficient and timely mission earned-value accomplishment, (3) contribution to the Company's reputation, (4) future potential with the Company, and (5) other extraordinary efforts. The cash component of the award is paid immediately and is approximately 20% of the total award for the EICP and 30% of the total award for the ECOMP. Under both Plans the remainder is awarded in Safe Accelerated Focused Execution Units (SAFE Units).

*2 When a SAFE Unit is awarded, both its value and the date it may be converted to cash are indeterminate. If the Company earns and receives an incentive payment under the Contract, it will convert the participants' earned SAFE Units to cash and make cash distributions at that time; otherwise SAFE Units will be worthless. Under the Plans, the cash conversion value of a SAFE Unit is determined when the Contract ends. The maximum value of a SAFE Unit is $1.00, based upon maximum fee and cost savings as well as an early completion date of December 15, 2005; the minimum value is zero. In years 2000 and 2001, the Company calculated the projected value of a SAFE Unit at the Contract's end to be zero and $0.55, respectively. Under both Plans, the DOE incentive payments, if any, will be the sole source of funds used to convert SAFE Units to cash. SAFE Units awarded to participants are subject to forfeiture if the participant: (1) voluntarily terminates employment with the Company, (2) is terminated "for cause," or (3) fails to provide a current address to the Company within a certain time period after notification, or attempted notification, that SAFE Units are eligible to be converted to cash. A participant's death, normal retirement under the Company's other tax-qualified retirement plans, or transfer to an affiliate is not considered a voluntary termination. Unless forfeited, a participant retains SAFE Units previously awarded and any earned for the year employment terminates. SAFE Units are nontransferable and the Company reserves the right to amend, modify, or terminate the Plans.

The Company's workforce size and composition will fluctuate over the term of the Contract and workers will be subject to periodic reductions-in-force as the Contract work progresses. In addition, some participants may be eligible for retirement prior to or at the time the Contract is completed. Although the Company is actively seeking new projects with the intention of remaining in operation after the Contract is completed, the Company has yet to secure additional work. To the extent the dearth of projects continues, this raises the possibility that many employees may terminate employment prior to receiving any SAFE Unit payments that may become due at the end of the Contract. The Company, however, anticipates that, even absent additional projects, some employees will be able to continue employment with the Company or its affiliates.

Section 3(2)(A) of ERISA provides, in relevant part, that the term "pension plan" includes any plan, fund, or program established or maintained by an employer to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program provides retirement income to employees or results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. The Department's regulation at 29 C.F.R. 2510.3-2 describes certain arrangements which will not be considered to constitute an employee pension benefit plan within the meaning of section 3(2) of Title I of ERISA. With respect to bonus programs, paragraph (c) of the regulation provides:

> *3 For purposes of Title I of [ERISA], the term . . . "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3-2(c).

Neither the ECOMP nor the EICP expressly condition distribution of any of the bonus payments on termination of employment or retirement. Accordingly, the Plans are not by their express terms employee pension benefit plans.[2] Approximately 20% to 30% of the Plans' awards are paid immediately in cash each year. Payment on the SAFE Units is delayed in this case only because the value of the SAFE Units is contingent upon the Company earning an incentive payment under the DOE Contract, and that value (which could ultimately be zero) cannot be determined prior to the Contract's end. Even with this delay, some participants are expected to receive cash for their SAFE Units while still in covered employment. Further, the Plans provide for forfeiture of SAFE Units by participants who voluntarily terminate employment during the term of the Contract except for death, normal retirement, or transfer to an affiliate. Under these circumstances, the mere fact that many of the Plans' participants may have separated from the Company prior to the completion of the Contract, and prior to the time they will be eligible to convert SAFE Units to cash, does not, in the Department's view, implicate a deferral of income of the kind contemplated by

section 3(2)(A) of ERISA or a systematic deferral of payments to the termination of covered employment or beyond that would preclude the ECOMP and EICP from being bonus programs within the meaning of 29 C.F.R. § 2510.3-2(c).

You should be aware that, under section 3(2)(A) of ERISA, the ECOMP and EICP may, nevertheless, be employee pension benefit plans if they provide retirement income to employees as a result of surrounding circumstances.[3] This question is inherently factual in nature and generally the Department does not issue advisory opinions on such questions. See Section 5.01 of ERISA Procedure 76-1, 41 Fed. Reg. 36281 (Aug. 27, 1976). We, however, have no reason to believe, based upon the representations in your submission, that the Plans would be pension plans as a result of such surrounding circumstances.

You have also requested that the Department consider whether the Plans are so-called "top hat" plans under sections 201(2), 301(a)(3), and 401(a)(1) of ERISA. Sections 201(2), 301(a)(3), and 401(a)(1) of ERISA, generally referred to as "top hat" plan provisions, apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Because we do not find, based upon your representations, that either the ECOMP or EICP is by its express terms a pension plan, it is unnecessary to address this issue.

*4 This letter constitutes an advisory opinion under ERISA Procedure 76-1 and is issued subject to the provisions of that procedure, including section 10 thereof relating to the effect of an advisory opinion.

Sincerely,

John J. Canary
Chief, Division of Coverage, Reporting & Disclosure
Office of Regulations and Interpretations

## Footnotes

1 The Contract commenced on February 1, 2000, and contains certain maximum cost targets and a target project completion date of December 15, 2006. The Contract provides for incentive payments to the Company that depend on whether actual costs are less than target costs and project completion is on time or accelerated.

2 From the information submitted, there is no indication that the Plans are employee welfare benefit plans within the meaning of ERISA section 3(1). The Plans were not established and are not maintained for the purpose of providing severance, unemployment or any of the other benefits described in that section.

3 For example, in the instant case, a significant factor would be whether in determining amounts awarded or employees selected to receive awards, the economic benefits under the Plans are disproportionately allocated to participants either at or near retirement age so as to provide retirement income.

Opinion No. 2002-13A (E.R.I.S.A), Pens. Plan Guide (CCH) P 19,989H, 2002 WL 31846478

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Opinion No. 98-02A (E.R.I.S.A.), Pens. Plan Guide (CCH) P 19987, 1998 WL 103654

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Samuel Arthur Butts III

*1 Manier Herod Hollabaugh & Smith
First Union Tower
Suite 2200
150 Fourth Avenue North
Nashville, TN 37219-2494
March 6, 1998

ERISA SECTIONS:

3(2)

Dear Mr. Butts:

This is in response to your request for an advisory opinion regarding the status of the UT Medical Group, Inc. Key Employee Incentive Plan (Plan). Specifically, you ask whether the Plan should be considered a "bonus plan," rather than a "pension plan" under section 3(2)(A) of the Employee Income Security Act of 1974, as amended (ERISA), and, if the Plan should be considered a pension plan, whether it is a so-called "top hat" plan under ERISA sections 201(2), 301(a)(3), and 401(a)(1). [1]

You represent that the UT Medical Group, Inc. (UTMG) provides medical services primarily through employee-physicians. UTMG would like to establish and maintain the Plan to motivate its physicians to increase revenues and to continue in employment with UTMG. The Plan would not be structured to qualify for any tax benefits under the Internal Revenue Code. The Plan would offer three different types of yearly bonuses. First, each physician would be eligible to receive an individual bonus award amount equal to the percentage of revenue that his or her efforts have gained during a fiscal year in excess of his individual Clinical Revenue Goals (CRGs). [2] Second, a physician can earn a group bonus award if the physician's medical practice department exceeds its applicable departmental performance target. An individual physician's share of such a group bonus award would also be set by negotiation between the physician and his or her department before the beginning of a fiscal year. Third, if a physician's individual and group goals are met, and if all departments of UTMG exceed their targets, a physician will receive a share of a corporate-wide bonus also negotiated in advance.

To receive any fiscal year bonus earned under the Plan, however, a physician must be continuously employed by UTMG for five years after the last day of the fiscal year in which the bonus is earned. If this condition is met, the bonus will be distributed to the physician on the first day of the sixth fiscal year after the year in which the bonus is earned (the distribution date), regardless of whether the physician continues to be employed as of this day or thereafter. Physicians may not extend or delay the distribution date.

Section 3(2)(A) of ERISA provides, in relevant part, that the term "pension plan" includes any plan, find, or program established or maintained by an employer to the extent that by its express terms or as a result of surrounding circumstances such plan, find or program provides retirement income to employees or results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. In Department of Labor (Department) regulation at 29 CFR § 2510.3-2(c), the Department described certain programs that do not constitute pension plans within the meaning of section 3(2)(A) because

they involve only payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

*2 The bonus program you described provides that employees who terminate their employment for any reason, including retirement, before the lapse of the five-year period following the last day of the year in which the bonus was earned will forfeit their right to receive such bonus. However, if a physician remains employed continuously during this five-year period, he or she will receive his or her bonus on the first day of the sixth fiscal year, regardless of his or her employment status on such date. You represent that this delay is designed to motivate physicians to continue in employment with UTMG. Because the Plan does not expressly condition distribution of the bonus payments upon termination of employment or retirement, the Plan is not by its express terms a pension plan within the meaning of section 3(2)(A) of ERISA, but rather may function. as a bonus program described in regulation section 2510.3-2(c).

You should be aware, however, under section 3(2)(A) of ERISA, a plan, find, or program which does not by its express terms provide retirement income or result in the deferral of income by employees for periods extending to the termination of covered employment or beyond may be a pension plan if it has these effects as a result of surrounding circumstances. Thus, if payments under a plan are, in operation, systematically deferred until the termination of employment or retirement age, in such case, the plan may be deemed to be a pension plan. For example, the manner in which bonus percentages are negotiated by employees yearly may allocate the economic benefits earned in a year disproportionately to retirees and participants reaching retirement age as defined under the Plan; an inordinate percentage of the bonus recipients may be at one time at or nearly at retirement age; and payments may not be made under the plan often enough or within a reasonable time to avoid their actually serving as retirement income. Furthermore, if the plan is communicated to participants in a manner that causes them to act under the Plan so as to result in their deferring receipt of income until retirement, it may be deemed a pension plan. The question of whether a plan, find, or program is a pension plan as a result of surrounding circumstances is inherently factual in nature, and generally the Department does not issue advisory opinions on such questions. See section 5.01 of ERISA Procedure 76-1 (41 FR 36281; August 27, 1976), relating to advisory opinions.

The second issue raised by your request is predicated upon a finding that the Plan is a pension plan. Because we do not find, based upon your representations, that the Plan by its express terms is a pension plan, it is unnecessary to address this issue. Moreover, we note that due to the inherently factual nature of such requests, advisory opinions generally will not be issued on the status of a particular plan as a so-called "top-hat" plan within the meaning of sections 201(2), 301(a)(3), and 401(a)(1) of ERISA.

*3 This letter constitutes an advisory opinion under ERISA Procedure 76-1 and is issued subject to the provisions of that procedure, including section 10 thereof relating to the effect of an advisory opinion.

Sincerely,

John J. Canary
Chief, Division of Coverage, Reporting & Disclosure
Office of Regulations and Interpretations

**Footnotes**

1 Sections 201(2), 301(a)(3), and 401 (a)(1) of ERISA, generally referred to as "top hat plan" provisions, apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."

2 Each physician would negotiate with UTMG in advance of each fiscal year to establish both his or her applicable bonus percentage and CRG for that fiscal year. Individual physicians' applicable percentages and CRGs would vary, depending on the education, research, and clinical practice goals established by negotiation for each medical practice department.

Opinion No. 98-02A (E.R.I.S.A.), Pens. Plan Guide (CCH) P 19987, 1998 WL 103654

End of Document

© 2023 Thomson Reuters. No claim to original U S. Government Works.

Opinion No. 89-07A (E.R.I.S.A), 1989 WL 206413

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Mr. Craig Westbrook

*1 Mitchell, Williams, Selig & Tucker
1000 Savers Federal Building
Capitol Avenue at Spring Street
Little Rock, Arkansas 72201
April 27, 1989

ERISA section:

Section 3 3(2)

Dear Mr. Westbrook:

This is in reply to your request for an advisory opinion regarding the applicability of title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you ask whether the Union National Bank Incentive Bonus Plan (the Incentive Plan) is an employee pension benefit plan within the meaning of section 3(2) of title I of ERISA.

You advise that Union National Bank (the Employer) currently has an incentive compensation plan in place based on the annual performance of different classes of employees. The Employer now wishes to alter that program to allocate a portion of that incentive compensation to the Incentive Plan. The percentage allocated annually would be discretionary as would the employees or classes of employees awarded bonuses under the Incentive Plan. If an employee awarded a bonus under the Incentive Plan is still employed by the Employer 5 years after the date the bonus is awarded, a lump sum payment would be due the employee. Otherwise the employee would forfeit the award. The Incentive Plan is not intended to be funded and participation would not be limited to a select group of management or highly compensated employees.

The term "employee pension benefit plan" is defined in section 3(2)(A) of title I of ERISA to include:

... any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

In Department of Labor (the Department) regulation 29 C.F.R. 2510.3-2, the Department described certain programs which would not be considered to constitute employee pension benefit plans within the meaning of section 3(2) of title I of ERISA. Specifically, regulation section 2510.3-2(c) provides:

(c) Bonus Program. For purposes of Title I of the Act and this chapter, the term "employee pension benefit plan" or "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

The reference to retirement income in the regulation cited above contemplates that a bonus program could be considered to be an employee pension benefit plan where payments under it are systematically deferred until such time as an employee terminates employment or so as to provide retirement income.

*2 The description of the Incentive Plan that you supplied specifically provides that employees who terminate their employment for any reason, including retirement, during the five year "vesting" period will forfeit their right to any amount allocated to their individual account(s). Therefore, according to its express terms, the Incentive Plan does not appear to contemplate the deferral of income to the termination of covered employment or beyond, but rather it appears to provide payment for work performed as contemplated by the regulatory definition of a bonus program described in section 2510.3-2(c).

The clear intent of the "bonus program" definition at 29 CFR 2510.3-2(c) is that bonuses, which are not subject to the provisions of ERISA, shall not be used as alternative forms of retirement or post-termination payments. As previously stated, bonuses are intended to be payments for work performed only. In comparison, payments described within the definition of "employee pension benefit plan" in section 3(2)(A) of title I of ERISA are to provide retirement, deferred termination, or post-termination income.

Although the express terms of the Incentive Plan disallow payment upon termination, since the income from the bonus program is deferred under the terms of the plan, it is necessary to ensure, in the selection of the amounts of the awards, the employees to receive the award, and the timing of the payments of the award, that the plan in operation is not a vehicle for the provision of retirement income. A significant operative factor would be that an inordinate percentage of the bonus recipients were at or nearly at retirement age as defined in section 1.01 of the Incentive Plan.

Where it is clear that the bonus, under the surrounding facts and circumstances, does not constitute retirement income, it would not be considered an employee pension benefit within the meaning of section 3(2) of title I of ERISA.

This letter constitutes an advisory opinion under ERISA Procedure 76-1 and is issued subject to the provisions of that procedure, including section 10 thereof relating to the effect of an advisory opinion.

Sincerely,

Robert J. Doyle
Director of Regulations and Interpretations

Opinion No. 89-07A (E.R.I.S.A), 1989 WL 206413

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works

Opinion No. 82-29A (E.R.I.S.A), 1982 WL 21212

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Mr. Ralph O. Winger

*1 Cahill Gordon & Reindel
ghty Pine Street
w York, New York 10005
July 2, 1982

ERISA Sections:

3(1)

3(2)

Dear Mr. Winger:

This is in reply to your letter of December 14, 1981, regarding the applicability of the Employee Retirement Income Security Act of 1974 (ERISA) to the Forest Oil Corporation and Forest Oil of Canada, Ltd. Division Overriding Royalty Bonus Plan (the Plan). Specifically, your inquiry concerns whether the Plan is an employee benefit plan within the meaning of ERISA section 3(3) and thus is covered by ERISA title I.

You state that the Plan has been established by Forest Oil Corporation and its wholly-owned subsidiary, Forest Oil of Canada, Ltd. (each of which corporations is referred to below as a 'Company'), as a long term performance incentive cash bonus program in order to attract and retain certain employees of each Company.

On the basis of your submission it appears that the Plan operates as follows. The Plan is administered by a committee appointed by the Board of Directors of Forest Oil Corporation and provides for a cash bonus to be paid to each participant. The amount of the bonus is measured by the net revenue interest of a Company (defined in the Plan as 'Forest's Net Revenue Interest') in the potentially productive acreage determined by a Company to be associated with an exploratory well (a Prospect). A participant's 'Benefit' consists of a cash payment equal to four one hundredths of one percent (.04%) of Forest's Net Revenue Interest in each successful Prospect in the division of the Company in which the participant is employed. To be eligible for the 'Benefit' the participant must be employed in that division on the date the first successful well was 'spudded' on that Prospect. Each participant is always 100 percent vested in his or her 'Benefit'.

'Benefits' commence to accrue as of the first production from a Prospect and continue until the date of termination of the participant's employment with the Company, except that if the participant's termination of employment is due to death, disability, or retirement, payment of benefits will continue until the later of the death of the participant or his or her surviving spouse. In any event a payment terminates when the Prospect from which it is payable reaches its economic limit. As soon as practical, but no less than quarterly, following receipt of the 'Benefit' amount by the Company, the Company is to pay an amount equal thereto to the participant (or his or her surviving spouse). In your letter of April 8, 1982, you indicate that the first such payment is generally received about 1 year after the date the first well on the Prospect is spudded and that subsequent payments are usually received on a monthly or quarterly basis. The participant is not entitled to any proprietory interest in the Prospect and is a general unsecured creditor of the Company regarding his or her payment.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works. 

The term 'employee benefit plan' is defined in section 3(3) of ERISA as, '. . . an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.' The term 'employee welfare benefit plan' is defined in section 3(1) of ERISA as, '. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).' Based on the representations set forth in your request for an advisory opinion, it does not appear that the purpose of the Plan is to provide any of the benefits enumerated in section 3(1) of ERISA. Accordingly, it is our view that the Plan is not a welfare plan within the meaning of section 3(1) of ERISA.

*2 The term 'employee pension benefit plan' is defined in section 3(2)(A) of ERISA as, '. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . ..'

Regulations issued by the Department of Labor clarify the definition of employee pension benefit plan. As you note in your submission, 29 C.F.R. § 2510.3-2(c) of the regulations provides as follows:

> For the purposes of Title I of the Act and [29 C.F.R. c. XXV], the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

Because the Plan does not condition distribution of the bonus payments upon termination of employment or retirement, the Plan is not by its express terms an employee pension benefit plan within the meaning of section 3(2)(A) of ERISA, but, rather, appears to be a bonus program described in regulation section 2510.3-2(c).

Under section 3(2)(A) of ERISA, a plan may be an employee pension benefit plan as a result of surrounding circumstances. While we have no reason to believe, based on the representations in your submission, that the Plan would be a pension plan as a result of surrounding circumstances, plan fiduciaries should be aware of the possibility that, if as a result of surrounding circumstances, payments are systematically deferred until the termination of employment or until retirement age, the Plan might be deemed to be a pension plan.

This letter constitutes an advisory opinion under ERISA Procedure 70-1. Accordingly, this letter is issued subject to the provisions of such procedure, including section 10 thereof relating to the effect of advisory opinions.

Sincerely,

Jeffrey N. Clayton
Administrator
Pension and Welfare Benefit Programs

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Opinion No. 82-29A (E.R.I.S.A), 1982 WL 21212

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Opinion No. 79-20A (E.R.I.S.A), 1979 WL 6959

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Mr. Anthony A. Lenza

*1 1058 Forest Avenue
Staten Island, New York 10310
March 19, 1979

ERISA Sections:

3(1)

3(2)

Dear Mr. Lenza:

This is in reply to your letter of August 22, 1978, regarding applicability of the Employee Retirement Income Security Act of 1974 (ERISA) to the proposed American Society of Travel Agents, Inc. Incentive Compensation Plan (the Plan). Specifically, your inquiry concerns whether the Plan is an employee benefit plan within the meaning of ERISA section 3(3), as further defined by ERISA sections 3(1) and 3(2), and, thus is covered by ERISA title I.

You represent that the proposed Plan provides periodic incentive compensation for managerial and non-managerial employees of the American Society of Travel Agents, Inc. (ASTA), a non-profit organization. The Plan is administered by the Executive Vice President of ASTA under the direction of the Executive Committee. At stated intervals of completed service, participating employees receive accumulated amounts equal to a percentage of annual total salary compensation credited for years of employment with ASTA, plus the earnings thereon. Managerial employees are credited with 5 percent of total annual salary compensation for the first 5 consecutive years of employment, 7 percent for the next 5 consecutive years of employment, and 8 percent for the third consecutive 5-year period of employment and for each 5 consecutive years of employment thereafter. Managerial employees are eligible for distribution of amounts thus credited when the first 5 years of employment after January 1, 1978, are completed and on completion of each succeeding 5-year period of continuing service thereafter. Non-managerial employees are credited with 4 percent of total annual salary compensation after 3 consecutive years of employment, 5 percent after the next 3 consecutive years of employment, and 6 percent after the third consecutive 3-year period of employment and for each 3 consecutive years of employment thereafter. Non-managerial employees are eligible for distribution of amounts thus credited when the first 3 years of continuous service after January 1, 1978, are completed and on completion of each succeeding 3-year period of continuous service thereafter.

