68736 Federal Register / Vol. 84, No. 241 / Monday, December 16, 2019 / Rules and Regulations

**DEPARTMENT OF LABOR**

**Wage and Hour Division**

**29 CFR Parts 548 and 778**

**RIN 1235–AA24**

# Regular Rate Under the Fair Labor Standards Act

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Fair Labor Standards Act (FLSA or Act) generally requires that covered, nonexempt employees receive overtime pay of at least one and one-half times their regular rate of pay for time worked in excess of 40 hours per workweek. The regular rate includes all remuneration for employment, subject to the exclusions outlined in section 7(e) of the FLSA. In this final rule, the Department of Labor (Department) updates a number of regulations on the calculation of overtime compensation both to provide clarity and to better reflect the 21st-century workplace. These changes will promote compliance with the FLSA, provide appropriate and updated guidance in an area of evolving law and practice, and encourage employers to provide additional and innovative benefits to workers without fear of costly litigation.

**DATES:** This final rule is effective on January 15, 2020.

**FOR FURTHER INFORMATION CONTACT:** Amy DeBisschop, Division of Regulations, Legislation, and Interpretation, Wage and Hour Division, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue NW, Washington, DC 20210; telephone: (202) 693–0406 (this is not a toll-free number). Copies of this final rule may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0675 (this is not a toll-free number). TTY/TDD callers may dial toll-free 1–877–889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of the agency's regulations may be directed to the nearest WHD district office. Locate the nearest office by calling WHD's toll-free help line at (866) 4US–WAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or visit WHD's website for a nationwide listing of WHD district and area offices at *http://www.dol.gov/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

The FLSA generally requires covered employers to pay nonexempt employees overtime pay of at least one and one-half times their regular rate for hours worked in excess of 40 per workweek. The FLSA defines the regular rate as "all remuneration for employment paid to, or on behalf of, the employee"—subject to eight exclusions established in section 7(e).[1] Part 778 of CFR title 29 contains the regulations addressing the calculation of the regular rate of pay for overtime compensation under section 7 of the FLSA.

The Department promulgated the majority of part 778 of CFR title 29 more than 60 years ago, when typical compensation often consisted predominantly of traditional wages, paid time off for holidays and vacations, and contributions to basic medical, life insurance, and disability benefits plans.[2] Since that time, the workplace and the law have evolved, but the Department has only made minor updates to part 778 since 1950.[3]

First, employee compensation packages, including employer-provided benefits and "perks," have expanded significantly. The Bureau of Labor Statistics (BLS) estimated that fringe benefits comprised only 5 percent of employees' total compensation in 1950.[4] Today, such benefits make up approximately one-third of total compensation.[5] Many employers, moreover, now offer various wellness benefits or perks, such as fitness classes, nutrition classes, weight loss programs, smoking cessation programs, health risk assessments, vaccination clinics, stress reduction programs, and training or coaching to help employees meet their health goals.

Both law and practice concerning more traditional benefits, such as sick leave, have likewise evolved in the decades since the Department first promulgated part 778. For example, instead of providing separate paid time off for illness and vacation, many employers now combine these and other types of leave into paid time off plans. Moreover, in recent years, a number of state and local governments have passed laws requiring employers to provide paid sick leave. In 2011, for example, Connecticut became the first state to require private-sector employers to provide paid sick leave to their employees.[6] Today, several states, the District of Columbia,[7] and various cities and counties[8] require paid sick leave, and many other states are considering similar requirements.

Recently, several states and cities have also begun considering and implementing scheduling laws. In the last 5 years, for example, New York, San Francisco, Seattle, and other cities have enacted laws imposing penalties on employers who change employees' schedules without the requisite notice, and various state governments are considering and beginning to pass

[1] *See* 29 U.S.C. 207(e).

[2] *See* U.S. Bureau of Labor Statistics, *An Overview of Employee Benefits,* Occupational Outlook Quarterly (U.S. Bureau of Labor Statistics), Summer 2005, at 20, *available at https://www.bls.gov/careeroutlook/2005/summer/art02.pdf.*

[3] *See, e.g.,* 33 FR 986 (Jan. 26, 1968) (codified at 29 CFR 778.0 through 778.603); 36 FR 4699 (Mar. 11, 1971) (updating 29 CFR 778.214 to clarify that advance approval by the Department is not required for plans providing benefits within the meaning of 29 U.S.C. 207(e)(4)); 36 FR 4981 (Mar. 16, 1971) (updating 29 CFR 778.117 to clarify commission payments that must be included in the regular rate); 46 FR 7308 (Jan. 23, 1981) (updating 29 CFR part 778 to increase the dollar amounts used as examples in the regulations, to respond to statutory amendments affecting other parts of the FLSA, and to modify § 778.320 to clarify that pay for nonworking time does not automatically convert such time into hours worked); 46 FR 33515–2 (June 30, 1981) (correcting errors in the January 1981 update in 29 CFR 778.323, 778.327, 778.501, 778.601); 56 FR 61100 (Nov. 29, 1991) (updating 29 CFR 778.603 to address statutory amendment adding section 7(q) regarding maximum-hour exemption for employees receiving remedial education); 76 FR 18832 (Apr. 5, 2011) (updating §§ 778.110, 778.111, 778.113, and 778.114 to reflect statutory changes to the minimum wage; updating § 778.200 to reflect amendments made by the Worker Economic Opportunity Act; updating § 778.208 from "seven" to "eight" types of remuneration excluded when computing the regular rate).

[4] Yung-Ping Chen, The Growth of Fringe Benefits Implications for Social Security, Monthly Labor Review Vol. 104 No. 11, November 1981, *https://www.bls.gov/opub/mlr/1981/11/art1full.pdf* ("cash payroll as a percentage of total compensation declined steadily over the last 30 years, falling from 95 percent in 1950, to 92.2 percent in 1960, 89.7 percent in 1970, and 84.2 percent in 1980").

[5] Bureau of Labor Statistics News Release, Employer Cost for Employee Compensation—March 2019, June 18, 2019, ("Wages and salaries cost employers $25.22 [per hour] while benefit costs were $11.55."), *https://www.bls.gov/news.release/pdf/ecec.pdf.*

[6] *See* 2011 Conn. Legis. Serv. P.A. 11–52 (West).

[7] *See* Ariz. Rev. Stat. secs. 23–364, 23–371 *et seq.;* Cal. Lab. Code secs. 245, 2810.5; 2011 Conn. Legis. Serv. P.A. 11–52 (West); D.C. Code sec. 32–131.01 *et seq.;* Me. Rev. Stat. Ann. tit. 26, sec. 636 (2019) (effective Jan. 1, 2021); Md. Code Ann., Lab. & Empl. section 3–1301 *et seq.* (West 2019); Mass. Gen. Laws ch. 149, sec. 148C, 148D; Mich. Comp. Laws secs. 408.961–974; 2019 Nev. Legis. Serv. 592 (West) (to be codified at Nev. Rev. Stat. Ch. 608 (2019) (effective Jan. 1, 2020); N.J. Stat. Ann. sec. 34:11D–1 *et seq.;* Or. Rev. Stat. sec. 653.601 *et seq.;* 28 R.I. Gen. Laws sec. 28–57–1 *et seq.;* 21 Vt. Stat. secs. 384, 481–485, 345; Wash. Rev. Code secs. 49.46.005, 49.46.020, 49.46.090, 49.46.100.

[8] *See, e.g.,* Austin, Tex., City Code ch. 4–19 (2018); Chi., Ill., Code ch. 1–24 (2017); Minneapolis, Minn., Admin. Code title 2, sec. 40.10 *et seq.* (2016); Phila., Pa., Code ch. 9–4100 (2015); N.Y.C., N.Y., Admin. Code sec. 20–911 (2013); Seattle, Wash., Mun. Code ch. 14.16 (2011); Westchester County, N.Y., Laws of Westchester County ch. 585 (2018).

similar scheduling legislation.[9] Some of these laws expressly exclude these penalties from the regular rate under state law,[10] but questions remain for employers determining how these and other penalties may affect regular rate calculations under federal law.

The Department published a notice of proposed rulemaking (NPRM) in the **Federal Register** on March 29, 2019 (84 FR 11888 (Mar. 29, 2019)), inviting comments about proposed updates to its regulations in part 778 to reflect changes in the modern workplace and to provide clarifications that reflect the statutory language and WHD's enforcement practices. Additionally, the Department proposed minor clarifications and updates to part 548 of title 29, which implements section 7(g)(3) of the FLSA. Section 7(g)(3) permits employers, under specific circumstances, to use a basic rate to compute overtime compensation rather than a regular rate.[11] Comments were initially due on or before May 28, 2019. In response to a request for an extension of the time period for filing written comments, the Department extended the deadline to June 12, 2019 (84 FR 21300 (May 14, 2019)). The Department received approximately 80 timely comments.

After considering the comments, the Department has decided to adopt the NPRM's proposed changes with some modifications. The final rule clarifies when payments for forgoing unused paid leave, payments for bona fide meal periods, reimbursements, benefit plan contributions, and certain ancillary benefits may be excluded from the regular rate. The final rule also revises certain sections of the existing regulation to more closely align with the Act. Additionally, the final rule incorporates, with modification, the proposed clarifications and updates to part 548. The final rule incorporates numerous suggestions from commenters, including adding examples of excludable state and local scheduling law payments to § 778.222, which addresses "other payments similar to call-back pay"; providing additional guidance in the preamble about how to determine whether a bonus is discretionary or nondiscretionary; revising language at §§ 778.202 and 778.205 to reflect that excludable overtime premium payments may be made pursuant to a "written or unwritten employment contract, agreement, understanding, handbook, policy, or practice"; and referencing state or local minimum wage laws as well as Federal law in the regulations at part 548 of title 29 discussing the basic rate.

The Department's estimated economic impact of this final rule follows below. The Department qualitatively estimates the potential benefits associated with reduced litigation at $281 million over 10 years, or $28.1 million per year. The Department quantitatively estimates the one-time regulatory familiarization cost of this final rule at $30.5 million, which results in a 10-year annualized cost of $3.6 million at a discount rate of 3 percent or $4.3 million at a discount rate of 7 percent.

This final rule is considered an Executive Order (E.O.) 13771 deregulatory action. Details on the estimated reduced burdens and cost savings of this final rule can be found in the rule's economic analysis.

## II. Background

### *A. The FLSA and Regular Rate Regulatory History*

Congress enacted the FLSA in 1938 to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers[,]" which burdened commerce and constituted unfair methods of competition.[12] In relevant part, section 7(a) of the FLSA requires employers to pay their employees overtime at one and one-half times their "regular rate" of pay for time worked in excess of 40 hours per workweek.[13] When enacted, however, the FLSA did not define the term "regular rate."

Later that year, WHD issued an interpretive bulletin addressing the meaning of "regular rate," which WHD later revised and updated in 1939, and again in 1940. The 1940 version of the bulletin stated, among other things, that an employer did not need to include extra compensation paid for overtime work in regular rate calculations.[14] It also specified that the regular rate must be "the rate at which the employee is actually employed and paid and not . . . a fictitious rate which the employer adopts solely for bookkeeping purposes." [15]

In 1948, the Supreme Court in *Bay Ridge Operating Co.* v. *Aaron,* 334 U.S. 446, addressed whether specific types of compensation may be excluded from the regular rate, or even credited towards an employer's overtime payment obligations. The Court held that an overtime premium payment, which it defined as "[e]xtra pay for work because of previous work for a specified number of hours in the workweek or workday whether the hours are specified by contract or statute," could be excluded from the computation of the regular rate.[16] Permitting an "overtime premium to enter into the computation of the regular rate would be to allow overtime premium on overtime premium—a pyramiding that Congress could not have intended." [17] The Court also held that "any overtime premium paid, even if for work during the first forty hours of the workweek, may be credited against any obligation to pay statutory excess compensation." [18] By contrast, the Court noted, "[w]here an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of work done or the time at which he is required to labor rather than an overtime premium. Such payments enter into the determination of the regular rate of pay." [19]

Following the *Bay Ridge* decision, in 1948, the Department promulgated 29 CFR part 778, concerning the regular rate.[20] This regulation codified the principles from *Bay Ridge* that extra payments for hours worked in excess of a daily or weekly standard established by contract or statute may be excluded from the regular rate and credited toward overtime compensation due, and that extra payments for work on Saturdays, Sundays, holidays, or at night that are made without regard to the number of hours or days previously worked in the day or workweek must be included in the regular rate and may not be credited toward the overtime owed.[21]

[9] *See* Chi., Ill., Fair Workweek Ordinance (July 24, 2019) (effective July 1, 2020); N.Y.C., N.Y., Admin. Code 20–1222 (2017); Phila., Pa., Code ch. 9–4600 (2018) (effective Jan. 1, 2020); Seattle, Wash., Mun. Code ch. 14.22.050 (2017); SB 828, 79th Leg. Assemb., 2017 Reg. Sess. (Or. 2017); *see also* Emeryville, Cal., Mun. Code 5–39.01 (2017); S.F., Cal., Police Code art. 33G (2015).

[10] *See, e.g.,* Or. Rev. Stat. Ann. sec. 653.412(7)(d) ("Regular rate of pay" does not include "[a]ny additional compensation an employer is required to pay an employee under ORS 653.442 [right to rest between work shifts] or 653.455 [compensation for work schedule changes].").

[11] *See* 29 U.S.C. 207(g)(3).

[12] 29 U.S.C. 202(a); *see* Fair Labor Standards Act of 1938, Public Law 75–718, ch. 676, 52 Stat. 1060 (codified as amended at 29 U.S.C. 201–219).

[13] 29 U.S.C. 207(a). The statutory maximum in 1938 was 44 hours per workweek; in 1939, it was 42 hours per workweek; and in 1940, it was 40 hours per workweek. *See* Public Law 75–718, 52 Stat. at 1063.

[14] *See* Interpretive Bulletin No. 4 ¶ 13 (Nov. 1940).

[15] *Id.* ¶ 18.

[16] 334 U.S. at 450 n.3, 465–66.

[17] *Id.* at 464.

[18] *Id.* at 464–65.

[19] *Id.* at 468–69.

[20] *See* 13 FR 4534 (Aug. 6, 1948).

[21] *See* 29 CFR 778.2 (1948).

It noted, however, that when extra payments for work on Saturdays, Sundays, holidays, or nights are contingent on the employee having previously worked a specified standard number of hours or days, such payments are true overtime premium payments that may be excluded from the regular rate and credited toward overtime compensation due.[22] The Department also explained that payments ''that are not made for hours worked, such as payments . . . for idle holidays or for occasional absences due to vacation or illness or other similar cause'' may be excluded from the regular rate, but could not be credited against statutory overtime compensation due.[23]

In 1949, Congress responded to the *Bay Ridge* decision by amending the FLSA to identify two categories of payments that could be both excluded from the regular rate and credited toward overtime compensation due.[24] The first category was extra compensation for work on Saturdays, Sundays, holidays, or the sixth or seventh day of the workweek paid at a premium rate of one and one-half times the rate paid for like work performed in nonovertime hours on other days. The second category was extra compensation paid pursuant to an applicable employment contract or collective bargaining agreement for work outside of the hours established therein as the normal workday (not exceeding eight hours) or workweek (not exceeding 40 hours) at a premium rate of one and one-half times the rate paid for like work performed during the workday or workweek.[25]

On October 26, 1949, Congress again amended the FLSA.[26] The amendments added, among other things, a comprehensive definition of the term ''regular rate.'' [27] ''Regular rate'' was defined to include ''all remuneration for employment paid to, or on behalf of, the employee[,]'' [28] with the exception of an exhaustive list of seven specific categories of payments that could be excluded from the regular rate.[29] Those categories of excludable payments were: (1) Gifts and payments on special occasions; (2) payments made for occasional periods when no work is performed such as vacation or sick pay, reimbursements for work-related expenses, and other similar payments that are not compensation for hours of employment; (3) discretionary bonuses, payments to profit-sharing or thrift or savings plans that meet certain requirements, and certain talent fees; (4) contributions to a bona fide plan for retirement, or life, accident, or health insurance; (5) extra compensation provided by a premium rate for certain hours worked in excess of eight in a day, 40 hours in a workweek, or the employee's normal working hours; (6) extra compensation provided by a premium rate for work on Saturdays, Sundays, regular days of rest, or the sixth or seventh days of the workweek; and (7) extra compensation provided by a premium rate pursuant to an employment contract or collective bargaining agreement for work outside of the hours established therein as the normal workday (not exceeding eight hours) or workweek (not exceeding 40 hours).[30] The October 1949 amendments also added a provision specifying that the last three of these categories are creditable against overtime compensation due.[31]

In 1950, the Department updated part 778 to account for the 1949 amendments to the FLSA.[32] These regulations explained general principles regarding overtime compensation and the regular rate, including the principle that each workweek stands on its own for purposes of determining the regular rate and overtime due.[33] The regulations also provided methods for calculating the regular rate under different compensation systems, such as salary and piecework compensation.[34] They further elaborated on the seven categories of payments that are excludable from regular rate calculations, and provided several examples.[35] The regulations also addressed special problems and pay plans designed to circumvent the FLSA.[36]

In 1961 and 1966, Congress made a few minor, non-substantive language changes and redesignated certain sections.[37] In 1968, the Department updated part 778, principally to clarify the statutory references, update the amounts used to illustrate pay computations, and reorganize the provisions in part 778.[38] Over the next several decades, the Department periodically made minor changes and updates to part 778.[39]

In 2000, Congress added another category of payments that could be excluded from the regular rate, currently contained in section 7(e)(8).[40] This amendment permitted an employer to exclude from the regular rate income derived from a stock option, stock appreciation right, or employee stock purchase plan, provided certain restrictions were met.[41] Congress also amended section 7(h) to state that, except for the types of extra compensation identified in sections 7(e)(5), (6), and (7), sums excluded from the regular rate are not creditable toward minimum wage or overtime compensation due.[42] In 2011, the Department updated part 778 to reflect the 2000 statutory amendments and to modify the wage rates used as examples to reflect the current minimum wage.[43]

Currently, the FLSA's definition of ''regular rate'' and the eight categories of

[22] *See id.*

[23] *Id.*

[24] *See* Public Law 81–177, ch. 352, 63 Stat. 446 (July 20, 1949). These provisions are currently codified at 29 U.S.C. 207(e)(6)–(7).

[25] *See id.*

[26] *See* Fair Labor Standards Amendments of 1949, Public Law 81–393, ch. 736, 63 Stat. 910.

[27] *Id.* Sec. 7, 63 Stat. at 913–14. This provision is currently codified at 29 U.S.C. 207(e).

[28] *Id.*

[29] *See id.* 63 Stat. at 913–14. These provisions are currently codified at 29 U.S.C. 207(e)(1)–(7).

[30] *See id.* The excludable categories of payments in sections 7(d)(6) and (7) in the October 1949 amendments were essentially the same as those that had been added in the July 1949 amendments as sections 7(e)(1) and (2); the October 1949 amendments eliminated them from section 7(e).

[31] *See id.* Public Law 81–393, 63 Stat. at 915. This provision is currently codified at 29 U.S.C. 207(h) (payments described in sections 7(e)(5)–(7) are creditable).

[32] *See* 15 FR 623 (Feb. 4, 1950) (codified at 29 CFR 778.0 through 778.27).

[33] *See* 29 CFR 778.2 (1950).

[34] *See* 29 CFR 778.3(b) (1950).

[35] *See* 29 CFR 778.5 through 778.8 (1950).

[36] *See* 29 CFR 778.9.17, 778.21 through 778.23 (1950).

[37] In 1961, Congress made non-substantive language changes to sections (d)(5) and (7). *See* Fair Labor Standards Amendments of 1961, Public Law 87–30, sec. 6, 75 Stat. 65, 70. In 1966, Congress redesignated section 7(d) as section 7(e). *See* Fair Labor Standards Amendments of 1966, Public Law 89–601, Title II, sec. 204(d)(1), 80 Stat. 830, 836. Additionally, section 7(g), which provided that extra compensation paid pursuant to sections 7(d)(5), (6), and (7) could be credited against overtime compensation due under section 7(a), was moved to section 7(h). *See id.*

[38] *See* 33 FR 986 (Jan. 26, 1968) (29 CFR 778.0 through 778.603).

[39] *See* 36 FR 4699 (Mar. 11, 1971) (updating § 778.214 to clarify that advance approval by the Department is not required for plans providing benefits within the meaning of section 7(e)(4)); 36 FR 4981 (Mar. 16, 1971) (updating § 778.117 to clarify commission payments that must be included in the regular rate); 46 FR 7308 (Jan. 23, 1981) (updating part 778 to increase the dollar amounts used as examples in the regulations, to respond to statutory amendments affecting other parts of the FLSA, and to modify § 778.320 to clarify that pay for nonworking time does not automatically convert such time into hours worked); 46 FR 33515–02 (June 30, 1981) (correcting errors in the January 1981 update in §§ 778.323, 778.327, 778.501, 778.601); 56 FR 61100 (Nov. 29, 1991) (updating § 778.603 to address statutory amendment adding section 7(q) regarding maximum-hour exemption for employees receiving remedial education).

[40] *See* Worker Economic Opportunity Act, Public Law 106–202, sec. 2(a)(3), 114 Stat. 308 (2000).

[41] *See id.*

[42] *See id.*

[43] *See* 76 FR 18832 (Apr. 5, 2011) (updating §§ 778.110, 778.111, 778.113, 778.114, 778.200, 778.208).

excludable payments are contained in section 7(e) of the Act.[44] The Department's regulations concerning the regular rate requirements are contained in 29 CFR part 778. As noted above, the last comprehensive revision to part 778 was in 1968.[45]

While section 7(a) defines the general overtime entitlement in terms of an employee's regular rate, under certain circumstances, the FLSA permits employers to use a "basic rate," rather than the regular rate as defined in section 7(e), to calculate overtime compensation.[46] Congress added this provision, currently contained in section 7(g), in 1949—at the same time that Congress added the definition of "regular rate" to the FLSA.[47] The requirements an employer must meet to use a basic rate are set forth in that same section 7(g).[48]

In 1955, the Department promulgated 29 CFR part 548 to establish the requirements for authorized basic rates under section 7(g)(3).[49] It amended various sections of the part 548 regulations several times over the next 12 years to reflect statutory amendments to other parts of the FLSA, including increases to the minimum wage.[50] The Department has not updated any of the regulations in part 548 since 1967, more than a half-century ago.

*B. The Department's Proposal*

On March 29, 2019, the Department issued its proposal to update and revise a number of regulations in parts 548 and 778.[51] The Department's proposal focused primarily on clarifying whether certain kinds of "perks," benefits, or other miscellaneous payments must be included in the regular rate. These clarifications included confirming that the cost of providing wellness programs, onsite specialist treatment, gym access and fitness classes, employee discounts on retail goods and services, and payments for tuition programs, such as reimbursement programs or repayment of educational debt, may be excluded from an employee's regular rate of pay. The Department also proposed to clarify that payments for unused paid leave, including paid sick leave, may be excluded from an employee's regular rate of pay; that reimbursed expenses need not be incurred "solely" for the employer's benefit for the reimbursements to be excludable from an employee's regular rate and that reimbursed travel expenses that do not exceed the maximum travel reimbursement permitted under the Federal Travel Regulation System and meet other regulatory requirements may be excluded from an employee's regular rate of pay; that employers do not need a prior formal contract or agreement with the employee(s) to exclude certain overtime premiums described in sections 7(e)(5) and (6) of the FLSA; and that pay for time that would not otherwise qualify as "hours worked," including bona fide meal periods, may be excluded from an employee's regular rate unless an agreement or established practice indicates that the parties have treated the time as hours worked. Additionally, the Department proposed to provide examples of discretionary bonuses that may be excluded from an employee's regular rate of pay under section 7(e)(3) of the FLSA and to clarify that the label given to a bonus does not determine whether it is discretionary. The Department also proposed to provide additional examples of benefit plans, including accident, unemployment, and legal services, that may be excluded from an employee's regular rate of pay under section 7(e)(4) of the FLSA.

The Department proposed two substantive changes to the existing regulations. First, the Department proposed to eliminate the restriction in 29 CFR 778.221 and 778.222 that "call-back" pay and other payments similar to call-back pay must be "infrequent and sporadic" to be excludable from an employee's regular rate, while maintaining that such payments must not be so regular that they are essentially prearranged. Second, the Department proposed to update its "basic rate" regulations, which are authorized under section 7(g)(3) of the FLSA, as an alternative to the regular rate under specific circumstances. Under the current regulations, employers using an authorized basic rate may exclude from the overtime computation any additional payment that would not increase total overtime compensation by more than $0.50 per week on average for overtime workweeks in the period for which the employer makes the payment. The Department proposed to update this regulation to change the $0.50 limit to 40 percent of the Federal minimum wage—currently $2.90.

In developing this rule, the Department was mindful of the Supreme Court's recent guidance that, to determine the scope of an exemption under the FLSA, the statutory text must be given a "fair reading" rather than a narrow reading because the FLSA's exemptions are "as much a part of the FLSA's purpose as the [minimum wage and] overtime-pay requirement[s]." *Encino Motorcars, LLC* v. *Navarro,* 138 S. Ct. 1134, 1142 (2018). As the Third Circuit recently noted in a regular rate case, "that is as should be expected, because employees' rights are not the only ones at issue and, in fact, are not always separate from and at odds with their employers' interests." *U.S. Dep't of Labor* v. *Bristol Excavating, Inc.,* 935 F.3d 122, 135 (3d Cir. 2019).

Approximately 80 individuals and organizations timely commented on the NPRM during the 75-day extended comment period that ended on June 12, 2019. The Department received comments from a broad array of constituencies, including small business owners, employer and industry associations, individual workers, worker advocacy groups, unions, non-profit organizations, law firms, professional associations, and other interested members of the public. The majority of comments supported the Department's efforts to clarify the regular rate regulations. All timely received comments may be viewed on *www.regulations.gov,* docket ID WHD–2019–0002.

Some commenters appear to have mistakenly filed comments intended for this rulemaking into the dockets for the Department's rulemakings concerning overtime (docket ID WHD–2019–0001) or joint employer status (docket ID WHD–2019–0003) under the FLSA. The Department did not consider these misfiled comments in this rulemaking.

The Department has carefully considered the timely-submitted comments on the proposed changes. Some of the comments were general statements of support or opposition. *See* Bloomin' Brands; International Bancshares Corporation (IBC); Independent Bakers Association (IBA); National Demolition Association (NDA); National Federation of Independent Businesses (NFIB); International Association of Firefighters (Association

[44] *See* 29 U.S.C. 207(e). Additionally, section 7(h) states that only payments excludable from the regular rate pursuant to sections 7(e)(5), (6), and (7) may be credited against the employer's overtime obligation and that all other excludable payments (*i.e.*, payments that qualify as excludable under sections 7(e)(1), (2), (3), (4), and (8)) are not creditable). *See* 29 U.S.C. 207(h).

[45] *See* 33 FR 986 (29 CFR 778.0 through 778.603).

[46] 29 U.S.C. 207(g).

[47] *See* Public Law 81–393, 63 Stat. at 914–15. In 1966, Congress redesignated section 7(f) as section 7(g), with section numbers (1)–(3) remaining the same; no substantive changes were made. *See* Public Law 89–601, 80 Stat. at 836.

[47] 29 U.S.C. 207(g)(1)–(3).

[48] *See id.*

[49] *See* 20 FR 5678 (Aug. 6, 1955). The regulations interpreting sections 7(g)(1)–(2) are at 29 CFR 778.415 through 778.421.

[50] *See* 21 FR 338 (Jan. 18, 1956); 26 FR 7730 (Aug. 18, 1961); 28 FR 11266 (Oct. 22, 1963); 31 FR 6769 (May 6, 1966); 32 FR 3293 (Feb. 25, 1967).

[51] 84 FR 11888.

of Firefighters); and various individual commenters.

The Department received a number of comments that are beyond the scope of this rulemaking. These include, for example, a request to address whether restricted stock units are excludable under 29 U.S.C. 207(e)(8) of the Act, which permits an employer to exclude from the regular rate income derived from a stock option, stock appreciation right, or employee stock purchase plan. *See* Semiconductor Industry Association (SIA); National Association of Manufacturers (NAM); the Chamber of Commerce (Chamber); Partnership to Protect Workplace Opportunity (PPWO); ERISA Industry Committee (ERIC); American Benefits Council. Similarly, some commenters urged the Department to require that any payment that must be included in the regular rate must count towards the overtime salary threshold under 29 CFR part 541. *See* American Hotel and Lodging Association (AHLA); PPWO; College and University Professional Association for Human Resources (CUPA–HR). The Department did not raise these issues in its proposal, and they are therefore out of scope of this rulemaking.

Some commenters raised issues that are the subject of other on-going rulemaking efforts by the Department. For example, commenters raised concerns regarding the fluctuating workweek regulation at 29 CFR 778.114. *See* Associated Builders and Contractors; AHLA; Chamber. The Department is currently engaged in rulemaking to revise this specific regulation.[52] Therefore, the Department does not address these issues in this final rule.

Significant issues raised in the comments on the Department's proposal are discussed below, along with the Department's response to those comments.

## III. Final Regulatory Provisions

The Department finalizes its proposals to update the regulations in parts 778 and 548 to clarify the Department's interpretation in light of modern compensation and benefits practices. The sections below discuss, in turn, each category of excludable compensation that the Department has addressed in this final rule.

### *A. Excludable Compensation Under Section 7(e)(2)*

Many of the Department's regulatory updates in this final rule clarify the type of compensation that is excludable from the regular rate under FLSA section 7(e)(2). Section 7(e)(2) permits an employer to exclude from the regular rate three distinct categories of payment: First, "payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause"; second, "reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer"; and third, "other similar payments to an employee which are not made as compensation for his hours of employment."[53] In this Preamble, these clauses are referred to as: The "occasional periods when no work is performed" clause; the "reimbursable expenses" clause; and the "other similar payments" clause. The Department's regulations interpreting section 7(e)(2) are contained in §§ 778.216 through 778.224.

#### 1. Pay for Forgoing Holidays or Leave

The initial clause of section 7(e)(2) of the FLSA permits an employer to exclude "payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar causes" from the regular rate.[54] Section 778.218 addresses this statutory provision and provides that payments for such time that "are in amounts approximately equivalent to the employee's normal earnings" are not compensation for hours of employment and are therefore excludable from the regular rate.[55]

Section 778.219 addresses a related issue: The exclusion of payments for working on a holiday or forgoing vacation leave, as distinct from the exclusion of payments for using leave.[56] It explains that if an employee who is entitled to "a certain sum as holiday or vacation pay, whether he works or not," receives additional pay for each hour worked on a holiday or vacation day, the sum allocable as the holiday or vacation pay is excluded from the regular rate.[57] In other words, when an employee works instead of taking a holiday or using vacation leave, and receives pay for both the hours of work performed as well as the holiday or vacation leave that he or she did not take, the amount paid for the forgone holiday or vacation leave may be excluded from the regular rate. In its current form, § 778.219 addresses only pay for forgoing holidays and vacation leave but does not address sums paid for forgoing the use of other forms of leave, such as leave for illness. As explained in the NPRM, WHD has addressed payments for forgoing sick leave in its Field Operations Handbook (FOH). The FOH states that the same rules governing exclusion of payments for unused vacation leave also apply to payments for unused sick leave.[58] Therefore, when "the sum paid for unused sick leave is the approximate equivalent of the employee's normal earnings for a similar period of working time," such payments are excludable from the regular rate.[59]

To clarify and modernize the regulations, the Department proposed to update § 778.219 to address payments for forgoing both holidays and other forms of leave. The Department noted in the NPRM that it is aware that many employers no longer provide separate categories of leave based on an employee's reason for taking leave—such as sick leave and vacation leave. Instead, employers provide one category of leave, which is commonly called paid time off. The Department explained that it saw no reason to distinguish between the types of leave when determining whether payment for forgoing use of the leave is excludable from the regular rate. Rather, the central issues are whether the amount paid is approximately equivalent to the employee's normal earnings for a similar period of time, and whether the payment is in addition to the employee's normal compensation for hours worked.

Accordingly, the Department proposed to clarify that occasional payments for forgoing the use of leave are treated the same regardless of the type of leave. The Department therefore proposed to revise the title of § 778.219, clarify in § 778.219(a) that payments for all forms of unused leave are treated the same for purposes of determining whether they may be excluded from the regular rate, and add an example concerning payment for forgoing the use of paid time off. The NPRM noted that the proposed changes reflected the

---

[52] *See* Fluctuating Workweek Method of Computing Overtime, Notice of Proposed Rulemaking, 84 FR 59590 (Nov. 5, 2019).

[53] 29 U.S.C. 207(e)(2).

[54] *See id.*

[55] 29 CFR 778.218; *see* FOH 32d03g ("Payment for absences charged against leave under a bona fide plan granting the employee a specified amount of annual, vacation, or sick leave with pay need not be included in the regular rate of pay, if the sum paid is the approximate equivalent of the employee's normal earnings for a similar period of working time. Payments for such absences may be excluded regardless of when or how the leave is taken.").

[56] *See* 29 CFR 778.219.

[57] 29 CFR 778.219(a).

[58] *See* FOH 32d03e(b).

[59] *Id.*

Department's longstanding practice of applying the same principles to payments of unused holiday, vacation, and sick leave.[60] The NPRM stated that the proposed changes would ensure the consistent application of the same principles across differing leave arrangements.[61] The Department also proposed to clarify that payments for forgoing the use of leave are excludable from the regular rate regardless of whether they are paid during the same pay period in which the previously scheduled leave is forgone or during a subsequent pay period as a lump sum.

A number of commenters representing both employers and employees addressed this proposal. *See, e.g.,* Center for Workplace Compliance (CWC); International Municipal Lawyers Association (IMLA); Wood Floor Covering Association (WFCA); National Public Labor Employer Relations Association (NPELRA); Chamber; National Employment Law Project (NELP); Association of Firefighters; the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO). Many supported the changes as proposed. *See, e.g.,* Associated Builders and Contractors; Seyfarth Shaw (Seyfarth); PPWO; Society for Human Resource Management (SHRM); National Automobile Dealers Association (NADA); Society of Independent Gasoline Marketers of America (SIGMA); NDA. SHRM stated that the proposal harmonizes the regulation "with the realities of the modern workplace" by treating all forms of leave in the same manner. NPELRA commented that the proposal "makes common sense." NELP expressed general agreement with the proposal.

WFCA asked that the regulation specify that the payout of unused leave is still excludable from the regular rate even if the amount of leave accrued is based on the number of hours worked. Rather than accruing leave on a periodic basis (*e.g.,* per pay-period), WFCA noted that many employees accrue leave based on the number of hours worked and that some states require the calculation of leave to be based on hours worked. In response to this comment, the Department notes that neither WHD in its guidance, nor the courts that have addressed this issue, have determined that pay for forgoing leave is excludable or not excludable on the basis of how the paid leave was accrued. Additionally, the Department recognizes that employers may use a variety of bases for determining leave amounts, such as hours or days worked or length of service. Therefore, the Department has concluded that the proposed regulatory language need not be modified as suggested. The method of computation or accrual of paid leave is not determinative. Under the language in the regulation finalized in this rule, the fact that paid leave may be accrued on an hourly basis would not disqualify pay for forgoing such leave from being excludable from the regular rate.

NELP, while generally agreeing with the Department's proposed amendments to § 778.219, requested clarification that regardless of the type of leave, it still must comply with the statutory requirements that it be "occasional" and "similar to vacation, holiday or illness" in order to be excluded from the regular rate. The Department acknowledges NELP's concern but does not believe that any modification to the proposed regulatory text in § 778.219 is necessary. Given the statutory language in section 7(e)(2) that, to be excludable, this form of payment must be made "for occasional periods when no work is performed due to vacation, holiday, illness, . . . or other similar cause,"[62] the Department believes that this is already clear and therefore further clarification in the regulation is unnecessary.

CWC suggested that the Department add an example illustrating the difference between attendance-based incentive bonuses, which must be included in the regular rate, and valid payments for forgoing leave, which can be excluded. The Department declines to modify the regulatory text as suggested. As discussed in the NPRM, in some situations, employers may make payments to encourage attendance at work rather than compensating employees for forgoing the use of leave. Attendance bonuses are typically non-discretionary bonuses that must be included in the regular rate because they are made "pursuant to [a] contract, agreement, or promise causing the employee to expect such payments[.]"[63] An important distinction between an excludable leave buy-back payment and a non-excludable attendance bonus is that an excludable buy-back payment results in the employee no longer having that leave available to use, *i.e.,* the employee's leave balance is diminished by the amount of leave "bought back." In contrast, where an employee receives an additional payment that does not affect his or her leave balance, or the payment is otherwise tied to factors that are not related to the holiday, vacation, or illness period, such payment may be an attendance bonus that is not excludable from the regular rate. As CWC noted in its comment, the distinction between an excludable payment for forgoing leave and an attendance bonus is usually very fact specific.[64] Because this issue is more appropriately addressed through subregulatory guidance, the Department declines to amend the regulation as suggested. The Department notes, however, that § 778.219(a), as adopted in this final rule, does not affect § 778.211(c), which addresses the exclusion of discretionary bonuses from the regular rate pursuant to FLSA section 7(e)(3)(a).[65]

A few commenters addressed the requirement that the pay for forgoing the leave be approximately equivalent to the employee's normal earnings. *See* Chamber; NPELRA; Association of Firefighters. The Chamber asserted that there was no statutory basis for requiring that the payment for the forgone leave be approximately equivalent to the employee's normal earnings for the amount of time covered by the forgone leave and therefore argued that this requirement be removed entirely. NPELRA requested that the proposed regulatory language in § 778.219 be modified to permit exclusion of a payment for an employee's unused leave where that

[60] *See* FOH 32d03e.

[61] *See, e.g., Balestrieri* v. *Menlo Park Fire Prot. Dist.*, 800 F.3d 1094, 1103–04 (9th Cir. 2015) (holding that annual leave comprised of both sick and vacation leave need not be included in the regular rate under section 7(e)(2)). The NPRM explained that such payments need not be included in the regular rate under section 7(e)(2) for the same reason that payments for unused vacations or holidays need not be included; it makes no difference that payments for unused annual leave or paid time off may include unused sick leave. *See also* WHD Opinion Letter FLSA2006–18NA, 2006 WL 4512960 (July 24, 2006) (holiday payments made to employees when they forgo holidays need not be included in the regular rate pursuant to section 7(e)(2)); WHD Opinion Letter FLSA2004–2NA, 2004 WL 5303030 (Apr. 5, 2004) (cashed-out accrued vacation time need not be included in regular rate pursuant to section 7(e)(2)).

[62] 29 U.S.C. 207(e)(2); *see also* 29 CFR 778.218.

[63] 29 U.S.C. 207(e)(3); *see* 29 CFR 778.211(c); *see also* 84 FR 11888, 11892 n. 57.

[64] *See* WHD Opinion Letter FLSA2009–19, 2009 WL 649021 at *4 (Jan. 16, 2009) (concluding that vacation buy-back payments were excludable, but stipends for nonuse of sick leave encouraged employees not to use or abuse sick leave and therefore were a form of attendance bonus that was not excludable); WHD Opinion Letter FLSA2006–18NA, 2006 WL 4512960, at *2 (July 24, 2006) (holiday payments made to employees when they forgo holidays need not be included in the regular rate because the employees continued to receive compensation at their customary rate for hours worked in addition to receiving holiday pay); WHD Opinion Letter FLSA2004–2NA (April 5, 2004) (cashed-out accrued vacation time need not be included in the regular rate because such payments were made at employees' applicable hourly rate and in addition to receiving their customary payment for hours worked).

[65] *See* 29 U.S.C. 207(e)(3)(a); 29 CFR 778.211(c).

payment is a percentage of the amount that would normally be paid to the employee when using the leave. NPELRA stated that instead of paying 100 cents on the dollar, employers should be permitted to pay a percentage of accrued leave, which is often based on a calculation negotiated with union representatives and takes into account time-in-service and the total amount of sick leave that an employee has accrued. NPELRA provided an example in which an employee with 20 or more years of service would be paid out for his or her unused sick leave at 20 percent if the employee had accrued between 1 and 125 hours of leave, 40 percent for 126 to 255 hours, 60 percent for 256–380 hours, and 80 percent for 381–607 hours. By contrast, Association of Firefighters commented that the Department did not provide any definition of what constitutes an ''approximate equivalent'' amount and expressed concern that buy-back payments at ''sub-premium'' rates will now be permitted.

The Department declines to modify the language in proposed § 778.219 to either remove the requirement that payments be made in amounts ''approximate[ly] equivalent'' or to provide a formulaic definition as to what constitutes an ''approximate equivalent.'' As an initial matter, the Department notes that this requirement is currently required under § 778.218, which addresses the statutory provision providing for exclusion of payments for occasional periods when no work is performed due to vacation, holiday, and illness. Section 778.218 has long provided that payments for such time that ''are in amounts approximately equivalent to the employee's normal earnings,'' are not compensation for hours of employment and are therefore excludable from the regular rate.[66] Given that § 778.219's exclusion of pay for forgoing leave is derived from § 778.218, the well-established inclusion of this requirement in the latter warrants its inclusion in the former. Additionally, requiring excludable payments for forgoing leave to be approximately equivalent to the employee's normal earnings helps ensure that the payments are true leave buy-back payments rather than attendance bonuses, which are generally considered to be non-discretionary bonuses that must be included in the regular rate. The example provided by NPELRA, which results in buying back sick leave in amounts that are not approximately equivalent to the employee's normal earnings for a similar period of working time, illustrates why this requirement is necessary. In that example, some of the forgone sick leave is ''bought back'' at only 20 percent of the dollar value of that leave. For these reasons, the Department has decided to adopt § 778.219 as proposed.

Association of Firefighters and the AFL–CIO contended that the Department's proposal to permit the exclusion of pay for forgoing sick leave is contrary to two appellate cases.[67] First, the court in *Chavez* relied on § 778.219—and in particular, its explicit reference to pay for vacation leave but lack of reference to pay for sick leave—to conclude that vacation-leave buy-back payments were excludable, but that sick-leave buy-back payments must be included in the regular rate.[68] In characterizing the Department's position on this issue, however, the court did not acknowledge WHD's statement in the FOH that the same rules governing exclusion of payments for unused vacation leave also apply to payments for unused sick leave.[69] Moreover, in citing a 2009 WHD opinion letter,[70] the court did not consider the fact-specific nature of the buy-back program at issue there, which, as discussed above, functioned as an attendance bonus. Nothing in the current language in § 778.219 or the 2009 opinion letter state that a sick-leave buy-back payment can never be excluded from the regular rate. In the second case, *Acton,* the court neither cited nor discussed the language in section 7(e)(2) that permits exclusion of payments for occasional periods when no work is performed due to vacation, holiday, or illness, or § 778.219, which interprets this statutory provision. Instead, the court mistakenly applied § 778.223 to determine whether buy-back payments were similar to call-back pay, and ultimately concluded that the sick-leave buy back must be included in the regular rate as it constitutes compensation for the general work duty of regular attendance over a significant period of an employee's work tenure.[71] Thus, the court's decision in *Acton* does not inform the proper interpretation of the statutory exclusion of payments for occasional periods when no work is performed due to vacation, holiday, or illness contained in section 7(e)(2) and explained in § 778.219.[72] Contrary to these two cases, the Department agrees with both the conclusion and underlying reasoning in *Balestrieri* v. *Menlo Park Fire Protection District.*[73] There, the court held that buy back payments for annual leave, which included both sick and vacation leave, need not be included in the regular rate. While acknowledging that some sick-leave buy-back programs, such as the one at issue in the 2009 WHD opinion letter, could function like an attendance bonus and therefore require their inclusion in the regular rate, the annual leave that was bought back in *Balestrieri* did not differentiate between sick leave and vacation leave. As a result, any portion of the annual leave that could be attributed to sick leave did not function as an attendance bonus.[74]

Lastly, IMLA requested that the Department provide an additional example to § 778.219(a) concerning the excludability of ''holiday-in-lieu'' pay from the regular rate. IMLA notes that some employees, particularly public sector emergency response personnel, work a set schedule without regard to holidays. Due to the nature of their work, such employees may be called upon to forgo a recognized holiday if their schedule requires them to work that day or if an emergency arises. IMLA states that the current regulations permit the excludability of such payments, but that several courts have nevertheless held that similar forms of ''holiday-in-lieu'' payments must be included in the regular rate.[75]

Current Department regulations support excluding holiday-in-lieu pay from the regular rate. Under 29 CFR 778.219, where an employee forgoes his

[66] 29 CFR 778.218; *see* FOH 32d03g (''Payment for absences charged against leave under a bona fide plan granting the employee a specified amount of annual, vacation, or sick leave with pay need not be included in the regular rate of pay, if the sum paid is the approximate equivalent of the employee's normal earnings for a similar period of working time. Payments for such absences may be excluded regardless of when or how the leave is taken.'').

[67] *See Chavez* v. *City of Albuquerque,* 630 F.3d 1300, 1309 (10th Cir. 2011); *Acton* v. *City of Columbia,* 436 F.3d 969, 977–78 (8th Cir. 2006).

[68] *See* 630 F.3d at 1308–09.

[69] *See* FOH 32d03e.

[70] WHD Opinion Letter FLSA2009–19, 2009 WL 649021 (Jan. 16, 2009).

[71] *See* 436 F.3d at 977.

[72] *See* 29 U.S.C. 207(e)(2); 29 CFR 778.219.

[73] *See* 800 F.3d 1094, 1103 (9th Cir. 2015).

[74] *See* 800 F.3d at 1102–04.

[75] *See Hart* v. *City of Alameda,* No. C–07–5845MMC, 2009 WL 1705612, at *3 (N.D. Cal. June 17, 2009) (holiday pay received by city police officers every pay period must be included in the regular rate); *Lewis* v. *County of Colusa,* No. 2:16–cv–01745–VC, 2018 WL 1605754, at *3 (E.D. Cal. Apr. 3, 2018) (defendant did not meet burden to show that biannual lump-sum holiday in-lieu payments to safety officers and dispatchers fall squarely within section 7(e)(2)); *McKinnon* v. *City of Merced,* No. 118CV01124LJOSAB, 2018 WL 6601900, at *5–8 (E.D. Cal. Dec. 17, 2018) (finding that payments are not excludable where it was ''not apparent that Plaintiffs are in fact entitled to paid time off at the holidays which they are able to forego'').

or her holiday and works, and is paid for his or her normal work plus an additional amount for the holiday, the additional amount paid for working the holiday is not included in the regular rate. The Department applied this principle in a 2006 opinion letter concluding that holiday-in-lieu pay could be excluded from the regular rate where the employer provided nine ''recognized'' holidays and two ''floating'' holidays paid in a lump sum, and on occasion when employees forgo a holiday and work they received both pay for the hours worked and holiday pay.[76] The Department notes that it does not matter whether the employee voluntarily forgoes the holiday to work or is required to work the holiday by the schedule set for the employee. Nothing in this regulation makes the excludability of such payments dependent on the employee having the option to work or not work on the holiday. All that is required for the holiday-in-lieu pay to be excludable is that the employee is paid an amount for the holiday, in addition to being paid for his hours worked on the holiday.[77] In response to IMLA's comments, the Department has added an additional example to § 778.219(a) involving employees who work a set schedule irrespective of holidays to clarify the regulation.

2. Exclusion of Compensation for Bona Fide Meal Periods

Section 778.218 addresses the clause of FLSA section 7(e)(2) concerning payments made for occasional periods when no work is performed and provides that when payments for such time ''are in amounts approximately equivalent to the employee's normal earnings,'' they are not compensation for hours of employment and may be excluded from the regular rate.[78] Section 778.218(b) states that this clause ''deals with the type of absences which are infrequent or sporadic or unpredictable'' and ''has no relation to regular 'absences' such as lunch periods nor to regularly scheduled days of rest.'' [79]

Section 778.320 addresses ''[h]ours that would not be hours worked if not paid for,'' and identifies ''time spent in eating meals between working hours'' as an example.[80] Section 778.320(b) further states that even when such time is compensated, the parties may agree that the time will not be counted as hours worked.

The Department proposed to remove the reference to ''lunch periods'' in § 778.218(b) to eliminate any uncertainty about its relation to § 778.320 concerning the excludability of payments for bona fide meal periods from the regular rate. As one court noted, the existing regulations in §§ 778.218 and 778.320 ''appear somewhat inconsistent'' on the excludability from the regular rate of compensation for bona fide meal periods.[81] In 1986, WHD acknowledged in an opinion letter ''that the reference to meal periods in section 778.218(b) of Part 778 may not be compatible with the position which is contained in section 778.320(b),'' and indicated that the issue was under review.[82] The Department subsequently clarified in a 1996 opinion letter that pay provided for a bona fide meal period is excludable from the regular rate under § 778.320(b).[83] As explained in the NPRM, while the Department clarified its position in an opinion letter more than 20 years ago, it is nonetheless concerned that the language in § 778.218(b) may cause confusion concerning the excludability of pay for bona fide meal periods. Thus, to remove any ambiguity and to codify its interpretation in regulation, the Department proposed to delete the reference to ''lunch periods'' from § 778.218(b).

Bona fide meal periods are not considered ''hours worked'' for purposes of the FLSA's minimum wage or overtime requirements, and employers are not required to pay for such time.[84] The Department proposed changing § 778.320 to clarify that the payment of compensation for bona fide meal periods alone does not convert such time to hours worked unless agreement or actual course of conduct establish that the parties have treated the time as hours worked. The Department explained in the NPRM that, in the Department's enforcement experience, the treatment of bona fide meal breaks is frequently not subject to formal agreement and is often established by informal policy or course of conduct. Payments for such periods need only be included in the regular rate when it appears from all the pertinent facts that the parties have treated compensated bona fide meal periods as hours worked. The NPRM noted that the proposal would clarify the existing requirements and not substantively change either the calculation of the regular rate or the determination of hours worked.

The Department received many comments supporting these changes and no comments opposed to the changes. *See, e.g.,* NDA; Associated Builders and Contractors; NADA; CWC; SHRM; PPWO. Accordingly, the Department adopts the changes to §§ 778.218(b) and 778.320 as proposed.

3. Additional Examples of ''Other Similar Causes''

As noted above, § 778.218 addresses the clause of FLSA section 7(e)(2) that permits employers to exclude certain payments for occasional periods when no work is performed ''due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause.'' [85] Section 778.218(d) lists examples that qualify as ''other similar causes,'' including ''absences due to jury service, reporting to a draft board, attending a funeral of a family member, [and] inability to reach the workplace because of weather condition.''

The Chamber requested that the Department ''add paid family medical leave as an example in § 778.218(d), and paid leave for military service; voting; attending child custody or adoption hearings; attending school activities; donating organs, bone marrow, or blood; voluntarily serving as a first responder; and any other paid leave required under state or local laws.'' Upon review, the Department believes these are all examples of non-routine absences that fall within the meaning of ''other similar causes'' in FLSA section 7(e)(2). Accordingly, the Department is adding these causes for absences in the list of examples of ''other similar causes.'' The Department further believes that attending any funeral, not just the funeral of a family member, is an ''other similar cause'' under FLSA section 7(e)(2). Therefore, the Department is

[76] FLSA2006–18NA, 2006 WL 4512960 (July 24, 2006). *Cf.* WHD Opinion Letter FLSA, 1999 WL 1788163, at *2 (Sept. 30, 1999) (payments received by employees were required to be included in the regular rate where employees were not entitled to take leave on holidays and instead received an additional 5 percent of base pay each pay period as ''in lieu of holiday pay.'').

[77] Thus, the Department disagrees with the *McKinnon* court's reliance on the word ''forgo'' in § 778.219 to mean that the employee must have the option of not working on the holiday for the holiday-in-lieu pay to be excludable. *See McKinnon,* 2018 WL 6601900 at *5.

[78] 29 CFR 778.218; *see* 29 U.S.C. 207(e)(2).

[79] 29 CFR 778.218(b).

[80] *See* 29 CFR 778.320.

[81] *Smiley* v. *E.I. Dupont De Nemours & Co.,* 839 F.3d 325, 331 n.5 (3d Cir. 2016).

[82] WHD Opinion Letter FLSA–937 (July 22, 1986).

[83] *See* WHD Opinion Letter FLSA, 1996 WL 1031805 (Dec. 3, 1996); *see also Ballaris* v. *Wacker Siltronic Corp.,* 370 F.3d 901, 909 (9th Cir. 2004) (holding that pay for a bona fide lunch period was ''properly excluded from the calculation of the regular rate under 29 U.S.C. 207(e)(2) as interpreted by revised § 778.320''); WHD Opinion Letter FLSA, 1997 WL 998021 (July 21, 1997) (stating that pay for bona fide meal periods need not be included in the regular rate).

[84] *See* 29 CFR 785.19.

[85] 29 CFR 778.218; *see* 29 U.S.C. 207(e)(2).

deleting "of a family member" from the text of § 778.218(d).

4. Reimbursable Expenses

The second clause of section 7(e)(2) excludes from the regular rate "reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer[.]" [86] Section 778.217 currently states that "[w]here an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses." [87] The Department promulgated this section in February 1950.[88]

While § 778.217, in its current form, limits reimbursable expenses to those "solely" in the interest of the employer, the statutory language does not include this limitation. Instead, the FLSA simply excludes all expenses incurred "in the furtherance of [the] employer's interests[,]" [89] and, as explained further below, neither the Department nor the courts have since restricted excludable expenses to only those that "solely" benefit the employer. As explained in the NPRM, the Department is concerned that this single use of the word "solely" in § 778.217 may be interpreted as more restrictive than what the FLSA actually requires. The Department therefore proposed to remove the word "solely" from § 778.217(a) to clarify its interpretation of the reimbursable expenses clause of section 7(e)(2). The Department noted that this proposed clarification was consistent with the other subsections of § 778.217, as well as court rulings and the Department's opinion letters—which have not required that excludable expenses solely benefit the employer.

Section 778.217(d) also discusses expenses that are excludable from the regular rate. The Department explained in the NPRM that this paragraph emphasizes only whether such payments benefit the employer or the employee; it does not require them to "solely" benefit one party or the other. Thus, payments for expenses that are "incurred by the employee on the employer's behalf or for his benefit or convenience" merit exclusion from the regular rate, but reimbursements for expenses "incurred by the employee for his own benefit," such as "expenses in traveling to and from work, buying lunch, paying rent, and the like," are not excluded from the regular rate under the "reimbursable expenses" clause of section 7(e)(2).[90]

Similarly, as the NPRM explained, the Department's opinion letters do not analyze whether an expense is incurred solely for the employer's convenience when discussing whether it may be excluded from the regular rate. Instead, the opinion letters analyze simply whether expenses benefit the employer.[91] Furthermore, since 1955, the Department's policy in WHD's FOH has mirrored the statutory requirement that "expenses incurred by an employee in furtherance of his/her employer's interests" may be excluded from the regular rate, regardless of whether they "solely" benefit one party or the other.[92]

In the NPRM, the Department pointed out that, consistent with the Department's practice and guidance, courts have not analyzed whether the expenses at issue were incurred solely for the employer's convenience when determining whether they are excludable from the regular rate. Instead, courts have emphasized the statutory requirement that the expenses need only benefit the employer.[93]

All of the comments regarding this proposal were supportive and agreed that the limitation imposed by the word "solely" in the current regulation could be overly restrictive and is not required by the FLSA. *See* Associated Builders and Contractors; CWC; Chamber; Fisher Phillips; NADA; PPWO; Seyfarth; SHRM; SIGMA. Two of these commenters also asked that the Department add a new sentence explicitly stating that "business expenses need not be solely or primarily incurred for the employer's benefit." *See* Associated Builders and Contractors; Chamber.

The Department has decided to finalize its proposal to remove the word "solely" from § 778.217(a) to better align the regulations with the FLSA. As explained above, the FLSA does not impose a limitation on the proportion of benefit to the employer in order for reimbursed expenses to be excludable. The Department does not believe it is necessary to further add a sentence stating that business expenses need not be "solely or primarily incurred for the employer's benefit" in order to be excludable. The removal of the term "solely" adequately aligns the regulations with the statute.

The Department also proposed to clarify section 7(e)(2)'s requirement that only "reasonable" and "properly reimbursable" expenses may be excluded from the regular rate when reimbursed. Current § 778.217(b)(3) permits employers to exclude from the regular rate "[t]he actual or reasonably approximate amount expended by an employee who is traveling 'over the road' on his employer's business, for transportation . . . and living expenses away from home, [or] other [such] travel expenses[.]" Section 778.217(c) cautions that "only the actual or reasonably approximate amount of the expense is excludable from the regular rate. If the amount paid as 'reimbursement' is disproportionately large, the excess amount will be included in the regular rate."

Two commenters asked the Department to clarify that specific reimbursable expenses are excludable from the regular rate. *See* NADA; AHLA. These requests included "cell phone reimbursement," "non-mandatory credentialing exam fees," "organization membership dues," and reimbursements for the cost of tools. These are clearly not compensation for hours of employment, but instead are expenses taken on by employees for the employer's convenience or benefit.

---

[86] 29 U.S.C. 207(e)(2).

[87] 29 CFR 778.217(a).

[88] *See* 15 FR 623.

[89] 29 U.S.C. 207(e)(2).

[90] 29 CFR 778.217(d). The NPRM noted that this is consistent with the illustrative examples in § 778.217(b) of reimbursable expenses that may be excluded from the regular rate, which include "purchasing supplies, tools, materials, or equipment on behalf of his employer," travel expenses, including living expenses away from home, incurred while traveling for work for the employer's benefit, and the cost of "supper money" to an employee in a situation where "he or she would ordinarily leave work in time to have supper at home, but instead must remain to work additional hours for the employer's benefit." *See* 29 CFR 778.217(b)(1), (2), (4).

[91] For example, the cost of food for eating meals during travel out of town for work is for the employer's benefit; therefore, such reimbursement may be excluded from the regular rate. *See* WHD Opinion Letter FLSA2004–3, 2004 WL 2146923 (May 13, 2004); *see also* WHD Opinion Letter FLSA–828 (July 19, 1976) ("[r]eimbursement to an employee for expenses incurred on behalf of an employer" would not become part of the regular rate); WHD Opinion Letter FLSA–940 (Mar. 9, 1977) (regular rate shall not include "reimbursement for expenses where an employee incurs out of pocket expenses on the employer's behalf"); WHD Opinion Letter FLSA, 1985 WL 1087356, at *2 (July 12, 1985) (reimbursement must be for "expenses incurred by the employee on the employer's behalf or convenience").

[92] FOH 32d05a(a).

[93] *See, e.g., Berry* v. *Excel Grp., Inc.*, 288 F.3d 252, 253–54 (5th Cir. 2002) (concluding that reimbursements of travel expenses were primarily for the employer's benefit; therefore, such expenses were excluded from the regular rate); *see also Sharp* v. *CGG Land, Inc.*, 840 F.3d 1211, 1215 (10th Cir. 2016) ("[T]he proper focus under § 778.217(b)(3) is whether the $35 payments are for reimbursement of travel expenses incurred in furtherance of the employer's interests . . . ."); *Brennan* v. *Padre Drilling Co., Inc.*, 359 F. Supp. 462, 465 (S.D. Tex. 1973) (per diem for traveling expenses is "expended by the employee in the furtherance of his employer's interest").

Because "[t]he actual amount expended by an employee in purchasing . . . tools" is already included in the regulation's illustrations of excludable reimbursements, the Department believes sufficient guidance is available regarding tool reimbursements.[94] However, to provide additional clarity regarding cell phone reimbursement, exam fees, and membership dues, the Department has decided to revise the language of the illustration provided at § 778.217(b)(1) to make clear that these too are excludable reimbursements.

The NPRM proposed additional explanation of what is "reasonable"—and thus not "disproportionately large"—by referring to the Federal Travel Regulation. The Department explained that it believes that the amounts set in the Federal Travel Regulation are not excessive and are easily ascertained, given its "two principal purposes" of "balanc[ing] the need to assure that official travel is conducted in a responsible manner with the need to minimize administrative costs" and "communicat[ing] the resulting policies in a clear manner to Federal agencies and employees."[95] The Department thus proposed to add regulatory text explaining that a payment for an employee traveling on his or her employer's business is per se reasonable if it is at or beneath the maximum amounts reimbursable or allowed for the same type of expense under the Federal Travel Regulation and meets § 778.217's other requirements. Those other requirements include that the reimbursement be for the "actual or reasonably approximate amount"[96] of the expense, that the expense be incurred on the employer's behalf, and that the expense not vary with hours worked.[97] The proposed regulatory text also clarified that a reimbursement for an employee traveling on his or her employer's business exceeding the Federal Travel Regulation limits is not necessarily unreasonable. As the NPRM explained, a payment may be more than that required "to minimize administrative costs" yet still within the realm of reasonable business and industry norms.

A number of commenters supported the Department's proposal to state in the regulatory text that reimbursements for travel expenses are per se reasonable if they do not exceed the rates in the Federal Travel Regulation. *See, e.g.,* NDA; PPWO; SIGMA; SHRM; Chamber. Several commenters noted that the Federal Travel Regulation rates are below market rate, and that in many cases expenses exceeding that amount may still be reasonable. To address this issue, some commenters recommended that the Department finalize proposed paragraph (c)(3) stating that costs exceeding the Federal Travel Regulation may still be reasonable, and two recommended that the Department develop additional guidance about the Federal Travel Regulations after issuance of the final rule. *See* AHLA; CWC; Chamber; SIGMA; SHRM. Two commenters noted that many employers use Internal Revenue Service (IRS) guidelines for reimbursement of employee travel expenses, and suggested that the final rule also state that expenses not exceeding the IRS's guidelines for reimbursement of employee travel expenses are per se reasonable. *See* NDA; PPWO.

The Department has decided to modify the language in proposed § 778.217(c)(2) to state that payments equal to or less than the Federal Travel Regulation rates or the substantiation amounts for travel expenses permitted by the IRS under 26 CFR 1.274–5(g) and (j) are per se reasonable and not disproportionately large.[98] The Department has also decided to finalize the regulatory language in proposed § 778.217(c)(3) noting that § 778.217(c)(2) does not create an inference that amounts in excess of the Federal Travel Regulation rates or the rates set by the IRS on travel expenses are per se unreasonable.[99]

5. Other Similar Payments

Section 7(e) requires "all remuneration for employment" be included in the regular rate, subject to that section's eight listed exclusions. Section 7(e)(2) consists of three clauses, each of which address a distinct category of excludable compensation. As discussed above, the first excludes "payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause." The second excludes "reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer." The third clause of section 7(e)(2) excludes from the regular rate "other similar payments to an employee which are not made as compensation for his hours of employment."

As explained in the NPRM, "[o]ther . . . payments" are "similar" to those in the first two clauses of section 7(e)(2) because they are "not made as compensation for [an employee's] hours of employment." The first two clauses share the essential characteristic of having no connection to the quantity or quality of work performed. The "other similar payments" clause thus excludes payments not tied to an employee's hours worked, services rendered, job performance, or other criteria linked to the quality or quantity of the employee's work.[100]

The NPRM explained that, in a sense, every benefit or payment that an employer gives an employee is

[94] *See* 29 CFR 778.217(b)(1).

[95] 41 CFR 300–1.2. Those amounts are published online annually by the General Services Administration. *See Plan and Book,* GSA, *www.gsa.gov/travel/plan-and-book* (last visited Aug. 23, 2019).

[96] *Gagnon* v. *United Technisource, Inc.,* 607 F.3d 1036, 1041–42 (5th Cir. 2010), provides a helpful contrast to a properly excludable reimbursement. There, multiple facts indicated that the employee's purported "per diem" was simply a scheme to avoid paying overtime. Those facts included the per diem's rise over time without any clear connection to travel or other expenses, its variance by the hour, its cap at 40 hours per week, and its payment in combination with a well-below-market wage.

[97] *See, e.g., Baouch* v. *Werner Enters., Inc.,* 908 F.3d 1107, 1116 (8th Cir. 2018) ("Per diem payments that vary with the amount of work performed are part of the regular rate."), *petition for cert. filed,* (U.S. June 13, 2019) (No. 18–1541).

[98] Under the authority of 26 U.S.C. 274(d), 26 CFR 1.274–5(g) and 26 CFR 1.274–5(j), the IRS Commissioner has prescribed special per diem methods under which a taxpayer may use a specified amount in lieu of substantiating the actual costs of certain travel while away from home. IRS guidelines regarding special per diem and meals and incidental expenses (M&IE) methods are set forth in Revenue Procedure 2011–47, 2011–42 I.R.B. 520, 2011 WL 4503974 (Oct. 17, 2011). The IRS publishes the special per diem rates in an annual notice. *See* Notice 2019–55 (2019–42 IRB 937) (or successor), available at: *https://www.irs.gov/pub/irs-drop/n-19-55.pdf.* Revenue Procedure 2011–47 provides optional substantiation methods (for example, meal and incidental expenses only per diem allowance, special rules for the transportation industry, and the high-low substantiation method).

[99] *See id.*

[100] *See Reich* v. *Interstate Brands Corp.,* 57 F.3d 574, 578 (7th Cir. 1995) ("The word 'similar' then refers to other payments that do not depend at all on when or how much work is performed."); *Minizza* v. *Stone Container Corp.,* 842 F.2d 1456, 1461 (3d Cir. 1988) ("[W]e interpret the phrase 'other similar payments' by reading each clause of section 207(e)(2) separately. The phrase 'other similar payments . . . not made as compensation for hours of employment' does not mean just other payment for idle hours or reimbursements, the two types of payments set forth in the two preceding clauses of the section, but payments not tied to hours of compensation, of which payments for idle hours and reimbursements are only two examples."). *But see Flores* v. *City of San Gabriel,* 824 F.3d 890, 899 (9th Cir. 2016) ("the 'key point'" for exclusion under the third clause "is whether the payment is 'compensation for work'" (quoting *Local 246 Utility Workers Union of Am.* v. *S. Cal. Edison Co.,* 83 F.3d 292, 295 (9th Cir. 1996)); *Acton,* 436 F.3d at 976 ("Section 207(e)(2), properly understood, operates not as a separate basis for exclusion, but instead clarifies the types of payments that do not constitute remuneration for employment for purposes of section 207.").

"remuneration for employment."[101] Certainly benefits like paid vacation or sick leave are seen as such by many employers and employees. But the section 7(e)(2) exclusions make clear that whether or not they are remuneration, they are "not made as compensation for [the employee's] hours of employment" because they have no relationship to the employee's hours worked or services rendered. This interpretation gives meaning to the third clause. It allows employers to provide benefits unconnected to the quality or quantity of work, even if those benefits are remuneration of a sort.

The NPRM further explained that interpreting the third clause as simply a restatement of the "remuneration" requirement would contravene basic principles of statutory interpretation. Such an interpretation would equate the unique phrases "all remuneration for employment" and "compensation for [the employee's] hours of employment," even though Congress used different words and thus, presumably, meant different things. This is especially so when considering that one phrase uses the word "employment" when the other uses the term "hours of employment." Such an interpretation would also render the third clause redundant, another disfavored result. And it would be difficult to reconcile with the first clause of section 7(e)(2), in which the payments are clearly remuneration yet excludable from the regular rate.

The NPRM also explained that payments to employees are not excludable under the "other similar payments" clause merely because the payments are not specifically tied to an employee's hours of work.[102] "Other similar payments" cannot be simply wages in another guise. When a payment is a wage supplement, even if not tied directly to employee performance or hours worked, it is still compensation for "hours of employment." For example, payments such as production bonuses,[103] and the cost of furnished board, lodging, or facilities,[104] which "though not directly attributable to any particular hours of work are, nevertheless, clearly understood to be compensation for services"[105] are not excludable under this provision. Similarly, payments that differ only in form from regular wages by, for instance, being paid in a monthly lump sum or as hardship premiums, are better characterized as wages or bonuses than as "other similar payments" excludable from the regular rate. The other similar payments clause cannot be interpreted so broadly as to "obliterate[ ] the qualifications and limitations" placed on excludable payments specifically addressed in section 7(e)'s various other sections, which could render such limits "superfluous."[106]

The NPRM stated that the Department's interpretation has considerable support in the case law, citing multiple decisions. First, the Third Circuit held in *Minizza* v. *Stone Container Corp.* that two lump sums paid to select employees to induce them to agree to a collective-bargaining agreement were excludable as an "other similar payment" because they were not compensation for hours worked or services rendered.[107] The court interpreted the clause to exclude "payments not tied to hours of compensation, of which payments for idle hours and reimbursements are only two examples."[108] The court's decision that these payments were not compensation for employment rested in part on the fact that the "eligibility requirements were not meant to serve as compensation for service, but rather to reduce the employers' costs," but also in part on the fact that "the eligibility terms themselves [for the lump sums] [did] not require specific service"—it did "not matter how many hours an employee worked during that period, nor how many hours he might work in the future."[109]

Second, the Seventh Circuit espoused a similar understanding in *Reich* v. *Interstate Brands Corp.*[110] There, the court held that regular, planned $12 payments to bakers who worked weeks without two consecutive days off could not be excluded from the regular rate under section 7(e)(2). The court reasoned that the payments were materially no different from a higher base rate to compensate the bakers for taking on an unpleasant schedule.[111] "Other similar payments" are different, wrote the court. "The word 'similar' . . . refers to other payments that do not depend at all on when or how much work is performed."[112]

Similarly, the Sixth Circuit has held that pay differentials based on employees' education level, shift differentials, and hazardous pay are compensation for services rendered, unlike payments that "are unrelated to [employees'] compensation for services and hours of service."[113] Some circuit courts have interpreted the "other similar payments" not to exclude payments that are "compensation for work."[114] The Department concurs with these courts to the extent that they have used these or similar phrases to capture the idea that the regular rate includes payments tied to work performance or that function as a wage supplement. But insofar as these courts have equated "compensation for work" with "remuneration for employment,"[115] that is difficult to reconcile with the text of the FLSA. As explained above, the FLSA uses two different phrases, "remuneration for employment" and "compensation for hours of employment," each of which should be given distinct content. And just as importantly, the first clause of section 7(e)(2) excludes vacation and sick leave, which is clearly remunerative; "other similar payments" to employees can be remunerative too.

Accordingly, the NPRM explained, the proposed clarifications would promote a clear yet flexible standard for employers and employees to order their affairs. Payments are "other similar payments" when they do not function as formulaic wage supplements and are not tied to hours worked, services

[101] *Cf. Minizza*, 842 F.2d at 1460 ("Employers have a finite amount to spend for the labor component of their product or service. This sum can be allocated solely as compensation on an hourly basis (in which event the payment would be fully includable in the 'regular rate'), or it can assume any number of other forms . . . (in which case the payments may or may not be includable), in any ratio the parties care to set."); *Sec'y U.S. Dep't of Labor* v. *Bristol Excavating, Inc.*, No. 17–3663, 2019 WL 3926937, at *3 (3d Cir. Aug. 20, 2019) (clarifying that not all payments relating to employment, regardless of source, qualify as remuneration for employment and that, in the context of third-party payments, a "payment qualifies as remuneration for employment only when the employer and employee have effectively agreed it will.").

[102] *See Local 246*, 83 F.3d at 295 n.2 ("Even if payments to employees are not measured by the number of hours spent at work, that fact alone does not qualify them for exclusion under section 207(e)(2)."); *Featsent* v. *City of Youngstown*, 70 F.3d 900, 904 (6th Cir. 1995) ("7(e)(2) does not exclude every payment not measured by hours of employment from the regular rate."); *Reich*, 57 F.3d at 577 ("We cannot read § 7(e)(2) in isolation . . . . It is one among many exemptions, and a glance at a few of the others shows that § 7(e)(2) cannot possibly exclude every payment that is not measured by the number of hours spent at work.").

[103] *See* 29 CFR 778.211(c).

[104] *See* 29 CFR 778.116.

[105] 29 CFR 778.224(a).

[106] *Reich*, 57 F.3d at 578.

[107] *Minizza*, 842 F.2d at 1461–62.

[108] *Id.* at 1461.

[109] *Id.* at 1460–61; *see also id.* at 1462 ("If the payments were made as compensation for hours worked or services provided, the payments would have been conditioned on a certain number of hours worked or on an amount of services provided.").

[110] 57 F.3d 574.

[111] *See id.* at 578–79.

[112] *Id.* at 578.

[113] *Featsent*, 70 F.3d at 904–06.

[114] *See, e.g., Flores*, 824 F.3d at 899.

[115] *See Acton*, 436 F.3d at 976 ("the language 'not made as compensation for [the employee's] hours of employment' posited in § 207(e)(2) is but a mere re-articulation of the 'remuneration for employment' requirement set forth in the preambulary language of § 207(e)").

rendered, job performance, or other criteria linked to the quality or quantity of the employee's work, but are conditioned merely on one being an employee. Conditions not tied to the quality or quantity of work performed, such as a reasonable waiting period for eligibility [116] or the requirement to repay benefits as a remedy for employee misconduct, are permitted. This standard also clarifies that there is space for a variety of creative benefits offerings, and encourages their provision to wide groups of employees instead of reserving them only for FLSA-exempt employees.

Section 778.224 addresses miscellaneous items that are excludable from an employee's regular rate under the ''other similar payments'' clause of section 7(e)(2) because they are ''not made as compensation for . . . hours of employment[.]'' [117] Section 778.224(b) currently provides a brief, nonexhaustive set of examples of ''other similar payments'' excludable from an employee's regular rate: ''(1) Sums paid to an employee for the rental of his truck or car[;] (2) Loans or advances made by the employer to the employee[;] [and] (3) The cost to the employer of conveniences furnished to the employee such as parking space, restrooms, lockers, on-the-job medical care and recreational facilities.'' [118] The NPRM noted that the Department added this set of examples to the part 778 regulations in 1950,[119] and has not substantively amended them since. The regulation makes clear that ''it was not considered feasible'' to provide an exhaustive list of excludable ''other similar payments'' given the ''variety of miscellaneous payments [that] are paid by an employer to an employee under peculiar circumstances.'' [120]

The Department explained in the NPRM that it continues to believe that providing a comprehensive list of all ''other similar payments'' excludable under section 7(e)(2)'s third clause is infeasible. Nonetheless, the Department recognized that an updated list would further help employers understand their legal obligations by addressing some of the innovative changes in compensation practices and workplace environments that have occurred since the Department added this set of examples in 1950. Therefore, the Department proposed clarifying in § 778.224(b) that the following items may be excluded from an employee's regular rate under the ''other similar payments'' clause of section 7(e)(2).

a. Specialist Treatment Provided Onsite; Gym Access, Gym Memberships, and Fitness Classes; Wellness Programs; Discounts on Retail Goods and Services

The Department proposed clarifying in § 778.224(b)(3) that employers may exclude from the regular rate the cost of providing onsite treatment from specialists such as chiropractors, massage therapists, personal trainers, counselors, Employment Assistance Programs, or physical therapists.[121] As explained in the NPRM, such specialist treatment resembles ''on-the-job medical care,'' which § 778.224(b)(3) already identifies as an excludable ''convenience furnished to the employee.'' [122] Employers that provide onsite specialist treatment do so for a variety of reasons, including to raise workplace morale, promote employee health, and reduce healthcare costs.

The Department also proposed clarifying in § 778.224(b)(3) that the cost of providing employees with gym access, gym memberships, and fitness classes, whether onsite or offsite, is excludable from the regular rate.[123] These fitness benefits, the Department explained, resemble ''recreational facilities,'' which § 778.224(b)(3) already identifies as an excludable convenience provided to employees. According to one survey, a substantial number of employers provided fitness benefits.[124] Employers may provide such conveniences for many reasons, including to raise workplace morale, promote employee health, and reduce healthcare costs.

The Department proposed adding an example in § 778.224(b)(4) to clarify that employers may exclude from the regular rate the cost of providing certain health promotion and disease prevention activities, often known as wellness programs. The NPRM noted that examples of some common wellness programs include health risk assessments, biometric screenings, vaccination clinics (including annual flu vaccinations), nutrition classes, weight loss programs, smoking cessation programs, stress reduction programs, exercise programs, and coaching to help employees meet health goals.[125] Wellness programs are often provided to employees enrolled in an employer-sponsored health insurance plan, but some employers offer wellness programs to employees regardless of their health insurance coverage. The NPRM stated that workplace wellness programs are similar to ''on-the-job medical care'' and ''recreational facilities,'' conveniences that the regulations already specify are excludable from an employee's regular rate.[126] Employers may provide such programs to, for example, reduce health care costs, reduce health-related absenteeism, and improve employee health and morale.

The Department also proposed adding an example in § 778.224(b)(5) to confirm that discounts on retail goods and services may be excluded from the regular rate of pay as long as they are not tied to an employee's hours worked or services rendered. The NPRM cited a survey that indicated that many employers provide employees with an option to purchase these types of goods or services at a discounted price relative to their full retail value.[127] Such discounts are commonly available to employees regardless of their quality or quantity of work, and it is solely the employees' choice whether to purchase anything under the discount. When these discounts are available to employees regardless of their hours worked or services rendered, and are not tied to any duties performed, they qualify as ''other similar payments''

[116] *See Minizza*, 842 F.2d at 1460 (''A review of the eligibility terms reflects a requirement only that a payee achieve the status of an active employee for a specified period of time prior to receipt. It does not matter how many hours an employee worked during that period, nor how many hours he might work in the future.'').

[117] 29 U.S.C. 207(e)(2).

[118] 29 CFR 778.224(b).

[119] *See* 15 FR 623 (1950) (codified at 29 CFR 778.7(g); relocated in 1968 to 29 CFR 778.224(b)).

[120] 29 CFR 778.224(a).

[121] This proposal is not intended to affect the circumstances under which receiving medical attention at the direction of the employer is considered to be hours worked. *See* 29 CFR 785.43.

[122] 29 CFR 778.224(b)(3).

[123] In circumstances where maintaining a certain level of physical fitness is a requirement of the employee's job, the cost to the employer of providing exercise opportunities is a facility furnished ''primarily for the benefit or convenience of the employer,'' as described in § 531.3(d). Facilities furnished for the employer's benefit do not qualify as wages or remuneration for employment and thus need not be included in the regular rate.

[124] *See* Soc'y for Human Res. Mgmt., *2018 Employee Benefits: The Evolution of Benefits* 23 (2018), *available at https://www.shrm.org/hr-today/trends-and-forecasting/research-and-surveys/Documents/2018%20Employee%20Benefits%20Report.pdf.*

[125] *See, e.g.*, Soc'y for Human Res. Mgmt., ''How to Establish and Design a Wellness Program,'' *https://www.shrm.org/resourcesandtools/hr-topics/pages/howtoestablishanddesignawellnessprogram.aspx* (last accessed Aug. 26, 2019).

[126] 29 CFR 778.224(b)(3).

[127] *See* Soc'y for Human Res. Mgmt., ''2018 Employee Benefits: The Evolution of Benefits,'' at 31 (June 2018), *https://www.shrm.org/hr-today/trends-and-forecasting/research-and-surveys/Documents/2018%20Employee%20Benefits%20Report.pdf* (from 2014 to 2018, employers offering an employee discount on company services ranged from 31 percent to 34 percent, and employers offering employer-sponsored personal shopping (*e.g.*, retail) discounts ranged from 11 percent to 19 percent).

under section 7(e)(2).[128] The NPRM pointed out that more than 50 years ago, the Department stated that such employee discounts are not included in the regular rate of pay. In a 1962 opinion letter, the Department found that the value of ''concessions granted to employees . . . on charges for telephone service'' was ''not part of wages includible in the regular rate of pay''—in part because ''[s]uch concessions appear to be similar to discounts on merchandise offered by many retail establishments to their employees which [the Department] do[es] not regard as wages.'' [129] The NPRM explained that discounts like these are not fungible cash but merely a lower price on the employer's offerings. They appeal only to the employees who want to use them and are limited to the offered selection of goods or services. Employees must expend their own funds to avail themselves of the discounts. The discounts are presumably limited in their value, since employers likely do not offer discounts that would materially harm their business. And employers may also place conditions on the discounts to protect their interests by, for instance, requiring that discounted restaurant meals be eaten on the premises to prevent abuse.

The Department received numerous comments in support of these clarifications, with many commenters noting that the additional clarity provided by the additional examples in § 778.224(b) will allow employers to provide these types of benefits to employees more frequently. *See, e.g.,* Chamber; National Association of Health Underwriters (NAHU); HR Policy Association (HR Policy); SHRM; Seyfarth; NFIB. By contrast, a few commenters expressed concerns with this proposed clarification. *See, e.g.,* National Employment Lawyers Association (NELA); NELP. NELA opposed this proposed clarification, suggesting that the Department instead state that such payments ''may be excluded from the regular rate only after a case by case analysis using applicable principles.'' NELP similarly expressed concern that the added examples created per se categorical exclusions of types of benefits.

The Chamber asked the Department to add the following language to § 778.224(a): ''Payments are 'similar' when the amount of the payment is not dependent on hours worked, production, or efficiency and when the amount of the payment is unaffected by the quantity or quality of work performed.'' The Department agrees that such a statement would provide further clarity and notes that the NPRM defined ''other similar payments'' in a comparable manner as ''payments not tied to an employee's hours worked, services rendered, job performance, credentials, or other criteria linked to the quality or quantity of the employee's work.'' [130] Three items in the NPRM's list of criteria not linked to the quality or quantity of work—''hours worked, services rendered, [and] job performance''—closely correspond with ''hours worked, production, or efficiency'' from the Chamber's proposal. The NPRM also listed ''credentials.'' But upon further reflection, the Department believes that, unlike the other listed criteria, credentials are not necessarily linked to the quality or quantity of an employee's work.

Additional pay for education credentials is generally connected with work quality or quantity, and therefore not excludable under § 778.224, as ''education advancement . . . enhances the quality of an employee's job performance.'' [131] However, because the connection between an employee's education credentials and his or her quality or quantity of work may vary, the Department declines to include ''credentials'' in the regulatory text as an example of a criterion inextricably linked to the quality or quantity of the employee's work.[132] In contrast, hours worked, services rendered, and job performance are necessarily linked to work quality or quantity, and therefore, these are appropriate examples for the regulatory text. Accordingly, the Department has revised § 778.224(a) using language adapted from the NPRM to clarify that ''other similar payments'' are ''payments that do not depend on hours worked, services rendered, job performance, or other criteria that depend on the quality or quantity of the employee's work.'' The Department has also revised § 778.224(b)(5) to remove language similar to that added in § 778.224(a) so as to avoid duplicative text.

To provide additional clarity, the Department is adding to § 778.224(a) two examples of conditions identified in the NPRM as being unconnected to the quality or quantity of work performed: ''reasonable waiting period for eligibility'' and ''the requirement to repay benefits as a remedy for employee misconduct.'' [133] The Department is also adding an additional example of a condition that is unconnected to the quality or quantity of work to § 778.224(a): ''limiting eligibility on the basis of geographic location or job position.'' Payments that depends on location—for instance, offering benefits for employees in certain states or cities—are not related to work quality or quantity. Nor do payments that depend on an employee's job position—for instance, offering a signing bonus to engineers but not salespersons.

Relatedly, in response to NELA's and NELP's comments, the Department believes that the addition of the above language to § 778.224(a) makes clear that the proposed examples in § 778.224(b) do not change the existing statutory analysis that the Department uses for determining whether a payment is properly excluded, but instead simply add examples of categories of payments that may be excluded as ''other similar payments.'' The Department will still look to see if a benefit plan labeled a ''wellness plan,'' for example, meets the statutory requirements of section 7(e)(2) and corresponding regulatory requirements to determine whether the benefit is tied to hours worked, services rendered, job performance, or other criteria linked to the quality or quantity of the employee's work. The benefit must be conditioned only on being an employee, although conditions unconnected to the quality or quantity of work, such as a reasonable waiting period for eligibility, are permissible. Furthermore, as explained in the NPRM, the benefit cannot be simply wages in another guise. When a payment is a wage supplement, even if not tied directly to employee performance or hours, it is still compensation for ''hours of employment.'' The additional examples that the Department has added to § 778.224(b) do not change these requirements or the Department's analysis regarding the appropriate treatment of these benefits.

Commenters also identified numerous commonly provided employee perks and asked the Department to clarify whether these items would be excludable under section 7(e)(2). The

[128] *See Reich,* 57 F.3d at 578 (payments under section 7(e)(2) are those ''that do not depend at all on when or how much work is performed''); *Minizza,* 842 F.2d at 1462 (payments under section 7(e)(2) all ''share the essential characteristic . . . of not being compensation for hours worked or services rendered'').

[129] WHD Opinion Letter FLSA, 1962 DOLWH LEXIS 217 (Oct. 31, 1962).

[130] 84 FR 11894.

[131] *See Featsent* v. *City of Youngstown,* 70 F.3d 900, 904 (6th Cir. 1995) (additional pay for education degrees was not excludable under § 778.224).

[132] *See, e.g., Duplesse* v. *Cty. of Los Angeles,* 714 F. Supp. 2d 1045, 1053–54 (C.D. Cal. 2010) (additional pay for credentials were excludable from the regular rate for firefighters who were not regularly assigned to positions involving those credentials).

[133] 84 FR 11895.

Department believes several of the items raised would be excludable and are consistent with the Department's proposal. These include discounts on employer-provided hotel rooms and travel, and non-mandatory credentialing classes. *See* AHLA; NADA.

AHLA asked the Department to clarify that beverage discounts, food discounts, hotel room discounts, and travel discounts are excludable from the regular rate as an ''other similar payment.'' In the NPRM, the Department proposed that discounts on employer-provided goods and services are excludable from the regular rate as ''other similar payments.'' As noted in the NPRM, such discounts are not fungible cash—they offer a lower price on certain offerings and are typically non-transferable. Further, employees have discretion as to whether or not to purchase anything under a discount, thereby receiving the benefit. Provided these beverage discounts, food discounts, hotel room discounts, and travel discounts are not tied to an employee's hours worked, services rendered, or other conditions related to the quality or quantity of work performed, they are excludable from the regular rate under the proposed language in § 778.224(b)(5). NADA asked the Department to clarify that the cost to the employer of paying for non-mandatory credentialing classes for employees is excludable from the regular rate under section 7(e)(2). To be excludable as an ''other similar payment'' under section 7(e)(2), these non-mandatory credentialing classes may not be compensation for hours worked, services rendered, or other conditions related to the quality or quantity of work performed. The Department believes the language proposed in the NPRM sufficiently addresses this issue, and as a result does not modify its proposal. As such, no further changes to § 778.224 have been made to address these comments.

However, the Department found that modifications would be helpful to add clarity with regards to the exclusion of other items raised by the commenters. For example, some commenters asked the Department to clarify in the final rule that the cost to employers of providing mental health wellness programs and financial wellness programs are excludable along with the cost of providing physical wellness programs. *See* ERIC; HR Policy. As ERIC noted in its comment, ''many employers . . . offer mental health and financial wellness plans as an integrated package with physical wellness plans.'' Further, HR Policy's comment stated that such benefits ''assist the employee in managing work-life balance . . . and are to the mutual benefit of both the employer and the employee.'' The NPRM explained that workplace wellness programs are similar to ''on-the-job medical care'' and ''recreational facilities,'' conveniences that the regulations already specify are excludable from an employee's regular rate. The Department finds no meaningful difference between mental health and financial wellness programs and the wellness programs included in the NPRM. Accordingly, the Department clarifies in the final rule that the cost of providing such mental health and financial wellness programs are excludable from the regular rate as an ''other similar payment.''

AHLA asked the Department to clarify that parking benefits, in addition to the parking spaces explicitly listed under § 778.224(b)(3)(i), are excludable from the regular rate. Parking benefits provide parking spaces for employees near the business premises of their employer. As explained under § 778.224(a), section 7(e)(2) of the FLSA does not ''permit the exclusion from the regular rate of payments such as . . . the furnishing of facilities like board and lodging . . . .'' The Department interprets facilities to include certain ''transportation furnished employees between their home and work.'' [134] Accordingly, the Department has long acknowledged that employer-provided parking spaces are excludable from the regular rate but commuter subsidies are not. It is the Department's view that parking benefits are analogous to an employer-provided parking space, and distinguishable from commuter subsidies. Parking benefits are conveniences provided by an employer so that the employee may have a parking spot near the business premises of the employer. The employee still bears the cost of the actual transportation between their home and work—purchasing and maintaining a vehicle, insurance, and gasoline, etc. To remove ambiguity, the Department modifies its proposal to clarify in the final rule that parking benefits, like parking spaces, are excludable from the regular rate.

Some of the items identified by commenters fit within statutory exclusions other than section 7(e)(2). First, a few commenters asked the Department to clarify whether adoption or surrogacy assistance benefits are excludable from the regular rate. *See* Chamber; SHRM; Seyfarth; PPWO. The term ''adoption assistance'' encompasses a wide variety of benefits. These benefits might include financial assistance, legal services, information and referral services, and paid or unpaid leave. Adoption assistance takes many forms, some of which are excludable under other statutory exceptions. Legal services are excludable under section 7(e)(4) to the extent they meet the requirements of § 778.215, and paid leave is excludable under section 7(e)(2) as ''occasional periods when no work is performed.'' Additionally, the costs of providing adoption assistance in the form of information and referral services or financial assistance for non-legal services may be excluded under section 7(e)(2)'s ''other similar payments'' clause. These benefits are not tied to an employee's hours worked, services rendered, or other criteria linked to the quality or quantity of work performed. The Department amends its final rule to include this clarification. Unlike adoption assistance, surrogacy assistance tends to consist solely of payment of or reimbursement for medical expenses, typically outside of a medical plan. Such payments may therefore be considered a wage under section 3(m) of the FLSA, which is not excludable from the regular rate.

Some commenters asked the Department to clarify that the cost of providing ''snacks,'' ''office coffee,'' ''meals,'' or ''pantry services'' are excludable from the regular rate. *See* HR Policy; National Automatic Merchandising Association (NAMA); Chamber. While commenters suggested these costs are excludable under section 7(e)(2)'s ''other similar payments'' clause, Department practice and case law already supports exclusion of many of these costs from the regular rate as gifts under section 7(e)(1).

Section 7(e)(1) excludes ''sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency.'' As the Department explained in the NPRM, because the first clause, ''sums paid as gifts,'' is separated from the second clause by a semicolon, the first clause addresses a separate set of excludable benefits from that in the second clause.[135] There may be some overlap between ''sums paid as gifts'' and ''payments in the nature of gifts made at Christmas time, on special occasions, or as a reward for services,'' but the categories are not coextensive.

[134] 29 CFR 531.32(a).

[135] *See Harris* v. *Best Buy Stores, L.P.*, No. 15–CV–00657–HSG, 2016 WL 4073327, at *6 (N.D. Cal. Aug. 1, 2016).

Specifically, sums under the first clause are those ''paid as gifts''—that is, paid with the express understanding that they are a gift—as opposed to sums under the second clause, which are not expressly given as a gift, but are nevertheless ''in the nature of gifts'' because of their timing. The second clause in 7(e)(1) therefore expands the universe of excludable gifts from sums that are obviously ''paid as gifts'' to include those that are also ''in the nature of gifts,'' but limits the latter category to those made at Christmas time, on special occasions, or as rewards for service. In either case, however, the payments must not be measured by or dependent on hours worked, production, or efficiency.[136]

The FLSA defines ''wage'' as ''the reasonable cost . . . [of] board, lodging, or other facilities'' and thus the cost of providing meals is included in the regular rate.[137] However, if snacks or other food are provided as a gift, or in the nature of a gift, and are ''not measured by hours worked, production, or efficiency,'' they may be excluded from the regular rate.[138] Courts have specifically found the cost to an employer of providing food items to employees, aside from regularly provided meals, to be excludable from the regular rate as gifts under section 7(e)(1).[139]

When an employer provides snacks or food to employees as a gift, the cost of providing such snacks or food is properly excludable from the regular rate under the first clause of section 7(e)(1). This commonly arises in situations where an employer provides employees with office coffee and snacks, the value of which is minimal. These are provided without regard to hours worked, production, or efficiency, and the cost of such provision is excludable from the regular rate.

Unlike snacks, meals furnished by an employer are generally considered to be wages.[140] However, when a meal is provided by an employer to employees on a special occasion, such as a celebratory pizza lunch, the cost to the employer of providing such food is properly excludable from the regular rate under the second clause of section 7(e)(1). The Department adds language to § 778.212(c) to clarify this in the final rule.[141]

Some commenters also requested clarification that prizes, such as coffee cups and t-shirts, provided in connection with contests or raffles are excludable from the regular rate as ''other similar payments'' under section 7(e)(2). *See* SHRM; PPWO; Seyfarth. As with snacks and special occasion meals, the Department believes that the gift provision in section 7(e)(1) already provides for their exclusion from the regular rate as sums ''paid as gifts''—that is, paid with the express understanding that they are a gift—the amounts of which are not measured by or dependent on hours worked, production, or efficiency.[142] Because ''the subsections of § 7(e) are not mutually exclusive,'' [143] there may be areas of overlap between payments that are excludable under section 7(e)(1) and those excludable under section 7(e)(2). Thus, in addition to being excludable as gifts under section 7(e)(1), small items such as coffee mugs or t-shirts provided to an employee may also be properly excludable as an ''other similar payment'' under section 7(e)(2), so long as its provision does not depend on hours worked, services rendered, job performance, or other criteria that depend on the quality or quantity of the employee's work.

Similarly, several commenters asked the Department to provide guidance on the excludability of sign-on bonuses, suggesting they might be excludable under section 7(e)(2) as an ''other similar payment'' or under 7(e)(3) as a discretionary bonus. *See* ERIC; AHLA; Associated Builders and Contractors; NADA; Seyfarth; SHRM; PPWO. Most of these commenters suggested that such payments are excludable under 7(e)(3) as a discretionary bonus. Such comments are addressed in that section of the preamble. ERIC suggested that sign-on bonuses, notwithstanding the inclusion of a clawback provision, are properly excludable under section 7(e)(2)'s ''other similar payments'' clause and following the Third Circuit's reasoning in *Minizza.*[144] *See also* NADA. In that case, the court found that lump sum payments to employees to induce ratification of a collective bargaining agreement were excludable as an ''other similar payment'' because such payments were unrelated to hours of employment or service.[145] Since a sign-on bonus with no clawback provision is granted before any work is performed, such payment is unrelated to hours worked or services provided and may be excluded under section 7(e)(2).

While still labeled a sign-on bonus, a sign-on bonus with a clawback provision is substantively different from a sign-on bonus that is paid free and clear. As explained by the Sixth Circuit in *Featsent* v. *City of Youngstown,* longevity bonuses are dependent on length of service and therefore do not fall within the section 7(e)(2) exception.[146] Since a sign-on bonus with a clawback provision is essentially a longevity bonus, these may not be excluded under section 7(e)(2). However, case law already supports exclusion of certain longevity bonuses under section 7(e)(1) as a gift provided as a reward for future service. The Department's regulations permit exclusion of such bonuses provided that the requirements of § 778.212 are satisfied. A sign-on bonus with no clawback provision is clearly provided on a special occasion as a reward for future service, and is not measured by or dependent on hours worked,

---

[136] 29 CFR 778.212.

[137] 29 U.S.C. 203(m); 29 CFR 778.116; 29 CFR 531.29 and 531.32.

[138] WHD Opinion Letter FLSA, 1999 WL 1002365 (Feb. 12, 1999).

[139] *Rau* v. *Darling's Drug Store, Inc.,* 388 F. Supp. 877, 879 (W.D. Pa. 1975). *See also Lemus* v. *Denny's Inc.,* No. 10CV2061–CAB (WVG), 2015 WL 13740136, at *11 (S.D. Cal. July 31, 2015) (finding employer-offered food discounts to be gifts since employees are entitled to receive the discount as soon as they begin working and the employer does not dictate whether or how the employee may use the discount); *Rodriguez* v. *Taco Bell Corp.,* No. 1:13–CV–01498–SAB, 2013 WL 5877788, at *5–6 (E.D. Cal. Oct. 30, 2013) (finding meal provided through discount meal policy not excludable from the regular rate, but noting that a similar meal policy may qualify as a gift if available to all employees at any time without restrictions based upon the number of hours worked).

[140] 29 U.S.C. 203(m); 29 CFR 531.29 and 531.32.

[141] The provision of meals by an employer using an authorized basic rate under section 7(g)(3) of the FLSA to compute overtime rather than a regular rate is discussed *infra.*

[142] Prizes that are not paid as gifts, but are awards for activities not normally part of an employee's job, may be excludable from the regular rate under 29 CFR 778.332.

[143] *Reich,* 57 F.3d at 578. The *Reich* court cautioned, however, that ''we hesitate to read § 7(e)(2) as a catch-all, one that obliterates the qualifications and limitations on the other subsections and establishes a principle that all lump-sum payments fall outside the 'regular rate,' for then most of the remaining subsections become superfluous.'' *Id.*

[144] *Minizza,* 842 F.2d at 1458–62.

[145] *See id.* at 1462.

[146] 70 F.3d 900, 905 (6th Cir. 1995); *see* WHD Opinion Letter WH–527, 1986 WL 383427, at *2 (Apr. 21, 1986) (''[W]here an employee must be on the payroll in order to receive a future bonus payment, . . . such a condition [is] an inducement for an employee to continue in employment until the time the payment is to be made'' and therefore the payment is not an excludable ''other similar payment.''). But eligibility requirements that are ''not meant to serve as compensation for service'' and ''do not require specific service'' do not preclude payments from being excludable under section 7(e)(2). *Minizza,* 842 F.2d at 1460–61. Courts and the Department have also concluded that longevity bonuses are not excludable discretionary bonuses under section 7(e)(3) when made pursuant to a collective bargaining agreement or city ordinance. *See O'Brien* v. *Town of Agawam,* 350 F.3d 279, 295 (1st Cir. 2003) (longevity pay paid pursuant to a collective bargaining agreement does not qualify as an excludable discretionary bonus and therefore must be included in the regular rate); WHD Opinion Letter, 1986 WL 1171142, at *2 (Aug. 26, 1986) (same); WHD Opinion Letter (Nov. 8, 1985) (same).

production, or efficiency. A clawback provision that makes such a bonus dependent on length of employment does not necessarily impact its excludability under section 7(e)(1). As courts have noted, longevity payments are properly excludable from the regular rate under 7(e)(1) when employees receive these payments as a reward for tenure, and the payments are not, for example, made pursuant to a city ordinance or policy, or collective bargaining agreement.[147] The Department's existing regulation at § 778.212(c) supports this interpretation, stating that gift payments may "vary with the amount of the salary or regular hourly rate of such employees or according to their length of service with the firm so long as the amounts are not measured by or directly dependent upon hours worked, production, or efficiency." [148] It follows that "length of service" is not necessarily "directly dependent on hours worked." As such, the Department does not amend its final rule because it believes this interpretation is already clear. In brief, sign-on bonuses with no clawback provision are excludable from the regular rate; sign-on bonuses with a clawback provision pursuant to collective bargaining agreement (CBA), or city ordinance or policy are included in the regular rate; and sign-on bonuses with a clawback provision not pursuant to a CBA, city ordinance or policy, or other similar document that complies with § 778.212, are excludable from the regular rate.

Several commenters asked the Department to clarify that childcare services or subsidies are excludable from the regular rate. *See, e.g.,* Chamber; Associated Builders and Contractors; HR Policy; CWC. Employer-provided childcare services and subsidies are generally unrelated to the quality or quantity of work performed. However, in the past, the Department has taken a broad view of what is considered to be a "wage" under 3(m) of the FLSA and as such, some payments for childcare services or subsidies may be considered a wage. Payments for childcare services or subsidies are excludable from the regular rate under (e)(2)'s "other similar payments" clause to the extent such payments are not wages under section 3(m).[149] For instance, routinely-provided childcare qualifies as an in-kind reimbursement for "expenses normally incurred by the employee for his own benefit," which are wages that must be included in the regular rate.[150] However, emergency childcare services provided by employers as an important component of their work-life support packages do not meet this test and may be excluded from the regular rate, if such services are not provided as compensation for hours of employment. Emergency care is provided in the case of unforeseen circumstances, such as when schools or daycares are closed for bad weather or when a child is sick. If these payments are not tied to the quality or quantity of work performed, they are properly excluded from the regular rate under section 7(e)(2)'s "other similar payments" clause.

Finally, some of the items raised by commenters were outside the scope of the Department's proposal, and better addressed in a separate rulemaking. These include meals, relocation stipends,[151] commissions, and programs that issue points redeemable for merchandise. *See* PPWO; Hancock Estabrook, LLP; SHRM; Seyfarth; Chamber.

b. Tuition

The Department proposed adding an example in § 778.224(b)(5) clarifying that certain tuition programs offered by employers may be excludable from the regular rate. The NPRM noted that some employers today offer discounts for online courses, continuing-education programs, modest tuition-reimbursement programs, programs for repaying educational debt, and the like. Unlike wage supplements, the Department explained, these tuition programs are not fungible, any-purpose cash, but must be directed toward particular educational and training opportunities. These programs are also optional, appeal only to those employees who want to use them, and are directed toward educational and training pursuits outside the employer's workplace. Such tuition programs do not meet the basic necessities of life, such as food, clothing, or shelter. While the educational benefit may result in employees better able to accomplish the employer's objectives, these programs are not directly connected to the employees' day-to-day duties for the employer. The NPRM stated that as long as tuition programs are available to employees regardless of their hours worked or services rendered, and are instead contingent merely on one's being an employee, these programs would qualify as "other similar payments" under section 7(e)(2).[152]

The Department noted in the NPRM that this clarification, permitting tuition programs to be excluded from the regular rate, would not affect the Department's regulations at § 531.32 referencing "meals, dormitory rooms, and tuition furnished by a college to its student employees" as an "other facility." [153] The college environment is a unique context in which learning, work, and daily living are inextricably connected, tightly knit, and often all provided by the same entity, that being the college.

The Department received numerous comments in support of this clarification. *See, e.g.,* PPWO; NPELRA; SHRM; Associated Builders and Contractors; Chamber; SIGMA. The Department also received a few comments opposed to this clarification as proposed and that suggested modifications to the regulatory language in this section. *See, e.g.,* NELP; NELA; Economic Policy Institute (EPI).

Several commenters requested additional guidance on the types of tuition benefits encompassed by the proposed rule. *See* ERIC; American Benefits Council; Chamber; CWC; HR Policy; PPWO. Payments for an employee's current coursework, payments for an employee's online coursework, payment for an employee's

[147] *See Moreau* v. *Klevenhagen,* 956 F.2d 516, 521 (5th Cir. 1992), *aff'd,* 508 U.S. 22 (1993); *Shiferaw* v. *Sunrise Senior Living Mgmt., Inc.,* 2016 WL 6571270, at *26 (C.D. Cal. Mar. 21, 2016) (finding an employer's tenure-based "Long Term Service Award" paid every five years to be excludable under 7(e)(1)); *White* v. *Publix Super Markets, Inc.,* 2015 WL 4949837, at *4 (M.D. Tenn. Aug. 19, 2015) (finding a holiday bonus based on length of employment to be excludable under 7(e)(1)); *Local 359 Gary Firefighters, AFL–CIO* v. *City of Gary,* 1995 WL 934175, *7 (N.D. Ind. Aug. 17, 1995) (longevity pay was not excludable under section 7(e)(1) because it was "a fixed amount given pursuant to city policy" that was "based on the scale promulgated by the City"); WHD Opinion Letter WH–332, 1975 WL 40955 (May 1, 1975) ("It would appear that an employee who satisfied the eligibility requirement for [payments provided for in personnel rules] would have a contractual right to [longevity] payments."); *see also* 29 CFR 778.212(b) (explaining that if a bonus is "consider[ed] . . . a part of the wages" or if "paid pursuant to a contract," it is not in the nature of a gift).

[148] 29 CFR 778.212(c).

[149] *See* Opinion Letter FLSA–642 (Jan. 23, 1983) (deductions from employees' wages for childcare payments and reimbursement for childcare expenses are wages under section 3(m) and must be included in employees' regular rates); *see also* Opinion Letter (Apr. 1, 1992) (employer payments that employees may redesignate for child care benefits must be included in the regular rate of pay).

[150] 29 CFR 778.217(d); *see* 29 CFR 531.37(b).

[151] Pursuant to guidance in its Field Operations Handbook, the Department generally considers sums "paid as an incentive to attract employees to an isolated or otherwise undesirable job site" to be includable in the regular rate. FOH 32c00(b)(6).

[152] *See Reich,* 57 F.3d at 578 (payments under section 7(e)(2) are those "that do not depend at all on when or how much work is performed"); *Minizza,* 842 F.2d at 1462 (payments under section 7(e)(2) all "share the essential characteristic . . . of not being compensation for hours worked or services rendered").

[153] 29 CFR 531.32(a).

family members' tuition, and student loan repayment programs each fit within the exclusion so long as they are not tied to hours worked, services rendered, or other conditions related to quality or quantity of work performed (except for conditions as stated in the rule). Of course, tuition benefits for coursework directly related to the employee's job are excludable under the reimbursements clause of section 7(e)(2).[154]

Some commenters asked the Department to clarify what eligibility limits an employer may place on excludable tuition benefits. *See* CWC; Seyfarth. For example, Seyfarth commented that many of their clients "employ workers who work for very short periods of time, or very infrequently" and they believe that "a minimum employment requirement is a 'basic commonsense condition' " for some benefits. As explained in the NPRM and proposed regulatory text, while "other similar payments," such as tuition benefits, must generally not be tied to hours worked, services rendered, job performance, or other criteria linked to the quality or quantity of the employee's work, employers may place "conditions, such as a reasonable waiting period for eligibility" on tuition benefits.[155] Minimum employment requirements would be a permissible condition that would not affect the excludability of the tuition benefit from the regular rate.

Additionally, several commenters asked the Department to clarify whether a tuition benefit payment must be made to the employee, directly to the education or training provider, or through a bona-fide third party service provider, in order to be excludable from the regular rate. *See, e.g.,* CWC; PPWO. So long as the employee is receiving a tuition benefit that is not based on hours worked or services rendered, or other conditions related to the quality or quantity of work performed, it makes no difference whether that benefit is a direct payment to the education provider, to the employee, or through a third-party provider. To make this clear, the Department adds the phrase "whether paid to an employee, an education provider, or a student loan program" to its final rule.

Many commenters asked the Department to clarify that student loan repayment programs are excludable from the regular rate under section 7(e)(2). *See* ERIC; Chamber; NADA; American Benefits Council; CWC; Seyfarth; SHRM; PPWO; HR Policy. As noted by these commenters, student loan repayment programs take many forms, but the excludability of each plan depends on the facts of that particular plan. As with tuition benefits, student loan repayment plans may be excludable as an "other similar payment" to the extent the payments are not compensation for hours worked or services rendered, or other conditions related to the quality or quantity of work performed.

Some commenters asked the Department to clarify that tuition programs may only be excluded from the regular rate after a case-by-case analysis of whether the tuition program is compensation for work.[156] *See* NELA; NELP; EPI. As discussed above, the other similar payments clause permits employers to exclude from the regular rate payments to an employee that are "not made as compensation for his hours of employment." [157] Accordingly, as proposed in the NPRM, the final regulatory text provides that tuition programs may only be excluded from the regular rate provided they are not tied to an employee's hours worked, services rendered, or other conditions related to the quality or quantity of work performed. Because the determination of whether individual tuition programs meet the requirements of section 7(e)(2) and § 778.224 will be based on the specific facts and circumstances of each program, the Department concludes there is no need to revise the proposed regulatory text.

6. Show-Up Pay, Call-Back Pay, and Payments Similar to Call-Back Pay

Section 778.220 excludes from the regular rate "show-up" or "reporting" pay, which is defined as compensation for a specified minimum number of hours at the applicable straight-time or overtime rate on "infrequent or sporadic" occasions in which an employee is not provided with the expected amount of work after reporting as scheduled.[158] Payments for hours actually worked are included in the regular rate; amounts beyond what the employee would receive for the hours worked are excludable.

Section 778.221 addresses "call-back" pay. Call-back pay is additional compensation for calling an employee back to work without prearrangement to perform extra work after the employee's scheduled hours have ended. It is typically paid for a specified number of hours at the applicable straight-time or overtime rate.[159] Call-back pay is treated the same as show-up pay under § 778.220.

Section 778.222 addresses "other payments similar to 'call-back' pay," which are "extra payments made to employees on infrequent and sporadic occasions, for failure to give the employee sufficient notice to report for work on regular days of rest or during hours outside of his regular work schedule," and "extra payments made, on infrequent and sporadic occasions, solely because the employee has been called back to work before the expiration of a specified number of hours between shifts or tours of duty, sometimes referred to as a 'rest period.' " [160] Such time is treated the same as show-up pay under § 778.220 and call-back pay under § 778.221. Sections 778.220, 778.221, and 778.222 all currently require that the payments be "infrequent and sporadic" to be excludable from the regular rate.

Show-up or reporting pay is paid when the employee is scheduled to work but the employer fails to provide the expected amount of work.[161] Show-up pay is therefore excludable under the first clause of section 7(e)(2), which excludes payments made for "occasional periods" when no work is performed due to the "failure of the employer to provide sufficient work." [162] Section 778.220 accordingly limits exclusion of such payments to when they are made "on infrequent and sporadic occasions." [163]

In contrast, call-back pay and other payments similar to call-back pay are not made for periods when the employer fails to provide sufficient

[154] *See* 29 CFR 778.217; *see also White* v. *Publix Super Markets, Inc.,* No. 3:14–CV–1189, 2015 WL 4949837 (M.D. Tenn. Aug. 19, 2015) (finding tuition reimbursement payments to be excludable from the regular rate because they constituted reimbursements for an expense incurred in furtherance of the employer's interest and were not tied to hours worked).

[155] 84 FR 11911; *see also Minizza,* 842 F.2d at 1461 ("eligibility terms [that] do not require specific service . . . do not lend support to the conclusion that the payments are compensation for employment").

[156] These commenters also requested that the Department include a discussion of whether tuition programs primarily benefit the employee or the employer. The Department typically conducts such an analysis when evaluating whether a payment is a wage under section 3(m) of the FLSA. 29 U.S.C. 203(m); *see also* 29 CFR 531.32. However, tuition programs are only excludable from the regular rate under section 7(e)(2) to the extent they are not a wage under section 3(m).

[157] 29 U.S.C. 207(e)(2).

[158] *See* 29 CFR 778.220.

[159] *See* 29 CFR 778.221(a).

[160] 29 CFR 778.222.

[161] Since 1940, the Department's position has been that show-up pay that exceeded pay due for hours worked was meant to compensate the employee for the consumption of his time and discourage employers from calling in employees for only a fraction of a day. Interpretive Bulletin No. 4 ¶ 70(8).

[162] 29 U.S.C. 207(e)(2).

[163] 29 CFR 778.220.

work, but are instead additional payments made to compensate the employee when the employer provides unanticipated work.[164] As such, as explained in the NPRM, these payments do not fall under the first clause of section 7(e)(2). The Department has stated that call-back pay described in § 778.221 and the other payments described in § 778.222 instead fall under the ''other similar payments'' clause of section 7(e)(2)—which Congress did not restrict to ''occasional periods'' (unlike the first clause of section 7(e)(2)).[165] The NPRM noted that the FLSA does not require that payments under §§ 778.221 and 778.222 be only ''occasional'' to be excluded from the regular rate. Accordingly, the Department proposed removing the regulatory restriction that requires the payments discussed in §§ 778.221 and 778.222 to be ''infrequent and sporadic.''[166]

Although the Department proposed removing the words ''infrequent and sporadic'' from §§ 778.221 and 778.222, the Department proposed to include in § 778.222 language that has long been in § 778.221 explaining that payments excluded under these provisions must still be ''without prearrangement'' in order to be excludable from the regular rate.[167] The proposed rule provided an example of payments made without prearrangement by describing an employer retailer who called in an employee to help clean up the store for 3 hours after an unexpected roof leak, and then again 3 weeks later for 2 hours to cover for a coworker who left work for a family emergency. The proposed rule stated that payments for those instances would be without prearrangement and any call-back pay that exceeded the amount the employee would receive for the hours worked would be excludable. The proposed rule also clarified that when payments under §§ 778.221 and 778.222 are so regular that they, in effect, are prearranged, they are compensation for work and should be included in the regular rate. The proposed rule provided an example of an employer restaurant calling in an employee server for two hours of supposedly emergency help during the busiest part of Saturday evening for 6 weeks out of 2 months in a row, and explained that those payments would essentially be prearranged and all of the call-back pay would be included in the regular rate. The Department further proposed to clarify that the regulations apply regardless of whether the compensation is pursuant to established practice, an employment agreement, or state or local law.

Several commenters supported the Department's proposal to remove the phrase ''infrequent and sporadic'' from §§ 778.221 and 778.222. *See, e.g.,* CWC; NADA; Chamber. Some of these commenters, however, were concerned that the proposed regulatory text about regularity of payments and prearrangement could create confusion. *See* PPWO; Seyfarth; SHRM; Chamber. Seyfarth expressed concern that it was unclear ''how regularly a payment can be made before it is 'essentially prearranged.' '' Other commenters expressed concern that the proposed §§ 778.221 and 778.222 would create confusion about when call-back pay and similar types of payments are frequent enough to be included in the regular rate calculation, and they urged the Department to retain the ''infrequent and sporadic'' language. *See* AFL–CIO; EPI; NELA; NELP.

The Department has decided to finalize its proposal to remove the term ''infrequent and sporadic'' from §§ 778.221 and 778.222. The Department believes that removing the ''infrequent and sporadic'' language from these sections better aligns the regulations with the third clause of section 7(e)(2) of the FLSA, which does not require that these excludable ''other similar payments'' be occasional. The Department has also decided to finalize the proposal to add language to § 778.222 stating that payments similar to call-back pay must be made without prearrangement in order to be excludable from the regular rate, which is consistent with long-standing language currently in § 778.221. The Department has decided, however, to clarify in §§ 778.221 and 778.222 that the regularity of payments, alone, does not necessarily establish that such payments are prearranged.

Call-back pay compensates the employee for unanticipated work. A prearranged payment, however, constitutes compensation for work that was anticipated, and so is not excludable call back pay. The key ''prearrangement'' inquiry is whether the work was anticipated and therefore reasonably could have been scheduled. This is necessarily a fact specific inquiry that must consider a range of circumstantial factors, in addition to regularity. While substantial regularity of call-back pay may be a factor indicating that work was anticipated, regularity does not by itself necessarily establish anticipation regardless of surrounding facts. For instance, the NPRM included an example of prearrangement in which a restaurant employer calls in a server for the busiest part of Saturday evening for six weeks in a two month period. Upon review, the Department believes that such regularity may suggest prearrangement, but consideration of other facts is necessary to draw a conclusion regarding prearrangement. For instance, if the restaurant called in the employee in response to unanticipated emergencies—for instance, the unexpected absence of scheduled servers—on each of the Saturday evenings worked, regularity would not indicate prearrangement.

The NPRM's example also stated that ''all the call-back pay would be included in the regular rate.'' But regularity over a two month period does not, by itself, establish that the first or second call backs were because there was no regularity in the early portion of that period. Again, consideration of other facts is needed. For instance, call backs in the early portion of the two-month period could have been in response to the unanticipated surge in Saturday evening business, in which cases they would not have been prearranged. But if the facts show that at some point in time the restaurant anticipated that such new business had become the norm, then the subsequent call backs would have been prearranged.

The Department is further concerned that the NPRM's example could be read to imply that prearrangement depends on the same employee being regularly called back. It does not. The key issue is whether the work—*i.e.,* need for an additional server on certain Saturday evenings—was anticipated. If the restaurant had anticipated additional work each evening yet scheduled fewer servers than needed, it would not matter if it had called back a different employee on each of the six evenings to perform the anticipated work. Call back pay would have been prearranged for all six employees.

At bottom, regularity is neither a necessary nor sufficient condition for prearrangement: Frequent call backs over a period of time are not necessarily prearranged, while a single call back could be prearranged. The Department

---

[164] 29 CFR 778.221 through 778.222.

[165] *See* WHD Opinion Letter FLSA–574 (Nov. 18, 1964) (''turn around'' payments excludable under third clause); WHD Opinion Letter FLSA–933 (July 20, 1964) (payment for failure to provide rest period excludable under third clause); WHD Opinion Letter FLSA (Jan. 1, 1964) (stating that extra payments ''made for recall to work outside of regular working hours and for shortened 'rest periods' between shifts . . . may be excludable from the regular rate under the third clause'' of section 7(e)(2)).

[166] The Department also proposed to update the reference to § 778.222 that appears in § 778.203(d).

[167] 29 CFR 778.221; *see also Stewart* v. *San Luis Ambulance Inc.*, No. CV 13–09458–BRO (SSX), 2015 WL 13684710, at *8 (C.D. Cal. Oct. 6, 2015) (call-back payments must be ''without prearrangement'').

is concerned that the proposed language regarding regularity in the NPRM might encourage employers and employees to use regularity as a substitute for prearrangement, without adequate regard for other relevant circumstances. Accordingly, the Department is not including that language in §§ 778.221 and 778.222. And the example in § 778.221(a) has been revised to make clear that the ''without prearrangement'' inquiry should focus on whether the call back work was anticipated.

The preamble to the NPRM also noted that certain states and localities regulate scheduling practices and impose a monetary penalty on employers (which is paid to employees) in situations analogous to those discussed in §§ 778.220, 778.221, and 778.222.[168] These state and local laws include certain penalties that potentially affect regular rate calculations. These include: (1) ''reporting pay'' for employees who are unable to work their scheduled hours because the employer subtracted hours from a regular shift before or after the employee reports for duty;[169] (2) ''clopening'' or ''right to rest'' pay for employees who work the end of one day's shift and the start of the next day's shift with fewer than 10 or 11 hours between the shifts, or who work during a rest period;[170] (3) ''predictability pay'' for employees who do not receive the requisite notice of a schedule change;[171] and (4) ''on-call pay'' for employees with a scheduled on-call shift but who are not called in to work.[172] In light of these recent trends in state and local scheduling laws, the Department proposed to clarify the treatment of these penalty payments under the regulations.

The preamble of the NPRM explained that, in the Department's view, reporting pay pursuant to state or local scheduling laws should be analyzed similar to show-up pay under § 778.220 because it is payment for an employer's failure to provide expected work.[173] Compensation for any hours actually worked are included in the regular rate; compensation beyond that may be excluded from the regular rate as payment to compensate the employee for time spent reporting to work and to prevent loss of pay from the employer's failure to provide expected work during regular hours.

''Clopening'' or ''right to rest'' pay under state or local scheduling laws would, the Department explained, be analyzed under § 778.222 (''other payments similar to 'call-back' pay'') and would therefore generally be excludable from the regular rate as long as the payments are not regular. The Department would also analyze ''predictability pay'' penalties under § 778.222, as they are analogous to payments for failure to give an employee sufficient notice to report for work outside of his or her regular work schedule. As with reporting and call-back pay, compensation ''over and above the employee's earnings for the hours actually worked at his applicable rate (straight-time or overtime, as the case may be), is considered as a payment that is not made for hours worked,'' and is therefore excludable from the regular rate.[174]

Finally, the Department explained that ''on-call pay'' scheduling penalties would be analyzed under § 778.223, which is entitled ''[p]ay for non-productive hours distinguished.''[175] Under this regulation, the Department may require payment for ''on-call'' time to be included in the regular rate when such payments are ''compensation for performing a duty involved in the employee's job.''[176]

Several commenters agreed with the Department's explanation of the proper treatment of state and local scheduling laws under §§ 778.220, 778.222, and 778.223. *See, e.g.,* Bloomin' Brands; SHRM; NADA; CWC; Seyfarth. CWC agreed with the Department's discussion analyzing common state and local scheduling laws under §§ 778.220, 778.221, and 778.222, but suggested that they be discussed in the regulatory text instead of only in the preamble, or that the Department issue subregulatory guidance, such as a Fact Sheet, on this topic.

The Department has accepted the suggestion to add language about certain types of state and local scheduling laws to the regulatory text in §§ 778.220, 778.222, and 778.223. Specifically, the Department has added paragraph (c) to § 778.220 explaining that an employer may exclude payments mandated by state or local scheduling laws for occasions when the employee reports to work but is not provided with the expected amount of work if such payments are not for hours worked and are paid on an infrequent or sporadic basis. As in current paragraph (a), new paragraph (c) makes clear that such payments cannot be credited toward statutory overtime compensation due. The Department is also updating paragraph (b) of § 778.220 in a non-substantive way by raising the wage of the employee in the example from $5 an hour—which is below the current minimum wage—to $12 an hour.

Specifically, the Department has further added a sentence to § 778.222 generally defining the types of excludable payments that may be considered ''similar to 'call-back' pay,'' and noted that such similar payments may include those made pursuant to state and local scheduling laws. The Department also added to § 778.222 examples of ''clopening'' or ''right to rest'' pay and ''predictability pay'' mandated by state or local law as payments similar to call-back pay. Finally, the Department is revising § 778.223 to explain that the principle that ''on call'' pay is ''compensation for performing a duty involved in the employee's job and is not a type of excludable pay under section 7(e)(2),'' applies with respect to ''on call'' pay mandated by state or local law.

## *B. Discretionary Bonuses Under Section 7(e)(3)*

Section 7(e)(3)(a) of the FLSA excludes from the regular rate ''sums paid in recognition of services performed'' if ''both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing employees to expect such payments regularly.''[177] Section 778.211 of the

---

[168] A number of state and local jurisdictions have introduced laws regulating scheduling practices in recent legislative sessions. *See, e.g.,* H.B. 2467, 53rd Leg., 2d Reg. Sess. (Ariz. 2018); S.B. 321, 2018 Reg. Sess. (Conn. 2018); H.B. 5046, 100th Gen. Assemb. (Ill. 2018); S.B. 1000, 190th Leg. (Mass. 2017–18); H.B. 1614, S.B. 1116, 2017 Reg. Sess. (Md. 2017); S109, 218th Leg. (N.J. 2018); H.B. 741, 2015 Sess. (N.C. 2015); H.B. 7515, 7634, Jan. Sess. A.D. 2016 (R.I. 2016); Chi., Ill., Mun. Ordinance O2017–4947 (introduced June 28, 2017); Employee Scheduling (Call-in Pay), N.Y. St. Reg. LAB. 47–17–00011–P (proposed Nov. 11, 2017); S.B. 828, 79th Leg. Assemb., 2017 Reg. Sess. (Or. 2017); H.B. 1436 (Penn. 2019); L.A., Ca., Fair Work Week LA (introduced Mar. 1, 2019); Bos., Mass., Docket No. 0137 (2019).

[169] *See, e.g.,* Seattle, Wash., Mun. Code ch. 14.22.050 (2017).

[170] *See, e.g.,* N.Y.C., N.Y., Admin. Code 20–1231 (2017); Seattle, Wash., Mun. Code 14.22.035 (2017); Emeryville, Cal. Mun. Code 5–39.06 (2017); Chi., Ill., Fair Workweek Ordinance (July 24, 2019) (effective July 1, 2020); Phila., Pa., Code ch. 9–4600 (2018) (effective Jan. 1, 2020).

[171] *See, e.g.,* S.F., Cal., Police Code art. 33G (2015); Emeryville, Cal., Mun. Code 5–39.01 (2017); N.Y.C., N.Y., Admin. Code § 20–1222 (2017); Seattle, Wash., Mun. Code ch. 14.22.050 (2017); Chi., Ill., Fair Workweek Ordinance (July 24, 2019) (effective July 1, 2020); Phila., Pa., Code ch. 9–4600 (2018) (effective Jan. 1, 2020).

[172] *See, e.g.,* S.F., Cal., Police Code art. 3300G.4(d) (2015); Seattle, Wash., Mun. Code ch. 14.22.050. (2017).

[173] *See, e.g.,* Seattle, Wash., Mun. Code ch. 14.22.050 (2017).

[174] 29 CFR 778.222.

[175] *Id.* § 778.223.

[176] *Id.*

[177] 29 U.S.C. 207(e)(3).

regulations implements this exclusion and provides additional details concerning the types of bonuses that qualify for this exclusion. In the NPRM, the Department proposed to elaborate on the types of bonuses that are and that are not discretionary in § 778.211 to add clarity for employers and employees.

The Department proposed modifying language in § 778.211(c) and adding a new paragraph (d) to clarify that, under longstanding principles, neither the label assigned to a bonus nor the reason it was paid conclusively determine whether it is discretionary under section 7(e)(3).[178] The Department explained in the NPRM that, while attendance, production, work quality, and longevity bonuses, as those terms are commonly used, are usually paid pursuant to a prior contract, agreement, or promise causing the employee to expect such payments regularly, and therefore are non-discretionary bonuses that must be included in the regular rate, there may be instances when a bonus that is labelled as one of these types of bonuses is not in fact promised in advance and instead the employer retains discretion as to the fact and amount of the bonus until at or near the end of the period to which the bonus corresponds. The proposed rule modified language in § 778.211(c) and added a new paragraph (d) to § 778.211 to clarify that the label assigned to a bonus is not determinative. Instead, the Department explained, the terms of the statute and the facts specific to the bonus at issue determine whether a bonus is an excludable discretionary bonus. Under section 7(e)(3), a bonus is discretionary and therefore excludable, regardless of what it is labelled or called, if both the fact that the bonus is to be paid and the amount are determined at the sole discretion of the employer at or near the end of the period to which the bonus corresponds and the bonus is not paid pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly.

Additionally, the Department proposed to include in new § 778.211(d) examples of bonuses that may be discretionary to supplement the examples of bonuses that commonly are non-discretionary discussed in current § 778.211(c). The NPRM explained that such bonuses may include, for example, employee-of-the-month bonuses, bonuses to employees who made unique or extraordinary efforts which are not awarded according to pre-established criteria, severance bonuses, bonuses for overcoming stressful or difficult challenges, and other similar bonuses for which the fact and amount of payment is in the sole discretion of the employer until at or near the end of the periods to which the bonuses correspond and that are not paid "pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly."[179] The Department explained that it recognized that employers offer many differing types of bonuses to their employees, and that compensation practices will continue to evolve going forward. Finally, the Department invited comments from the public regarding other common types of bonuses that may be discretionary and that should be addressed in § 778.211.

The majority of the commenters supported the proposal's clarification that labels are not determinative. *See, e.g.,* SIGMA; IBC; NADA; Cavanagh Law Firm; HR Policy. IBC commented that the proposal's "focus on the circumstances of the actual payment versus what the payment is called better reflects the reality of business operations as well as the purpose and spirit of the FLSA." The PPWO and CWC noted that this change is consistent with the Department's longstanding position. HR Policy approved of this proposal because "the proper analysis" is the statutory requirements, not the label applied to the bonus. Other commenters addressed what they perceived as an inconsistency between stating that labels are not determinative and providing examples of bonuses that are excludable discretionary bonuses. PPWO commented that the proposal to include additional examples of discretionary bonuses was inconsistent with the proposal to make clear that labels are not determinative. CWC similarly commented that "the addition of examples that '*may* be discretionary' is not particularly helpful as it may give a false impression that the types of bonuses listed are usually excludable." CWC added that more guidance is needed which describes facts that make a bonus more or less likely to be discretionary. By contrast, several commenters requested that the Department include additional examples of excludable discretionary bonuses, such as referral bonuses, and sign-on bonuses. *See* Cavanagh Law Firm; Chamber; HR Policy; AHLA; Seyfarth, SHRM; Associated Builders and Contractors; PPWO; ERIC; World Floor Covering Association.

After reviewing the comments, the Department adopts the changes to paragraph (c) of § 778.211 and the proposed addition of paragraph (d), with the addition of referral bonuses for employees not primarily engaged in recruiting activities as an example of a bonus that may be discretionary, as suggested by the commenters.

In reviewing the comments, the Department agrees that there is a need for more guidance regarding the facts that may make a bonus discretionary or nondiscretionary. The statute requires *all* of the following facts to be present for a bonus to be discretionary: (1) The employer has the sole discretion, until at or near the end of the period that corresponds to the bonus, to determine whether to pay the bonus; (2) the employer has the sole discretion, until at or near the end of the period that corresponds to the bonus, to determine the amount of the bonus; and (3) the payment is not made pursuant to any prior contract, agreement, or promise causing employees to expect such payments. In response to comments regarding referral bonuses, sign-on bonuses, and other examples, the Department has addressed each of these below.

Five commenters asked the Department to include employee referral bonuses in the list of bonuses that may be discretionary, finding that such examples "[provide] some clarity to employers" and "[encourage] employers to offer these incentives to their workforce." *See* AHLA; HR Policy; Associated Builders and Contractors; Cavanagh Law Firm; Chamber. Cavanaugh Law Firm noted that payment of a referral bonus is "not related to the hours worked by the employee, their productivity, etc." Such payments are excludable from the regular rate where recruiting activities are not part of the receiving employees' job duties and other conditions are met. Specifically, the Department does not

[178] *See* 29 U.S.C. 207(e)(3); *Minizza,* 842 F.2d at, 1462 n.9 (observing that "what the payments are termed is not important"); *Walling* v. *Harnischfeger Corp.,* 325 U.S. 427, 430 (1945) ("To discover [the regular] rate . . . we look not to contract nomenclature but to the actual payments."); *Donohue* v. *Francis Servs., Inc.,* No. Civ.A.04–170, 2005 WL 1155860, at *1 (E.D. La. May 11, 2005) (denying an employer's summary judgment motion over "amounts described as 'discretionary bonuses' "). The NPRM noted that this principle comports with longstanding interpretation of other FLSA provisions; *see, e.g.,* 29 CFR 541.2 (cautioning that "[a] job title alone is insufficient to establish the exempt status of an employee" under section 13(a)(1) of the Act).

[179] *See* 29 U.S.C. 207(e)(3); *see also Alonzo* v. *Maximus, Inc.,* 832 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (holding that bonuses to employees who "made unique or extraordinary efforts and were not awarded according to pre-established criteria or pre-established rates" were excludable) (internal quotation marks omitted); WHD Opinion Letter FLSA2008–12, 2008 WL 5483051 (Dec. 1, 2008) (bonuses paid without prior promise or agreement to 911 dispatchers in recognition of high stress level of their job are excludable discretionary bonuses).

consider sums "paid to an employee who recruits another to join his employer's work force" to be "part of an employee's remuneration for employment which must be included in [the] regular rate" if (1) participation in the activity is strictly voluntary, (2) the employee's efforts in connection with the activity do not involve significant amounts of time, and (3) the activity is limited to after-hours solicitation among friends, relatives, neighbors, and acquaintances as part of the employee's social affairs.[180] Because it is consistent with the Department's long-standing position, and because it would provide clarity to employers and encourage employers to offer bonuses of this type to employees, the Department includes "referral bonuses for employees not primarily engaged in recruiting activities" as a type of bonus that may be discretionary, so long as it satisfies the statutory test, in its final rule.

Several commenters requested that the Department clarify that sign-on bonuses are excludable as discretionary bonuses. *See* AHLA; Associated Builders and Contractors; Seyfarth; SHRM; PPWO. ERIC and NADA requested the Department recognize that sign-on bonuses are excludable under 7(e)(2) of the FLSA as an "other similar payment," which the Department addresses separately in this Preamble. As emphasized by the Department's addition of § 778.211(d), labels are not dispositive in determining whether a bonus is discretionary. Therefore, as with all bonuses, the discretionary nature of a sign-on bonus will be decided by assessing whether it meets the statutory test.

Several commenters requested that the Department address whether other common types of bonuses are excludable as a discretionary bonus. These include year-end bonuses based on company performance where the company retains discretion on whether to pay the bonus until at or near the end of the performance period, bonuses to induce ratification of union agreements, preannounced bonuses, incentive bonuses, safety bonuses, spot bonuses, and quarterly bonuses. *See* HR Policy; World Floor Covering Association; AHLA; Associated Builders and Contractors; Cavanagh Law Firm. In each of these cases, the Department believes that its finalized regulation provides sufficient clarity by emphasizing that labels are not determinative. Instead, the facts specific to a bonus must be considered against the statutory terms expounded in the final regulation.

Lastly, the Department does not address in this final rule comments concerning bonuses that are outside the scope of this rulemaking, such as a request to modify the regulation on percentage bonuses at § 778.110, or industry-specific bonuses, such as bonuses given to front-desk associates for upselling hotel rooms. *See* Chamber; AHLA.

*C. Excludable Benefits Under Section 7(e)(4)*

Section 7(e)(4) of the FLSA excludes from the regular rate "contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits for employees." [181] Section 778.215(a)(2) explains that, among other things, "[t]he primary purpose of the plan must be to provide systematically for the payment of benefits to employees on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, and the like." The NPRM proposed to add examples of benefits on account of "accident, unemployment, and legal services" to § 778.215(a)(2).

The Department noted in the NPRM that the addition of "accident" is derived directly from section 7(e)(4), which expressly uses the term (even though the current regulations do not). The Department noted that the addition of benefits for unemployment and legal services reflected the Department's conclusion that, although employers may not have commonly offered these benefits when Congress enacted the FLSA in 1938,[182] they are "similar benefits" to those expressly listed in section 7(e)(4). The Department explained that, first, like other specifically enumerated types of benefit plans under section 7(e)(4), these benefit plans typically provide monetary benefits that are "specified or definitely determinable on an actuarial basis." [183] Second, benefit plans for unemployment or legal services protect employees from events that are rare but statistically predictable and that could otherwise cause significant financial hardship, just as is the case with life insurance, accident insurance, and the catastrophic-protection provisions of life insurance. Third, benefit plans for unemployment or legal services offer financial help when an employee's earnings are (unemployment) or may be (legal services) materially affected, as is the case with the other benefit plans. Employees who retire, reach an older age, or suffer an accident or health issue may be unable to work, or have their ability to work affected.

The Department noted that other characteristics of the various types of plans excludable under section 7(e)(4) may differ, but they still remain "similar" for purposes of the statute. Under the plain text of the statute, excludable plans need not be related to physical health. Retirement benefits are excludable, for instance, even though an employee may choose to retire for reasons wholly unrelated to health. And excludable plans also need not be limited to benefits for rare or even uncommon events. Health insurance, for instance, often pays for everyday medical expenses, and retirement is an event typically planned years in advance. Moreover, the benefits listed in the statute may be subject to various forms of payment. Retirement benefits are often a recurring payment, while accident and health benefits can fluctuate, and a life insurance death benefit can be paid in a lump sum. Therefore, insofar as the proposed additional examples differ among themselves or among other expressly listed benefits by not all being related to physical health, or not all being for rare events, or not all being paid out the same way, those differences do not make the proposed examples not "similar" under the statute. Indeed, such differences are encompassed in the statutory examples themselves.

The Department further explained that these proposed examples, like the examples already provided in regulation and statute, would have to satisfy the other various requirements outlined in § 778.215.[184] The Department noted that these additions would simply help clarify that such plans are not categorically barred from qualifying for exclusion under section 7(e)(4). The Department solicited comments and data on the prevalence and nature of these types of programs and on whether

[180] *See* WHD Opinion Letter FLSA (Jan. 27, 1969) (concluding that an employee referral bonus is excludable from the regular rate of pay under the FLSA).

[181] 29 U.S.C. 207(e)(4). The Department acknowledges that contributions to a plan made by an *employee* through elective salary reduction are generally treated as *employer* contributions under the Internal Revenue Code. *See, e.g.,* 26 U.S.C. 402(e)(3). But employees' elective contributions are not "contributions irrevocably made by an employer" under section 7(e)(4) of the FLSA, and so are not excludable from the regular rate as employer contributions to a bona fide plan.

[182] *See* Bureau of Labor Statistics, *An Overview of Employee Benefits,* supra note 2, at 20.

[183] 29 CFR 778.215(a)(3)(i).

[184] Section 778.215(a) contains five conditions all of which must be met in order for employer contributions to be excluded from the regular rate under 7(e)(4). 29 CFR 778.215(a)(1)–(5).

there are other similar benefit plans that should be expressly included as examples.

The Department received several comments supporting the proposed changes to § 778.215(a)(2) and no comments opposed to the changes. *See, e.g.,* SHRM; Associated General Contractors of America (AGC); PPWO; Seyfarth; NADA. Some of these commenters requested that the Department consider including additional examples of benefits. NADA, for instance, stated that it ''supports an expansion of the non-exclusive list but urges the DOL to indicate that cash payments in lieu of plan participation also may be excluded.'' The American Benefits Council suggested the Department add that employer-provided ''programs for repaying educational debt'' may be excludable under section 7(e)(4). *See also* ERIC. Upon review, the Department does not believe it would be appropriate to further expand the list of example benefits in § 778.215(a)(2) to include repaying an employee's accumulated educational debt or cash payments in lieu of plan participation.

An employee benefit plan satisfies the ''primary purpose'' requirement under § 778.215(a)(2) if it provides a ''similar benefit'' to the expressly listed benefits in FLSA section 7(e)(4)—*i.e.,* ''old-age, retirement, life, accident, or health insurance.'' The expressly listed benefits are similar to one another in that they all provide assistance in preparation for a future expense. As explained in the NPRM, such ''similar benefits'' include providing accident, unemployment, and legal services [185] that protect employees from rare but statistically predictable events that could otherwise cause significant financial hardship or expense.[186] ''Similar benefits'' also include assistance in preparation for common and predictable events—*e.g.,* retirement. Or even inevitable events—*e.g.,* old age. But a common thread remains: the benefit must help the employee prepare for an event that may result in significant *future* financial hardship or expense. By contrast, accumulated educational debt represents an expense that an employee would have incurred in the past. As such, repayment of past debt is not similar to the future-oriented benefits expressly listed in section 7(e)(4). Nor are cash payments in lieu of plan participation, as cash is not limited to paying for future expenses.[187] To provide further clarification on this matter, the Department is revising § 778.215(a)(2) to codify the future-expense requirement on ''similar benefits.'' Specifically, the Department is replacing ''or the like'' with ''or other events that could cause significant future financial hardship or expense.''

The NPRM also proposed to revise § 778.215(b), which currently provides that where the benefit plan or trust has been approved by the Bureau of Internal Revenue as satisfying the requirements of section 401(a) of the Internal Revenue Code in the absence of evidence to the contrary, the plan or trust will be considered to meet the conditions specified in § 778.215(a)(1), (4), and (5). In particular, the NPRM proposed to modernize this provision by replacing ''Bureau of Internal Revenue''—a term that has not been used since 1953—with ''Internal Revenue Service.'' [188]

Commenters suggested several additional ways for the Department to modernize § 778.215(b). Some commenters informed the Department that the recent elimination of significant aspects of the IRS's determination letter program results in fewer ''approvals'' from the IRS. American Benefits Council; Chamber. The American Benefits Council suggested that the Department replace ''approved by the Internal Revenue Service as satisfying the requirements of section 401(a)'' with ''designed to meet the requirements of section 401(a).''

Commenters also requested that the Department expand the coverage of § 778.215(b) to presume that more benefit plans meet the requirements of § 778.215(a). The American Benefits Council, for instance, suggested that the Department deem section 401(a) plans to meet all five conditions required under § 778.215(a), rather than just the conditions in paragraphs (a)(1), (4), and (5). The American Benefits Council further requested that the Department ''expand . . . § 778.215(b) to other common types of retirement plans, namely [Internal Revenue] Code section 403(a), 403(b), 408(k), 408(p), and governmental 457(b) plans.'' Other commenters requested that the Department ''amend 29 CFR 778.215(b) to provide an exemption for all . . . employee welfare benefit and employee pension benefit plans governed by ERISA[.]'' Chamber, *see also* ERIC. Some commenters who supported the proposed changes also suggested the Department clarify that certain types of ERISA employee benefit plans are excludable under section 7(e)(4) of the Act. For example, WageWorks requested that the Department clarify that ''amounts that an employer contributes to an employee's HRA are to be excluded . . . just like the benefits provided under any other employer provided health plan.'' And the Associated Builders and Contractors and NAM requested the Department clarify that employer contributions to multiple employer plans, *e.g.,* Association Retirement Plans or Association Health Plans (AHPs), are excludable.

After careful consideration, the Department has concluded that it would be appropriate to expand the scope of § 778.215(b) in three ways. First, the Department agrees with commenters that § 778.215(b) should be revised in light of the IRS's recent decision to change its determination letter procedures. The IRS maintains a program under which plan sponsors can obtain a determination letter that approves a plan as complying with requirements under section 401(a) or 403(a) of the Internal Revenue Code. In addition, the IRS issues approval letters for pre-approved plans, which can be relied upon by plan sponsors, that a plan meets the requirements of section 401(a) or 403(b) of the Internal Revenue Code. But, as of 2017, sponsors of individually designed plans generally may request a determination letter only for initial qualification or upon plan termination.[189] This change may prevent some sponsors that amend an existing plan from receiving a determination letter approving the amended plan. Thus, under the current § 778.215(b), some sponsors that amend a qualified plan are unable to obtain a determination letter that the plan, as amended, satisfies the requirements of section 401(a) of the Internal Revenue Code. In order to reflect these changes to the IRS's determination letter program, the Department is revising the provision to state that, absent evidence to the contrary, a plan ''maintained pursuant to a written document that the plan sponsor reasonably believes satisfies the requirements'' of section 401(a) of the Internal Revenue Code will

[185] The Department has taken the position that legal services plans qualify for exclusion under FLSA section 7(e)(4) since at least 1978. *See* WHD Opinion Letter FLSA (Feb. 7, 1978)

[186] 84 FR 11899.

[187] Moreover, § 778.215(a)(5) specifically restricts payments of ''cash instead of the benefits under the plan'' to be ''an incidental part . . . and not inconsistent with the general purpose of the plan to provide benefits described in section 7(e)(4) of the Act.'' By necessary implication, cash in lieu of a benefit under a plan must be different from that benefit.

[188] 84 FR 11909.

[189] *See* Revenue Procedure 2016–37, *available at https://www.irs.gov/irb/2016-29_IRB, for approval letters procedures for qualified plans. See also* Revenue Procedure 2013–22, *available at https://www.irs.gov/irb/2013-18_IRB,* for approval letters procedures for section 403(b) plans.

be considered to meet certain requirements of § 778.215(a).

Second, the Department agrees with commenters that plans meeting the requirements of section 401(a) of the Internal Revenue Code should be deemed to comply with § 778.215(a)(2). A section 401(a) plan is an employer-sponsored tax-advantaged plan in which the employer, the employee, or both may contribute funds for use in retirement. Treasury regulations state that a section 401(a) pension plan must provide "for the payment of definitely determinable benefits to [an employer's] employees over a period of years, usually for life, after retirement." [190] In addition, a retirement plan that is a profit-sharing plan must provide "for distributing the funds accumulated under the plan after a fixed number of years, the attainment of a stated age, or upon the prior occurrence of some event such as layoff, illness, disability, retirement, death, or severance of employment." [191] The Internal Revenue Code further generally subjects early distributions to a 10 percent additional tax unless the plan participant has reached age 59½, dies, becomes disabled, or meets certain other exceptions.[192] The Treasury regulations' definition of pension plan, the conditions on distributions from profit-sharing plans, and the additional 10 percent tax on early distributions ensure plan assets are used for retirement or another permitted benefit under § 778.215(a)(2). The Department is therefore revising § 778.215(b) to state that a section 401(a) plan may be presumed to satisfy § 778.215(a)(2), in addition to § 778.215(a)(1), (4), and (5). The Department notes that section 401(k) plans, which came into existence in 1978 and have become popular among private employers, are a type of section 401(a) plan that uses a qualified cash or deferred arrangement to provide retirement funds.[193] Accordingly, a section 401(k) plan is a section 401(a) plan and therefore enjoys the same presumptions as a section 401(a) plan.

However, the Department does not believe section 401(a) profit-sharing plans should be presumed to satisfy the requirement in § 778.215(a)(3) that either benefits must be definitely determinable on an actuarial basis or there must be a definite formula to determine both the employer's contribution amount and the benefits for each employee participating in the plan. Although Treasury regulations provide that benefits under a pension plan must be definitely determinable,[194] Treasury regulations require that section 401(a) profit-sharing and stock bonus plans have "a definite predetermined formula to allocating the contributions made to the plan *among the participants*." [195] For section 401(a) profit-sharing and stock bonus plans, there is no requirement that there be a definite formula to determining the amount to be contributed by the employer, as required by § 778.215(a)(3).[196] Thus, a section 401(a) profit-sharing or stock bonus plan may grant an employer complete discretion regarding the amount of contributions. The Department's opinion letter dated August 17, 1970, explained that such a plan would not satisfy § 778.215(a)(3).[197] But contributions to such a plan may still be excludable under FLSA section 7(e)(3) as "payments . . . to a bona fide profit-sharing plan or trust." [198] As the Southern District of California recently explained, a plan need only meet the requirements of a profit-sharing plan under section 7(e)(3) *or* a bona fide employee benefit plan under section 7(e)(4), but not both, in order for contributions thereto to be excludable.[199]

Third, the Department is extending the presumption of satisfaction under § 778.215(b) to plans that meet the requirements of section 403(a), 403(b), 408(k) or 408(p) of the Internal Revenue Code and to governmental plans that satisfy the requirements of section 457(b) of the Internal Revenue Code (governmental section 457(b) plans). In contrast to section 401(a) plans, section 403(a) plans are employer-sponsored retirement plans that are funded through annuity contracts rather than trusts,[200] and section 403(b) plans are funded through annuity contracts or custodial accounts.[201] Section 408(k) plans—also called Simplified Employee Pension (SEP) plans—are employer-sponsored retirement plans that allow employers to make tax-favored contributions to an employee's Individual Retirement Account or Annuity (IRA).[202] Section 408(p) plans—also called SIMPLE (Savings Incentive Match Plan for Employees) IRA plans—are plans established and maintained by a small business on behalf of its employees.[203] The employer generally is required to contribute to each eligible employee's SIMPLE IRA every year, while employees may also contribute. Finally, governmental section 457(b) plans are tax-advantaged retirement saving accounts available to employees of state and local governments.[204]

Sections 403(a), 403(b), 408(k), and 408(p) plans and governmental section 457(b) plans are all established and maintained by an employer and therefore satisfy the "adopted by the employer" requirement of § 778.215(a)(1). All five types of plans are designed to provide retirement and advanced age benefits by offering tax-favored treatment of plan contributions. Thus, these plans satisfy § 778.215(a)(2). A section 403(a) plan's assets must be placed in an annuity contract provided through a third-party insurer,[205] and a section 403(b) plan's assets must be placed in such an annuity contract or in a custodial account invested in regulated investment company stock (mutual fund).[206] Employer

---

[190] 26 CFR 1.401–1(b)(1)(i).

[191] 26 CFR 1.401–1(b)(1)(ii). Section 1.401–1(b)(1)(iii) provides that a stock bonus plan is a plan established and maintained by an employer to provide benefits similar to those of a profit-sharing plan with certain exceptions.

[192] *See* 26 U.S.C. 72(t).

[193] *See* 26 U.S.C. 401(k)(1) (a "plan shall not be considered as not satisfying the requirements of subsection (a) merely because the plan includes a qualified cash or deferred arrangement.").

[194] 26 CFR 1.401–1(b)(1)(i).

[195] 26 CFR 1.401–1(b)(1)(ii), (iii) (emphasis added).

[196] 29 CFR 778.215(a)(3) permits plans to, in the alternative, have benefits that are specified or definitively determinable on an actuarial basis or to have a formula for determining the amount to be contributed by the employer and a provision for determining the individual benefits by a method which is consistent with the purposes of the plan or trust under section 7(e)(4) of the Act.

[197] WHD Opinion Letter FLSA, 1970 WL 26444, at *1 (Aug. 17, 1970) ("The plan fails to meet the formula requirements of § 778.215(a)(3) of Part 778, in that it does not contain a definite formula for determining the amount to be contributed by the employer."). However, a profit sharing plan that permits discretionary contributions but uses a definite formula to determine the amount of such contributions *does* satisfy § 778.215(a)(3). *See Russell* v. *Gov't Employees Ins. Co.,* No. 17–CV–672 JLS (WVG), 2018 WL 1210763, at *8 (S.D. Cal. Mar. 8, 2018).

[198] The requirements of a bona fide profit sharing plan or trust are set forth in part 549 of the Department's regulations. *See* 29 CFR part 549.

[199] *Russell,* 2018 WL 1210763, at *6.

[200] *See* 26 U.S.C. 403(a); 26 CFR 1.403(a)–1.

[201] *See* 26 U.S.C. 403(b); 26 CFR 1.403(b)–8.

[202] 26 U.S.C. 408(k); *see also* IRS, Establishing a SEP, *https://www.irs.gov/retirement-plans/establishing-a-sep.*

[203] 26 U.S.C. 408(p); *see also* IRS, Establishing a SIMPLE IRA Plan, *https://www.irs.gov/retirement-plans/establishing-a-simple-ira-plan.*

[204] *See* 26 U.S.C. 457(b); *see also* IRS, IRC 457(b) Deferred Compensation Plans, *https://www.irs.gov/retirement-plans/irc-457b-deferred-compensation-plans.*

[205] 26 U.S.C. 403(a)(1)

[206] U.S. Department of Labor, Employee Benefits Security Administration, Field Assistance Bulletin No. 2007–02, ERISA Coverage Of IRC Section 403(b) Tax-Sheltered Annuity Programs (July 24, 2007) ("Under a 403(b) plan, employers may purchase for their eligible employees annuity contracts or establish custodial accounts invested only in mutual funds for the purpose of providing retirement income. Annuity contracts must be

contributions made under SEP and SIMPLE IRA plans must be paid into each eligible employee's IRA, which is maintained by a financial institution that serves as the trustee of the employee's retirement assets.[207] And "[g]overnmental 457(b) plans must be funded, with assets held in trust for the benefit of employees." [208] Thus, all five types of plans also satisfy the § 778.215(a)(4) requirement that "[t]he employer's contributions must be paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust or other funded arrangement."

Section 778.215(a)(5) requires that employer contributions to a plan be used in furtherance of a benefit under FLSA section 7(e)(4), except that incidental cash distributions for other purposes are permitted. Section 403(a) plans are subject to a 10 percent additional tax on early distributions and the minimum distribution requirements under section 401(a)(9) of the Internal Revenue Code. A section 403(b) plan generally permits an employee to withdraw funds only if he or she (1) reaches age 59½, (2) separates from employment, (3) becomes disabled, (4) dies, (5) encounters a financial hardship, or (6) is called up to active duty military service.[209] The first four conditions correspond to benefits listed in § 778.215(a)(2)—*i.e.,* advanced age, retirement, disability, and death—and therefore distributions under these conditions are consistent with § 778.215(a)(5). The remaining conditions permitting distribution—financial hardship and active duty service—are narrow. A hardship distribution is permitted only if the participant faces an immediate and heavy financial need that cannot be met with available financial resources, and the distribution amount must be limited to that need (increased by the amount of tax reasonably anticipated to result from the distribution).[210] And an active duty distribution is available only where a reservist or national guardsman is called up for at least 180 days of active duty military service.[211] The Department believes that financial hardship and active duty distributions are consistent with the incidental-payment requirements of § 778.215(a)(5). Indeed, such distributions are also permitted under certain section 401(a) plans, which currently are presumed to satisfy § 778.215(a)(5). Accordingly, section 403(a) and section 403(b) plans may be presumed to satisfy § 778.215(a)(5).

Section 457(d)(1)(A) of the Internal Revenue Code permits early distribution from a 457(b) plan only if the participant "attains age 70½," "has a severance from employment," or "is faced with an unforeseeable emergency." Thus, the only type of 457(b) distribution that does not serve as an FLSA section 7(e)(4) benefit is an unforeseeable emergency distribution. Treasury regulations define unforeseeable emergency as a severe financial hardship resulting from illness, accident, loss of home, or other similar extraordinary and unforeseeable circumstances.[212] An unforeseeable emergency distribution is not permitted unless the participant's other financial assets are insufficient, and the amount of such distribution must be limited to the needs of the emergency (increased by the amount of tax reasonably anticipated to result from the distribution).[213] The Department believes these restrictions ensure unforeseeable emergency distributions are consistent with the incidental-payment requirements of § 778.215(a)(5) and therefore governmental section 457(b) plans may be presumed to satisfy § 778.215(a)(5).

The funding vehicles for SEP and SIMPLE IRA plans are IRAs, which do not prohibit employees from receiving distributions before reaching retirement age. But to discourage the use of plan funds for purposes other than retirement, the Internal Revenue Code generally imposes an additional 10 percent tax on SEP and SIMPLE IRA distributions before the employee reaches age 59½ unless the employee dies, becomes disabled, or meets certain other specified exceptions.[214] The Department believes the additional 10 percent tax ensures that early distributions are incidental to retirement benefits, and so these types of plans should be presumed to satisfy the incidental-payment requirement under § 778.215(a)(5).[215]

Based on the above discussion, the Department believes that a retirement plan satisfying section 403(a), 403(b), 408(k), or 408(p) of the Internal Revenue Code, or a governmental section 457(b) plan, should be presumed to satisfy § 778.215(a)(1), (2), (4), and (5). Accordingly, the Department is revising § 778.215(b) to extend that presumption to any plan "maintained pursuant to a written document that the plan sponsor reasonably believes satisfies the requirements of section 401(a), 403(a), 403(b), 408(k), or 408(p) of the Internal Revenue Code, or is sponsored by a government employer that reasonably believes the plan satisfies the requirements of section 457(b) of the Internal Revenue Code." The Department believes this clarifying revision will make it easier for employers to determine whether employer contributions to an employee retirement plan are excludable from the regular rate under FLSA section 7(e)(4) and would serve "the policy of the Federal Government to expand access to workplace retirement plans for American workers." [216]

The Department is declining to create a new presumption for employee benefit plans governed by and in compliance with ERISA, as requested by some commenters. *See* ERIC; Chamber. ERISA requirements appear to overlap with some of the requirements of a bona fide

purchased from a state licensed insurance company, and the custodial accounts must be held by a custodian bank or IRS approved non-bank trustee/custodian.").

[207] IRS, Establishing a SEP, *https://www.irs.gov/retirement-plans/establishing-a-sep;* IRS, Establishing a SIMPLE IRA Plan, *https://www.irs.gov/retirement-plans/establishing-a-simple-ira-plan.*

[208] IRS, Government Retirement Plans Toolkit, *https://www.irs.gov/government-entities/federal-state-local-governments/government-retirement-plans-toolkit.*

[209] IRS Publication 571, Tax-Sheltered Annuity Plans (403(b) Plans) (January 2019), *https://www.irs.gov/publications/p571.* The plan may, but is not required to, permit participants to receive a cash distribution in response to financial hardship.

[210] *See* 26 CFR 1.401(k)–1(d)(3). Hardship distributions are generally subject to a 10 percent tax penalty. *See* 26 U.S.C. 72(t).

[211] IRS Publication 571, Tax-Sheltered Annuity Plans (403(b) Plans) (January 2019), *https://www.irs.gov/publications/p571.*

[212] 26 CFR 1.457–6(c)(2); *see also* Rev. Rul. 2010–27, *https://www.irs.gov/irb/2010-45_IRB#RR-2010-27* (providing guidance on what constitutes an unforeseeable emergency distribution).

[213] *Id.*

[214] 26 U.S.C. 72(t). For example, the 10 percent additional tax does not apply to early distributions that are used to pay for certain medical expenses. *See* 26 U.S.C. 72(t)(2)(B). Nor does the tax apply to early distribution from SEP and SIMPLE IRA plans that pay for certain expenses relating to qualified higher education, first-time home ownership, and being called to active duty military service. *See* 26 U.S.C. 72(t)(2)(E)–(G). *For a list of the exceptions to the 10 percent additional tax under section 72(t) of the Code, see* IRS, Retirement Topics—Exceptions to Tax on Early Distributions, *https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-tax-on-early-distributions.* Early distributions from a SIMPLE IRA plan "incur a 25% additional tax instead of 10% if made within the first 2 years of participation." *Id.*

[215] As the Department articulated in an opinion letter dated July 2, 2003, a plan that distributes over 20 percent of the employer's total contributions to the plan for purposes other than a FLSA section 7(e)(4) benefit does not satisfy § 778.215(a)(5) because such distributions would not be incidental. WHD Opinion Letter FLSA2003–4, 2003 WL 23374600, at *2 (July 2, 2003). Thus, while the Department believes it is appropriate to presume a SEP and SIMPLE IRA plan satisfies § 778.215(a)(5), the early withdrawal of over 20 percent of total employer contributions may constitute "evidence to the contrary" that would rebut such a presumption.

[216] Exec. Order No. 13847, Strengthening Retirement Security in America, 83 FR 45321 (Aug. 31, 2018).

plan detailed in § 778.215(a)(1)–(5). But compliance with ERISA does not address all requirements for excludability under FLSA section 7(e)(4) and § 778.215(a). For example, ERISA does not require all covered employee benefit plans to have benefits that are determined on an actuarial basis or by a definite formula that sets the employer's contribution amount, as required under § 778.215(a)(3); an ERISA-covered profit-sharing plan may grant the employer complete discretion regarding the amount of contributions.[217] Such a plan would not meet the requirements of § 778.215(a)(3).[218]

Additionally, contributions to an employee benefit plan are excludable under FLSA section 7(e)(4) only if they are ''irrevocably made by an employer to a trustee or third person'' and § 778.215(a)(4) accordingly requires employer contributions to be ''paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust or other funded arrangement.'' But ERISA does not uniformly require employers to fund all types of ERISA plans through a trustee or third party. While some ERISA plans are funded through a trust or an insurer, ERISA permits employers to establish self-funded plans that pay benefits out of the employer's general assets, which would not satisfy the requirement of FLSA section 7(e)(4) and § 778.215(a)(4).

For example, a Health Reimbursement Arrangement (HRA) is a group health plan that enables employers to reimburse employees' medical expenses in a tax-favored manner. An HRA may be funded through a trust, in which case it would satisfy the irrevocable-contribution requirement of FLSA section 7(e)(4) and § 778.215(a)(4). But an employer may also structure an HRA using a notional account through which reimbursements are paid out of the employer's general assets. In this type of self-funded HRA, there are no irrevocable contributions to a trust or third party, and therefore, reimbursements by such a plan would not be excludable under FLSA section 7(e)(4).[219] However, the Department believes that benefits from self-funded employee benefit plans—including self-funded HRAs—could be excludable under the ''other similar payments'' clause of section 7(e)(2) if the availability and amount of benefits do not depend on hours worked, services rendered, or any other criteria that depend on the quality or quantity of an employee's work.[220] Because compliance with ERISA is not a substitute for statutory and regulatory prerequisites for excludability from the regular rate under FLSA section 7(e)(4), the Department does not believe it would be appropriate to create a presumption that employer contributions to ERISA employee benefit plans are excludable. Employers should assess the plan's compliance with the elements set forth in § 778.215(a)(1)–(5) to determine excludability, rather than rely on the plan's compliance with ERISA.

The above principle applies equally with respect to a multiple employer plan.[221] One common type of a multiple employer plan is an Association Retirement Plan—which provides group retirement benefits. A multiple employer plan is treated the same for purposes of this regulation as if it were a single plan: If the plan satisfies the conditions set forth in § 778.215(a)(1)–(5), then employer contributions to the plan would be excludable under FLSA section 7(e)(4).[222]

Some commenters who supported the proposed changes also suggested the Department clarify that other specific benefit plans are excludable under section 7(e)(4) of the Act. For example, ERIC requested that the Department clarify that contributions to Health Saving Accounts (HSA) and Individual Retirement Accounts (IRA) are excludable, and the American Benefits Council asked the Department to clarify that discretionary contributions to retirement plans are excludable. Other commenters asked the same regarding cash payments to employees made in-lieu of receiving health insurance provided through contributions to a cafeteria plan. *See* IMLA; NADA; Seyfarth; NPELRA. The Department discusses the excludability of each of these types of benefit plan contributions below.

A cafeteria plan is an employer-sponsored plan established under section 125 of the Internal Revenue Code. A cafeteria plan allows employees to choose between using employer contributions to pay for an employer-provided qualified benefit, including premiums for health coverage or contributions to an HSA, or to receive cash payments (or some other taxable benefits).[223] As an employer-sponsored plan that provides for ''payment of benefits to employees on account of . . . medical expenses,'' a cafeteria plan would generally meet the requirements of § 778.215(a)(1) and (2). And § 778.215(a)(3) and (4) likely are satisfied if employer contributions are determinable or based on a formula, and are irrevocably made to a trust or third party.[224] The key issue is whether a cafeteria plan satisfies § 778.215(a)(5)'s requirement that cash payments to employees must be incidental to the plan's benefits.

The Department's opinion letter dated July 2, 2003, explained that § 778.215(a)(5) recognizes that ''[a] bona fide plan may allow incidental cash payments to employees.''[225] Incidental payments must be consistent with the plan's purpose of providing qualifying benefits. And cash payments in excess

[217] *See e.g.,* 26 U.S.C. 412(a) and (e)(2) (requiring minimum funding of certain plans but exempting profit sharing plans from this requirement).

[218] *See e.g.,* WHD Opinion Letter FLSA, 1970 WL 26444, at *1. A profit sharing plan that permits discretionary contributions but uses a definite formula to determine the amount of such contributions *does* satisfy 778.215(a)(3). *See Russell,* 2018 WL 1210763, at *8.

[219] *See Gilbertson* v. *City of Sheboygan,* 165 F. Supp. 3d 742, 750 (E.D. Wis. Feb. 5, 2016).

[220] *See Minizza,* 842 F.2d 14562 (payments under section 7(e)(2) all ''share the essential characteristic . . . of not being compensation for hours worked or services rendered''). The *Gilbertson* court held that HRA reimbursement payments were not excludable under section 7(e)(2)'s reimbursement clause because such reimbursements benefited the employee, not the employer. 165 F. Supp. 3d. at 750–51. But the court did not analyze the excludability of HRA reimbursements under the ''other similar payments'' clause of section 7(e)(2).

[221] For general information on ERISA-covered multiple employer plans, see generally, the Department's recently promulgated final rule that expands access to affordable quality retirement saving options by clarifying the circumstances under which an employer group or association or a professional employer organization may sponsor a multiple employer workplace retirement plan under title I of ERISA. Definition of ''Employer'' Under section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 84 FR 37508 (July 31, 2019).

[222] In a typical Association Retirement Plan, multiple employers participate in a single retirement plan—such as a section 401(k) plan—and each employer may choose among eligibility, contribution, vesting, and distribution options provided by the plan document. Under revised § 778.215(b), the section 401(k) plan in the above example may be presumed to satisfy § 778.215(a)(1), (2), (4) and (5). An employer's contributions to that Association Retirement Plan would be excludable so long as the contribution and benefits provisions in the plan document and the employer's participation agreement satisfy the requirements of § 778.215(a)(3). *See Laughlin* v. *Jim Fischer, Inc.,* 2019 WL 1440406, at *7 (E.D. Wisc. March 31, 2019) (section 401(k) contributions excluded from regular rate where ''there is no room for discretion in [employer]'s plan for the amount to be contributed.'').

[223] 26 U.S.C. 125(d)(1)(B) (''participants may choose among 2 or more benefits consisting of cash and qualified benefits''). If an employee chooses to use employer contributions for a qualified benefit, then the value of that benefit is excluded from income for tax purposes, notwithstanding the ability of the employee to receive taxable cash in lieu of the benefit.

[224] Self-insured cafeteria plans, for instance, health flexible saving arrangements, are not funded through a trust or a third party. Accordingly, employer contributions to such plans would not satisfy § 778.215(a)(4).

[225] WHD Opinion Letter FLSA2003–4, 2003 WL 23374600, at *2.

of 20 percent of plan contributions are not incidental to the plan's purpose, unless such payments are used for benefits that are the same or similar as those listed in FLSA section 7(e)(4).[226] Notably, this 20 percent limit is not applied on an employee-by-employee basis, but plan-wide. As the 2003 opinion letter explained, a plan-wide limit "is more consistent with the regulatory language which allows '*all* or a part of the amount' standing to an employee's credit to be paid in cash. . . ." [227] Thus, "a cafeteria plan may qualify as a bona fide benefits plan for purposes of section 7(e)(4) if: (1) No more than 20% of the employer's contribution is paid out in cash; and (2) the cash is paid under circumstances that are consistent with the plan's overall primary purpose of providing benefits." [228]

However, the Department disagrees with commenters requesting that cash payments in-lieu of plan participation also may be excluded from the regular rate under section 7(e)(4). *See* NADA; Seyfarth; NPELRA; IMLA. This is because such cash payments are made directly to the employee, and so fail to satisfy the requirement under FLSA section 7(e)(4) that contributions be "made by an employer to a trustee or third person." [229] Nor are cash-in-lieu of medical benefits generally excludable under the "other similar payments" clause of section 7(e)(2), as the International Municipal Lawyers Association suggests. As explained above, "other similar payments" cannot be wages in another guise. Cash payments in lieu of medical benefits in many cases function essentially as wage supplements. Even though they are not directly tied to hours worked or service rendered, they are typically paid frequently, regularly, and as fungible cash. And it would make little sense for Congress to require employers to provide a bona fide plan to exclude health care benefits under section 7(e)(4) if employers could simply pay cash toward the same purpose and claim exclusion under section 7(e)(2). As the Seventh Circuit has noted, "we hesitate to read § 7(e)(2) as a catch-all, one that obliterates the qualifications and limitations on the other subsections and establishes a principle that all lump-sum payments fall outside the 'regular rate,' for then most of the remaining subsections become superfluous." [230]

IRAs and HSAs are tax-favored savings accounts that provide, respectively, retirement and health benefits. Employer contributions to an IRA or HSA may satisfy § 778.215(a)(1) if they are made pursuant to an arrangement where the employer makes contributions for employees that is communicated to employees. As explained in the above discussion concerning SIMPLE and SEP plans, an IRA encourages retirement savings.[231] And HSA contributions may be distributed on a tax-free basis to pay for certain qualified medical expenses.[232] Thus, employer contributions to IRAs and HSAs satisfy § 778.215(a)(2). If the plan requires the benefits be specified or definitely determinable based on an actuarial basis, or based on a definite formula for determining the amount to be contributed by the employer and for determining the benefits for each of the employees participating in the plan, or based on a formula for determining the amount to be contributed by the employer and the individual benefits which is consistent with the purposes of the plan or trust, then § 778.215(a)(3) is satisfied as well. IRA and HSA accounts must be with a trustee or custodian, and so employer contributions would also satisfy § 778.215(a)(4)'s requirement that employer contributions must be "paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust, or other funded arrangement." Finally, IRAs and HSAs permit participants to withdraw cash for purposes unrelated to retirement or medical benefits, but participants must pay an additional tax on those withdrawals.[233] The additional tax ensures that any cash payments are incidental to retirement and/or health benefits, and so both types of accounts satisfy the incidental-payment requirement of § 778.215(a)(5). Accordingly, the Department believes employer contributions to an IRA or HSA under these circumstances would be excludable from the regular rate.

Discretionary employer contributions to a retirement plan may also be excludable, provided that the retirement plan otherwise satisfies § 778.215(a)(1), (2), (4), and (5). Many retirement plans, such as section 401(k) profit-sharing plans, grant employers discretion to make additional contributions at the end of a plan year. The Department's opinion letter dated August 17, 1970, explained that § 778.215(a)(3) requires the amounts of such discretionary contributions to be based on a definite formula.[234] A plan that simply provides that "[t]he Board of Directors of the company at its discretion may make a greater or lesser contribution for any plan year" would fall short.[235] But a plan that enables employers to make discretionary contributions based on a formula that "quantifies each variable" and "describes those variables' relation to each other" would satisfy the definite formula requirement.[236]

### *D. Overtime Premiums Under Sections 7(e)(5)–(7)*

FLSA sections 7(e)(5), (6), and (7) permit employers to exclude from the regular rate certain overtime premium payments made for hours of work on special days or in excess or outside of specified daily or weekly standard work periods.[237] More specifically, section 7(e)(5) permits exclusion of premiums for "hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee [under section 7(a)] or in excess of the employee's normal working hours or regular working hours, as the case may be[.]" [238] Section 7(e)(6) permits exclusion of premiums "for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days[.]" [239] Section 7(e)(7) permits exclusion of premiums in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such

---

[226] *Id.*

[227] *Id.* at *2 (emphasis added).

[228] *Id.*

[229] *See Local 246 Util. Workers Union of Am.* v. *S. California Edison Co.*, 83 F.3d 292, 296 (9th Cir. 1996) ("Section 207(e)(4) deals with contributions by the employer [to a trust or third person], not payments to the employee.").

[230] *Reich*, 57 F.3d at 578; *see also Flores*, 824 F.3d at 900–01.

[231] Most employer-funded IRAs are SIMPLE and SEP plans that, as explained above, may be presumed to satisfy the requirements of § 778.215(a)(1), (2), (4), and (5). Employer contributions to other IRAs that are described in Internal Revenue Code section 219(f)(5) fall outside this presumption and those contributions must be analyzed in accordance with all five elements of § 778.215(a).

[232] 26 U.S.C. 223.

[233] The additional tax is 10 percent for an early withdrawal from an IRA and 20 percent for an HSA.

[234] WHD Opinion Letter FLSA, 1970 WL 26444, at *1 ("The plan fails to meet the formula requirements of § 778.215(a)(3) of Part 778, in that it does not contain a definite formula for determining the amount to be contributed by the employer.").

[235] *Id.*

[236] *Russell*, 2018 WL 1210763, at *8; *see also Laughlin*, 2019 WL 1440406, at *7.

[237] 29 U.S.C. 207(e)(5)–(7).

[238] 29 U.S.C. 207(e)(5).

[239] 29 U.S.C. 207(e)(6).

employee under subsection 7(a), where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek.[240] Additionally, section 7(h)(2) provides that extra compensation of the types described in sections 7(e)(5), (6), and (7) is creditable toward overtime compensation owed under section 7(a).[241] These are the only types of compensation excludable from the regular rate that are also creditable toward overtime compensation.[242]

Sections 778.202, 778.203, 778.205, and 778.207 explain the requirements for excluding from the regular rate the overtime premiums described in sections 7(e)(5) and (6).[243] Sections 778.202 and 778.202(e) refer to extra premium payments paid pursuant to contracts.[244] Similarly, § 778.205 uses an example of an extra premium payment paid pursuant to an employment ''agreement,'' [245] and § 778.207(a) refers to ''contract premium rates[.]'' [246]

The Department proposed amending §§ 778.202 and 778.205 to remove references to employment agreements and contracts in those sections to eliminate any confusion that the overtime premiums described in sections 7(e)(5) and (6) may be excluded only under written contracts or agreements. The NPRM explained that these proposed regulatory clarifications were consistent with sections 7(e)(5) and (6) of the FLSA, neither of which requires that the overtime premiums be paid pursuant to a formal employment contract or collective bargaining agreement. Those statutory exclusions contrast with section 7(e)(7), which explicitly requires ''an employment contract or collective-bargaining agreement'' to exclude premiums ''for work outside of the hours established in good faith by the contract or work agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek[.]'' [247] Exclusion of premium payments under sections 7(e)(5) and (6) turns on deviation from the employee's normal work schedule. The NPRM further explained that the proposed removal of the word ''contract'' from the regulations did not change the fact that, while there need not be a formal contract or agreement under sections 7(e)(5) or (6), there must be a discernable schedule of hours and days worked from which the excess or nonregular hours for which the overtime premiums are paid are distinguishable.[248] Relatedly, the Department also proposed to amend § 778.207 to refer to the ''premium payments'' instead of ''contract premium rates.'' The NPRM noted that the proposed change was consistent with the description of the overtime premiums found in § 778.201 and removes any implication that all of the overtime premium payments must be paid pursuant to a formal contract.

The Department noted in the NPRM that, while the regulations at §§ 778.202, 778.205, and 778.207 have, since 1950, referred to employment contracts and agreements when describing the types of overtime premiums excludable under sections 7(e)(5) and (6),[249] the Department has not interpreted the use of the words ''contract'' or ''agreement'' to limit excludable overtime premium payments to only those paid pursuant to a formal contract or collective bargaining agreement.[250] The Department has historically evaluated the actual practice of the parties to determine if extra payments are true overtime premiums that are excludable from the regular rate.[251] In the initial publication of part 778 in 1948, for example, the Department emphasized the primacy of ''actual practice'' over any contractual terms when assessing whether extra payments were true overtime premiums that could be excluded from the regular rate.[252]

The NPRM further noted that, consistent with the Department's practice, most courts have not required employers using the exclusions in sections 7(e)(5) and (6) to establish the existence of any formal contract or agreement with employees.[253] Even apart from sections 7(e)(5) and (6), courts interpreting the FLSA do not generally require that contracts be in writing (unless specifically required by statute), and they likewise emphasize the importance of the employer's actual practices in determining whether a pay practice complies with the FLSA.[254]

A few commenters addressed these proposals. *See* Fisher Phillips; CWC; Seyfarth; SHRM; NELA; NELP; EPI. While employers and their representatives were generally supportive of the proposed revisions, three employee groups disagreed with the proposal to remove the word ''contract'' from §§ 778.202 and 778.205. NELP and EPI suggested that instead of eliminating the word ''contract,'' the Department should instead consider adding additional terms such as ''contract, handbook, policy, or explicit agreement or understanding.'' Similarly, NELA suggested that the Department replace the word ''contract'' with the phrase ''contract, agreement or understanding.''

In response to the comments received, the Department has adopted the

[240] 29 U.S.C. 207(e)(7).

[241] 29 U.S.C. 207(h)(2).

[242] 29 CFR 778.201(c).

[243] *See id.* § 778.202, 778.203, 778.205, 778.207.

[244] *See id.* § 778.202(a), (b), (e).

[245] *Id.* § 778.205.

[246] *Id.* § 778.207(a).

[247] 29 U.S.C. 207(e)(7).

[248] Section 7(e)(5) allows exclusion of premiums for hours ''in excess of the employee's normal working hours or regular working hours'' and sections 7(e)(6) permits exclusion of premiums for work on regular days of rest or on the sixth or seventh day of the workweek. Thus, exclusion under these provisions requires a discernable schedule.

[249] *See* 15 FR 623–02 (the precursor to §§ 778.202, 778.205, and 778.207 was located in § 778.5 in the 1950 version of the regulations).

[250] The FOH sections discussing sections 7(e)(5) and (6) overtime premiums make no reference to the need for a contract, and instead instruct investigators to look to the employee's normal hours or days of work ''as established by agreement or practice.'' FOH 32e01; *see also id.* 32e04 (describing criteria for 207(e)(6) overtime premium for work on special days without any reference to a requirement that the compensation be paid pursuant to contract).

[251] *See* 13 FR 4534–01 (Aug. 6, 1948) (codified at 29 CFR 778.2 (1948)).

[252] *Id.* Those regulations stated that ''[t]he mere fact that a contract calls for premium payments for work on Saturdays, Sundays, holidays or at night would not necessarily prove that the higher rate is [a non-excludable shift differential] paid merely because of undesirable working hours if, as a matter of fact, the actual practice of the parties shows that the payments are made because the employees have previously worked a specified number of hours or days, according to a bona fide standard.''

[253] *See Fulmer* v. *City of St. Albans, W. Va.*, 125 Fed. App'x 459, 461 (4th Cir. Jan. 7, 2005) (holding that city properly excluded overtime premiums from regular rate under 207(e)(5) even though the premiums were not included in employment contract and were mentioned only during the employment interview); *Hesseltine* v. *Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 522 (E.D. Tex. 2005) (''If an employer voluntarily pays an employee a premium rate contingent upon his working more than eight hours in one day, then such payment may be excluded from the employee's regular rate and credited toward unpaid overtime.''); *Laboy* v. *Alex Displays, Inc.*, No. 02 C 8721, 2003 WL 21209854, at *4 (N.D. Ill. May 21, 2003) (''The court need not determine whether the parties had an agreement for purposes of [section] 7(e)(7) because the payments must be excluded from the regular rate under [section] 7(e)(5)[.]'').

[254] *See Bay Ridge*, 334 U.S. at 464 (''As the regular rate cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee, it must be drawn from what happens under the employment contract.''); *Singer* v. *City of Waco, Tex.*, 324 F.3d 813, 824 (5th Cir. 2003) (same); *see also 149 Madison Ave. Corp.* v. *Asselta*, 331 U.S. 199, 204 (1947) (''[I]n testing the validity of a wage agreement under the Act the courts are required to look beyond that which the parties have purported to do.'') (citing *Walling* v. *Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424–25 (1945) (''Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts.'')).

suggestion to replace the term "employment contracts" in § 778.202 and "agreement of employment" in § 778.205 with "written or unwritten employment contract, agreement, understanding, handbook, policy, or practice." This language achieves the original objective of clarifying that overtime premiums do not need to be made pursuant to a written contract or agreement to be excluded under these sections, while also recognizing that they must still be paid pursuant to some form of legitimate agreement or understanding.

*E. Clarification That Examples in Part 778 Are Not Exclusive*

As explained in the NPRM, the Department recognizes that compensation practices can vary significantly and will continue to evolve. In general, the FLSA does not restrict the forms of "remuneration" that an employer may pay—which may include an hourly rate, salary, commission, piece rate, a combination thereof, or any other method—as long as the regular rate is equal to at least the applicable minimum wage and non-exempt employees are paid any overtime owed at one and one-half times the regular rate. While the eight categories of excludable payments enumerated in section 7(e)(1)–(8) are exhaustive,[255] the NPRM proposed to confirm in § 778.1 that, unless otherwise indicated, part 778 does not contain an exhaustive list of permissible or impermissible compensation practices. Rather, it provides examples of regular rate and overtime calculations that, by their terms, may or may not comply with the FLSA, and the types of compensation excludable from regular rate calculations under section 7(e). Because it is impossible to address all of the various compensation and benefits arrangements that may exist between employers and employees, both now and in the future, the NPRM proposed to specify in § 778.1 that the examples set forth in part 778 of the types of payments that are excludable under section 7(e)(1)–(8) are not exhaustive; there may be other types of payments not discussed or used as examples in part 778 that nonetheless qualify as excludable payments under section 7(e)(1)–(8).

The Department received a number of comments on this clarification, all in support. *See, e.g.,* Associated Builders and Contractors; AHLA; Chamber. Two of these commenters requested that the Department clarify that employers may pay via any method without changing the regular rate calculation and asked the Department to identify alternatives to the examples provided in the regulations. *See* PPWO; SHRM. The Department believes that the proposed language of § 778.1 accomplishes this, stating specifically that "the FLSA does not restrict the forms of 'remuneration' that an employer may pay . . . as long as the regular rate is equal to at least the applicable minimum wage and compensation for overtime hours worked is paid at the rate of at least one and one-half times the regular rate." Furthermore, while the NPRM proposed to update and add examples in part 778, the proposed language of § 778.1(b) makes clear that it is not feasible to address all of the various types of compensation practices that may exist. Proposed § 778.1(b) accordingly clarifies that the examples in part 778 are not an exhaustive list of permissible or impermissible compensation practices under section 7(e) of the Act unless otherwise clearly indicated. Therefore, the Department adopts the changes to § 778.1 as proposed. Additionally, the Department changes the title of § 778.1 and makes non-substantive edits to modernize the introductory statement.

*F. Basic Rate Calculations Under Section 7(g)(3)*

Section 7(g) of the FLSA identifies three circumstances in which an employer may calculate overtime compensation using a basic rate rather than the regular rate, provided that the basic rate is established by an agreement or understanding between the employer and employee, reached before the performance of the work.[256] The third of these, identified in section 7(g)(3), allows for the establishment of a basic rate of pay when the rate is "authorized by regulation by the Administrator as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time[.]"[257] Part 548 addresses the requirements for using such basic rates to compute overtime pay under section 7(g)(3).[258]

Section 548.2 provides ten requirements for using a basic rate when calculating overtime compensation.[259] Section 548.3 discusses six different authorized basic rates that may be used if the criteria in § 548.2 are met.[260] Section 548.300 explains that these basic rates "have been found in use in industry and the Administrator has determined that they are substantially equivalent to the straight-time average hourly earnings of the employee over a representative period of time."[261] As relevant to this rulemaking, the current regulation at § 548.3 authorizes a basic rate that excludes "additional payments in cash or in kind which, if included in the computation of overtime under the Act, would not increase the total compensation of the employee by more than 50 cents a week on the average for all overtime weeks . . . in the period for which such additional payments are made."[262] Section 548.305(b) explains that, under § 548.3(e), upon agreement or understanding between an employer and employee, the basic rate may exclude from the computation of overtime "certain incidental payments which have a trivial effect on the overtime compensation due."[263] This section provides a nonexhaustive list of examples of payments that have such a trivial effect on the overtime compensation due and therefore may be excluded from the basic rate, including "modest housing," "bonuses or prizes of various sorts," and compensation "for soliciting or obtaining new business."[264] Section 548.305 also provides examples with specific amounts of additional payments to illustrate the application of § 548.3(e).[265] The $0.50 amount is also referenced in § 548.400(b). The Department last updated these regulations more than 50 years ago, in 1966.[266]

The Department proposed to update the $0.50 amount in §§ 548.3, 548.305, and 548.400. Rather than provide a specific dollar or cent amount, however, the Department proposed to replace the $0.50 language in these regulations with "40 percent of the applicable hourly minimum wage under section 6(a) of the Act." The Department explained that

[255] *See, e.g., Smiley*, 839 F.2d at 330; *Caraballo* v. *City of Chicago*, 969 F. Supp. 2d 1008, 1015 (N.D. Ill. 2013); *see also* 29 CFR 778.200(c).

[256] *See* 29 U.S.C. 207(g).

[257] *Id.* 207(g)(3). By contrast, section 7(g)(1) allows for a basic rate to be established for employees employed at piece rates, and section 7(g)(2) allows for a basic rate to be established for employees performing two or more kinds of work for which different hourly or piece rates apply. *Id.* 207(g)(1)–(2). Only the basic rate provided by section 7(g)(1) is limited to employees paid on a piece rate basis. The Department proposed to clarify the cross reference in § 548.1 to the regulations for sections 7(g)(1) and (2), which are at 29 CFR 778.415 through 778.421. No comments addressed this proposal. Therefore, the final rule adopts § 548.1 as proposed.

[258] *See* 29 CFR 548.1; *see also id.* §§ 778.400 through 778.401.

[259] *See id.* § 548.2.

[260] *See id.* § 548.3.

[261] *Id.* § 548.300.

[262] *Id.* § 548.3(e).

[263] *Id.* § 548.305(b).

[264] *Id.* § 548.305(b).

[265] *See id.* § 548.305(c), (d), (f).

[266] *See* 31 FR 6769.

this is the same methodology that the Department used in the past to update the threshold. In 1955, the Department set the threshold for excludable amounts in § 548.3(e) at $0.30—which, at the time, was 40 percent of the hourly minimum wage required under the FLSA ($0.75 per hour).[267] Similarly, in 1966, after the minimum wage increased to $1.25 per hour, the Department correspondingly increased the threshold amount in § 548.3(e) to $0.50—which, again, was 40 percent of the hourly minimum wage at the time.[268] The current minimum wage is $7.25 per hour, and 40 percent of $7.25 is $2.90. To avoid the need for future rulemaking in response to any further minimum wage increases, however, the Department proposed to replace the current $0.50 references in §§ 548.3(e), 548.305, and 548.400(b) with ''40 percent of the applicable minimum hourly wage under section 6(a) of the Act.'' Relatedly, the Department also proposed to update the examples provided in § 548.305(c), (d), and (f) with updated dollar amounts, and to fix a typographical error in § 548.305(e) by changing the phrase ''would not exceed'' to ''would exceed.'' The Department specifically invited comment as to (1) whether the additional payments that are excludable if they would not increase total overtime compensation should be tied to a percentage of the applicable minimum wage under the FLSA, or a percentage of the applicable minimum wage under state or Federal law; and (2) whether 40 percent of the applicable minimum wage is an appropriate threshold, or if this proposed percentage should be increased or decreased.

A few commenters addressed these basic rate proposals. *See* Chamber; PPWO; SHRM; NPELRA. The Chamber noted with approval that the proposal modernized certain aspects of this regulation while ''hewing closely to the Department's historical approach.'' It also commented that the proposal to use a percentage of the applicable minimum wage rather than a fixed dollar amount ''makes sense.'' While generally supportive of the proposal to update this regulation, PPWO and SHRM commented that the 40 percent amount was too low and suggested that the amount be raised to ten dollars or more per week. In response to the Department's question regarding tying the percentage of the applicable minimum wage under the FLSA or under state or Federal law, the Chamber suggested that the final rule reference state law as well as Federal law, commenting that ''[w]hether payments count as trivial will rise with the employee's minimum compensation.'' NPELRA appreciated the proposal, but noted that very few public employers use section 7(g)(3)'s basic rate calculations and asked that the regulations implementing 7(g)(3) be further amended to take account of the unique work schedules for law enforcement and fire protection personnel and the partial overtime exemption for such personnel in 29 U.S.C. 207(k) of the FLSA. No comments were received that opposed the proposed changes.

In response to the comments received, the Department has finalized the regulations in part 548 as proposed, with a modification to the regulatory text to reference the minimum wage under either the FLSA or state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher. The Department agrees with the Chamber that the proper measure of whether these additional payments may be excluded from the basic rate calculation should be based on the higher state or local minimum wage. While the Chamber did not specifically reference local minimum wage laws, the rationale for including state laws setting a higher minimum wage is equally applicable to local laws setting a minimum wage higher than the FLSA minimum wage. Therefore, the final rule references the minimum wage under either the FLSA or state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher. The Department continues to believe that 40 percent of the applicable minimum wage, the ratio that the Department has historically used for this regulation, is the proper threshold for exclusion of incidental payments from the basic rate and therefore declines to adopt the suggestion to raise the amount to ten dollars or more per week. The Department also declines to modify these regulations to account for the partial overtime exemption for employees engaged in law enforcement and fire protection because such a request is outside of the scope of the Department's proposal.

Several commenters asked the Department for clearer guidance regarding treatment of furnished meals under the regular rate. *See* PPWO; HR Policy Association; Chamber. While the cost of meals provided by an employer must be included in the regular rate,[269] where an employer is paying its employees pursuant to an authorized basic rate under section 7(g)(3) of the FLSA and that section's implementing regulations in part 548, the cost of a single meal per workday provided by an employer need not be included in the basic rate.[270] Nonetheless, the Department recognizes there is an apparent tension between its authorized basic rate regulations, which allow for the exclusion from overtime calculations of a customarily furnished employer-provided single daily meal,[271] and section 3(m), which indicates that employer-provided meals are wages that must be included in overtime calculations.[272] As stated in the basic rate regulations published in 1956 after notice and comment, an employer may, when calculating overtime compensation due, exclude from the basic rate the cost of providing one free daily meal to employees upon agreement between the employer and said employees. The regulations explain this authorization is based on ''the Administrator's experience that the amount of additional overtime compensation involved in such cases is trivial and does not justify the bookkeeping required in computing it.'' [273] This remains true today. While there may be tension between section 3(m) and the part 548 authorized basic rate regulations with regards to exclusion of meals from overtime calculations upon agreement of the employer and employees, part 531 is outside the scope of this rulemaking and thus no changes will be made at this time.

### IV. Paperwork Reduction Act

The Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.*, and its attendant regulations, 5 CFR part 1320, require the Department to consider the agency's need for its information collections and their practical utility, the impact of paperwork and other information collection burdens imposed

[267] *See* 20 FR 5679.

[268] *See* 31 FR 4149 (Mar. 9, 1966); 31 FR 6769.

[269] *See* 29 U.S.C. 203(m) (defining wage to include, among other things, ''board''); 29 CFR 531.32 (noting examples of meals furnished under certain circumstances are wages under section 3(m)); 29 CFR 778.116 (''Where payments are made to employees in the form of goods or facilities which are regarded as part of wages, the reasonable cost to the employer or the fair value of such goods or of furnishing such facilities must be included in the regular rate.''); 29 CFR 778.224 (''It is clear that the [other similar payments] clause was not intended to permit the exclusion from the regular rate of payments such as . . . the furnishing of facilities like board and lodging which, though not directly attributable to any particular hours of work are, nevertheless, clearly understood to be compensation for services.'').

[270] *See* 29 CFR 548.3(d), 548.304.

[271] 29 CFR 548.3(d); 29 CFR 548.304.

[272] 29 CFR 531.32; 29 CFR 778.116.

[273] 29 CFR 548.304(b).

on the public, and how to minimize those burdens. This final rule does not require a collection of information subject to approval by the Office of Management and Budget (OMB) under the PRA, or affect any existing collections of information. The Department did not receive any comments on this determination.

**V. Executive Order 12866, Regulatory Planning and Review; and Executive Order 13563, Improved Regulation and Regulatory Review**

*A. Introduction*

Under E.O. 12866, OMB's Office of Information and Regulatory Affairs (OIRA) determines whether a regulatory action is significant and, therefore, subject to the requirements of the E.O. and OMB review.[274] Section 3(f) of E.O. 12866 defines a ''significant regulatory action'' as an action that is likely to result in a rule that: (1) Has an annual effect on the economy of $100 million or more, or adversely affects in a material way a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as economically significant); (2) creates serious inconsistency or otherwise interferes with an action taken or planned by another agency; (3) materially alters the budgetary impacts of entitlement grants, user fees, or loan programs, or the rights and obligations of recipients thereof; or (4) raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the E.O. OIRA has determined that this rule is significant under section 3(f) of E.O. 12866.

E.O. 13563 directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; that it is tailored to impose the least burden on society, consistent with achieving the regulatory objectives; and that, in choosing among alternative regulatory approaches, the agency has selected the approaches that maximize net benefits. E.O. 13563 recognizes that some benefits are difficult to quantify and provides that, when appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

[274] *See* 58 FR 51735 (Sept. 30, 1993).

*B. Economic Analysis*

This economic analysis provides a quantitative analysis of regulatory familiarization costs attributable to the final rule and a qualitative analysis of other potential benefits, cost savings, and transfers. This includes a discussion of benefits resulting from reduced litigation. As described above, this rule clarifies existing regulations for employees and employers in the 21st-century workplace with modern forms of compensation and benefits. The Department believes that these updates will provide clarity and flexibility for employers interested in providing such benefits to their employees.

1. Overview of Changes

This final rule makes several changes to the existing regulatory language in 29 CFR part 778 to update and clarify the FLSA's regular rate requirements, and makes a change to 29 CFR part 548 addressing a ''basic rate'' that can be used to calculate overtime compensation under section 7(g)(3) of the FLSA when specific conditions are met. Specifically, this final rule includes the following:

- Clarification in § 778.219 that payments for unused paid leave, including paid sick leave, may be excluded from an employee's regular rate of pay;
- Clarification in §§ 778.218(b) and 778.320 that pay for time that would not otherwise qualify as ''hours worked,'' including bona fide meal periods, may be excluded from an employee's regular rate unless an agreement or established practice indicates that the parties have treated the time as hours worked;
- Clarification in § 778.217 that reimbursed expenses need not be incurred ''solely'' for the employer's benefit for the reimbursements to be excludable from an employee's regular rate;
- Clarification in § 778.217 that certain reimbursements are per se reasonable and excludable from the regular rate;
- Elimination of the restriction in §§ 778.221 and 778.222 that ''call-back'' pay and other payments similar to call-back pay must be ''infrequent and sporadic'' to be excludable from an employee's regular rate, while maintaining that such payments must not be prearranged;
- Addition of regulatory text in §§ 778.220, 778.222, and 778.223 addressing exclusion from the regular rate of payments to employees pursuant to state and local scheduling laws;
- Inclusion of additional examples in § 778.224 of employer provided perks or benefits that may be excluded from an employee's regular rate of pay as ''other similar payments'';
- Clarification in § 778.215 of the types of benefit plans that are excludable as ''similar benefits for employees'' under section 7(e)(4) and other additions;
- Clarification in §§ 778.202, 778.203, 778.205, and 778.207 that employers do not need a prior contract or agreement with the employee(s) to exclude certain overtime premiums described in sections 7(e)(5) and (6) of the FLSA;
- Clarification and examples in § 778.211 of discretionary bonuses that are excludable from an employee's regular rate of pay under section 7(e)(3) of the FLSA;
- Adoption of the interpretation that some longevity and sign-on bonuses, when certain requirements are met, qualify as gifts under § 778.212 and may be excludable from the regular rate;
- Clarification in § 778.1 that the examples of compensation discussed in part 778 of the types of excludable payments under section 7(e)(1)–(8) are not exhaustive; and
- An increase from $0.50 to a weekly amount equivalent to 40 percent of the applicable hourly minimum wage under the FLSA (currently $2.90, or 40 percent of $7.25) or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, the amount by which total compensation would not be affected by the exclusion of certain additional payments when using the ''basic rate'' to compute overtime provided by § 548.3(e).

To measure potential costs, cost savings, benefits, and transfers relative to a baseline of current practice, the Department has attempted to distinguish between specific components that will change existing requirements, and those that will merely clarify existing requirements. Here, the Department believes that only two of the components listed above constitute changes to existing regulatory requirements: (1) Increasing the threshold for exclusion of certain payments when using the ''basic rate'' to compute overtime under § 548.3(e), from $0.50 to a weekly amount equivalent to 40 percent of the hourly minimum wage under the FLSA (currently $2.90, or 40 percent of $7.25) or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher; and (2) eliminating the restriction in §§ 778.221 and 778.222 that call-back pay and similar payments must be ''infrequent and sporadic'' to be excludable from the regular rate, while

maintaining that such payments must not be prearranged. Both of these changes are deregulatory in nature.

The Department believes that all of the remaining changes clarify existing requirements. Thus, none of the changes in this final rule will impose any new regulatory requirements, or require any regulated entity (*i.e.,* any employer) to change its conduct to remain in compliance with the law.

2. Potential Costs

The only potential costs attributable to this final rule are regulatory familiarization costs. Familiarization costs represent direct costs to businesses associated with reviewing any changes to regulatory requirements caused by a final rule. Familiarization costs do not include recurring compliance costs that regulated entities would incur with or without a rulemaking.[275] The Department calculated regulatory familiarization costs by multiplying the estimated number of firms likely to review the final rule by the estimated time to review the rule and the average hourly compensation of a Compensation, Benefits, and Job Analysis Specialist.

To calculate the cost associated with reviewing the rule, the Department first estimated the number of firms likely to review the final rule.[276] According to the data from the U.S. Census Bureau's Statistics of U.S. Businesses (SUSB), there are a total of 5,954,684 firms in the United States.[277] The SUSB data shows that 3,665,182 firms have four or fewer employees.[278] These small-sized firms are less likely than larger firms to offer perks or benefits similar to those addressed in this rulemaking (*e.g.,* wellness programs, on-site medical or specialty treatment, and so forth) and are typically exempt from legislation mandating paid sick leave or scheduling-related premium pay.[279] Thus, the Department believes that firms with fewer than five employees are unlikely to review this final rule. For the purposes of estimating familiarization costs across all firms, the Department believes that the 2,289,502 firms with five or more employees—approximately 38 percent of all 6.0 million firms—represent a reasonable proxy estimate of the total number of interested firms expected to dedicate time learning about the final rule.

Next, the Department estimated the time interested firms will likely take to review the rule. Because the majority of the changes are merely clarifications of existing regulatory requirements, the Department estimates that it will take an *average* of approximately 15 minutes for each interested firm to review and understand the changes in the rule. Some firms might spend more than 15 minutes reviewing the final rule, while others might take less time; the Department believes that 15 minutes is a reasonable estimated average for all interested firms.

Finally, the Department estimated the hourly compensation of the employees who will likely review the final rule. The Department assumes that a Compensation, Benefits, and Job Analysis Specialist (Standard Occupation Classification 13–1141), or an employee of similar status and comparable pay, will review the rule at each firm. The mean hourly wage of a Compensation, Benefits, and Job Analysis Specialist is $32.65.[280] The Department adjusted this base wage rate to reflect fringe benefits such as health insurance and retirement benefits, as well as overhead costs such as rent, utilities, and office equipment. The Department used a fringe benefits rate of 46 percent of the base rate and an overhead rate of 17 percent of the base rate, resulting in a fully loaded hourly compensation rate for Compensation, Benefits, and Job Analysis Specialists of $53.22 (= $32.65 + ($32.65 × 46%) + ($32.65 × 17%)).[281] The Department notes that employers have compliance responsibilities under existing regular rate standards, and any changes in responsibilities associated with this final rule may, therefore, be absorbed by existing staff. Consistent with other WHD rulemakings, the Department has used a 17 percent overhead rate in this calculation.

Therefore, regulatory familiarization costs in Year 1 for interested firms are estimated to be $30,461,538 (= 2,289,502 firms × 0.25 hours of review time × $53.22 per hour), which amounts to a 10-year annualized cost of $3,571,022 at a discount rate of 3 percent (which is $1.56 per firm) or $4,337,038 at a discount rate of 7 percent (which is $1.89 per firm).

This final rule will not impose any new requirements on employers or require any affirmative measures for regulated entities to come into compliance; therefore, there are no other costs attributable to this final rule.

3. Potential Cost Savings

The Department believes that this final rule could lead to potential cost savings. The clarifications and updated examples included in this final rule may reduce the amount of time employers spend attempting to understand their obligations under the law. For example, employers interested in providing an employee discount program, a wellness program, or onsite exercise opportunities will know immediately from the language included in § 778.224 that the cost of providing such programs may be excluded from the regular rate, thereby avoiding the need for further research on the issue. In addition, the two updates that constitute changes to the regulations will also achieve cost savings. For example, the Department expects that the changes to the basic rate regulations will permit employers that use a basic rate plan to give employees additional incidental payments without concern about the impact on their overtime obligations. Increasing the amount by which total compensation would not be affected by the exclusion of certain additional payments when using the "basic rate" to compute

[275] For example, time and resources spent on an annual basis to train staff on FLSA compliance are not familiarization costs attributable to any particular rulemaking, because an employer incurs these kinds of recurring costs regardless of whether specific parts of the regulations have been recently amended. To the extent that this rule would make certain regulatory requirements easier to understand, the rule may achieve a reduction in these recurring compliance costs.

[276] The Department assumes that familiarization for this rulemaking will generally occur at the headquarters of each interested firm, rather than at the establishment level. According to a recent survey, just eight percent of surveyed employers reported that their benefits are administered locally at different "locations." *See* Soc'y for Human Res. Mgmt., 2017 Employee Benefits: Remaining Competitive in a Challenging Talent Marketplace, *https://www.shrm.org/hr-today/trends-and-forecasting/research-and-surveys/Documents/2017%20Employee%20Benefits%20Report.pdf.*

[277] U.S. Census Bureau, 2016 Statistics of U.S. Businesses (SUSB) Annual Data Tables by Establishment Industry, *https://www.census.gov/data/tables/2016/econ/susb/2016-susb-annual.html.*

[278] *Id.*

[279] For example, none of the predictable scheduling ordinances passed in Chicago, New York City, Philadelphia, San Francisco, and Seattle apply to employers with fewer than 20 employees. *See, e.g.,* Chi., Ill., Fair Workweek Ordinance (July 24, 2019) (effective July 1, 2020); N.Y.C., N.Y., Admin. Code 20–1222 (2017) (applying to retail employers with at least 20 employees and fast food employers with at least 30 affiliated enterprise or franchise establishments); Phila., Pa., Code ch. 9–4600 (2018) (effective Jan. 1, 2020); S.F., Cal., Police Code art. 33G, 3300G.3 (2015) (applying to retail employers with at least 20 employees); Seattle, Wash., Mun. Code 14.22.050 (2017) (applying to retail, food service, and full-service restaurant employers with at least 500 employees). Similar coverage thresholds apply to employers under state paid sick leave laws in Maryland (15 employees), Oregon (10 employees with smaller employers required to provide equivalent unpaid sick leave), and Rhode Island (18 employees with smaller employers required to provide equivalent unpaid sick leave). *See* Md. Code, Labor & Emp't sec. 3–1304 (West 2019); Or. Rev. Stat. sec. 653.606; R.I. Gen. Laws sec. 28–57–4(c).

[280] Estimate based on the BLS's May 2018 Occupational Employment Statistics, *https://www.bls.gov/oes/current/oes131141.htm.*

[281] Rounded to the nearest whole cent.

overtime will both eliminate avoidable litigation and expand the circumstances in which employers that meet the requirements to use a basic rate may exclude ''certain incidental payments which have a trivial effect on the overtime compensation due.''

The Department expects that these cost savings will outweigh regulatory familiarization costs. Unlike familiarization costs, the potential cost savings described in this section will continue into the future, saving employers valuable time and resources.

The Department is unable to provide quantitative estimates for cost savings and other potential effects of the final rule due to a lack of data and uncertainty regarding employer responses to the changes. Employers are not generally required to report to the Department their use of these regulatory provisions, and to the Department's knowledge, there is no publicly available data on items such as employers' use of basic rate calculations to calculate overtime due.

The Department is unable to provide quantitative estimates for other potential effects of the final rule due to a lack of data and uncertainty regarding employer responses. The Department did not receive any public comments providing data or information to quantify cost savings.

4. Potential Benefits

This section analyzes the potential benefits of the rule. The Department is unable to provide quantitative estimates for these potential benefits due to a lack of data and uncertainty regarding potential employer responses to the final rule. The Department does not know, for example, how many employers will begin offering wellness programs or other benefits to their employees as a result of this rule. The Department did not receive any public comments providing data or information to quantify benefits.

Distinct from the potential cost savings described above, the rule will likely yield benefits. The Department expects that the added clarity that this rule provides will encourage some employers to start providing benefits that they may presently refrain from providing due to apprehension about potential overtime consequences. These newly provided benefits might have a positive impact on workplace morale, employee health, employee compensation, and employee retention.

For example, the Department has added ''the cost to the employer of providing wellness programs, such as health risk assessments, biometric screenings, vaccination clinics (including annual flu vaccinations), nutrition classes, weight loss programs, smoking cessation programs, stress reduction programs, exercise programs, and coaching to help employees meet health goals'' to the list of miscellaneous payments excludable from the regular rate provided in § 778.224(b). If employers know they can offer wellness programs without the threat of potentially protracted class or collective action litigation and without potentially having to track employee participation in these activities for purposes of calculating the regular rate, employers might feel more encouraged to offer such programs. An increase in the provision of wellness programs similar to those described in this rule (*e.g.,* smoking cessation programs, vaccine clinics, and so forth) may improve worker health and reduce healthcare costs.[282] Such improvements benefit both the worker and the employer with added value to each.

The final rule will also provide employers greater flexibility and incentivizes greater creativity in their employee-benefits practices. This room to innovate may help workers and increase retention and productivity by allowing employers the chance to provide unique benefits that their employees want and that improve workers' physical and mental health, work environment, and morale. As noted earlier in this final rule, the Department cannot feasibly list every permissible benefit that employers may provide employers, and employers may create new and desirable benefits in the future. But the Department believes that the changes made here will foster that innovation.

In addition, the Department believes that clarifying the regulations will prevent many avoidable ''regular rate'' disputes. For example, the omission of unused sick leave in the current version of § 778.219 could be responsible for disputes over whether payments for unused sick leave should be included in the regular rate. Although the Department's amendment to § 778.219 simply reflects the Department's current guidance, the added clarity provided by changing the text of the regulations might prevent future expenses stemming from avoidable workplace disputes. Due to uncertainty regarding the costs and prevalence of FLSA-related settlement agreements, arbitration actions, and state court filings, the Department has only estimated cost savings attributable to an expected reduction in Federal FLSA regular rate lawsuits—which may represent only a fraction of all regular rate litigation.

To estimate the number of Federal lawsuits that the final rule may prevent, the Department first attempted to determine the percentage of FLSA lawsuits that predominantly or exclusively feature a ''regular rate'' dispute. Here, the Department studied two sets of data. First, the Department examined a randomly selected sample of Federal FLSA court filings from 2014 taken from the U.S. Court's Public Access to Court Electronic Records (PACER). After reviewing each of the 500 FLSA cases in this sample for relevant information, the Department found that 6.8 percent of the cases (34 out of 500) primarily featured a regular rate dispute.[283] To corroborate the PACER data, the Department separately reviewed a sample of 258 Federal court decisions from 2017 involving FLSA collective action certification claims,[284] and found that 3.9 percent of these cases primarily centered around a regular rate dispute (10 out of 258). Considering these two different percentages, the Department takes an approximate average and conservatively assumes that approximately five percent of all FLSA cases primarily or exclusively involve a regular rate dispute.

According to the Transactional Records Access Clearinghouse, 25,605 Federal FLSA lawsuits were filed in Fiscal Years 2015, 2016, and 2017, averaging 8,535 lawsuits per year.[285] Assuming there are approximately 8,535 FLSA lawsuits per year, the Department estimates that about 427 cases, or 5 percent of 8,535, primarily or exclusively involve a regular rate

[282] According to a recent survey, 88 percent of employers with a wellness program rated their initiatives as somewhat or very effective in improving employee health, while 77 percent indicated their wellness program was somewhat or very effective in reducing health care costs. *See* Soc. for Human Res. Mgmt., 2017 Employee Benefits: Remaining Competitive in a Challenging Talent Marketplace, *https://www.shrm.org/hr-today/trends-and-forecasting/research-and-surveys/Documents/2017%20Employee%20Benefits%20Report.pdf.*

[283] The Department downloaded data on 521 cases; however, 21 of these provided no information because they were administratively closed, voluntarily dismissed, closed due to deficiencies, or a notice of removal was filed. This left a sample of 500 usable cases.

[284] Seyfarth Shaw LLP, 14th Annual Workplace Class Action Litigation Report 127–270 (2018), *https://www.seyfarth.com/dir_docs/publications/2018_workplace_class_action_report.pdf.*

[285] TRAC at Syracuse University uses the Freedom of Information Act (FOIA) to obtain data about government enforcement and regulatory activities. According to TRAC Reports, the following numbers of FLSA lawsuits were filed in Fiscal Years 2015, 2016, and 2017: 8917, 8830, and 7858. *See* TRAC Reports, Fair Labor Standards Act Lawsuits Down from 2015 Peak (2018), *http://trac.syr.edu/tracreports/civil/498/.*

dispute. Given data limitations, if the Department assumes for purposes of this analysis that this final rule will prevent approximately 10 percent of FLSA cases primarily or exclusively featuring a regular rate dispute then this rule will prevent approximately 43 FLSA regular rate lawsuits per year.[286]

To quantify the expected reduction in FLSA lawsuits, the Department must estimate the average cost of an FLSA lawsuit. Here, the Department examined a selection of 56 FLSA cases concluded between 2012 and 2015 that contained litigation cost information.[287] To calculate average litigation costs associated with these cases, the Department first examined records of court filings in the Westlaw Case Evaluator tool and on PACER to ascertain how much plaintiffs in these cases received for attorney fees, administrative fees, and/or other costs, apart from any monetary damages attributable to the alleged FLSA violations. (The FLSA provides for successful plaintiffs to be awarded reasonable attorney's fees and costs, so this data is available in some FLSA cases.) After determining the plaintiff's total litigation costs for each case, the Department then doubled the figures to account for litigation costs that the defendant employers incurred.[288] According to this analysis, the average litigation cost for FLSA cases concluded between 2012 and 2015 was $654,182 per case.[289] Applying this figure to approximately 43 Federal regular rate cases that this final rule could prevent, the Department estimated that avoided litigation costs resulting from the rule will total approximately $28.1 million per year. Once again, the Department believes this total may underestimate total litigation costs because some FLSA regular rate cases are heard in state court and thus were not captured by PACER; some FLSA regular rate matters are resolved before litigation or by alternative dispute resolution; and some attorneys representing FLSA regular rate plaintiffs may take a contingency fee atop their statutorily awarded fees and costs.

5. Potential Transfers

Transfer payments occur when income is redistributed from one party to another. The Department has identified two possible transfer payments between employers and employees that could occur due to this final rule, flowing in opposite directions. On the one hand, income might transfer from employers to employees if some employers respond to the new clarity that particular benefits are excludable from the regular rate calculation by newly providing certain payments or benefits they did not previously provide. On the other hand, income might transfer from employees to employers if some employers respond to this rule's new clarity that a particular benefit currently provided is excludable from the regular rate calculation by newly excluding certain payments from their employees' regular rates without changing any other compensation practices. As discussed above, the Department is unable to quantify an estimated net transfer amount to employers or employees due to a lack of data on the kinds of payments employers presently provide, and the inherent uncertainty in predicting how employers will respond to this rule.

Summary

The Department estimates that this rule will result in one-time regulatory familiarization costs of $30.5 million, which will result in a 10-year annualized cost of $3,571,022 at a discount rate of 3 percent or $4,337,038 at a discount rate of 7 percent.

This final rule is an Executive Order (E.O.) 13771 deregulatory action. Although benefits and cost savings could not be quantified, they are expected to exceed costs. In perpetuity, the annualized costs are estimated to be $913,846 using a 3 percent discount rate and $2,132,308 using a 7 percent discount rate.

## VI. Regulatory Flexibility Analysis

In accordance with the Regulatory Flexibility Act,[290] the Department examined the regulatory requirements of the rule to determine whether they will have a significant economic impact on a substantial number of small entities. The Department believes that this final rule will achieve long-term cost savings that outweigh initial regulatory familiarization costs.[291] For example, the Department believes that removing ambiguous language and adding updated examples to the FLSA's regular rate regulations should reduce compliance costs and litigation risks that small business entities would otherwise continue to bear.

The Department received one comment from a private citizen pertaining to the economic analysis. The commenter suggested that the regulation may negatively impact job growth by making it difficult for small or new employers to attract and retain talent in a competitive labor market. The commenter therefore requested the Department limit the scope of the regulation to apply only to certain businesses. The Department notes that the final rule is intended to provide clarity and promote compliance with the Act and encourage employers to provide additional innovative benefits without fear of costly litigation. Further, the Act generally requires that covered, nonexempt employees receive overtime pay of at least one and one-half times their regular rate of pay for time worked in excess of 40 hours per week. Coverage criteria of the Act are designated by statute, and therefore outside of the scope of this rulemaking.

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* (as amended), WHD examined the regulatory requirements of the rule to determine if they will have a significant economic impact on a substantial number of small entities. The final rule is expected to add no regulatory burden for employers, whether large or small. Accordingly, the Agency certifies that the final rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this certification is described in the following paragraph.

As discussed above, the Department used data from the U.S. Census Bureau's Statistics of U.S. Businesses (SUSB) to calculate the number of firms likely to review the final rule. The SUSB data show that there are 5,954,684 firms in the U.S., 3,665,182 of which have four or fewer employees.[292] Also, as

[286] The Department rounds up to 43 cases for purpose of estimating (10 percent of 427 cases equals 42.7 cases).

[287] The 56 cases used for this analysis were retrieved from Westlaw's Case Evaluator database using a keyword search for case summaries between 2012 and 2015 mentioning the terms "FLSA" and "fees." Although the initial search yielded 64 responsive cases, the Department excluded one duplicate case, one case resolving litigation costs through a confidential settlement agreement, and six cases where the defendant employer(s) ultimately prevailed. Because the FLSA only entitles prevailing plaintiffs to litigation cost awards, information about litigation costs was only available for the remaining 56 FLSA cases that ended in settlement agreements or court verdicts favoring the plaintiff employees.

[288] This is likely a conservative approach to estimate the total litigation costs for each FLSA lawsuit, as defendant employers tend to incur greater litigation costs than plaintiff employees because of, among other things, typically higher discovery costs.

[289] The median cost was $111,835 per lawsuit.

[290] *See* 5 U.S.C. 601 *et seq.* (as amended).

[291] This rule does not impose any new requirements on employers or require any affirmative measures for regulated entities to come into compliance. Therefore, there are no other costs attributable to this deregulatory rule.

[292] U.S. Census Bureau, 2016 Statistics of U.S. Businesses (SUSB) Annual Data Tables by Establishment Industry, *https://www.census.gov/data/tables/2016/econ/susb/2016-susb-annual.html.*

discussed above, the Department believes that firms with fewer than five employees are unlikely to review this rule, because these small-sized firms are less likely than larger firms to offer perks or benefits similar to those addressed in this rulemaking (*e.g.*, wellness programs, on-site medical or specialty treatment, and so forth) and are typically exempt from legislation mandating paid sick leave or scheduling-related premium pay.[293] Familiarization costs will therefore be zero for small businesses with fewer than five employees. The Department estimated familiarization costs across all 2,289,502 firms with five or more employees, and found that the estimated annualized familiarization cost per firm is $1.56 annually over ten years at a discount rate of 3 percent and $1.89 annually at a discount rate of 7 percent. This comprises less than 0.002 percent of gross annual revenues for a small business earning $100,000 per year.

## VII. Unfunded Mandates Reform Act Analysis

The Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. 1532, requires that agencies prepare a written statement, which includes an assessment of anticipated costs and benefits, for any Federal mandate that may result in excess of $100 million (adjusted annually for inflation) in expenditures in any one year by state, local, and tribal governments in the aggregate, or by the private sector. While this rulemaking would affect employers in the public and private sectors, it is not expected to result in expenditures greater than $100 million in any one year. Please see Section V for an assessment of anticipated costs and benefits to the private sector.

## VIII. Executive Order 13132, Federalism

The Department has reviewed this final rule in accordance with Executive Order 13132 regarding federalism and determined that it does not have federalism implications. The final rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

## IX. Executive Order 13175, Indian Tribal Governments

This final rule would not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

## List of Subjects in 29 CFR Parts 548 and 778

Wages.

Signed at Washington, DC, this 2nd day of December, 2019.

**Cheryl M. Stanton,**

*Administrator, Wage and Hour Division.*

For the reasons set out in the preamble, the Department of Labor amends title 29 of the Code of Federal Regulations parts 548 and 778 as follows:

## PART 548—AUTHORIZATION OF ESTABLISHED BASIC RATES FOR COMPUTING OVERTIME PAY

■ 1. The authority citation for part 548 continues to read as follows:

**Authority:** Sec. 7. 52 Stat. 1063, as amended; 29 U.S.C. 207, unless otherwise noted.

■ 2. Amend § 548.1 by revising the first sentence to read as follows:

### § 548.1 Scope and effect of regulations.

The regulations for computing overtime pay under sections 7(g)(1) and 7(g)(2) of the Fair Labor Standards Act of 1938, as amended (''the Act'' or ''FLSA''), for employees paid on the basis of a piece rate, or at a variety of hourly rates or piece rates, or a combination thereof, are set forth in §§ 778.415 through 778.421. * * *

■ 3. Amend § 548.3 by revising paragraph (e) and removing the parenthetical authority citation at the end of the section to read as follows:

### § 548.3 Authorized basic rates.

* * * * *

(e) The rate or rates (not less than the rates required by section 6(a) and (b) of the Act) which may be used under the Act to compute overtime compensation of the employee but excluding additional payments in cash or in kind which, if included in the computation of overtime under the Act, would not increase the total compensation of the employee by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average for all overtime weeks (in excess of the number of hours applicable under section 7(a) of the Act) in the period for which such additional payments are made.

* * * * *

■ 4. Amend § 548.305 by revising paragraphs (a), (c), (d), (e), and (f) to read as follows:

### § 548.305 Excluding certain additions to wages.

(a) See § 548.3(e) for authorized established basic rates.

* * * * *

(c) The exclusion of one or more additional payments under § 548.3(e) must not affect the overtime compensation of the employee by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average for the overtime weeks.

(1) *Example.* An employee, who normally would come within the 40-hour provision of section 7(a) of the Act, is paid a cost-of-living bonus of $1300 each calendar quarter, or $100 per week. The employee works overtime in only 2 weeks in the 13-week period, and in each of these overtime weeks he works 50 hours. He is therefore entitled to $10 as overtime compensation on the bonus for each week in which overtime was worked (*i.e.,* $100 bonus divided by 50 hours equals $2 an hour; 10 overtime hours, times one-half, times $2 an hour, equals $10 per week). Forty percent of the minimum wage of $7.25 is $2.90 (this example assumes the employee works in a state or locality that does not have a minimum wage that is higher than the minimum wage under the FLSA). Since the overtime on the bonus is more than $2.90 on the average for the 2 overtime weeks, this cost-of-living bonus would be included in the overtime computation under § 548.3(e).

(2) [Reserved]

(d) It is not always necessary to make elaborate computations to determine whether the effect of the exclusion of a bonus or other incidental payment on the employee's total compensation will exceed 40 percent of the applicable hourly minimum wage under either

[293] For example, none of the predictable scheduling ordinances passed in New York City, San Francisco, and Seattle apply to employers with fewer than 20 employees. *See, e.g.*, S.F., Cal., Police Code art. 33G, 3300G.3 (2015) (applying to retail employers with at least 20 employees); N.Y.C., N.Y., Admin. Code 20–1222 (2017) (applying to retail employers with at least 20 employees and fast food employers with at least 30 affiliated enterprise or franchise establishments); Seattle, Wash., Mun. Code ch. 14.22.050 (2017) (applying to retail, food service, and full-service restaurant employers with at least 500 employees). *See also, e.g.*, Md. Code, Labor & Emp't sec. 3–1304 (West 2019) (coverage threshold of 15 employees); Or. Rev. Stat. sec. 653.606 (coverage threshold of 10 employees with smaller employers required to provide equivalent unpaid sick leave); R.I. Gen. Laws sec. 28–57–4(c) (coverage threshold of 18 employees with smaller employers required to provide equivalent unpaid sick leave).

section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average. Frequently the addition to regular wages is so small or the number of overtime hours is so limited that under any conceivable circumstances exclusion of the additional payments from the rate used to compute the employee's overtime compensation would not affect the employee's total earnings by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week. The determination that this is so may be made by inspection of the payroll records or knowledge of the normal working hours.

(1) *Example.* An employer has a policy of giving employees who have a perfect attendance record during a 4-week period a bonus of $50. The employee never works more than 50 hours a week. Exclusion of this attendance bonus from the rate of pay used to compute overtime compensation could not affect the employee's total earnings by more than $2.90 per week (*i.e.,* 40 percent of the minimum wage of $7.25, assuming the employee works in a state or locality that does not have a minimum wage that is higher than the minimum wage under the FLSA).[14]

[14] For a 50-hour week, an employee's bonus would have to exceed $29 a week to affect his overtime compensation by more than $2.90 (*i.e.,* 40 percent of the minimum wage of $7.25). ($30 ÷ 50 hours worked × 10 overtime hours × 0.5).

(2) [Reserved]

(e) There are many situations in which the employer and employee cannot predict with any degree of certainty the amount of bonus to be paid at the end of the bonus period. They may not be able to anticipate with any degree of certainty the number of hours an employee might work each week during the bonus period. In such situations, the employer and employee may agree prior to the performance of the work that a bonus will be disregarded in the computation of overtime pay if the employee's total earnings are not affected by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average for all overtime weeks during the bonus period. If it turns out at the end of the bonus period that the effect on the employee's total compensation would exceed 40 percent of the applicable minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average, then additional overtime compensation must be paid on the bonus. (See § 778.209 of this chapter, for an explanation of how to compute overtime on the bonus).

(f) In order to determine whether the exclusion of a bonus or other incidental payment would affect the total compensation of the employee by not more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average, a comparison is made between his total compensation computed under the employment agreement and his total compensation computed in accordance with the applicable overtime provisions of the Act.

(1) *Example.* An employee, who normally would come within the 40-hour provision of section 7(a) of the Act, is paid at piece rates and at one and one-half times the applicable piece rates for work performed during hours in excess of 40 in the workweek. The employee is also paid a bonus, which when apportioned over the bonus period, amounts to $10 a week. He never works more than 50 hours a week. The piece rates could be established as basic rates under the employment agreement and no additional overtime compensation paid on the bonus. The employee's total compensation computed in accordance with the applicable overtime provision of the Act, section 7(g)(1)[15] would be affected by not more than $1 in any week by not paying overtime compensation on the bonus.[16]

[15] Section 7(g)(1) of the Act provides that overtime compensation may be paid at one and one-half times the applicable piece rate but extra overtime compensation must be properly computed and paid on additional pay required to be included in computing the regular rate.

[16] Bonus of $10 divided by fifty hours equals 20 cents an hour. Half of this hourly rate multiplied by ten overtime hours equals $1.

(2) [Reserved]

* * * * *

■ 5. Amend § 548.400 by revising paragraph (b) and removing the parenthetical authority citation at the end of the section to read as follows:

**§ 548.400 Procedures.**

* * * * *

(b) Prior approval of the Administrator is also required if the employer desires to use a basic rate or basic rates which come within the scope of a combination of two or more of the paragraphs in § 548.3 unless the basic rate or rates sought to be adopted meet the requirements of a single paragraph in § 548.3. For instance, an employee may receive free lunches, the cost of which, by agreement or understanding, is not to be included in the rate used to compute overtime compensation.[17] In addition, the employee may receive an attendance bonus which, by agreement or understanding, is to be excluded from the rate used to compute overtime compensation.[18] Since these exclusions involve two paragraphs of § 548.3, prior approval of the Administrator would be necessary unless the exclusion of the cost of the free lunches together with the attendance bonus do not affect the employee's overtime compensation by more than 40 percent of the applicable hourly minimum wage under either section 6(a) of the Act or the state or local law applicable in the jurisdiction in which the employee is employed, whichever is higher, per week on the average, in which case the employer and the employee may treat the situation as one falling within § 548.3(e).

[17] See § 548.304.

[18] See § 548.305.

## PART 778—OVERTIME COMPENSATION

■ 6. The authority citation for part 778 continues to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.* Section 778.200 also issued under Pub. L. 106–202, 114 Stat. 308 (29 U.S.C. 207(e) and (h)).

■ 7. Revise § 778.1 to read as follows:

**§ 778.1 Introductory statement.**

(a) This part contains the Department of Labor's general interpretations with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Fair Labor Standards Act of 1938, as amended (''the Act'' or ''FLSA''). The Administrator of the Wage and Hour Division will use these interpretations to guide the performance of his or her duties under the Act, and intends the interpretations to be used by employers, employees, and courts to understand employers' obligations and employees' rights under the Act. These official interpretations are issued by the Administrator on the advice of the Solicitor of Labor, as authorized by the Secretary (Reorg. Pl. 6 of 1950, 64 Stat. 1263; Gen. Ord. 45A, published in the **Federal Register** on May 24, 1950).

(b) The Department recognizes that compensation practices can vary significantly and will continue to evolve in the future. The Department also recognizes that it is not feasible to address all of the various compensation and benefits arrangements that may exist between employers and employees, both currently and in the future. In general, the FLSA does not restrict the forms of ''remuneration'' that an employer may pay—which may include an hourly rate, salary, commission, piece rate, a combination thereof, or any other method—as long as the regular rate is equal to at least the applicable minimum wage and compensation for overtime hours worked is paid at the rate of at least one and one-half times the regular rate. While the eight categories of payments in section 7(e)(1)–(8) are the exhaustive list of payments excludable from the regular rate, this part does not contain an exhaustive list of permissible or impermissible compensation practices under section 7(e), unless otherwise indicated. Rather, it provides examples of regular rate and overtime calculations under the FLSA and the types of compensation that may be excluded from regular rate calculations under section 7(e) of the FLSA.

■ 8. Amend § 778.202 by revising paragraphs (a), (b), (c), and (e) to read as follows:

**§ 778.202 Premium pay for hours in excess of a daily or weekly standard.**

(a) *Hours in excess of 8 per day or statutory weekly standard.* A written or unwritten employment contract, agreement, understanding, handbook, policy, or practice may provide for the payment of overtime compensation for hours worked in excess of 8 per day or 40 per week. If the payment of such overtime compensation is in fact contingent upon the employee's having worked in excess of 8 hours in a day or in excess of the number of hours in the workweek specified in section 7(a) of the Act as the weekly maximum and such hours are reflected in an agreement or by established practice, the extra premium compensation paid for the excess hours is excludable from the regular rate under section 7(e)(5) of the Act and may be credited toward statutory overtime payments pursuant to section 7(h) of the Act. In applying the rules in this paragraph (a) to situations where it is the custom to pay employees for hours during which no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause, as these terms are explained in §§ 778.216 through 778.224, it is permissible (but not required) to count these hours as hours worked in determining the amount of overtime premium pay, due for hours in excess of 8 per day or the applicable maximum hours standard, which may be excluded from the regular rate and credited toward the statutory overtime compensation.

(b) *Hours in excess of normal or regular working hours.* Similarly, where the employee's normal or regular daily or weekly working hours are greater or fewer than 8 hours and 40 hours respectively and such hours are reflected in an agreement or by established practice, and the employee receives payment of premium rates for work in excess of such normal or regular hours of work for the day or week (such as 7 in a day or 35 in a week), the extra compensation provided by such premium rates, paid for excessive hours, is a true overtime premium to be excluded from the regular rate and it may be credited toward overtime compensation due under the Act.

(c) *Premiums for excessive daily hours.* If an employee whose maximum hours standard is 40 hours is hired at the rate of $12 an hour and receives, as overtime compensation under his contract, $12.50 per hour for each hour actually worked in excess of 8 per day (or in excess of his normal or regular daily working hours), his employer may exclude the premium portion of the overtime rate from the employee's regular rate and credit the total of the extra 50-cent payments thus made for daily overtime hours against the overtime compensation which is due under the statute for hours in excess of 40 in that workweek. If the same contract further provided for the payment of $13 for hours in excess of 12 per day, the extra $1 payments could likewise be credited toward overtime compensation due under the Act. To qualify as overtime premiums under section 7(e)(5) of the Act, the daily overtime premium payments must be made for hours in excess of 8 hours per day or the employee's normal or regular working hours. If the normal workday is artificially divided into a ''straight time'' period to which one rate is assigned, followed by a so-called ''overtime'' period for which a higher ''rate'' is specified, the arrangement will be regarded as a device to contravene the statutory purposes and the premiums will be considered part of the regular rate. For a fuller discussion of this problem, see § 778.501.

* * * * *

(e) *Premium pay for sixth or seventh day worked.* Under sections 7(e)(6) and 7(h), extra premium compensation paid for work on the sixth or seventh day worked in the workweek (where the workweek schedule is reflected in an agreement or by established practice) is regarded in the same light as premiums paid for work in excess of the applicable maximum hours standard or the employee's normal or regular workweek.

■ 9. Amend § 778.203 by revising paragraph (d) to read as follows:

**§ 778.203 Premium pay for work on Saturdays, Sundays, and other ''special days''.**

* * * * *

(d) Payment of premiums for work performed on the ''special day'': To qualify as an overtime premium under section 7(e)(6), the premium must be paid because work is performed on the days specified and not for some other reason which would not qualify the premium as an overtime premium under sections 7(e)(5), (6), or (7) of the Act. (For examples distinguishing pay for work on a holiday from idle holiday pay, see § 778.219.) Thus a premium rate paid to an employee only when he received less than 24 hours' notice that he is required to report for work on his regular day of rest is not a premium paid for work on one of the specified days; it is a premium imposed as a penalty upon the employer for failure to give adequate notice to compensate the employee for the inconvenience of disarranging his private life. The extra compensation is not an overtime premium. It is part of his regular rate of pay unless such extra compensation is paid the employee so as to qualify for exclusion under section 7(e)(2) of the Act in which event it need not be included in computing his regular rate of pay, as explained in § 778.222.

■ 10. Revise § 778.205 to read as follows:

**§ 778.205 Premiums for weekend and holiday work—example.**

The application of section 7(e)(6) of the Act may be illustrated by the following example: Suppose, based on a written or unwritten employment contract, agreement, understanding, handbook, policy, or practice, an employee earns $18 an hour for all hours worked on a holiday or on Sunday in the operation of machines by operators whose maximum hours standard is 40 hours and who are paid a bona fide hourly rate of $12 for like work performed during nonovertime hours on other days. Suppose further that the workweek of such an employee begins at 12:01 a.m. Sunday, and in a particular week he works a schedule of

8 hours on Sunday and on each day from Monday through Saturday, making a total of 56 hours worked in the workweek. Tuesday is a holiday. The payment of $768 to which the employee is entitled will satisfy the requirements of the Act since the employer may properly exclude from the regular rate the extra $48 paid for work on Sunday and the extra $48 paid for holiday work and credit himself with such amount against the statutory overtime premium required to be paid for the 16 hours worked over 40.

■ 11. Amend § 778.207 by revising paragraph (a) to read as follows:

**§ 778.207 Other types of contract premium pay distinguished.**

(a) *Overtime premiums are those defined by the statute.* The various types of premium payments which provide extra compensation qualifying as overtime premiums to be excluded from the regular rate (under sections 7(e)(5), (6), and (7) and credited toward statutory overtime pay requirements (under section 7(h)) have been described in §§ 778.201 through 778.206. The plain wording of the statute makes it clear that extra compensation provided by premium rates other than those described in the statute cannot be treated as overtime premiums. When such other premiums are paid, they must be included in the employee's regular rate before statutory overtime compensation is computed; no part of such premiums may be credited toward statutory overtime pay.

* * * * *

■ 12. Amend § 778.211 by revising paragraph (c) and adding paragraph (d) to read as follows:

**§ 778.211 Discretionary bonuses.**

* * * * *

(c) *Promised bonuses not excluded.* The bonus, to be excluded under section 7(e)(3)(a), must not be paid pursuant to any prior contract, agreement, or promise. For example, any bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate under this provision of the Act. Bonuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay. Most attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work, bonuses contingent upon the employee's continuing in employment until the time the payment is to be made and the like are in this category; in such circumstances they must be included in the regular rate of pay.

(d) *Labels are not determinative.* The label assigned to a bonus does not conclusively determine whether a bonus is discretionary under section 7(e)(3). Instead, the terms of the statute and the facts specific to the bonus at issue determine whether bonuses are excludable discretionary bonuses. Thus, regardless of the label or name assigned to bonuses, bonuses are discretionary and excludable if both the fact that the bonuses are to be paid and the amounts are determined at the sole discretion of the employer at or near the end of the periods to which the bonuses correspond and they are not paid pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly. Examples of bonuses that may be discretionary include bonuses to employees who made unique or extraordinary efforts which are not awarded according to pre-established criteria, severance bonuses, referral bonuses for employees not primarily engaged in recruiting activities, bonuses for overcoming challenging or stressful situations, employee-of-the-month bonuses, and other similar compensation. Such bonuses are usually not promised in advance and the fact and amount of payment is in the sole discretion of the employer until at or near the end of the period to which the bonus corresponds.

■ 13. Amend § 778.212 by revising paragraph (c) to read as follows:

**§ 778.212 Gifts, Christmas and special occasion bonuses.**

* * * * *

(c) *Application of exclusion.* If the bonus paid at Christmas or on other special occasion is a gift or in the nature of a gift, it may be excluded from the regular rate under section 7(e)(1) even though it is paid with regularity so that the employees are led to expect it and even though the amounts paid to different employees or groups of employees vary with the amount of the salary or regular hourly rate of such employees or according to their length of service with the firm so long as the amounts are not measured by or directly dependent upon hours worked, production, or efficiency. A Christmas bonus paid (not pursuant to contract) in the amount of two weeks' salary to all employees and an equal additional amount for each 5 years of service with the firm, for example, would be excludable from the regular rate under this category. Employers may also provide gifts with more regularity throughout the year, as long as they are provided with the understanding that they are gifts. Office coffee and snacks provided to employees, for example, would also be excludable from the regular rate under this category.

■ 14. Amend § 778.215 by revising paragraphs (a)(2) and (b) to read as follows:

**§ 778.215 Conditions for exclusion of benefit-plan contributions under section 7(e)(4).**

(a) * * *

(2) The primary purpose of the plan must be to provide systematically for the payment of benefits to employees on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, accident, unemployment, legal services, or other events that could cause significant future financial hardship or expense.

* * * * *

(b) *Plans under sections of the Internal Revenue Code.* In the absence of evidence to the contrary, where the benefit plan or trust has been approved by the Internal Revenue Service as satisfying the requirements of section 401(a), 403(a), or 403(b) of the Internal Revenue Code, is otherwise maintained pursuant to a written document that the plan sponsor reasonably believes satisfies the requirements of section 401(a), 403(a), 403(b), 408(k) or 408(p) of the Internal Revenue Code, or is sponsored by a government employer that reasonably believes the plan satisfies the requirements of section 457(b) of the Internal Revenue Code, the plan or trust will be considered to meet the conditions specified in paragraphs (a)(1), (2), (4), and (5) of this section.

■ 15. Amend § 778.217 by revising paragraphs (a), (b)(1), and (c) to read as follows:

**§ 778.217 Reimbursement for expenses.**

(a) *General rule.* Where an employee incurs expenses on his employer's behalf or where he is required to expend sums by reason of action taken for the convenience of his employer, section 7(e)(2) is applicable to reimbursement for such expenses. Payments made by the employer to cover such expenses are not included in the employee's regular rate (if the amount of the reimbursement reasonably approximates the expense incurred). Such payment is not compensation for services rendered by the employees during any hours worked in the workweek.

(b) * * *

(1) The actual amount expended by an employee in purchasing supplies, tools, materials, cell phone plans, or equipment on behalf of his employer or in paying organization membership

dues or credentialing exam fees where relevant to the employer's business.

* * * * *

(c) *Payments excluding expenses.* (1) It should be noted that only the actual or reasonably approximate amount of the expense is excludable from the regular rate. If the amount paid as ''reimbursement'' is disproportionately large, the excess amount will be included in the regular rate.

(2) A reimbursement amount for an employee traveling on his or her employer's business is per se reasonable, and not disproportionately large, if it:

(i) Is the same or less than the maximum reimbursement payment or per diem allowance permitted for the same type of expense under 41 CFR subtitle F (the Federal Travel Regulation System) or IRS guidance issued under 26 CFR 1.274–5(g) or (j); and

(ii) Otherwise meets the requirements of this section.

(3) Paragraph (c)(2) of this section creates no inference that a reimbursement for an employee traveling on his or her employer's business exceeding the amount permitted under 41 CFR subtitle F (the Federal Travel Regulation System) or IRS guidance issued under 26 CFR 1.274–5(g) or (j) is unreasonable for purposes of this section.

* * * * *

■ 16. Amend § 778.218 by revising paragraphs (b) and (d) to read as follows:

**§ 778.218 Pay for certain idle hours.**

* * * * *

(b) *Limitations on exclusion.* The provision of section 7(e)(2) of the Act deals with the type of absences which are infrequent or sporadic or unpredictable. It has no relation to regular ''absences'' such as regularly scheduled days of rest. Sundays may not be workdays in a particular establishment, but this does not make them either ''holidays'' or ''vacations,'' or days on which the employee is absent because of the failure of the employer to provide sufficient work. The term holiday is read in its ordinary usage to refer to those days customarily observed in the community in celebration of some historical or religious occasion; it does not refer to days of rest given to employees in lieu of or as an addition to compensation for working on other days.

* * * * *

(d) *Other similar cause.* The term ''other similar cause'' refers to payments made for periods of absence due to factors like holidays, vacations, sickness, and failure of the employer to provide work. Examples of ''similar causes'' are absences due to jury service, reporting to a draft board, attending a funeral, inability to reach the workplace because of weather conditions, attending adoption or child custody hearings, attending school activities, donating organs or blood, voting, volunteering as a first responder, military leave, family medical leave, and nonroutine paid leave required under state or local laws. Only absences of a non-routine character which are infrequent or sporadic or unpredictable are included in the ''other similar cause'' category.

■ 17. Revise § 778.219 to read as follows:

**§ 778.219 Pay for forgoing holidays and unused leave.**

(a) *Sums payable whether employee works or not.* As explained in § 778.218, certain payments made to an employee for periods during which he performs no work because of a holiday, vacation, or illness are not required to be included in the regular rate because they are not regarded as compensation for working. When an employee who is entitled to such paid leave forgoes the use of leave and instead receives a payment that is the approximate equivalent to the employees' normal earnings for a similar period of working time, and is in addition to the employee's normal compensation for hours worked, the sum allocable to the forgone leave may be excluded from the regular rate. Such payments may be excluded whether paid out during the pay period in which the holiday or prescheduled leave is forgone or as a lump sum at a later point in time. Since it is not compensation for work, pay for unused leave may not be credited toward overtime compensation due under the Act. Four examples in which the maximum hours standard is 40 hours may serve to illustrate this principle:

(1) An employee whose rate of pay is $12 an hour and who usually works a 6-day, 48-hour week is entitled, under his employment contract, to a week's paid vacation in the amount of his usual straight-time earnings—$576. He forgoes his vacation and works 50 hours in the week in question. He is owed $600 as his total straight-time earnings for the week, and $576 in addition as his vacation pay. Under the statute he is owed an additional $60 as overtime premium (additional half-time) for the 10 hours in excess of 40. His regular rate of $12 per hour has not been increased by virtue of the payment of $576 vacation pay, but no part of the $576 may be offset against the statutory overtime compensation which is due. (Nothing in this example is intended to imply that the employee has a statutory right to $576 or any other sum as vacation pay. This is a matter of private contract between the parties who may agree that vacation pay will be measured by straight-time earnings for any agreed number of hours or days, or by total normal or expected take-home pay for the period, or that no vacation pay at all will be paid. The example merely illustrates the proper method of computing overtime for an employee whose employment contract provides $576 vacation pay.)

(2) An employee who is entitled under his employment contract to 8 hours' pay at his rate of $12 an hour for the Christmas holiday, forgoes his holiday and works 9 hours on that day. During the entire week, he works a total of 50 hours. He is paid under his contract $600 as straight-time compensation for 50 hours plus $96 as idle holiday pay. He is owed, under the statute, an additional $60 as overtime premium (additional half-time) for the 10 hours in excess of 40. His regular rate of $12 per hour has not been increased by virtue of the holiday pay but no part of the $96 holiday pay may be credited toward statutory overtime compensation due.

(3) An employee whose rate of pay is $12 an hour and who usually works a 40-hour week is entitled to two weeks of paid time off per year per his or her employer's policies. The employee takes one week of paid time off during the year and is paid $480 pursuant to employer policy for the one week of unused paid time off at the end of the year. The leave payout may be excluded from the employee's regular rate of pay, but no part of the payout may be credited toward statutory overtime compensation due.

(4) An employee is scheduled to work a set schedule of two 24-hour shifts on duty, followed by four 24-hour shifts off duty. This cycle repeats every six days. The employer recognizes ten holidays per year and provides employees with holiday pay for these days at amounts approximately equivalent to their normal earnings for a similar period of working time. Due to the cycle of the schedule, employees may be on duty during some recognized holidays and off duty during others, and due to the nature of their work, employees may be required to forgo a holiday if an emergency arises. In recognition of this fact, the employer provides the employees holiday pay regardless of whether the employee works on the holiday. If the employee works on the

holiday, the employee will receive his or her regular salary in addition to the holiday pay. In these circumstances, the sum allocable to the holiday pay may be excluded from the regular rate.

(b) *Premiums for holiday work distinguished.* The example in paragraph (a)(2) of this section should be distinguished from a situation in which an employee is entitled to idle holiday pay under the employment agreement only when he is actually idle on the holiday, and who, if he forgoes his holiday also, under his contract, forgoes his idle holiday pay.

(1) The typical situation is one in which an employee is entitled by contract to 8 hours' pay at his rate of $12 an hour for certain named holidays when no work is performed. If, however, he is required to work on such days, he does not receive his idle holiday pay. Instead he receives a premium rate of $18 (time and one-half) for each hour worked on the holiday. If he worked 9 hours on the holiday and a total of 50 hours for the week, he would be owed, under his contract, $162 (9 × $18) for the holiday work and $492 for the other 41 hours worked in the week, a total of $654. Under the statute (which does not require premium pay for a holiday) he is owed $660 for a workweek of 50 hours at a rate of $12 an hour. Since the holiday premium is one and one-half times the established rate for nonholiday work, it does not increase the regular rate because it qualifies as an overtime premium under section 7(e)(6), and the employer may credit it toward statutory overtime compensation due and need pay the employee only the additional sum of $6 to meet the statutory requirements. (For a discussion of holiday premiums see § 778.203.)

(2) If all other conditions remained the same but the contract called for the payment of $24 (double time) for each hour worked on the holiday, the employee would receive, under his contract $216 (9 × $24) for the holiday work in addition to $492 for the other 41 hours worked, a total of $708. Since this holiday premium is also an overtime premium under section 7(e)(6), it is excludable from the regular rate and the employer may credit it toward statutory overtime compensation due. Because the total thus paid exceeds the statutory requirements, no additional compensation is due under the Act. In distinguishing this situation from that in the example in paragraph (a)(2) of this section, it should be noted that the contract provisions in the two situations are different and result in the payment of different amounts. In the example in paragraph (a)(2) of this section, the employee received a total of $204 attributable to the holiday: 8 hours' idle holiday pay at $12 an hour (8 × $12), due him whether he worked or not, and $108 pay at the nonholiday rate for 9 hours' work on the holiday. In the situation discussed in this paragraph (b)(2), the employee received $216 pay for working on the holiday—double time for 9 hours of work. All of the pay in this situation is paid for and directly related to the number of hours worked on the holiday.

■ 18. Amend § 778.220 by revising paragraph (b) and adding paragraph (c) to read as follows:

**§ 778.220 "Show-up" or "reporting" pay.**

* * * * *

(b) *Application illustrated.* To illustrate, assume that an employee entitled to overtime pay after 40 hours a week whose workweek begins on Monday and who is paid $12 an hour reports for work on Monday according to schedule and is sent home after being given only 2 hours of work. He then works 8 hours each day on Tuesday through Saturday, inclusive, making a total of 42 hours for the week. The employment agreement covering the employees in the plant, who normally work 8 hours a day, Monday through Friday, provides that an employee reporting for scheduled work on any day will receive a minimum of 4 hours' work or pay. The employee thus receives not only the $24 earned in the 2 hours of work on Monday but an extra 2 hours' "show-up" pay, or $24 by reason of this agreement. However, since this $24 in "show-up" pay is not regarded as compensation for hours worked, the employee's regular rate remains $12 and the overtime requirements of the Act are satisfied if he receives, in addition to the $504 straight-time pay for 42 hours and the $24 "show-up" payment, the sum of $12 as extra compensation for the 2 hours of overtime work on Saturday.

(c) *Show-up or reporting pay mandated by law.* State and local laws may mandate payments or penalties paid to an employee when, before or after reporting to work as scheduled, the employee is not provided with the expected amount of work. All such payments or penalties paid to employees that are mandated by such laws and that are not payments for hours worked by the employee are excludable from the regular rate if such penalties are paid or payments made on an infrequent or sporadic basis. They cannot be credited toward statutory overtime compensation due.

■ 19. Revise § 778.221 to read as follows:

**§ 778.221 "Call-back" pay.**

(a) *General.* Typically, "call-back" or "call-out" payments are made pursuant to agreement or established practice and consist of a specified number of hours' pay at the applicable straight time or overtime rates received by an employee on occasions when, after his scheduled hours of work have ended and without prearrangement, he responds to a call from his employer to perform extra work. The amount by which the specified number of hours' pay exceeds the compensation for hours actually worked is considered as a payment that is not made for hours worked. As such, it may be excluded from the computation of the employee's regular rate and cannot be credited toward statutory overtime compensation due the employee. Payments that are prearranged, however, may not be excluded from the regular rate. For example, if an employer retailer called in an employee to help clean up the store for 3 hours after an unexpected roof leak, and then again 3 weeks later for 2 hours to cover for a coworker who left work for a family emergency, payments for those instances would be without prearrangement and any call-back pay that exceeded the amount the employee would receive for the hours worked would be excludable. However, when payments under §§ 778.221 and 778.222 are prearranged, they are compensation for work. The key inquiry for determining prearrangement is whether the extra work was anticipated and therefore reasonably could have been scheduled. For example, if an employer restaurant anticipates needing extra servers for two hours during the busiest part of each Saturday evening and calls in employees to meet that need instead of scheduling additional servers, that would be prearrangement and any call-back pay would be included in the regular rate.

(b) *Application illustrated.* The application of the principles in paragraph (a) of this section to call-back payments may be illustrated as follows: An employment agreement provides a minimum of 3 hours' pay at time and one-half for any employee called back to work outside his scheduled hours. The employees covered by the agreement, who are entitled to overtime pay after 40 hours a week, normally work 8 hours each day, Monday through Friday, inclusive, in a workweek beginning on Monday, and are paid overtime compensation at time and one-half for all hours worked in excess of 8 in any day or 40 in any workweek. Assume

that an employee covered by this agreement and paid at the rate of $12 an hour works 1 hour overtime or a total of 9 hours on Monday, and works 8 hours each on Tuesday through Friday, inclusive. After he has gone home on Friday evening, he is called back to perform an emergency job. His hours worked on the call total 2 hours and he receives 3 hours' pay at time and one-half, or $54, under the call-back provision, in addition to $480 for working his regular schedule and $18 for overtime worked on Monday evening. In computing overtime compensation due this employee under the Act, the 43 actual hours (not 44) are counted as working time during the week. In addition to $516 pay at the $12 rate for all these hours, he has received under the agreement a premium of $6 for the 1 overtime hour on Monday and of $12 for the 2 hours of overtime work on the call, plus an extra sum of $18 paid by reason of the provision for minimum call-back pay. For purposes of the Act, the extra premiums paid for actual hours of overtime work on Monday and on the Friday call (a total of $18) may be excluded as true overtime premiums in computing his regular rate for the week and may be credited toward compensation due under the Act, but the extra $18 received under the call-back provision is not regarded as paid for hours worked; thus, it may be excluded from the regular rate, but it cannot be credited toward overtime compensation due under the Act. The regular rate of the employee, therefore, remains $12, and he has received an overtime premium of $6 an hour for 3 overtime hours of work. This satisfies the requirements of section 7 of the Act. The same would be true, of course, if in the foregoing example, the employee was called back outside his scheduled hours for the 2-hour emergency job on another night of the week or on Saturday or Sunday, instead of on Friday night.

■ 20. Revise § 778.222 to read as follows:

**§ 778.222 Other payments similar to "call-back" pay.**

The principles discussed in § 778.221 are also applied with respect to certain types of extra payments which are similar to call-back pay. Payments are similar to call-back pay if they are extra payments, including payments made pursuant to state or local scheduling laws, to compensate an employee for working unanticipated or insufficiently scheduled hours or shifts. The extra payment, over and above the employee's earnings for the hours actually worked at his applicable rate (straight time or overtime, as the case may be), is considered as a payment that is not made for hours worked. Payments that are prearranged, however, may not be excluded from the regular rate. Examples of payments similar to excludable call-back pay include:

(a) Extra payments made to employees for failure to give the employee sufficient notice to report for work on regular days of rest or during hours outside of his regular work schedule;

(b) Extra payments made solely because the employee has been called back to work before the expiration of a specified number of hours between shifts or tours of duty, sometimes referred to as a "rest period;"

(c) Pay mandated by state or local law for employees who are scheduled to work the end of one day's shift and the start of the next day's shift with fewer than the legally required number of hours between the shifts; and

(d) "Predictability pay" mandated by state or local law for employees who do not receive requisite notice of a schedule change.

■ 21. Revise § 778.223 to read as follows:

**§ 778.223 Pay for non-productive hours distinguished.**

(a) Under the Act an employee must be compensated for all hours worked. As a general rule the term "hours worked" will include:

(1) All time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace; and

(2) All time during which an employee is suffered or permitted to work whether or not he is required to do so.

(b) Thus, working time is not limited to the hours spent in active productive labor, but includes time given by the employee to the employer even though part of the time may be spent in idleness. Some of the hours spent by employees, under certain circumstances, in such activities as waiting for work, remaining "on call", traveling on the employer's business or to and from workplaces, and in meal periods and rest periods are regarded as working time and some are not. The governing principles are discussed in part 785 of this chapter (interpretative bulletin on "hours worked") and part 790 of this chapter (statement of effect of Portal-to-Portal Act of 1947). To the extent that these hours are regarded as working time, payment made as compensation for these hours obviously cannot be characterized as "payments not for hours worked." Such compensation is treated in the same manner as compensation for any other working time and is, of course, included in the regular rate of pay. Where payment is ostensibly made as compensation for such of these hours as are not regarded as working time under the Act, the payment is nevertheless included in the regular rate of pay unless it qualifies for exclusion from the regular rate as one of a type of "payments made for occasional periods when no work is performed due to failure of the employer to provide sufficient work, or other similar cause" as discussed in § 778.218 or is excludable on some other basis under section 7(e)(2). For example, an employment contract may provide that employees who are assigned to take calls for specific periods will receive a payment of $5 for each 8-hour period during which they are "on call" in addition to pay at their regular (or overtime) rate for hours actually spent in making calls. If the employees who are thus on call are not confined to their homes or to any particular place, but may come and go as they please, provided that they leave word where they may be reached, the hours spent "on call" are not considered as hours worked. Although the payment received by such employees for such "on call" time is, therefore, not allocable to any specific hours of work, it is clearly paid as compensation for performing a duty involved in the employee's job and is not of a type excludable under section 7(e)(2). The payment must therefore be included in the employee's regular rate in the same manner as any payment for services, such as an attendance bonus, which is not related to any specific hours of work. The principle in this paragraph (b) also applies when such "on call" pay is mandated by state or local law.

■ 21. Revise § 778.224 to read as follows:

**§ 778.224 "Other similar payments".**

(a) *General.* Sections 778.216 through 778.223 have enumerated and discussed the basic types of payments for which exclusion from the regular rate is specifically provided under section 7(e)(2) because they are not made as compensation for hours of work. Section 7(e)(2) also authorizes exclusion from the regular rate of other similar payments to an employee which are not made as compensation for his hours of employment. Such payments do not depend on hours worked, services rendered, job performance, or other criteria that depend on the quality or quantity of the employee's work. Conditions not dependent on the quality

or quality of work include a reasonable waiting period for eligibility, the requirement to repay benefits as a remedy for employee misconduct, and limiting eligibility on the basis of geographic location or job position. Since a variety of miscellaneous payments are paid by an employer to an employee under peculiar circumstances, it was not considered feasible to attempt to list them. They must, however, be ''similar'' in character to the payments specifically described in section 7(e)(2). It is clear that the clause was not intended to permit the exclusion from the regular rate of payments such as most bonuses or the furnishing of facilities like board and lodging which, though not directly attributable to any particular hours of work are, nevertheless, clearly understood to be compensation for services.

(b) *Examples of other excludable payments.* A few examples may serve to illustrate some of the types of payments intended to be excluded as ''other similar payments''.

(1) Sums paid to an employee for the rental of his truck or car.

(2) Loans or advances made by the employer to the employee.

(3) The cost to the employer of conveniences furnished to the employee such as:

(i) Parking spaces and parking benefits;

(ii) Restrooms and lockers;

(iii) On-the-job medical care;

(iv) Treatment provided on-site from specialists such as chiropractors, massage therapists, physical therapists, personal trainers, counselors, or Employee Assistance Programs; or

(v) Gym access, gym memberships, fitness classes, and recreational facilities.

(4) The cost to the employer of providing wellness programs, such as health risk assessments, biometric screenings, vaccination clinics (including annual flu vaccinations), nutrition classes, weight loss programs, smoking cessation programs, stress reduction programs, exercise programs, coaching to help employees meet health goals, financial wellness programs or financial counseling, and mental health wellness programs.

(5) Discounts on employer-provided retail goods and services, and tuition benefits (whether paid to an employee, an education provider, or a student loan program).

(6) Adoption assistance (including financial assistance, legal services, or information and referral services).

■ 22. Revise § 778.320 to read as follows:

**§ 778.320 Hours that would not be hours worked if not paid for.**

In some cases an agreement or established practice provides for compensation for hours spent in certain types of activities which would not be regarded as working time under the Act if no compensation were provided. Preliminary and postliminary activities and time spent in eating meals between working hours fall in this category. Compensation for such hours does not convert them into hours worked unless it appears from all the pertinent facts that the parties have treated such time as hours worked. Except for certain activity governed by the Portal-to-Portal Act (see paragraph (b) of this section), the agreement or established practice of the parties will be respected, if reasonable.

(a) *Time treated as hours worked.* Where the parties have reasonably agreed to include as hours worked time devoted to activities of the type described in the introductory text of this section, payments for such hours will not have the mathematical effect of increasing or decreasing the regular rate of an employee if the hours are compensated at the same rate as other working hours. The requirements of section 7(a) of the Act will be considered to be met where overtime compensation at one and one-half times such rate is paid for the hours so compensated in the workweek which are in excess of the statutory maximum.

(b) *Time not treated as hours worked.* Under the principles set forth in § 778.319, where the payments are made for time spent in an activity which, if compensable under contract, custom, or practice, is required to be counted as hours worked under the Act by virtue of section 4 of the Portal-to-Portal Act of 1947 (see parts 785 and 790 of this chapter), no agreement by the parties to exclude such compensable time from hours worked would be valid. On the other hand, in the case of time spent in an activity which would not be hours worked under the Act if not compensated and would not become hours worked under the Portal-to-Portal Act even if made compensable by contract, custom, or practice, such time will not be counted as hours worked unless agreement or established practice indicates that the parties have treated the time as hours worked. Such time includes bona fide meal periods, see § 785.19. Unless it appears from all the pertinent facts that the parties have treated such activities as hours worked, payments for such time will be regarded as qualifying for exclusion from the regular rate under the provisions of section 7(e)(2), as explained in §§ 778.216 through 778.224. The payments for such hours cannot, of course, qualify as overtime premiums creditable toward overtime compensation under section 7(h) of the Act.

[FR Doc. 2019–26447 Filed 12–12–19; 8:45 am]

BILLING CODE 4510–27–P

# 24-3141(L), 24-3271(XAP)

# United States Court of Appeals
*for the*
# Second Circuit

MATTHEW T. SHAFER, individually and on behalf of all others similarly situated, MACE TAMSE, STEVE SHERESKY, GEORGE LIVANOS, JEFFREY SHOVER, MARK LOFTUS, SANDY JUKEL, STEVE NADLER, SHERI HAUGABOOK, JEFFREY SHERESKY, PETER HEIDT, JEFFREY SAMSEN,

*Plaintiffs-Appellees-Cross-Appellants,*

– v. –

MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE,

*Defendants-Appellants-Cross-Appellees,*

JOHN/JANE DOES, 1-20,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES**

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
17th Floor
New York, New York 10019
(212) 326-2000

MEAGHAN VERGOW
BRIAN D. BOYLE
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

*Attorneys for Defendants-Appellants-Cross-Appellees*

COUNSEL PRESS (800) 4-APPEAL • (335786)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for the undersigned certifies as follows:

Defendant-Appellant Morgan Stanley is a publicly held corporation that has no parent corporation. Based on Securities and Exchange Commission Rules regarding beneficial ownership, Mitsubishi UFJ Financial Group, Inc., 4-5 Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8330, beneficially owns greater than 10% of Morgan Stanley's outstanding common stock.

Defendant-Appellant Morgan Stanley Smith Barney LLC is a limited liability company whose sole member is Morgan Stanley Capital Management, LLC, a limited liability company whose sole member is Morgan Stanley.

Defendant-Appellant Morgan Stanley Compensation Management Development and Succession Committee is an unincorporated association and a committee of Morgan Stanley's Board of Directors.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1
JURISDICTIONAL STATEMENT ....... 5
ISSUES PRESENTED ....... 7
STATEMENT OF THE CASE ....... 7
A. Morgan Stanley's deferred compensation awards ....... 7
B. Plaintiffs' claims ....... 10
C. Morgan Stanley's motion to compel arbitration ....... 11
D. The district court's November 2023 order ....... 13
E. Morgan Stanley's motion for reconsideration or clarification ....... 15
F. The district court's November 2024 order ....... 16
G. Morgan Stanley's appeal ....... 19
H. Parallel arbitrations ....... 20
SUMMARY OF ARGUMENT ....... 21
STANDARD OF REVIEW ....... 25
ARGUMENT ....... 26
I. THE DISTRICT COURT IMPROPERLY PURPORTED TO RESOLVE THE MERITS OF PLAINTIFFS' CLAIMS, EFFECTIVELY DEPRIVING MORGAN STANLEY OF ITS RIGHT TO ARBITRATION. ....... 266
A. The district court should have granted Morgan Stanley's motion to compel arbitration without addressing whether Morgan Stanley's deferred compensation awards qualify as ERISA pension plans. ....... 27
B. The district court's improper merits finding has caused Morgan Stanley the very harm the FAA is designed to avoid. ....... 33

**TABLE OF CONTENTS**
(continued)

**Page**

C. If the Court determines it lacks appellate jurisdiction over Morgan Stanley's appeal, it should issue a writ of mandamus to vacate the district court's improper ERISA finding. ....36

II. THE DISTRICT COURT'S MERITS COMMENTARY IS WRONG ....38

A. Morgan Stanley's deferred compensation awards are not a pension benefit plan. ....39

1. The awards do not qualify as a "pension plan" under the statutory test. ....40

a. The district incorrectly concluded that exceptional payments to former employees transform the awards into an ERISA "pension plan." ....40

b. The district court incorrectly concluded that the deferred compensation awards are "earned" at the point of grant ....45

c. The district court incorrectly declined to consider the awards' purposes in analyzing ERISA coverage ....47

2. The DOL's bonus plan exemption applies to the awards ....49

a. The awards are ERISA-exempt "bonuses" under DOL regulation. ....49

b. The bonus regulation applies because payment is not "systematically deferred" until after employment.. ....53

B. Evidence developed in parallel arbitrations reinforces that the awards are not ERISA-governed. ....57

CONCLUSION ....58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albers v. Guardian Life Ins. Co. of Am.*,
1999 WL 228367 (S.D.N.Y. Apr. 19, 1999) ....................41

*Allen v. McCurry*,
449 U.S. 90 (1980) ....................35

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ....................26

*Ashe v. Swenson*,
397 U.S. 436 (1970) ....................34

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) .................... 2, 26, 31

*Berenson v. National Financial Services LLC*,
485 (1st Cir. 2007) ....................6

*Bobby v. Bies*,
556 U.S. 825 (2009) ....................34

*Boos v. AT&T, Inc.*,
643 F.3d 127 (5th Cir. 2011) ....................44

*Callan v. Merrill Lynch & Co.*,
2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ....................51

*Cashman v. GreyOrange, Inc.*,
2023 WL 2652789 (N.D. Ga. Mar. 27, 2023) ....................52

*Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Acc. Ins. Co.*,
809 F.2d 617 (9th Cir. 1987) ....................56

*Deibler v. United Food & Com. Workers' Loc. Union 23*,
973 F.2d 206 (3d Cir. 1992) ....................56

*Depew v. MNC Fin., Inc.*,
819 F. Supp. 492 (D. Md. 1993) ....................42

*Donovan v. Dillingham*,
688 F.2d 1367 (11th Cir. 1982) ....................56

*Emmenegger v. Bull Moose Tube Co.*,
197 F.3d 929 (8th Cir. 1999) ....................51

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Faris v. S. Ute Indian Tribe*,
2023 WL 7386870 (D. Colo. Nov. 8, 2023) .... 41, 52

*Finlay v. King's Lessee*,
28 U.S. (3 Pet.) 346 (1830) .... 46

*Gelb v. Royal Globe Ins. Co.*,
798 F.2d 38 (2d Cir. 1986) .... 35

*Greenlaw v. United States*,
554 U.S. 237 (2008) .... 27

*Henry on behalf of BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*,
72 F.4th 499 (3d Cir. 2023) .... 5

*Hester v. Whatever It Takes*,
2022 WL 89176 (W.D. Ky. Jan. 7, 2022) .... 52

*Huidekoper's Lessee v. Douglass*,
7 U.S. (3 Cranch) 1 (1805) .... 46

*In re DES Litig.*,
7 F.3d 20 (2d Cir. 1993) .... 7

*Int'l Paper Co. v. Suwyn*,
978 F. Supp. 506 (S.D.N.Y. 1997) .... 56

*Killian v. McCulloch*,
850 F. Supp. 1239 (E.D. Pa. 1994) .... 41, 52

*Langley v. DaimlerChrysler Corp.*,
502 F.3d 475 (6th Cir. 2007) .... 56

*Leister v. Dovetail, Inc.*,
546 F.3d 875 (7th Cir. 2008) .... 44

*Lora v. O'Heaney*,
602 F.3d 106 (2d Cir. 2010) .... 19

*Man Ferrostaal, Inc. v. M/V Akili*,
704 F.3d 77 (2d Cir. 2012) .... 26

*McKinsey v. Sentry Ins.*,
986 F.2d 401 (10th Cir. 1993) .... 51, 52

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Murphy v. Inexco Oil Co.*,
611 F.2d 570 (5th Cir. 1980) ... 39, 40

*Oatway, Inc. v. Am. Int'l Grp., Inc.*,
325 F.3d 184 (3d Cir. 2003) ... 41, 48, 50, 51

*Pasternack v. Shrader*,
863 F.3d 162 (2d Cir. 2017) ... 39

*Picard v. Credit Sols., Inc.*,
564 F.3d 1249 (11th Cir. 2009) ... 35

*Pilkington v. CGU Ins. Co.*,
2000 WL 33159253 (E.D. Pa. Feb. 9, 2001) ... 52

*Rich v. Shrader*,
823 F.3d 1205 (9th Cir. 2016) ... 47

*Rite Aid of Pa., Inc. v. United Food & Com. Workers Union, Loc. 1776*,
595 F.3d 128 (3d Cir. 2010) ... 31

*S.E.C. v. Rajaratnam*,
622 F.3d 159 (2d Cir. 2010) ... 6, 36

*Seguros Banvenez S.A. v. S/S Oliver Drescher*,
715 F.2d 54 (2d Cir. 1983) ... 6

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
999 F.3d 828 (2d Cir. 2021) ... 25

*Stein v. KPMG, LLP*,
486 F.3d 753 (2d Cir. 2007) ... 36, 37

*Tolbert v. RBC Cap. Mkts. Corp.*,
758 F.3d 619 (5th Cir. 2014) ... 41, 43, 44

*Transit Mix Concrete Corp. v. Loc. Union No. 282, Int'l Bhd. of Teamsters*,
809 F.2d 963 (2d Cir. 1987) ... 26

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ... 27

*United Steelworkers of Am. v. Am. Mfg. Co.*,
363 U.S. 564 (1960) ... 26

## TABLE OF AUTHORITIES
## (continued)

Page(s)

*Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989) ....................................................................................33

*WasteCare Corp. v. Harmony Enters., Inc.*,
822 F. App'x 892 (11th Cir. 2020) .................................................................25

*Wickman v. Nw. Nat'l Ins. Co.*,
908 F.2d 1077 (1st Cir. 1990) ........................................................................56

*Wilson v. Safelite Grp., Inc.*,
930 F.3d 429 (6th Cir. 2019)........................................................ 41, 44, 47, 50

*Young v. Verizon's Bell Atl. Cash Balance Plan*,
615 F.3d 808 (7th Cir. 2010)..........................................................................28

**Statutes**

9 U.S.C. § 16 ....................................................................................... 6, 36

9 U.S.C. § 16(a) ..........................................................................................5

9 U.S.C. § 16(a)(1)(B) ................................................................................19

9 U.S.C. § 16(a)(1)(C) ..................................................................................5

9 U.S.C. § 206 ..............................................................................................5

28 U.S.C. § 1331 ...........................................................................................5

29 U.S.C. § 1002(1) .....................................................................................56

29 U.S.C. § 1002(2)(A)........................................................................ 39, 48, 55

29 U.S.C. § 1002(2)(A)(ii)............................................................................ passim

29 U.S.C. § 1053(a)(2)(B)(ii) ........................................................................28

29 U.S.C. § 1132(e)(1)...................................................................................5

**Rules**

Fed. R. App. P. 4(a)(1)(A) ............................................................................19

FINRA Code of Arbitration Procedure for Industry Disputes, Rule 13904............37

**Regulations**

29 C.F.R. § 2510.3–2(c)............................................................................ passim

Guidance on Sound Incentive Compensation Policies,
75 Fed. Reg. 36,395 (June 25, 2010) ............................................................10



DOLAR0958

# TABLE OF AUTHORITIES (continued)

Page(s)

Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318 (July 12, 2019) ..... 10

**Other Authorities**

18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4421 (3d ed. Apr. 2023 update) ..... 35

FINRA Award, *Rude et al. v. Morgan Stanley* (June 17, 2024) ..... 21

FINRA, 2024 FINRA Annual Regulatory Oversight Report (Jan. 2024) ..... 10

Miriam Rozen, *Ex-Morgan Stanley Brokers Must Arbitrate Class Claim Over Deferred Comp, Judge Rules*, AdvisorHub (Nov. 22, 2023) ..... 14

Notice of Proposed Rulemaking, "Incentive-Based Compensation Arrangements," Office of the Comptroller of the Currency (May 6, 2024) ..... 10

Op. 79-20A, 1979 WL 6959 (Mar. 19, 1979) ..... 42

Op. 79-15A, 1979 WL 6953 (Mar. 12, 1979) ..... 42

Op. 82-29A, 1982 WL 21212 (July 2, 1982) ..... 42, 52

Op. 98-02A, 1998 WL 103654 (Mar. 6, 1998) ..... 42, 51, 52, 54

Op. 2002-13A, 2002 WL 31846478 (Dec. 6, 2002) ..... 42, 48, 52, 54

## INTRODUCTION

The district court improperly adjudicated the merits of a dispute it simultaneously (and correctly) held the parties had agreed to arbitrate. The district court nominally compelled arbitration of the plaintiffs' claims, but in that very same order, the court, in its own words, "resolved the parties' dispute" over whether plaintiffs' deferred compensation awards are really ERISA plans. That question is *the* core dispute in plaintiffs' claims against Morgan Stanley, and the court's ruling has effectively deprived Morgan Stanley of its bargained-for right to have an arbitrator adjudicate it.[1]

The underlying dispute is about whether Morgan Stanley is required to pay deferred compensation awards that the plaintiffs failed to earn. Morgan Stanley issues the awards to financial advisors to motivate retention and good conduct. Under the express terms of the awards, an advisor must be employed and in good standing on the award's vesting date to earn the award. Plaintiffs resigned from Morgan Stanley before the awards at issue vested, and the awards were therefore cancelled according to their terms. Plaintiffs filed this putative class action claiming that the awards should still be paid because they are actually "employee

---

[1] In this brief, "ERISA" refers to the Employee Retirement Income Security Act of 1974 and "Morgan Stanley" refers to the Defendants-Appellants Morgan Stanley, Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management and Development Committee collectively.

pension benefit plans" under ERISA and therefore protected from cancellation by ERISA's anti-forfeiture rules.

Because the parties had entered into valid, controlling arbitration agreements, Morgan Stanley moved to compel arbitration under the Federal Arbitration Act ("FAA"). The district court purported to grant the motion, but not before finding that the deferred compensation awards are governed by ERISA, in the mistaken belief that it was necessary to answer that central merits question before deciding whether the matter should be arbitrated. But the court's merits finding was *not* in fact necessary to its order compelling arbitration, because as the district court itself correctly concluded, arbitration was appropriate *even if* the awards were ERISA plans. And because the merits finding was unnecessary, it was improper: When "deciding whether the parties have agreed to submit a particular grievance to arbitration, *a court is not to rule on the potential merits of the underlying claims*." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (emphasis added).

The district court justified its approach by suggesting that Morgan Stanley invited the court to reach the merits, and was merely the victim of its own gamble. That is demonstrably incorrect. In briefing Morgan Stanley's motion to compel arbitration, *neither party* asked the court to resolve the ERISA coverage question: the central dispute in that motion was whether plaintiffs could obtain complete

relief in arbitration if their ERISA claims succeeded. (Morgan Stanley argued, and the district court ultimately agreed, that plaintiffs could obtain full payment of their benefits claims in arbitration.) More than a year after briefing on the motion to compel concluded, the district court *sua sponte* issued an order *directing* the parties to address the ERISA coverage question because it wasn't addressed in the parties' briefing. To state the obvious, the question wasn't addressed because both parties agreed that it didn't need to be decided. But Morgan Stanley responded as ordered, stating its underlying merits position in the five-page letter brief permitted by the district judge's rules, while reiterating that the court should send the matter to arbitration—the entire reason Morgan Stanley had filed the motion to compel in the first place.

The decision below has effectively denied Morgan Stanley's right to arbitration of the merits of this dispute. The district court's order is Exhibit A to the statements of claim that plaintiffs have filed in arbitration. Plaintiffs' counsel has publicly declared that the order conclusively resolves the merits of the parties' dispute. And the order has prompted a flurry of copycat claims—more than 80 and counting—in which other claimants are arguing the district court's ERISA-coverage finding on this central question is "binding" law that definitively resolves the dispute in their favor. By purporting to resolve the merits of this dispute, the

district court's order violates the FAA, which protects Morgan Stanley's contractual right to arbitration free from undue judicial influence.

The district court's unnecessary merits finding is also just plain wrong—the awards indisputably are not ERISA plans. This Court should not reach that ultimate question, which is reserved for arbitration. But the serious errors in the district court's merits analysis reinforce the importance of vacating, whether through appellate or mandamus review, the court's erroneous decision to reach the merits at all.[2] The district court found that ERISA applies because the awards permit some payments after the end of employment for humanitarian reasons such as death and disability, even though the awards lack the features that courts and the Department of Labor (DOL) have deemed essential to pension plan status. That ERISA theory is unprecedented and truly radical.

The district court's errors can perhaps be explained by the peculiar procedure in which this issue was purportedly decided—on a motion to compel arbitration, where no party presented the issue, without the briefing, discovery, testimony, or evidentiary record that is needed to support a decision on the merits. But Morgan Stanley now faces arbitrations in which it must overcome plaintiffs'

[2] If the Court were to conclude that it was necessary to reach the merits to decide arbitrability, it should reverse the district court's merits analysis on mandamus review—but as explained within, it cannot seriously be disputed that the ERISA finding was unnecessary to the arbitrability question.

contention that the only disputed legal issue has already been decided by a federal district court—and decided *against* Morgan Stanley. The FAA permits this Court to address the district court's effective denial of Morgan Stanley's right to arbitrate. The Court should vacate the orders below so that the district court may compel arbitration without the unnecessary commentary on the merits.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because plaintiffs assert claims under ERISA.

This Court has jurisdiction over this appeal under 9 U.S.C. § 16(a)(1)(C) because the district court constructively denied Morgan Stanley's application to compel arbitration under 9 U.S.C. § 206 when it purported to resolve the merits of the dispute that the parties had agreed to arbitrate. ECF No. 32 at 9–17[3]; *see, e.g.*, *Henry on behalf of BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 505 (3d Cir. 2023) ("We have consistently held that under 9 U.S.C. § 16(a), all orders that have the effect of declining to compel arbitration [are] reviewable." (quotation omitted)). The court's finding on the merits in its order nominally compelling arbitration has, in effect, deprived Morgan Stanley of its contractual right to an *arbitral* resolution of the merits. To the extent

[3] "ECF" refers to the docket in this appeal, No. 24-3141.

the district court's merits "finding" could be given preclusive effect in future proceedings, defendants must be afforded the opportunity for appellate review.[4]

To that end, if the Court concludes that it lacks appellate jurisdiction, it may treat the instant appeal as a petition for a writ of mandamus. ECF No. 32 at 17–18; *see S.E.C. v. Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010) ("Even though we lack interlocutory jurisdiction to review the district court's order, a writ of mandamus may still be appropriate."); *Seguros Banvenez S.A. v. S/S Oliver Drescher*, 715 F.2d 54, 56 n.1 (2d Cir. 1983) ("In an appropriate case, we may treat an appeal from an unappealable interlocutory order as a motion for leave to file a petition for mandamus."); *infra* at 36–38.

Finally, Morgan Stanley has Article III standing to appeal the district court's order because Morgan Stanley is "aggrieved" by the portion of the district court's

---

[4] *Berenson v. National Financial Services LLC*, 485 F.3d 35 (1st Cir. 2007), relied upon by plaintiffs in opposing jurisdiction, ECF No. 39 at 6, is inapposite. In *Berenson*, the party seeking to appeal had previously "invited the court to consider broadly the merits" of the dispute at summary judgment, moving to compel arbitration only after obtaining a favorable summary judgment ruling. *Berenson*, 485 F.3d at 36, 42. The moving party had thus affirmatively waived its right to arbitrate the merits by inviting the court to decide the merits, *see id.* at 43, unlike here, *see infra* at 27–33. Multiple other courts of appeals have recognized that appellate jurisdiction over effective denials of arbitration may lie under 9 U.S.C. § 16, ECF No. 32 at 13–14 (collecting cases), and this Court may exercise mandamus jurisdiction in any event.



DOLAR0965

order that purports to resolve the merits of the dispute in plaintiffs' favor. *See In re DES Litig.*, 7 F.3d 20, 25 (2d Cir. 1993).

## ISSUES PRESENTED

1. Did the district court legally err in resolving the parties' core dispute on the merits—*i.e.*, whether ERISA applies to Morgan Stanley's deferred compensation awards—when the parties agreed that those claims should be resolved not in court but in arbitration?

2. If the Court concludes that it was necessary to determine ERISA's application in order to determine arbitrability, did the district court err in concluding that Morgan Stanley's deferred compensation awards are governed by ERISA?

## STATEMENT OF THE CASE

### A. Morgan Stanley's deferred compensation awards

Morgan Stanley financial advisors generally receive two forms of incentive compensation. A25 ¶ 27. Their incentive compensation includes both ongoing cash incentive compensation that is paid on a monthly basis, which makes up the vast majority of advisors' pay; and deferred cash and stock awards that are granted annually and subject to multi-year vesting periods. A27–28 ¶¶ 31–34. The deferred cash awards issued under the Morgan Stanley Incentive Compensation Plan ("MSCIP") vest in six years (eight years, before 2015), and the deferred stock awards issued under the Equity Incentive Compensation Plan ("EICP") vest in four

years. A27 ¶ 31.

The terms of financial advisors' compensation—including deferred incentive compensation—are disclosed by Morgan Stanley ahead of time in a compensation plan published annually (the "Compensation Plan"). The Compensation Plan explains that financial advisors will receive a guaranteed monthly base salary (Section 1.1), and then are allocated "Total Credits" based on their tenure and production (Section 1.2.1), from which the values of their deferred incentive compensation (Section 1.2.2) and monthly incentive compensation (Section 1.2.3) are calculated. A173–77. The Compensation Plan discloses the vesting schedule for the cash- and equity-based awards, and states:

> Deferred compensation awards are contingent upon the [advisor] remaining employed through the grant and vesting dates of the award.

A176.

The full terms of the deferred awards are set forth in Award Certificates that are issued to financial advisors annually. A28 ¶ 36. The Award Certificates disclose the purpose of the deferred awards—"to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct)"—and explain that:

> In view of these purposes, you will earn your . . . award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), [and] (2) do not engage in any Prohibited Activity[.]



DOLAR0967

A216. Each Award Certificate is supplemented by a Summary Description, or "Term Sheet," that provides an abbreviated, general description of the key award terms and conditions. *See* A302. The first paragraph of the Term Sheet includes a disclosure nearly identical to that in the Award Certificate:

> You have no right to your . . . award until it is "earned." Generally, to earn your award, you must (1) remain in continuous Employment through the Scheduled Vesting Date, [and] (2) even if your award is vested, not engage in any activity that constitutes Prohibited Activity[.]

*Id.* The award documents provide that as a general rule any unvested awards are cancelled if a financial advisor leaves Morgan Stanley. *See* A220–21, § 7; A303.

Morgan Stanley has subjected that general rule to a handful of narrow exceptions that do not frustrate the retention and guardianship purposes of the awards. If a financial advisor is unable to remain employed through the awards' vesting dates because of death, disability, retirement, involuntary not-for-cause termination (*i.e.*, layoff), or government service, Morgan Stanley will still pay the compensation to the financial advisor (or his or her beneficiaries). *See* A218–20, §§ 3–5; A303–04. Under these exceptions, and only under these exceptions, some payments may be made to former Morgan Stanley employees. Otherwise, all payments by definition go to current employees.

The awards are structured in part to meet the expectations of Morgan Stanley's financial regulators. Regulators including the Financial Industry Regulatory Authority (FINRA), the Federal Reserve Board of Governors, the

Securities and Exchange Commission, and the Office of the Comptroller of the Currency have issued and proposed guidance to financial firms advising them to defer portions of employee incentive compensation—and to make that compensation contingent and cancellable—to address risk-taking and other behaviors that may be harmful to customers and the public markets.[5]

### B. Plaintiffs' claims

Plaintiffs are former Morgan Stanley financial advisors who voluntarily left the firm to join competitors, resulting in the cancellation of their unvested deferred compensation awards. A23–24 ¶¶ 11–22. In their complaint, plaintiffs do not dispute that Morgan Stanley correctly applied the terms of the deferred compensation awards by cancelling the awards when they resigned. Instead, plaintiffs argue that the deferred compensation awards are "employee benefit

---

[5] *See, e.g.*, Guidance on Sound Incentive Compensation Policies, 75 Fed. Reg. 36,395, 36,396, 36,408–10 (June 25, 2010) (commending the use of awards that are deferred for multi-year periods and subject to cancellation); Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318, 33,392 (July 12, 2019) (addressing compensation-related best practices for compliance); FINRA, 2024 FINRA Annual Regulatory Oversight Report 45 (Jan. 2024), https://bit.ly/3PDRxBO (describing expectation that FINRA member firms will "adjust[] compensation for financial professionals who fail to adequately manage conflicts of interest associated with account recommendations"); Notice of Proposed Rulemaking, "Incentive-Based Compensation Arrangements," Office of the Comptroller of the Currency 180–81, 192 (May 6, 2024), https://bit.ly/40CKEqA (proposing regulation requiring the multi-year deferral and potential cancellation of incentive compensation awarded to "significant risk-takers").

pension plans" under ERISA—meaning plaintiffs' unvested awards could not lawfully be "forfeited" and the awards' vesting requirements cannot be enforced—because the awards permit some payments after the end of employment. Plaintiffs assert three claims: (1) a claim for declaratory and equitable relief under ERISA § 502(a)(3), A43–44 ¶¶ 98–101; (2) a claim for benefits and for reformation of the deferred compensation awards under ERISA § 502(a)(1) and § 502(a)(3), A44–45 ¶¶ 102–107; and (3) a claim of fiduciary breach under ERISA § 502(a)(2) on behalf of the putative ERISA plan against the Morgan Stanley Compensation Management Development and Succession Committee, A45–47 ¶¶ 108–117.

The complaint explicitly requests "an Order from the Court … declaring that the FA Deferred Compensation Program is subject to ERISA[.]" A22 ¶ 6.

### C. Morgan Stanley's motion to compel arbitration

In May 2022, Morgan Stanley moved to compel arbitration of plaintiffs' claims under the Federal Arbitration Act. A51. Morgan Stanley argued that all plaintiffs had entered valid arbitration agreements that encompassed their claims, A65–72, and that those agreements delegated questions concerning arbitrability to the arbitrator, A72–73. Morgan Stanley also explained that the arbitration agreements lawfully extended to the claims that plaintiffs styled as "representative" claims because however styled, plaintiffs' claims were quintessential individual benefits claims which are unquestionably arbitrable—

plaintiffs were seeking to recover benefits they claim are due *to* them *from* the alleged plans. A70–72.

In its briefing on the motion to compel arbitration, including its reply brief and responses to plaintiffs' notices of supplemental authority, Morgan Stanley structured its arguments to show that the claims were arbitrable even if plaintiffs were entitled to relief under ERISA. At no point in its briefing did Morgan Stanley argue that plaintiffs' claims are not arbitrable because the deferred compensation awards are not subject to ERISA, or argue that the district court needed to reach that question in order to resolve the motion to compel. Instead, Morgan Stanley repeatedly emphasized that plaintiffs could obtain complete relief on their ERISA claims in arbitration, as agreed, if the arbitrators determined they were entitled to any relief at all. *See* A53, 104, 124, 131. Plaintiffs similarly did not seek a resolution of the merits in opposing Morgan Stanley's motion to compel. *See* A76, 120, 127.

On Friday, September 15, 2023, the district court issued an order stating that the "parties' briefing does not adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan." A136. The Court directed:

> [B]y **Wednesday, September 20, 2023**, the parties will submit letters addressing whether Plaintiffs' allegations that, in certain scenarios, some financial analysts receive their scheduled payouts after their employment with Morgan Stanley ends demonstrates that the deferred compensation program is an ERISA plan.

*Id.* (emphasis in original). The court did not explain the purpose of its request. On the same day, plaintiffs filed a letter in response to an apparent *ex parte* "request received" from chambers—the specifics of which have never been disclosed to Morgan Stanley—attaching the documents cited in the complaint. A138. Five days later, the parties submitted five-page letters, consistent with the district court's rules (SPA91 §I(A)), stating their positions on plaintiffs' ERISA-coverage allegations. *See* A309, 314. Morgan Stanley addressed, as ordered, why plaintiffs' allegations did not demonstrate that ERISA governs the at-issue deferred compensation awards. But it concluded its letter by reiterating that the issue should be decided by an arbitrator, reminding the court that "plaintiffs may—*and must*—obtain any relief on their ERISA claims in arbitration." A318 (emphasis added; capitalization altered).

**D. The district court's November 2023 order**

On November 21, 2023, the district court issued a memorandum opinion and order purporting to grant Morgan Stanley's motion to compel arbitration. SPA1. The district court explained that the parties entered valid arbitration agreements with paradigmatically broad language. SPA15–27. The district court then considered plaintiffs' argument that "their claims are not arbitrable" because "they have brought their claims in a representative capacity on behalf of ERISA plans." SPA28. The district court concluded that plaintiffs do not assert any genuinely

representative claims under ERISA § 502(a)(2) but rather raise individual benefits claims that are indisputably arbitrable, SPA41–51; that plaintiffs failed to show that their § 502(a)(3) claims are not arbitrable, SPA51–53; and that compelling arbitration would not result in an impermissible prospective waiver of any statutory rights under ERISA, since plaintiffs could obtain full payment of their benefits through arbitration, SPA53–55.

Before concluding that arbitration was appropriate *regardless whether ERISA applied*, the district court took the extra—and remarkable—step of analyzing whether Morgan Stanley's deferred compensation awards qualify as pension plans. SPA29–39. Based on the complaint and incorporated documents, the district court concluded that the awards are ERISA plans, SPA39, thereby purporting to resolve the key question on the merits and granting relief the complaint explicitly seeks, A22 ¶ 6. Within 24 hours of the court's decision, plaintiffs' counsel publicly characterized the finding as conclusively resolving the merits of the parties' dispute.[6]

---

[6] *See* Miriam Rozen, *Ex-Morgan Stanley Brokers Must Arbitrate Class Claim Over Deferred Comp, Judge Rules*, AdvisorHub (Nov. 22, 2023), https://bit.ly/4hkPA9e ("Judge Gardephe concluded that the Morgan Stanley deferred compensation plan is an ERISA pension plan … . This means that our clients' deferred compensation is vested and non-forfeitable.").

### E. Morgan Stanley's motion for reconsideration or clarification

On December 5, 2023, Morgan Stanley timely moved for reconsideration or clarification of the district court's November 2023 order. A319. The motion asked the court to clarify that it did not intend to rule on the merits of plaintiffs' claims in deciding the motion to compel arbitration or, if that was the court's intention, to reconsider that decision, since arbitrability was not dependent on the merits and the court did not have the evidentiary foundation to decide the merits. A319–50.

On April 2, 2024, Morgan Stanley filed an emergency motion for leave to submit a declaration and certain arbitration-related documents demonstrating the exigency of the motion for reconsideration in view of arguments by claimants in arbitration that the district court's ERISA-governance finding "bound" the panel. A393–95. Morgan Stanley explained that it was facing an "imminent threat of recurring irreparable harm" given the order's outsized influence in ongoing arbitrations where final awards premised on the court's order are not generally appealable. A395.

On May 24, 2024, with multiple arbitrations proceeding under the cloud of the district court's opinion, Morgan Stanley petitioned this Court for a writ of mandamus directing the district court (1) to compel arbitration without purporting to resolve whether the deferred compensation awards are ERISA-governed, or alternatively (2) to rule promptly on the motion for reconsideration so that Morgan

Stanley could appeal to this Court in the ordinary course. A533. On August 27, 2024, the Court denied the petition "without prejudice to renewal if the district court fails to act on the reconsideration motion within a reasonable time." A576.

**F. The district court's November 2024 order**

On November 5, 2024, the district court denied Morgan Stanley's motion for reconsideration or clarification. SPA57. Describing its November 2023 order, the district court stated the order had "*addressed and resolved the parties' dispute* as to whether the deferred compensation programs at issue are covered by ERISA." SPA58 (emphasis added). The district court thus rejected Morgan Stanley's primary request to clarify that it did not intend to resolve the merits of the dispute it ostensibly agreed was reserved for arbitration, stating that it had unambiguously "concluded that Morgan Stanley's deferred compensation programs are ERISA plans." SPA72 (quotation omitted).

The district court then rejected Morgan Stanley's request to reconsider its ERISA finding. SPA72–89.

1. The district court reasoned that it needed to resolve the ERISA-coverage question because if ERISA did not apply, then plaintiffs' arguments to avoid arbitration would fail and there would be no need to consider whether arbitrating their claims would be contrary to ERISA. SPA75. But as the district court's own opinion demonstrates, plaintiffs' arguments to avoid arbitration *also*

fail if ERISA *does* apply—that is how the court purported to compel arbitration despite concluding that ERISA applies. The district court therefore did not need to reach the ERISA issue to decide arbitrability. *Contra* SPA77–78.

2. The court also faulted Morgan Stanley for "never suggest[ing] that [the court] should assume—for purposes of their motion to compel arbitration—that ERISA applied." SPA74. But arguing—as Morgan Stanley did—that arbitration was appropriate regardless whether ERISA applies is just another way of saying precisely that: the court could assume the question away. *See, e.g.*, A114 ("Plaintiffs do not and could not dispute that individual claims for benefits may be arbitrated . . . [and] can obtain complete relief, if any, through their individual claims for benefits."). The irrelevance of the underlying merits was plain from the parties' briefing, where *neither party* briefed the merits question—a void that the district court confirmed when it issued its September 2023 order observing that the parties had neglected that subject. A136.

3. In its reconsideration order, the court mischaracterized Morgan Stanley's five-page letter response to that September 2023 order as evidence that Morgan Stanley somehow "*chose[]* to litigate ERISA coverage on the merits," SPA76 (emphasis added). Morgan Stanley had no choice in the matter. When the court directed the parties to present their views on plaintiffs' allegations that "Morgan Stanley's deferred compensation program is an ERISA plan," A136,

Morgan Stanley responded as ordered. But in the very same response, Morgan Stanley reminded the court that plaintiffs could *and must* obtain any relief on their ERISA claims in arbitration. A318. Morgan Stanley's request to send the merits to arbitration could not have been clearer.[7]

4. Even as it suggested that Morgan Stanley had willfully sought to litigate the merits, the district court also faulted Morgan Stanley for failing to do so—saying Morgan Stanley had been "on notice of the ERISA coverage issue from the outset of this action and chose not to properly brief it," or to develop a record with the evidence it considered necessary to the decision of the merits, SPA76–77 n.4. But of course, Morgan Stanley was asking the court to send the merits *to arbitration*. Asking the district court to decide the merits would have jeopardized that right. And as explained, it was *not* necessary to reach the ERISA-coverage question to decide arbitrability—the court's belief that Morgan Stanley could have and should have developed a record on the merits follows only from its threshold analytical error in believing the merits were relevant to arbitrability at all.

[7] The purpose of the court's September 2023 order was not clear at the time—given the nature of the parties' dispute over whether plaintiffs could obtain complete relief in arbitration, Morgan Stanley understood the judge to be considering that question. That is why Morgan Stanley framed its reminder that the merits had to be arbitrated in those terms: plaintiffs *could* obtain the benefits they were seeking in arbitration, and therefore were *obliged* to arbitrate their claims.

5. Finally, the district court rejected Morgan Stanley's argument that the court's substantive analysis of the ERISA-coverage issue constituted "clear error." SPA82–89. The court doubled down on its prior findings and concluded that the evidence Morgan Stanley had suggested would be important to a proper analysis would not change the court's mind. *Id.*

**G. Morgan Stanley's appeal**

On November 29, 2024, Morgan Stanley timely appealed the district court's November 2024 order denying reconsideration and the underlying November 2023 order it addresses, both of which purport to resolve the merits of the dispute reserved for the arbitrators and therefore amount to an effective denial of Morgan Stanley's motion to compel arbitration. A531; *see* 9 U.S.C. § 16(a)(1)(B); Fed. R. App. P. 4(a)(1)(A); *see also Lora v. O'Heaney*, 602 F.3d 106, 110 (2d Cir. 2010) (timely filed motion for reconsideration "toll[s] the time to file a notice of appeal regarding the underlying order until decision of the motion for reconsideration."). On December 20, 2024, plaintiffs moved to dismiss the appeal for lack of jurisdiction. ECF No. 26. On January 6, 2025, Morgan Stanley filed its opposition to that motion, explaining the jurisdictional bases for its appeal. ECF No. 32. On January 8, 2025, Morgan Stanley moved to expedite briefing on its appeal. ECF No. 34.

### H. Parallel arbitrations

Morgan Stanley is currently defending over 80 arbitrations brought by hundreds of former financial advisors before FINRA. *See* A395–96, 549–50. The first such claim was filed on September 2, 2021, roughly nine months after plaintiffs initiated this action. A549. The claims have proliferated since the district court's November 2023 order, with statements of claim closely hewing to the complaint's allegations and citing the order as resolving the key issue: Whether the deferred compensation awards are subject to ERISA. *Id.*

A handful of the arbitrations have already gone to hearing. Since the district court's November 2023 order, claimants in these hearings have maintained that the district court's opinion "is the law"; that "it holds in no uncertain terms that Morgan Stanley's plans are governed by the broad law ERISA"; that "the panel's duty is to apply the law," and that "it is not within the province of a panel in arbitration to overrule a federal court decision." A418–19 at 23:9–24:1 (claimants' opening statement), A517–18 at 43:22–44:14 (claimants' closing argument). The claimants have objected to the presentation of evidence to the panels, arguing that the key merits issue in the case "has already been decided," A410 at 15:21–23, leaving only the calculation and award of damages to the arbitrators. Morgan

Stanley lost an arbitration on this issue for the first time after the district court's order. A550.[8]

Several of the plaintiffs in this case have initiated arbitrations. They attached the district court's November 2023 order to their statements of claim, consistent with their counsel's public statements that the order has decided the merits of the claims in their favor.

## SUMMARY OF ARGUMENT

**I.** The district court improperly adjudicated the merits of a dispute it held the parties agreed to arbitrate, effectively depriving Morgan Stanley of its FAA-protected right to arbitration. The court's merits analysis was unnecessary, and violated the FAA's mandate to refrain from ruling on the merits of claims that parties have agreed to submit to arbitration.

**A.** Plaintiffs' claims against Morgan Stanley hinge on whether Morgan Stanley's deferred compensation awards are governed by ERISA. The district court should have resolved Morgan Stanley's motion to compel arbitration without reaching that key question. The court correctly recognized that plaintiffs' benefits

[8] While Morgan Stanley has also prevailed in arbitrations since the district court's November 2023 order, even those decisions illustrate the extent of the prejudice Morgan Stanley now faces due to the order: Morgan Stanley not only must establish that plaintiffs' claims lack merit, but also must convince lay arbitrators to reject a federal judge's finding on the key issue before them. *See, e.g.*, FINRA Award, *Rude et al. v. Morgan Stanley* (June 17, 2024), https://bit.ly/4aolWhi.

claims were unquestionably arbitrable because plaintiffs could obtain complete relief in arbitration even if ERISA applied. That holding did not require the court to resolve whether ERISA actually applies to plaintiffs' awards, as demonstrated by the fact that the court found arbitration appropriate *whether or not* plaintiffs' ERISA claims had any merit.

The court has since suggested that Morgan Stanley invited the district court to reach the merits, but that is wrong. Morgan Stanley sought to have an *arbitrator* decide plaintiffs' claims. Neither Morgan Stanley's nor plaintiffs' arguments at the motion-to-compel stage addressed ERISA's application to the at-issue awards. The district court *sua sponte* ordered the parties to brief the merits precisely because neither party had addressed the merits (because they were irrelevant to the motion to compel). Morgan Stanley responded as ordered, but reiterated that the plaintiffs' claims had to be decided in arbitration.

**B.** The district court's improper merits finding has frustrated Morgan Stanley's right to arbitrate the merits of the dispute, and has prompted dozens of copycat claims. Morgan Stanley now faces arbitrations against plaintiffs and hundreds of other former financial advisors in which it must contend with a federal court "ruling" that claimants argue binds the arbitrators to rule against Morgan Stanley. While that is wrong as a matter of law, the influence that a federal judge's finding has on lay arbitrators has effectively deprived Morgan Stanley of the

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 73 of 194

bargained-for arbitration process the FAA is designed to protect.

**C.** If the Court determines that the FAA does not permit Morgan Stanley to appeal the district court's improper ERISA finding, then it still can and should issue a writ of mandamus to vacate the finding. The district court's decision to resolve the merits was clearly and indisputably incorrect, and absent this Court's intervention Morgan Stanley has no other way to obtain relief from the district court's errors that are irreparably harming its arbitration rights.

**II.** The district court's merits commentary is also wrong, which amplifies the prejudice it is causing and reinforces the importance of this Court's review.

**A.** A compensation program is not subject to ERISA either if it is not a "pension plan" under the ERISA statute or if it is an exempt "bonus" plan under Department of Labor regulation. Morgan Stanley's deferred compensation awards fall outside ERISA's scope under both tests.

1. Contrary to the district court's finding, the awards are not a "pension plan" simply because they permit payment to certain former employees under certain humanitarian exceptions. Courts and the DOL have recognized that incidental payments to former employees do not transform a contingent incentive compensation program into a pension plan. The at-issue subsection of the statute applies to voluntary deferral plans, where employees choose to defer their own earned income to post-employment periods. These awards do not permit any

deferral of earnings by employees—they are earned and paid upon vesting.

The district court misapprehended the contingent nature of the awards by declaring that the awards are earned upon grant. The governing award documents say otherwise: to earn an award, a financial advisor must remain at Morgan Stanley in good standing through the vesting date. That means that financial advisors do not choose to defer any earned income under the statute.

The district court also incorrectly ignored the awards' express purposes—the "paramount" consideration in determining pension plan status. The purposes of these awards are to reward current employees for their continued service to the firm and good conduct, not to provide retirement or pension income.

2. The awards are also exempt from ERISA under the DOL's "bonus" regulation, which applies as long as bonuses are not "systematically deferred" until employees' post-employment years. The district court erred when it concluded the regulation does not apply because the awards are supposedly "commissions," not bonuses. There is no foundation for the district court's views that bonuses cannot be calculated based on revenue generation or that companies can only issue one type of bonus. To the contrary, courts and the DOL have consistently recognized that contingent awards just like Morgan Stanley's are ERISA-exempt retention bonuses.

The bonus regulation applies to bonuses as long as payment is not

"systematically deferred" until after employment. The district court inverted that standard, declaring that the bonus regulation cannot apply unless payments to former employees are "rare." Compounding matters, the district court assumed that fact against Morgan Stanley at the motion to compel stage, where no record had been developed on this point (because the merits of plaintiffs' claims were not at issue); and then relied on its manufactured legal standard to cast aside evidence at the reconsideration stage that over 85% of award distributions go to *current* Morgan Stanley employees.

**B.** The district court erred in declaring it had everything it needed to decide the ERISA issue. While the court felt equipped to rule on the issue at the motion to compel stage without a complete record or dedicated legal briefing, its ERISA finding—a radical departure from 50 years of caselaw and DOL guidance—demonstrates otherwise.

## STANDARD OF REVIEW

The question whether the district court properly ruled on the merits of the dispute when considering a motion to compel arbitration is a legal one, and the Court reviews questions of law *de novo*. *See WasteCare Corp. v. Harmony Enters., Inc.*, 822 F. App'x 892, 895 (11th Cir. 2020) (applying *de novo* review to decision "effectively" denying motion to compel arbitration); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833 (2d Cir. 2021) (denial of

arbitration is reviewed *de novo*). The Court likewise reviews *de novo* the mixed questions of law and fact implicated in the district court's ERISA-coverage finding. *Man Ferrostaal, Inc. v. M/V Akili*, 704 F.3d 77, 82 (2d Cir. 2012).

If the Court concludes that it lacks appellate jurisdiction, or that it was necessary for the district court to reach the merits, then it can in the alternative treat this appeal as a petition for a writ of mandamus. *See supra* at 6; *infra* at 36–38.

## ARGUMENT

### I. THE DISTRICT COURT IMPROPERLY PURPORTED TO RESOLVE THE MERITS OF PLAINTIFFS' CLAIMS, EFFECTIVELY DEPRIVING MORGAN STANLEY OF ITS RIGHT TO ARBITRATION

The FAA requires courts to "rigorously enforce arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quotation omitted). "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T Techs.*, 475 U.S. at 649; *see Transit Mix Concrete Corp. v. Loc. Union No. 282, Int'l Bhd. of Teamsters*, 809 F.2d 963, 967 (2d Cir. 1987) (stating the same); *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) (noting that courts "have no business weighing the merits of the grievance" reserved for arbitration). Adherence to this general prohibition is even more important when the parties have not presented the merits for resolution

in the first place. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (explaining that courts are "essentially passive instruments of government" that should "decide only questions presented by the parties" (quotations omitted)); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Here, the district court failed to respect the terms of the parties' arbitration agreements, which reserve *for the arbitrators* the question whether plaintiffs' claims have any merit—*i.e.*, whether ERISA governs Morgan Stanley's deferred compensation awards. The district court purported to resolve that question, even though it was not necessary to decide that question to decide whether plaintiffs' claims were arbitrable and the parties never argued otherwise. The district court's decision to reach the merits conflicts with the FAA's mandate and should therefore be abrogated.

**A. The district court should have granted Morgan Stanley's motion to compel arbitration without addressing whether Morgan Stanley's deferred compensation awards qualify as ERISA pension plans.**

The key question in the parties' underlying dispute is whether the deferred compensation awards at issue are subject to ERISA. If the awards are not, then plaintiffs' claims—all of which are brought under ERISA—fail. But if the awards *are* subject to ERISA, then there would be no dispute that the cancellation of

plaintiffs' unvested awards when they resigned from Morgan Stanley conflicted with the statute's anti-forfeiture provisions. Under ERISA's vesting provisions, an employee with "at least 3 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions." 29 U.S.C. § 1053(a)(2)(B)(ii). Each of the plaintiffs worked at Morgan Stanley for at least three years, and the awards at issue were cancelled thereafter. A23–24 ¶¶ 11–22. As a practical matter, then, resolution of the ERISA-coverage issue in either direction is dispositive of the ERISA violation plaintiffs allege.[9]

Morgan Stanley's motion to compel presented a much narrower question, independent of the merits: Whether plaintiffs' ERISA claims must be directed to arbitration. The district court correctly answered yes, and none of its reasoning rejecting plaintiffs' contrary arguments required addressing, much less resolving, the ERISA-coverage issue.

*First*, plaintiffs argued (i) that the "parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; and (ii) that the alleged ERISA plan (*i.e.*, the deferred compensation awards) "never agreed to arbitrate any claims," and that this precluded arbitration "because Plaintiffs' § 502(a)(2) claims belong

---

[9] If the awards were determined to be ERISA pension plans, Morgan Stanley would be limited to asserting equitable defenses to plaintiffs' entitlement to relief. *See, e.g.*, *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 822 (7th Cir. 2010).

to" the alleged plan. A90, 93 (quotation omitted). The district court correctly rejected these arguments "because Plaintiffs have not alleged losses to the plan" and thus "are not, in fact, proceeding in a representative capacity." SPA48 (quotation omitted). The district court's reasoning holds even if ERISA actually governs the deferred compensation awards: As the district court explained, because plaintiffs "failed to allege a true § 502(a)(2) claim," their complaint did not require the district court to decide whether "claims under § 502(a)(2) are non-arbitrable." SPA51.[10]

*Next*, plaintiffs similarly argued they were not bound to arbitrate because they "assert claims in a representative capacity under ERISA § 502(a)(3)." A91. The district court correctly rejected this argument, too, because § 502(a)(3) claims may seek individual relief and be arbitrated individually, and plaintiffs had "not demonstrated that their § 502(a)(3) claims are non-arbitrable." SPA53. Again, that logic holds whether or not ERISA governs the deferred compensation awards.

*Finally*, plaintiffs objected to arbitration under the prospective waiver doctrine, arguing that "the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3)."

[10] Morgan Stanley also argued that plaintiffs' benefits claims were subject to arbitration regardless whether plaintiffs also asserted bona fide representative claims, such that the benefits claims had to proceed to arbitration even if plaintiffs also asserted litigable claims. A71–72.

A96. The district court correctly rejected this argument because plaintiffs had "not identified any limitation on remedies that would apply in an arbitration, . . . other than the class waiver" contained in their arbitration agreements, and the class waiver did not preclude the recovery of the benefits plaintiffs were seeking. SPA54–55. Once again, that reasoning remains valid whether or not ERISA governs plaintiffs' deferred compensation awards. Simply put, the district court concluded that arbitration was appropriate *even if* plaintiffs' ERISA claims had merit. The disputed issue in the motion to compel was only whether plaintiffs could obtain complete relief on their claims in arbitration, and because they could, the claims were arbitrable.

Morgan Stanley raised these points in its motion for reconsideration or clarification, A334–36, but the district court denied the motion based on its belief that it was necessary to reach the ERISA issue:

> [I]n order to rule on the enforceability of the arbitration provision on which Defendants rely, this Court had to determine (1) whether ERISA applies to Plaintiffs' claims – i.e., whether Morgan Stanley's deferred compensation [awards] are indeed ERISA plans; and (2) if so, whether arbitration of Plaintiffs' claims would be contrary to ERISA. Ruling on the first of those questions – whether the deferred compensation [awards] are covered by ERISA – was necessary because, if Morgan Stanley's deferred compensation [awards] are not covered by ERISA, Plaintiffs' arguments to avoid arbitration fail, and there would be no need to reach the second issue – whether arbitration of Plaintiffs' claims would be contrary to ERISA.

SPA75 (citation omitted).

That analysis rests on a logical fallacy. True enough, if the district court had determined that the deferred compensation awards were not covered by ERISA, then plaintiffs' arguments to avoid arbitration would have failed. But that does not mean such a determination was *necessary* to conclude that plaintiffs' claims should be directed to arbitration—after all, the district court *in fact* concluded that ERISA applied and that plaintiffs' claims were nevertheless arbitrable. Because the court's analysis established that arbitration was compulsory even if plaintiffs were right on the merits that ERISA applied, the court could have and should have resolved Morgan Stanley's motion to compel without reaching the merits question, as it would have avoided violating the well-established rule against courts opining "on the potential merits of the underlying claims" subject to arbitration. *See AT&T Techs.,* 475 U.S. at 649.

The district court therefore erred in justifying its decision with reference to caselaw noting that where the question of arbitrability and the merits are "inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits." SPA77 (quoting *Rite Aid of Pa., Inc. v. United Food & Com. Workers Union, Loc. 1776*, 595 F.3d 128, 136 (3d Cir. 2010)). As just explained, the questions of arbitrability and the merits are *not* intertwined here—they are entirely independent. The district court concluded (correctly) that

Case: 24-3141, 01/23/2025, DktEntry: 48.1, Page 41 of 172

plaintiffs' claims are arbitrable whether or not the awards are ERISA pensions, so the court could have resolved the arbitrability question without reaching the merits.

The district court also insisted that Morgan Stanley "never suggested that [the district court] should assume – for purposes of [its] motion to compel arbitration – that ERISA applied to the[] deferred compensation [awards]." SPA74. That is incorrect. *Both parties* operated on that assumption, as the court itself recognized when it issued an order charging the parties with having ignored the issue. A136. Morgan Stanley maintained throughout its motion to compel briefing that plaintiffs' claims could be arbitrated *even if* they were subject to ERISA. *See* A70–72, 111–14. Its arguments necessarily assumed that ERISA covered plaintiffs' claims and explained why those claims were arbitrable *anyway*. The same assumption also governed Morgan Stanley's arguments in response to plaintiffs' notices of supplemental authority. *See* A125 ("[I]f [Plaintiffs] succeed in showing that Morgan Stanley's deferred compensation program is an ERISA plan at all, they may obtain the claimed benefits in full in an arbitration proceeding."); A132 (stating the same).

Last, the district court stated that Morgan Stanley "asked [it] to rule that the[] deferred compensation [awards] were not covered by ERISA." SPA74. That, too, is incorrect. Morgan Stanley did not ask for a merits ruling when it asked the court to compel *arbitration* of the merits. A word-by-word review of Morgan

Stanley's briefs in support of its motion to enforce its arbitration agreements confirms that, as should be obvious, Morgan Stanley did not ask the court to substitute its judgment for the arbitrators. *See* A53–75, 104–19. Morgan Stanley addressed the merits *only* in response to the district court's September 2023 order that it do so. Even in that letter, Morgan Stanley did not ask the district court to rule on the merits (and the district court never indicated that it intended to do so)—Morgan Stanley instead reiterated again that plaintiffs could obtain complete relief in arbitration, and that they therefore *had* to arbitrate their claims: "plaintiffs may—and *must*—obtain any relief on their claims in arbitration." A318 (emphasis added; capitalization altered).

The district court's unprompted foray into the merits was a mistake. The district court should have granted Morgan Stanley's motion to compel arbitration without addressing the merits of the parties' underlying dispute. This Court should correct that error.

### B. The district court's improper merits finding has caused Morgan Stanley the very harm the FAA is designed to avoid.

Congress's "principal purpose" in enacting the FAA was to "ensur[e] that private arbitration agreements are enforced according to their terms." *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). The district court's improper ERISA-coverage finding has compromised Morgan Stanley's FAA-protected contractual right to resolve the merits of the dispute with

plaintiffs in arbitration. Plaintiffs' counsel has publicly stated that the district court resolved the merits of their claims in plaintiffs' favor. *Supra* at 14 & n.6. The November 2023 order is Exhibit A to plaintiffs' arbitral statements of claim.

The court's finding has likewise undermined the arbitral resolution of claims surrounding Morgan Stanley's deferred compensation awards more broadly. Morgan Stanley is currently defending over 80 other arbitrations brought by former financial advisors asserting identical ERISA claims to recover unvested deferred compensation. *See* A395–96, 549–50. Most of these claims were filed in the wake of the district court's November 2023 order and expressly cite the order as judicial precedent confirming ERISA's application to the claimants' deferred compensation awards. A549. In the arbitrations that have proceeding to hearing, the claimants have uniformly argued that the district court's finding is "binding law" that arbitration panels are prohibited from manifestly disregarding, leaving nothing but damages for the arbitrators to decide. This posturing has prompted hearings centered as much on disputes over the effect of the district court's order as on the actual evidence and the merits of the claims. *See* A394–95, 550.

Of course, the district court's ERISA governance finding does *not* actually "bind" the arbitration panels in other cases. The district court's finding cannot have preclusive effect when it was not necessary to the decision, *see Bobby v. Bies*, 556 U.S. 825, 835 (2009); when it is not a "valid and final judgment," *see Ashe v.*

*Swenson*, 397 U.S. 436, 443 (1970); when it has not been affirmed on appeal, *see Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986) (no preclusive effect absent appellate review of finding); 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4421 (3d ed. Apr. 2023 update); and when Morgan Stanley did not have a "full and fair opportunity" to litigate the merits, *see Allen v. McCurry*, 449 U.S. 90, 95 (1980); *see also, e.g.*, *Picard v. Credit Sols., Inc.*, 564 F.3d 1249, 1256 (11th Cir. 2009) (concluding the "portion of the district court's decision" addressing a merits issue was "dicta that is unnecessary to support the district court's arbitration ruling," and therefore had no preclusive effect).

Nevertheless, to a panel of FINRA arbitrators, some with little or no legal background, a federal judge's determination of the merits has incalculable influence, especially when the district court's own opinion incorrectly but quite emphatically states that it resolved the ERISA question because it was required to do so as a matter of law. The result is that the district court's order is effectively depriving Morgan Stanley of the arbitration process that it bargained for with plaintiffs and that the FAA protects. Consistent with the FAA's directive that courts should enforce arbitration agreements according to their terms without reaching the merits themselves, *supra* at 26, this Court should hold that the district court did not have to reach the merits when deciding arbitrability, and therefore

should not have done so.

### C. If the Court determines it lacks appellate jurisdiction over Morgan Stanley's appeal, it should issue a writ of mandamus to vacate the district court's improper ERISA finding.

The Court has jurisdiction under 9 U.S.C. § 16 to reverse the district court's effective denial of Morgan Stanley's contractual right to arbitrate the merits. *Supra* at 5–6. But the Court may also treat Morgan Stanley's appeal as a petition for a writ of mandamus in the alternative, *see Rajaratnam*, 622 F.3d at 169, and direct the same corrective steps on that basis.

Mandamus is warranted where the right to issuance of the writ is clear and indisputable, there are no other adequate means to obtain relief, and issuance of the writ is appropriate under the circumstances. *Stein v. KPMG, LLP*, 486 F.3d 753, 759–60 (2d Cir. 2007). Those factors are satisfied here. Morgan Stanley's right to the writ is clear and indisputable: the district court plainly erred under the FAA in unnecessarily resolving the merits of a dispute the parties agreed to arbitrate (and did not ask the court to resolve). *Supra* § I.A; *see also* A533. The district court's decision is causing Morgan Stanley irreparable harm, and absent review, Morgan Stanley will have no other adequate means to obtain relief. Morgan Stanley generally will not have the ability to seek review of the arbitration awards that follow, as FINRA awards do not require any explanation of the arbitration panel's decision and are not ordinarily subject to appellate review. *See* FINRA Code of

Arbitration Procedure for Industry Disputes, Rule 13904. Finally, the writ is appropriate under the extraordinary circumstances here: the district court's unsolicited ERISA finding is wreaking havoc in countless arbitrations, including those brought by plaintiffs, *supra* § I.B, and is based on critical misstatements of fact and law, *infra* § II.

As this Court explained in *Stein*, "mandamus is available to confine courts to their designated jurisdiction"; the "touchstones of mandamus review are usurpation of power, clear abuse of discretion and the presence of an issue of first impression." 486 F.3d at 759 (quotation omitted). All of those considerations favor review here, where the district court reached an issue it lacked the power to decide and got it badly wrong. The order is not just wreaking havoc in arbitrations pending against Morgan Stanley which will not be reparable on appeal—the court's novel and unprecedented ruling is creating confusion and uncertainty among regulated entities about their ability to continue to offer a longstanding compensation structure that serves important purposes and is designed to satisfy requirements imposed by their financial regulators. *Supra* at 7–10 & n.5. And Morgan Stanley will have no opportunity to ameliorate these harms through the ordinary appellate process. If any case is suitable for mandamus review, it's this one.

## II. THE DISTRICT COURT'S MERITS COMMENTARY IS WRONG

The district court made a series of errors in concluding that Morgan Stanley's deferred compensation awards are subject to ERISA. The errors can perhaps be explained by the absence of party presentation, meaning the district court lacked a responsive pleading, full briefing, an evidentiary record, or the other procedural accoutrements ordinarily associated with a finding on the merits, but whatever the reason, the district court misunderstood the materials before it and misunderstood the law when it concluded that the deferred compensation awards at issue here are ERISA pension plans. While this Court should not reach the merits for the same reasons the district court should not have, the errors in the district court's decision—and the confusion it is causing about the state of the law—reinforce why the Court's review is needed and appropriate.

If and only if the Court were to determine that a merits finding was necessary to decide arbitrability, the Court should reverse that finding on mandamus review. But because the two issues are clearly independent, as discussed above, the district court's errors on the merits are principally relevant to demonstrating the importance of this Court's review.[11]

---

[11] The district court's merits finding is clearly wrong based on the law and the very limited materials the court reviewed, and could be reversed on that basis. But the district court's finding could not be *affirmed* without affording Morgan Stanley the opportunity to present a complete evidentiary record and briefing, *see infra* at 55–58, and the district court erred in suggesting that Morgan Stanley had such an

### A. Morgan Stanley's deferred compensation awards are not a pension benefit plan.

ERISA defines an "employee pension benefit plan" as a plan or program that "by its express terms or as a result of surrounding circumstances . . . (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). The DOL, the federal agency charged with enforcing ERISA, has also promulgated a regulation that exempts from ERISA's scope "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). Taken together, a compensation program is not subject to ERISA either if it is not a "pension plan" under the statute *or* if it is a "bonus" plan under the DOL regulation.

As this Court has observed, the "pension plan" definition is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Pasternack v. Shrader*, 863 F.3d 162, 168 (2d Cir. 2017) (quoting *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574–75 (5th Cir. 1980)).

---

opportunity below, *supra* at 32–33. To reiterate, the merits of this case should be arbitrated—but if liability is to be found in litigation, it cannot be on a one-sided record formulated by plaintiffs alone.

Neither plan sponsors nor employees benefit when a compensation program is retrospectively recast as a pension plan, limiting how much can be paid to current employees and when. In this case, both the statutory definition and the bonus plan regulation lead to a single conclusion: Morgan Stanley's deferred compensation awards to financial advisors are not a pension plan.

1. *The awards do not qualify as a "pension plan" under the statutory test.*

a. The district incorrectly concluded that exceptional payments to former employees transform the awards into an ERISA "pension plan."

The district court's ERISA finding was premised on Morgan Stanley's humanitarian exceptions to cancellation for advisors who cannot remain at Morgan Stanley through the vesting period due to death, disability, layoff, ordinary course retirement, and transition to government service. The court reasoned that, because the awards permit payment to former financial advisors under those narrow circumstances, the payments "sometimes occur at the end of employment or beyond" and are therefore within the scope of 29 U.S.C. § 1002(2)(A)(ii). SPA38.

The district court's reasoning that the existence of "some" post-employment payments triggers ERISA coverage under § 1002(2)(A)(ii) has been directly rejected by numerous courts. The Fifth Circuit put it bluntly:

> [ERISA] does not embrace all plans that may *incidentally* result in the payment of benefits after death or disability but only plans established for the purpose of providing those benefits. . . .Under the statutory

> definition, the mere fact that *some payments* under a plan may be made after an employee has retired or left the company *does not result in ERISA coverage*.

*Murphy*, 611 F.2d at 574–75 (emphases added). The district court's contrary decision stands alone: No court has previously interpreted § 1002(2)(A)(ii) to mean that any payment to a former employee, even on an exception basis, brings a plan within ERISA's reach. *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 436 (6th Cir. 2019) (deferral of payment to termination of employment or retirement must be the plan's frequent and intended result for ERISA to apply, not merely "incidental"); *Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619, 625 (5th Cir. 2014) ("The mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage."); *Oatway, Inc. v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) (rejecting ERISA coverage because purpose of plan was to encourage employee retention, where "post-retirement payments" were "only incidental" to that goal); *Faris v. S. Ute Indian Tribe*, 2023 WL 7386870, at *5, *8–9 (D. Colo. Nov. 8, 2023) (incentive plan that paid current employees, with "limited number of exceptions" to cancellation that resulted in payments to former employees, was not subject to ERISA); *Albers v. Guardian Life Ins. Co. of Am.*, 1999 WL 228367, at *3–4 (S.D.N.Y. Apr. 19, 1999) (plan that generally made payments during employment, but paid immediately upon death, retirement, or disability was not subject to

ERISA because post-employment payments were "merely incidental to the goal of providing current compensation"); *Killian v. McCulloch*, 850 F. Supp. 1239, 1246 (E.D. Pa. 1994) (plan with purpose of incentivizing employee retention that contemplated post-termination payments after retirement, death, or disability was not subject to ERISA); *Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 494 (D. Md. 1993) (rejecting contention that any payment after death, disability, and other termination resulted in ERISA coverage).

Guidance from the DOL further underscores the district court's error. Assessing an incentive program in which departing employees' awards were generally cancelled, except in the event of the employee's death or retirement, the DOL advised that the "mere fact that many of the [p]lans' participants may have separated from the Company . . . prior to the time they will be eligible . . . does not, in [DOL's] view, implicate a deferral of income of the kind contemplated by section 3(2)(A)." Op. 2002-13A, 2002 WL 31846478, at *3 (Dec. 6, 2002). That advice is consistent with the DOL's prior pronouncements on the issue, advising the public that payments that are merely "incidental" to the employer's goal of compensating current employees do not trigger ERISA's pension provisions. Op. 98-02A, 1998 WL 103654, at *1–2 (Mar. 6, 1998); *see also* Op. 82-29A, 1982 WL 21212, at *1–2 (July 2, 1982); Op. 79-20A, 1979 WL 6959, at *1–2 (Mar. 19, 1979); Op. 79-15A, 1979 WL 6953, at *1–2 (Mar. 12, 1979).

The district court misread the Fifth Circuit's decision in *Tolbert* to embrace its "one penny" rule. In fact, just like all the other courts to have considered the issue and the Department of Labor, the Fifth Circuit required more than mere payment after the termination of employment to find ERISA coverage. As relevant here, the statute applies to a plan that by its express terms "results in a deferral of income *by employees* for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii) (emphasis added). The plan in *Tolbert* allowed just that—employees could themselves voluntarily defer distribution of their mandatory deferred compensation amounts—even after the amounts became earned through vesting—to the end of their employment. *Tolbert*, 758 F.3d at 622. The critical feature of the plan that led to the application of ERISA was that the "employees ha[d] the option to defer receipt of a portion of their compensation"—the employees "forewent [a present right to] income . . . in exchange for receiving income . . . at a later date." *Id.* at 625–26.

The deferrals in the *Tolbert* plan are thus distinguishable from Morgan Stanley's deferred awards, where employees lack any ability to voluntarily defer distribution of vested awards—the awards are paid as soon as they are earned, and their payment cannot be deferred by employees until after the end of employment. *See* A234 § 2(b) (awards "will, to the extent vested, be paid in cash (minus applicable tax and other withholding liabilities) on the Scheduled Distribution

Date"). Indeed, Morgan Stanley's awards are like another non-ERISA plan the Fifth Circuit distinguished in *Tolbert*, under which the plaintiff-retirees "had no right to income" before certain conditions were met and therefore "had not foregone any income in exchange for receiving income at a later date." *Tolbert*, 758 F.3d at 265 (citing *Boos v. AT&T, Inc.*, 643 F.3d 127, 134–35 (5th Cir. 2011)). The awards here, like the plan in *Boos*, are contingent on the advisor meeting specific conditions for payment—meaning advisors have no right to the awards, and thus do not forgo or defer any income, at the point of grant. In its reconsideration order, the district court chastised Morgan Stanley for supposedly misreading *Tolbert* to turn on this additional feature, SPA87—but it was the district court that overlooked this critical part of the *Tolbert* decision.[12]

The otherwise-universal recognition that compensation plans can include some post-employment payments without implicating ERISA makes sense. ERISA is not intended to reach programs designed to compensate current employees—other legal regimes govern that. *See Leister v. Dovetail, Inc.*, 546

---

[12] The Sixth Circuit's *Wilson* decision similarly helps illustrate the point. In *Wilson*, the Sixth Circuit found that ERISA applied because the plan allowed participants to "choose to defer each upcoming year's compensation" and "authorize[d] options for payment of deferred income . . . after termination." 930 F.3d at 432, 437. No such voluntary deferral mechanism exists with respect to the Morgan Stanley awards at issues here, where financial advisors have no right to the compensation at all until the vesting date and cannot defer a fully vested award.

F.3d 875, 882 (7th Cir. 2008) ("[R]egular compensation is not an ERISA benefit."). These awards could not function if they were ERISA plans—under the pension rules they could not be used to reward *current* employees for retention and good guardianship, their very purposes for existing in the first place. Morgan Stanley would therefore have to either eliminate the awards altogether, or eliminate payments to advisors in cases of death, disability, layoff, retirement, or transition to government service—the only award term that purportedly "results in" post-employment payments under 29 U.S.C. § 1002(2)(A)(ii), *see* SPA38. In fact, ERISA does not preclude the use of deferred compensation with humanitarian exceptions, and the district court erred in concluding otherwise.

b. The district court incorrectly concluded that the deferred compensation awards are "earned" at the point of grant.

The district court also misapprehended the contingent nature of the awards, prompting its erroneous finding that financial advisors earn the awards—and thus have their own "income" forcibly deferred—at the point of grant. SPA37–39. Not so. The governing documents before the district court reflect that financial advisors only earn the right to payment once they satisfy the award conditions, *viz.*, remaining employed and in good standing through the vesting date. *Supra* at 8–9 (award documentation); *see* A209 ("[N]or shall a Participant or any Beneficiary or any other person have any right to receive any distribution under the Plan except as, and to the extent, expressly provided in this plan document or the Award

Certificate."). Because advisors do not earn the deferred compensation until they satisfy the award conditions and the compensation is paid immediately once it is earned, there is no deferral of any earned income at all, by employees or otherwise. *See* 29 U.S.C. § 1002(2)(A)(ii).

The district court nevertheless described a financial advisor's failure to fulfill the conditions for payment as the "forfeiture of a contractual right," reasoning that Morgan Stanley could not undo advisors' supposed entitlement to the awards by making them contingent. SPA39. That illogicism cannot be squared with the express terms of the awards, nor with basic, longstanding tenets of contract law. *See Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 29 (1805) ("What is a condition precedent? It is a condition to be performed before the estate can vest."); *Finlay v. King's Lessee*, 28 U.S. (3 Pet.) 346, 347 (1830) (where a contract has a "condition precedent, without performance . . . no right could vest"). The district court based this analysis on its belief that advisors really "earn" the deferred compensation at an earlier point in time because the awards are computed based on the revenues financial advisors generate for the firm. SPA38 (citing A143–45 §§ 1.2.1, 1.2.2). But the district court cited nothing to support the conclusion that how the awards are computed overrides the express terms of the awards, and a uniform body of precedent recognizes that contingent incentive awards absolutely can be calculated based on the employee's performance. *See*

*infra* at 51. At the end of the day, the terms of the awards define what they are—a reward for doing something specific, which is earned if and only if the employee does that specific thing.

c. The district court incorrectly declined to consider the awards' purposes in analyzing ERISA coverage.

The primary purposes of the awards are the "paramount consideration" in determining whether the deferred compensation program "falls under § 1002(2)(A)(i) or (ii)." *Wilson*, 930 F.3d at 436 (quoting *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016)). Here, those purposes are expressly disclosed in the Award Certificates issued to financial advisors every year. For example:

> The purposes of the 2015 award are . . . to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct).

A233 (2015 Award Certificate); *accord* A250, 216 (2016 and 2017 Award Certificates). The award Term Sheets issued to advisors each year include a similar disclosure—with an additional disclaimer that the awards are *not* intended for retirement or otherwise subject to ERISA:

> This program is not a retirement plan. Its purposes are to reward and retain key employees of the Firm and to align their interests with those of the shareholders. Participants should not look to this program as a source of retirement income. This program is not subject to the Employee Retirement Income Security Act of 1974.

A308 (2015 Term Sheet) (emphasis removed). And the plan documents for the MSCIP and EICP likewise state that the plans' primary purposes are "to attract,

retain, and motivate employees" and "to compensate them for their contributions" to Morgan Stanley. A202 (MSCIP Plan Document); A265 (EICP Plan Document).

The district court incorrectly dismissed the purposes of the awards in analyzing whether they qualify as a "pension plan" under the statute. Citing nothing, the court declared that the test for determining ERISA coverage is "whether the deferred compensation program at issue is a bonus plan"—if it is, only then would the court "consider the plan's purpose and whether the deferral of income is systematic"; if it is not a bonus plan, the court would "consider only whether the deferred compensation program 'results in' deferred income." SPA35. No other court has ever assessed ERISA coverage using this type of decision tree. That is because whether something qualifies as an ERISA "pension" plan under the statute is one test, 29 U.S.C. § 1002(2)(A), and whether it is nevertheless exempt from ERISA under DOL's bonus regulation is another test, 29 C.F.R. § 2510.3-2(c). *See, e.g.*, *Oatway*, 325 F.3d at 188–89 (first determining incentive plan was an ERISA-exempt bonus, and separately concluding "plan was also not an employee pension benefit plan under ERISA"); Op. 2002-13A, 2002 WL 31846478, at *3 (advising that plans did not "implicate a deferral of income of the kind contemplated by section 3(2)(A) of ERISA *or* a systemic deferral of payments . . . that would preclude the [plans] from being bonus programs" (emphasis added)).

The district court's decision to bypass the purposes of the awards, and consider only the binary question of whether Morgan Stanley's program "results in" a deferral under the statute, was wrong as a matter of law. The awards' purposes here are part of their express terms—and the expressly stated purposes only reinforce that the awards really are not, as their other terms equally provide, ERISA plans.

2. *The DOL's bonus plan exemption applies to the awards.*

a. The awards are ERISA-exempt "bonuses" under DOL regulation.

The district court incorrectly determined that the bonus regulation does not apply to the deferred compensation awards. The district court erred in concluding that the awards are not "bonuses" but rather are "commissions" because the awards are calculated based on the revenue financial advisors generate and because financial advisors are also eligible to receive other year-end bonuses. SPA37; *see* SPA84–85 (affirming prior analysis).

The district court's analysis is wrong for multiple reasons. *First*, the district court's finding that the awards are earned "commissions" rather than contingent "bonuses" is contradicted by the documents that govern the awards. The Compensation Plan that is published to financial advisors ahead of each compensation year does not refer to the awards as "commissions" at all, much less "earned commissions," but rather discloses that the "awards are *contingent* upon

the [advisor] remaining employed through the grant and vesting dates of the award." A176 (emphasis added). The Award Certificates and Term Sheets provided to advisors when the awards are granted similarly include explicit disclosures regarding the contingent nature of the awards. *See* A216, 233, 250, 279 (Award Certificates); A302 (Term Sheet). In effect, the district court gave the awards a label ("commission") that the governing documents *do not use*, and then used that label to rewrite the terms of those documents (to say the awards are earned at grant, not at vesting). Needless to say, that analysis cannot be squared with the express terms of the awards—and yet the express terms of the awards are what supposedly drove the district court's ERISA-coverage finding.

*Second*, neither the courts nor the DOL have ever suggested, as the district court concluded here, that a qualifying "bonus[] for work performed" under the regulation cannot be calculated based on an employee's productivity. *See* 29 C.F.R. § 2510.3-2(c). The regulation's reference to "bonus for work performed" in fact implies that the payment *can* be based on performance. The word "bonus" does not in any event support the limitation the district court imposed on it. As the Sixth Circuit has observed, "[g]enerally, a bonus plan's express purpose is to pay a financial 'bonus' or 'additional incentive' to employees to encourage performance or retention." *Wilson*, 930 F.3d at 435–36. Every other Circuit that has analyzed the regulation takes the same approach. *See Oatway*, 325 F.3d at 186–89

("incentive plan designed to provide a financial incentive for employees to remain with [the firm] and improve their performance there" was ERISA-exempt bonus plan); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931–34 (8th Cir. 1999) (incentive plan with objective of encouraging "selected managers" to stay at the company was ERISA-exempt bonus program); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) (plan with the "purpose of promoting . . . loyalty to the organization[,]" with cancellation of unvested awards upon termination, qualified as ERISA-exempt bonus plan).

Applying those general principles, courts and the DOL have recognized that similar contingent incentive programs tied to employee revenue generation are covered by the bonus regulation. *See, e.g.*, *McKinsey*, 986 F.2d at 405–06 (finding a "bonus plan" for sales representatives who received awards "based on their sales of insurance" and "the amount of Sales Credits they produce"); *Callan v. Merrill Lynch & Co.*, 2010 WL 3452371, at *8–9 (S.D. Cal. Aug. 30, 2010) (finding Merrill incentive awards based on financial advisors' production were "bonus" payments); Op. 98-02A, 1998 WL 103654, at *1–2 (finding a bonus plan where awards were calculated based on "the percentage of revenue that [the employee's] efforts have gained during a fiscal year"). The caselaw is unambiguous: incentive payments designed to encourage employees to remain at the company are retention bonuses, regardless of the form they take. *See, e.g.*, *Oatway*, 325 F.3d at 188–89

(incentive plan designed to retain and motivate "key employees" was a bonus plan); *McKinsey*, 986 F.2d at 406 (incentive plan designed to promote "loyalty" to the organization was a bonus plan); *Faris*, 2023 WL 7386870, at *5–6 (long-term incentive plan with "express purpose" of "reward[ing] and retain[ing] eligible employees" was a bonus plan); *Cashman v. GreyOrange, Inc.*, 2023 WL 2652789, at *5 (N.D. Ga. Mar. 27, 2023) (plans intended to encourage retention and good conduct were bonus plans); *Hester v. Whatever It Takes*, 2022 WL 89176, at *5 (W.D. Ky. Jan. 7, 2022) (retention programs were bonus plans); *Pilkington v. CGU Ins. Co.*, 2000 WL 33159253, at *1, *3 (E.D. Pa. Feb. 9, 2001) (plan with purpose to "encourage . . . associates to remain with the company" qualified as bonus plan); *Killian*, 850 F. Supp. at 1246 (plan whose "express purpose" was "to provide employees with an incentive to remain with the Company" was bonus plan). Agency opinions dating back to ERISA's enactment in the 1970s likewise recognize that similar retention incentives are qualifying bonuses under the bonus plan regulation. *See, e.g.*, Op. 2002-13A, 2002 WL 31846478, at *3 (applying bonus regulation to incentive payments for "motivating and retaining skilled employees"); Op. 98-02A, 1998 WL 103654, at *1–2 (plan designed "to motivate [employees] to increase revenues and to continue in employment" is a bonus program); Op. 82-29A, 1982 WL 21212, at *1–2 (plan designed to "attract and retain" employees is a bonus program).

Case: 24-3141, 01/23/2025, DktEntry: 48.1, Page 62 of 172

Nevertheless, in its two-page analysis of whether Morgan Stanley's deferred awards qualify as ERISA-exempt bonuses under the DOL regulation, the district court did not cite a *single* authority interpreting or applying the regulation—relying instead solely on two dictionaries and three cases involving other issues. SPA35–37. The district court's limitation on what qualifies as a bonus was a drastic departure from decades of otherwise uniform precedent.

*Last*, there is no legal or logical basis for the district court's suggestion that an employer can only issue one form of "bonus" (in this case, a "year-end" bonus) to employees. SPA37. Employers, including Morgan Stanley, can and do commonly issue a variety of bonuses that can serve different purposes. *See, e.g.*, A176, 188, 194 (describing year-end awards, Growth Awards, and Capital Accumulation Program awards). In this case, the deferred compensation awards are bonuses that reward very specific things: retention and good conduct.

b. The bonus regulation applies because payment is not "systematically deferred" until after employment.

Because the deferred compensation awards qualify as a "bonus for work performed" and their payment is not "systematically deferred" until after the end of employment, the awards are not a pension plan. By their terms, the awards are generally paid *only if* the employee is still employed on the date of vesting, and payments under the limited humanitarian exceptions do not predominate over payments to current employees. The district court's conclusion that the awards are

Case: 24-3141, 01/23/2025, DktEntry: 48.1, Page 63 of 172

not a bonus plan within the meaning of the regulation was therefore error.

In its November 2023 order, the district court inverted the standard for evaluating payments to former employees under the regulation, asserting without support that "nothing in the record suggest[ed] that post-employment deferred compensation payments are rare." SPA39. Of course, there was nothing in "the record" on the prevalence of post-employment payments because there *was* no record on the merits—Morgan Stanley's motion to compel did not implicate whether the awards are ERISA-governed or not, *supra* at 27–33. But the standard the district court applied was legally erroneous in any case—payment does not have to be "rare" in order to meet the regulatory standard, and the court cited nothing to the contrary. The DOL's advisory opinions reinforce that the payment of a minority of awards to former employees under humanitarian exceptions does not qualify as a systematic deferral under the regulation: for payments to be "systematically deferred to the termination of covered employment or beyond" and therefore fall outside the regulation, 29 C.F.R. § 2510.3-2(c), an "inordinate percentage" must be paid after employment such that the economic benefits of the program are allocated "disproportionately to retirees." Op. 98-02A, 1998 WL 103654, at *2; Op. 2002-13A, 2002 WL 31846478, at *3 n.3. Plaintiffs did not and could not allege that the awards are systematically deferred under the regulatory standard.

In its motion for reconsideration, Morgan Stanley alerted the district court to evidence in conflict with its decision, including the fact that in parallel arbitrations Morgan Stanley has produced data reflecting that 85% to 92% of award payments historically have been made to current employees. SPA89 (citing A452). But the district court held fast to its original conclusion, declaring that "payments made at a rate of 8 to 15 percent [to former employees] are not rare – they are commonplace." That observation applies the wrong legal standard. A distribution rate of 8% to 15% is not an "inordinate percentage" that is "disproportionately" allocated to former employees, and is not a "systematic deferral" as a matter of law.

* * *

The district court made its finding regarding ERISA coverage on a record comprising just the plaintiffs' complaint and the documents cited therein, without the benefit of full legal briefing, discovery, testimony, or an actual evidentiary record on the issue. Determining whether the deferred compensation awards qualify as an ERISA pension plan, 29 U.S.C. § 1002(2)(A), and whether they are nevertheless exempt from ERISA under the DOL's "bonus" regulation, 29 C.F.R. § 2510.3-2(c), is a fact-intensive, context-dependent inquiry—requiring analysis of the awards' purposes and structure and understanding how they work in practice. The "existence of an ERISA plan is a question of fact, to be answered in the light

of all the surrounding circumstances from the point of view of a reasonable person."[13] *Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Acc. Ins. Co.*, 809 F.2d 617, 625 (9th Cir. 1987) (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)); *accord Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 (6th Cir. 2007); *Deibler v. United Food & Com. Workers' Loc. Union 23*, 973 F.2d 206, 209–10 (3d Cir. 1992); *Wickman v. Nw. Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990); *see also, e.g., Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 511 (S.D.N.Y. 1997) ("[I]n addition to the express terms of the benefits plans in question, a number of key factors are pertinent" to the pension plan inquiry). Even when evaluating just the express terms of a program, testimony and other evidence can be critical to understanding what a program's express terms mean, and how they operate in practice.

The district court rendered its finding in a highly irregular procedural posture, without the benefit of the tools a court—or an arbitration panel—would ordinarily have to render a merits finding. The result was an analysis rife with error. The Court can address those errors by simply ordering the defective analysis

---

[13] Indeed, this Court has vacated and remanded a district court's finding that a plan was an ERISA "welfare benefit plan" (29 U.S.C. § 1002(1)) because the "sparse factual record" was insufficient to definitively answer the question one way or another. *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 149–50 (2d Cir. 1994).

struck, leaving the merits for the arbitrators. But if it concludes the merits need to be reached to resolve arbitrability, it should reverse the district court's finding.

### B. Evidence developed in parallel arbitrations reinforces that the awards are not ERISA-governed.

The district court further erred in rejecting Morgan Stanley's argument, on reconsideration, that a factfinder could not reach a reliable decision on the merits without a fully developed factual record and comprehensive legal submissions. A339–43; *see* A393. The record developed in parallel arbitrations reinforces that the awards are ERISA-exempt retention bonuses that do not qualify as an ERISA "pension plan":

- The awards are designed to meet the demands of Morgan Stanley's financial regulators that contingent deferred compensation be used to reward good conduct (and penalize misconduct).
- As with any bonus, financial advisors have to do something "additional"—stay at Morgan Stanley in good standing for a certain number of years—to earn their awards.
- Financial advisors do not have to wait until they are retirement age to receive payment on a vested award, and in fact between 85% and 92% of award distributions go to current employees, not retirees.
- Vested awards are immediately deposited into financial advisors' payroll or brokerage accounts, not 401(k) or other retirement accounts.
- Award distributions are taxed as ordinary bonus income, not retirement income, on the date of distribution.
- The awards make up between just 1.5% and 15.5% of financial advisors' overall incentive compensation, reinforcing that they function as an "additional" incentive for doing something specific.

The district court erroneously concluded that it was equipped to render a conclusive finding on the merits without any of the critical context that arbitration panels will have the opportunity to consider.

The district court's characterization of the awards as pension plans under ERISA contravenes the text of the statute and applicable regulation as well as fifty years of interpretation by courts and the DOL. The court's order is incompatible with the directives of financial regulators that institutions like Morgan Stanley use cancellable deferred compensation to deter and penalize behaviors that harm consumers. The court's orders are interfering with the arbitrators' independent assessment of the law and the evidence, and they are creating uncertainty for the many institutions that offer this type of compensation to comply with the expectations of their financial regulators. This Court should ensure that the merits of these claims can be decided in arbitration, based on the evidence and the law.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's orders and require the court to reissue its order compelling arbitration without any analysis of the merits. Alternatively, if the Court determines that it was necessary for the district court to resolve the ERISA-coverage question, then the Court should reverse the district court's ERISA finding.

Dated: January 22, 2025

Respectfully submitted,

*/s/ Meaghan VerGow*

MEAGHAN VERGOW
BRIAN D. BOYLE
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel: (202) 383–5300
Fax: (202) 383–5414
mvergow@omm.com
bboyle@omm.com

ANTON METLITSKY
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
17th Floor
New York, NY 10019
Tel: (212) 326–2000
Fax: (212) 326–2061
ametlitsky@omm.com

*Attorneys for Defendants-Appellants Morgan Stanley, Morgan Stanley Smith Barney LLC, and Morgan Stanley Compensation Management Development and Succession Committee*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,863 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: January 22, 2025
Washington, D.C.

*/s/ Meaghan VerGow*
MEAGHAN VERGOW

# No. 24-3141(L), 24-3271(XAP)

---

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

Matthew T. Shafer, individually and on behalf of all others similarly situated, Mace Tamse, Steve Sheresky, George Livanos, Jeffrey Shover, Mark Loftus, Sandy Jukel, Steve Nadler, Sheri Haugabook, Jeffrey Sheresky, Peter Heidt, Jeffrey Samsen,

*Plaintiffs-Appellees-Cross-Appellants*

v.

Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development and Succession Committee,

*Defendants-Appellants-Cross-Appellees*,

John/Jane Does, 1-20,

*Defendant.*

---

On Appeal From The United States District Court for the Southern District of New York, No. 1:20-cv-11047, the Hon. Paul G. Gardephe

---

**BRIEF OF *AMICUS CURIAE***
**Society for Human Resource Management**
***In support of* Defendants-Appellants-Cross-Appellees & Reversal**

---

Ian H. Morrison
Sam Schwartz-Fenwick
Jules A. Levenson
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000

imorrison@seyfarth.com
sschwartz-fenwick@seyfarth.com
jlevenson@seyfarth.com
*Attorneys for Amicus Curae*
SOCIETY FOR HUMAN RESOURCE MANAGEMENT
January 29, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 29(b)(4), the undersigned counsel state that the *amicus curiae* is not a corporation, and thus no disclosure statement is required by Rule 26.1.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION ........ 3

ARGUMENT ........ 6

I. The District Court's decision, rendered on an undeveloped record with limited briefing, vastly expanded the scope of ERISA coverage in the absence of statutory authority and despite contrary regulatory guidance ........ 6

A. The District Court erred in finding ERISA coverage. ........ 6

B. The District Court's erroneous conclusion threatens to greatly expand ERISA coverage. ........ 15

II. Expanding the scope of ERISA coverage would have deleterious effects on SHRM members and other employers nationwide. ........ 19

A. ERISA imposes extensive obligations on retirement plan sponsors. ........ 19

B. Employers could be subject to significant costs and penalties under the District Court's interpretation of ERISA. ........ 23

CONCLUSION ........ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, F. 713 Supp. 2d 378 (D. Del. 2010) .......... 17

*Cunningham v. Cornell Univ.*, 86 F.4th 961 (2d Cir. 2023) .......... 21

*Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016) .......... 20

*McKinsey v. Sentry Ins.*, 986 F.2d 401 (10th Cir. 1993) .......... 12

*Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) .......... 8, 10, 15

*O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494 (S.D.N.Y. 2015) .......... 18

*Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184 (3d Cir. 2003) .......... 15

*Osberg v. Rajaratnam*, 95 A.D.3d 649, 946 N.Y.S.2d 21 (1st Dept. 2012) .......... 18

*Pasternack v. Shrader*, 863 F.3d 162 (2d Cir. 2017) .......... 8

*Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378 (D. Del. 2010) .......... 17

*Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619 (5th Cir. 2014) .......... 10, 13, 14

*Wilson v. Safelite Grp., Inc.*, 930 F.3d 429 (6th Cir. 2019) .......... 13, 14

**Statutes**

29 U.S.C. § 1002 .......... 8, 9, 13

29 U.S.C. § 1021 .......... 20, 21

29 U.S.C. § 1024 .......... 20

29 U.S.C. § 1030 .......... 9

29 U.S.C. § 1052 .......... 21

29 U.S.C. § 1053 .......... 21, 24

29 U.S.C. § 1055 .......... 21

29 U.S.C. § 1081 .......... 21

29 U.S.C. § 1083 .......... 21

29 U.S.C. § 1103 .......... 22

29 U.S.C. § 1104 .......... 21

29 U.S.C. § 1106 .......... 21

29 U.S.C. § 1132 .......... 24, 25

29 U.S.C. § 1135 .......... 8

29 U.S.C. § 1306 .......... 23

29 U.S.C. § 1321 .......... 22

**Regulations**

29 C.F.R. § 2510.3-2 .......... 9, 12, 13

29 C.F.R. § 2575.2 .......... 24

29 C.F.R. § 2575.502c-1 .......... 25

29 CFR § 2560.503-1 .......... 22

40 FR 34526 (Aug. 15, 1975) .......... 9

**Other Authorities**

27 Am. Jur. 2d *Employment Relationship* § 66 .......... 18

DOL Op. No. 98-02A, 1998 WL 103654 (Mar. 6, 1998) .......... 10, 12, 15, 17

DOL Op. No. 2002-13A, 2002 WL 31846478 (Dec. 6, 2002) .......... 9, 17

*ERISA Practice and Procedure* (2024) .......... 7, 21, 23

Fed. R. App. P. 29 .......... 2

Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:2 (2024) .......... 22

Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:4 (2024) .......... 23

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 117 of 194

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Society for Human Resource Management ("SHRM") is a member-driven organization dedicated to creating better workplaces where people and businesses thrive together. As the trusted authority on all things work, SHRM is the foremost expert, researcher, advocate, and thought leader on issues and innovations impacting today's evolving workplaces. With nearly 340,000 members in 180 countries, SHRM touches the lives of more than 362 million workers and their families globally. In New York alone, SHRM has over 15,000 members who represent a diverse cross-section of employers across industries. Over 31% of members work for smaller companies with less than 500 employees, while the top five sectors—services, healthcare, nonprofit, manufacturing, and others—comprise 53% of New York SHRM members. Moreover, a majority (51%) of New York SHRM members hold Director or Manager titles within their organizations.

---

[1] This brief was principally authored by *Amicus* along with Seyfarth Shaw LLP, counsel for *Amicus*. No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money related to the preparation or submission of this brief. No person other than *Amicus*, its members, and their counsel contributed money related to the preparation or submission of this brief.

Given the prevalence of bonus and incentive plans (in SHRM's 2024 employee benefits survey, over half of respondents reported offering an incentive bonus plan), SHRM anticipates that expanded ERISA coverage under the novel theory set forth in the District Court's opinion will have a significant impact on its members and employers throughout the country. The impacts include restricting usage of incentive plans to motivate retention, placing potentially onerous administrative burdens on programs funded from general assets, and raising the specter of penalties and legal exposure for past noncompliance. SHRM offers this *amicus* brief because the issues raised in this matter are of immense importance to both SHRM's members and the business community at large. SHRM submits this brief in support of Defendants-Appellants-Cross-Appellees' appeal. All parties have consented to the filing of this brief, so no further leave to file is required. Fed. R. App. P. 29(a)(2).

# INTRODUCTION

For decades, employers nationwide have utilized incentive programs to reward employees for productivity and motivate them to remain employed by providing additional compensation beyond the employees' base pay. These programs, even when they include deferred receipt of incentive payments, are not designed to offer retirement income, but to provide additional compensation to current employees. Accordingly, these programs have long been understood to be outside the scope of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, which governs retirement plans and imposes extensive regulatory requirements and potential liability for failure to comply.

The District Court's decision below—both erroneous and unnecessary—threatens to upend this status quo. In granting Morgan Stanley's motion to compel arbitration, the District Court improperly prejudged the merits in holding that the Morgan Stanley Incentive Compensation Plan and the Equity Incentive Compensation Plan are subject to ERISA because they pay incentive awards based on the revenue generated by the employees receiving the awards (thus making

the payments "commissions" that are not subject to regulations limiting ERISA coverage of bonus plans) and because the Incentive Plans allow certain employees to be paid their awards after separating employment.

The District Court relied on inapposite authority to conclude that revenue-based incentive pay cannot be a bonus and compounded this error by misinterpreting ERISA to cover *any* program where *any* participant can be paid after leaving employment. These conclusions run counter to significant contrary case law and regulatory guidance and upend employers' longstanding understanding of the rules applicable to incentive plans.

The District Court's unforced error,[2] if followed by other courts, would have significant deleterious effects on employer incentive plans. ERISA imposes extensive regulatory requirements, fiduciary responsibility, and costs with respect to plan maintenance. ERISA also has mandatory vesting provisions that would prevent employers from

[2] Not only did the District Court err in holding that the Incentive Plans were governed by ERISA, it erred in making this ruling when that issue was not even before the Court. The District Court did not need to reach the ERISA question to rule on Morgan Stanley's motion to compel arbitration, as it concluded that Plaintiffs' claims were arbitrable regardless of whether ERISA governs the Incentive Plans.

Case: 24-3141, 01/29/2025, DktEntry: 64.1, Page 11 of 35

even offering many of the incentive plans that are currently available. Moreover, ERISA imposes significant penalties for failure to comply with its reticulated regulations. Thus, if incentive plans are suddenly covered, every employer offering a newly covered plan might be exposed to hundreds of thousands of dollars, and potentially millions of dollars, in penalties. This is both incompatible with the governing statutes and regulations, as well as an untenable conclusion in the procedural posture of Morgan Stanley's motion to compel arbitration.

Accordingly, the Court should vacate or reverse the District Court's ERISA coverage decision.

## ARGUMENT

### I. The District Court's decision, rendered on an undeveloped record with limited briefing, vastly expanded the scope of ERISA coverage in the absence of statutory authority and despite contrary regulatory guidance.

#### A. The District Court erred in finding ERISA coverage.

The Court should vacate or reverse the District Court's decision that Morgan Stanley's incentive programs at issue in this case (the Morgan Stanley Incentive Compensation Plan and the Equity Incentive Compensation Plan ("Incentive Plans")) are governed by ERISA.[3] The District Court held (SPA.35-39[4]), while granting Morgan Stanley's motion to compel arbitration, that the incentive programs are governed by ERISA because they are not bonus programs and because the programs allowed for certain employees to receive payments after separation from employment. The District Court's ruling on this issue was unnecessary to the outcome of the motion to compel arbitration and

---

[3] This brief focuses on the merits and consequences of the District Court's ERISA-coverage determination—the issue that is acutely important for SHRM members.

[4] SPA.___ refers to the documents in Defendants-Appellants-Cross-Appellees' special appendix (ECF No. 48.1). A.___ refers to the documents in Defendants-Appellants-Cross-Appellees' appendix (ECF No. 49.1, 50.1). ECF No.__ refers to documents filed in this Court. R.___ refers to documents filed in the District Court.

defeated the purpose of compelling arbitration because it prejudged the merits of the case. Additionally, it was wrong as a matter of law.

ERISA (the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*) was adopted by Congress to in the wake of catastrophic failures of private employer pension plans to secure employees' entitlement to receive promised benefits. *See* Ronald J. Cooke, "Congressional policy, basic concepts, and coverage," 2 *ERISA Practice and Procedure* § 4:1 (2024) (Congress enacted ERISA seeking "to remedy the predicament of thousands of employees whose expectations of adequate retirement income were destroyed by stingy pension plan provisions, bad management, or inadequate funding"). ERISA imposes a wide range of reporting, disclosure, and fiduciary obligations on the employers that sponsor covered plans. These range from annual government filings (with severe penalties for noncompliance), detailed disclosure duties requiring periodic publication of plan summaries, and the obligation to maintain assets to secure pension obligations in separately custodied trust. If upheld by this Court, the District Court's conclusion that Morgan Stanley's compensation programs was really an ERISA-governed pension plan,

would subject Morgan Stanley to all of the statute's requirements and obligations.

As relevant here, ERISA governs an employer sponsored benefit plan, fund, or program that "to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). To be sure, on its face, this is a broad definition. However, this Court (and others) have held that not every plan that can be squeezed into the literal language of § 1002(2)(A)(ii) is an ERISA plan. *Pasternack v. Shrader*, 863 F.3d 162, 168 (2d Cir. 2017) (quoting *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) for the proposition that "this statutory provision is 'not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach'").

Additionally, Congress authorized the Department of Labor to issue regulations refining the extent of ERISA coverage. 29 U.S.C. § 1135 ("Subject to subchapter II and section 1029 of this title, the Secretary may prescribe such regulations as he finds necessary or

appropriate to carry out the provisions of this subchapter [29 U.S.C. §§ 1001-1003, 1021-1193c]," including "defin[ing] accounting, technical and trade terms"); *see also, e.g.* 29 U.S.C. § 1002 (authorizing certain specific regulations); 29 U.S.C. § 1030 (authorizing alternate methods of compliance with reporting and disclosure requirements). In August 1975, less than one year after ERISA came into force, the Department of Labor promulgated regulations excluding from ERISA coverage "payments made by an employer . . . as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c); 40 FR 34526, 34532 (Aug. 15, 1975).[5]

This longstanding view has been supplemented with Department guidance explaining the mere fact certain employees receive payments after separation from employment is insufficient to bring the payment in question into the category of deferral covered by § 1002(2)(A)(ii). *E.g.*, DOL Op. No. 2002-13A, 2002 WL 31846478, at *3 (Dec. 6, 2002) ("the mere fact that many of the Plans' participants may have separated from

---

[5] This portion of the regulation has remained unchanged for the last 50 years.

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 126 of 194

the Company . . . prior to the time they will be eligible to convert SAFE Units to cash, does not, in the Department's view, implicate a deferral of income of the kind contemplated by section 3(2)(A) of ERISA"); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998) ("Because the Plan [did] not expressly condition distribution of the bonus payments upon termination of employment or retirement, the Plan [wa]s not by its express terms a pension plan within the meaning of section 3(2)(A) of ERISA," even though certain employees were entitled to receive payments following separation of employment.); *accord Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619, 625 (5th Cir. 2014) ("the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage") (quoting *Murphy*, 611 F.2d at 575).

Despite this authority, the District Court held that the Incentive Plans at issue here are governed by ERISA. (SPA.35-39). The District Court first held that the payments under the Incentive Plans are not bonuses because the incentive payments were calculated as a percentage of revenue generated and were thus by definition "not 'over and above normal compensation.'" (SPA.36-37). It further held that

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 127 of 194

because incentive plans were not "bonuses," the plans were covered by ERISA so long as *some* employees received payments after separation, without respect to the purpose of the Plan or the frequency of post-separation payments. *Id.*

These holdings were erroneous, as Morgan Stanley explains at length in its principal brief. (*See* ECF No. 48.1 at 47-67). However, two points that would result in significant expansion of ERISA coverage are particularly salient here.

*First*, the District Court announced a categorical rule that any payment to an employee based on a percentage of revenue generated is a commission, not a bonus. (SPA.37 ("Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not 'over and above normal compensation.'")). The District Court cited no authority for this sweeping proposition. Though the District Court cited case authority and dictionary definitions that hold that commissions are a *type* of payment based on revenue generated (*e.g.*, SPA.36-37 (citing *Commission*, *Black's Law Dictionary* (11th ed. 2019); *Commission*, *Webster's Third New International Dictionary of the English Language*

Case: 24-3141, 01/29/2025, DktEntry: 64.1, Page 18 of 35

– *Unabridged* (1993 ed.); *Israel v. Voya Institutional Plan Servs., LLC*, No. 15-cv-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017))), none of the District Court's authority holds that any payment based on revenue generated is *perforce* a commission and thus outside the scope of the Department of Labor's bonus regulation. Moreover, such a proposition is contrary to both case law and Department of Labor guidance. *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405-06 (10th Cir. 1993) (applying DOL bonus regulation (29 C.F.R. § 2510.3–2(c)) to plan where payments were "based upon the amount of Sales Credits [sales representatives] produce[d]"); DOL Op. No. 98-02A, 1998 WL 103654, at *1-2 (Mar. 6, 1998) (noting plan potentially qualified for treatment as a bonus plan where it provided for physicians to receive "individual bonus award amount[s] equal to the percentage of revenue that his or her efforts have gained during a fiscal year in excess of . . . individual [g]oals"). Moreover, nowhere do the Incentive Plans themselves refer to payments as commissions. To the contrary, the Incentive Plans repeatedly emphasize the contingent nature of the payments. *See* ECF No. 48.1 at 58-62.

*Second*, the District Court held that any non-bonus plan (*i.e.*, a plan outside the scope of 29 C.F.R. § 2510.3–2(c)) that permits payments to be made after an employee's separation falls within 29 U.S.C. § 1002(2)(A)(ii) regardless of the plan's purpose. (SPA.38-39 (holding that Incentive Plans "programs result in the deferral of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii)" because "[a]lthough Plaintiffs in the instant case . . . cannot elect post-employment vesting, disability, retirement, layoff, and government service are not unusual means by which workers leave their employment")).

However, the cases that the District Court relies on do not support such a conclusion. For example, in *Tolbert*, not only did the plan in question permit employees to elect post-termination payment distribution, it also expressly authorized immediate vesting of certain benefits even for voluntary separation. 758 F.3d at 622 (noting that under the plan "Mandatory Deferred Compensation and Company Contributions vest immediately upon either the death of the employee or the separation of the employee" provided requisite conditions were met). Similarly, in *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 437 (6th

Cir. 2019), the plan "expressly provide[d] for employees to defer income from several sources to the future[,] authorize[d] options for payment of deferred income both before and after termination[,] . . . [and its] default provision provide[d] for distributions to occur after termination of employment." Thus, both the *Tolbert* and *Wilson* plans made offering a choice to participants as to the timing of the deferred income (pre or post separation) a key feature of the respective plans.

Conversely, the Incentive Plans at issue here provide incentive income on a fixed schedule. This is no accident, as the purpose of this program is to enhance retention by providing extra compensation to employees who generated more business for the firm. The Incentive Plans were undisputedly designed to pay employees while they remained employed, with limited exceptions. (*See* SPA.5-6). Hence, the Incentive Plans at issue here are not comparable to the cases the District Court relied on. Rather, they are analogous to the authority rejected by the District Court, which holds that incidental post-termination payments does not transform a plan into one covered by ERISA. *E.g.*, *Tolbert*, 758 F.3d at 625 ("[T]he mere fact that some payments under a plan may be made after an employee has retired or

left the company does not result in ERISA coverage.") (quoting *Murphy*, 611 F.2d at 575); *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) ("post-retirement payments [that] were only incidental to the goal of providing current compensation" did not trigger ERISA coverage); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998) ("Because the Plan [did] not expressly condition distribution of the bonus payments upon termination of employment or retirement, the Plan [wa]s not by its express terms a pension plan within the meaning of section 3(2)(A) of ERISA," even though certain employees were entitled to receive payments following separation of employment.); *see also* ECF No. 48.1 at 50-54. Accordingly, the District Court erred in its statutory analysis.

### B. The District Court's erroneous conclusion threatens to greatly expand ERISA coverage.

Given the extensive ERISA obligations that fall on an employer sponsoring a pension plan, it is essential that employers know at the outset whether they are setting up a bonus plan or a pension plan. The District Court's sweeping re-write of the statute and regulations was legal error as set forth above. Equally important, it was an improper exercise of judicial authority because the decision was unnecessary to

Case: 24-3141, 01/29/2025, DktEntry: 64.1, Page 22 of 35

the outcome of the case and was rendered on no factual record with limited opportunity for legal argument. In light of the grave consequences, not just for Morgan Stanley but for all employers, the District Court should have exercised restraint and not reached this question.

Because it did decide the issue, however, the District Court triggered vast ramifications for employers by dramatically expanding ERISA coverage to numerous types of incentive plans that have never heretofore been thought of as pension plans. The incredible overreach of this decision and its clearly erroneous holding, mandate reversal. If left to stand, under the District Court's statutory interpretation, any employer incentive plan tied to revenue generated by an employee (and in fact *any* non-bonus deferred payment structure) is governed by ERISA so long as the plan allows any payments following the separation of employment, regardless of the plan's goals and even if the vast majority of participants are paid while still employed.

Not only is this contrary to statute, governing regulations, and case authority, it would greatly expand ERISA coverage to incentive programs administered by SHRM members throughout the country.

"[A]ccess to stock options and [compensation] according to [company] performance . . . are ubiquitous in corporate America," *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011), a fact further underscored by the opinion letters issued by the Department of Labor concerning a variety of incentive plans. *E.g.*, DOL Op. No. 2002-13A, 2002 WL 31846478, at *3 (Dec. 6, 2002); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998). In fact, over 50% of respondents in SHRM's 2024 employee benefit survey reported offering an incentive bonus plan.[6]

In light of the broad prevalence of incentive programs, the District Court's holding (if allowed to remain in force) would represent a potential sea change in ERISA coverage requirements for such programs. Under the District Court's logic, any entity that provides incentives to employees based on the revenue generated by the employees would be forced to comply with ERISA if any portion of the incentive were payable to separated employees. For example, under this erroneous approach, a law firm bonus plan based on billable hours or

[6] The SHRM 2024 Employee Benefits Survey is available at, https://www.shrm.org/topics-tools/research/employee-benefits-survey/other.

value of time (both close proxies for revenue generation) would be required to comply with ERISA so long as bonuses were not paid *immediately* when earned and any set of individuals might be paid the bonus after termination.

This is problematic because most employers condition bonus payments in incentive plans so that the employees must remain actively employed on the bonus payment date to get their bonus, as shown by many cases across the country about who is entitled to bonuses. *E.g.*, *O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 501 (S.D.N.Y. 2015) (bonus plan provided that employee "will not be eligible to be paid any bonus if at any time prior to the date of any payment ... [his] employment has been terminated"), *aff'd*, 646 F. App'x 2 (2d Cir. 2016); *Osberg v. Rajaratnam*, 95 A.D.3d 649, 946 N.Y.S.2d 21, 22 (1st Dept. 2012) (holding that plaintiff was not entitled to bonus where his "employment was terminated prior to the end of the year" and "bonus . . . was expressly and unambiguously conditioned upon his working through the end of the relevant calendar year"); 27 Am. Jur. 2d *Employment Relationship* § 66 (surveying case law since 1980 on effect of termination on bonus payment and noting that certain "courts find

that if an employee is terminated prior to the date when he or she was to become eligible for a bonus payment, then the employer is not obligated to pay his or her bonus").

Under the District Court's view of ERISA, however, if these employers so much as allow humanitarian exemptions to the rule requiring incentives be paid to only current employees, they now subject themselves to ERISA. The only alternative to complying with ERISA's vast and complex regulatory scheme (discussed *infra*) would be to terminate the incentive plans entirely or prohibit *any* post-termination payments, even when the termination was for disability or death.[7] (*See also* ECF No. 48.1 at 53-54).

## II. Expanding the scope of ERISA coverage would have deleterious effects on SHRM members and other employers nationwide.

### A. ERISA imposes extensive obligations on retirement plan sponsors.

The importance of the District Court's error in expanding ERISA coverage can be seen by a brief overview of the extensive regulatory burdens placed on pension plans. "Employee benefit plans governed by

---

[7] And certain incentive structures might not be permissible *at all* within the ERISA framework.

ERISA are highly regulated by the federal government." Lee T. Polk, 1 *ERISA Practice and Litigation* § 1:7 (2023). As this Court has recognized, "ERISA is a comprehensive reticulated statute, and is enormously complex and detailed." *Halo v. Yale Health Plan*, 819 F.3d 42, 59 (2d Cir. 2016) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 477 (1999)).

This complexity and high level of regulation are evident from even a brief perusal of ERISA's statutory structure. For example, ERISA contains extensive disclosure and reporting requirements. 29 U.S.C. §§ 1021-1032. Some of these obligations include:

- Publishing and furnishing participants with summary plan descriptions, 29 U.S.C. § 1021(a)(1);
- Filing annual reports with the Department of Labor, 29 U.S.C. §§ 1021(b), 1024(a);
- Furnishing participants with summary annual reports, 29 U.S.C. §§ 1021(a)(2); 29 U.S.C. § 1024(b)(3);
- Providing governing plan documents to participants upon written request, 29 U.S.C. § 1024(b)(4); and

- Providing plan funding notices to the Pension Benefit Guaranty Corporation (for defined benefit plans[8] subject to ERISA's funding requirements), 29 U.S.C. § 1021(f).[9]

ERISA also imposes vesting and participation standards, which place limits on the extent to which employers can restrict participation and require that covered plan benefits be nonforfeitable within a specified range of years of service. 29 U.S.C. §§ 1052, 1053. And defined benefit plans must offer survivorship annuities. 29 U.S.C. § 1055. Furthermore, many defined benefit plans are subject to comprehensive minimum funding requirements. 29 U.S.C. §§ 1081, 1083 (funding standards for single-employer defined benefit plans).

Additionally, with the exception of certain exempt plans, ERISA governed benefit plans must be run by fiduciaries adhering to standards of prudence and loyalty, 29 U.S.C. § 1104, and are heavily restricted as to permissible transactions, 29 U.S.C. § 1106. *See also Cunningham v. Cornell Univ.*, 86 F.4th 961, 973, 981 (2d Cir. 2023) (analyzing claims

---

[8] The Incentive Plans and similar incentive programs would likely be classified as defined benefit plans because they pay a specific benefit as outlined by the incentive program.

[9] *See also* Ronald J. Cooke, 1 *ERISA Practice and Procedure* § 3:2 (2024) (surveying the vast requirements, penalties for failure to comply, and "substantial record keeping requirements").

asserting prohibited transactions and breaches of fiduciary duty), *cert. granted*, No. 23-1007, 2024 WL 4394127 (U.S. Oct. 4, 2024). ERISA plans must also establish formal claims procedures to adjudicate benefit claims submitted by participants. 29 CFR § 2560.503-1(b) ("Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations[.]").

Beyond this, ERISA plans (unless exempt) must hold all assets in a trust, 29 U.S.C. § 1103 (subject to exceptions, "assets of an employee benefit plan shall be held in trust by one or more trustees") and plans that are insured by the Pension Benefit Guarantee Corporation must pay per-participant premium rates of up to $717 annually for variable rate premiums and $106 annually for flat-rate premiums.[10] *Premium Rates*, PBGC (Oct. 11, 2024), *available at*,

---

[10] "The Pension Benefit Guarantee Corporation (PBGC) insurance provisions of the Employee Retirement Income Security Act of 1974 (ERISA) apply to most defined benefit pension plans established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce. The PBGC insures qualified or nonqualified plans that have met the qualifications requirement in practice for the preceding five years." Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:2 (2024); 29 U.S.C. § 1321.

https://www.pbgc.gov/prac/prem/premium-rates (last accessed Jan. 28, 2025); *see also* 29 U.S.C. § 1306; Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:4 (2024) (explaining forms of PBGC premiums); 29 U.S.C. § 1306.

In short, treating an incentive program as an ERISA governed pension plan subjects it to compliance with myriad rules, regulations, and restrictions, and has significantly broader consequences than simply fixing obligations of benefit payments between employees and employers. *See Preliminary Materials*, Ronald J. Cooke, *ERISA Practice and Procedure* (2024) ("it cannot be disputed that [ERISA] is massive in its complexity, detail and scope").

### B. Employers could be subject to significant costs and penalties under the District Court's interpretation of ERISA.

ERISA's extensive regulatory requirements also impose significant costs on employers—both in the form of *complying* with applicable regulations and penalties for failure to do so. For example, the Incentive Plans in this case are operated to provide supplemental compensation beyond employees' base salary and their rules are defined in the applicable program description. (*See, e.g.*, A.143-44). But if the

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 140 of 194

Incentive Plans were to be governed by ERISA, a single document laying out the incentive plans would be insufficient. Morgan Stanley would have been obligated to create a summary plan document; submit annual reports; respond to document requests; comply with participation, vesting, and funding requirements; comply with fiduciary duties; and avoid prohibited transactions. *Supra* § II.A. Not only would this add significant compliance costs, but it would also frustrate the stated goal of the Incentive Plans—motivating employee retention—and undermine their rationale, because ERISA restricts Morgan Stanley's ability to limit payments to current employees. *See* 29 U.S.C. § 1053 (vesting requirements).

In addition to the prospective compliance costs, expanding ERISA coverage could expose employers that offer incentive plans to retrospective liability (and the attendant litigation costs). For example, an ERISA-covered plan administrator who fails to file an annual report with the Secretary of Labor is subject to fines of over $2,000 per day. 29 U.S.C. § 1132(c)(2); 29 C.F.R. § 2575.2(b). Similarly, plan administrators can be fined up to $110 per day for failing to furnish ERISA plan participants with certain disclosures and requested

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 141 of 194

documents. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1. Under the District Court's erroneous reading of ERISA coverage, an incentive program that has been operating as a non-ERISA plan could be subject to hundreds of thousands of dollars in penalty liability. And this is even before a participant may attempt to claim that the employer was not appropriately complying with its fiduciary duties (as required under ERISA. *See* 29 U.S.C. § 1132(a)(2) (allowing a "a participant, beneficiary or fiduciary" to assert a claim "for appropriate relief" for alleged fiduciary breaches or otherwise not administering plan in accordance with ERISA's strictures).

Moreover, these costs would not be borne by a single employer in a single case. Rather, every single employer with an incentive plan based on revenue generated by employees would be faced with these costs unless *no* payments were made after separation. Given the ubiquity of these incentive plans, SHRM anticipates that its members could be facing tens or hundreds of millions of dollars in further liability both for transforming how they run incentive programs, as well as in potential exposure for past plan administration outside the scope of ERISA. This Court should not countenance such a massive expansion of liability,

particularly when the District Court reached its erroneous conclusion on a limited record in a posture that did not require deciding the question of ERISA coverage.

* * *

The District Court erred in finding ERISA coverage in a way that would greatly expand the number of regulated plans beyond the scope set forth by Congress and the DOL regulations, while imposing vast costs that are not permitted or required by governing law. Accordingly, the decision should be vacated or reversed.

## CONCLUSION

For the foregoing reasons, the Court should vacate or reverse the District Court's holding on ERISA coverage.

Respectfully submitted,

DATED: January 29, 2025

SOCIETY FOR HUMAN RESOURCE MANAGEMENT

*/s/ Ian H. Morrison*
Ian H. Morrison
Samuel Schwartz-Fenwick
Jules A. Levenson
SEYFARTH SHAW LLP
233 S. Wacker Dr., Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
imorrison@seyfarth.com

sschwartz-fenwick@seyfarth.com
jlevenson@seyfarth.com

*Attorneys for Amicus Curiae*

Society for Human Resource Management

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(4), 29(a)(5), and 32(a)(7)(B) and Circuit Rules 29.1(c) and 32.1(a)(4) because the brief contains 4,785 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and Circuit Rule 32.1, as well as the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in plain, 14-point Century Schoolbook typeface; footnotes appear in plain, 14-point Century Schoolbook typeface.

s/ Ian H. Morrison
Ian H. Morrison

Dated: January 29, 2025

## CERTIFICATE OF SERVICE

I, certify that on January 29, 2025, I electronically filed the foregoing Brief with the Clerk of Courts using the ACMS filing system, which will send notification of such filing to all counsel of record.

s/ Ian H. Morrison

# 24-3141(L), 24-3271(XAP)

## United States Court of Appeals for the Second Circuit

MATTHEW T. SHAFER, individually and on behalf of all others similarly situated, MACE TAMSE, STEVE SHERESKY, GEORGE LIVANOS, JEFFREY SHOVER, MARK LOFTUS, SANDY JUKEL, STEVE NADLER, SHERI HAUGABOOK, JEFFREY SHERESKY, PETER HEIDT, JEFFREY SAMSEN,

*Plaintiffs-Appellees-Cross-Appellants,*

v.

MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE,

*Defendants-Appellants-Cross-Appellees,*

JOHN/JANE DOES, 1-20,

*Defendant.*

On Appeal from the United States District Court for the Southern District of New York, Case No. 20-cv-11047 (Hon. Paul G. Gardephe)

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE ERISA INDUSTRY COMMITTEE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS APPELLANTS-CROSS-APPELLEES

ANDREW J. PINCUS
ARCHIS A. PARASHARAMI
DANIEL E. JONES
*Mayer Brown LLP*
*1999 K Street NW*
*Washington, DC 20006*
*(202) 263-3000*

*Counsel for* Amici Curiae

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The ERISA Industry Committee states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. ERIC has no parent corporation and no publicly held company has 10% or greater ownership.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii
INTEREST OF AMICI CURIAE ........ 1
INTRODUCTION AND SUMMARY OF ARGUMENT ........ 4
ARGUMENT ........ 6
The District Court's Erroneous Expansion Of ERISA's Coverage Threatens Adverse Consequences For Both Employers And Employees. ........ 6
A. The Deferred Compensation Arrangements In This Case Are Not ERISA Pension Plans. ........ 6
B. Employers Routinely Use Deferred Incentive Compensation Arrangements Like Those In This Case To Encourage Employee Retention And Reward Loyalty, Not To Provide Retirement Benefits. ........ 12
C. Adopting The District Court's Overbroad Reading Of ERISA Would Harm Employers And Employees Alike. ........ 18
CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Emmenegger v. Bull Moose Tube Co.*,
197 F.3d 929 (8th Cir. 1999) ... 11

*McKinsey v. Sentry Ins.*,
986 F.2d 401 (10th Cir. 1993) ... 11

*Merrill Lynch, Pierce, Fermer &. Smith, Inc. v. Brennan*,
2007 WL 632904 (N.D. Ohio Feb. 23, 2007) ... 14

*Milligan v. Merrill Lynch*,
No. 24-cv-440 (W.D.N.C. filed Apr. 30, 2024) ... 19

*Murphy v. Inexco Oil Co.*,
611 F.2d 570 (5th Cir. 1980) ... 10, 11

*Oatway v. Am. Int'l Grp., Inc.*,
325 F.3d 184 (3d Cir. 2003) ... 10, 11

*Pasternack v. Shrader*,
863 F.3d 162 (2d Cir. 2017) ... 10

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*,
712 F.3d 705 (2d Cir. 2013) ... 20

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) ... 6

*Tolbert v. RBC Cap. Mkts. Corp.*,
758 F.3d 619 (5th Cir. 2014) ... 10

## Statutes and Regulations

12 U.S.C. § 5641 ... 17

29 U.S.C. § 1002(2)(A) ... 7

29 U.S.C. § 1002(2)(A)(ii) .......... 9, 10

29 U.S.C. § 1053 .......... 6

29 U.S.C. § 1101(a)(1) .......... 17

29 C.F.R. § 2510.3-2(c) .......... 7, 12

29 C.F.R. § 2530 .......... 6

**Other Authorities**

Andreas Stuermann, *Employers, Are You Ready For The Great Resignation? Actionable Ideas To Recruit, Retain, And Reward Key Talent*, Stuermann Consulting (Feb. 2022) .......... 15

Bartek Podolski, *Ask an Advisor: What is a long-term incentive plan and how can it help us?*, EBN (July 15, 2022) .......... 16

Deborah S. Davidson et al., *A Chubb Special Report: A Primer on 401(k) Forfeiture Litigation*, Chubb (Oct. 2024) .......... 18

DOL Advisory Op. 98-02A, 1998 WL 103654 .......... 10, 12

DOL Advisory Op. 2002-13A, 2002 WL 31846478 .......... 12

Eduardo Rivera Greenwood, *Workers are leaving. What can you do about it?*, Deloitte (Oct. 5, 2022) .......... 13

J.P. Morgan, *A Quick Guide to Long Term Incentive Plans (LTIPs)* (Mar. 13, 2024) .......... 15, 16

*Long-term incentive plans: A comprehensive guide for HR*, Rippling (Dec. 12, 2024) .......... 15

Mason Braswell, *Recruiting Bonuses for Top Producers Flirt with 400%, Hitting Fresh Highs*, AdvisorHub (Sept. 21, 2022) .......... 14

Pearl Meyer, *Looking Ahead to Executive Pay Practices in 2024* .......... 16

Sam Cook, *The Professional Services Industry Is Leading The Office Worker Revolt*, MentorcliQ (Dec. 1, 2021) .......... 13

Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Businesses $1 Trillion*, Gallup (Mar. 13, 2019) .......... 14

Vincent Amanor-Boadu, *Empirical evidence for the "Great Resignation"*, Monthly Labor Review, U.S. Bureau of Labor Statistics (Nov. 2022) .......... 13

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The ERISA Industry Committee (ERIC) is a national non-profit business trade association representing approximately 100 of the nation's largest employers in their capacity as sponsors of employee benefit plans for their workers, retirees, and families. ERIC routinely

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

participates as *amicus curiae* in cases implicating the scope and content of the regulation of employee benefits.

*Amici*'s members include many employers that, in addition to maintaining retirement plans, offer a variety of deferred incentive compensation or long-term incentive arrangements to their employees. These arrangements play a vital role—both in the financial services industry and beyond—in efforts to retain valuable employees, reward their loyalty, and discourage misconduct. The orders below threaten the continued utility of these arrangements.

The district court never should have addressed whether Morgan Stanley's deferred compensation awards are employee pension benefit plans governed by the Employee Retirement Income Security Act of 1974 (ERISA): that merits question was for arbitrators to resolve. That is reason enough to vacate the orders below. But if this Court reaches the substantive ERISA issue, *amici* have a strong interest in this Court's rejection of the district court's improper extension of ERISA to deferred compensation arrangements like the ones in this case. Allowing the district court's interpretation to stand would harm employers and

employees alike by threatening to eliminate or curtail these beneficial compensation arrangements.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The principal underlying merits issue in this case is whether the deferred compensation award programs offered by Morgan Stanley are "employee benefit pension plans" (pension plans) under ERISA. In the course of compelling arbitration, the district court determined that they are. For all of the reasons explained by Morgan Stanley, the district court should never have reached the ERISA-coverage issue, which the parties agreed to resolve in arbitration. This Court should accordingly vacate the orders below and allow the arbitrators to decide the issue in the first instance.

If this Court reaches the parties' dispute over whether Morgan Stanley's programs are ERISA pension plans, *amici* write separately to explain why the district court's interpretation of the statute is both incorrect and detrimental to employers and employees alike.

The court below extended ERISA's reach far beyond what the statute and its implementing regulations allow. Both the express terms and the surrounding circumstances of Morgan Stanley's deferred compensation arrangements (which are similar to incentive award arrangements used across employers) demonstrate that they are not

pension plans, but rather reward current employees for their continued service and good conduct. The text of the statute, the Department of Labor's regulatory exemption for "bonus" incentive programs, and the overwhelming consensus among judicial and Department of Labor decisions all point to the same result: the arrangements are not ERISA pension plans.

Broader workplace dynamics—both in and beyond the securities and financial services industries—further confirm that arrangements like Morgan Stanley's are not ERISA plans. Deferred incentive compensation and long-term incentive programs are in widespread use, and employers offer them for a variety of reasons that have nothing to do with providing income after retirement. Those programs play a critical role in promoting retention of productive employees, rewarding good conduct, and deterring or penalizing misconduct.

The district court's interpretation of ERISA, if upheld, would harm employers and employees alike. It would encourage a wave of litigation in which the ERISA plaintiffs' bar seizes on ERISA's strict vesting and anti-forfeiture rules to expose employers to potentially astronomical liability for legitimate cancellations of incentive awards that have not

vested. *See* 29 U.S.C. § 1053; 29 C.F.R. § 2530. It would undermine employers' justifiable reliance on nearly fifty years of case law and regulatory guidance and deprive employers of their ability to offer attractive and flexible compensation programs. It also would pressure some employers into eliminating their deferred incentive compensation programs altogether, stripping them of a valuable tool in their efforts to retain talented employees and depriving employees of a beneficial compensation arrangement.

## ARGUMENT

**The District Court's Erroneous Expansion Of ERISA's Coverage Threatens Adverse Consequences For Both Employers And Employees.**

**A. The Deferred Compensation Arrangements In This Case Are Not ERISA Pension Plans.**

Congress passed ERISA in 1974 to "promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Congress defined the term "employee benefit plan" to include "both *pension* plans and welfare plans." *Id.* at 90-91 (emphasis added). Welfare plans (such as plans providing health or disability benefits) are not at issue here. And a pension plan, as the term suggests, refers to a program that provides for

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 158 of 194

retirement or other *post*-employment income, not a program designed to compensate current employees.

That is clear from the statutory text. To qualify as an "employee benefit pension plan" under ERISA, a program must, "by its express terms or as a result of surrounding circumstances," either "(i) provide[] retirement income to employees" or "(ii) result[] in a deferral of income by employees for periods extending to the *termination* of covered employment *or beyond*." 29 U.S.C. § 1002(2)(A) (emphasis added). The Department of Labor has by regulation further exempted from ERISA's coverage a program providing "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are *systematically* deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c) (emphasis added).

As Morgan Stanley's brief explains, its deferred compensation arrangements do not meet the statutory definition of a "pension plan" and are independently exempt from ERISA's coverage under the DOL's definition of a "bonus" plan. Opening Br. 38-58. The district court's contrary determinations also conflict with the overwhelming weight of

case law and DOL guidance concluding that arrangements that share many features with Morgan Stanley's are not covered by ERISA.

Numerous characteristics of Morgan Stanley's deferred compensation arrangements confirm that they fall outside ERISA's scope. Among other things, Morgan Stanley's deferred cash or stock awards are:

- Unvested—i.e., unearned—unless and until an advisor stays at Morgan Stanley in good standing for the specified vesting period;
- Automatically distributed directly to the advisor once vested, and are not eligible to be deferred by either the advisor or Morgan Stanley;
- As a result, distributed to current employees except when one of the narrow enumerated exceptions to the vesting rules applies, which may result in payment being made to a former employee;
- Overwhelmingly distributed to current employees (in fact between 85-92% of the time);

- Expressly described in the program terms as a "reward" for "your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct)" and *not* "as a source of retirement income"; and
- Taxed as ordinary bonus income, not retirement income.

Opening Br. 7-11, 57-58.

The district court acknowledged that these awards do not provide retirement income. SPA30. Instead, the district court seized on the exceptions permitting distribution of an award to former advisors who leave Morgan Stanley before the vesting period ends due to death, disability, not-for-cause layoff, ordinary course retirement, or transition to government service. According to the district court, those exceptions mean that payments "sometimes occur at the end of employment or beyond" and therefore bring the programs within the scope of 29 U.S.C. § 1002(2)(A)(ii). SPA37-39.

That outlier result departs from an otherwise uniform consensus among courts and the Department of Labor that "incidental" payments to former employees under plans generally designed to compensate

current employees are insufficient to trigger ERISA's coverage. *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) (following *Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980) and "the unbroken line of cases that have followed *Murphy*'s reasoning"); *Murphy*, 611 F.2d at 574-75; DOL Advisory Op. 98-02A, 1998 WL 103654, at *1-2; *see also* Opening Br. 41-42 (collecting additional cases and DOL opinions).[2]

That consensus is for good reason: this Court and others have admonished that ERISA's definition of "pension plan" is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Pasternack v. Shrader*, 863 F.3d 162,

[2] The district court relied on *Tolbert v. RBC Cap. Mkts. Corp.*, 758 F.3d 619 (5th Cir. 2014), but *Tolbert* is readily distinguishable. Unlike the programs here, under which awards automatically distribute when vested and cannot be deferred by employees, the plan in *Tolbert* expressly allowed employees to voluntarily defer their earned compensation awards *until the end of their employment*. *Id.* at 622, 625-26. That characteristic made termination or post-termination payments entirely within the control of the employee rather than incidental, and placed the plan squarely within the statutory definition for plans that "result[] in a deferral of income *by employees* for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii) (emphasis added). If anything, *Tolbert* further supports the consensus view in favor of Morgan Stanley's position, reaffirming the Fifth Circuit's earlier decision in *Murphy* and explaining that the "'mere fact' of post-termination payments" is not enough to transform a deferred compensation program into an ERISA pension plan. 758 F.3d at 625 (quoting *Murphy*, 611 F.2d at 575).

168 (2d Cir. 2017) (quoting *Murphy*, 611 F.2d at 574-75). Like many forms of long-term incentive or deferred compensation programs, the awards here are designed to, and do, provide additional compensation to current employees to reward them for continued service and good conduct. That is a far cry from a program aimed at providing retirement or post-termination income; and it explains why these plans cannot be shoehorned into the category of an ERISA pension plan.

Finally, the district court also erred by determining that the DOL's exemption for bonuses does not apply. Other courts of appeals analyzing the regulation, and the DOL, have uniformly taken the view that an "incentive plan designed to provide a financial incentive for employees to remain" with their employer "and improve their performance there" falls within ERISA's exemption for bonus plans. *Oatway*, 325 F.3d at 186-89; *see also*, *e.g.*, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931-34 (8th Cir. 1999); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993); Opening Br. 51-52 (collecting additional cases and DOL opinions).

That is exactly the purpose of the awards here, both under the express terms of Morgan Stanley's programs and in practice. The district court took the view that the awards cannot be bonuses because they are

calculated based on past revenue generated by the advisor. SPA37. But that approach ignores the reality that bonuses are frequently tied to past revenue generation, as courts and the DOL have repeatedly recognized. Opening Br. 51-52.

In sum, the awards here are ERISA-exempt bonuses. That should end the inquiry, because there is no reasonable dispute that the payments are not "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c). The DOL has made clear that the "systemically deferred" standard is a high one, under which an "inordinate percentage" of payments under the program must be made after employment and the economic benefits of the program allocated "disproportionately to retirees." DOL Advisory Op. 98-02A, 1998 WL 103654, at *2; *accord* DOL Advisory Op. 2002-13A, 2002 WL 31846478, at *3 n.3. The incidental payments to former advisors here come nowhere close to meeting that stringent regulatory standard.

### B. Employers Routinely Use Deferred Incentive Compensation Arrangements Like Those In This Case To Encourage Employee Retention And Reward Loyalty, Not To Provide Retirement Benefits.

Broader workplace dynamics, both in the securities and financial services industries and beyond, confirm that employers offer

arrangements like Morgan Stanley's to retain and reward current employees, not to provide retirement or post-termination income.

Employers face significant challenges in retaining productive employees. Those challenges have been particularly acute during the past few years, with workers voluntarily leaving their jobs at historically high rates—a phenomenon known as the "Great Resignation." *See*, *e.g.*, Vincent Amanor-Boadu, *Empirical evidence for the "Great Resignation"*, Monthly Labor Review, U.S. Bureau of Labor Statistics (Nov. 2022), https://www.bls.gov/opub/mlr/2022/article/empirical-evidence-for-the-great-resignation.htm; Eduardo Rivera Greenwood, *Workers are leaving. What can you do about it?*, Deloitte (Oct. 5, 2022), https://action.deloitte.com/insight/2737/workers-are-leaving.-what-can-you-do-about-it.

Professional and business services firm resignations spiked during the Great Resignation. Bureau of Labor Statistics data show that approximately 3.4 million workers in that industry quit their jobs in just the five months between May and September of 2021—representing 17% of the 20 million Americans who resigned during that time period. *See* Sam Cook, *The Professional Services Industry Is Leading The Office Worker Revolt*, MentorcliQ (Dec. 1, 2021), https://www.mentorcliq.com/

blog/the-professional-services-industry-is-leading-the-office-worker-revolt-2.

This turnover is tremendously costly to businesses. Generally, a "conservative estimate" of the cost to replace a departing worker is "one-half to two times the employee's annual salary." Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Businesses $1 Trillion*, Gallup (Mar. 13, 2019), https://www.gallup.com/workplace/247391/fixable-problem-costs-businesses-trillion.aspx. These costs can be even greater for client-focused professional services firms, where financial advisors and similar workers maintain and cultivate client relationships, and those clients may follow their advisors to a new firm. *See, e.g.*, *Merrill Lynch, Pierce, Fermer &. Smith, Inc. v. Brennan*, 2007 WL 632904, at *2 (N.D. Ohio Feb. 23, 2007) (noting the "fluid nature" of the financial services industry, where "brokers routinely switch firms and take their client lists with them").

Indeed, the employees who are most successful at developing extensive client networks are often the target of competition among firms, with firms offering "eye-popping bonuses to woo talent." Mason Braswell, *Recruiting Bonuses for Top Producers Flirt with 400%, Hitting*

*Fresh Highs*, AdvisorHub (Sept. 21, 2022), https://www.advisorhub.com/recruiting-bonuses-for-top-producers-flirt-with-400-hitting-fresh-highs/ (reporting that signing bonuses for brokers can reach up to four times the broker's prior 12-month revenue).

To address this problem, employers have adopted a variety of deferred incentive compensation arrangements designed to promote employee loyalty and longevity. *See*, *e.g.*, Andreas Stuermann, *Employers, Are You Ready For The Great Resignation? Actionable Ideas To Recruit, Retain, And Reward Key Talent*, Stuermann Consulting (Feb. 2022), https://www.stuermannconsulting.com/wp-content/uploads/2022/02/SCIgreatresignationblogfinal.pdf. Among the most common and effective features of such arrangements is the use of mandatory vesting periods—like those in Morgan Stanley's programs—requiring employees to remain at the firm for a certain period of time in good standing prior to receiving an award of additional cash or equity. *See generally* J.P. Morgan, *A Quick Guide to Long Term Incentive Plans (LTIPs)* (Mar. 13, 2024), https://www.globalshares.com/insights/long-term-incentive-plan-design-what-you-need-to-know/; *Long-term incentive plans: A*

*comprehensive guide for HR*, Rippling (Dec. 12, 2024), https://www.rippling.com/blog/long-term-incentive-plan.

Employers across a variety of industries use these arrangements "to further enhance retention." Pearl Meyer, *Looking Ahead to Executive Pay Practices in 2024*, at 7, https://pearlmeyer.com/sites/default/files/knowledge-share/research-report/looking-ahead-to-executive-pay-practices-in-2024-executive-summary.pdf (reporting that nearly 20% of responding employers that offer long-term incentive arrangements increased participation levels in those arrangements in 2023). And employers are increasingly starting to offer long-term incentive awards to employees below the executive level. *See, e.g.*, J.P. Morgan, *supra* (53% of publicly traded companies reported granting long-term incentives to employees below the vice president level) (citing Pearl Meyer, *supra*); *see also* Bartek Podolski, *Ask an Advisor: What is a long-term incentive plan and how can it help us?*, EBN (July 15, 2022), https://www.benefitnews.com/advisers/news/can-long-term-incentive-plans-help-employers-

attract-talent (similarly noting that "[m]any companies are starting to offer [LTIPs] to employees below the executive level").[3]

Finally, deferred incentive compensation arrangements not only reward loyalty and good conduct, but also discourage misconduct by providing real consequences in the form of cancelled incentive awards. Indeed, financial regulators have exercised their statutory mandate under Section 956 of the Dodd-Frank Act to direct regulated firms to use multi-year vesting periods and subject incentive awards to cancellation to deter and penalize excessive risk-taking and other harmful behaviors. *See* 12 U.S.C. § 5641 (requiring federal regulators to "prescribe regulations or guidelines" prohibiting incentive-based payment arrangements "that the regulators determine encourage[] inappropriate risks by covered financial institutions"); Opening Br. 9-10 & n.5

[3] Because employers are increasingly offering deferred compensation arrangements to employees other than executives and senior management, ERISA's separate exclusion of "top hat" plans from the fiduciary duties imposed by ERISA, 29 U.S.C. § 1101(a)(1), is no solution to the district court's overbroad reading of the statute. Top hat plans must be maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" (*id.*), rather than a broader set of the employer's workforce.

(discussing directives from FINRA, the SEC, and other financial regulators).

### C. Adopting The District Court's Overbroad Reading Of ERISA Would Harm Employers And Employees Alike.

Upholding the district court's outlier interpretation of ERISA's reach would harm employers and employees.

To begin with, the district court's construction would encourage a wave of litigation threatening employers in a variety of sectors who use deferred compensation with potentially enormous liability for past cancellation of unvested deferred compensation. It is no secret that the ERISA plaintiffs' bar is dominated by a small number of specialized firms that sometimes target businesses with theories of liability that challenge well-established legal understandings and seek to push the boundaries of liability under the statute.[4]

---

[4] For example, since the fall of 2023 the ERISA plaintiffs' bar has filed a wave of lawsuits asserting the "novel theory" that employers are violating ERISA when they use 401(k) plan forfeitures—employer contributions that participants forfeit when they leave the plan before those contributions vest—to offset future employer contributions. Deborah S. Davidson et al., *A Chubb Special Report: A Primer on 401(k) Forfeiture Litigation*, Chubb (Oct. 2024). So far, "courts' reactions to plaintiffs' theories have been mixed," with some courts granting motions to dismiss and others allowing the claims to proceed past the pleadings stage. *Id.*

This case embodies that trend: Recognizing that ERISA's strict vesting and anti-forfeiture rules, if they apply, could require employers to pay unearned or cancelled deferred compensation, the ERISA plaintiffs' bar is trying to push for the expansion of the statute beyond bona fide retirement plans to reach deferred incentive compensation and long-term incentive arrangements that have long been understood not to be covered by ERISA.

Indeed, the plaintiffs' firms leading the series of cases and arbitrations against Morgan Stanley (*see* Opening Br. 20-21) have also advanced a similar theory in a suit against Merrill Lynch. *See*, *e.g.*, *Milligan v. Merrill Lynch*, No. 24-cv-440 (W.D.N.C. filed Apr. 30, 2024).

And if their theory succeeds, these plaintiffs' firms will have no reason to stop with the financial services industry. It is not difficult for a single firm or set of firms to bring dozens of cookie-cutter lawsuits—that is already par for the course in ERISA litigation. An attorney need only identify a theory that applies to a large number of employers before blanketing the country with a series of similar complaints to see which ones gain traction. *See* note 4, *supra*.

Defending lawsuits designed to extract lucrative settlements from commonplace and useful compensation arrangements would force employers to expend enormous resources. As this Court has recognized, the prospect of "asymmetric" discovery for defendants in ERISA actions comes at an "ominous" price, entailing "probing and costly inquiries." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). But the harmful consequences of this increase in costs would not be limited to employers. Market forces will pass the uptick in litigation costs to customers in the form of higher prices or less attractive service offerings, and to employees in the form of reduced compensation.

Relatedly, if this Court were to uphold the district court's departure from nearly fifty years of case law and regulatory guidance on the meaning of an ERISA pension plan, that change in the law would undermine employers' settled expectations and introduce substantial uncertainty. Consistent application of the statutory text and regulatory exemptions is critical to give employers clear guidance about what legal regimes apply to their compensation arrangements and to allow them to structure their arrangements accordingly.

That uncertainty, and the prospect of burdensome and costly ERISA litigation, may cause employers to stop offering deferred incentive compensation arrangements altogether. That would injure employers because they would lose a valuable tool for retaining employees and discouraging misconduct. And it would harm employees who would otherwise reap the rewards for their long-term contributions to their employer.

In the securities and financial services context in particular, firms must satisfy the expectations of financial regulators that firms will use cancellable deferred compensation subject to multi-year vesting periods as a tool for policing misconduct. But adopting such plans would run headlong into ERISA's requirements—if, as the district court mistakenly held, ERISA applied to deferred compensation arrangements like Morgan Stanley's.

At minimum, employers in all industries would be forced to offer deferred incentive compensation on much less attractive and flexible terms. For example, to avoid even incidentally paying awards to former employees, employers would be forced to jettison humanitarian and common-sense exceptions and impose a strict rule cancelling all deferred

incentive compensation awards the moment an employee no longer works for the employer, even due to death, disability, or layoff. That harsh and inequitable result is not what ERISA's text requires.

## CONCLUSION

The Court should vacate the orders below, and, if it reaches the ERISA-coverage issue, reverse the district court's determination on that issue.

Dated: January 29, 2025

Respectfully submitted,

/s/ Andrew J. Pincus
ANDREW J. PINCUS
ARCHIS A. PARASHARAMI
DANIEL E. JONES
*Mayer Brown LLP*
*1999 K Street NW*
*Washington, DC 20006*
*(202) 263-3000*

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 29.1(c) because it contains 3,686 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point type for text and footnotes.

Dated: January 29, 2025

/s/ Andrew J. Pincus
Andrew J. Pincus

# 24-3141

## IN THE UNITED STATES COURT OF APPEALS
FOR THE
## SECOND CIRCUIT

MATTHEW T. SHAFER, individually and on behalf of all others similarly situated, MACE TAMSE, STEVE SHERESKY, GEORGE LIVANOS, JEFFREY SHOVER, MARK LOFTUS, SANDY JUKEL, STEVE NADLER, SHERI HAUGABOOK, JEFFREY SHERESKY, PETER HEIDT, JEFFREY SAMSEN,

*Plaintiffs-Appellees-Cross-Appellants*,

\- v. -

MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, AND MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE,

*Defendants-Appellants-Cross-Appellees,*

JOHN/JANE DOES, 1-20,

*Defendant.*

On Appeal from the United States District Court for the Southern District of New York, No. 20-cv-11047, Hon. Paul G. Gardephe

**BRIEF OF THE AMERICAN BENEFITS COUNCIL AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS-CROSS APPELLEES**

Alexander C.B. Barnard
Scott J. Splittgerber
Kristi E. Jacques
EPSTEIN BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Telephone: 212.351.4500

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, The American Benefits Council states that it is a non-profit organization that does not have a parent corporation and it does not issue stock.

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE* .......................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT......................................................................................................... 4

I. THE DISTRICT COURT IMPROPERLY ADDRESSED THE MERITS OF PLAINTIFFS' CLAIMS SUBJECT TO ARBITRATION ........................... 4

II. THE IMPROPER ERISA DETERMINATION CONFUSES THE BOUNDARIES BETWEEN ERISA PLANS AND CONTINGENT DEFERRED INCENTIVE PLANS ........................................................... 5

A. The district court's opinion erred in finding that the incentive compensation plan documents unambiguously demonstrate that the awards qualify as "commissions" or earned wages ............................ 6

B. The unintended consequences of the opinion's improper merits finding has caused unwarranted uncertainty and threatens other regulatory goals ..........................................................................10

CONCLUSION ..........................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) .......... 4

*Conkright v. Frommert*,
559 U.S. 506 (2010) .......... 13

*Harvey v. Joyce*,
199 F.3d 790 (5th Cir. 2000) .......... 4

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 5

*Lawson Fabrics, Inc. v. Akzona, Inc.*,
355 F. Supp. 1146 (S.D.N.Y.), *aff'd*, 486 F.2d 1394 (2d Cir. 1973) .......... 4

*Lucente v. Int'l Bus. Machines Corp.*,
310 F.3d 243 (2d Cir. 2002) .......... 6

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
7 F.3d 1091 (2d Cir. 1993) .......... 5

**Statutes**

29 U.S.C. § 1051(2) .......... 6

26 U.S.C. § 409A .......... 3

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) .......... 1

Federal Rule of Appellate Procedure 29(a)(4)(E) .......... 2

Federal Rule of Appellate Procedure 26.1 .......... Corporate Statement

Federal Rule of Appellate Procedure 32(a)(5) .......... 15

Federal Rule of Appellate Procedure 32(a)(7)(B) .......... 15

Local Rule 29.1(b) .......... 1

**Other Authorities**

Bd. of Governors of the Fed. Rsrv. Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* (2011) .......... 11

Compensation Clawbacks Report, Harvard Law School Forum on Corporate Governance, July 24, 2024 .......... 12

DOJ, The Criminal Division's Pilot Program Regarding Compensation Incentives and Clawbacks, March 3, 2023 .......... 12

Employee Retirement Security Act of 1974 (ERISA) .......... *passim*

Financial Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 62 (2011) .......... 11

N.Y. State Dep't of Fin. Servs., *Guidance on Incentive Compensation Agreements* 2 (2016) .......... 11

U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *FAQs about Retirement Plans and ERISA* .......... 12-13

Case: 24-3141, 01/29/2025, DktEntry: 67.1, Page 6 of 20

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The American Benefits Council ("The Council") is a Washington D.C.-based employee benefits public policy organization with more than 430 members that advocates for employers that are dedicated to the achievement of best-in-class solutions that protect and encourage the health and financial well-being of their workers, retirees, and families.

The Council works closely with Congress, the White House, executive branch agencies and the courts to champion legislation, regulation, and legal rulings favorable to its members' needs, and to defend the employer-sponsored benefits system from proposals that would add burdens, liabilities, and costs. The Council also serves as a technical resource on benefits issues for lawmakers, the media and other industry trade associations.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's decision is legally erroneous. The consequences of this decision would cause disruption and litigation by upending the settled expectations

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Local Rule 29.1(b), *amicus* states that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus or its members of counsel contributed money intended to fund the preparation or submission of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to this filing.

of employers and employees across the United States, particularly in the financial services industry. In short, the district court's decision unnecessarily transformed standard contingent deferred incentive compensation that is designed as a reward for good conduct and loyalty into a guaranteed pension that cannot serve the purposes for which the compensation was awarded. These incentive awards, by design, are not earned if an employee triggers any of the identified prohibitions. By wrongfully applying ERISA, the district court's decision suggests that such prohibitions should be written out of the governing documents. In so doing, the decision not only undermines the reason for offering such an incentive, it puts Defendants-Appellants and countless similarly situated employers across the country at risk of enforcement from regulators who expect those provisions to be applied, not to mention the increased potential for litigation.

ERISA does not govern most compensation agreements, including deferred compensation. Companies offer employees compensation in myriad forms, from salary to contingent incentive awards, as here, to pensions, 401(k) plans, insurance plans, etc. These plans and programs are carefully drafted and implemented by a host of subject matter experts. It is well understood that pension plans are governed by ERISA[2] with its fiduciary obligations, which is why special committees are typically formed and carefully managed to ensure compliance. The district court's

---

[2] "ERISA" refers to the Employee Retirement Security Act of 1974.

Case 1:25-cv-08935-PGG Document 80-15 Filed 09/18/26 Page 182 of 194

decision purports to extend these stringent obligations to those involved in crafting and overseeing contingent deferred incentive compensation.

There are also other unintended consequences that could arise from the district court's decision, which impact the maximum value of awards, tax treatment of awards,[3] and accounting for awards on the books and records of firms, among others. Such unanticipated consequences are just one of the reasons why there is a prohibition on district courts unnecessarily weighing in on the merits of an underlying dispute at the preliminary stage of a motion to compel arbitration. Necessarily, the record is very limited, without consideration of the broader context. However, the district court's opinion inappropriately ruled on the core issue in the case, the applicability of ERISA, even though that was not necessary. The court held that the matter was arbitrable whether ERISA applies or not, which means it should have simply said that, rather than deciding the core issue underlying every claim that Plaintiffs-Appellees assert in this case. By doing so, the opinion undermined a core purpose of arbitration agreements as protected by the Federal Arbitration Act. Most importantly, for *amicus*, the opinion errs in its legal analysis of the incentive

[3] For instance, deferred compensation awards like these are subject to section 409A of the Internal Revenue Code (IRC), 26 U.S.C. § 409A, which requires, among other things, that deferred compensation schedules are adhered to, failing which the employee is subject to substantial penalties.

compensation plans at issue such that its ruling that the plans are subject to ERISA has created potentially major adverse consequences for employers generally.

## ARGUMENT

### I. THE DISTRICT COURT IMPROPERLY ADDRESSED THE MERITS OF PLAINTIFFS' CLAIMS SUBJECT TO ARBITRATION

It was improper for the opinion to weigh in on the merits of the underlying dispute because that was a task that was delegated to arbitration. Courts recognize that parties to an arbitration agreement have the right to a *meaningful* arbitration. *Cf. Harvey v. Joyce*, 199 F.3d 790, 796 (5th Cir. 2000) (granting stay and observing that permitting parallel litigation to determine issues common to, or inextricably intertwined with, the arbitration would render the arbitration proceedings "both redundant and meaningless; in effect, thwarting the federal policy in favor of arbitration"); *Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F. Supp. 1146, 1151 (S.D.N.Y.), *aff'd*, 486 F.2d 1394 (2d Cir. 1973) (same). While *amicus* will not repeat Defendants-Appellants' arguments on this point, we urge that this Court reverse on the basis of the Supreme Court's directive in *AT&T Techs., Inc. v. Commc'ns Workers*

*of Am.*, 475 U.S. 643, 649 (1986), that "a court is not to rule on the potential merits of the underlying claims" subject to arbitration.[4]

## II. THE IMPROPER ERISA DETERMINATION CONFUSES THE BOUNDARIES BETWEEN ERISA PLANS AND CONTINGENT DEFERRED INCENTIVE PLANS

Regardless of the propriety of the opinion reaching the merits, the determination is erroneous. *First*, the opinion improperly substituted dictionary definitions of terms for the actual contract terms. *Second*, the opinion erroneously found that the incentive plans, which unambiguously state that the awards are not vested nor wages when they are awarded, nevertheless qualified as earned commissions that are protected ERISA plans.[5] SPA72, 79. The opinion erroneously determined that the awards are effectively "commissions" that are deferred income subject to ERISA, regardless of plan vesting provisions, SPA88-89, and that the awards are thereby shielded from forfeiture for any reason. This disregarded the plain meaning of the express terms and definitions in the incentive compensation

---

[4] The Supreme Court has stated that this rule applies to all merit determinations underlying the claims assigned by the contract to arbitration, even the threshold issue of arbitrability. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68-69 (2019).

[5] "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and citation omitted).

Case: 24-3141, 01/29/2025, DktEntry: 67.1, Page 11 of 20

plans and how they are earned under the governing plans, for instance, in the case of the Morgan Stanley Compensation Incentive Program ("MSCIP") and applicable New York labor and other laws (A211 ¶ 17).

### A. The district court's opinion erred in finding that the incentive compensation plan documents unambiguously demonstrate that the awards qualify as "commissions" or earned wages

A brief analysis of the compensation plan documents at issue illustrates why the various aspects of the opinion's findings are wrong. First, the awards at issue are defined as "notional" and/or "unfunded," meaning there is no account or money (or anything else) set aside or allocated for any award prior to vesting.[6] *See* A209 ¶ 9 (MSCIP Plan Document). Rather, the awards have certain characteristics and are "earned" once an Advisor remains employed through vesting and refrains from behaviors that could harm Morgan Stanley, its clients and its shareholders. *See, e.g.,* A227-228 ¶ 16(p) (2017 Award Certificate). Once "earned," according to these requirements, Morgan Stanley delivers cash or shares to the recipient, thus paying for performance of the contractual requirements. *See, e.g.,* A217 ¶ 2 (2017 Award Certificate). The opinion turns this analysis on its head, treating an award as "earned" commission up front. This analysis is misplaced and certainly should not apply in

[6] The Court observed in *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 256 (2d Cir. 2002) that ERISA exempts certain plans from its non-forfeitability provisions such as those that are unfunded and designed to provide deferred compensation to certain employees) (citing 29 U.S.C. § 1051(2)).

the regulated context of executive compensation in financial services, which is governed by regulatory expectations that the opinion does not address.

As can be seen from the record, the governing incentive compensation documentation spells out that a financial advisor whose firm clients generate adequate revenue potentially receive "a deferred compensation award shortly following year-end (provided the Advisor is employed on the grant date)." A145 (2018 FA Compensation Plan). Accordingly, the deferred awards at issue here are not even ***granted*** if the Advisor leaves before year-end. And even after granting, awards remain subject to restrictions including provisions under which an Advisor does not earn them[7] where the Advisor:

> Resigns before vesting and delivery of awards. *See* A145 (2018 FA Compensation Plan).
>
> Fails to demonstrate "excellent guardianship at all times," etc., giving Morgan Stanley the right to make downward adjustments. *See* A177 (2015 FA Compensation Plan).
>
> Engages in any one of the "Prohibited Activit[ies]" defined to include disclosing confidential information, soliciting clients, competition, or other requirements. *See* A216, 227-228 ¶ 16(p) (2017 Award Certificate).

Thus, these compensation documents demonstrate that no amounts are "earned" until each of the above requirements is satisfied, something that cannot be

[7] "[Y]our Applicable Account Value, even if vested, is not earned until the Scheduled Distribution Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 9 below . . . .)." A221 ¶ 7 (2017 Award Certificate).

evaluated until years *after the underlying revenue event*. Accordingly, a conclusion that deems amounts to be "earned" each month ignores the entire compensation framework in addition to industry-wide, long-settled understanding.

The district court's opinion fails to account for this language, instead finding that if anything of value is received by an Advisor after employment ends, that must be governed by a law more commonly understood to refer to actual pensions and 401(k) plans that are funded. If the opinion were right, the above restrictions would be unenforceable across the entire country, despite the damage that it may cause to the regulatory framework.

Central to the opinion is the assumption that the awards at issue are in fact "earned" monthly and, meaning that they cause advisors to have their "income" forcibly deferred to the post-employment period. *See* SPA37-39. The plan documents are clear, however: the award is not "earned" until the conditions are satisfied. *See, e.g.*, A146 (2018 FA Compensation Plan) ("Under no circumstances shall an Advisor be eligible to receive any Incentive Compensation … unless and until the Incentive Compensation calculation is made and the Advisor meets all other conditions . . . ."). Accordingly, the awards require that the Advisor perform their

obligations (including by remaining loyal and responsibly caring for clients) then "earns" and receives awards. That is clear under the documents.

The district court opinion erred in holding that ERISA could apply here. The district court's opinion depends on finding that the Morgan Stanley compensation plans are "pension plans" and not defined "bonuses." But as explained in the Morgan Stanley brief, an employee compensation plan is not subject to ERISA if it is not a "pension plan"— that is either intended to or as a practical matter does—provide retirement income. The Morgan Stanley compensation plans do neither, and are rather designed to motivate employees to stay employed and comply with their legal and regulatory obligations, failing which nothing is granted, vested or earned. Just because *some* of the payments may *incidentally* occur "at the end of employment or beyond" under certain circumstances does not transform this compensation program into a pension and thereby invalidate the award documentation. The compensation plans are explicitly incentive plans and not retirement plans and these are two very different creatures. For instance, the Financial Advisor Compensation Plan states that: "[d]eferred compensation awards are not intended to provide for retirement income," A145 (2018 FA Compensation Plan), and that "neither MSCIP nor any program under MSCIP is treated as an 'employee benefit plan' under ERISA." A208 (MSCIP Plan Document); *see also* A308 (2017 MSCIP Award Summary Description) ("This program is not a retirement plan. . . . and is not subject to the

[ERISA].”). Instead, the compensation plans are “long-term incentive plan[s]” whose goals are designed “to attract, retain and motivate employees and to compensate them for their contributions to the Firm . . .” and to “[align] the interests of . . . employees . . . with the interests of the Firm’s clients and shareholders . . . .” A202 (MSCIP Plan Document); *see also* A265 (Equity Incentive Compensation Plan) (“The primary purposes of the Morgan Stanley Equity Incentive Compensation Plan are to attract, retain and motivate employees, to compensate them for their contributions to the growth and profits of the Company and to encourage them to own Morgan Stanley stock”).

### B. The unintended consequences of the opinion’s improper merits finding has caused unwarranted uncertainty and threatens other regulatory goals

Employee compensation packages at large financial firms have been the focus of regulators for several years, especially because of their perceived role in the 2008 financial crisis in rewarding employees’ risk-taking behavior without proper risk management. These packages offered payments to produce increases in short-term profit without regard to long-term risks. Financial Crisis Inquiry Comm’n, *The Financial Crisis Inquiry Report* 62 (2011), available at https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf. It was therefore necessary to implement a compensation program which balanced risks and rewards and had effective risk management. N.Y. State Dep’t of Fin. Servs.,

*Guidance on Incentive Compensation Agreements* 2 (2016), available at https://www.dfs.ny.gov/industry_guidance/industry_letters/il20161011_guidance_incentive_compensation_arrangements. To that end, in late 2009, the Federal Reserve engaged in a "Horizontal Review" of global financial institutions' incentive-based practices. *See* Bd. of Governors of the Fed. Rsrv. Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* (2011), available at https://www.federalreserve.gov/publications/other-reports/files/incentive-compensation-practices-report-201110.pdf. The Horizontal Review found that the two pillars of effective incentive compensation were risk adjustments and deferral of payments. *Id.* at 2.

Compensation packages featuring mandatory deferred compensation with vesting conditions align with these expectations because they allow a firm to cancel outstanding awards if employees engage in behaviors that may result in material harm (financial, reputational, or other) to the firm. Contrary to what Plaintiffs-Appellees allege, the vesting restrictions are not designed to punish Advisors who leave for other firms, but rather serve to minimize risk and to align employee interests with that of investors. The vesting period and the conditions that need to be met before payment strike a balance between providing effective incentives and

allowing for a sufficient period of time for the validation of the performance measures that gave rise to the original awards.

Furthermore, after the financial crisis, many regulations and laws were implemented relating to executive compensation, including the Dodd-Frank Wall Street Reform and Consumer Protection Act. The employee compensation packages are also heavily regulated by the U.S. Federal Reserve Board, the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and other agencies. Most financial institutions are required to submit an annual report to their federal regulator, in this case, the SEC.[8]

The objective of ERISA, on the other hand, is wholly different: “ERISA is a federal law that sets minimum standards for retirement plans in private industry,” thereby “protect[ing] the assets of millions of Americans” for retirement. U.S. Dep’t of Labor, Emp. Benefits Sec. Admin., *FAQs about Retirement Plans and ERISA* at

---

[8] The regulatory and federal guidance is not limited to financial industry firms. The DOJ has encouraged, and incentivized, all companies to adopt clawbacks as part of their compensation system to promote compliance and good conduct. *See* DOJ, *The Criminal Division’s Pilot Program Regarding Compensation Incentives and Clawbacks*, March 3, 2023, available at https://www.justice.gov/criminal/criminal-fraud/file/1571941/dl. Not surprisingly, seventy percent of the 401 of S&P 500 companies that filed disclosures have exceeded the SEC’s clawback requirements, “indicating a strong inclination towards mitigating risks associated with executive compensation and ensuring accountability.” N. McCarthy, et al., *Compensation Clawbacks Report*, Harvard Law School Forum on Corporate Governance, July 24, 2024, available at https://corpgov.law.harvard.edu/2024/07/24/compensation-clawbacks-report/.

1, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/faqs-retirement-plans-erisa.pdf. Different federal regulations apply to the administration of an ERISA plan.

The opinion fails to take account of these key differences and conflates the two different types of compensation instruments. The opinion risks upending settled expectations of companies and employees and may cause regulatory issues and litigation.

As Plaintiffs-Appellees note in their brief, one of the goals of ERISA is to "promote uniformity in benefits administration." A98. The Supreme Court has observed that in addition to uniformity, ERISA is supposed to encourage other goals such as predictability for plan administrators that decreases costs of litigation. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010). Classifying a plan as an ERISA plan when it is not intended as such a plan does not promote uniformity or predictability – it does the opposite.

## CONCLUSION

For the foregoing reasons, this Court should vacate and/or reverse the opinion.

Dated: January 29, 2025

Respectfully submitted,

/s/ *Alexander C.B. Barnard*

ALEXANDER C.B. BARNARD
SCOTT J. SPLITTGERBER
KRISTI E. JACQUES

EPSTEIN BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Telephone: 212.351.4500
Facsimile: 212.878.8600

*Counsel for Amicus Curiae American Benefits Council*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Second Circuit Local Rule 32.1(a)(4) because this brief contains 2,870 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: January 29, 2025
New York, NY

*/s/ Alexander C.B. Barnard*
ALEXANDER C.B. BARNARD