Participating employees who terminate employment due to involuntary termination, resignation, death or disability prior to completing an interval of service required for entitlement to a distribution under the Plan ordinarily forfeit all sums credited to them. However, the Executive Committee may waive up to 2 years of required service for managerial employees and up to 1 year of required service for non-managerial employees who terminate employment due to death, disability, or other reason. The Plan's waiver of service provision thus allows the Executive Committee to permit, at their discretion, the payment of incentive compensation to deserving employees who die or become disabled or who terminate service with ASTA for other reasons, even though such employees have not completed the entire interval of service required for distribution under the Plan.

*2 ERISA section 3(3) defines the term 'employee benefit plan' as '. . . an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.'

ERISA section 3(1) defines the term 'employee welfare benefit plan' as '. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).' Based on the representations set forth in your request for an advisory opinion, it does not appear that the purpose of the Plan is to provide any of the benefits enumerated in section 3(1) of ERISA. Therefore, the Plan is not an employee welfare benefit plan within the meaning of that section.

ERISA section 3(2) defines the term 'employee pension benefit plan' as '. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(A) provides retirement income to employees, or (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond; regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.' Based on the representations set forth in your request for an advisory opinion, it does not appear that the Plan by its express terms provides retirement income or results in a deferral of income for periods extending to the termination of covered employment or beyond. Therefore, it would appear that, by its express terms, the Plan is not an employee pension benefit plan within the meaning of section 3(2) of ERISA. You should note, however, that under section 3(2), a plan may be an employee pension benefit plan as a result of surrounding circumstances. While we have no reason to believe, based on the representations in your submission, that the Plan would be a pension plan as a result of surrounding circumstances, plan fiduciaries should be aware of the possibility that if a pattern should be adopted of delaying payouts until retirement age, this would cause the Plan to be deemed a pension plan.

*3 This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, this letter is issued subject to the provisions of the procedure, including section 10 thereof relating to the effect of advisory opinions.

Sincerely,

Ian D. Lanoff
Administrator of Pension and Welfare Benefit Programs

Opinion No. 79-20A (E.R.I.S.A), 1979 WL 6959

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works

Opinion No. 79-15A (E.R.I.S.A), 1979 WL 6953

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Mr. Homer L. Elliott

*1 Drinker Biddle & Reath
1100 Philadelphia National Bank Building
Broad and Chestnut Streets
Philadelphia, Pennsylvania 19107
March 12, 1979

ERISA Sections:

3(1)

3(2)

Dear Mr. Elliott:

This is in reply to your letter requesting an advisory opinion concerning whether title I of the Employee Retirement Income Security Act of 1974 (ERISA) is applicable to the Betz Laboratories, Inc. Employee Stock Incentive Plan (the Plan). Specifically, your inquiry concerns whether the Plan is an employee welfare benefit plan or an employee pension benefit plan, or both, within the meaning of section 3(3) of ERISA.

You represent that the Plan provides for issuance of common stock of Betz Laboratories, Inc. (the Company) to key employees, including officers and directors who are employees, selected by the Stock Incentive Committee which is appointed by the Company's Board of Directors. All current participants are employees earning $25,000 or more per annum. Employees selected by the Committee (grantees) receive shares of Company stock at no expense to the individual employees. From the date the stock is issued, grantees have all rights of shareholders, including dividend and voting rights, except that certificates for the shares are held by the Company Treasurer until certain restrictions described below lapse. Stock, granted in accordance with the Plan, is subject to restrictions on disposition (namely, grantees are prohibited from selling, assigning, or transferring the stock granted) until lapse of such restrictions. Unless the Stock Incentive Committee determines that the percentage will be less or the period before lapse will be longer, restrictions lapse on 50 percent of shares granted on a date 3 years after the original grant and, thereafter, at the discretion of the Stock Incentive Committee. With regard to stock granted under the Plan to date, the Committee has generally provided for lapse of restrictions on one-third of shares issued on each of three dates: the third, fourth, and fifth anniversaries of the grant.

Stock on which restrictions have not yet lapsed is forfeited and reverts to the Company when the grantee's full-time employment with the Company or its subsidiary terminates for any reason. Death of the grantee after 3 years from the date of the stock grant causes all restrictions, which had not previously lapsed, to lapse at the time of death, unless the Stock Incentive Committee has fixed a later date, in which case the later date will determine whether the restrictions lapse at the grantee's death or whether the shares will be forfeited and revert to the Company.

The Plan is not qualified for special tax treatment under any provision of the Internal Revenue Code. You state that under section 83 of the Internal Revenue Code, transferees of stock granted in accordance with the Plan may elect to defer recognition

of taxable income to the date the restrictions lapse due to the substantial risk of forfeiture involved or may elect that taxable income be recognized at the time of the grant.

*2 An 'employee benefit plan' is defined in section 3(3) of ERISA as '. . . an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.'

An 'employee welfare benefit plan' is defined in section 3(1) of ERISA as '. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).'

Because the Plan is maintained solely to provide employees with shares of Company stock which is not among the purposes listed in ERISA section 3(1), the Plan is not an employee welfare benefit plan within the meaning of ERISA section 3(1).

An 'employee pension benefit plan' is defined in section 3(2) of ERISA as:
any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
(A) provides retirement income to employees, or

(B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

Because the Plan does not, by its express terms, provide retirement income or result in a deferral of income for periods extending to the termination of covered employment or beyond, it is the Department's position, based on the information submitted, that the Plan is not, by its express terms, an employee pension benefit plan. We note however, that because, among other things, the Stock Incentive Committee has discretion with respect to when restrictions on disposition will lapse, the Plan may, as a result of surrounding circumstances, provide retirement income or result in a deferral of income to the termination of covered employment or beyond. Since the question as to whether the Plan is a pension plan as a result of surrounding circumstances involves a factual determination, the Department will not render an opinion on that question. See section 5 of ERISA Procedure 76-1.

This letter constitutes an advisory opinion as defined in ERISA Procedure 76-1, copy enclosed. Accordingly, this letter is issued subject to the provisions of such procedure, including section 10 thereof relating to the effect of advisory opinions.

*3 Sincerely,

Ian D. Lanoff
Administrator of Pension and Welfare Benefit Programs

Enclosure

Opinion No. 79-15A (E.R.I.S.A), 1979 WL 6953

End of Document

© 2023 Thomson Reuters No claim to original U.S. Government Works

**DEPARTMENT OF THE TREASURY**

**Office of the Comptroller of the Currency**

12 CFR Part 42

Docket ID OCC-2011-0001

RIN 1557-AD39

**FEDERAL DEPOSIT INSURANCE CORPORATION**

12 CFR Part 372

RIN 3064–AD86

**FEDERAL HOUSING FINANCE AGENCY**

12 CFR Part 1232

RIN-2590-AA42

**NATIONAL CREDIT UNION ADMINISTRATION**

12 CFR Parts 741 and 751

RIN 3133-AE48

**Incentive-Based Compensation Arrangements**

**AGENCY**: Office of the Comptroller of the Currency, Treasury; Federal Deposit Insurance Corporation; Federal Housing Finance Agency; and National Credit Union Administration.

**ACTION**: Notice of proposed rulemaking and request for public comment.

**SUMMARY:** The Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Housing Finance Agency, and National Credit Union Administration seek comment on a proposed rule to implement section 956 of the Dodd-Frank Wall Street Reform and

Consumer Protection Act. The statute requires that the appropriate Federal regulators, jointly issue regulations or guidelines: (1) prohibiting incentive-based compensation arrangements at covered financial institutions that encourage inappropriate risks by providing excessive compensation or that could lead to material financial loss; and (2) requiring those covered financial institutions to disclose information concerning incentive-based compensation arrangements to the appropriate Federal regulator.

**DATES**: Comments are due on or before **[INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].**

*OCC:* Commenters are encouraged to submit comments through the Federal eRulemaking Portal. Please use the title "Incentive-Based Compensation Arrangements" to facilitate the organization and distribution of the comments. You may submit comments by any of the following methods:

- *Federal eRulemaking Portal – Regulations.gov:* Go to https://regulations.gov/. Enter "Docket ID OCC-2011-0001" in the Search Box and click "Search." Public comments can be submitted via the "Comment" box below the displayed document information or by clicking on the document title and then clicking the "Comment" box on the top-left side of the screen. For help with submitting effective comments, please click on "Commenter's Checklist." For assistance with the *Regulations.gov* site, please call 1-866-498-2945 (toll free) Monday-Friday, 8am-7pm ET, or e-mail regulationshelpdesk@gsa.gov.
- *Mail*: Chief Counsel's Office, Attention: Comment Processing, Office of the Comptroller of the Currency, 400 7th Street, SW, Suite 3E-218, Washington, DC 20219.
- *Hand Delivery/Courier*: 400 7th Street, SW, Suite 3E-218, Washington, DC 20219.

*Instructions*: You must include "OCC" as the agency name and "Docket ID OCC-2011-0001" in your comment. In general, the OCC will enter all comments received into the docket and publish the comments on the Regulations.gov website without change, including any business or personal information provided such as name and address information, e-mail addresses, or phone numbers. Comments received, including attachments and other supporting materials, are part of the public record and subject to public disclosure. Do not include any information in your comment or supporting materials that you consider confidential or inappropriate for public disclosure.

You may review comments and other related materials that pertain to this action by the following methods:

- *Viewing Comments Electronically – Regulations.gov*:

Go to https://regulations.gov/. Enter "Docket ID OCC-2011-0001" in the Search Box and click "Search." Click on the "Dockets" tab and then the document's title. After clicking the document's title, click the "Browse All Comments" tab. Comments can be viewed and filtered by clicking on the "Sort By" drop-down on the right side of the screen or the "Refine Comments Results" options on the left side of the screen. Supporting materials can be viewed by clicking on the "Browse Documents" tab. Click on the "Sort By" drop-down on the right side of the screen or the "Refine Results" options on the left side of the screen checking the "Supporting & Related Material" checkbox. For assistance with the Regulations.gov site, please call 1-866-498-2945 (toll free) Monday-Friday, 8am-7pm ET, or e-mail regulationshelpdesk@gsa.gov. The docket may be viewed after the close of the comment period in the same manner as during the comment period.

*FDIC*: You may submit comments, identified by RIN 3064–AD86, by any of the following methods:

- FDIC Website: https://www.fdic.gov/regulations/laws/publiccomments/. Follow instructions for submitting comments on the agency website.
- Email: IncentiveCompProposal2024@fdic.gov. Include RIN 3064– AD86 on the subject line of the message.
- Mail: James P. Sheesley, Assistant Executive Secretary, Attention: Comments RIN 3064–AD86, Federal Deposit Insurance Corporation, 550 17th Street NW, Washington, DC 20429.
- Hand Delivery to FDIC: Comments may be hand-delivered to the guard station at the rear of the 550 17th Street NW building (located on F Street NW) on business days between 7 a.m. and 5 p.m. Please include your name, affiliation, address, email address, and telephone number(s) in your comment. All statements received, including attachments and other supporting materials, are part of the public record and are subject to public disclosure.
- Public Inspection: Comments received, including any personal information provided, may be posted without change to https://www.fdic.gov/regulations/laws/publiccomments/. Commenters should submit only information that the commenter wishes to make available publicly. The FDIC may review, redact, or refrain from posting all or any portion of any comment that it may deem to be inappropriate for publication, such as irrelevant or obscene material. The FDIC may post only a single representative example of identical or substantially identical comments, and in such cases will generally identify the number of identical or substantially identical comments represented by the posted example. All comments that have been redacted, as well as those that have not been posted, that contain comments on the merits of this document will be retained in the public comment file and

will be considered as required under all applicable laws. All comments may be accessible under the Freedom of Information Act.

*NCUA*: You may submit comments, identified by RIN 3133-AE48, by any of the following methods (please send comments by one method only):

- *Federal eRulemaking Portal:* https://www.regulations.gov. The docket number for this proposed rule is 2024-0038. Follow the instructions for submitting comments. A plain language summary of the proposed rule is also available on the docket website.
- *Mail:* Address to Melane Conyers-Ausbrooks, Secretary of the Board, National Credit Union Administration, 1775 Duke Street, Alexandria, Virginia 22314-3428.
- *Hand Delivery/Courier:* Same as mailing address.

*Public Inspection:* You may view all public comments on the Federal eRulemaking Portal at https://www.regulations.gov, as submitted, except for those we cannot post for technical reasons. The NCUA will not edit or remove any identifying or contact information from the public comments submitted. If you are unable to access public comments on the internet, you may contact the NCUA for alternative access by calling (703) 518-6540 or emailing OGCMail@ncua.gov.

*FHFA*: You may submit your comments on the proposed rule, identified by regulatory information number (RIN) 2590–AA42, by any one of the following methods:

- *Agency Website:* www.fhfa.gov/open-for-comment-or-input.
- *Federal eRulemaking Portal:* https://www.regulations.gov. Follow the instructions for submitting comments. If you submit your comment to the Federal eRulemaking Portal, please also send it by email to FHFA at RegComments@fhfa.gov to ensure timely

receipt by FHFA. Include the following information in the subject line of your submission: Comments/RIN 2590–AB30.

- *Hand Delivered/Courier:* The hand delivery address is: Clinton Jones, General Counsel, Attention: Comments/ RIN 2590–AB30, Federal Housing Finance Agency, 400 Seventh Street SW, Washington, DC 20219. Deliver the package at the Seventh Street SW entrance Guard Desk, First Floor, on business days between 9 a.m. and 5 p.m.
- *U.S. Mail, United Parcel Service, Federal Express, or Other Mail Service:* The mailing address for comments is: Clinton Jones, General Counsel, Attention: Comments/RIN 2590–AB30, Federal Housing Finance Agency, 400 Seventh Street SW, Washington, DC 20219. Please note that all mail sent to FHFA via U.S. Mail is routed through a national irradiation facility, a process that may delay delivery by approximately two weeks. For time sensitive correspondence, please plan accordingly.
- *Public Comments and Access:* Copies of all comments received by the deadline will be posted on the FHFA website at http://www.fhfa.gov, and will include any personal information you provide, such as your name, address, email address, and telephone number. In addition, copies of all comments received by the deadline will be available for examination by the public through the electronic rulemaking docket for this proposed rule, also located on the FHFA website.

**FOR FURTHER INFORMATION CONTACT:**

*OCC*: Alison MacDonald, Senior Counsel, (202) 649-7314, or Melissa Lisenbee, Counsel, (202) 649-7392, Chief Counsel's Office; Tamara Culler, Director for Governance and Operational Risk Policy, Bank Supervision Policy, (202) 649-7866; or Heather Gilmore,

Lead Expert for Governance and Operational Risk, Supervision Risk and Analysis, (215) 494-7686, Office of the Comptroller of the Currency, 400 7th Street, SW, Washington, DC 20219. If you are deaf, hard of hearing, or have a speech disability, please dial 7–1–1 to access telecommunications relay services.

*FDIC*: Thomas Lyons, Associate Director, Risk Management Policy, (202) 898-6850, Nefretete Smith, Supervisory Counsel, Legal Division, (202) 898– 6851, NefSmith@FDIC.gov, Catherine Topping, Counsel, Legal Division, (202) 898–3975, CTopping@FDIC.gov, Amy Ledig, Senior Attorney, Legal Division, (202) 898-7261, ALedig@fdic.gov, Chantal Hernandez, Counsel, Legal Division, (202) 898-7388, ChHernandez@FDIC.gov.

*NCUA*: Office of Examination and Insurance: Summer Chapman, Policy Division Director, (703) 203-6262, *schapman@ncua.gov*, and John Berry, Policy Officer, (571) 451-7264, jberry@ncua.gov; Office of General Counsel: Senior Staff Attorneys, Ariel Pereira, (703) 548-2778, apereira@ncua.gov, and Gira Bose, (703) 518-6562, gbose@ncua.gov.

*FHFA*: Richard Oettinger, Policy Manager, Executive Compensation and Benefits, (202) 649-3797, richard.oettinger@fhfa.gov; or Dinah Knight, Assistant General Counsel, Office of General Counsel, (202) 748-7801, dinah.knight@fhfa.gov, Federal Housing Finance Agency, 400 Seventh Street, SW, Washington, DC 20219. These are not toll-free numbers. For TTY/TRS users with hearing and speech disabilities, dial 711 and ask to be connected to any of the contact numbers above.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. INTRODUCTION .......... 8
Overview of Previous Issuances .......... 12
Relevant Supervisory Experience and Developments .......... 27

II. OVERVIEW OF THE 2024 PROPOSED RULE ..... 44
III. REQUESTS FOR COMMENT ..... 47
A. Requests for Comment ..... 47
B. Specific alternatives ..... 64
IV. ADMINISTRATIVE LAW MATTERS ..... 73
A. Regulatory Flexibility Act ..... 74
B. Paperwork Reduction Act ..... 77
C. Providing Accountability Through Transparency Act of 2023 ..... 82
D. Riegle Community Development and Regulatory Improvement Act of 1994 ..... 83
E. Plain Language ..... 84
F. OCC Unfunded Mandates Reform Act of 1995 Determination ..... 85
G. Differences Between the Federal Home Loan Banks and the Enterprises ..... 86
H. NCUA Executive Order 13132 Determination ..... 86
I. Assessment of Federal Regulations and Policies on Families ..... 87

## I. INTRODUCTION

Section 956 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act" or the "Act")[1] requires "the appropriate Federal regulators," defined as the Federal Deposit Insurance Corporation ("FDIC"), the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Board"), the Federal Housing Finance Agency ("FHFA"), the National Credit Union Administration ("NCUA"), and the Securities and Exchange Commission ("SEC"),[2] to jointly prescribe regulations or guidelines with respect to incentive-based compensation practices at certain financial institutions (referred to as "covered financial institutions").[3] Specifically, section 956 of the Dodd-Frank Act ("section 956") requires that the appropriate Federal regulators prohibit any types of incentive-based compensation

[1] Public Law 111–203, 124 Stat. 1376 (2010), codified at 12 U.S.C. 5641.
[2] The Act also lists the Office of Thrift Supervision, which was abolished in 2011.
[3] 12 U.S.C. 5641(b).

§ 1232.1 Authority, scope, and initial applicability.

(a) Authority. This part is issued pursuant to section 956 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 5641) and sections 1311, 1313, 1314, 1318, and 1319G and Subtitle C of the Safety and Soundness Act (12 U.S.C. 4511(b), 4513, 4514, 4518, 4526, and ch. 46 subch. III).

(b) Scope. This part applies to a covered institution with average total consolidated assets greater than or equal to $1 billion that offers incentive-based compensation to covered persons.

(c) Initial applicability—(1) Compliance date. A covered institution must meet the requirements of this part no later than [Date of the beginning of the first calendar quarter that begins at least 540 days after a final rule is published in the Federal Register]. Whether a covered institution other than a Federal Home Loan Bank is a Level 1, Level 2, or Level 3 covered institution at that time will be determined based on average total consolidated assets as of [Date of the beginning of the first calendar quarter that begins after a final rule is published in the Federal Register].

(2) Grandfathered plans. A covered institution is not required to comply with the requirements of this part with respect to any incentive-based compensation plan with a performance period that begins before [Compliance Date as described in paragraph (c)(1) of this section].

(d) Preservation of authority. Nothing in this part in any way limits the authority of the Federal Housing Finance Agency under other provisions of applicable law and regulations.

**§ 1232.2 Definitions.**

For purposes of this part only, the following definitions apply unless otherwise specified:

(a) [Reserved].

(b) Average total consolidated assets means the average of a regulated institution's total consolidated assets, as reported on the regulated institution's regulatory reports, for the four most recent consecutive quarters. If a regulated institution has not filed a regulatory report for each of the four most recent consecutive quarters, the regulated institution's average total consolidated assets means the average of its total consolidated assets, as reported on its regulatory reports, for the most recent quarter or consecutive quarters, as applicable. Average total consolidated assets are measured on the as-of date of the most recent regulatory report used in the calculation of the average.

(c) To award incentive-based compensation means to make a final determination, conveyed to a covered person, of the amount of incentive-based compensation payable to the covered person for performance over a performance period.

(d) Board of directors means the governing body of a covered institution that oversees the activities of the covered institution, often referred to as the board of directors or board of managers.

(e) Clawback means a mechanism by which a covered institution can recover vested incentive-based compensation from a covered person.

(f) Compensation, fees, or benefits means all direct and indirect payments, both cash and non-cash, awarded to, granted to, or earned by or for the benefit of, any covered person in exchange for services rendered to a covered institution.

(g) [Reserved.]

(h) Control function means a compliance, risk management, internal audit, legal, human resources, accounting, financial reporting, or finance role responsible for identifying, measuring, monitoring, or controlling risk-taking.

(i) Covered institution means a regulated institution with average total consolidated assets greater than or equal to $1 billion.

(j) Covered person means any executive officer, employee, director, or principal shareholder who receives incentive-based compensation at a covered institution.

(k) Deferral means the delay of vesting of incentive-based compensation beyond the date on which the incentive-based compensation is awarded.

(l) Deferral period means the period of time between the date a performance period ends and the last date on which the incentive-based compensation awarded for such performance period vests.

(m) [Reserved]

(n) Director of a covered institution means a member of the board of directors.

(o) Downward adjustment means a reduction of the amount of a covered person's incentive-based compensation not yet awarded for any performance period that has already begun, including amounts payable under long-term incentive plans, in accordance with a forfeiture and downward adjustment review under § 1232.7(b).

(p) Equity-like instrument means:

(1) Equity in the covered institution or of any affiliate of the covered institution; or

(2) A form of compensation:

(i) Payable at least in part based on the price of the shares or other equity instruments of the covered institution or of any affiliate of the covered institution; or

(ii) That requires, or may require, settlement in the shares of the covered institution or of any affiliate of the covered institution.

(q) Forfeiture means a reduction of the amount of deferred incentive-based compensation awarded to a covered person that has not vested.

(r) Incentive-based compensation means any variable compensation, fees, or benefits that serve as an incentive or reward for performance.

(s) Incentive-based compensation arrangement means an agreement between a covered institution and a covered person, under which the covered institution provides incentive-based compensation to the covered person, including incentive-based compensation delivered through one or more incentive-based compensation plans.

(t) Incentive-based compensation plan means a document setting forth terms and conditions governing the opportunity for and the payment of incentive-based compensation payments to one or more covered persons.

(u) Incentive-based compensation program means a covered institution's framework for incentive-based compensation that governs incentive-based compensation practices and establishes related controls.

(v) Level 1 covered institution means a covered institution with average total consolidated assets greater than or equal to $250 billion that is not a Federal Home Loan Bank.

(w) Level 2 covered institution means a covered institution with average total consolidated assets greater than or equal to $50 billion that is not a Level 1 covered institution and any Federal Home Loan Bank that is a covered institution.

(x) Level 3 covered institution means a covered institution with average total consolidated assets greater than or equal to $1 billion that is not a Level 1 covered institution or Level 2 covered institution.

(y) Long-term incentive plan means a plan to provide incentive-based compensation that is based on a performance period of at least three years.

(z) Option means an instrument through which a covered institution provides a covered person the right, but not the obligation, to buy a specified number of shares representing an ownership stake in a company at a predetermined price within a set time period or on a date certain, or any similar instrument, such as a stock appreciation right.

(aa) Performance period means the period during which the performance of a covered person is assessed for purposes of determining incentive-based compensation.

(bb) Principal shareholder means a natural person who, directly or indirectly, or acting through or in concert with one or more persons, owns, controls, or has the power to vote 10 percent or more of any class of voting securities of a covered institution.

(cc) Qualifying incentive-based compensation means the amount of incentive-based compensation awarded to a covered person for a particular performance period, excluding

amounts awarded to the covered person for that particular performance period under a long-term incentive plan.

(dd) Regulated institution means an Enterprise, as defined in 12 U.S.C. 4502(10), and a Federal Home Loan Bank.

(ee) Regulatory report means the Call Report Statement of Condition.

(ff) [Reserved].

(gg) Senior executive officer means a covered person who holds the title or, without regard to title, salary, or compensation, performs the function of one or more of the following positions at a covered institution for any period of time in the relevant performance period: president, chief executive officer, executive chairman, chief operating officer, chief financial officer, chief investment officer, chief legal officer, chief lending officer, chief risk officer, chief compliance officer, chief audit executive, chief credit officer, chief accounting officer, or head of a major business line or control function.

(hh) Significant risk-taker means:

(1) Any covered person at a Level 1 or Level 2 covered institution, other than a senior executive officer, who received annual base salary and incentive-based compensation for the last calendar year that ended at least 180 days before the beginning of the performance period of which at least one-third is incentive-based compensation and is—

(i) A covered person of a Level 1 covered institution who received annual base salary and incentive-based compensation for the last calendar year that ended at least 180 days before the beginning of the performance period that placed the covered person

among the highest 5 percent in annual base salary and incentive-based compensation among all covered persons (excluding senior executive officers) of the Level 1 covered institution;

(ii) A covered person of a Level 2 covered institution who received annual base salary and incentive-based compensation for the last calendar year that ended at least 180 days before the beginning of the performance period that placed the covered person among the highest 2 percent in annual base salary and incentive-based compensation among all covered persons (excluding senior executive officers) of the Level 2 covered institution; or

(iii) A covered person of a covered institution who may commit or expose 0.5 percent or more of the regulatory capital, in the case of a Federal Home Loan Bank, or the minimum capital, in the case of an Enterprise, of the covered institution; and

(2) Any covered person at a Level 1 or Level 2 covered institution, other than a senior executive officer, who is designated as a "significant risk-taker" by the Federal Housing Finance Agency because of that person's ability to expose a covered institution to risks that could lead to material financial loss in relation to the covered institution's size, capital, or overall risk tolerance, in accordance with procedures established by the Federal Housing Finance Agency, or by the covered institution.

(3) [Reserved].

(4) If the Federal Housing Finance Agency determines, in accordance with procedures established by the Federal Housing Finance Agency, that a Level 1 covered institution's activities, complexity of operations, risk profile, and compensation practices are similar

to those of a Level 2 covered institution, the Level 1 covered institution may apply paragraph (hh)(1)(i) of this section to covered persons of the Level 1 covered institution by substituting "2 percent" for "5 percent".

(ii) [Reserved].

(jj) Vesting of incentive-based compensation means the transfer of ownership of the incentive-based compensation to the covered person to whom the incentive-based compensation was awarded, such that the covered person's right to the incentive-based compensation is no longer contingent on the occurrence of any event.

**§ 1232.3 Applicability.**

(a) When average total consolidated assets increase—(1) In general. A regulated institution other than a Federal Home Loan Bank shall become a Level 1, Level 2, or Level 3 covered institution when its average total consolidated assets increase to an amount that equals or exceeds $250 billion, $50 billion, or $1 billion, respectively.

(2) Compliance date. A regulated institution that becomes a Level 1, Level 2, or Level 3 covered institution pursuant to paragraph (a)(1) of this section shall comply with the requirements of this part for a Level 1, Level 2, or Level 3 covered institution, respectively, not later than the first day of the first calendar quarter that begins at least 540 days after the date on which the regulated institution becomes a Level 1, Level 2, or Level 3 covered institution, respectively. Until that day, the Level 1, Level 2, or Level 3 covered institution will remain subject to the requirements of this part, if any, that applied to the regulated institution on the day before the date on which it became a Level 1, Level 2, or Level 3 covered institution.

(3) Grandfathered plans. A regulated institution that becomes a Level 1, Level 2, or Level 3 covered institution under paragraph (a)(1) of this section is not required to comply with requirements of this part applicable to a Level 1, Level 2, or Level 3 covered institution, respectively, with respect to any incentive-based compensation plan with a performance period that begins before the date described in paragraph (a)(2) of this section. Any such incentive-based compensation plan shall remain subject to the requirements under this part, if any, that applied to the regulated institution at the beginning of the performance period.

(b) When total consolidated assets decrease. A Level 1, Level 2, or Level 3 covered institution other than a Federal Home Loan Bank will remain subject to the requirements applicable to such covered institution under this part unless and until the total consolidated assets of the covered institution, as reported on the covered institution's regulatory reports, fall below $250 billion, $50 billion, or $1 billion, respectively, for each of four consecutive quarters. A Federal Home Loan Bank will remain subject to the requirements of a Level 2 covered institution under this part unless and until the total consolidated assets of the Federal Home Loan Bank, as reported on the Federal Home Loan Bank's regulatory reports, fall below $1 billion for each of four consecutive quarters. The calculation will be effective on the as-of date of the fourth consecutive regulatory report.

**§ 1232.4 Requirements and prohibitions applicable to all covered institutions.**

(a) In general. A covered institution must not establish or maintain any type of incentive-based compensation arrangement, or any feature of any such arrangement, that encourages inappropriate risks by the covered institution:

(1) By providing a covered person with excessive compensation, fees, or benefits; or

(2) That could lead to material financial loss to the covered institution.

(b) Excessive compensation. Compensation, fees, and benefits are considered excessive for purposes of paragraph (a)(1) of this section when amounts paid are unreasonable or disproportionate to the value of the services performed by a covered person, taking into consideration all relevant factors, including, but not limited to:

(1) The combined value of all compensation, fees, or benefits provided to the covered person;

(2) The compensation history of the covered person and other individuals with comparable expertise at the covered institution;

(3) The financial condition of the covered institution;

(4) Compensation practices at comparable institutions, based upon such factors as asset size, geographic location, and the complexity of the covered institution's operations and assets;

(5) For post-employment benefits, the projected total cost and benefit to the covered institution; and

(6) Any connection between the covered person and any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the covered institution.

(c) Material financial loss. An incentive-based compensation arrangement at a covered institution encourages inappropriate risks that could lead to material financial loss to the covered institution, unless the arrangement:

(1) Appropriately balances risk and reward;

(2) Is compatible with effective risk management and controls; and

(3) Is supported by effective governance.

(d) Performance measures. An incentive-based compensation arrangement will not be considered to appropriately balance risk and reward for purposes of paragraph (c)(1) of this section unless:

(1) The arrangement includes financial and non-financial measures of performance, including considerations of risk-taking, that are relevant to a covered person's role within a covered institution and to the type of business in which the covered person is engaged and that are appropriately weighted to reflect risk-taking;

(2) The arrangement is designed to allow non-financial measures of performance to override financial measures of performance when appropriate in determining incentive-based compensation; and

(3) Any amounts to be awarded under the arrangement are subject to adjustment to reflect actual losses, inappropriate risks taken, compliance deficiencies, or other measures or aspects of financial and non-financial performance.

(e) Board of directors. A covered institution's board of directors, or a committee thereof, must:

(1) Conduct oversight of the covered institution's incentive-based compensation program;

(2) Approve incentive-based compensation arrangements for senior executive officers, including the amounts of all awards and, at the time of vesting, payouts under such arrangements; and

(3) Approve any material exceptions or adjustments to incentive-based compensation policies or arrangements for senior executive officers.

(f) Disclosure and recordkeeping requirements. A covered institution must create annually and maintain for a period of at least seven years records that document the structure of all its incentive-based compensation arrangements and demonstrate compliance with this part. A covered institution must disclose the records to the Federal Housing Finance Agency upon request. At a minimum, the records must include copies of all incentive-based compensation plans, a record of who is subject to each plan, and a description of how the incentive-based compensation program is compatible with effective risk management and controls.

(g) Rule of construction. A covered institution is not required to report the actual amount of compensation, fees, or benefits of individual covered persons as part of the disclosure and recordkeeping requirements under this part, though it may be required to do so under other applicable regulations of the Federal Housing Finance Agency.

**§ 1232.5 Additional disclosure and recordkeeping requirements for Level 1 and Level 2 covered institutions.**

(a) A Level 1 or Level 2 covered institution must create annually and maintain for a period of at least seven years records that document:

(1) The covered institution's senior executive officers and significant risk-takers, listed by legal entity, job function, organizational hierarchy, and line of business;

(2) The incentive-based compensation arrangements for senior executive officers and significant risk-takers, including information on percentage of incentive-based compensation deferred and form of award;

(3) Any forfeiture and downward adjustment or clawback reviews and decisions for senior executive officers and significant risk-takers; and

(4) Any material changes to the covered institution's incentive-based compensation arrangements and policies.

(b) A Level 1 or Level 2 covered institution must create and maintain records in a manner that allows for an independent audit of incentive-based compensation arrangements, policies, and procedures, including those required under § 1232.11.

(c) A Level 1 or Level 2 covered institution must provide the records described in paragraph (a) of this section to the Federal Housing Finance Agency in such form and with such frequency as requested by the Federal Housing Finance Agency.

**§ 1232.6 Reservation of authority for Level 3 covered institutions.**

(a) In general. The Federal Housing Finance Agency may require a Level 3 covered institution with average total consolidated assets greater than or equal to $10 billion and less than $50 billion to comply with some or all of the provisions of §§ 1232.5 and 1232.7 through 1232.11 if the Federal Housing Finance Agency determines that the Level 3 covered institution's complexity of operations or compensation practices are consistent with those of a Level 1 or Level 2 covered institution.

(b) Factors considered. Any exercise of authority under this section will be in writing by the Federal Housing Finance Agency in accordance with procedures established by the Federal Housing Finance Agency and will consider the activities, complexity of operations, risk profile, and compensation practices of the Level 3 covered institution, in addition to any other relevant factors.

**§ 1232.7 Deferral, forfeiture and downward adjustment, and clawback requirements for Level 1 and Level 2 covered institutions.**

An incentive-based compensation arrangement at a Level 1 or Level 2 covered institution will not be considered to appropriately balance risk and reward, for purposes of § 1232.4(c)(1), unless the following requirements are met.

(a) Deferral. (1) Qualifying incentive-based compensation must be deferred as follows:

(i) Minimum required deferral amount. (A) A Level 1 covered institution must defer at least 60 percent of a senior executive officer's qualifying incentive-based compensation awarded for each performance period.

(B) A Level 1 covered institution must defer at least 50 percent of a significant risk-taker's qualifying incentive-based compensation awarded for each performance period.

(C) A Level 2 covered institution must defer at least 50 percent of a senior executive officer's qualifying incentive-based compensation awarded for each performance period.

(D) A Level 2 covered institution must defer at least 40 percent of a significant risk-taker's qualifying incentive-based compensation awarded for each performance period.

(ii) Minimum required deferral period. (A) For a senior executive officer or significant risk-taker of a Level 1 covered institution, the deferral period for deferred qualifying incentive-based compensation must be at least 4 years.

(B) For a senior executive officer or significant risk-taker of a Level 2 covered institution, the deferral period for deferred qualifying incentive-based compensation must be at least 3 years.

(iii) Vesting of amounts during deferral period—(A) Pro rata vesting. During a deferral period, deferred qualifying incentive-based compensation may not vest faster than on a pro rata annual basis beginning no earlier than the first anniversary of the end of the performance period for which the amounts were awarded.

(B) Acceleration of vesting. A Level 1 or Level 2 covered institution must not accelerate the vesting of a covered person's deferred qualifying incentive-based compensation that is required to be deferred under this part, except in the case of death or disability of such covered person.

(2) Incentive-based compensation awarded under a long-term incentive plan must be deferred as follows:

(i) Minimum required deferral amount.

(A) A Level 1 covered institution must defer at least 60 percent of a senior executive officer's incentive-based compensation awarded under a long-term incentive plan for each performance period.

(B) A Level 1 covered institution must defer at least 50 percent of a significant risk-taker's incentive-based compensation awarded under a long-term incentive plan for each performance period.

(C) A Level 2 covered institution must defer at least 50 percent of a senior executive officer's incentive-based compensation awarded under a long-term incentive plan for each performance period.

(D) A Level 2 covered institution must defer at least 40 percent of a significant risk-taker's incentive-based compensation awarded under a long-term incentive plan for each performance period.

(ii) Minimum required deferral period. (A) For a senior executive officer or significant risk-taker of a Level 1 covered institution, the deferral period for deferred long-term incentive plan amounts must be at least 2 years.

(B) For a senior executive officer or significant risk-taker of a Level 2 covered institution, the deferral period for deferred long-term incentive plan amounts must be at least 1 year.

(iii) Vesting of amounts during deferral period—(A) Pro rata vesting. During a deferral period, deferred long-term incentive plan amounts may not vest faster than on a pro rata annual basis beginning no earlier than the first anniversary of the end of the performance period for which the amounts were awarded.

(B) Acceleration of vesting. A Level 1 or Level 2 covered institution must not accelerate the vesting of a covered person's deferred long-term incentive plan amounts that is required to be deferred under this part, except in the case of death or disability of such covered person.

(3) Adjustments of deferred qualifying incentive-based compensation and deferred long-term incentive plan compensation amounts. A Level 1 or Level 2 covered institution

may not increase deferred qualifying incentive-based compensation or deferred long-term incentive plan amounts for a senior executive officer or significant risk-taker during the deferral period. For purposes of this paragraph, an increase in value attributable solely to a change in share value, a change in interest rates, or the payment of interest according to terms set out at the time of the award is not considered an increase in incentive-based compensation amounts.

(4) Composition of deferred qualifying incentive-based compensation and deferred long-term incentive plan compensation for Level 1 and Level 2 covered institutions—(i) Cash and equity-like instruments. For a senior executive officer or significant risk-taker of a Level 1 or Level 2 covered institution, any deferred qualifying incentive-based compensation or deferred long-term incentive plan amounts must include substantial portions of both deferred cash and, in the case of a covered institution that issues equity instruments and is permitted by the Federal Housing Finance Agency to use equity-like instruments as compensation for senior executive officers and significant risk-takers, equity-like instruments throughout the deferral period.

(ii) Options. If a senior executive officer or significant risk-taker of a Level 1 or Level 2 covered institution receives incentive-based compensation for a performance period in the form of options, the total amount of such options that may be used to meet the minimum deferral amount requirements of paragraph (a)(1)(i) or (a)(2)(i) of this section is limited to no more than 15 percent of the amount of total incentive-based compensation awarded to the senior executive officer or significant risk-taker for that performance period.

(b) Forfeiture and downward adjustment—(1) Compensation at risk. (i) A Level 1 or Level 2 covered institution must place at risk of forfeiture all unvested deferred incentive-based compensation of any senior executive officer or significant risk-taker, including unvested deferred amounts awarded under long-term incentive plans.

(ii) A Level 1 or Level 2 covered institution must place at risk of downward adjustment all of a senior executive officer's or significant risk-taker's incentive-based compensation amounts not yet awarded for the current performance period, including amounts payable under long-term incentive plans.

(2) Events triggering forfeiture and downward adjustment review. At a minimum, a Level 1 or Level 2 covered institution must consider forfeiture and downward adjustment of incentive-based compensation of senior executive officers and significant risk-takers described in paragraph (b)(3) of this section due to any of the following adverse outcomes at the covered institution:

(i) Poor financial performance attributable to a significant deviation from the risk parameters set forth in the covered institution's policies and procedures;

(ii) Inappropriate risk taking, regardless of the impact on financial performance;

(iii)Material risk management or control failures;

(iv)Non-compliance with statutory, regulatory, or supervisory standards that results in:

(A) Enforcement or legal action against the covered institution brought by a federal or state regulator or agency; or

(B) A requirement that the covered institution report a restatement of a financial statement to correct a material error; and

(v) Other aspects of conduct or poor performance as defined by the covered institution.

(3) <u>Senior executive officers and significant risk-takers affected by forfeiture and downward adjustment</u>. A Level 1 or Level 2 covered institution must consider forfeiture and downward adjustment for a senior executive officer or significant risk-taker with direct responsibility, or responsibility due to the senior executive officer's or significant risk-taker's role or position in the covered institution's organizational structure, for the events related to the forfeiture and downward adjustment review set forth in paragraph (b)(2) of this section.

(4) <u>Determining forfeiture and downward adjustment amounts.</u> A Level 1 or Level 2 covered institution must consider, at a minimum, the following factors when determining the amount or portion of a senior executive officer's or significant risk-taker's incentive-based compensation that should be forfeited or adjusted downward:

(i) The intent of the senior executive officer or significant risk-taker to operate outside the risk governance framework approved by the covered institution's board of directors or to depart from the covered institution's policies and procedures;

(ii) The senior executive officer's or significant risk-taker's level of participation in, awareness of, and responsibility for, the events triggering the forfeiture and downward adjustment review set forth in paragraph (b)(2) of this section;

(iii)Any actions the senior executive officer or significant risk-taker took or could have taken to prevent the events triggering the forfeiture and downward adjustment review set forth in paragraph (b)(2) of this section;

(iv) The financial and reputational impact of the events triggering the forfeiture and downward adjustment review set forth in paragraph (b)(2) of this section to the covered institution, the line or sub-line of business, and individuals involved, as applicable, including the magnitude of any financial loss and the cost of known or potential subsequent fines, settlements, and litigation;

(v) The causes of the events triggering the forfeiture and downward adjustment review set forth in paragraph (b)(2) of this section, including any decision-making by other individuals; and

(vi) Any other relevant information, including past behavior and past risk outcomes attributable to the senior executive officer or significant risk-taker.

(c) Clawback. A Level 1 or Level 2 covered institution must include clawback provisions in incentive-based compensation arrangements for senior executive officers and significant risk-takers that, at a minimum, allow the covered institution to recover incentive-based compensation from a current or former senior executive officer or significant risk-taker for seven years following the date on which such compensation vests, if the covered institution determines that the senior executive officer or significant risk-taker engaged in:

(1) Misconduct that resulted in significant financial or reputational harm to the covered institution;

(2) Fraud; or

(3) Intentional misrepresentation of information used to determine the senior executive officer or significant risk-taker's incentive-based compensation.

an exemption under the Freedom of Information Act (5 U.S.C. 552(b)(4) and (b)(6)). The confidentiality status of the information submitted will be judged on a case-by-case basis.

*Abstract:* The information collected assists the Federal Reserve, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision in fulfilling their statutory responsibilities as supervisors. Each of these forms is used to collect information in connection with applications and notices filed prior to proposed changes in the ownership or management of banking organizations. The agencies use the information to evaluate the controlling owners, senior officers, and directors of the insured depository institutions subject to their oversight.

4. *Report title:* Recordkeeping and Disclosure Requirements Associated with Regulation R.

*Agency form number:* FR 4025.

*OMB control number:* 7100–0316.

*Frequency:* On occasion.

*Reporters:* Commercial banks and savings associations.

*Estimated annual reporting hours:* Section 701, disclosures to customers—12,500 hours; Section 701, disclosures to brokers—375 hours; Section 723, recordkeeping—188 hours; Section 741, disclosures to customers—62,500 hours.

*Estimated average hours per response:* Section 701, disclosures to customers—5 minutes; Section 701, disclosures to brokers—15 minutes; Section 723, recordkeeping—15 minutes; Section 741, disclosures to customers—5 minutes.

*Number of respondents:* Section 701, disclosures to customers—1,500; Section 701, disclosures to brokers—1,500; Section 723, recordkeeping—75; Section 741, disclosures to customers—750.

*General description of report:* This information collection is required to obtain a benefit pursuant to section 3(a)(4)(F) of the Securities Exchange Act (15 U.S.C. 78c(a)(4)(F)) and may be given confidential treatment under the authority of the Freedom of Information Act (5 U.S.C. 552(b)(4) and (b)(8)).

*Abstract:* Regulation R implements certain exceptions for banks from the definition of broker under Section 3(a)(4) of the Securities Exchange Act of 1934, as amended by the Gramm-Leach-Bliley Act. Sections 701, 723, and 741 of Regulation R contain information collection requirements. Section 701 requires banks that wish to utilize the exemption in that section to make certain disclosures to the high net worth customer or institutional customer. In addition, section 701 requires banks that wish to utilize the exemption in that section to provide a notice to its broker-dealer partner regarding names and other identifying information about bank employees. Section 723 requires a bank that chooses to rely on the exemption in that section to exclude certain trust or fiduciary accounts in determining its compliance with the chiefly compensated test in section 721 to maintain certain records relating to the excluded accounts. Section 741 requires a bank relying on the exemption provided by that section to provide customers with a prospectus for the money market fund securities, not later than the time the customer authorizes the bank to effect the transaction in such securities, if the class of series of securities are not no-load.

Board of Governors of the Federal Reserve System, June 22, 2010.

**Jennifer J. Johnson,**

*Secretary of the Board.*

[FR Doc. 2010–15492 Filed 6–24–10; 8:45 am]

BILLING CODE 6210–01–P

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR Part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The applications listed below, as well as other related filings required by the Board, are available for immediate inspection at the Federal Reserve Bank indicated. The applications also will be available for inspection at the offices of the Board of Governors. Interested persons may express their views in writing on the standards enumerated in the BHC Act (12 U.S.C. 1842(c)). If the proposal also involves the acquisition of a nonbanking company, the review also includes whether the acquisition of the nonbanking company complies with the standards in section 4 of the BHC Act (12 U.S.C. 1843). Unless otherwise noted, nonbanking activities will be conducted throughout the United States. Additional information on all bank holding companies may be obtained from the National Information Center website at *www.ffiec.gov/nic/*.

Unless otherwise noted, comments regarding each of these applications must be received at the Reserve Bank indicated or the offices of the Board of Governors not later than July 22, 2010.

**A. Federal Reserve Bank of Atlanta** (Clifford Stanford, Vice President) 1000 Peachtree Street, N.E., Atlanta, Georgia 30309:

1. *USAmeriBancorp, Inc.*, Largo, Florida; to acquire at least 50 percent of the voting shares of Aliant Financial Corporation, and thereby indirectly acquire voting shares of Aliant Bank, both of Alexander City, Alabama.

**B. Federal Reserve Bank of Minneapolis** (Jacqueline G. King, Community Affairs Officer) 90 Hennepin Avenue, Minneapolis, Minnesota 55480–0291:

1. *First Holding Company of Park River, Inc.*, Park River, North Dakota; to establish a wholly owned subsidiary, Sheyenne Bancorp, Inc., Park River, North Dakota, and thereby acquire 100 percent of the voting shares of First Sharon Holding Company, Inc., Aneta, North Dakota, and indirectly acquire voting shares of First State Bank of Sharon, Sharon, North Dakota. In connection with this application, Sheyenne Bancorp, Inc., has also applied to become a bank holding company.

Board of Governors of the Federal Reserve System, June 22, 2010.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

[FR Doc. 2010–15474 Filed 6–24–10; 8:45 am]

BILLING CODE 6210–01–S

## DEPARTMENT OF THE TREASURY

### Office of the Comptroller of the Currency

[Docket ID OCC–2010–0013]

## FEDERAL RESERVE SYSTEM

[Docket No. OP–1374]

## FEDERAL DEPOSIT INSURANCE CORPORATION

## DEPARTMENT OF THE TREASURY

### Office of Thrift Supervision

[Docket ID OTS–2010–0020]

### Guidance on Sound Incentive Compensation Policies

**AGENCY:** Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System, (Board or Federal Reserve);

Federal Deposit Insurance Corporation (FDIC); Office of Thrift Supervision, Treasury (OTS).

**ACTION:** Final guidance.

**SUMMARY:** The OCC, Board, FDIC and OTS (collectively, the Agencies) are adopting final guidance designed to help ensure that incentive compensation policies at banking organizations do not encourage imprudent risk-taking and are consistent with the safety and soundness of the organization.

**DATES:** *Effective Date:* The guidance is effective on June 25, 2010.

**FOR FURTHER INFORMATION CONTACT:**

*OCC:* Karen M. Kwilosz, Director, Operational Risk Policy, (202) 874–9457, or Reggy Robinson, Policy Analyst, Operational Risk Policy, (202) 874–4438.

*Board:* William F. Treacy, Adviser, (202) 452–3859, Division of Banking Supervision and Regulation; Mark S. Carey, Adviser, (202) 452–2784, Division of International Finance; Kieran J. Fallon, Associate General Counsel, (202) 452–5270 or Michael W. Waldron, Counsel, (202) 452–2798, Legal Division. For users of Telecommunications Device for the Deaf ("TDD") only, contact (202) 263–4869.

*FDIC:* Mindy West, Chief, Policy and Program Development, Division of Supervision and Consumer Protection, (202) 898–7221, or Robert W. Walsh, Review Examiner, Policy and Program Development, Division of Supervision and Consumer Protection, (202) 898–6649.

*OTS:* Rich Gaffin, Financial Analyst, Risk Modeling and Analysis, (202) 906–6181, or Richard Bennett, Senior Compliance Counsel, Regulations and Legislation Division, (202) 906–7409; Donna Deale, Director, Holding Company and International Policy, (202) 906–7488, Grovetta Gardineer, Managing Director, Corporate and International Activities, (202) 906–6068; Office of Thrift Supervision, 1700 G Street, NW., Washington, DC 20552.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Compensation arrangements are critical tools in the successful management of financial institutions. These arrangements serve several important and worthy objectives, including attracting skilled staff, promoting better organization-wide and employee performance, promoting employee retention, providing retirement security to employees, and allowing an organization's personnel costs to vary along with revenues.

It is clear, however, that compensation arrangements can provide executives and employees with incentives to take imprudent risks that are not consistent with the long-term health of the organization. For example, offering large payments to managers or employees to produce sizable increases in short-term revenue or profit—without regard for the potentially substantial short or long-term risks associated with that revenue or profit—can encourage managers or employees to take risks that are beyond the capability of the financial institution to manage and control.

Flawed incentive compensation practices in the financial industry were one of many factors contributing to the financial crisis that began in 2007. Banking organizations too often rewarded employees for increasing the organization's revenue or short-term profit without adequate recognition of the risks the employees' activities posed to the organization.

Having witnessed the damaging consequences that can result from misaligned incentives, many financial institutions are now re-examining their compensation structures with the goal of better aligning the interests of managers and other employees with the long-term health of the institution. Aligning the interests of shareholders and employees, however, is not always sufficient to protect the safety and soundness of a banking organization. Because banking organizations benefit directly or indirectly from the protections offered by the Federal safety net (including the ability of insured depository institutions to raise insured deposits and access the Federal Reserve's discount window and payment services), shareholders of a banking organization in some cases may be willing to tolerate a degree of risk that is inconsistent with the organization's safety and soundness. Thus, a review of incentive compensation arrangements and related corporate governance practices to ensure that they are effective from the standpoint of shareholders is not sufficient to ensure they adequately protect the safety and soundness of the organization.

### *A. Proposed Guidance*

In October 2009, the Federal Reserve issued and requested comment on Proposed Guidance on Sound Incentive Compensation Policies ("proposed guidance") to help protect the safety and soundness of banking organizations supervised by the Federal Reserve and to promote the prompt improvement of incentive compensation practices throughout the banking industry.[1] The proposed guidance was based on three key principles. These principles provided that incentive compensation arrangements at a banking organization should—

- Provide employees incentives that appropriately balance risk and reward;
- Be compatible with effective controls and risk-management; and
- Be supported by strong corporate governance, including active and effective oversight by the organization's board of directors.

Because incentive compensation arrangements for executive and non-executive employees may pose safety and soundness risks if not properly structured, the proposed guidance applied to senior executives as well as other employees who, either individually or as part of a group, have the ability to expose the relevant banking organization to material amounts of risk.

With respect to the first principle, the proposed guidance, among other things, provided that a banking organization should ensure that its incentive compensation arrangements do not encourage short-term profits at the expense of short- and longer-term risks to the organization. Rather, the proposed guidance indicated that banking organizations should adjust the incentive compensation provided so that employees bear some of the risk associated with their activities. To be fully effective, these adjustments should take account of the full range of risks that the employees' activities may pose for the organization. The proposed guidance highlighted several methods that banking organizations could use to adjust incentive compensation awards or payments to take account of risk.

With respect to the second principle, the proposed guidance provided that banking organizations should integrate their approaches to incentive compensation arrangements with their risk-management and internal control frameworks to better monitor and control the risks these arrangements may create for the organization. Accordingly, the proposed guidance provided that banking organizations should ensure that risk-management personnel have an appropriate role in designing incentive compensation arrangements and assessing whether the arrangements may encourage imprudent risk-taking. In addition, the proposed guidance provided that banking organizations should track incentive compensation awards and payments, risks taken, and actual risk outcomes to

[1] 74 FR 55227 (October 27, 2009).

determine whether incentive compensation payments to employees are reduced or adjusted to reflect adverse risk outcomes.

With respect to the third principle, the proposed guidance provided that a banking organization's board of directors should play an informed and active role in ensuring that the organization's compensation arrangements strike the proper balance between risk and profit not only at the initiation of a compensation program, but on an ongoing basis. Thus, the proposed guidance provided that boards of directors should review and approve key elements of their organizations' incentive compensation systems across the organization, receive and review periodic evaluations of whether their organizations' compensation systems for all major segments of the organization are achieving their risk-mitigation objectives, and directly approve the incentive compensation arrangements for senior executives.

The Board's proposed guidance applied to all banking organizations supervised by the Federal Reserve. However, the proposed guidance also included provisions intended to reflect the diversity among banking organizations, both with respect to the scope and complexity of their activities, as well as the prevalence and scope of incentive compensation arrangements. Thus, for example, the proposed guidance provided that the reviews, policies, procedures, and systems implemented by a smaller banking organization that uses incentive compensation arrangements on a limited basis would be substantially less extensive, formalized, and detailed than those at a large, complex banking organization (LCBO)[2] that uses incentive compensation arrangements extensively. In addition, because sound incentive compensation practices are important to protect the safety and soundness of all banking organizations, the Federal Reserve announced that it would work with the other Federal banking agencies to promote application of the guidance to all banking organizations.

The Board invited comment on all aspects of the proposed guidance. The Board also specifically requested comments on a number of issues, including whether:

- The three core principles are appropriate and sufficient to help ensure that incentive compensation arrangements do not threaten the safety and soundness of banking organizations;
- There are any material legal, regulatory, or other impediments to the prompt implementation of incentive compensation arrangements and related processes that would be consistent with those principles;
- Formulaic limits on incentive compensation would likely promote the safety and soundness of banking organizations, whether applied generally or to specific types of employees or banking organizations;
- Market forces or practices in the broader financial services industry, such as the use of "golden parachute" or "golden handshake" arrangements to retain or attract employees, present challenges for banking organizations in developing and maintaining balanced incentive compensation arrangements;
- The proposed guidance would impose undue burdens on, or have unintended consequences for, banking organizations, particularly smaller, less complex organizations, and whether there are ways such potential burdens or consequences could be addressed in a manner consistent with safety and soundness; and
- There are types of incentive compensation plans, such as organization-wide profit sharing plans that provide for distributions in a manner that is not materially linked to the performance of specific employees or groups of employees, that could and should be exempted from, or treated differently under, the guidance because they are unlikely to affect the risk-taking incentives of all, or a significant number of employees.

*B. Supervisory Initiatives*

In connection with the issuance of the proposed guidance, the Federal Reserve announced two supervisory initiatives:

- A special horizontal review of incentive compensation practices at LCBO's; and
- A review of incentive compensation practices at other banking organizations as part of the regular, risk-focused examination process for these organizations.

The horizontal review was designed to assess: The potential for these arrangements or practices to encourage imprudent risk-taking; the actions an organization has taken or proposes to take to correct deficiencies in its incentive compensation practices; and the adequacy of the organization's compensation-related risk-management, control, and corporate governance processes.

**II. Overview of Comments**

The Board received 34 written comments on the proposed guidance, which were shared and reviewed by all of the Agencies. Commenters included banking organizations, financial services trade associations, service providers to financial organizations, representatives of institutional shareholders, labor organizations, and individuals. Most commenters supported the goal of the proposed guidance—to ensure that incentive compensation arrangements do not encourage imprudent or undue risk-taking at banking organizations. Commenters also generally supported the principles-based approach of the proposed guidance. For example, many commenters specifically supported the avoidance of formulaic or one-size-fits-all approaches to incentive compensation in the proposed guidance. These commenters noted financial organizations are very diverse and should be permitted to adopt incentive compensation measures that fit their needs, while also being consistent with safe and sound operations. Several commenters also asserted that a formulaic approach would inevitably lead to exaggerated risk-taking incentives in some situations while discouraging employees from taking reasonable and appropriate risks in others. One commenter also argued that unintended consequences would be more likely to result from a "rigid rulemaking" than from a flexible, principles-based approach.

Many commenters requested that the Board revise or clarify the proposed guidance in one or more respects. For example, several commenters asserted that the guidance should impose specific restrictions on incentive compensation at banking organizations or mandate certain corporate governance or risk-management practices. One commenter recommended a requirement that most compensation for senior executives be provided in the form of variable, performance-vested equity awards that are deferred for at least five years, and that stock option compensation be prohibited. Another commenter advocated a ban on "golden parachute" payments and on bonuses based on metrics related to one year or less of performance. Other commenters suggested that the guidance should require banking organizations to have an independent chairman of the board of directors, require annual majority voting for all directors, or provide for shareholders to have a vote (so called

[2] In the proposed guidance (issued by the Federal Reserve), the term LCBO was used as this is the term utilized by the Federal Reserve in describing such organizations. The final guidance uses the term Large Banking Organization (LBO), which encompasses terminology utilized by the OCC, FDIC and OTS.

"say-on-pay" voting provisions) on the incentive compensation arrangements for certain employees of banking organizations. Other commenters requested that certain types of compensation plans, such as organization-wide profit sharing plans or 401(k) plans or plans covered by the Employee Retirement Income Security Act (29 U.S.C. 1400 *et seq.*), be exempted from the scope of the guidance because they were unlikely to provide employees incentives to expose their banking organization to undue risk.

Several commenters, however, did not support the proposed guidance. Some of these commenters felt that the proposed guidance was unnecessary and that the principles used in the proposed guidance were not needed. These commenters argued that the existing system of financial regulation and enforcement is sufficient to address the concerns raised in the proposed guidance. Several commenters also thought that the proposed guidance was too vague to be helpful, and that the ambiguity of the proposed guidance would make compliance more difficult, leading to increased costs and regulatory uncertainty. Some commenters also argued that the guidance was not warranted because there is insufficient evidence that incentive compensation practices contributed to safety and soundness or financial stability problems, or questioned the authority of the Federal Reserve or the other Federal banking agencies to act in this area.

In addition, a number of commenters expressed concern that the proposed guidance would impose undue burden on banking organizations, particularly smaller, less complex organizations. These commenters believed that incentive compensation practices at smaller banking organizations were generally not problematic from a safety and soundness perspective.[3] A number of commenters suggested that all or most smaller banking organizations should be exempt from the guidance. A number of commenters expressed concerns that the proposed guidance would impose unreasonable demands on the boards of directors of banking organizations and especially smaller organizations.

Several commenters also expressed concern that the proposed guidance, if implemented, could impede the ability of banking organizations to attract or retain qualified staff and compete with other financial services providers. In light of these concerns, some commenters suggested that the guidance expressly allow banking organizations to enter into such compensation arrangements as they deem necessary for recruitment or retention purposes. A number of commenters also encouraged the Federal Reserve to work with other domestic and foreign supervisors and authorities to promote consistent standards for incentive compensation practices at financial institutions and a level competitive playing field for financial service providers.

The comments received on the proposed guidance are further discussed below.

### III. Final Guidance

After carefully reviewing the comments on the proposed guidance, the Agencies have adopted final guidance that retains the same key principles embodied in the proposed guidance, with a number of adjustments and clarifications that address matters raised by the commenters. These principles are: (1) Incentive compensation arrangements at a banking organization should provide employees incentives that appropriately balance risk and financial results in a manner that does not encourage employees to expose their organizations to imprudent risk; (2) these arrangements should be compatible with effective controls and risk-management; and (3) these arrangements should be supported by strong corporate governance, including active and effective oversight by the organization's board of directors. The Agencies believe that it is important that incentive compensation arrangements at banking organizations do not provide incentives for employees to take risks that could jeopardize the safety and soundness of the organization. The final guidance seeks to address the safety and soundness risks of incentive compensation practices by focusing on the basic problem they can pose from a risk-management perspective, that is, incentive compensation arrangements—if improperly structured—can give employees incentives to take imprudent risks.

The Agencies believe the principles of the final guidance should help protect the safety and soundness of banking organizations and the stability of the financial system, and that adoption of the guidance is fully consistent with the Agencies' statutory mandate to protect the safety and soundness of banking organizations.[4]

The final guidance applies to all the banking organizations supervised by the Agencies, including national banks, State member banks, State nonmember banks, savings associations, U.S. bank holding companies, savings and loan holding companies, the U.S. operations of foreign banks with a branch, agency or commercial lending company in the United States, and Edge and agreement corporations (collectively, "banking organizations").

A number of changes have been made to the proposed guidance in response to comments. For example, the final guidance includes several provisions designed to reduce burden on smaller banking organizations and other banking organizations that are not significant users of incentive compensation. The Agencies also have made a number of changes to clarify the scope, intent, and terminology of the final guidance.

#### *A. Scope of Guidance*

Compensation practices were not the sole cause of the financial crisis, but they certainly were a contributing cause—a fact recognized by 98 percent of the respondents to a survey of banking organizations engaged in wholesale banking activities conducted in 2009 by the Institute of International Finance and publicly by a number of individual financial institutions.[5] Moreover, the problems caused by improper compensation practices were not limited to U.S. financial institutions, but were evident at major financial institutions worldwide, a fact recognized by international bodies such

[3] On the other hand, one commenter requested that the proposed guidance not be enforced differently at larger institutions solely because of their size.

[4] *See, e.g.*, 12 U.S.C. 1818(b). The Agencies regularly issue supervisory guidance based on the authority in section 8 of the Federal Deposit Insurance (FDI) Act. Guidance is used to identify practices that the Agencies believe would constitute an unsafe or unsound practice and/or identify risk-management systems, controls, or other practices that the Agencies believe would assist banking organizations in ensuring that they operate in a safe and sound manner. Savings associations should also refer to OTS's rule on employment contracts 12 CFR 563.39.

[5] *See*, Institute of International Finance, Inc. (2009), *Compensation in Financial Services: Industry Progress and the Agenda for Change* (Washington: IIF, March) available at *http://www.oliverwyman.com/ow/pdf_files/OW_En_FS_Publ_2009_CompensationInFS.pdf*. *See also* UBS, Shareholder Report on UBS's Write-Downs, April 18, 2008, pp. 41–42 (identifies incentive effects of UBS compensation practices as contributing factors in losses suffered by UBS due to exposure to the subprime mortgage market) available at *http://www.ubs.com/1/ShowMedia/investors/agm?contentId=140333&name=080418ShareholderReport.pdf*.

as the Financial Stability Board (FSB) and the Senior Supervisors Group.[6]

Because compensation arrangements for executive and non-executive employees alike may pose safety and soundness risks if not properly structured, these principles and the final guidance apply to senior executives as well as other employees who, either individually or as part of a group, have the ability to expose the banking organization to material amounts of risk.[7] These employees are referred to as "covered employees" in the final guidance. In response to comments, the final guidance clarifies that an employee or group of employees has the ability to expose a banking organization to material amounts of risk if the employees' activities are material to the organization or are material to a business line or operating unit that is itself material to the organization.

Some commenters suggested that certain categories of employees, such as tellers, bookkeepers, administrative assistants, or employees who process but do not originate transactions, do not expose banking organizations to significant levels of risk and therefore should be exempted from coverage under the final guidance. The final guidance, like the proposed guidance, indicates that the facts and circumstances will determine which jobs or categories of employees have the ability to expose the organization to material risks and which jobs or categories of employees may be outside the scope of the guidance. The final guidance recognizes, for example, that tellers, bookkeepers, couriers, and data processing personnel would likely not expose organizations to significant risks of the types meant to be addressed by the guidance. On the other hand, employees or groups of employees who do not originate business or approve transactions could still expose a banking organization to material risk in some circumstances. Therefore, the Agencies do not believe it would be appropriate to provide a blanket exemption from the final guidance for any category of covered employees that would apply to all banking organizations.

After reviewing the comments, the Agencies have retained the principles-based framework of the proposed guidance. The Agencies believe this approach is the most effective way to address incentive compensation practices, given the differences in the size and complexity of banking organizations covered by the guidance and the complexity, diversity, and range of use of incentive compensation arrangements by those organizations. For example, activities and risks may vary significantly across banking organizations and across employees within a particular banking organization. For this reason, the methods used to achieve appropriately risk-sensitive compensation arrangements likely will differ across and within organizations, and use of a single, formulaic approach likely will provide at least some employees with incentives to take imprudent risks.

The Agencies, however, have not modified the guidance, as some commenters requested, to provide that a banking organization may enter into incentive compensation arrangements that are inconsistent with the principles of safety and soundness whenever the organization believes that such action is needed to retain or attract employees. The Agencies recognize that while incentive compensation serves a number of important goals for banking organizations, including attracting and retaining skilled staff, these goals do not override the requirement for banking organizations to have incentive compensation systems that are consistent with safe and sound operations and that do not encourage imprudent risk-taking. The final guidance provides banking organizations with considerable flexibility in structuring their incentive compensation arrangements in ways that both promote safety and soundness and that help achieve the arrangements' other objectives.

The Agencies are mindful, however, that banking organizations operate in both domestic and international competitive environments that include financial services providers that are not subject to prudential oversight by the Agencies and, thus, not subject to the final guidance. The Agencies also recognize that international coordination in this area is important both to promote competitive balance and to ensure that internationally active banking organizations are subject to consistent requirements. For this reason, the Agencies will continue to work with their domestic and international counterparts to foster sound compensation practices across the financial services industry. Importantly, the final guidance is consistent with both the Principles for Sound Compensation Practices and the related Implementation Standards adopted by the FSB in 2009.[8] A number of commenters expressed concern about the levels of compensation paid to some employees of banking organizations. As noted above, several commenters requested that the Board eliminate or limit certain types of incentive compensation for employees of banking organizations. Other commenters advocated that certain forms of compensation be required. For example, some commenters urged a ban on incentive compensation payments made in stock options, while others supported their mandatory use. Comments also were received with regard to the use of other types of stock-based compensation, such as restricted stock and stock appreciation rights. Consistent with its principles-based approach, the final guidance does not mandate or prohibit the use of any specific forms of payment for incentive compensation or establish mandatory compensation levels or caps. Rather, the forms and levels of incentive compensation payments at banking organizations are expected to reflect the principles of the final guidance in a manner tailored to the business, risk profile, and other attributes of the banking organization. Incentive compensation structures that offer employees rewards for increasing short-term profit or revenue, without taking into account risk, may encourage imprudent risk-taking even if they meet formulaic levels or include or exclude certain forms of compensation. On the other hand, incentive compensation arrangements of various forms and levels may be properly structured so as not to encourage imprudent risk-taking.

In response to comments, the final guidance clarifies in a number of respects the expectation of the Agencies that the impact of the final guidance on

[6] *See*, Financial Stability Forum (2009), *FSF Principles for Sound Compensation Practices (87 KB PDF)* (Basel, Switzerland: FSF, April), available at *http://www.financialstabilityboard.org/publications/r_0904b.pdf*; and Senior Supervisors Group (2009), *Risk-management Lessons from the Global Banking Crisis of 2008* (Basel, Switzerland: SSG, October), available at *http://www.newyorkfed.org/newsevents/news/banking/2009/ma091021.html*. The Financial Stability Forum was renamed the Financial Stability Board in April 2009.

[7] In response to a number of comments requesting clarification regarding the scope of the term "senior executives" as used in the guidance, the final guidance states that "senior executive" includes, at a minimum, "executive officers" within the meaning of the Board's Regulation O (12 CFR 215.2(e)(1)) and, for publicly traded companies, "named officers" within the meaning of the Securities and Exchange Commission's rules on disclosure of executive compensation (17 CFR 229.402(a)(3)). Savings associations should also refer to OTS's rule on loans by savings associations to their executive officers, directors, and principal shareholders. 12 CFR 563.43.

[8] *See*, Financial Stability Forum, FSF Principles for Sound Compensation Practices, in note 6; and Financial Stability Board (2009), FSB Principles for Sound Compensation Practices: Implementation Standards (35 KB PDF) (Basel, Switzerland: FSB, September), available at *http://www.financialstabilityboard.org/publications/r_090925c.pdf*.

banking organizations will vary depending on the size and complexity of the organization and its level of usage of incentive compensation arrangements. It is expected that the guidance will generally have less impact on smaller banking organizations, which typically are less complex and make less use of incentive compensation arrangements than larger banking organizations. Because of the size and complexity of their operations, large banking organizations (LBOs)[9] should have and adhere to systematic and formalized policies, procedures and processes. These are considered important in ensuring that incentive compensation arrangements for all covered employees are identified and reviewed by appropriate levels of management (including the board of directors where appropriate and control units), and that they appropriately balance risks and rewards . The final guidance highlights the types of policies, procedures, and systems that LBOs should have and maintain, but that are not expected of other banking organizations. It is expected that, particularly in the case of LBO's, adoption of this principles-based approach will require an iterative supervisory process to ensure that the embedded flexibility that allows for customized arrangements for each banking organization does not undermine effective implementation of the guidance.

With respect to U.S. operations of foreign banks, incentive compensation policies, including management, review, and approval requirements for a foreign bank's U.S. operations should be coordinated with the foreign banking organization's group-wide policies developed in accordance with the rules of the foreign banking organization's home country supervisor. These policies and practices should be consistent with the foreign bank's overall corporate and management structure and its framework for risk-management and internal controls, as well as with the final guidance.

[9] For purposes of the final guidance, LBOs include, in the case of banking organizations supervised by (i) the Federal Reserve, large, complex banking organizations as identified by the Federal Reserve for supervisory purposes; (ii) the OCC, the largest and most complex national banks as defined in the Large Bank Supervision booklet of the Comptroller's Handbook; (iii) the FDIC, large complex insured depository institutions (IDIs); and (iv) the OTS, the largest and most complex savings associations and savings and loan holding companies. The term "smaller banking organizations" is used to refer to banking organizations that are not LBOs under the relevant agency's standard.

*B. Balanced Incentive Compensation Arrangements*

The first principle of the final guidance is that incentive compensation arrangements should provide employees incentives that appropriately balance risks and rewards in a manner that does not encourage imprudent risk-taking. The amounts of incentive pay flowing to covered employees should take account of and adjust for the risks and losses—as well as gains—associated with employees' activities, so that employees do not have incentives to take imprudent risk. The formulation of this principle is slightly different from that used in the proposed guidance, which stated that organizations should provide employees incentives that do not encourage imprudent risk-taking beyond the organization's ability to effectively identify and manage risk. This change was made to clarify that risk-management procedures and control functions that ordinarily limit risk-taking do not obviate the need to identify covered employees and to develop incentive compensation arrangements that properly balance risk-taking incentives. To be fully effective, balancing adjustments to incentive compensation arrangements should take account of the full range of risks that employees' activities may pose for the organization, including credit, market, liquidity, operational, legal, compliance, and reputational risks.

A number of commenters expressed the view that increased controls could mitigate a lack of balance in incentive compensation arrangements. Under this view, unbalanced incentive compensation arrangements could be addressed either through the modification of the incentive compensation arrangements or through the application of additional or more effective risk controls to the business. The final guidance recognizes that strong and effective risk-management and internal control functions are critical to the safety and soundness of banking organizations. However, the Agencies believe that poorly designed or managed incentive compensation arrangements can themselves be a source of risk to banking organizations and undermine the controls in place. Unbalanced incentive compensation arrangements can place substantial strain on the risk-management and internal control functions of even well-managed organizations. Furthermore, poorly balanced incentive compensation arrangements can encourage employees to take affirmative actions to weaken the organization's risk-management or internal control functions.

The final guidance, like the proposed guidance, outlines four methods that are currently in use to make compensation more sensitive to risk. These are risk adjustment of awards; deferral of payment; longer performance periods; and reduced sensitivity to short-term performance. Each method has advantages and disadvantages. For example, incentive compensation arrangements for senior executives at LBOs are likely to be better balanced if they involve deferral of a substantial portion of the executives' incentive compensation over a multi-year period, with payment made in the form of stock or other equity-based instruments and with the number of instruments ultimately received dependent on the performance of the organization (or, ideally, the performance of the executive) during the deferral period. Deferral, however, may not be effective in constraining the incentives of employees who may have the ability to expose the organization to long-term risks, as these risks may not be realized during a reasonable deferral period. For this reason, the final guidance recognizes that in some cases, two or more methods may be needed in combination (*e.g.*, risk adjustment of awards and deferral of payment) to achieve an incentive compensation arrangement that properly balances risk and reward.

Furthermore, the few methods noted in the final guidance are not exclusive, and other effective methods or variations may exist or be developed. Methods for achieving balanced compensation arrangements at one organization may not be effective at another organization. Each organization is responsible for ensuring that its incentive compensation arrangements are consistent with the safety and soundness of the organization. The guidance clarifies that LBOs should actively monitor industry, academic, and regulatory developments in incentive compensation practices and theory and be prepared to incorporate into their incentive compensation systems new or emerging methods that are likely to improve the organization's long-term financial well-being and safety and soundness.

In response to a question asked in the proposed guidance, several commenters requested that certain types of compensation plans be treated as beyond the scope of the final guidance because commenters believed these plans do not threaten the safety and soundness of banking organizations. These included organization-wide profit sharing plans, 401(k) plans, defined benefit plans, and ERISA plans.

The final guidance does not exempt any broad categories of compensation plans based on their tax structure, corporate form, or status as a retirement or other employee benefit plans, because any type of incentive compensation plan may be implemented in a way that increases risk inappropriately. In response to these comments, however, the final guidance recognizes that the term "incentive compensation" does not include arrangements that are based solely on the employees' level of compensation and that do not vary based on one or more performance metrics (*e.g.*, a 401(k) plan under which the organization contributes a set percentage of an employee's salary). In addition, the final guidance notes that incentive compensation plans that provide for awards based solely on overall organization-wide performance are unlikely to provide employees, other than senior executives and individuals who have the ability to materially affect the organization's overall performance, with unbalanced risk-taking incentives.

In many cases, there were comments on both sides of an issue, with some wanting less or no guidance and others wanting tough, or very specific prohibitions. For example, a number of commenters argued that the use of "golden parachutes" and similar retention and recruitment provisions to retain employees should be prohibited because such provisions have been abused in the past.[10] A larger number of commenters, however, argued against a per se ban on such arrangements, stating that these provisions were in some cases essential elements of effective recruiting and retention packages and are not necessarily a threat to safety and soundness. One commenter stated that golden parachute payments triggered by changes in control of a banking organization are too speculative to encourage imprudent risk-taking by employees.

The final guidance, like the proposed guidance, provides that banking organizations should carefully consider the potential for golden parachutes and similar arrangements to affect the risk-taking behavior of employees. The final guidance adds language noting that arrangements that provide an employee with a guaranteed payout upon departure from an organization regardless of performance may neutralize the effect of any balancing features included in the arrangement to help prevent imprudent risk-taking. Organizations should consider including balancing features—such as risk adjustments or deferral requirements—in golden parachutes and similar arrangements to mitigate the potential for the arrangements to encourage imprudent risk-taking.

Provisions that require a departing employee to forfeit deferred incentive compensation payments may also weaken the effectiveness of a deferral arrangement if the departing employee is able to negotiate a "golden handshake" arrangement with the employee's new organization.[11] Golden handshake provisions present special issues for banking organizations and supervisors, some of which are discussed in the final guidance, because it is the action of the employee's new employer—which may not be a regulated institution—that can affect the current employer's ability to properly align the employee's interest with the organization's long-term health. The final guidance states that LBOs should monitor whether golden handshake arrangements are materially weakening the organization's efforts to constrain the risk-taking incentives of employees. The Agencies will continue to work with banking organizations and others to develop appropriate methods for addressing any effect that such arrangements may have on the safety and soundness of banking organizations.

*C. Compatibility With Effective Controls and Risk-Management*

The second principle of the final guidance states that a banking organization's risk-management processes and internal controls should reinforce and support the development and maintenance of balanced incentive compensation arrangements. Banking organizations should integrate incentive compensation arrangements into their risk-management and internal control frameworks to ensure that balance is achieved. In particular, banking organizations should have appropriate controls to ensure that processes for achieving balance are followed. Appropriate personnel, including risk-management personnel, should have input in the design and assessment of incentive compensation arrangements. Compensation for risk-management and control personnel should be sufficient to attract and retain appropriately qualified personnel and such compensation should not be based substantially on the financial performance of the business unit that they review. Rather, their performance should be based primarily on the achievement of the objectives of their functions (*e.g.*, adherence to internal controls).

Banking organizations should monitor incentive compensation awards, risks taken and actual risk outcomes to determine whether incentive compensation payments to employees are reduced to reflect adverse risk outcomes. Incentive compensation arrangements that are found not to appropriately reflect risk should be modified as necessary. Organizations should not only provide rewards when performance standards are met or exceeded, they should also reduce compensation when standards are not met. If senior executives or other employees are paid substantially all of their potential incentive compensation when risk outcomes are materially worse than expected, employees may be encouraged to take large risks in the hope of substantially increasing their personal compensation, knowing that their downside risks are limited. Simply put, incentive compensation arrangements should not create a "heads I win, tails the firm loses" expectation.

A significant number of comments expressed concerns about the scope of the applicability of the proposed guidance to smaller banking organizations as well as the burden the proposed guidance would impose on these organizations. In response to these comments, the final guidance has made more explicit the Agencies' view that the monitoring methods and processes used by a banking organization should be commensurate with the size and complexity of the organization, as well as its use of incentive compensation. Thus, for example, a smaller organization that uses incentive compensation only to a limited extent may find that it can appropriately monitor its arrangements through normal management processes. The final guidance also discusses specific aspects of policies and procedures related to controls and risk-management that are applicable to LBOs and are not expected of other banking organizations.

*D. Strong Corporate Governance*

The third principle of the final guidance is that incentive compensation programs at banking organizations should be supported by strong corporate governance, including active and effective oversight by the organization's

[10] Arrangements that provide for an employee (typically a senior executive), upon departure from an organization or a change in control of the organization, to receive large additional payments or the accelerated payment of deferred amounts without regard to risk or risk outcomes are sometimes called "golden parachutes."

[11] Golden handshakes are arrangements that compensate an employee for some or all of the estimated, non-adjusted value of deferred incentive compensation that would have been forfeited upon departure from the employee's previous employment.

board of directors.[12] The board of directors of an organization is ultimately responsible for ensuring that the organization's incentive compensation arrangements for all covered employees—not solely senior executives—are appropriately balanced and do not jeopardize the safety and soundness of the organization. Boards of directors should receive data and analysis from management or other sources that are sufficient to allow the board to assess whether the overall design and performance of the organization's incentive compensation arrangements are consistent with the organization's safety and soundness. These reviews and reports should be appropriately scoped to reflect the size and complexity of the banking organization's activities and the prevalence and scope of its incentive compensation arrangements. The structure, composition, and resources of the board of directors should be constructed to permit effective oversight of incentive compensation. The board of directors should, for example, have, or have access to, a level of expertise and experience in risk-management and compensation practices in the financial services sector that is appropriate for the nature, scope, and complexity of the organization's activities.[13]

Given the key role of senior executives in managing the overall risk-taking activities of an organization, the board of directors should directly approve compensation arrangements involving senior executives and closely monitor such payments and their sensitivity to risk outcomes. If the compensation arrangements for a senior executive include a deferral of payment or "clawback" provision, then the review should include sufficient information to determine if the provision has been triggered and executed as planned. The board also should approve and document any material exceptions or adjustments to the incentive compensation arrangements established for senior executives and should carefully consider and monitor the effects of any approved exceptions or adjustments to the arrangements.

In response to comments expressing concern about the impact of the proposed guidance on smaller banking organizations, the final guidance identifies specific aspects of the corporate governance provisions of the final guidance that are applicable to LBOs or other organizations that use incentive compensation to a significant degree, and are not expected of other banking organizations. In particular, boards of directors of LBOs and other organizations that use incentive compensation to a significant degree should actively oversee the development and operation of the organization's incentive compensation policies, systems and related control processes. If such an organization does not already have a compensation committee, reporting to the full board, with primary responsibility for incentive compensation arrangements, the board should consider establishing one. LBOs, in particular, should follow a systematic approach, outlined in the final guidance, in developing compensation systems that have balanced incentive compensation arrangements.

Several commenters expressed concern that the proposed guidance appeared to create a new substantive qualification for boards of directors that requires the boards of all banking organizations to have members with expertise in compensation and risk-management issues. A group of commenters noted that such a requirement could limit an already small pool of people suitable to serve on boards of directors of banking organizations and that smaller organizations may not have access to, or the resources to compensate, directors meeting these additional requirements. Some commenters also stated that terms such as "closely monitor" and "actively oversee" could be read to impose a higher standard on directors for their oversight of incentive compensation issues. On the other hand, one commenter noted that current law requires financial expertise on the boards of directors and audit committees of public companies and recommended that specialized risk-management competencies be required on the boards of all banking organizations.

To address concerns raised by these commenters, the final guidance clarifies that risk-management and compensation expertise and experience at the board level may be present collectively among the members of the board, and may come from formal training or from experience in addressing risk-management and compensation issues, including as a director, or may be obtained from advice received from outside counsel, consultants, or other experts with expertise in incentive compensation and risk-management. Furthermore, the final guidance recognizes that smaller organizations with less complex and extensive incentive compensation arrangements may not find it necessary or appropriate to require specially tailored board expertise or to retain and use outside experts in this area.

A banking organization's disclosure practices should support safe and sound incentive compensation arrangements. Specifically, a banking organization should supply an appropriate amount of information concerning its incentive compensation arrangements and related risk-management, control, and governance processes to shareholders to allow them to monitor and, where appropriate, take actions to restrain the potential for such arrangements to encourage employees to take imprudent risks.

While some commenters supported increased public disclosure of the incentive compensation practices of banking organizations, a greater number expressed concerns that any required disclosures of incentive compensation information by banking organizations be tailored to protect the privacy of employees and take account of the impact of such disclosures on the ability of organizations to attract and retain talent. Several commenters supported an alignment of required disclosures with existing requirements for public companies, arguing that additional requirements would add to the regulatory burden on banking organizations.

The proposed guidance did not impose specific disclosure requirements on banking organizations. The final guidance makes no significant changes from the proposed guidance with regard to disclosures, and states that the scope and level of information disclosed by a banking organization should be tailored to the nature and complexity of the organization and its incentive compensation arrangements. The final guidance notes that banking organizations should comply with the incentive compensation disclosure requirements of the Federal securities law and other laws, as applicable.

A number of commenters supported additional governance requirements for banking organizations, such as "say on pay" provisions requiring shareholder approval of compensation plans, separation of the board chair and chief executive officer positions, majority voting for directors, annual elections for all directors, and improvements to the audit function. Some of these comments seek changes in Federal laws beyond the jurisdiction of the Agencies; others

[12] In the case of foreign banking organizations (FBOs), the term "board of directors" refers to the relevant oversight body for the firm's U.S. operations, consistent with the FBO's overall corporate and management structure.

[13] Savings associations should also refer to OTS's rule on directors, officers, and employees. 12 CFR 563.33.

address issues—such as "say on pay" requirements—that are currently under consideration by the Congress. The final guidance does not preempt or preclude these proposals, and indicates that the Agencies expect organizations to comply with all applicable statutory disclosure, voting and other requirements.

*E. Continuing Supervisory Initiatives*

The horizontal review of incentive compensation practices at LBOs is well underway. While this initiative is being led by the Federal Reserve, the other Federal banking agencies are participating in the work. Supervisory teams have collected substantial information from LBOs concerning existing incentive compensation practices and related risk-management and corporate governance processes. In addition, LBOs have submitted analyses of shortcomings or "gaps" in existing practices relative to the principles contained in the proposed guidance, as well as plans for addressing identified weaknesses. Some organizations already have implemented changes to make their incentive compensation arrangements more risk sensitive. Indeed, many organizations are recognizing that strong risk-management and control systems are not sufficient to protect the organization from undue risks, including risks arising from unbalanced incentive compensation arrangements. Other organizations have considerably more work to do, such as developing processes that can effectively compare incentive compensation payments to risks and risk outcomes. The Agencies intend to continue to regularly review incentive compensation arrangements and related risk-management, control, and corporate governance practices of LBOs and to work with these organizations through the supervisory process to promptly correct any deficiencies that may be inconsistent with safety and soundness.[14]

The Agencies intend to actively monitor the actions being taken by banking organizations with respect to incentive compensation arrangements and will review and update this guidance as appropriate to incorporate best practices that emerge. In addition, in order to monitor and encourage improvements, Federal Reserve staff will prepare a report, in consultation with the other Federal banking agencies, after the conclusion of 2010 on trends and developments in compensation practices at banking organizations.

**IV. Other Matters**

In accordance with the Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3506; 5 CFR Part 1320 Appendix A.1), the Agencies have determined that certain aspects of the final guidance constitute a collection of information. The Board made this determination under the authority delegated to the Board by the Office of Management and Budget (OMB).

An agency may not conduct or sponsor, and an organization is not required to respond to, an information collection unless the information collection displays a currently valid OMB control number. Any changes to the Agencies' regulatory reporting forms that may be made in the future to collect information related to incentive compensation arrangements would be addressed in a separate **Federal Register** notice.

The final guidance includes provisions that state large banking organizations (LBOs) should (i) have policies and procedures that identify and describe the role(s) of the personnel and units authorized to be involved in incentive compensation arrangements, identify the source of significant risk-related inputs, establish appropriate controls governing these inputs to help ensure their integrity, and identify the individual(s) and unit(s) whose approval is necessary for the establishment or modification of incentive compensation arrangements; (ii) create and maintain sufficient documentation to permit an audit of the organization's processes for incentive compensation arrangements; (iii) have any material exceptions or adjustments to the incentive compensation arrangements established for senior executives approved and documented by its board of directors; and (iv) have its board of directors receive and review, on an annual or more frequent basis, an assessment by management of the effectiveness of the design and operation of the organization's incentive compensation system in providing risk-taking incentives that are consistent with the organization's safety and soundness.

The OCC, FDIC, and OTS have obtained emergency approval under 5 CFR 1320.13 for issuance of the guidance and will issue a **Federal Register** notice shortly for 60 days of comment as part of the regular PRA clearance process. During the regular PRA clearance process the estimated average response time may be re-evaluated.

The Board has approved the collection of information under its delegated authority. As discussed earlier in this notice, on October 27, 2009, the Board published in the **Federal Register** a notice requesting comment on the proposed Guidance on Sound Incentive Compensation Policies (74 FR 55227). The comment period for this notice expired November 27, 2009. The Board received three comments that specifically addressed paperwork burden. The commenters asserted that the hourly estimate of the cost of compliance should be considerably higher than the Board projected.

The final guidance clarifies in a number of respects the expectation that the effect of the final guidance on banking organizations will vary depending on the size and complexity of the organization and its level of use of incentive compensation arrangements. For example, the final guidance makes more explicit the view that the monitoring methods and processes used by a banking organization should be commensurate with the size and complexity of the organization, as well as its use of incentive compensation. In addition, the final guidance highlights the types of policies, procedures, systems, and specific aspects of corporate governance that LBOs should have and maintain, but that are not expected of other banking organizations.

In response to comments and taking into account the considerations discussed above, the Board is increasing the burden estimate for implementing or modifying policies and procedures to monitor incentive compensation. For this purpose, consideration of burden is limited to items in the final guidance constituting an information collection within the meaning of the PRA. The Board estimates that 1,502 large respondents would take, on average, 480 hours (two months) to modify policies and procedures to monitor incentive compensation. The Board estimates that 5,058 small respondents would take, on average, 80 hours (two business weeks)

[14] For smaller banking organizations, the Federal Reserve is gathering consistent information through regularly scheduled examinations and the normal supervisory process. The focus of the data gathering is to identify the types of incentive plans in place, the job types covered and the characteristics, prevalence and level of documentation available for those incentive compensation plans. After comparing and analyzing the information collected, supervisory efforts and expectations will be scaled appropriately to the size and complexity of the organization and its incentive compensation arrangements. For these smaller banking organizations, the expectation is that there will be very limited, if any, targeted examination work or supervisory follow-up. To the extent that any of these organizations has incentive compensation arrangements, the policies and systems necessary to monitor these arrangements are expected to be substantially less extensive, formalized and detailed than those of larger, more complex organizations.

to establish or modify policies and procedures to monitor incentive compensation. The total one-time burden is estimated to be 1,125,600 hours. In addition, the Board estimates that, on a continuing basis, respondents would take, on average, 40 hours (one business week) each year to maintain policies and procedures to monitor incentive compensation arrangements and estimates the annual on-going burden to be 262,400 hours. The total annual PRA burden for this information collection is estimated to be 1,388,000 hours.

*General Description of Report*

This information collection is authorized pursuant to:

*Board*—Sections 11(a), 11(i), 25, and 25A of the Federal Reserve Act (12 U.S.C. 248(a), 248(i), 602, and 611,), section 5 of the Bank Holding Company Act (12 U.S.C. 1844), and section 7(c) of the International Banking Act (12 U.S.C. 3105(c)).

*OCC*—12 U.S.C. 161, and Section 39 of the Federal Deposit Insurance Act (12 U.S.C. 1831p–1).

*FDIC*—Section 39 of the Federal Deposit Insurance Act (12 U.S.C. 1831p–1).

*OTS*—Section 39 of the Federal Deposit Insurance Act (12 U.S.C. 1831p–1) and Sections 4, 5, and 10 of the Home Owners' Loan Act (12 U.S.C. 1463, 1464, and 1467a).

The Agencies expect to review the policies and procedures for incentive compensation arrangements as part of their supervisory processes. To the extent the Agencies collect information during an examination of a banking organization, confidential treatment may be afforded to the records under exemption 8 of the Freedom of Information Act (FOIA), 5 U.S.C. 552(b)(8).

*Board*

*Title of Information Collection:* Recordkeeping Provisions Associated with the Guidance on Sound Incentive Compensation Policies.

*Agency form number:* FR 4027.

*OMB control number:* 7100—to be assigned.

*Frequency:* Annually.

*Affected Public:* Businesses or other for-profit.

*Respondents:* U.S. bank holding companies, State member banks, Edge and agreement corporations, and the U.S. operations of foreign banks with a branch, agency, or commercial lending company subsidiary in the United States.

*Estimated average hours per response:* Implementing or modifying policies and procedures: large respondents 480 hours; small respondents 80 hours. Maintenance of policies and procedures: 40 hours.

*Estimated number of respondents:* Large respondents, 1,502; Small respondents, 5,058.

*Estimated total annual burden:* 1,388,000 hours.

As mentioned above, the OCC, FDIC, and OTS have obtained emergency approval under 5 CFR 1320.13. The OCC and OTS approvals were obtained prior to the Board revising its burden estimates based on the comments received. For this reason, the OCC and OTS are publishing in this notice the original burden estimates. They will issue a **Federal Register** notice shortly for 60 days of comment as part of the regular PRA clearance process. During the regular PRA clearance process the estimated average response time may be re-evaluated based on comments received. The FDIC is publishing in this notice the revised burden estimates developed by the Board based on the comments received. The FDIC will issue a **Federal Register** notice shortly for 60 days of comment as part of the regular PRA clearance process and, during the regular PRA clearance process, the estimated average response time may be re-evaluated based on comments received.

*OCC*

*Title of Information Collection:* Guidance on Sound Incentive Compensation Policies.

*Agency form number:* N/A.

*OMB control number:* 1557–0245.

*Frequency:* Annually.

*Affected Public:* Businesses or other for-profit.

*Respondents:* National banks.

*Estimated average hours per response:* 40 hours.

*Estimated number of respondents:* 1,650.

*Estimated total annual burden:* 66,000 hours.

*FDIC*

*Title of Information Collection:* Guidance on Sound Incentive Compensation Policies.

*Agency form number:* N/A.

*OMB control number:* 3064–0175.

*Frequency:* Annually.

*Affected Public:* Businesses or other for-profit.

*Respondents:* Insured State nonmember banks.

*Estimated average hours per response:* Implementing or modifying policies and procedures: large respondents 480 hours; small respondents 80 hours. Maintenance of policies and procedures: 40 hours.

*Estimated number of respondents:* Implementing or modifying policies and procedures: large respondents—20; small respondents—4,870; Maintenance of policies and procedures: 4,890.

*Estimated total annual burden:* 594,800 hours.

*OTS*

*Title of Information Collection:* Sound Incentive Compensation Guidance.

*Agency form number:* N/A.

*OMB control number:* 1550–0129.

*Frequency:* Annually.

*Affected Public:* Businesses or other for-profit.

*Respondents:* Savings associations.

*Estimated average hours per response:* 40 hours.

*Estimated number of respondents:* 765.

*Estimated total annual burden:* 30,600 hours.

The Agencies have a continuing interest in the public's opinions of our collections of information. At any time, comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, may be sent to:

*Board*

Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW., Washington, DC 20551.

*OCC*

Communications Division, Office of the Comptroller of the Currency, Mailstop 2–3, Attention: 1557–0245, 250 E Street, SW., Washington, DC 20219. In addition, comments may be sent by fax to (202) 874–5274 or by electronic mail to *regs.comments@occ.treas.gov*. You may personally inspect and photocopy comments at the OCC, 250 E Street, SW., Washington, DC 20219. For security reasons, the OCC requires that visitors make an appointment to inspect comments. You may do so by calling (202) 874–4700. Upon arrival, visitors will be required to present valid government-issued photo identification and to submit to security screening in order to inspect and photocopy comments.

*FDIC*

All comments should refer to the name of the collection, "Guidance on Sound Incentive Compensation Policies." Comments may be submitted by any of the following methods:

- *http://www.FDIC.gov/regulations/laws/federal/propose.html.*
- *E-mail: comments@fdic.gov.*
- *Mail:* Gary Kuiper (202.898.3877), Counsel, Federal Deposit Insurance

Corporation, F–1072, 550 17th Street, NW., Washington, DC 20429.

• *Hand Delivery:* Comments may be hand-delivered to the guard station at the rear of the 550 17th Street Building (located on F Street), on business days between 7 a.m. and 5 p.m.

*OTS*

Information Collection Comments, Chief Counsel's Office, Office of Thrift Supervision, 1700 G Street, NW., Washington, DC 20552; send a facsimile transmission to (202) 906–6518; or send an e-mail to *infocollection.comments@ots.treas.gov.* OTS will post comments and the related index on the OTS Internet Site at *http://www.ots.treas.gov.* In addition, interested persons may inspect comments at the Public Reading Room, 1700 G Street, NW., Washington DC 20552 by appointment. To make an appointment, call (202) 906–5922, send an e-mail to *public.info@ots.treas.gov,* or send a facsimile transmission to (202) 906–7755.

*OMB*

Additionally, please send a copy of your comments by mail to: Office of Management and Budget, 725 17th Street, NW., #10235, Paperwork Reduction Project (insert Agency OMB control number), Washington, DC 20503. Comments can also be sent by fax to (202) 395–6974.

While the Regulatory Flexibility Act (5 U.S.C. 603(b)) does not apply to this guidance, because it is not being adopted as a rule, the Agencies have considered the potential impact of the proposed guidance on small banking organizations. For the reasons discussed in the SUPPLEMENTARY INFORMATION above, the Agencies believe that issuance of the proposed guidance is needed to help ensure that incentive compensation arrangements do not pose a threat to the safety and soundness of banking organizations, including small banking organizations. The Board in the proposed guidance sought comment on whether the guidance would impose undue burdens on, or have unintended consequences for, small organizations and whether there were ways such potential burdens or consequences could be addressed in a manner consistent with safety and soundness.

It is estimated that the guidance will apply to 8,763 small banking organizations. *See* 13 CFR 121.201. As noted in the "Supplementary Information" above, a number of commenters expressed concern that the proposed guidance would impose undue burden on smaller organizations. The Agencies have carefully considered the comments received on this issue. In response to these comments, the final guidance includes several provisions designed to reduce burden on smaller banking organizations. For example, the final guidance has made more explicit the Agencies' view that the monitoring methods and processes used by a banking organization should be commensurate with the size and complexity of the organization, as well as its use of incentive compensation. The final guidance also highlights the types of policies, procedures, and systems that LBOs should have and maintain, but that are not expected of other banking organizations. Like the proposed guidance, the final guidance focuses on those employees who have the ability, either individually or as part of a group, to expose a banking organization to material amounts of risk and is tailored to account for the differences between large and small banking organizations.

## V. Final Guidance

The text of the final guidance is as follows:

*Guidance on Sound Incentive Compensation Policies*

I. Introduction

Incentive compensation practices in the financial industry were one of many factors contributing to the financial crisis that began in mid-2007. Banking organizations too often rewarded employees for increasing the organization's revenue or short-term profit without adequate recognition of the risks the employees' activities posed to the organization.[1] These practices exacerbated the risks and losses at a number of banking organizations and resulted in the misalignment of the interests of employees with the long-term well-being and safety and soundness of their organizations. This document provides guidance on sound incentive compensation practices to banking organizations supervised by the Federal Reserve, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (collectively, the "Agencies").[2] This guidance is intended to assist banking organizations in designing and implementing incentive compensation arrangements and related policies and procedures that effectively consider potential risks and risk outcomes.[3]

Alignment of incentives provided to employees with the interests of shareholders of the organization often also benefits safety and soundness. However, aligning employee incentives with the interests of shareholders is not always sufficient to address safety-and-soundness concerns. Because of the presence of the Federal safety net, (including the ability of insured depository institutions to raise insured deposits and access the Federal Reserve's discount window and payment services), shareholders of a banking organization in some cases may be willing to tolerate a degree of risk that is inconsistent with the organization's safety and soundness. Accordingly, the Agencies expect banking organizations to maintain incentive compensation practices that are consistent with safety and soundness, even when these practices go beyond those needed to align shareholder and employee interests.

To be consistent with safety and soundness, incentive compensation arrangements[4] at a banking organization should:

• Provide employees incentives that appropriately balance risk and reward;
• Be compatible with effective controls and risk-management; and
• Be supported by strong corporate governance, including active and effective oversight by the organization's board of directors.

These principles, and the types of policies, procedures, and systems that banking organizations should have to help ensure compliance with them, are discussed later in this guidance.

The Agencies expect banking organizations to regularly review their incentive compensation arrangements

[1] Examples of risks that may present a threat to the organization's safety and soundness include credit, market, liquidity, operational, legal, compliance, and reputational risks.

[2] As used in this guidance, the term "banking organization" includes national banks, State member banks, State nonmember banks, savings associations, U.S. bank holding companies, savings and loan holding companies, Edge and agreement corporations, and the U.S. operations of foreign banking organizations (FBOs) with a branch, agency, or commercial lending company in the United States.

[3] This guidance and the principles reflected herein are consistent with the *Principles for Sound Compensation Practices* issued by the Financial Stability Board (FSB) in April 2009, and with the FSB's *Implementation Standards* for those principles, issued in September 2009.

[4] In this guidance, the term "incentive compensation" refers to that portion of an employee's current or potential compensation that is tied to achievement of one or more specific metrics (*e.g.*, a level of sales, revenue, or income). Incentive compensation does not include compensation that is awarded solely for, and the payment of which is solely tied to, continued employment (*e.g.*, salary). In addition, the term does not include compensation arrangements that are determined based solely on the employee's level of compensation and does not vary based on one or more performance metrics (*e.g.*, a 401(k) plan under which the organization contributes a set percentage of an employee's salary).

for all executive and non-executive employees who, either individually or as part of a group, have the ability to expose the organization to material amounts of risk, as well as to regularly review the risk-management, control, and corporate governance processes related to these arrangements. Banking organizations should immediately address any identified deficiencies in these arrangements or processes that are inconsistent with safety and soundness. Banking organizations are responsible for ensuring that their incentive compensation arrangements are consistent with the principles described in this guidance and that they do not encourage employees to expose the organization to imprudent risks that may pose a threat to the safety and soundness of the organization.

The Agencies recognize that incentive compensation arrangements often seek to serve several important and worthy objectives. For example, incentive compensation arrangements may be used to help attract skilled staff, induce better organization-wide and employee performance, promote employee retention, provide retirement security to employees, or allow compensation expenses to vary with revenue on an organization-wide basis. Moreover, the analysis and methods for ensuring that incentive compensation arrangements take appropriate account of risk should be tailored to the size, complexity, business strategy, and risk tolerance of each organization. The resources required will depend upon the complexity of the firm and its use of incentive compensation arrangements. For some, the task of designing and implementing compensation arrangements that properly offer incentives for executive and non-executive employees to pursue the organization's long-term well-being and that do not encourage imprudent risk-taking is a complex task that will require the commitment of adequate resources.

While issues related to designing and implementing incentive compensation arrangements are complex, the Agencies are committed to ensuring that banking organizations move forward in incorporating the principles described in this guidance into their incentive compensation practices.[5]

As discussed further below, because of the size and complexity of their operations, LBOs[6] should have and adhere to systematic and formalized policies, procedures, and processes. These are considered important in ensuring that incentive compensation arrangements for all covered employees are identified and reviewed by appropriate levels of management (including the board of directors where appropriate and control units), and that they appropriately balance risks and rewards. In several places, this guidance specifically highlights the types of policies, procedures, and systems that LBOs should have and maintain, but that generally are not expected of smaller, less complex organizations. LBOs warrant the most intensive supervisory attention because they are significant users of incentive compensation arrangements and because flawed approaches at these organizations are more likely to have adverse effects on the broader financial system. The Agencies will work with LBOs as necessary through the supervisory process to ensure that they promptly correct any deficiencies that may be inconsistent with the safety and soundness of the organization.

The policies, procedures, and systems of smaller banking organizations that use incentive compensation arrangements[7] are expected to be less extensive, formalized, and detailed than those of LBOs. Supervisory reviews of incentive compensation arrangements at smaller, less-complex banking organizations will be conducted by the Agencies as part of the evaluation of those organizations' risk-management, internal controls, and corporate governance during the regular, risk-focused examination process. These reviews will be tailored to reflect the scope and complexity of an organization's activities, as well as the prevalence and scope of its incentive compensation arrangements. Little, if any, additional examination work is expected for smaller banking organizations that do not use, to a significant extent, incentive compensation arrangements.[8]

For all banking organizations, supervisory findings related to incentive compensation will be communicated to the organization and included in the relevant report of examination or inspection. In addition, these findings will be incorporated, as appropriate, into the organization's rating component(s) and subcomponent(s) relating to risk-management, internal controls, and corporate governance under the relevant supervisory rating system, as well as the organization's overall supervisory rating.

An organization's appropriate Federal supervisor may take enforcement action against a banking organization if its incentive compensation arrangements or related risk-management, control, or governance processes pose a risk to the safety and soundness of the organization, particularly when the organization is not taking prompt and effective measures to correct the deficiencies. For example, the appropriate Federal supervisor may take an enforcement action if material deficiencies are found to exist in the organization's incentive compensation arrangements or related risk-management, control, or governance processes, or the organization fails to promptly develop, submit, or adhere to an effective plan designed to ensure that its incentive compensation arrangements do not encourage imprudent risk-taking and are consistent with principles of safety and soundness. As provided under section 8 of the Federal Deposit Insurance Act (12 U.S.C. 1818), an enforcement action may, among other things, require an organization to take affirmative action, such as developing a corrective action plan that is acceptable to the appropriate Federal supervisor to rectify safety-and-soundness deficiencies in its incentive compensation arrangements or related processes. Where warranted, the appropriate Federal supervisor may require the organization to take additional affirmative action to correct or remedy deficiencies related to the

[5] In December 2009 the Federal Reserve, working with the other Agencies, initiated a special horizontal review of incentive compensation arrangements and related risk-management, control, and corporate governance practices of large banking organizations (LBOs). This initiative was designed to spur and monitor the industry's progress towards the implementation of safe and sound incentive compensation arrangements, identify emerging best practices, and advance the state of practice more generally in the industry.

[6] For supervisory purposes, the Agencies segment organizations they supervise into different supervisory portfolios based on, among other things, size, complexity, and risk profile. For purposes of the final guidance, LBOs include, in the case of banking organizations supervised by (i) the Federal Reserve, large, complex banking organizations as identified by the Federal Reserve for supervisory purposes; (ii) the OCC, the largest and most complex national banks as defined in the Large Bank Supervision booklet of the Comptroller's Handbook; (iii) the FDIC, large, complex insured depository institutions (IDIs); and (iv) the OTS, the largest and most complex savings associations and savings and loan holding companies.

[7] This guidance does not apply to banking organizations that do not use incentive compensation.

[8] To facilitate these reviews, where appropriate, a smaller banking organization should review its compensation arrangements to determine whether it uses incentive compensation arrangements to a significant extent in its business operations. A smaller banking organization will not be considered a significant user of incentive compensation arrangements simply because the organization has a firm-wide profit-sharing or bonus plan that is based on the bank's profitability, even if the plan covers all or most of the organization's employees.

organization's incentive compensation practices.

Effective and balanced incentive compensation practices are likely to evolve significantly in the coming years, spurred by the efforts of banking organizations, supervisors, and other stakeholders. The Agencies will review and update this guidance as appropriate to incorporate best practices that emerge from these efforts.

II. Scope of Application

The incentive compensation arrangements and related policies and procedures of banking organizations should be consistent with principles of safety and soundness.[9] Incentive compensation arrangements for executive officers as well as for non-executive personnel who have the ability to expose a banking organization to material amounts of risk may, if not properly structured, pose a threat to the organization's safety and soundness. Accordingly, this guidance applies to incentive compensation arrangements for:

• Senior executives and others who are responsible for oversight of the organization's firm-wide activities or material business lines;[10]

• Individual employees, including non-executive employees, whose activities may expose the organization to material amounts of risk (*e.g.*, traders with large position limits relative to the organization's overall risk tolerance); and

• Groups of employees who are subject to the same or similar incentive compensation arrangements and who, in the aggregate, may expose the organization to material amounts of risk, even if no individual employee is likely to expose the organization to material risk (*e.g.*, loan officers who, as a group, originate loans that account for a material amount of the organization's credit risk).

For ease of reference, these executive and non-executive employees are collectively referred to hereafter as "covered employees" or "employees." Depending on the facts and circumstances of the individual organization, the types of employees or categories of employees that are outside the scope of this guidance because they do not have the ability to expose the organization to material risks would likely include, for example, tellers, bookkeepers, couriers, or data processing personnel.

In determining whether an employee, or group of employees, may expose a banking organization to material risk, the organization should consider the full range of inherent risks arising from, or generated by, the employee's activities, even if the organization uses risk-management processes or controls to limit the risks such activities ultimately may pose to the organization. Moreover, risks should be considered to be material for purposes of this guidance if they are material to the organization, or are material to a business line or operating unit that is itself material to the organization.[11] For purposes of illustration, assume that a banking organization has a structured-finance unit that is material to the organization. A group of employees within that unit who originate structured-finance transactions that may expose the unit to material risks should be considered "covered employees" for purposes of this guidance even if those transactions must be approved by an independent risk function prior to consummation, or the organization uses other processes or methods to limit the risk that such transactions may present to the organization.

Strong and effective risk-management and internal control functions are critical to the safety and soundness of banking organizations. However, irrespective of the quality of these functions, poorly designed or managed incentive compensation arrangements can themselves be a source of risk to a banking organization. For example, incentive compensation arrangements that provide employees strong incentives to increase the organization's short-term revenues or profits, without regard to the short- or long-term risk associated with such business, can place substantial strain on the risk-management and internal control functions of even well-managed organizations.

Moreover, poorly balanced incentive compensation arrangements can encourage employees to take affirmative actions to weaken or circumvent the organization's risk-management or internal control functions, such as by providing inaccurate or incomplete information to these functions, to boost the employee's personal compensation. Accordingly, sound compensation practices are an integral part of strong risk-management and internal control functions. A key goal of this guidance is to encourage banking organizations to incorporate the risks related to incentive compensation into their broader risk-management framework. Risk-management procedures and risk controls that ordinarily limit risk-taking do not obviate the need for incentive compensation arrangements to properly balance risk-taking incentives.

III. Principles of a Sound Incentive Compensation System

Principle 1: Balanced Risk-Taking Incentives

Incentive compensation arrangements should balance risk and financial results in a manner that does not encourage employees to expose their organizations to imprudent risks.

Incentive compensation arrangements typically attempt to encourage actions that result in greater revenue or profit for the organization. However, short-run revenue or profit can often diverge sharply from actual long-run profit because risk outcomes may become clear only over time. Activities that carry higher risk typically yield higher short-term revenue, and an employee who is given incentives to increase short-term revenue or profit, without regard to risk, will naturally be attracted to opportunities to expose the organization to more risk.

An incentive compensation arrangement is balanced when the amounts paid to an employee appropriately take into account the risks (including compliance risks), as well as the financial benefits, from the employee's activities and the impact of those activities on the organization's safety and soundness. As an example, under a balanced incentive compensation arrangement, two employees who generate the same amount of short-term revenue or profit for an organization should not receive the same amount of incentive compensation if the risks taken by the employees in generating that revenue or profit differ materially. The employee whose activities create materially larger risks for the organization should receive

[9] In the case of the U.S. operations of FBOs, the organization's policies, including management, review, and approval requirements for its U.S. operations, should be coordinated with the FBO's group-wide policies developed in accordance with the rules of the FBO's home country supervisor. The policies of the FBO's U.S. operations should also be consistent with the FBO's overall corporate and management structure, as well as its framework for risk-management and internal controls. In addition, the policies for the U.S. operations of FBOs should be consistent with this guidance.

[10] Senior executives include, at a minimum, "executive officers" within the meaning of the Federal Reserve's Regulation O (*see* 12 CFR 215.2(e)(1)) and, for publicly traded companies, "named officers" within the meaning of the Securities and Exchange Commission's rules on disclosure of executive compensation (*see* 17 CFR 229.402(a)(3)). Savings associations should also refer to OTS's rule on loans by saving associations to their executive officers, directors, and principal shareholders. (12 CFR 563.43).

[11] Thus, risks may be material to an organization even if they are not large enough to themselves threaten the solvency of the organization.

less than the other employee, all else being equal.

The performance measures used in an incentive compensation arrangement have an important effect on the incentives provided employees and, thus, the potential for the arrangement to encourage imprudent risk-taking. For example, if an employee's incentive compensation payments are closely tied to short-term revenue or profit of business generated by the employee, without any adjustments for the risks associated with the business generated, the potential for the arrangement to encourage imprudent risk-taking may be quite strong. Similarly, traders who work with positions that close at year-end could have an incentive to take large risks toward the end of a year if there is no mechanism for factoring how such positions perform over a longer period of time. The same result could ensue if the performance measures themselves lack integrity or can be manipulated inappropriately by the employees receiving incentive compensation.

On the other hand, if an employee's incentive compensation payments are determined based on performance measures that are only distantly linked to the employee's activities (*e.g.*, for most employees, organization-wide profit), the potential for the arrangement to encourage the employee to take imprudent risks on behalf of the organization may be weak. For this reason, plans that provide for awards based solely on overall organization-wide performance are unlikely to provide employees, other than senior executives and individuals who have the ability to materially affect the organization's overall risk profile, with unbalanced risk-taking incentives.

Incentive compensation arrangements should not only be balanced in design, they also should be implemented so that actual payments vary based on risks or risk outcomes. If, for example, employees are paid substantially all of their potential incentive compensation even when risk or risk outcomes are materially worse than expected, employees have less incentive to avoid activities with substantial risk.

• Banking organizations should consider the full range of risks associated with an employee's activities, as well as the time horizon over which those risks may be realized, in assessing whether incentive compensation arrangements are balanced.

The activities of employees may create a wide range of risks for a banking organization, such as credit, market, liquidity, operational, legal, compliance, and reputational risks, as well as other risks to the viability or operation of the organization. Some of these risks may be realized in the short term, while others may become apparent only over the long term. For example, future revenues that are booked as current income may not materialize, and short-term profit-and-loss measures may not appropriately reflect differences in the risks associated with the revenue derived from different activities (*e.g.*, the higher credit or compliance risk associated with subprime loans versus prime loans).[12] In addition, some risks (or combinations of risky strategies and positions) may have a low probability of being realized, but would have highly adverse effects on the organization if they were to be realized ("bad tail risks"). While shareholders may have less incentive to guard against bad tail risks because of the infrequency of their realization and the existence of the Federal safety net, these risks warrant special attention for safety-and-soundness reasons given the threat they pose to the organization's solvency and the Federal safety net.

Banking organizations should consider the full range of current and potential risks associated with the activities of covered employees, including the cost and amount of capital and liquidity needed to support those risks, in developing balanced incentive compensation arrangements. Reliable quantitative measures of risk and risk outcomes ("quantitative measures"), where available, may be particularly useful in developing balanced compensation arrangements and in assessing the extent to which arrangements are properly balanced. However, reliable quantitative measures may not be available for all types of risk or for all activities, and their utility for use in compensation arrangements varies across business lines and employees. The absence of reliable quantitative measures for certain types of risks or outcomes does not mean that banking organizations should ignore such risks or outcomes for purposes of assessing whether an incentive compensation arrangement achieves balance. For example, while reliable quantitative measures may not exist for many bad-tail risks, it is important that such risks be considered given their potential effect on safety and soundness.

As in other risk-management areas, banking organizations should rely on informed judgments, supported by available data, to estimate risks and risk outcomes in the absence of reliable quantitative risk measures.

*Large banking organizations.* In designing and modifying incentive compensation arrangements, LBOs should assess in advance of implementation whether such arrangements are likely to provide balanced risk-taking incentives. Simulation analysis of incentive compensation arrangements is one way of doing so. Such analysis uses forward-looking projections of incentive compensation awards and payments based on a range of performance levels, risk outcomes, and levels of risks taken. This type of analysis, or other analysis that results in assessments of likely effectiveness, can help an LBO assess whether incentive compensation awards and payments to an employee are likely to be reduced appropriately as the risks to the organization from the employee's activities increase.

• An unbalanced arrangement can be moved toward balance by adding or modifying features that cause the amounts ultimately received by employees to appropriately reflect risk and risk outcomes.

If an incentive compensation arrangement may encourage employees to expose their banking organization to imprudent risks, the organization should modify the arrangement as needed to ensure that it is consistent with safety and soundness. Four methods are often used to make compensation more sensitive to risk. These methods are:

○ *Risk Adjustment of Awards:* The amount of an incentive compensation award for an employee is adjusted based on measures that take into account the risk the employee's activities may pose to the organization. Such measures may be quantitative, or the size of a risk adjustment may be set judgmentally, subject to appropriate oversight.

○ *Deferral of Payment:* The actual payout of an award to an employee is delayed significantly beyond the end of the performance period, and the amounts paid are adjusted for actual losses or other aspects of performance that are realized or become better known only during the deferral period.[13] Deferred payouts may be

[12] Importantly, the time horizon over which a risk outcome may be realized is not necessarily the same as the stated maturity of an exposure. For example, the ongoing reinvestment of funds by a cash management unit in commercial paper with a one-day maturity not only exposes the organization to one-day credit risk, but also exposes the organization to liquidity risk that may be realized only infrequently.

[13] The deferral-of-payment method is sometimes referred to in the industry as a "clawback." The term "clawback" also may refer specifically to an arrangement under which an employee must return incentive compensation payments previously received by the employee (and not just deferred) if certain risk outcomes occur. Section 304 of the

altered according to risk outcomes either formulaically or judgmentally, subject to appropriate oversight. To be **most effective, the deferral period should be sufficiently long to allow for the realization of a substantial portion of the risks from employee activities, and the measures of loss should be clearly explained to employees and closely tied to their activities during the relevant performance period.**

○ *Longer Performance Periods:* The time period covered by the performance measures used in determining an employee's award is extended (for example, from one year to two or more years). Longer performance periods and deferral of payment are related in that both methods allow awards or payments to be made after some or all risk outcomes are realized or better known.

○ *Reduced Sensitivity to Short-Term Performance:* The banking organization reduces the rate at which awards increase as an employee achieves higher levels of the relevant performance measure(s). Rather than offsetting risk-taking incentives associated with the use of short-term performance measures, this method reduces the magnitude of such incentives. This method also can include improving the quality and reliability of performance measures in taking into account both short-term and long-term risks, for example improving the reliability and accuracy of estimates of revenues and long-term profits upon which performance measures depend.[14]

These methods for achieving balance are not exclusive, and additional methods or variations may exist or be developed. Moreover, each method has its own advantages and disadvantages. For example, where reliable risk measures exist, risk adjustment of awards may be more effective than deferral of payment in reducing incentives for imprudent risk-taking. This is because risk adjustment potentially can take account of the full range and time horizon of risks, rather than just those risk outcomes that occur or become more evident during the deferral period. On the other hand, deferral of payment may be more effective than risk adjustment in mitigating incentives to take hard-to-measure risks (such as the risks of new activities or products, or certain risks such as reputational or operational risk that may be difficult to measure with respect to particular activities), especially if such risks are likely to be realized during the deferral period. Accordingly, in some cases two or more methods may be needed in combination for an incentive compensation arrangement to be balanced.

The greater the potential incentives an arrangement creates for an employee to increase the risks associated with the employee's activities, the stronger the effect should be of the methods applied to achieve balance. Thus, for example, risk adjustments used to counteract a materially unbalanced compensation arrangement should have a similarly material impact on the incentive compensation paid under the arrangement. Further, improvements in the quality and reliability of performance measures themselves, for example improving the reliability and accuracy of estimates of revenues and profits upon which performance measures depend, can significantly improve the degree of balance in risk-taking incentives.

Where judgment plays a significant role in the design or operation of an incentive compensation arrangement, strong policies and procedures, internal controls, and ex post monitoring of incentive compensation payments relative to actual risk outcomes are particularly important to help ensure that the arrangements as implemented are balanced and do not encourage imprudent risk-taking. For example, if a banking organization relies to a significant degree on the judgment of one or more managers to ensure that the incentive compensation awards to employees are appropriately risk-adjusted, the organization should have policies and procedures that describe how managers are expected to exercise that judgment to achieve balance and that provide for the manager(s) to receive appropriate available information about the employee's risk-taking activities to make informed judgments.

*Large banking organizations.* Methods and practices for making compensation sensitive to risk are likely to evolve rapidly during the next few years, driven in part by the efforts of supervisors and other stakeholders. LBOs should actively monitor developments in the field and should incorporate into their incentive compensation systems new or emerging methods or practices that are likely to improve the organization's long-term financial well-being and safety and soundness.

• The manner in which a banking organization seeks to achieve balanced incentive compensation arrangements should be tailored to account for the differences between employees—including the substantial differences between senior executives and other employees—as well as between banking organizations.

Activities and risks may vary significantly both across banking organizations and across employees within a particular banking organization. For example, activities, risks, and incentive compensation practices may differ materially among banking organizations based on, among other things, the scope or complexity of activities conducted and the business strategies pursued by the organizations. These differences mean that methods for achieving balanced compensation arrangements at one organization may not be effective in restraining incentives to engage in imprudent risk-taking at another organization. Each organization is responsible for ensuring that its incentive compensation arrangements are consistent with the safety and soundness of the organization.

Moreover, the risks associated with the activities of one group of non-executive employees (*e.g.*, loan originators) within a banking organization may differ significantly from those of another group of non-executive employees (*e.g.*, spot foreign exchange traders) within the organization. In addition, reliable quantitative measures of risk and risk outcomes are unlikely to be available for a banking organization as a whole, particularly a large, complex organization. This factor can make it difficult for banking organizations to achieve balanced compensation arrangements for senior executives who have responsibility for managing risks on an organization-wide basis solely through use of the risk-adjustment-of-award method.

Furthermore, the payment of deferred incentive compensation in equity (such as restricted stock of the organization) or equity-based instruments (such as options to acquire the organization's stock) may be helpful in restraining the risk-taking incentives of senior executives and other covered employees whose activities may have a material effect on the overall financial performance of the organization. However, equity-related deferred compensation may not be as effective in restraining the incentives of lower-level covered employees (particularly at large organizations) to take risks because such

Sarbanes-Oxley Act of 2002 (15 U.S.C. 7243), which applies to chief executive officers and chief financial officers of public banking organizations, is an example of this more specific type of "clawback" requirement.

[14] Performance targets may have a material effect on risk-taking incentives. Such targets may offer employees greater rewards for increments of performance that are above the target or may provide that awards will be granted only if a target is met or exceeded. Employees may be particularly motivated to take imprudent risk in order to reach performance targets that are aggressive, but potentially achievable.

employees are unlikely to believe that their actions will materially affect the organization's stock price.

Banking organizations should take account of these differences when constructing balanced compensation arrangements. For most banking organizations, the use of a single, formulaic approach to making employee incentive compensation arrangements appropriately risk-sensitive is likely to result in arrangements that are unbalanced at least with respect to some employees.[15]

*Large banking organizations.* Incentive compensation arrangements for senior executives at LBOs are likely to be better balanced if they involve deferral of a substantial portion of the executives' incentive compensation over a multi-year period in a way that reduces the amount received in the event of poor performance, substantial use of multi-year performance periods, or both. Similarly, the compensation arrangements for senior executives at LBOs are likely to be better balanced if a significant portion of the incentive compensation of these executives is paid in the form of equity-based instruments that vest over multiple years, with the number of instruments ultimately received dependent on the performance of the organization during the deferral period.

The portion of the incentive compensation of other covered employees that is deferred or paid in the form of equity-based instruments should appropriately take into account the level, nature, and duration of the risks that the employees' activities create for the organization and the extent to which those activities may materially affect the overall performance of the organization and its stock price. Deferral of a substantial portion of an employee's incentive compensation may not be workable for employees at lower pay scales because of their more limited financial resources. This may require increased reliance on other measures in the incentive compensation arrangements for these employees to achieve balance.

• Banking organizations should carefully consider the potential for "golden parachutes" and the vesting arrangements for deferred compensation to affect the risk-taking behavior of employees while at the organizations.

Arrangements that provide for an employee (typically a senior executive), upon departure from the organization or a change in control of the organization, to receive large additional payments or the accelerated payment of deferred amounts without regard to risk or risk outcomes can provide the employee significant incentives to expose the organization to undue risk. For example, an arrangement that provides an employee with a guaranteed payout upon departure from an organization, regardless of performance, may neutralize the effect of any balancing features included in the arrangement to help prevent imprudent risk-taking.

Banking organizations should carefully review any such existing or proposed arrangements (sometimes called "golden parachutes") and the potential impact of such arrangements on the organization's safety and soundness. In appropriate circumstances an organization should consider including balancing features—such as risk adjustment or deferral requirements that extend past the employee's departure—in the arrangements to mitigate the potential for the arrangements to encourage imprudent risk-taking. In all cases, a banking organization should ensure that the structure and terms of any golden parachute arrangement entered into by the organization do not encourage imprudent risk-taking in light of the other features of the employee's incentive compensation arrangements.

*Large banking organizations.* Provisions that require a departing employee to forfeit deferred incentive compensation payments may weaken the effectiveness of the deferral arrangement if the departing employee is able to negotiate a "golden handshake" arrangement with the new employer.[16] This weakening effect can be particularly significant for senior executives or other skilled employees at LBOs whose services are in high demand within the market.

Golden handshake arrangements present special issues for LBOs and supervisors. For example, while a banking organization could adjust its deferral arrangements so that departing employees will continue to receive any accrued deferred compensation after departure (subject to any clawback or malus[17]), these changes could reduce the employee's incentive to remain at the organization and, thus, weaken an organization's ability to retain qualified talent, which is an important goal of compensation, and create conflicts of interest. Moreover, actions of the hiring organization (which may or may not be a supervised banking organization) ultimately may defeat these or other risk-balancing aspects of a banking organization's deferral arrangements. LBOs should monitor whether golden handshake arrangements are materially weakening the organization's efforts to constrain the risk-taking incentives of employees. The Agencies will continue to work with banking organizations and others to develop appropriate methods for addressing any effect that such arrangements may have on the safety and soundness of banking organizations.

• Banking organizations should effectively communicate to employees the ways in which incentive compensation awards and payments will be reduced as risks increase.

In order for the risk-sensitive provisions of incentive compensation arrangements to affect employee risk-taking behavior, the organization's employees need to understand that the amount of incentive compensation that they may receive will vary based on the risk associated with their activities. Accordingly, banking organizations should ensure that employees covered by an incentive compensation arrangement are informed about the key ways in which risks are taken into account in determining the amount of incentive compensation paid. Where feasible, an organization's communications with employees should include examples of how incentive compensation payments may be adjusted to reflect projected or actual risk outcomes. An organization's communications should be tailored appropriately to reflect the sophistication of the relevant audience(s).

## Principle 2: Compatibility With Effective Controls and Risk-management

A banking organization's risk-management processes and internal controls should reinforce and support the development and maintenance of balanced incentive compensation arrangements.

[15] For example, spreading payouts of incentive compensation awards over a standard three-year period may not appropriately reflect the differences in the type and time horizon of risk associated with the activities of different groups of employees, and may not be sufficient by itself to balance the compensation arrangements of employees who may expose the organization to substantial longer-term risks.

[16] Golden handshakes are arrangements that compensate an employee for some or all of the estimated, non-adjusted value of deferred incentive compensation that would have been forfeited upon departure from the employee's previous employment.

[17] A malus arrangement permits the employer to prevent vesting of all or part of the amount of a deferred remuneration award. Malus provisions are invoked when risk outcomes are worse than expected or when the information upon which the award was based turns out to have been incorrect. Loss of unvested compensation due to the employee voluntarily leaving the firm is not an example of malus as the term is used in this guidance.

In order to increase their own compensation, employees may seek to evade the processes established by a banking organization to achieve balanced compensation arrangements. Similarly, an employee covered by an incentive compensation arrangement may seek to influence, in ways designed to increase the employee's pay, the risk measures or other information or judgments that are used to make the employee's pay sensitive to risk.

Such actions may significantly weaken the effectiveness of an organization's incentive compensation arrangements in restricting imprudent risk-taking. These actions can have a particularly damaging effect on the safety and soundness of the organization if they result in the weakening of risk measures, information, or judgments that the organization uses for other risk-management, internal control, or financial purposes. In such cases, the employee's actions may weaken not only the balance of the organization's incentive compensation arrangements, but also the risk-management, internal controls, and other functions that are supposed to act as a separate check on risk-taking. For this reason, traditional risk-management controls alone do not eliminate the need to identify employees who may expose the organization to material risk, nor do they obviate the need for the incentive compensation arrangements for these employees to be balanced. Rather, a banking organization's risk-management processes and internal controls should reinforce and support the development and maintenance of balanced incentive compensation arrangements.

- Banking organizations should have appropriate controls to ensure that their processes for achieving balanced compensation arrangements are followed and to maintain the integrity of their risk-management and other functions.

To help prevent damage from occurring, a banking organization should have strong controls governing its process for designing, implementing, and monitoring incentive compensation arrangements. Banking organizations should create and maintain sufficient documentation to permit an audit of the effectiveness of the organization's processes for establishing, modifying, and monitoring incentive compensation arrangements. Smaller banking organizations should incorporate reviews of these processes into their overall framework for compliance monitoring (including internal audit).

*Large banking organizations.* LBOs should have and maintain policies and procedures that (i) identify and describe the role(s) of the personnel, business units, and control units authorized to be involved in the design, implementation, and monitoring of incentive compensation arrangements; (ii) identify the source of significant risk-related inputs into these processes and establish appropriate controls governing the development and approval of these inputs to help ensure their integrity; and (iii) identify the individual(s) and control unit(s) whose approval is necessary for the establishment of new incentive compensation arrangements or modification of existing arrangements.

An LBO also should conduct regular internal reviews to ensure that its processes for achieving and maintaining balanced incentive compensation arrangements are consistently followed. Such reviews should be conducted by audit, compliance, or other personnel in a manner consistent with the organization's overall framework for compliance monitoring. An LBO's internal audit department also should separately conduct regular audits of the organization's compliance with its established policies and controls relating to incentive compensation arrangements. The results should be reported to appropriate levels of management and, where appropriate, the organization's board of directors.

- Appropriate personnel, including risk-management personnel, should have input into the organization's processes for designing incentive compensation arrangements and assessing their effectiveness in restraining imprudent risk-taking.

Developing incentive compensation arrangements that provide balanced risk-taking incentives and monitoring arrangements to ensure they achieve balance over time requires an understanding of the risks (including compliance risks) and potential risk outcomes associated with the activities of the relevant employees. Accordingly, banking organizations should have policies and procedures that ensure that risk-management personnel have an appropriate role in the organization's processes for designing incentive compensation arrangements and for assessing their effectiveness in restraining imprudent risk-taking.[18] Ways that risk managers might assist in achieving balanced compensation arrangements include, but are not limited to, (i) reviewing the types of risks associated with the activities of covered employees; (ii) approving the risk measures used in risk adjustments and performance measures, as well as measures of risk outcomes used in deferred-payout arrangements; and (iii) analyzing risk-taking and risk outcomes relative to incentive compensation payments.

Other functions within an organization, such as its control, human resources, or finance functions, also play an important role in helping ensure that incentive compensation arrangements are balanced. For example, these functions may contribute to the design and review of performance measures used in compensation arrangements or may supply data used as part of these measures.

- Compensation for employees in risk-management and control functions should be sufficient to attract and retain qualified personnel and should avoid conflicts of interest.

The risk-management and control personnel involved in the design, oversight, and operation of incentive compensation arrangements should have appropriate skills and experience needed to effectively fulfill their roles. These skills and experiences should be sufficient to equip the personnel to remain effective in the face of challenges by covered employees seeking to increase their incentive compensation in ways that are inconsistent with sound risk-management or internal controls. The compensation arrangements for employees in risk-management and control functions thus should be sufficient to attract and retain qualified personnel with experience and expertise in these fields that is appropriate in light of the size, activities, and complexity of the organization.

In addition, to help preserve the independence of their perspectives, the incentive compensation received by risk-management and control personnel staff should not be based substantially on the financial performance of the business units that they review. Rather, the performance measures used in the incentive compensation arrangements for these personnel should be based primarily on the achievement of the objectives of their functions (*e.g.*, adherence to internal controls).

- Banking organizations should monitor the performance of their incentive compensation arrangements and should revise the arrangements as needed if payments do not appropriately reflect risk.

Banking organizations should monitor incentive compensation awards and payments, risks taken, and actual risk outcomes to determine whether

[18] Involvement of risk-management personnel in the design and monitoring of these arrangements also should help ensure that the organization's risk-management functions can properly understand and address the full range of risks facing the organization.

incentive compensation payments to employees are reduced to reflect adverse risk outcomes or high levels of risk taken. Results should be reported to appropriate levels of management, including the board of directors where warranted and consistent with Principle 3 below. The monitoring methods and processes used by a banking organization should be commensurate with the size and complexity of the organization, as well as its use of incentive compensation. Thus, for example, a small, noncomplex organization that uses incentive compensation only to a limited extent may find that it can appropriately monitor its arrangements through normal management processes.

A banking organization should take the results of such monitoring into account in establishing or modifying incentive compensation arrangements and in overseeing associated controls. If, over time, incentive compensation paid by a banking organization does not appropriately reflect risk outcomes, the organization should review and revise its incentive compensation arrangements and related controls to ensure that the arrangements, as designed and implemented, are balanced and do not provide employees incentives to take imprudent risks.

Principle 3: Strong Corporate Governance

Banking organizations should have strong and effective corporate governance to help ensure sound compensation practices, including active and effective oversight by the board of directors.

Given the key role of senior executives in managing the overall risk-taking activities of an organization, the board of directors of a banking organization should directly approve the incentive compensation arrangements for senior executives.[10] The board also should approve and document any material exceptions or adjustments to the incentive compensation arrangements established for senior executives and should carefully consider and monitor the effects of any approved exceptions or adjustments on the balance of the arrangement, the risk-taking incentives of the senior executive, and the safety and soundness of the organization.

The board of directors of an organization also is ultimately responsible for ensuring that the organization's incentive compensation arrangements for all covered employees are appropriately balanced and do not jeopardize the safety and soundness of the organization. The involvement of the board of directors in oversight of the organization's overall incentive compensation program should be scaled appropriately to the scope and prevalence of the organization's incentive compensation arrangements.

*Large banking organizations and organizations that are significant users of incentive compensation.* The board of directors of an LBO or other banking organization that uses incentive compensation to a significant extent should actively oversee the development and operation of the organization's incentive compensation policies, systems, and related control processes. The board of directors of such an organization should review and approve the overall goals and purposes of the organization's incentive compensation system. In addition, the board should provide clear direction to management to ensure that the goals and policies it establishes are carried out in a manner that achieves balance and is consistent with safety and soundness.

The board of directors of such an organization also should ensure that steps are taken so that the incentive compensation system—including performance measures and targets—is designed and operated in a manner that will achieve balance.

- The board of directors should monitor the performance, and regularly review the design and function, of incentive compensation arrangements.

To allow for informed reviews, the board should receive data and analysis from management or other sources that are sufficient to allow the board to assess whether the overall design and performance of the organization's incentive compensation arrangements are consistent with the organization's safety and soundness. These reviews and reports should be appropriately scoped to reflect the size and complexity of the banking organization's activities and the prevalence and scope of its incentive compensation arrangements.

The board of directors of a banking organization should closely monitor incentive compensation payments to senior executives and the sensitivity of those payments to risk outcomes. In addition, if the compensation arrangement for a senior executive includes a clawback provision, then the review should include sufficient information to determine if the provision has been triggered and executed as planned.

The board of directors of a banking organization should seek to stay abreast of significant emerging changes in compensation plan mechanisms and incentives in the marketplace as well as developments in academic research and regulatory advice regarding incentive compensation policies. However, the board should recognize that organizations, activities, and practices within the industry are not identical. Incentive compensation arrangements at one organization may not be suitable for use at another organization because of differences in the risks, controls, structure, and management among organizations. The board of directors of each organization is responsible for ensuring that the incentive compensation arrangements for its organization do not encourage employees to take risks that are beyond the organization's ability to manage effectively, regardless of the practices employed by other organizations.

*Large banking organizations and organizations that are significant users of incentive compensation.* The board of an LBO or other organization that uses incentive compensation to a significant extent should receive and review, on an annual or more frequent basis, an assessment by management, with appropriate input from risk-management personnel, of the effectiveness of the design and operation of the organization's incentive compensation system in providing risk-taking incentives that are consistent with the organization's safety and soundness. These reports should include an evaluation of whether or how incentive compensation practices may increase the potential for imprudent risk-taking.

The board of such an organization also should receive periodic reports that review incentive compensation awards and payments relative to risk outcomes on a backward-looking basis to determine whether the organization's incentive compensation arrangements may be promoting imprudent risk-taking. Boards of directors of these organizations also should consider periodically obtaining and reviewing simulation analysis of compensation on a forward-looking basis based on a range of performance levels, risk outcomes, and the amount of risks taken.

[10] As used in this guidance, the term "board of directors" is used to refer to the members of the board of directors who have primary responsibility for overseeing the incentive compensation system. Depending on the manner in which the board is organized, the term may refer to the entire board of directors, a compensation committee of the board, or another committee of the board that has primary responsibility for overseeing the incentive compensation system. In the case of FBOs, the term refers to the relevant oversight body for the firm's U.S. operations, consistent with the FBO's overall corporate and management structure.

• The organization, composition, and resources of the board of directors should permit effective oversight of incentive compensation.

The board of directors of a banking organization should have, or have access to, a level of expertise and experience in risk-management and compensation practices in the financial services industry that is appropriate for the nature, scope, and complexity of the organization's activities. This level of expertise may be present collectively among the members of the board, may come from formal training or from experience in addressing these issues, including as a director, or may be obtained through advice received from outside counsel, consultants, or other experts with expertise in incentive compensation and risk-management. The board of directors of an organization with less complex and extensive incentive compensation arrangements may not find it necessary or appropriate to require special board expertise or to retain and use outside experts in this area.

In selecting and using outside parties, the board of directors should give due attention to potential conflicts of interest arising from other dealings of the parties with the organization or for other reasons. The board also should exercise caution to avoid allowing outside parties to obtain undue levels of influence. While the retention and use of outside parties may be helpful, the board retains ultimate responsibility for ensuring that the organization's incentive compensation arrangements are consistent with safety and soundness.

*Large banking organizations and organizations that are significant users of incentive compensation.* If a separate compensation committee is not already in place or required by other authorities,[20] the board of directors of an LBO or other banking organization that uses incentive compensation to a significant extent should consider establishing such a committee—reporting to the full board—that has primary responsibility for overseeing the organization's incentive compensation systems. A compensation committee should be composed solely or predominantly of non-executive directors. If the board does not have such a compensation committee, the board should take other steps to ensure that non-executive directors of the board are actively involved in the oversight of incentive compensation systems. The compensation committee should work closely with any board-level risk and audit committees where the substance of their actions overlap.

• A banking organization's disclosure practices should support safe and sound incentive compensation arrangements.

If a banking organization's incentive compensation arrangements provide employees incentives to take risks that are beyond the tolerance of the organization's shareholders, these risks are likely to also present a risk to the safety and soundness of the organization.[21] To help promote safety and soundness, a banking organization should provide an appropriate amount of information concerning its incentive compensation arrangements for executive and non-executive employees and related risk-management, control, and governance processes to shareholders to allow them to monitor and, where appropriate, take actions to restrain the potential for such arrangements and processes to encourage employees to take imprudent risks. Such disclosures should include information relevant to employees other than senior executives. The scope and level of the information disclosed by the organization should be tailored to the nature and complexity of the organization and its incentive compensation arrangements.[22]

• Large banking organizations should follow a systematic approach to developing a compensation system that has balanced incentive compensation arrangements.

At banking organizations with large numbers of risk-taking employees engaged in diverse activities, an ad hoc approach to developing balanced arrangements is unlikely to be reliable. Thus, an LBO should use a systematic approach—supported by robust and formalized policies, procedures, and systems—to ensure that those arrangements are appropriately balanced and consistent with safety and soundness. Such an approach should provide for the organization effectively to:

○ Identify employees who are eligible to receive incentive compensation and whose activities may expose the organization to material risks. These employees should include (i) senior executives and others who are responsible for oversight of the organization's firm-wide activities or material business lines; (ii) individual employees, including non-executive employees, whose activities may expose the organization to material amounts of risk; and (iii) groups of employees who are subject to the same or similar incentive compensation arrangements and who, in the aggregate, may expose the organization to material amounts of risk;

○ Identify the types and time horizons of risks to the organization from the activities of these employees;

○ Assess the potential for the performance measures included in the incentive compensation arrangements for these employees to encourage the employees to take imprudent risks;

○ Include balancing elements, such as risk adjustments or deferral periods, within the incentive compensation arrangements for these employees that are reasonably designed to ensure that the arrangement will be balanced in light of the size, type, and time horizon of the inherent risks of the employees' activities;

○ Communicate to the employees the ways in which their incentive compensation awards or payments will be adjusted to reflect the risks of their activities to the organization; and

○ Monitor incentive compensation awards, payments, risks taken, and risk outcomes for these employees and modify the relevant arrangements if payments made are not appropriately sensitive to risk and risk outcomes.

## III. Conclusion

Banking organizations are responsible for ensuring that their incentive compensation arrangements do not encourage imprudent risk-taking behavior and are consistent with the safety and soundness of the organization. The Agencies expect banking organizations to take prompt action to address deficiencies in their incentive compensation arrangements or related risk-management, control, and governance processes.

The Agencies intend to actively monitor the actions taken by banking organizations in this area and will promote further advances in designing and implementing balanced incentive compensation arrangements. Where appropriate, the Agencies will take supervisory or enforcement action to ensure that material deficiencies that pose a threat to the safety and soundness of the organization are promptly addressed. The Agencies also

---

[20] *See,* New York Stock Exchange Listed Company Manual Section 303A.05(a); Nasdaq Listing Rule 5605(d); Internal Revenue Code section 162(m) (26 U.S.C. 162(m)).

[21] On the other hand, as noted previously, compensation arrangements that are in the interests of the shareholders of a banking organization are not necessarily consistent with safety and soundness.

[22] A banking organization also should comply with the incentive compensation disclosure requirements of the Federal securities law and other laws as applicable. *See, e.g.,* Proxy Disclosure Enhancements, SEC Release Nos. 33–9089, 34–61175, 74 FR 68334 (Dec. 23, 2009) (to be codified at 17 CFR pts. 229 and 249).

will update this guidance as appropriate to incorporate best practices as they develop over time.

This concludes the text of the Guidance on Sound Incentive Compensation Policies.

Dated: June 17, 2010.

**John C. Dugan,**

*Comptroller of the Currency.*

By order of the Board of Governors of the Federal Reserve System, June 21, 2010.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

Dated: June 21, 2010.

**Valerie J. Best,**

*Assistant Executive Secretary, Federal Deposit Insurance Corporation.*

Dated: June 10, 2010.

By the Office of Thrift Supervision.

**John E. Bowman,**

*Acting Director.*

[FR Doc. 2010–15435 Filed 6–24–10; 8:45 am]

BILLING CODE 6210–01–P 4810–33–P 6714–01–P 6720–01–P

## GENERAL SERVICES ADMINISTRATION

[Docket 2010–009; Sequence 3]

### Federal Travel Regulation (FTR); Directions for Reporting Other Than Coach-Class Accommodations for Employees on Official Travel

**AGENCY:** Office of Governmentwide Policy, General Services Administration (GSA).

**ACTION:** Notice of GSA Bulletin FTR 10–05.

**SUMMARY:** The General Services Administration (GSA), in conjunction with the Government Accountability Office (GAO) report, *Premium Class Travel: Internal Control Weaknesses Governmentwide Led to Improper and Abusive Use of Premium Class Travel* (GAO–07–1268), has issued GSA Bulletin FTR 10–05. This bulletin provides directions to Federal Agencies for reporting other than coach-class accommodations for employees on official travel. GSA Bulletin FTR 10–05 may be found at *http://www.gsa.gov/federaltravelregulation.*

**DATES:** The provisions in this Bulletin are effective June 9, 2010.

**FOR FURTHER INFORMATION CONTACT:** Mr. Patrick O'Grady, Office of Governmentwide Policy (M), Office of Travel, Transportation, and Asset Management (MT), General Services Administration at (202) 208–4493 or via e-mail at *patrick.ogrady@gsa.gov.* Please cite GSA Bulletin FTR 10–05.

Dated: June 16, 2010.

**Becky Rhodes,**

*Associate Administrator, Office of Travel, Transportation, and Asset Management.*

[FR Doc. 2010–15433 Filed 6–24–10; 8:45 am]

BILLING CODE 6820–14–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Indian Health Service

### American Indians Into Psychology; Notice of Competitive Grant Applications for American Indians Into Psychology Program

*Announcement Type:* New.

*Funding Opportunity Number:* HHS–IHS–2010–INPSY–0001.

*CFDA Number:* 93.970.

#### Key Dates

*Application Deadline:* July 23, 2010.

*Review Date:* July 29, 2010.

*Earliest Anticipated Start Date:* September 1, 2010.

#### I. Funding Opportunity Description

The Indian Health Service (IHS) is accepting competitive grant applications for the American Indians into Psychology Program. This program is authorized under the authority of "25 U.S.C. 1621p(a–d).", Indian Health Care Improvement Act, Public Law 94–437, as amended by Public Law 102–573 and Public Law 111–148.

*Purpose*

The purpose of the Indians into Psychology Program is to develop and maintain Indian psychology career recruitment programs as a means of encouraging Indians to enter the behavioral health field. This program is described at 93.970 in the Catalog of Federal Domestic Assistance. Costs will be determined in accordance with applicable Office of Management and Budget Circulars. The Public Health Service (PHS) is committed to achieving the health promotion and disease prevention objectives of Healthy People 2010, a PHS-led activity for setting priority areas. This program announcement is related to the priority area of Educational and Community-based programs. Potential applicants may obtain a copy of Healthy People 2010, summary report in print, Stock No. 017–001–00547–9, or via CD–ROM, Stock No. 107–001–00549–5, through the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, PA 15250–7945, (202) 512–1800. You may also access this information via the Internet at the following Web site: *http://www.health.gov/healthypeople.*

The PHS strongly encourages all grant and contract recipients to provide a smoke-free workplace and promote the non-use of all tobacco products. In addition, Public Law 103–227, the Pro-Children Act of 1994, prohibits smoking in certain facilities (or in some cases, any portion of the facility) in which regular or routine education, library, day care, health care, or early childhood development services are provided to children. This is consistent with the PHS mission to protect and advance the physical and mental health of the American people.

#### II. Award Information

*Type of Awards:* Grant.

*Estimated Funds Available:* The total amount identified for Fiscal Year 2010 is $757,386. The award is for 12 months in duration and the average award is approximately $252,462. Awards under this announcement are subject to the availability of funds. In the absence of funding, the agency is under no obligation to make awards funded under this announcement.

*Anticipated Number of Awards:* An estimated two awards will be made under the program. If funding becomes available, additional awards may be made.

*Project Period:* 4 years.

*Award Amount:* $252,462, per year.

#### III. Eligibility Information

*1. Eligible Applicants*

Public and nonprofit private colleges and universities that offer a Ph.D. in clinical programs accredited by the American Psychological Association will be eligible to apply for a grant under this announcement. However, only one grant will be awarded and funded to a college or university per funding cycle.

*2. Cost Sharing/Matching*

This announcement does not require matching funds or cost sharing.

*3. Other Requirements*

Required Affiliations—The grant applicant must submit official documentation indicating a Tribe's cooperation with and support of the program within the schools on its reservation and its willingness to have a Tribal representative serving on the program advisory board. Documentation must be in the form prescribed by the Tribe's governing body, *i.e.*, letter of support or Tribal resolution. Documentation must be submitted from every Tribe involved in the grant program. If application budgets exceed